Nos. 03-1501, 04-1126
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WILLIAM D. HOOKER,
d/b/a GEORGIA BOWHUNTERS SUPPLY,

Plaintiff,

v.

UNITED STATES,

Defendant.

# DEFENDANT'S PARTIAL MOTION TO DISMISS

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

TODD M. HUGHES
Assistant Director

LINDSAY E. WILLIAMS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202)353-7995
Facsimile: (202)514-8624

January 10, 2005

Attorneys for Defendant

# TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . ii-iii

STATEMENTOF THE ISSUES . . . . . . . . . . 1-2

STATEMENT OF THE FACTS . . . . . . . . . . 2-11

I. The Contracts . . . . . . . . . . 2-3

II. The Requests For Adjustment . . . . . . . . . . 3-6

III. Procedural History . . . . . . . . . . 6-7

IV. The First Amended Complaint, 03-1501: The Beaver Contract . . . . . . . . . . 7-8

V. The New Complaint, 04-1126: The Hog Contract . . . . . . . . . . 8-11

SUMMARY OF ARGUMENT . . . . . . . . . . 11-12

ARGUMENT . . . . . . . . . . 12-26

I. Standard Of Review . . . . . . . . . . 12

II. This Court Lacks Jurisdiction to Entertain Mr. Hooker's Claims That He Is Entitled To Compensation For Alleged Exposure To Contamination Because They Sound In Tort . . . . . . . . . . 13-14

III. Mr. Hooker Has Failed To Establish A Claim For Tortious Breach Of Contract . . . . . . . . . . 14-17

IV. This Court Lacks Jurisdiction To Entertain Mr. Hooker's Claim For Additional Money Under The Beaver Contract To Hire RAD II Trained Workers Because He Failed To Present This Claim To The Contracting Officer . . . . . . . . . . 17-19

V. Mr. Hooker Has Failed To State A Claim For Breach Of The Beaver Contract Upon Which Relief Can Be Granted Because The Government Did Not Have A Contractual Duty To Maintain Its Requirements Or To Exercise The Option Year Absent Bad Faith, And Mr. Hooker Has Failed To Establish That The Government Acted In Bad Faith . . . . . . . . . . 19-23

VI. Mr. Hooker Has Failed To Establish That The Government Breached

The Hog Contract By Withholding Payments For Nonconformance,
Barring Two Of His Employees, Or "Losing" His Contraband Pass . . . . . . . 23-26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## TABLE OF AUTHORITIES

### FEDERAL CASES

Alan Sparks v. United States,
36 Fed. Cl. 488 (1996) . . . . . . . . . . 19

Asco-Falcon II Shipping Co. v. United States,
32 Fed. Cl. 595 (1994) . . . . . . . . . . 21

Badgley v. United States,
31 Fed. Cl. 508 (1994) . . . . . . . . . . 21

Bohac v. Dept of Agriculture,
239 F.3d 1334 (Fed. Cir. 2001) . . . . . . . . . . 26

Camelus Development Corp. v. United States,
31 Fed. Cl. 399 (1994) . . . . . . . . . . 12

Coney v. Gibson,
355 U.S. 41 (1957) . . . . . . . . . . 12

Continental Collection & Disposal, Inc. v. United States,
29 Fed. Cl. 644 (1993) . . . . . . . . . . 21-22

Contract Cleaning Maintenance, Inc. v. United States,
811 F.2d 586 (Fed.Cir. 1987) . . . . . . . . . . 17

DeRoo v. United States,
12 Cl. Ct. 356, 362 (1987) . . . . . . . . . . 14

Fields v. United States,
53 Fed. Cl. 412 (2002) . . . . . . . . . . 21

Government System Advisors, Inc. v. United States,
847 F.2d 811 (Fed. Cir. 1988) . . . . . . . . . . 21

H.H.O. Inc. v. United States,
7 Cl. Ct. 703 (1985) . . . . . . . . . . 14

Holden v. United States,
38 Fed. Cl. 732 (1997) . . . . . . . . . . 26

Lopez v. A.C. & S. Inc.,
858 F.2d 712 (Fed. Cir. 1988) . . . . . . . . . . 17

McCauley v. United States,
38 Fed. Cl. 250 (1997) . . . . . . . . . . 14

Mega Construction Company, Inc. v. United States,
29 Fed. Cl. 396 (1993) . . . . . . . . . . 16

Morris v. United States,
33 Fed. Cl. 733 (1995) . . . . . . . . . . 12,14

Nemotallahi et al., v. United States,
38 Fed. Cl. 224 (1997) . . . . . . . . . . 14

Orbas & Associate v. United States,
34 Fed. Cl. 68 (1995) . . . . . . . . . . 17,19

Perez v. United States,
156 F.3d 1366 (Fed. Cir. 1998) . . . . . . . . . . 12

Ponder v. United States,
117 F.3d 549 (Fed. Cir. 1997) . . . . . . . . . . 12

Pratt v. United States,
50 Fed. Cl. 469 (2001) . . . . . . . . . . 26

Reynolds v. Army and Air Force Exch. Service,
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . 12

San Carlos Irrigation and Drainage District v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . 19

Santa Fe Engineers v. United States,
818 F.2d 856 (Fed. Cir. 1987) . . . . . . . . . . 17

Scheuer v. Rhodes,
416 U.S. 232 (1974) . . . . . . . . . . 11

Smithson v. United States,
847 F.2d 791 (Fed. Cir. 1988) . . . . . . . . . . 14

Spirit Leveling Contractors v. United States,
19 Cl. Ct. at 90 . . . . . . . . . . 17,18,19
Somali Development Bank v. United States,
508 F.2d 817 (Ct. Cl. 1974) . . . . . . . . . . 14

Southern California Edison v. United States,
58 Fed. Cl. 313 (2003) . . . . . . . . . . 21

T. Brown Constructors v. Pena,
132 F.3d 724 (Fed. Cir. 1997) . . . . . . . . . . 15

T & M Distributing v. United States,
185 F.3d 1279 (Fed. Cir. 1999) . . . . . . . . . . 21

Technical Assistance International v. United States,
150 F.3d 1369 (Fed. Cir. 1998) . . . . . . . . . . 20

WM. T. Thompson Company v. United States,
26 Cl. Ct. 17, 23 (1992) . . . . . . . . . . 16

**FEDERAL STATUTES**

28 U.S.C. §1491(a)(1) . . . . . . . . . . 13

41 U.S.C. § 601 et seq . . . . . . . . . . 6

**COURT RULES**

12(b)(1) . . . . . . . . . . 1

12(b)(6) . . . . . . . . . . 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WILLIAM D. HOOKER, d/b/a<br>GEORGIA BOWHUNTERS SUPPLY, | ) |
| Plaintiff, | ) |
| v. | ) Nos. 03-1501C, 04-1126<br>) (Judge Allegra) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

**DEFENDANT'S PARTIAL MOTION TO DISMISS**

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that this Court dismiss portions of plaintiff's first amended complaint, case number 03-1501, and plaintiff's original complaint, 04-1126, for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.[1] In support of our motion, we rely upon plaintiff's first amended complaint in case number 03-1501, original complaint in case number 04-1126, the following brief and appendix.

**DEFENDANT'S BRIEF**

**STATEMENT OF THE ISSUES**

1. Whether this Court possesses jurisdiction to entertain Mr. Hooker's claims regarding alleged exposure to contamination, and if so, whether Mr. Hooker has stated a claim upon which

[1] The Government does not at this time seek to dismiss Mr. Hooker's claim in case number 04-1126 that modification number 4 extended the hog contract until October 31, 1999 or until a new contract was awarded.

relief can be granted.

2. Whether this Court has jurisdiction to entertain Mr. Hooker's claim that he incurred additional costs in hiring RAD II trained employees under the beaver contract, as he did not present this claim to the contracting officer prior to filing his complaint.

3. Whether Mr. Hooker has failed to state a claim for a breach of the beaver contract based upon the allegation that the Government reduced its requirements under the contract and did not exercise the option year.

4. Whether Mr. Hooker has failed to state a claim for a breach of the hog contract based upon the allegations that the Government wrongfully withheld payments for non-conformance of services, barred two of his employees, and "lost" his contraband pass.

## STATEMENT OF THE FACTS

### I. The Contracts

On October 29, 1997, Mr. Hooker was awarded a contract (#53-4660-8-04) by the United States Department of Agriculture Forest Service ("USFS") to control the wild hog population on the Savannah River Site[2] ("SRS") by trapping and use of trained dogs. Compl.[3] ¶ 6; App. 1, 9. The contract was an indefinite quantity contract with a minimum quantity of 200 hogs and a maximum quantity of 800 hogs (later increased to 1,000). App. 7, 51, 93-94.[4] Mr. Hooker was to be paid $55 for each hog trapped and properly delivered. App. 7, 25. The contract period was

---

[2] The SRS is owned by the Department of Energy ("DOE") and managed by Westinghouse, who is the operating contractor. DOE has an inter-agency agreement with USFS to maintain the land.

[3] "Compl." refers to plaintiff's original complaint filed in case number 03-1501.

[4] "App." refers to the appendix attached to defendant's motion to dismiss.

for one year with options to extend the contract for twelve month increments until a three-year maximum contract period had been reached. Compl. ¶ 5, App. 9.

On January 22, 1999, USFS awarded Mr. Hooker a contract (#53-4660-9-06) to trap beaver and maintain culvert outlets and inlets on the SRS in accordance with contract specifications. First Amend. Compl.[5] ¶ 6; App. 96, 102. The contract was a requirements contract for which work was to be performed on a task order basis. App. 132-33. Mr. Hooker was to be paid $45 per beaver trapped and $18 per hour for culvert work. First Amend. Compl. ¶ 7; App. 102. Only one task order was issued (#43-4660-9-0108). App. 184-95. Quantities of services specified in the contract were estimates only and cannot constitute a basis for an equitable adjustment. App. 102, 132.

II. The Requests For Equitable Adjustment

Beginning on October 1, 2000, Mr. Hooker submitted numerous requests for equitable adjustments ("REA"). Mr. Hooker's claims were duplicative and extremely vague.

With respect to the beaver contract, Mr. Hooker submitted twelve REA's. His first REA for the beaver contract, dated October 1, 2000, contained a statement that the "United States Government, has lied to me as a contractor;" referred to contract specification C, which provides, "No toxicological hazards are associated with trapping beaver at SRS; however, normal environmental and physical hazards such as snakes and uncertain footing do exist;" contained a general allegation that "the United States Government is spending Billions of Dollars on cleaning up the SRS due to toxic chemicals that were dumped in the streams and ponds...;" requested a list

[5] "First Amend. Compl." refers to plaintiff's first amended complaint in case number 03-1501.

of chemicals used to kill vegetation on the right of ways on the SRS; and contained a general allegation that the REA in the amount of $1,000,000,000.00, was to compensate him for "performing work out scope [sic] for the USFS, and Intimidation and Discrimation [sic] by WSRC and DOE for Contract Number 53-4660-9-06." App. 198.

The second REA, dated October 23, 2000, was identical, except he reduced the amount requested to $10,000,000.00 and based the REA solely upon work performed out of the scope of the contract. App. 201. He did not identify what work he performed that was out of the scope of the contract or why he thought it was out of the scope of the contract.

The third, fourth, and fifth REA's, all dated October 26, 2000, were identical to the second REA. App. 203-208.

The sixth and seventh REA's, both dated October 27, 2000, were identical to the second REA, but also contained a request for a list of chemicals that were used on the SRS in 1994. App. 209.

The eighth REA, dated April 1, 2002, was more specific than the prior REA's. Mr. Hooker alleged that Four Mile Branch contained toxicological hazards; that DOE never checked on him from February 10, 1992, through December 31,1999; that he had a right to know what was in the water and the sediment; and, that he was entitled to $100,000,000.000 for exposure to "toxicological hazards without the proper permits, protective clothing, or equipment being surveyed by Rad OPS as stated on Work Clearance Permit signed shift manager Tim. L. McCormick on 2/22/99 at 1200." App. 216. One can infer from this that Mr. Hooker believed he was exposed to toxicological hazards during the period of February 1992 to December 1999, and that he wanted $100,000,000.00 to compensate him for the alleged exposure. He has at no

time made any mention of actual costs incurred as a result of the alleged exposure.

His ninth REA under the beaver contract, dated April 8, 2002, again quoted the contract specification C regarding no toxicological hazards. App. 218.

The tenth REA under the beaver contract, also dated April 8, 2002, requested $252,450.00 for research that he and an individual identified as Mr. Cromer completed. App. 218.

The eleventh REA, also dated April 8, 2002, requested $99,999.99 for "false statement made and shown on 3-20-2000 to NIOSH." App. 219. He did not identify the false statement.

The twelfth REA, also dated April 8, 2002, again alleged that DOE officials made fraudulent and false statements and demanded $100,000,000.00. App. 220-21. He did not identify the false statements or indicate why he was due $100,000,000.00.

On July 29, 2002, the contracting officer ("CO") issued a final decision denying these and other claims. App. 223-27.

With respect to the hog contract, Mr. Hooker originally submitted 5 REA's. These REA's are, however, irrelevant because Mr. Hooker submitted a new REA to the CO on April 7, 2004. This new REA contained six claims: 1) the CO wrongly withheld payment for hogs Mr. Hooker brought to the cooler based upon the belief that they were domestic, not wild hogs; 2) the CO wrongfully barred two of Mr. Hooker's employees from the SRS for their involvement with bringing domestic hogs to the cooler; 3) the CO lost the resume of Mr. Hooker's new employee along with Mr. Hooker's paperwork for a contraband pass for a period of six weeks in 1999, prevented Mr. Hooker from hunting, and required Mr. Hooker to demonstrate hog killing using a pocketknife, which caused injury to his dog for which he incurred additional costs; 4) the CO wrongfully charged Mr. Hooker for traps and equipment claimed missing or damaged; 5) the CO

refused to discuss an adjustment with Mr. Hooker for his alleged exposure to contamination; and 6) the CO did not respond to Mr. Hooker's bid for a new hog contract. 04-1126, Compl. Attachment. Mr. Hooker requested $90,000 to compensate him for loss of the option period, wrongfully withheld payments, and damages resulting from the barring of his employees, purchase and upkeep of dogs, equipment purchases and wrongful deductions. Id.

On June 10, 2004, the CO denied all of Mr. Hooker's claims with the exception of his fourth claim regarding the traps and equipment. 04-1126, Compl. Attachment, Contracting Officer's Final Decision, June 10, 2004.

## III. Procedural History

On June 17, 2003, Mr. Hooker filed a complaint pursuant to the Contract Disputes Act, 41 U.S.C. § 601 et seq., for breach of both the beaver and hog contracts. On September 17, 2003, the Government filed a motion to dismiss Mr. Hooker's complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. The parties held oral argument on February 20, 2004. Five days later, this Court issued an opinion granting in part and denying in part the Government's motion. The Court denied the Government's motion with respect to the beaver contract claims, instructing Mr. Hooker to file an amended complaint to clarify how alleged exposure to contaminants resulted in damages and to assert a claim of bad faith. Mr. Hooker filed an amended complaint on March 17, 2004. The Court dismissed without prejudice Mr. Hooker's claims related to the hog contract because he had failed to raise those claims before the CO. In a footnote the Court suggested that Mr. Hooker file a new claim with the CO and then a new complaint if his claims were denied. Mr. Hooker did this and filed a new complaint, number 04-1126, on July 7, 2004.

IV. The First Amended Complaint, 03-1501: The Beaver Contract

In his first amended complaint Mr. Hooker alleges that per contract specification C there were not supposed to be any toxicological hazards associated with trapping beavers at SRS. He states that USFS officials presented him with a work clearance permit requiring him to be RAD II certified and wear protective equipment and clothing while he trapped in one particular area. First Amend. Compl. ¶¶ 8-10. Mr. Hooker further alleges that he made inquiries "as to what substances were in the water that he and his men had been trapping in." First Amend. Compl. ¶ 11. He then allegedly "investigated" and discovered a sign on the ground under debris that for some reason led him to believe that the pond was contaminated. First Amend. Compl. ¶ 12.

Mr. Hooker states that he then requested additional money under the contract in order to hire RAD II trained workers; stating that he would have increased his bid if he had known the sites were not clean and would require trained personnel. First Amend. Compl. ¶ 13. Mr. Hooker does not allege that he actually hired RAD II trained workers or that he incurred any specific cost related to the RAD II training or protective equipment. In fact, Mr. Hooker was already RAD II certified. First Amend. Compl. ¶ 11.

Mr. Hooker alleges he continued to request information on "what contamination existed" in the sites, and apparently, had one of his employees film the sign that had fallen on the ground. First Amend. Compl. ¶ 14. Mr. Hooker believes and alleges in his first amended complaint that USFS "effectively terminated" his contract because of his questions and his film of the sign on the ground. First Amend. Compl. ¶ 15. This "effective termination" allegedly took place on July 21, 1999, though Mr. Hooker does not reveal why he believes that date is significant. First Amend. Compl. ¶ 16. He further alleges that after July 1, 1999, all culvert cleaning stopped

and he was allowed to trap only 1 site and was given only 3 work orders. First Amend. Compl. ¶ 16. Mr. Hooker claims that USFS breached its contract by reducing the number of trapping sites from the original contract language and by prohibiting him from performing culvert cleaning. First Amend. Compl. ¶ 17.

Finally, Mr. Hooker, alleges that USFS acted in bad faith, in failing to inform him of the alleged contamination in the ponds in which USFS require him to work, breach of contract and option years, and in retaliation for his concerns about the alleged contamination. First Amend. Compl. ¶¶ 21-26.

Mr. Hooker requests $80,000 in damages to cover the remaining contract term and the loss of the option year, as well as an unspecified amount in consequential and punitive damages. First Amend. Compl. ¶¶ A-D.

V. The New Complaint, 04-1126: The Hog Contract

In his new complaint regarding the hog contract (#53-4660-8-04) Mr. Hooker appeals the June 10, 2004 CO's final decision on the claim Mr. Hooker submitted on April 7, 2004. In this complaint Mr. Hooker claims the Government breached the contract when it: 1) withheld payments and refused to pay invoices for hogs deemed "domestic;" 2) barred Mr. Hooker's employees from the SRS; 3) lost Mr. Hooker's contraband pass for six weeks, preventing him from performing the work under the contract; and 4) failed to respond to Mr. Hooker's proposal subsequent to contract modification number 4.

First, Mr. Hooker alleges that USFS wrongfully withheld payments due to non-conformance to contract specifications, namely attempting to pass off domestic hogs as wild hogs. 04-1126, Compl. ¶¶ 7-10. Mr. Hooker claims USFS breached the contract when it withheld $1,320.00

from him. 04-1126, Compl. ¶ 10.

Second, Mr. Hooker alleges that USFS breached the contract when it barred two of his employees from the SRS as a result of their involvement in attempting to pass off domestic pigs as wild hogs. 04-1126, Compl. ¶ 11. Mr. Hooker claims he was unable to perform under the contract because those employees were the owners of the hunting dogs he used. 04-1126, Compl. ¶ 12. He requests damages in an amount to compensate him for the purchase of dogs and equipment and lost employee time. 04-1126, Compl. ¶ 15.

Third, Mr. Hooker alleges that USFS "lost" his paperwork for his contraband pass, which prevented him from obtaining a gun permit to dispatch hogs, which in turn prevented him from performing under the contract. 04-1126, Compl. ¶¶ 16-18. He requests that he be awarded damages to compensate him for his lost income during these weeks. 04-1126, Compl. ¶ 18.

Fourth, he claims he is entitled to a contract readjustment for hunting in allegedly contaminated areas. 04-1126, Compl. ¶ 19. Mr. Hooker alleges that prior to June 30, 1999, he and his employees became aware that they had been working in contaminated areas and requested an adjustment in the contract price. 04-1126, Compl. ¶ 20. Mr. Hooker does not reveal how he and his employees "became aware" of this alleged contamination. Mr. Hooker states that the CO denied his request based upon a report from the National Institute of Occupational Safety and Health ("NIOSH"), which found after an extensive investigation that "based on the available environmental data and our medical findings, we conclude that beaver and pig trapping at SRS has not been associated with harmful exposure to radioactive or toxic

environmental contaminants." 04-1126, Compl. ¶ 22; App. 236-245.[6] He emphasizes one particular portion of the NIOSH report, apparently as support for his theory that he was exposed to cesium-137 dust when he hunted hogs near Par Pond at a time when the water level had been substantially reduced in order to repair a dam. 04-1126, Compl. ¶ 22. The portion of the NIOSH report at issue states that the report was unable to determine if Mr. Hooker or his employees were exposed to any, much less a harmful amount, of radiation because Par Pond had since been filled with water again, covering the alleged cesium-137 dust, but more importantly because Mr. Hooker and his employees did not spend anywhere near enough time around the pond to even approach the the minimum exposure time listed on the guidelines. App. 240. Mr. Hooker believes there should have been a readjustment to the contract based on the possibility of exposure to contaminants. Nowhere in his REA's or his first amended complaint does Mr. Hooker state that he actually incurred any additional costs related to the alleged exposure.

Fifth, Mr. Hooker alleges that USFS breached the contract when it opted not to exercise the option year. 04-1126, Compl. ¶¶ 24-29. Mr. Hooker bases his allegation on the grounds that contract modification number 4 extended the contract to October 31, 1999, or until a new contract was awarded. 04-1126, Compl. ¶24. Mr. Hooker acknowledges that in the CO's response to Mr. Hooker's request for equitable adjustment, the CO stated that USFS had decided to perform the contract work using USFS employees. 04-1126, Compl. ¶ 27. In fact, USFS did not award another hog trapping contract until 2001. 04-1126, Compl. ¶ 28. Mr. Hooker requests the maximum amount of the contract price or $55,000. 04-1126, Compl. ¶ 29.

---

[6] Because Mr. Hooker has quoted a portion of the NIOSH report in his complaint, we have included the report in its entirety as part of the appendix so that the Court may consider the quoted portion within the context of the report as a whole.

Finally, Mr. Hooker alleges that all of the above action were taken in bad faith and with specific intent to injure him. 04-1126, Compl. ¶¶ 30-34. Mr. Hooker does not state why he believes USFS had intent to injure him and offers no evidence of bad faith.

Mr. Hooker requests damages to compensate him for loss of employees, dogs, equipment purchased to perform the contract, withheld payments and unpaid invoices, a price adjustment per hog under the contract due to alleged contamination of the work environment, the maximum amount of the option year ($55,000), attorney's fees, and punitive damages. 04-1126, Compl. ¶¶ A-G.

## SUMMARY OF ARGUMENT

This Court should dismiss Mr. Hooker's claims regarding alleged exposure to contamination for lack of subject matter jurisdiction or for failure to state a claim, as they sound in tort and he has failed to state a proper claim for tortious breach of contract. Mr. Hooker's claim that he incurred additional costs in hiring RAD II trained employees under the beaver contract should be dismissed for lack of jurisdiction, as he did not present this claim to the contracting officer. Mr. Hooker's claims that the Government breached the beaver contract when it reduced its requirements and did not exercise the option year should be dismissed for failure to state a claim. Absent a showing of bad faith, the Government has a right to vary its requirements and no obligation to exercise the option year. Mr. Hooker has failed to plead facts sufficient to establish bad faith on the part of the Government. Finally, Mr. Hooker's claims that the Government breached the hog contract when it withheld payments for non-conformance of services, barred two of his employees, and "lost" his contraband pass should be dismissed for failure to state a claim.

## ARGUMENT

I. Standard of Review

When reviewing a RCFC 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Court must construe all the facts alleged in the complaint in favor of the plaintiff. Morris v. United States, 33 Fed. Cl. 733, 741 (1995) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). The Court also must presume all factual allegations to be true and correct. Id. at 741-42 (citing Reynolds v. Army and Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). However, when a defendant challenges the facts upon which jurisdiction is premised, the plaintiff bears the burden of establishing the Court's jurisdiction by a preponderance of the evidence. Id. The Court then "may look outside the complaint and receive evidence for the purpose of resolving the jurisdictional issue of fact." Morris, 33 Fed. Cl. at 742 (citing Mainer v. United States, 31 Fed. Cl. 410, 413-14 (1994); Camelus Development Corp. v. United States, 31 Fed. Cl. 399, 405 (1994)).

A motion to dismiss pursuant to RFC 12(b)(6) for failure to state a claim upon which relief can be granted is appropriate when the plaintiff's alleged facts do not entitle him to a remedy. Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998). Dismissal pursuant to RFC 12(b)(6) is proper only when it is apparent that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Ponder v. United States, 117 F.3d 549, 552 (Fed. Cir. 1997)(quoting Coney v. Gibson, 355 U.S. 41, 45-46 (1957)). A case dismissed pursuant to RFC 12(b)(6) is considered a dismissal on the merits. Id. at 552-53.

## II. This Court Lacks Jurisdiction to Entertain Mr. Hooker's Claims That He Is Entitled To Compensation For Alleged Exposure To Contamination Because They Sound In Tort

The Tucker Act waives sovereign immunity for actions "founded either upon the Constitution, or any Act of Congress or any regulation of any executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. §1491(a)(1) (emphasis added). This Court does not possess jurisdiction to entertain Mr. Hooker's claims because they are essentially claims for negligent misrepresentation, which is a tort.

In his complaint, case number 04-1126, concerning the hog contract, Mr. Hooker claims that he and his employees hunted through the entire SRS property; and at no time were they warned about contaminated areas. 04-1126, Compl. ¶ 19. At some undefined point, they "became aware" that they had been working in contaminated areas and requested an adjustment in contract price. 04-1126, Compl. ¶ 20. Mr. Hooker does not state what additional costs he incurred as a result of the alleged contamination or upon which he based his REA's. Instead he states that "there should have been a readjustment to the contract price in light of the possible exposure to contamination." 04-1126, Compl. ¶ 23.

In his first amended complaint, concerning the beaver contract, Mr. Hooker claims that "USFS knew or should have known prior to February 1999 that some of the beaver trapping and culvert sites were contaminated; and should have required the protections that were instituted by way of the work clearance permit of February 22, 1999." First Amend. Compl. ¶ 21. He does not assert that he incurred any costs as a result of the alleged exposure, but he does request punitive damages. Both claims are based upon a theory of negligent misrepresentation.

This Court has long held that "claims based on negligent misrepresentation, wrongful inducement, or the careless performance of a duty allegedly owed, are claims sounding in tort." Somali Development Bank v. United States, 508 F.2d 817, 821 (Ct. Cl. 1974); accord Smithson v. United States, 847 F.2d 791, 795 (Fed. Cir. 1988) ("any undue delay by [Farmers Home Administration] in making loan, or failure to provide alternative loans or loan servicing relief, is vindicable, if at all, only in a tort action of which the Claims Court would have no jurisdiction."); McCauley v. United States, 38 Fed. Cl. 250, 264 (1997) (dismissing allegations of misconduct and fraud by Government officials); DeRoo v. United States, 12 Cl. Ct. 356, 362 (1987) (dismissing claim that HUD officials negligently issued conditional commitment).

## III. Mr. Hooker Fails To Establish A Claim For Tortious Breach Of Contract

The only exception to the rule that this Court lacks jurisdiction to consider tortious claims, is if the claims , although perhaps somewhat 'tortious' in nature, are essentially based upon the breach of a contractual obligation." DeRoo, 12 Cl. Ct. at 362 (quoting H.H.O. Inc. v. United States, 7 Cl. Ct. 703, 706 (1985)). Mr. Hooker, however, fails to fall within this exception, as he fails to state claim for either contractual misrepressentation or failure to disclose superior knowledge.

This Court has held that the Government may be held liable when it makes erroneous representations to those with whom it enters into contractual relations. Morris, 33 Fed. Cl. at 744 To recover under a theory of contractual misrepresentation, a plaintiff must prove that 1) the Government made a misrepresentation; 2) the misrepresentation was either fraudulent or material; 3) the misrepresentation induced plaintiff to enter into the contract; and 4) plaintiff was justified in relying on the misrepresentation. Nemotallahi et al., v. United States, 38 Fed. Cl.

224, 231 (1997). The remedy for a finding of misrepresentation is rescission or reformation of the contract. Id. A misrepresentation claim requires proof that the Government made a misrepresentation of a material fact that the plaintiff honestly and reasonably relied on to his detriment. T. Brown Constructors v. Pena, 132 F.3d 724, 729 (Fed. Cir. 1997). Mr. Hooker has failed to establish that the Government made a misrepresentation or that he relied upon it to his detriment.

Mr. Hooker claims that the Government misrepresented to him that the areas in which he was trapping beaver contained no toxicological hazards, when in fact they did contain such hazards, and that the Government was aware that they contained such hazards. Here, Mr. Hooker fails to establish that the Government made any misrepresentation to him regarding the presence of toxicological hazards because he has failed to establish any factual evidence supporting his theory that the areas in which he hunted unprotected contained any such hazards.[7] The only evidence he has offered is his discovery of a sign on the ground that led him to believe one area was contaminated. In fact, the NIOSH report clearly shows that neither Mr. Hooker, nor his employees, were actually exposed to contamination. App. 236-245. The only time the Government ever asked Mr. Hooker to trap beaver in a contaminated area it gave him notice that the area was contaminated, gave him the option not to trap beaver in that area, gave him the option of using snares so that he did not have to enter the water, and informed him as to what protective equipment he needed to use. The only evidence Mr. Hooker has proffered is his discovery of a sign that had fallen on the ground. Thus, Mr. Hooker has failed to establish that

---

[7] Additionally, only the beaver contract contained a specification regarding toxicological hazards. The hog contract made no representation as to whether there were or were not toxicological hazards present.

any misrepresentation existed.

Additionally, damages arising from the Government's alleged breach must still be limited to compensation for those injuries directly related to completion of the contract in question, as opposed to any remote or speculative effects the misrepresentations might have had; the damages must be proper contract damages. Mega Construction Company, Inc. v. United States, 29 Fed. Cl. 396, 477 (1993). Mr. Hooker has failed to allege any damages that are directly related to the completion of the hog or beaver contracts. He, therefore, has failed to state a claim for contractual misrepresentation.

Government contractors may also recover from the Government the unexpected increased costs of performance of a contract if the Government, at the time the contract was formed, had superior knowledge regarding difficulties in production which were not apparent and were not otherwise known by the contractor. WM. T. Thompson Company v. United States, 26 Cl. Ct. 17, 23 (1992).

To allege a claim that the Government failed to disclose its superior knowledge, a plaintiff must establish that 1) the contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; 2) the Government was aware the contractor had no knowledge of and had no reason to obtain such information; 3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and 4) the Government failed to provide the relevant information. Id. at 24. The "vital knowledge, which the Government possesses and the contractor does not, must be a fact that affects performance costs or duration of performance." Id. (emphasis in original). The burden of proof rests with the contractor to establish breach of contract or entitlement to an equitable adjustment on grounds of

superior knowledge. "Since the Government is entitled to presume that one who bids on a Government invitation knows his own capabilities and has ascertained he will be able to produce, and at what cost, it would be up to the contractor, complaining of a breach by non-disclosure, to produce specific information to back up his contention." Lopez v. A.C. & S. Inc., 858 F.2d 712, 717 (Fed. Cir. 1988).

Again, Mr. Hooker offers no specific information regarding the existence of the alleged contamination, other than his discovery of a sign on the ground. In reality, Mr. Hooker was not exposed to contamination while performing his duties under these contracts. The NIOSH report, after extensive investigation and medical examinations of Mr. Hooker and his employees, found no evidence of contamination. App. 236-245. Nor does Mr. Hooker claim that he had any problems in the completion of the contract that increased the costs of completion or caused delay in performance due to the alleged contamination. As a result, the superior knowledge doctrine does not apply to his claim and does not entitle him to recover costs that were not connected to actual performance under the contract.

IV. This Court Lacks Jurisdiction To Entertain Mr. Hooker's Claim For Additional Money Under The Beaver Contract To Hire RAD II Trained Workers Because He Failed To Present This Claim To The Contracting Officer

The CDA does not require that a claim be submitted using any particular form or wording. Contract Cleaning Maintenance, Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987). The contractor is, however, required to submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim. Orbas & Assoc. v. United States, 34 Fed. Cl. 68, 70 (1995) (emphasis added). A contractor may not raise in this Court any claims not presented and certified to the contracting

officer. Id. (citing Santa Fe Engineers v. United States, 818 F.2d 856, 858 (Fed. Cir. 1987); Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 90 (1989)).

Mr. Hooker failed to present to the contracting officer a clear and unequivocal statement that he was requesting additional money in order to hire RAD II trained workers for the completion of the beaver contract. None of his REA's mentioned a need to hire other workers, trained or otherwise. Most of his REA's simply stated that he was requesting an equitable adjustment for performing work out of the scope of the contract, intimidation and discrimination, fraud and false statements, defamation of his business and/or " being lied to by the Government..." App. 196-222. Additionally, Mr. Hooker never stated why he thought he had been required to do work outside of the scope of the contract or what work he had done that he considered to be outside the scope of the contract. Mr. Hooker's most specific claim includes an April 1, 2002 REA on the beaver contract in which he requests $100,000,000.00 for exposure to "toxicological hazards associated with Four Mile Branch without the proper permits, protective clothing, or equipment being surveyed by Rad OPS as stated on Work Clearance Permit signed shift manager Tim L. McCormick on 2-22-1999 at 1200." App. at 215. This claim, though confusing, requests money for alleged exposure to contamination for times that the governmend did not provide permits, protective clothing, or equipment. This REA in no way addresses any costs he allegedly incurred as a result of the February 1999 permit, specifically in hiring trained workers.[8]

Consequently, Mr. Hooker did not submit a clear and unequivocal statement that gave the

[8] Additionally, Mr. Hooker was required pursuant to the contract to submit to monitoring by Westinghouse health protection personnel after trapping specified areas, contract specification C.2.E.4, and to obtain any necessary permits, contract specification H.3.

contracting officer adequate notice that Mr. Hooker was requesting money so that he could hire RAD II trained personnel. Orbas, 34 Fed. Cl. at 70 (emphasis added)(holding that a claim based upon whether insulation constituted a contract requirement at all was different than requesting compensation for being required to install a type of insulation not mandated by the contract); Alan Sparks v. United States, 36 Fed. Cl. 488, 492 (1996) (holding that contractor's reference in his claims to "other various sales awarded prior to 1993" was too vague to convey jurisdiction to the Court); Spirit Leveling Contractors, 19 Cl. Ct. at 90 (holding that Court did not have jurisdiction to entertain plaintiff's claims for additional money due to differing site conditions caused by the Government, when plaintiff in his claim to the contracting officer attributed those differing site conditions to the weather ). Accordingly, this claim must be dismissed.

V. Mr. Hooker Has Failed To State A Claim For Breach Of The Beaver Contract Upon Which Relief Can Be Granted Because The Government Did Not Have A Contractual Duty To Maintain Its Requirements Or To Exercise The Option Year Absent Bad Faith, And Mr. Hooker Has Failed To Establish That The Government Acted In Bad Faith

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties; (2) an obligation or duty arising out of that contract; (3) a breach of that duty; and (4) damages caused by the breach." San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). Mr. Hooker has failed to establish that the Government breached any duty under the contract or that the damages alleged in his complaint were proximately caused by the alleged breach.

In addition to the previously discussed allegations, Mr. Hooker contends that the Government breached the contract by allegedly reducing the number of trapping sites and culverts from the original contract language and by opting not to exercise the option year. Am.

Compl. ¶ 13, 16, 17, 18.

Pursuant to the contract, the Government had a specific right to reduce the quantities of services ordered:

> This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. ... [I]f the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

App. 132-133.

Mr. Hooker was to be paid only for work for which task orders were placed. App. 103. The quantities of services listed in the schedule were estimates only and were not purchased by the Government. App. 102. The Government did not breach the contract by reducing its requests for beavers trapped and culverts cleaned. In fact, the only limitation upon the Government's ability to vary its requirements under a requirements contract is that it must do so in good faith. Technical Assistance International v. United States, 150 F.3d 1369, 1371 (Fed. Cir. 1998). Mr. Hooker, as discussed below, has failed to allege sufficient facts to establish that the Government acted in bad faith.

Next, Mr. Hooker alleges that the Government breached the contract by choosing not to exercise the option year. Am. Compl. ¶ 18. The beaver contract contained the contract clause, FAR § 217-9 "Option to Extend the Term of the Contract," which states that the "Government may extend the term of this contract by written notice to the Contractor within 60 days . . . " (emphasis added). The Government was not required to exercise the option period, thus the Government did not breach the contract by not exercising the option period. It is axiomatic that a

defendant must have failed to do something which is required under the contract for a plaintiff to recover. Badgley v. United States, 31 Fed. Cl. 508, 512 (1994). It is well-settled law that the Government is not required to exercise an option period. See e.g., Gov't Sys. Advisors, Inc. v. United States, 847 F.2d 811, 813 (Fed. Cir. 1988); Fields v. United States, 53 Fed. Cl. 412, 419 (2002). Mr. Hooker, therefore, has failed to establish that the Government was required to exercise the option on the contract.

The only exception, as the Court noted in its February 25, 2004 opinion, to the general rule that the Government has the right not to exercise an option or to reduce its requirements under a requirements contract, is if the Government did so in bad faith. Op. at 3-4. Mr. Hooker has in its first amended complaint included an allegation that the Government acted in bad faith. That allegation, however, is entirely conclusory. Mr. Hooker has failed to allege any facts establishing that the Government acted in bad faith.

"[I]n order to state a claim premised on a violation of the obligation of good faith and fair dealing, plaintiffs must allege facts which if proved would constitute malice or an intent to injure." Southern California Edison v. United States, 58 Fed. Cl. 313, 325 (2003). It is well-settled that Government officials are presumed to act conscientiously and in good faith in the discharge of their duties. T & M Distrib. v. United States, 185 F.3d 1279, 1285 (Fed. Cir. 1999). For this Court to find that the Government acted in bad faith, "plaintiffs must allege and prove, by clear and strong evidence, specific acts of bad faith on the part of the Government." Asco-Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595, 604 (1994). Thus, without any facts to support a claim of bad faith, a plaintiff cannot withstand the motion to dismiss for failure to state a claim. Id. To demonstrate bad faith, specific instances of the Government's ill will directed

toward the plaintiff must be identified. Id. (citing Continental Collection & Disposal, Inc. v. United States, 29 Fed. Cl. 644, 652 (1993)).

Mr. Hooker's entire allegation of bad faith is grounded upon his allegation that in June of 1999, he found a sign on the ground – though he does not indicate where he found the sign or what it said – that led him to believe a pond had at one time been contaminated; that he had an employee video tape the sign; that someone at USFS discovered this – though he does not say who, how they discovered this or how he knew they discovered this; and, that this was the sole reason that USFS decreased the number of beavers and sites on Mr. Hooker's work orders.[9] This allegation flies in the face of the fact that the Government fully cooperated with NIOSH's complete and thorough study of Mr. Hooker's allegations and medical examinations of him and all of his employees. Nor do Mr. Hooker's allegations carry much weight in light of the fact that NIOSH conclusively found that there was no evidence that Mr. Hooker or any of employees had been exposed to contamination.

As the contracting officer stated in her decision, all areas that Mr. Hooker was directed to enter for the purposes of the two contracts at issue were safe and SRS procedures for entry to the areas were followed. App. 224. Mr. Hooker voluntarily trapped beaver at four sites with possible contaminants in Four Mile Branch after being told by the contracting officer's

---

[9] The number of beavers trapped in June of 1999, the month Mr. Hooker allegedly discovered and filmed the sign, did not decrease. The bar graph, upon which Mr. Hooker relied in one of his April 8, 2002 claims, indicates that more beavers were trapped during June, almost 60, than any other month. Additionally, Mr. Hooker, in his first amended complaint, also relies upon this bar graph to support his theory that the number of beavers requested by USFS decreased after July 1999. He fails to mention to the Court that he, himself, challenged the accuracy of the graph in one of his April 8, 2002 claims. In fact, he alleged that the bar graph wrongly indicated that no beavers were trapped in November 1999. He attached an invoice for 11 beavers and 18.5 hours of culvert cleaning work to his claim as support for his argument.

representative and the safety inspector that he could refuse to trap those four sites. Id. A work clearance permit was issued for those four sites and Mr. Hooker and his personnel were monitored by Site Health Protection personnel before entering the sites each time and upon leaving the sites each time. Id. Mr. Hooker was allowed to use snares at these four sites so that he would not have to enter the water. Id. Health Protection personnel never found any contamination of Mr. Hooker, his employees, or any equipment or personal protective equipment. Id.

Mr. Hooker's allegation that, in spite of all of the Government's cooperation and clear concern, his discovery of an old sign on the ground caused USFS officials to "effectively terminate" the contract is without basis is fact. It certainly is not sufficient to overcome the pleading requirements necessary to allege bad faith on the part of Government officials. His allegations of bad faith are conclusory at best and must be dismissed.

## IV. Mr. Hooker Has Failed To Establish That The Government Breached The Hog Contract By Withholding Payments For Nonconformance, Barring Two Of His Employees, Or "Losing" His Contraband Pass

With respect to the hog contract, in addition to his contamination claim, Mr. Hooker alleges that USFS breached the contract when it: 1) withheld payments and refused to pay invoices for hogs deemed "domestic;" 2) barred Mr. Hooker's employees from the SRS; and 3) lost Mr. Hooker's contraband pass for six weeks, preventing him from performing the work under the contract. The Government seeks to dismiss these claims.

As reflected in the CO's final decision, dated June 10, 2004, the Government withheld $1,320.00 in payments due to non-conformance to contract specifications. Contract technical specification C.2.A states, "The contractor shall trap and dispatch wild hogs from the designated

areas at SRS during the contract period." Additionally, contract technical specification C.2.B.6 provides that the dogs used to hunt the hogs must be "exclusively wild hog trail dogs, wild hog bay dogs, and wild hog capture dogs." According to the CO's decision, a biologist who was conducting a study on the wild hogs noticed that Mr. Hooker and his employees were submitting animals that had the characteristics of domestic pigs and not wild hogs; these characteristics include dull rounded hooves, which is an indication of standing on concrete, extra teats, and the absence of parasites. Pursuant to contract specification E.2 the Government had the right to reject any services it deemed out of conformance with the contract:

> If any of the services do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by reperformance, the Government may (1) require the Contractor to take necessary action to ensure that future performance conforms to contract requirements and (2) reduce the contract price to reflect the reduced value of the services performed.

(emphasis added). Consequently, the contracting officer determined that these animals were out of conformance with the contract and were, therefore, subject to the nonconformance clause.

Mr. Hooker relies upon The New Shorter Oxford English Dictionary definition of the word "feral," to support his theory that domestic hogs running loose on the SRS property constitute wild or feral hogs as meant in the contract. This argument holds no merit.

First, the contract more frequently uses the word "wild," not feral. App. 10, 11, 89. Second, the meaning of the word "wild" in this context clearly does not mean domestic or farmed hogs that someone released onto the SRS property. Third, if the Court feels the need to rely upon a definition of a word, the word "wild" is more appropriate than "feral," as it appears more frequently in the contract. The definition of wild includes, "occurring, growing, or living in a

natural state; not domesticated, cultivated, or tamed." The American Heritage Dictionary. All definitions indicate that domestic hogs running free on the SRS property would not constitute wild hogs as meant in the contract. Moreover, Mr. Hooker stated on his resume that he had "3 years of experiences [sic] watching other Hog contractors conduct hog hunting contracts at Savannah River Site, S.C. for U.S.F.S. Have read numerous books on wild pigs, trapping tech., etc." App. 18. This indicates he should know what USFS meant when it used the term "wild hog."

Furthermore, USFS conducted an investigation to determine why Mr. Hooker and his employees were submitting the domestic hogs, and it was determined that Mr. Hooker's employees were doing so intentionally and with knowledge that they were not wild hogs. This investigation led to USFS barring two of Mr. Hooker's employees from the SRS.[10] Pursuant to the contract, USFS had a contractual right to do so. Contract specification H.6 provides:

> The Contractor shall be responsible for maintaining satisfactory standards of employee competency, conduct, and integrity, and shall be responsible for taking disciplinary action with respect to his/her employees as may be necessary. In the event the Contractor fails to remove any employee whose continued employment is deemed by the Government to be contrary to the public interest, the Government reserves the right to require the Contractor to remove the employee.

Contract specification H.16 provides:

> Contractor or their representative shall be notified of employees that will be denied access to SRS and immediately upon notification, contractor shall remove the employee(s) from SRS and return the site access badge(s) to the Contracting Officer or COR. Contractor shall be responsible for replacing those employee(s) denied access to SRS and denial of access for contractor's employee(s) shall not be construed as a suitable excuse for nonpeformance of the contract. If the contractor is denied access to SRS the contract may be terminated for default.

---

[10] It was later determined that one of the barred employees, Mike Eller, was not the primary offender and was, thus, later awarded a contract under a separate solicitation.

(emphasis added).

Thus, pursuant to the contract, the Government had the contractual right to require Mr. Hooker to remove his employees from the SRS and Mr. Hooker had the contractual obligation to bear the cost in such a situation.

Mr. Hooker also alleges that USFS "lost" his paperwork for his contraband pass, which prevented him from obtaining a gun permit to dispatch hogs, which in turn prevented him from performing under the contract. He requests that he be awarded damages to compensate him for his lost income during this breach. Yet, lost income constitutes consequential damages, which are not recoverable. Holden v. United States, 38 Fed. Cl. 732, 734 (1997). "As a matter of law, unforeseeable consequential damages cannot be recovered in the Court of Federal Claims." Pratt v. United States, 50 Fed. Cl. 469, 482 (2001) (citing Bohac v. Dep't of Agriculture, 239 F.3d 1334, 1339 (Fed. Cir. 2001). Mr. Hooker cannot calculate damages from an alleged speculative price. Furthermore, contract specification I.6 states, "Minimum order. When the Government requries supplies or services covered by this contract in an amount of less than 200 each, the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract." This specification makes Mr. Hooker's alleged "lost income" even more speculative, as there is no evidence that the Government required more services than he was providing, even without the contraband pass.

## CONCLUSION

For the foregoing reasons, we respectfully request that this Court grant this motion to dismiss plaintiff's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Todd M. Hughes
TODD M. HUGHES
Assistant Director

s/ Lindsay E. Williams
LINDSAY E. WILLIAMS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tel:(202) 353-7995
Fax: (202) 514-8624

January 10, 2005 Attorneys for Defendant

# APPENDIX

Document — Page

Hog Contract dated September 9, 1997 (#53-4660-8-4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Beaver Contract dated November 24, 1998 (# 53-4660-9-06) . . . . . . . . . . . . . . . . . . . . . . . . . 96

Purchase Order dated January 29, 1999 (#43-4660-9-0108) . . . . . . . . . . . . . . . . . . . . . . . . . 184

Request for Equitable Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Contracting Officer's Final Decision, June 29, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

Claim for Beaver Contract with Attachments, April 8, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . 228

NIOSH Report, December 27, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235