SOLICITATION, OFFER AND AWARD



1. This contract is a rated order under DPAS(15 CFR 350) RATING:

| 2. CONTRACT NO. | 3. SOLICITATION NO. | 4. TYPE OF SOLICITATION |
|---|---|---|
| 53-4660-8-04 | R8 36-98-01 | [ ] SEALED BID (IFB)<br>[X] NEGOTIATED (RFP) |

| 5. DATE ISSUED | 6. REQUISITION/PURCHASE REQ. NO. |
|---|---|
| September 9, 1997 | |

| 7. ISSUED BY CODE | 8. ADDRESS OFFER TO (If other than Item 7) |
|---|---|
| USDA FOREST SERVICE - SRI<br>BLDG 760-G<br>1-MILE INSIDE AIKEN BARRICADE<br>AIKEN, SC 29802 | USDA FS-SAVANNAH RIVER INSTITUTE<br>P.O. BOX 710<br>NEW ELLENTON, SC 29809-0710 |

NOTE: In sealed bid solicitations, "offer" and "offeror" mean "bid" and "bidder".

SOLICITATION

9. Sealed offers in original and 0 copies for furnishing the supplies or services in the Schedule will be received at the place specified in Item 8, or if handcarried, in the depository located in Item 7, until 2:00 P.M. local time on 10/09/97. CAUTION-LATE Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-10. All offers are subject to all terms and conditions contained in this solicitation.

| 10. FOR INFORMATION CALL: | A. NAME: Homer R. Gabard | B. TELEPHONE NO. (Include Area Code) (NO COLLECT CALLS) 803-725-0239 |
|---|---|---|

11. TABLE OF CONTENTS


| X | SEC | DESCRIPTION | PAGE(S) |
|---|---|---|---|
| | | PART I - THE SCHEDULE | |
| | A | SOLICITATION/CONTRACT FORM | |
| | B | SUPPLIES OR SERVICES AND PRICES/COSTS | |
| | C | DESCRIPTION/SPECIFICATIONS/WORK STATEMENT | |
| | D | PACKAGING AND MARKING | |
| | E | INSPECTION AND ACCEPTANCE | |
| | F | DELIVERIES OR PERFORMANCE | |
| | G | CONTRACT ADMINISTRATION DATA | |
| | H | SPECIAL CONTRACT REQUIREMENTS | |
| | | PART II - CONTRACT CLAUSES | |
| | I | CONTRACT CLAUSES | |
| | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS | |
| | J | LIST OF ATTACHMENTS | |
| | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| | L | INSTRUCTIONS, CONDITIONS, AND NOTICES TO OFFERORS | |
| | M | EVALUATION FACTORS FOR AWARD | |


OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provision at 52.214-16, Minimum Bid Acceptance Period.

 3. Contract 53-4660-8-04

SOLICITATION, OFFER AND AWARD



12. In compliance with the above, the undersigned agrees, if this offer is accepted within 60 calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

13. DISCOUNT FOR PROMPT PAYMENT (See Section I, Clause No. 52.232-8)

| 10 CALENDAR DAYS | 20 CALENDAR DAYS | 30 CALENDAR DAYS | 0 CALENDAR DAYS |
|---|---|---|---|
| 0 % | 0 % | 0 % | 0 % |

14. ACKNOWLEDGEMENT OF AMENDMENTS (The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated: W D Hooker 9-27-97

| AMENDMENT NO. | DATE | AMENDMENT NO. | DATE |
|---|---|---|---|
| NO. 1 | Sep 19-1997 | | |

15A. NAME AND ADDRESS OF OFFEROR | CODE | ______ | FACILITY | ______

Ga. Bowhunter Supply Co.
3623 Peach Orchard Rd
Augusta, GA 30906

16. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER (Type or print)

William Danny Hooker

15B. TELEPHONE NO. (Include Area Code)

706-792-9422

15C. CHECK IF REMITTANCE ADDRESS IS [ ] DIFFERENT FROM ABOVE - ENTER SUCH ADDRESS IN SCHEDULE

17. SIGNATURE: W. D. Hooker

18. OFFER DATE: 10-1-97

AWARD (To be completed by Government)

19. ACCEPTED AS TO ITEMS NUMBERED: 01 Base Period

20. AMOUNT: Per Each Task Order

21. ACCOUNTING AND APPROPRIATION: Per Each Task Order

22. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:

[ ] 10 U.S.C. 2304(c)( ) [ ] 41 U.S.C. 253(c)( )

23. SUBMIT INVOICES TO ADDRESS SHOWN IN (4 copies unless otherwise specified) | ITEM 8

24. ADMINISTERED BY (If other than Item 7) CODE | ______

25. PAYMENT WILL BE MADE BY CODE | ______

USDA FOREST SERVICE - SRFS
BLDG 760-G
1-MILE INSIDE AIKEN BARRICADE
AIKEN, SC 29802

26. NAME OF CONTRACTING OFFICER (Type or Print)

HOMER R. GABARD

27. UNITED STATES OF AMERICA

Homer R. Gabard
(Signature of Contracting Officer)

28. AWARD DATE

10/29/97

IMPORTANT - Award will be made on this Form or on Standard Form 26, or by other authorized official written notice.

EXCEPTION TO STANDARD FORM 33 (REV.4-85)

TABLE OF CONTENTS PAGE


SOLICITATION, OFFER AND AWARD. . . . . . . . . . . . . . . . . . . . 1

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . 3

PART I - THE SCHEDULE . . . . . . . . . . . . . . . . . . . . . . 8

SECTION B - SUPPLIES OR SERVICES AND PRICE/COSTS . . . . . . . . . . 8
B.1 MINIMUM AND MAXIMUM CONTRACT AMOUNTS (AGAR 452.216-73). . . 8
(FEB 1988)

SECTION C - DESCRIPTION/SPECIFICATION /WORK STATEMENT . . . . . . . . . . . . . 10
C.1 GENERAL SPECIFICATIONS . . . . . . . . . . . . . . . . . . 10
C.2 TECHNICAL SPECIFICATIONS . . . . . . . . . . . . . . . . . 11
C.3 PAYMENT. . . . . . . . . . . . . . . . . . . . . . . . . . 18

SECTION D - PACKAGING AND MARKING . . . . . . . . . . . . . . 19
[For this Solicitation, there are NO clauses in this Section] . . 19

SECTION E - INSPECTION AND ACCEPTANCE . . . . . . . . . . . . . . 20
E.1 CLAUSES INCORPORATED BY REFERENCE . . . . . . . . . . . . . 20
(FAR 52.252-2) (JUN 1988)
E.2 INSPECTION OF SERVICES--FIXED-PRICE . . . . . . . . . . . . 20
(FAR 52.246-4) (AUG 1996)

SECTION F - DELIVERIES OR PERFORMANCE . . . . . . . . . . . . . . 22
F.1 CLAUSES INCORPORATED BY REFERENCE . . . . . . . . . . . . . 22
(FAR 52.252-2) (JUN 1988)
F.2 PERIOD OF PERFORMANCE (AGAR 452.211-5) (FEB 1988) . . . . . 22

SECTION G - CONTRACT ADMINISTRATION DATA . . . . . . . . . . . . . 23

SECTION H - SPECIAL CONTRACT REQUIREMENTS . . . . . . . . . . . . 24
H.1 POST AWARD CONFERENCE (AGAR 452.215-73) (NOV 1996). . . . . 24
H.2 INSURANCE COVERAGE (AGAR 452.228-71) (NOV 1996) . . . . . . 24
ALTERNATE I (NOV 1996)
H.3 PERMITS AND RESPONSIBILITIES (FAR 52.236-7) . . . . . . . . . 25
(NOV 1991)
H.4 EMERGENCY RESPONSE (AGAR 452.236-77) (NOV 1996) . . . . . . 25
H.5 KEY PERSONNEL (AGAR 452.237-74) (FEB 1988). . . . . . . . . 25
H.6 COMPLIANCE WITH AREA REGULATIONS. . . . . . . . . . . . . . 26
H.7 SAFETY AND HEALTH . . . . . . . . . . . . . . . . . . . . . 27
H.8 QUARANTINE RESTRICTIONS . . . . . . . . . . . . . . . . . . 29
H.9 REQUIRED INSURANCE. . . . . . . . . . . . . . . . . . . . . 29
H.10 LOSS OF TIMBER SALE LOCK KEY OR LOCK OR SECURITY BADGES . . 30
H.11 USE OF PREMISES (AGAR 452.236-72) (NOV 1996) . . . . . . . . 30
H.12 ARCHAEOLOGICAL OR HISTORIC SITES (AGAR 452.236-73) (FEB. . . 31
H.13 RESPONSIBILITIES OF THE CONTRACTOR (AGAR 4G52.236-807) . . . 31
(JUL 1986)
H.14 USE OF UNDOCUMENTED WORKERS. . . . . . . . . . . . . . . . . 31
H.15CRIMINAL LIABILITY. . . . . . . . . . . . . . . . . . . . . . 32
H.16 SITE ACCESS AUTHORIZATION FOR CONTRACTOR AND EMPLOYEES . . . 32

PART II - CONTRACT CLAUSES. . . . . . . . . . . . . . . . . . . . 34

TABLE OF CONTENTS PAGE


| | | |
|---|---|---|
| SECTION I - CONTRACT CLAUSES | | 34 |
| I.1 | CLAUSES INCORPORATED BY REFERENCE (FAR 52.252-2) (JUN 1988) | 34 |
| I.2 | ANTI-KICKBACK PROCEDURES (FAR 52.203-7) (JUL 1995) | 35 |
| I.3 | CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY (FAR 52.203-8) (JAN 1997) | 37 |
| I.4 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (FAR 52.203-12) (JAN 1990) - (DEVIATION) | 37 |
| I.5 | ORDERING (FAR 52.216-18) (OCT 1995) | 43 |
| I.6 | ORDER LIMITATIONS (FAR 52.216-19) (OCT 1995) | 44 |
| I.7 | INDEFINITE QUANTITY (FAR 52.216-22) (OCT 1995) | 44 |
| I.8 | OPTION TO EXTEND THE TERM OF THE CONTRACT (FAR 52.217-9) (MAR 1989) | 45 |
| I.9 | LIMITATIONS ON SUBCONTRACTING (FAR 52.219-14) (DEC 1996) | 45 |
| I.10 | CONTRACT WORK HOURS AND SAFETY STANDARDS ACT--OVERTIME COMPENSATION (FAR 52.222-4) (JUL 1995) | 46 |
| I.11 | SERVICE CONTRACT ACT OF 1965, AS AMENDED (FAR 52.222-41) (MAY 1989) | 47 |
| I.12 | STATEMENT OF EQUIVALENT RATES FOR FEDERAL HIRES (FAR 52.222-42) (MAY 1989) | 55 |
| I.13 | FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT ACT--PRICE ADJUSTMENT (MULTIPLE YEAR AND OPTION CONTRACTS) (FAR 52.222-43) (MAY 1989) | 55 |
| I.14 | DRUG-FREE WORKPLACE (FAR 52.223-6) (JAN 1997) | 57 |
| I.15 | EUROPEAN UNION SANCTION FOR SERVICES (FAR 52.225-19) (JAN 1996) | 59 |
| I.16 | RIGHTS TO PROPOSAL DATA (TECHNICAL) (FAR 52.227-23) (JUN 1987) | 59 |
| I.17 | EXTRAS (FAR 52.232-11) (APR 1984) | 59 |
| I.18 | AVAILABILITY OF FUNDS FOR THE NEXT FISCAL YEAR (FAR 52.232-19) (APR 1984) | 59 |
| I.19 | ASSIGNMENT OF CLAIMS (FAR 52.232-23) (JAN 1986) | 59 |
| I.20 | PROMPT PAYMENT (FAR 52.232-25) (MAY 1997) | 60 |
| I.21 | DISPUTES (FAR 52.233-1) (OCT 1995) ALTERNATE I (DEC 1991) | 65 |
| I.22 | PROTECTION OF GOVERNMENT BUILDINGS, EQUIPMENT, AND VEGETATION (FAR 52.237-2) (APR 1984) | 67 |
| I.23 | CHANGES--FIXED-PRICE (FAR 52.243-1) (AUG 1987) ALTERNATE I (APR 1984) | 68 |
| I.24 | GOVERNMENT-FURNISHED PROPERTY (SHORT FORM) (FAR 52.245-4) (APR 1984) | 68 |
| I.25 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (SERVICES) (SHORT FORM) (FAR 52.249-4) (APR 1984) | 69 |
| I.26 | DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (FAR 52.249-8) (APR 1984) | 69 |
| I.27 | AUTHORIZED DEVIATIONS IN CLAUSES (FAR 52.252-6) (APR 1984) | 71 |
| PART III - LIST OF DOCUMENTS, EXHIBITS | | 72 |

TABLE OF CONTENTS PAGE

AND OTHER ATTACHMENTS

SECTION J - LIST OF ATTACHMENTS. . . . . . . . . . . . . . . . . . . . . 72

PART IV - REPRESENTATIONS AND INSTRUCTIONS . . . . . . . . . . . . . . 73

SECTION K - REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS . . . . . . . . . . . . 73

K.1 CERTIFICATE OF INDEPENDENT PRICE DETERMINATION. . . . . . . . 73
(FAR 52.203-2) (APR 1985)

K.2 CERTIFICATION AND DISCLOSURE REGARDING PAYMENTS TO. . . . . . 74
INFLUENCE CERTAIN FEDERAL TRANSACTIONS
(FAR 52.203-11) DEVIATION (APR 1991)

K.3 TAXPAYER IDENTIFICATION (FAR 52.204-3) (MAR 1994) . . . . . . 75

K.4 CONTRACTOR IDENTIFICATION NUMBER--DATA UNIVERSAL. . . . . . . 76
NUMBERING SYSTEM (DUNS) NUMBER (FAR 52.204-6)
(DEC 1996)

K.5 CERTIFICATION REGARDING DEBARMENT, SUSPENSION,. . . . . . . . 77
PROPOSED DEBARMENT, AND OTHER RESPONSIBILITY MATTERS
(FAR 52.209-5) (MAR 1996)

K.6 TYPE OF BUSINESS ORGANIZATION (FAR 52.215-6). . . . . . . . . 78
(JUL 1987)

K.7 AUTHORIZED NEGOTIATORS (FAR 52.215-11) (APR 1984) . . . . . . 78

K.8 SMALL BUSINESS PROGRAM REPRESENTATIONS. . . . . . . . . . . . 78
(FAR 52.219-1) (JAN 1997)

K.9 CERTIFICATION OF NONSEGREGATED FACILITIES . . . . . . . . . . 80
(FAR 52.222-21) (APR 1984)

K.10 PREVIOUS CONTRACTS AND COMPLIANCE REPORTS . . . . . . . . . . 81
(FAR 52.222-22) (APR 1984)

K.11 AFFIRMATIVE ACTION COMPLIANCE . . . . . . . . . . . . . . . . 82
(FAR 52.222-25) (APR 1984)

K.12 CLEAN AIR AND WATER CERTIFICATION (FAR 52.223-1). . . . . . . 82
(APR 1984)

K.13 CERTIFICATION OF TOXIC CHEMICAL RELEASE REPORTING . . . . . . 82
(FAR 52.223-13) (OCT 1996)

K.14 BUY AMERICAN CERTIFICATE. . . . . . . . . . . . . . . . . . . 83
(FAR 52.225-1) (DEC 1989)

SECTION L - INSTRUCTIONS, CONDITIONS, AND NOTICES TO OFFERORS . . . . . . . . . . 84

L.1 SOLICITATION PROVISIONS INCORPORATED BY REFERENCE . . . . . . 84
(FAR 52.252-1) (JUN 1988)

L.2 INQUIRIES (AGAR 452.204-70) (FEB 1988). . . . . . . . . . . . 84

L.3 SUBMISSION OF OFFERS (FAR 52.215-9) (MAR 1997). . . . . . . . 84

L.4 LATE SUBMISSIONS, MODIFICATIONS, AND. . . . . . . . . . . . . 85
WITHDRAWALS OF PROPOSALS (FAR 52.215-10) (MAY 1997)

L.5 RESTRICTION ON DISCLOSURE AND USE OF DATA . . . . . . . . . . 87
(FAR 52.215-12) (APR 1984)

L.6 PREPARATION OF OFFERS . . . . . . . . . . . . . . . . . . . . 87
(FAR 52.215-13) (APR 1984)

L.7 EXPLANATION TO PROSPECTIVE OFFERORS . . . . . . . . . . . . . 88
(FAR 52.215-14) (APR 1984)

L.8 CONTRACT AWARD (FAR 52.215-16) (OCT 1995) . . . . . . . . . . 88

L.9 INSTRUCTIONS FOR THE PREPARATION OF TECHNICAL AND . . . . . . 89
BUSINESS PROPOSALS (AGAR 452.215-71) (NOV 1996)

TABLE OF CONTENTS


| | | PAGE |
|---|---|---|
| L.10 | AMENDMENTS TO PROPOSALS (AGAR 452.215-72) (FEB 1988) | 91 |
| L.11 | TYPE OF CONTRACT (FAR 52.216-1) (APR 1984) | 91 |
| L.12 | SINGLE OR MULTIPLE AWARDS (FAR 52.216-27) (OCT 1995) | 91 |
| L.13 | SIZE STANDARD AND SIC CODE INFORMATION (AGAR 452.219-70) (NOV 1996) | 92 |
| L.14 | SITE VISIT (FAR 52.237-1) (APR 1984) | 92 |
| L.15 | PRE-BID/PRE-PROPOSAL CONFERENCE (AGAR 452.237-71) (FEB 1988) | 92 |
| L.16 | SERVICE OF PROTEST (FAR 52.233-2) (AUG 1996) | 93 |
| L.17 | AUTHORIZED DEVIATIONS IN PROVISIONS (FAR 52.252-5) (APR 1984) | 93 |
| L.18 | REQUIREMENTS FOR COST OR PRICING DATA OR INFORMATION OTHER THAN COST OR PRICING DATA (FAR 52.215-41) (JAN 1997) ALTERNATE IV (OCT 1995) | 93 |
| SECTION M - EVALUATION FACTORS FOR AWARD | | 96 |
| M.1 | EVALUATION QUANTITIES--INDEFINITE DELIVERY CONTRACT (AGAR 452.216-72) (FEB 1988) | 96 |
| M.2 | EVALUATION OF OPTIONS (FAR 52.217-5) (JUL 1990) | 96 |
| M.3 | AWARD DETERMINATION | 96 |
| M.4 | EVALUATION FACTORS | 97 |

## PART I - THE SCHEDULE

## SECTION B - SUPPLIES OR SERVICES AND PRICE/COSTS

| Item No. | Supplies/Services | ESTIMATED Quantity | Unit | Unit Price | Total |
|---|---|---|---|---|---|
| 01 | BASE PERIOD (12 MO) TRAP AND DISPATCH FERAL HOGS (ESTIMATED) | | | | |
| | Min quantity | 200 | EA | $ 55.00 | $11,000.00 |
| | Max quantity | 800 | EA | $ 55.00 | $44,000.00 |
| | | | | TOTAL BASE PERIOD | $ 55,000.00 |
| 01 | OPTION PERIOD 1 (12 MO) TRAP AND DISPATCH FERAL HOGS (ESTIMATED) | | | | |
| | Min quantity | 200 | EA | $ 55.00 | $ 11,000.00 |
| | Max quantity | 800 | EA | $ 55.00 | $ 44,000.00 |
| | | | | TOTAL OPTION PERIOD 1 | $ 55,000.00 |
| 01 | OPTION PERIOD 2 (12 MO) TRAP AND DISPATCH FERAL HOGS (ESTIMATED) | | | | |
| | Min quantity | 200 | EA | $ 55.00 | $11,000.00 |
| | Max quantity | 800 | EA | $ 55.00 | $44,000.00 |
| | | | | TOTAL OPTION PERIOD 2 | $ 55,000.00 |

B.1 MINIMUM AND MAXIMUM CONTRACT AMOUNTS (AGAR 452.216-73) (FEB 1988)

During the period specified in FAR clause 52.216-18, ORDERING, the Government shall place orders totaling a minimum of 200 EACH, but not in excess of 800 EACH.

NOTICE:

Savannah River Site is a restricted access Government facility and only United States citizens are authorized entry to the Site.

Contractor and all personnel using firearms on the contract must

possess either a S.C. Resident Hunting License or a S.C. Non-Resident Hunting License.

Contractor and personnel using firearms must not have any hunting violations either in S.C. or State of residence.

Contractor must show required hunting licenses to Contracting Officer prior to issuance of the Notice to Proceed or prior to any new employee being issued a Contraband Pass to bring firearm(s) on SRS.

## SECTION C - DESCRIPTION/SPECIFICATION /WORK STATEMENT

---

C.1 GENERAL SPECIFICATIONS

A. Scope of Contract - The contractor shall be required to implement an organized program to control the wild hog population on the Savannah River Site (SRS). This program will include trapping and the use of trained dogs. The intensity and duration of use of these two techniques shall be subject to the direction of the Contracting Officer. The Contractor shall supply all supplies, personnel, equipment (including safety equipment), supervision and transportation (with the exception of the traps) for this contract. The following Contractor-furnished equipment is required as a minimum:

1. the only type of firearm that will be allowed to be used in the performance of the contract shall be a ~~single shot~~ .22 caliber rim fire rifle.
2. The bait for the traps and bait stations.
3. Adequate transportation (pickup truck preferred)
4. Dogs trained to hunt hogs only.

Attempts to dispatch hogs will take place during the daylight hours. No hogs will be taken at night with spotlights.

Any injuries incurred by the contractor, contractor's employees, or SRS employees or visitors during interaction with hogs or any part of the contract is the responsiblilty of the contractor.

The period of this contract shall be a base period of 12 months with options to extend the contract in 12 month increments. The maximum contract time shall not extend beyond 36 months (3 years). the option to extend would be evaluated every 12 months and would occur only upon the mutual agreement of the government and the contractor (see FAR Clause 52.217-9, page 37). The bid amount per wild hog trapped and properly delivered to the SRFS in accordance with C.3-PAYMENT.

B. Description and Location - All areas are within the boundaries of the Savannah River Site, Aiken, Barnwell and Allendale counties, S.C. (see Vicinity Map in Section J).

C. Boundaries - The hog control activities are located within the established boundaries of the Savannah River

Site.

D. Government-Furnished Property. The government will supply 25 traps and the supplies needed to maintain and modify the traps. These supplies could include lumber, plywood, wire, etc..

C.2 TECHNICAL SPECIFICATIONS

A. Trapping - The contractor shall trap and dispatch wild hogs from the designated areas at SRS during the contract period. To accomplish this, the Contractor shall perform the following tasks:

1. Trap during each seven day period throughout the term of the contract. The Contractor may leave traps set 24 hours per day seven days per week if the Contractor desires to do so. The number of traps to be used at a given time during the contract will be determined by the COR or Inspector(s).

2. Physically inspect each trap during each workday that traps are set. Hogs may be dispatched physically within the confines of the trap or removed live and dispatched within 1/4 mile of the trap. The hogs will not be transported live outside the 1/4 mile limit of the trap, unless for approved research purposes. All non-target animals trapped will be immediately released unharmed. Trapped hogs shall be dispatched using a 22 Caliber rim fire rifle, a bow and arrow or other method approved by CO.

3. The contractor may modify the traps to specifications desired, with the approval of the COR or Contracting Officer.

4. The trapping locations will be determined by the Contracting Officer, COR, and/or Inspector(s).

5. The bait will consist of fermented corn or other bait if approved by COR. The contractor will supply all materials needed to make the fermented corn or other bait mixture.

6. At the end of the contract, the contractor shall return the traps to the SRFS in the same condition as received except for normal wear and tear. If, upon inspection of the traps by the SRFS, they are not found to be in the same condition, the contractor shall make those necessary repairs prior to final payment.

7. Shooting with firearms (.22 rifle or bow & arrow) will take place only if the contractor knows what is in the line of fire and where the projectile(s) will stop if the hog is hit or missed. If the contractor does not know with 100% certainty that a shot can be

made at no risk to site employees or other persons, then the shot will not be made.

B. Use of Dogs - Contractor will use trained dogs (dogs that silently trail and bay) to find and dispatch hogs. The contractor will supply the dogs. The use of dogs will be in accordance with the following specifications:

1. Dogs shall be used to locate and dispatch hogs during each 7 day period of the contract.

2. All dogs to be used must have current rabies vaccinations and a rabies certificate must be provided by the contractor.

3. All dogs will wear a collar showing the owner's name, address, and telephone number. Also the dogs will be assigned a number that will remain the same for the contract period. This number will be displayed on the dog. Dogs may have tatoo instead of painted numbers if contractor chooses.

4. No dogs will be used if they have a history of aggression toward people.

5. The dogs must be a "silent trailer". In other words the dogs will bark only when they have bayed or captured a hog.

6. The dogs must be exclusively wild hog trail dogs, wild hog bay dogs, and wild hog capture dogs. Dogs that hunt or are prone to hunt other wildlife species will not be used. The dogs should respond favorably to the handlers commands. Prior to the award of the contract, the contractor will be asked to field demonstrate their dogs' compliance with above criteria and their effectiveness for hunting hogs and handling (see Section M - Evaluation Factors).

7. Locations where hogs will be dispatched with the use of dogs will be determined by the COR or Inspector(s).

8. When hogs are located by dogs, the contractor will dispatch the hog immediately at that location. Caution will be used when approaching and dispatching the hog to avoid personal injury to the contractor. Safety is a top priority in this situation and if the hog cannot be dispatched in a safe manner to ensure the contractor's safety and any nearby person's safety, then the hog will not be dispatched. Any injuries incurred by the contractor, contractors employees, or any person during interaction with hogs or tracking or any

other activity is the responsibililty of the contractor.

9. The death of dogs due to injury by hogs or other reasons is the responsibility of the contractor. Replacements for these dogs should be readily available so as not to delay the use of this technique during the contract. If dogs are lost on site, then the contractor has the responsibility for thoroughly searching for the dog and picking the dog up from persons who may find it. The government will not house the dog for the contractor.

10. Shooting with firearms (.22 rifle or bow & arrow) will take place only if the contractor knows what is in the line of fire and where the projectile(s) will stop if the hog is hit or missed. If the contractor does not know with 100% certainty that a shot can be made at no risk to site employees or other persons, then the shot will not be made.

D. Data Collection - Data will be collected to maintain population records, aid management efforts and research, and to document records for payments to the contractor. The contractor will be responsible for the collection of this data according to the following:

1. Deliver the whole carcass (not field stripped) to the SRFS workcenter cooler at the end of each workday in order to receive credit for payment. The contractor shall not remove any hogs alive or dead, from the SRS. Body parts shall not be removed from SRS unless specifically authorized by the CO, COR, and/or Inspectors. Each carcass will be tagged with a serial identification number on a metal tag (same number as on data sheet) prior to placement in the cooler.

2. Data to be collected includes weight, age, sex, reproductive condition (pregnant &/or lactating), fetal measurements, and locations/dates the animals were dispatched. Also note the time the carcass was placed in the cooler. Data will be recorded and collected by the contractor according to SRFS guidelines and at the direction of the Contracting Officer, COR, and/or Inspector(s). The contractor will cooperate with researchers' request for data and will collect and deliver the data upon notification by the the Contracting Officer, COR, and/or Inspector(s).

3. One 50 ml test tube of blood will be collected from each hog immediately after it has been killed.

These vials of blood wil be placed in a portable cooler and stored in the SRFS workcenter cooler at the end of each workday. All test tubes, storage racks and coolers will be provided by the SRFS. Failure to collect blood samples will evaluated by the COR and appropriate action will be taken.

4. Twice a week remove all hogs not designated for research studies from the SRFS cooler and deliver to designated landfill. Hogs may not remain in cooler for more than four days. Contractor will log in all hogs with the operator at time of delivery to designated landfill.

5. Research needs which develop during the course of the contract may result in the need for additional data collection. If such action is required by the SRFS, a modification to the contract will be negoiated.

6. After the removal of all hogs from the SRFS cooler, contractro shall clean the cooler using Government furnished water, bleach or disinfectant. Cooler shall be cleaned so that all blood, tissue, etc. from wild hog carcasses and otehr carcasses are removed from cooler. COR shall provide instructions on how coolers shall be cleaned to the contractor and or contractor's employees at the star of the contract. COR shall inspect the SRFS cooler periodically to ensure that the cooler is being cleaned properly.

E. Other Considerations

1. Register with the Contracting Officer, COR, or Inspector(s) and Security forces the vehicle or vehicles and firearms that all contractor personnel will use. The contractor shall provide the state license number, the make and color of each vehicle. No other vehicles will be allowed on site. The firearms identification number shall be registered with the SRS Security forces. Vehicles used by the contractor shall be subject to search by the SRFS and the SRS Security forces. The use of ATV's is limited to four-wheelers in pre-approved locations only. The make, model, and serial number of all firearms to be used shall be given to the C.O. or COR immediately upon notification of award of this contract so that a Contraband Pass may be requested from DOE.

2. The total number of contractor employees shall not exceed eight (including contractor). No more than five contractor employees (including contractor) shall be permitted to possess or use firearms on the SRS.

3. Notify the SRFS or Technical Support Center, TSC (EOC), when entering site and when leaving for the day.

4. Submit to monitoring by Westinghouse Health protection personnel after trapping in specified areas.

5. The contractor will choose two barricades by which to enter and leave the SRS during the contract period. The contractor will use these barricades upon entering or leaving the SRS for any reason (except emergencies) during the contract period. When leaving SRS, the same barricade will be used as was used to enter on that day. At this barricade, the contractor and all employees shall be required to sign in with SRS security personnel whenever entering and leaving the SRS. Perimeter gates or other barricades will not be utilized by the contractor during the contract period.

6. If mutually agreeable, Contractor may store equipment, bait or other supplies necessary to the completion of the contract at the SRFS workcenter. SRFS and DOE assume no responsibility for any of the vendor's equipment, supplies, or material stored at the workcenter, in transit or in use at a designated work site.

7. In areas scheduled to be utilized on the SRS Deer Hunts, hogs will not be taken for one week prior to the deer hunt. Also, ~~traps shall be removed from the hunt areas~~. Contractor will not hunt in these units on the days they are scheduled for SRS Deer Hunt. → traps can remain in hunt areas but must be secured closed and Contrac[tor] shall not bait the[m] in hunt area for a week prior to scheduled hun[t]

8. Taking of hogs and related activities will not be done within the Advanced Tactical Training Area (ATTA) or the Small Arms Training Area (SATA) until proper notification of Wackenhut.

9. The contractor may use boats to retrieve hog carcasses in wet areas as approved by the Contracting Officer, COR, or Inspector(s) but not in the Savannah River. Use of boats in the Savannah River and on adjacent DOE lands shall be confined to the retrieval of dogs only. Any entrance to and departure from water by boat shall be confined to points within the boundaries of the SRS.

10. Contractor may use tracked vehicles similar in size to a four wheeled ATV in pre-approved locations only. Tracked vehicles larger than a four wheeled ATV will not be permitted to be used. Information on make, model, etc. for all tracked vehicles must


USFS
W.D. Hooker
Contractor/Supervisor
Andy Cromer
Trapper
Goldman Eller
Dog Man
Mike Eller
Dog Man

## Introduction

The following details represents how Georgia Bowhunters Supply Company would organize and implement the following programs to control the wild hog population at the Savannah River Site. This technical proposal describes the aspects of the program to be conducted above and in addition to the specifications defined in the requirements of the Government (USFS) statement of work. All requirements from the Government (USFS) defined in this statement are to be considered and included in this technical proposal, irregardless of any specific mention in this document.

## Contract Objectives

Georgia Bowhunters Supply objectives of the proposed program, are to be conducted in a safe, professional manner. We are to remove a minimum of 200 and up to a maximum 800 wild hogs from the populations of these animals found on Savannah River Site in a safe and efficient manner as possible. Georgia Bowhunters Supply will work in a manner which is responsive to the needs of the Government (USFS). The products provided by this program will be dead wild hogs removed from Savannah River Site population and accurate data and blood samples collected from those animals removed during this program.

## General Background of Organization

Georgia Bowhunters Supply Company has held for the last 6 years trapping contracts for the Government (USFS). We have had no time lost due to injuries, or accidents due to unsafe acts. We have trapped over 51 different locations on the Savannah River Site. We have performed hog trapping for over 3 years (R8-36-94-08). The personnel that I have assembled for this bid have over 60 years of experience hunting wild hogs. See attached resumes of personnel. All have valid state drivers licenses and are U. S. citizens. We have as project equipment available to us for use in this contract, 27 Bay dogs and Trails dogs, 4 trucks, three with dog boxes, 4 ATVs with trailers, 3 boats with trailers, one motor home used as office only, and 3 trailers for transporting dead hogs. The Government Hog contracts that Georgia Bowhunters Supply Company have held R8-36-94-08 (RFP). All contracts were completed on time with no lost time due to injuries and at present contract for 97 has not lost time for injuries or unsafe conditions. Again details for personnel are attached to this technical proposal.

## Contingency Plan for Replacement Personnel

I know and have hunted with other hog hunters in the local Georgia and South Carolina vicinity. I can readily provide experienced replacement personnel for anyone who cannot continue to work the contract for whatever reason.

## Project Organization

The project personnel organization chart for this program is attached at the back of the technical proposal. The program will be organized and managed by myself, W. D. Hooker. The program will be staffed by Andy Cromer, Mr. Eller Sr. and Mike Eller. Decisions on the number and location of traps and bait piles will be determined by myself based on discussions with the Savannah River Forest Station and the project personnel. Daily locations to be hunted with dogs will be determined by a general agreement among the project personnel present at the time. All project personnel will work on all tasks in the proposed program. The approximate percentage of time that each individual will be available for this project is as follows: W. D. Hooker - a minimum of 5 days during every week during the contract, Andy Cromer - 3 days during every week of the contract, Mr. Eller, Sr., and Mike Eller 3 days during every week of the contract. There are no consultant and/or subcontract efforts associated with this technical proposal. All work required for the completion of this contract will be provided by the project personnel identified above.

**Proposal Task Technical Approac**

The proposed starting date would be immediately following the awarding of this contract to Georgia Bowhunters Supply. All project personnel are prepared to begin work on this proposed program immediately following the starting date. Both methods will be used during each 7 day period of the entire 12 months. These task technical approaches will be operated in a flexible manner such that any specific control/removal needs of the Savannah River Forest Station can be met as necessary and as soon as possible. Specific details on how the both tasks within this technical proposal will be accomplished are provided below.

**Trapping** -The use of the traps will begin immediatly after the contract is awarded to Georgia Bowhunters Supply. The traps will be modified before use. The modification will be the construction of wood drop doors rather than the metal doors provided. The use of wood drop doors was taught to me by John Reiner in 1994. The location of the traps will depend on either initial direction from Savannah River Forest Station or areas cf recent hog activity. The initial areas to be searched for activity will include Hog Barn, Leigh-Banana Road, Watergap, Robbins Station, L Lake, area below Wackenhut office, and the roads behind Forestry Headquarters. At least 25 traps will be used. When ideal locations are identified to set traps, the traps will be set up within 40 feet of a road so they will be accessible with a trailer. Corn, soured in water with lye, will be used as bait. Traps will be prebaited for 5 days before setting. A pegged trip bar, connected by a string through pulleys to the drop door. will be used for the trigger. All traps which are set will be checked the next morning. This will increase the chance of finding a hog feeding on the bait outside of the trap. Instead of shooting hogs found at bait lines, dogs will be used to catch hogs feeding on the bait. This will eliminate any problems caused by trying to shoot the hog. Any hogs caught in the traps will not be dispatched in the trap. The hog will be run into a trailer and relocated to be dispatched with either bow and arrow or 22 cal. rifle. A collecting permit will be requested from Mike Caudell to catch and dispatch any raccoons caught eating corn at the traps. A similar permit was used during 1995, 1996 and 1997. This will eliminate losing corn to raccoons. The proposed staff hours the project personnel will be allocated are: Andy Comer - 274 hours, W. D. Hooker - 600 hours, and Goldman Eller - 181 hours.

**Dogs** - The use of dogs will begin immediately after the contract is awarded to Georgia Bowhunters Supply. As stated in the section on General Background of Organization, our total of 97 dogs includes trail dogs, combined trail and bay dogs, and catch dogs. All of these dogs have been trained and used successfully to hunt hogs. Most of the hunting with dogs will begin in the late morning after the traps and bait piles are checked or in the late afternoon. However, dogs will be carried at all times in the event hogs are found unexpectedly. The dogs will be hunted out of trucks or on foot in the woods. When hunted out of the truck, all dogs will be carried in the dog box until a hog or a fresh sign is identified, or one trail dog may be released to walk in front of the truck to find fresh signs or wind of a hog. The roads hunted with dogs will initially be the same ones searched for trapping locations. As more hog signs are identified, dogs will be used in these areas. Hunting on foot with dogs will be done in areas of known hog activities. ATVs will be used for hunting in the woods and areas where access is limited. Hogs caught by the dogs will be killed by using hunting knives rather than guns, this will reduce the chance of injuring the trained dogs. The proposed staff hours that the project personnel will be allocated for this task are: W. D. Hooker - 440 hours, Andy Cromer - 350 hours, Mike Eller 616 - hours, and Goldman Eller - 441 hours.

# RESUME

Name: William D. Hooker Sr. Age: 43

Citizenship: USA SSN: 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

Address: 2603 Glenn Hills Dr.
Augusta, GA 30906

Education: High School Diploma 1971
6 1/2 years Augusta Technical School
"Q" Clearance at SRS

Training: Master Plumber # M007197 STATE GA.
3 years supervising Hog Trapping/Running Dogs on Contract R8-36-94-08 (RFP).

Skill/Experience in Wild Hog Control Techniques:

3 years of experiences watching other Hog contractors conduct hog hunting contracts at Savannah River Site S.C. for U.S.F.S. Have read numerous books on wild pigs, trapping tech., etc.

A. Trapping - under the guidance of John Riner I have learned to use the Root-Door as tool in trapping wild hogs prebait with sour corn. Savannah River Site 1993 and 1994.

B. Have 35 years of hunting experience.

C. Owner of GA. Bowhunter Supply Co. which has had 8 government contracts with no lost work days due to unsafe conditions, no unsafe act.

D. Certified Archery Instructor, State of Georgia.

E. Past Director of District #10 State Trapping Assoc. State of GA.

F. CPR Course - have taken 5 times at Local 150.

G. Completed 18 month course in Forestry & Conservation

H. Safety #1 priority

Ability to Obtain Proper SC Hunting License/List of Hunting Violations:

No past hunting violations in any state.

References available upon request

# RESUME

Name: Andy Cromer III

Age: 41

Citizenship: USA

SSN: 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

Address: 3726 Cemetary Road
Augusta, GA 30906

Education: High School Diploma 1973
2 years College / Brenton Fartier College
4 years Technical School / Augusta Tech.
18 years Journeyman Electrician
"Q" Clearance at SRS

Training: Master Electrician CIC # High Voltage EN007356
Low Voltage LVUOO0613

Skill/Experience in Wild Hog Control Techniques:

3 years of experience Trapping / Running Dogs Contract R8-36-94-08 (RFP)

3 years of experiences watching other Hog contractors conduct business at Savannah River Site S.C. for U.S.F.S.

A. Trapping - experienced with J. Riner in Root-Door Corral Traps - Prebaited and then baited with sour corn. Savannah River Site 1993. Also caught and dispatched hogs with Mr. Riner.

B. Actively hunted for 37 years been hunting unsupervised for 27 years actively trapped for 20 years. No safety related incidence. Presently working for GA. Bowhunter Supply Co. (trapping 6 years) Bow Instructor, Hunting Advisor, Coordinator.

C. CPR Course (Have taken twice Local 1579)

D. Safety is my #1 priority.

Ability to Obtain Proper SC Hunting License/List of Hunting Violations:

No hunting violations in any state.

References available upon request

# RESUME

NAME: Goldman Edward Eller

AGE: 70

CITIZENSHIP: USA

SSN: 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

ADDRESS: 302 Malson Street
Jackson,SC 29831

EDUCATION: Graduate Hiwassee High School - 1945
Military Army 1945 - 1948
Air Force 1948 - 1950

OBJECTIVE: An opportunity to progress with the Forestry Department in Control and eliminating wild boar on the SRS. Safety is my #1 priority

SKILL/EXPERIENCE IN WILD HOG CONTROL TECHNIQUES:

Instructor in First Aid, C.P.C., Emergency Medical Technician, Ambulance Driver

Was on the Dupont Pistol team 12 years. Was on the Governor's top 20 Shooter for 8 years.

Hunted Deer, Bear and Wild Boar with dogs in the Great Smokey mountains in North Carolina 1940 to 1960.

Hunted wild hogs with dogs in South Carolina from 1960 to present.

Hunted wild hogs with dogs on the SRS with Fox Enterprises in 1991, 1992 and 1993, Palmetto Wildlife 1994. Also worked for GA Bowhunters for past Contract # R8-36-94-08. 95, 96, 97.

I have 7 years of setting up traps for wild hogs, catching, baiting and killing hogs with 12 Ga. Shotgun/22 Cal. Rifle.

I have had training in ageing, weighting and checking hogs for preganacy.

Ability to Obtain Proper SC Hunting License/List of Hunting Violations:

Currently have valid 1997, 1998, SC Hunting License - YES

No past hunting violations

References available upon request

# RESUME

NAME: Michael Edward Eller

AGE: 40

CITIZENSHIP: USA

SSN: 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

ADDRESS: 204 Daniel Street
Jackson, SC 29831

EDUCATION: Jackson High School, Jackson SC
Attended Aiken Tech
2 years in Elector Mechanical Engineer

OBJECTIVE: An opportunity to progress with the Forestry Department in Control and eliminating wild hog on the SRS. Safety is my #1 priority

SKILL/EXPERIENCE IN WILD HOG CONTROL TECHNIQUES:

Hunted Deer & Bear in North Carolina and Canada

Hunted wild hog with dogs in South Carolina for the past 28 years.

Hunted and trapped wild hogs with dogs on the SRS for Fox Enterprises 1991-1992-1993, Weeks Farm near Spring Field, SC.

Palmetto Wildlife 1994 - have received training in weighing hogs and checking for pregnancy.

Trapped/Hunted hogs for GA Bowhunters Supply Co., 1995, 1996, 1997 contract # R8-36-94-08 (RFP).

Ability to Obtain Proper SC Hunting License/List of Hunting Violations:

Currently have valid 1997-1998 SC Hunting License - YES

No past hunting violations

References available upon request

HUNTER SAFETY CERTIFICATE

This is to certify that

HOOKER W. D.

has completed a course in Hunter Education as prescribed by Georgia Law.

Date of Issue Aug, 13 94

Instructor's Signature

349

Instructor No.

GEORGIA DEPARTMENT OF NATURAL RESOURCES

Certification # 377702

HUNTER SAFETY CERTIFICATE

This is to certify that

John Andrew Cromer III

has completed a course in Hunter Education as prescribed by Georgia Law.

Date of Issue Aug. 13, 94

Instructor's Signature

349

Instructor No.

GEORGIA DEPARTMENT OF NATURAL RESOURCES

Certification # 377701

be provided to the COR prior to teh contractor bringing the vehicle(s) on SRS. Tracked vehicles shall not be used in the Savannah River.

F. Protection of Improvements. The contractor shall take every precaution necessary to prevent damage to any improvement in the contract area such as roads, trails, ditches, fences, etc.

Roads and trails shall be kept free of logs, slash and debris. Any road or trail damage by the contractor's operation shall be promptly repaired by the contractor. Access guidelines will be provided by the COR.

G. Safety & Environment Requirements.

Contractor and all employees shall be required to attend an Environmental, Safety and Health Orientation at SRFS prior to starting work. The orientation will be no more than 2 hours long. Each new employee that the Contractor hires will be required to attend the above orientation prior to receiving a SRS access badge from SRFS.

The Contractor shall be required to comply with the Savannah River Forest Station's "Field Worker and Contractor Tracking System." This system aids in teh location of personnel in the case of an emergency, such as: severe weather, fire, personal injury, or other threats. The system will be explained at the Pre-Work Meeting.

1. The contractor shall provide and wear safety glasses with side shields when working in thick underbrush or where eyes are susceptible to injury from surrounding vegetation or flying debris.

2. The contractor shall have a First aid kit with each vehicle (including ATV's) in use on this contract.

3. Some form of communications (ie CB, 2-way radio, or cellular phone) must be provided for each crew for emergency notification.

4. Hardhats must be provided and worn at all times while working in wooded areas.

5. The contractor shall provide and use a metal "Safety Fuel Can" when dispensing gasoline into small engines (ie ATV's).

6. An operable "ABC" type fire extinguisher of at least 5 lbs. in size shall be located on each vehicle in use on this contract.

7. Employees operating seatbelt-equipped vehicles shall

wear the seatbelts at all times while vehicle is in motion.

8. All handtools (axes, shovels, etc..) used in the performance of this contract shall be in good working condition. Splintered, cracked or damaged handles and loose parts on any tool must be repaired or taken out of service. Hand tools with cutting edges must be properly guarded while not in use.

9. Any and all spills of petroleum products (ie gasoline, hydraulic fluid, motor oil, and antifreeze) must be contained and reported to the COR. The contractor will be responsible for cleanup and disposal. This will include, but is not limited to excavating all contaminated soils.

10. Any and all contractor generated debris must be cleaned up on a daily basis. This includes, but is not limited to empty petroleum product cans and/or drums.

11. Other personal protective equipment may be required for any other special equipment in use on this contract.

12. The contractor shall provide a "Written Bloodborne Pathogen and Hazard Communication Plan" prior to the start of work. The plan must include information on the hazards of the work, training, material safety data sheets for all hazardous chemicals in use, and documentation of training provided for each employee.

13. Contractor shall comply with all safety regulations governing the handling and storage of firearms and ammunition during the performance of this contract.

14. Persons handling firearms must provide documentation for attending and successfully completing a hunter safety course. They must demonstrate their ability to handle the firearms to be used on this contract.

15. Never permit loaded firearms in vehicles or boats in use on this contract. The safest firearm has an open action.

16. Never climb a tree or fence carrying a firearm with a loaded chamber. Before going over a fence, place the gun on the ground pointing away from you and others and leave chamber empty.

17. All firearms in use with this contract must be regularly maintained, with safety devices in perfect working orde

18. Consider trajectory and impact points before shooting.

19. Always treat firearms as if they are loaded. An unloaded firearm does not have ammunition in either the chamber or the magazine.

20. Do not shoot at any sound or movement in the brush and be absolutely sure no one is in your line of fire.

C.3 PAYMENT

Vendor will be paid a price per hog trapped and dispatched. Vendor is to provide a bid price per hog.

SECTION D - PACKAGING AND MARKING

[For this Solicitation, there are NO clauses in this Section]

## SECTION E - INSPECTION AND ACCEPTANCE

E.1 CLAUSES INCORPORATED BY REFERENCE
(FAR 52.252-2) (JUN 1988)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

| CLAUSE NUMBER | DATE | TITLE |
|---|---|---|

None by reference

E.2 INSPECTION OF SERVICES--FIXED-PRICE
(FAR 52.246-4) (AUG 1996)

(a) Definitions. "Services," as used in this clause, includes services performed, workmanship, and material furnished or utilized in the performance of services.

(b) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the services under this contract. Complete records of all inspection work performed by the Contractor shall be maintained and made available to the Government during contract performance and for as long afterwards as the contract requires.

(c) The Government has the right to inspect and test all services called for by the contract, to the extent practicable at all times and places during the term of the contract. The Government shall perform inspections and tests in a manner that will not unduly delay the work.

(d) If the Government performs inspections or tests on the premises of the Contractor or a subcontractor, the Contractor shall furnish, and shall require subcontractors to furnish, at no increase in contract price, all reasonable facilities and assistance for the safe and convenient performance of these duties.

(e) If any of the services do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by reperformance, the Government may (1) require the Contractor to take necessary action to ensure that future

performance conforms to contract requirements and (2) reduce the contract price to reflect the reduced value of the services performed.

(f) If the Contractor fails to promptly perform the services again or to take the necessary action to ensure future performance in conformity with contract requirements, the Government may (1) by contract or otherwise, perform the services and charge to the Contractor any cost incurred by the Government that is directly related to the performance of such service or (2) terminate the contract for default.

## SECTION F - DELIVERIES OR PERFORMANCE

F.1 CLAUSES INCORPORATED BY REFERENCE (FAR 52.252-2) (JUN 1988)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

| CLAUSE NUMBER | DATE | TITLE |
|---|---|---|
| 52.247-55 | APR 1984 | F.O.B. POINT FOR DELIVERY OF GOVERNMENT-FURNISHED PROPERTY |

F.2 PERIOD OF PERFORMANCE (AGAR 452.211-5) (FEB 1988)

The period of performance of this contract is from Date of Contract Award through September 30, 2000.

## SECTION G - CONTRACT ADMINISTRATION DATA

THE FOLLOWING GOVERNMENT-FURNISHED PROPERTY SHALL BE PROVIDED:

1. 25 TRAPS AS REQUIRED
2. TRAP SUPPLIES AS REQUIRED^W

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

H.1 POST AWARD CONFERENCE (AGAR 452.215-73) (NOV 1996)

A post award conference with the successful offeror is required. It will be scheduled within 15 days after the date of contract award. The conference will be held at:

Savannah River Forest Station, Building 760-15G
1 mile inside the Aiken barricade
Aiken, South Carolina

H.2 INSURANCE COVERAGE (AGAR 452.228-71) (NOV 1996)
ALTERNATE I (NOV 1996)

Pursuant to FAR clause 52.228-5, Insurance-Work on a Government Installation, the Contractor will be required to present evidence to show, as a minimum, the amounts of insurance coverage indicated below:

(a) Workers Compensation and Employer's Liability. The Contractor is required to comply with applicable Federal and State workers' compensation and occupational disease statutes. If occupational diseases are not compensable under those statutes, they shall be covered under the employer's liability section of the insurance policy, except when contract operations are so commingled with a Contractor's commercial operations that it would not be practical to require this coverage. Employer's liability coverage of at least $100,000 shall be required, except in States with exclusive or monopolistic funds that do not permit worker's compensation to be written by private carriers.

(b) General Liability.

(1) The Contractor shall have bodily injury liability coverage written on a comprehensive form of policy of at least $500,000 per occurrence.

(2) The Contractor shall have property damage liability insurance shall be required in the amount of 500,000 per occurrence.

(c) Automobile Liability. The Contractor shall have automobile liability insurance written on a comprehensive form of policy. The policy shall provide for bodily injury and property damage liability covering the operation of all automobiles used in connection with performing the contract. Policies covering automobiles operated in the United States shall provide coverage of at least $200,000 per person and $500,000 per occurrence for bodily injury and $20,000 per occurrence for property damage or loss.

(d) Aircraft Public and Passenger Liability. When aircraft are used in connection with performing the contract, the Contractor shall have aircraft public and passenger liability insurance. Coverage shall be at least $200,000 per person and $500,000 per occurrence for bodily injury, other than passenger injury. Coverage for passenger injury shall be at least $200,000 multiplied by the number of seats or passengers, whichever is greater.

H.3 PERMITS AND RESPONSIBILITIES (FAR 52.236-7) (NOV 1991)

The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work. The Contractor shall also be responsible for all damages to persons or property that occur as a result of the Contractor's fault or negligence. The Contractor shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire work, except for any completed unit of work which may have been accepted under the contract.

H.4 EMERGENCY RESPONSE (AGAR 452.236-77) (NOV 1996)

(a) Contractor's Responsibility for Fire Fighting . (1) The Contractor, under the provisions of FAR clause 52.236-9, PROTECTION OF EXISTING VEGETATION, STRUCTURES, EQUIPMENT, UTILITIES, AND IMPROVEMENTS, shall immediately extinguish all fires on the work site other than those fires in use as a part of the work. (2) The Contractor may be held liable for all damages and for all costs incurred by the Government for labor, subsistence, equipment, supplies, and transportation deemed necessary to control or suppress a fire set or caused by the Contractor or the Contractor's agents or employees.

(b) Contractor's Responsibility for Notification in Case of Fire. The Contractor shall immediately notify the Government of any fires sighted on or in the vicinity of the work site.

(c) Contractor's Responsibility for Responding to Emergencies. When directed by the Contracting Officer, the Contractor shall allow the Government to temporarily use employees and equipment from the work site for emergency work (anticipated to be restricted to fire fighting). An equitable adjustment for the temporary use of employees and equipment will be made under the CHANGES clause, FAR 52.243-4.

H.5 KEY PERSONNEL (AGAR 452.237-74) (FEB 1988)

(a) The Contractor shall assign to this contract the following key personnel:

Supervisor
Trapper/Hunter

(b) During the first ninety (90) days of performance, the Contractor shall make no substitutions of key personnel unless the substitution is necessitated by illness, death, or termination of employment. The Contractor shall notify the Contracting Officer within 15 calendar days after the occurrence of any of these events and provide the information required by paragraph (c) below. After the initial 90-day period, the Contractor shall submit the information required by paragraph (c) to the Contracting Officer at least 15 days prior to making any permanent substitutions.

(c) The Contractor shall provide a detailed explanation of the circumstances necessitating the proposed substitutions, complete resumes for the proposed substitutes, and any additional information requested by the Contracting Officer. Proposed substitutes should have comparable qualifications to those of the persons being replaced. The Contracting Officer will notify the Contractor within 15 calendar days after receipt of all required information of the decision on substitutions. The contract will be modified to reflect any approved changes of key personnel.

H.6 COMPLIANCE WITH AREA REGULATIONS

The Contractor agrees to comply with all security and safety regulations and requirements of the Government. A short security questionnaire is required of the Contractor and all of his/her employees working on SRS. The Contractor shall be responsible for maintaining satisfactory standards of employee competency, conduct, and integrity, and shall be responsible for taking disciplinary action with respect to his/her employees as may be necessary. In the event the Contractor fails to remove any employee whose continued employment is deemed by the Government to be contrary to the public interest, the Government reserves the right to require the Contractor to remove the employee. The Contractor agrees to designate a representative who shall be authorized to receive on behalf of the Contractor any notices and instructions given by the Contracting Officer in regard to performance under this contract and to take such action thereon as is required by the terms of this contract.

The Contractor further agrees that only persons possessing a valid state driver's license will be permitted to operate motor vehicles engaged in the performance of this Contract upon the roads of the SRS. Failure to furnish evidence of such license for an employee driver, will result in such employee being denied access to the SRS. In addition, Contractor and all employee drivers shall comply with all applicable state laws regulating traffic on SRS.

NOTE: All personnel working on the SRS must be United States citizens.

H.7 SAFETY AND HEALTH

The contractor shall take all reasonable precautions in the performance of the work under this contract to protect the safety and health of employees, subcontractors, and members of the public and shall comply with all applicable safety and health regulations and requirements of the Department of Energy, USDA Forest Service and OSHA, including reporting.

The contractor agrees to cooperate in making it possible for the Contracting Officer, Forest Service, and DOE personnel to safely and economically inspect activities under this contract and to conduct their official duties on the contract site and such other places on the SRS where the contractor, his/her employees, and subcontractors conduct operations under this contract. The Contracting Officer shall notify the contractor, in writing, of any noncompliance with the provisions of this clause and the corrective action to be taken. After receipt of such notice, the contractor shall immediately take such corrective action. In the event that the contractor fails to comply with said regulations or requirements, the Contracting Officer may, without prejudice to any other legal or contractual rights, issue an order stopping all or any part of the work; thereafter, a start order for resumption of the work may be issued at the discretion of the Contracting Officer. The contractor shall make no claim for an extension of time or for compensation of damage by reason of or in connection with such work stoppage.

In the absence of the Contracting Officer, the COR, or the inspector, any DOE or government employee has the authority to stop all or any part of the work being conducted by the contractor if it is determined that any unsafe condition is occurring that threatens life or limb. If such action is taken, the government employee must notify the Contracting Officer or COR immediately at 5-2441. If the COR or inspector is at the work site the government employee must promptly notify the COR or inspector of the action taken and the unsafe condition observed. Resulting formal contract action will be directed by the Contracting Officer.

The contractor further agrees that only persons possessing a valid state driver's license will be permitted to operate motor vehicles engaged in the performance of this contract upon the roads of the SRS. Failure to furnish evidence of such license for any employee-driver will result in such employee being denied access to the SRS. In addition, the contractor and all employee-drivers shall comply with all applicable state laws regulating traffic & condition of vehicles on SRS.

Operating supplies and maintenance responsibility: Contractor shall furnish all fuel, oil, grease and repairs. The Contractor will pay any other expense incidental to operation of equipment.

Protection of streams, lakes and reservoirs: The contractor shall take sufficient precautions to prevent pollutions of streams, lakes and reservoirs by fuels, oils and other chemicals, silt or other harmful materials. Contractor shall schedule and conduct contract in such a manner so as to avoid siltation of streams, lakes and reservoirs, and loss of embankment materials during high flow periods. All streams will be kept free of contractor-generated debris.

Erosion: The Contractor shall take every precaution necessary to prevent soil erosion on contract areas and access facilities including, but not limited to installing and/or maintaining drainage dips and water bars on roads and trails, outsloping and revegetation of areas disturbed by Contractor's operations.

Final clean-up: Before final acceptance all trash, rubbish, spills, and debris generated by Contractor's operation shall be removed from DOE land.

Area clean-up: Contractor shall be responsible for the housekeeping of Contractor's employees and any approved subcontractors working under this contract. Roads, right-of-ways, timber stands and general areas shall be kept free of disabled or abandoned vehicles and equipment, parts of vehicles or equipment, fuel, oil, beverage and lunch containers, and other debris resulting from Contractor's operations.

Contractor shall be responsible for the clean up of all spills of any amount of petroleum products (i.e. diesel, oil, and coolant). This includes excavation of contaminated soils.

Liabilities: Contractor shall assume responsibilities and be liable for all damages to persons or property incurred in or resulting from Contractor's negligence and/or willful acts in conducting the operations required under this contract, and Contractor shall hold the Government harmless for any damages to property and/or injury to persons which may arise or result from the operations required hereof.

Fire protection: The Contractor and all approved subcontractors under Contractor shall exercise due diligence, and take all reasonable and practicable action, both independently and in cooperation with the Government to prevent and suppress forest fires on the contract areas and vicinity. A minimum of one axe and one shovel will be available in the immediate vicinity of the work areas. Gasoline or diesel-powered equipment will be equipped with satisfactory mufflers or spark arrestors. Contractor will not be allowed to start any warming fires on the SRS and agrees to reimburse the Government for the cost of fire suppression incurred as the result of Contractor's negligence and/or willful acts. All operations on the SRS may be suspended by the Contracting Officer during periods of extreme fire danger as determined by the Savannah River Forest Station's Fire Department or when ongoing fires warrant such suspension. Such suspension shall be effected by written

notice to the Contractor except in cases of sudden emergency when such notice may be given verbally. In the event of such suspension, the Contractor agrees to remove all personnel and equipment immmediately as requested by the Contracting Officer. The Government shall not be liable for any damages or claims of any nature resulting from suspension.

H.8 QUARANTINE RESTRICTIONS

(a) The DOE Savannah River Site is infested with imported fire ants and is under quarantine; therefore, the Contractor shall comply with U.S. Department of Agriculture (USDA) and South Carolina Plant Pest Regulatory Service restrictions to prevent the spread of the fire ants until they can be eliminated.

(b) Quarantine restrictions apply to movement of articles that may carry fire ants; such as used soil-moving equipment, soil plants with roots, grass sod, and hay and straw except hay and straw used for bedding and packing. The restrictions are imposed on the movement of the regulated articles from an infested area to noninfested areas. Movement of the regulated articles within the infested areas is not restricted. Geographical areas under quarantine for imported fire ants are shown on an Attachment in section J.

Cleaning and processing procedures are required before moving restricted material to a non-infested area. Earth moving equipment shall be cleaned of all loose noncompacted soil before moving. Facilities are available for this cleaning at the Savannah River Site.

Restricted material shall contain a certification from the USDA Animal and Plant Inspection Service (APHIS) that the material is pest-free before moving from an infested to a non-infested area.

Additional information may be obtained from the Savannah River Forest Station, Telephone (803)725-2441, or the USDA, APHIS, PPQ, P.O. Box 21792, Columbia, SC 29221, Telephone (803)765-5901.

H.9 REQUIRED INSURANCE

In accordance with FAR 52.228-05 Insurance - Work on a Government Installation, the following information on required insurance levels is provided:

| | |
|---|---|
| Workmen's Compensation and Employer's Liability Insurance that provides coverage for employees working in the State of South Carolina | $100,000.00 |
| General Liability Insurance | |
| For Bodily Injury Liability Minimum per occurrence | $500,000.00 |
| Automobile Liability Insurance | |
| Minimum per person | $200,000.00 |

| | |
|---|---|
| Minimum per occurence for bodily injury | $500,000.00 |
| Minimum per occurrence for property damage | $ 20,000.00 |

H.10 LOSS OF TIMBER SALE LOCK KEY OR LOCK OR SECURITY BADGES

When necessary Forest Service personnel will place Timber Sale locks on exterior and/or interior gates for areas where contractor will be working. Contractor will be issued one or more keys for these Timber Sale locks to allow the contractor access to the areas. When a key(s) and/or locks are lost or misplaced, Department of Energy Security Regulations require the Forest Service to remove all current Timber Sale locks and replace these locks immediately.

If the contractor or contractor's employee(s) loses a Timber Sale key(s) and/or lock the loss shall be reported to the COR or Contracting Officer immediately. When the loss of the Timber Sale key(s) and/or lock is due to the contractor's or contractor's employee(s) fault or negligence, the contractor shall be charged the costs that the Government incurs in removing all current Timber Sale locks, placing new locks on all required gates, collecting all keys for the locks that are removed, and issuing keys for the new locks. This charge will be approximately $1,935.00 and will be deducted from any payments due the contractor including the final payment.

A security badge is issued to the contractor and each of the contractor's employees to allow them access to SRS. When a security badge is lost or misplaced the contractor or his/her representative shall report the loss to the COR or Contracting Officer immediately and obtain a replacement badge for the lost or misplaced badge. At the completion of the contract, all security badges must be returned to the Government. A deduction of $10 will be made on the Final Payment for each security badge that is not returned.

Final payments will not be processed until all Timber Sale keys and security badges are either returned to the Government or determined to be lost. When a Timber Sale key(s) and security badge(s) are determined to be lost prior to final payment, appropriate deductions will be made from the Final Payment for this contract.

H.11 USE OF PREMISES (AGAR 452.236-72) (NOV 1996)

(a) Before any camp, quarry, borrow pit, storage, detour, or bypass site, other than shown on the drawings, is opened or operated on USDA lands or lands administered by the USDA, the Contractor shall obtain written permission from the Contracting Officer. A camp is interpreted to include a campsite or trailer parking area of any employee working on the project for the Contractor.

(b) Unless excepted elsewhere in the contract, the Contractor shall: (i) provide and maintain sanitation facilities for the work

force at the site and (ii) dispose of solid waste in accordance with applicable Federal, State and local regulations.

H.12 ARCHAEOLOGICAL OR HISTORIC SITES (AGAR 452.236-73) (FEB 1988)

If a previously unidentified archaeological or historic site(s) is encountered, the Contractor shall discontinue work in the general area of the site(s) and notify the Contracting Officer immediately.

H.13 RESPONSIBILITIES OF THE CONTRACTOR (AGAR 4G52.236-807) (JUL 1986)

(a) The contractor shall protect all trails, ditches, fences and other improvements in the operating area. Roads and trails needed for fire protection or other purposes shall be kept free of logs, slash and debris. Any road or trail used by the contractor that is damaged by his operations shall be promptly restored by him to its original condition.

(b) The contractor shall use every precaution necessary to prevent damage to young growth and trees left standing.

H.14 USE OF UNDOCUMENTED WORKERS

The Immigration and Nationality Act as amended by the Immigation reform and Control Act (8 USC 1324a; 8 CFR 274a) makes it unlawful for an employer to hire unauthorized aliens (undocumented workers) and establishes the I-9 Form as the document to be used for employment eligibility verification.

The contractor is required to 1) have all employees complete and sign the I-9 Form to certify that they are eligible for employment; 2) examine documents presented by the employee and ensure the documents appear to be geniune and related to the individual; 3) record information about the documents on the form, and complete the certification portion of the form; 4) retain the form for three years, or one year past the end of employment of the individual, whichever is longer.

It is illegal to discriminate against any individual (other than a citizen of another county who is not authorized to work in the U.S.) in hiring, discharging, or recruiting because of that individual's national origin or citizenship status.

For further information on the requirements of the Act, contractors should contract the Employer and Labor Relations Officer of their local INS office.

H.15CRIMINAL LIABILITY

It is understood that disclosure of any classified information relating to the work or services ordered herunder to any person not entitled to receive it, or failure to safeguard any classified information that may come to the USFS or any person under the USFS's control in connection with work under this Agreement, may subject USFS, its agents, employees, or subcontractors to criminal liability under the laws of the United States. (See the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq.; 18 U.S.C. 793 and 794; and Executive Order 12356)

H.16 SITE ACCESS AUTHORIZATION FOR CONTRACTOR AND EMPLOYEES

Prior to badging of contractor and contractor's employee(s), contractor and all employees requiring access to the Savannah River Site in order to work on this contract shall be required to complete a questionnaire titled "Application for Site Access Authorization". Also, the contractor and all employees shall be fingerprinted. Contractor and employees shall receive a red site access badge after this process. However, a screening process will be performed and those individuals meeting the following conditions will be denied future access to SRS.

A. Those who are currently on probation or parole for a felony (as determined by the state where the conviction occurred).

B. Any applicant for employment at SRS who has received a positive drug screen.

C. Any employee who was assigned by his employer to work at the SRS and was fired for possession, trafficking or use of illegal drugs or for being under the influence of drugs while at SRS.

D. Any employee who has been fired or quit to avoid being fired from any employment for violation of a contractor or subcontractor policy on the use or abuse of illegal drugs.

E. Any employee who has been denied a DOE access authorization (security clearance) pursuant to the procedures of 10 CFR 710 administrative review.

F. Individuals who have been involuntarily terminated or have voluntarily terminated to avoid involuntary termination from any employment for theft of government property at the SRS or for a willful violation of contractor policies or security regulations which may jeopardize the security of site operations or the health and safety of other employees or the general public.

G. Any employee who has been fired or quit to avoid being fired from any employment at the SRS for theft of property.

Contractor or their representative shall be notified of employees that will be denied access to SRS and immediately upon notification, contractor shall remove the employee(s) from SRS and return the site access badge(s) to the Contracting Officer or COR. Contractor shall be responsible for replacing those employee(s) denied access to SRS and denial of access for contractor's employee(s) shall not be construed as a suitable excuse for nonperformance of the contract. If the contractor is denied access to SRS the contract may be terminated for default.

Failure of the contractor to promptly remove employee(s) denied access and surrender their site access badges to the C.O. or COR may result in termination for default.

## PART II - CONTRACT CLAUSES

## SECTION I - CONTRACT CLAUSES

I.1 CLAUSES INCORPORATED BY REFERENCE
(FAR 52.252-2) (JUN 1988)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

| CLAUSE NUMBER | DATE | TITLE |
|---|---|---|
| 52.202-1 | OCT 1995 | DEFINITIONS |
| 52.203-3 | APR 1984 | GRATUITIES |
| 52.203-5 | APR 1984 | COVENANT AGAINST CONTINGENT FEES |
| 52.203-6 | JUL 1995 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT |
| 52.203-10 | JAN 1997 | PRICE OR FEE ADJUSTMENT FOR IMPROPER OR ILLEGAL ACTIVITY |
| 52.204-4 | JUN 1996 | PRINTING/COPYING DOUBLE-SIDED ON RECYCLED PAPER |
| 52.209-6 | JUL 1995 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT |
| 52.215-2 | AUG 1996 | AUDIT AND RECORDS--NEGOTIATION |
| 52.215-33 | JAN 1986 | ORDER OF PRECEDENCE |
| 52.222-3 | AUG 1996 | CONVICT LABOR |
| 52.222-26 | APR 1984 | EQUAL OPPORTUNITY |
| 52.222-35 | APR 1984 | AFFIRMATIVE ACTION FOR SPECIAL DISABLED AND VIETNAM ERA VETERANS |
| 52.222-36 | APR 1984 | AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS |
| 52.222-37 | JAN 1988 | EMPLOYMENT REPORTS ON SPECIAL DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA |
| 52.223-2 | APR 1984 | CLEAN AIR AND WATER |
| 52.223-14 | OCT 1996 | TOXIC CHEMICAL RELEASE REPORTING |
| 52.225-11 | OCT 1996 | RESTRICTIONS ON CERTAIN FOREIGN PURCHASES |
| 52.227-1 | JUL 1995 | AUTHORIZATION AND CONSENT |
| 52.227-2 | AUG 1996 | NOTICE AND ASSISTANCE |

| | | |
|---|---|---|
| | | REGARDING PATENT AND COPYRIGHT INFRINGEMENT |
| 52.228-5 | JAN 1997 | INSURANCE--WORK ON A GOVERNMENT INSTALLATION |
| 52.229-3 | JAN 1991 | FEDERAL, STATE, AND LOCAL TAXES |
| 52.229-5 | APR 1984 | TAXES -- CONTRACTS PERFORMED IN U.S. POSSESSIONS OR PUERTO RICO |
| 52.232-17 | JUN 1996 | INTEREST |
| 52.232-18 | APR 1984 | AVAILABILITY OF FUNDS |
| 52.232-33 | AUG 1996 | MANDATORY INFORMATION FOR ELECTRONIC FUNDS TRANSFER PAYMENT |
| 52.233-3 | AUG 1996 | PROTEST AFTER AWARD |
| 52.242-13 | JUL 1995 | BANKRUPTCY |
| 52.245-1 | APR 1984 | PROPERTY RECORDS |
| 52.245-19 | APR 1984 | GOVERNMENT PROPERTY FURNISHED "AS IS" |
| 52.246-25 | FEB 1997 | LIMITATION OF LIABILITY--SERVICES |
| 52.253-1 | JAN 1991 | COMPUTER GENERATED FORMS |

I.2 ANTI-KICKBACK PROCEDURES (FAR 52.203-7) (JUL 1995)

(a) Definitions.

"Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

"Person," as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.

"Prime contract," as used in this clause, means a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind.

"Prime Contractor" as used in this clause, means a person who has entered into a prime contract with the United States.

"Prime Contractor employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

"Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies, materials, equipment, or services of any kind under a prime contract.

"Subcontractor," as used in this clause, (1) means any person,