IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a<br>GEORGIA BOWHUNTERS SUPPLY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Nos. 03-1501C, 04-1126<br>(Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO
DEFENDANT'S PARTIAL MOTION TO DISMISS

Pursuant to Rule 7.2 (b) of the Rules of the Court of Federal Claims, defendant, the United States, respectfully replies to plaintiff's opposition to defendant's partial motion to dismiss.

In our motion we demonstrated that portions of plaintiff's, Mr. Hooker's, complaint in case numbers 03-1501C and 04-1126C should be dismissed both for lack of jurisdiction and failure to state a claim pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC").

## ARGUMENT

### I. Plaintiff Did Not Plead In His Complaint The Elements Necessary For A Claim That The Government Was Negligent In The Estimates Used For The Beaver Contract

For the first time in the history of this case, after amending his complaint in case number 03-1501 and filing a second complaint as case number 04-1126, plaintiff alleges in his response to the Government's partial motion to dismiss that "this is essentially a claim that the Government was negligent in its estimates." Pl's Resp. at 7. Beyond the fact that Mr. Hooker has never raised this claim before and should not be allowed to raise it at this late stage, he has completely failed to state any facts upon which he could base his newfound assertion that the Government's

estimates in the beaver contract were negligent.

The Government is ordinarily not liable for even significant variations between its estimated and actual requirements pursuant to a requirements contract. See Clearwater Forest Indus., Inc. v. United States, 227 Ct. Cl. 386, 392, 650 F.2d 233, 240 (1981). The Government is obligated to exercise due care and to use information reasonably available in formulating its estimates. See Medart, Inc. v. Austin, 967 F.2d 579, 580-82 (Fed. Cir. 1992). The Government, however, "need not search for or create additional information." Id. at 582 (citing Womack v. United States, 182 Ct. Cl. 399, 408, 389 F.2d 793, 802 (1968)). Moreover, even if a contractor can establish that alternative estimation methods "might have improved the accuracy of the government estimates . . . their mere existence does not mean the approach selected was not reasonable." Id. at 581. At any rate, in order to establish a claim for negligent estimates, a contractor must allege and prove facts sufficient to show by a preponderance of the evidence that estimates were "inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made." Medart, Inc. v. Austin, 967 F.2d 579, 581 (Fed. Cir. 1992). Mr. Hooker has failed to allege any facts that would support a claim that the Government was negligent in its estimates. He simply makes a conclusory allegation that is entirely unsupported by the facts. As such, this Court should lend no credence to Mr. Hooker's theory.

II. Mr. Hooker Fails To Establish The Elements For The Reformation Of The Beaver Contract

Mr. Hooker also states in his response to our motion to dismiss that he is not claiming that he is entitled to compensation for alleged exposure to contamination, nor is he claiming that the Government made a misrepresentation to him regarding the alleged contamination. Pl.'s Resp. at

6. Instead, he argues that "the Government should have renegotiated or reformed the beaver contract terms to reflect the additional training and equipment required once the possibility of contamination was discovered." (emphasis added). Pl.'s Resp. at 7. Mr. Hooker's argument is without merit.

"Reformation of a contract is appropriate if the plaintiff can show the contract terms reflect a mutual mistake of material fact, resulting in a contract which does not faithfully embody the parties' actual intent." Union Pacific Railroad, Corp., v. United States, 52 Fed. Cl. 730, 735 (2002) (citing Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 665 (Fed. Cir. 1992); Northop Brumman Corp. v. United States, 47 Fed. Cl. 20, 41-42 (2000)). "The narrow purpose of reforming a contract on the basis of mutual mistake is to make a defective writing conform to the agreement of the parties upon which there was a meetings of the minds." Humlen v. United States, 49 Fed. Cl. 497, 505 (2001) (internal citations and quotations omitted). Courts will grant reformation when there has been a mutual mistake of fact, only if the plaintiff can show that the Government would have agreed to the contract if worded in accordance with the plaintiff's intention. Utility Contractors Inc., v. United States, 8 Cl. Ct. 42, 53 (1985). Another justification for reformation is for the plaintiff to show that the mistake was one of which the Government knew or should have known. Id.

Many aspects of Mr. Hooker's reformation theory are vague. For instance, it is unclear whether Mr. Hooker believes there has been a mutual mistake of fact or whether it was a mistake about which the Government knew or should have known. He alleges in his complaint that the Government knew or should have known of the possible contamination, but in his response Mr. Hooker states that he is not claiming that the Government "intentionally misrepresented the state

of affairs at the SRS site." Pl's Resp. at 7. Later he states that the "issue is not whether the ponds were actually contaminated...but, rather, did the Forest Service decide that protection was required contrary to the contract language." Pl's Resp. at 8. Thus, it is unclear whether Mr. Hooker believes the Government made a misrepresentation to him and if so it is unclear what he consider that misrepresentation to be.

Regardless, to establish mutual mistake of fact so as to justify reformation of a contract, Mr. Hooker must show that: (1) the parties were mistaken in their belief regarding facts; (2) the mistaken belief constituted a basic assumption underlying contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of mistake on the party seeking reformation. Dairyland Power Cooperative v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994). Mr. Hooker has failed to establish any of the forgoing elements.

Mr. Hooker has failed to establish that both parties were mistaken in their belief regarding the facts surrounding the contract. He has offered no evidence that the Forest Service knew at the time the contract was entered into, that there were toxicological hazards involved in trapping beavers, which is necessary for him to meet his burden. L.W. Matteson v. United States, 61 Fed. Cl. 296, 321 (2004) (holding that to meet burden plaintiff must show that one or both of the parties knew of the existence of the fact that was mistaken at the time the contract was entered into); Dairyland Power Coop. v. United States, 16 F.3d 1197, 1201 (Fed. Cir. 1994) (holding the erroneous belief held by the parties must relate to an existing fact); ECC Int'l v. United States, 43 Fed. Cl. 359, 371 (1999)("a prediction or judgment regarding an event to occur in the future, if erroneous, does not constitute a 'mistake,' as the term is contemplated within the doctrine of mutual mistake of fact."). Additionally, once USFS was made aware of possible toxicological

hazards, it gave Mr. Hooker the option not to trap in the area, to trap in a manner that would allow him to avoid the hazards, or to trap using protective gear, all of which eliminate the effects of toxicological hazards. Thus, it is questionable whether there was a "mistake of fact" such as to justify a reformation of the contract.

If, however, the contamination of Four Mile Branch could be considered a mistake of fact, Mr. Hooker has also failed to show that the "mistaken belief" constituted a basic assumption underlying the contract. Courts are generally wary of granting relief from innocent mutual mistakes imbedded in contracts. National Presto Industries Inc., v. United States, 338 F.2d 99, 106-07 (1964). An assumption is considered basic if it is a significant part of the bargaining process. See John Cibinic, Jr. and Ralph C. Nash, Jr., ADMINISTRATION OF GOVERNMENT CONTRACTS, 323 (3d ed. 1995). Mr. Hooker has failed to show how the absence or presence of toxicological hazards in one area formed a significant part of the bargaining process.

Mr. Hooker has further failed to show that the contamination present in Four Mile Branch had a material effect on the bargain. There simply is no basis in fact for Mr. Hooker's assertion that any additional training or equipment was required. USFS gave Mr. Hooker the option of not hunting in this area or of hunting using snares so that he did not have to go in the water and could avoid contact with any hazards. Mr. Hooker voluntarily chose to hunt in this area and opted not to use the snares. When Mr. Hooker stated that he would hunt in this area and would go into the water, USFS provided him with protective gear. Mr. Hooker already possessed the RAD II certification; USFS did not require him to obtain this certification for himself or anyone else. There is no evidence that Mr. Hooker ever had to obtain any additional equipment or training for himself or any employee as a result of any contamination, real or possible under this contract.

Additionally, Mr. Hooker has abandoned his claim that he incurred any additional costs as a result of hunting in Four Mile Branch or any other area, as he did not present the claim to the contracting officer. Pl.'s Resp. at 9. Thus, the Government is at a loss as to what basis Mr. Hooker has for requesting contract reformation.

Mr. Hooker's claim for reformation must also fail on the last element as the contract put the risk of the mistake on him. General specification A, "Scope of Contract," provides that the "contractor shall furnish all labor, materials, supervision, transportation, equipment, supplies (including safety and safely perform all work necessary to remove beaver from problem areas and maintain open and free flowing culverts at the Savannah River Site." A161. Additionally, general specification C, "Safety," provides that "[s]afety equipment the contractor shall be required to have and use is listed below. This list may not be all inclusive and other equipment may be required as directed by SRI and DOE safety personnel and/or OSHA requirements." A162. Thus, if any safety equipment or supplies were required under the contract, Mr. Hooker was responsible for providing them.

Mr. Hooker has failed to plead the elements necessary to state a claim for reformation. Moreover, his claim is vague and somewhat contradictory, to such an extent that the Government cannot be sure what he believes the mistake of fact to be and whether he considers it to be mutual or unilateral. At any rate, Mr. Hooker failed to present these claims to the contracting officer and has abandoned this claim. Moreover, he has failed to meet his burden of showing why reformation is proper.

III. Mr. Hooker Has Failed To State A Claim For Bad Faith

As Mr. Hooker states in his response to the Government's motion, a requirements contract "calls for the Government to fill all its actual requirements for specified supplies or services during the contract period by purchasing from the awardee, who agrees to provide them at the agreed price." Medart, Inc. v. Austin, 967 579, 580 (Fed. Cir. 1992). Here, he has failed to plead any facts that support his theory that the Government did not fill its actual beaver trapping and culvert cleaning requirements during the contract period by purchasing services from Mr. Hooker. Mr. Hooker continued to trap beaver and clean culverts and he continued to invoice USFS for these beavers and culverts until the end of the beaver contract in December of 1999.[1] At no point did USFS hire someone else to trap beaver or clean culverts, and Mr. Hooker has failed to even allege as much.

He further alleges in his response that the evidence of misrepresentation is the contract itself, which stated that no toxicological hazards existed. Yet, the USFS made no misrepresentation regarding any hazards. They notified him immediately upon their discovery that hazards existed, provided him with several safety options and finally provided him with protective gear. Further, as the Government argued in its partial motion to dismiss, Mr. Hooker has failed to state a claim for tortious breach of contract. Nor, has he pled any facts that support his argument that the Government acted in bad faith with respect to the hog contract. He has only alleged that he discovered a sign on the ground, he asked about contamination at the SRS, and that the USFS then reduced the number of sites they wished Mr. Hooker to trap.

[1] He is also aware that the SRS experienced a drought during the summer and fall of 1999, thus decreasing the water levels in the ponds on the site and causing a decrease in beavers.

Mr. Hooker's claim of bad faith cannot survive on such meager facts in light of the "well-nigh irrefragable proof" standard required to combat the assumption that Government officials act in good faith. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (holding that well-nigh irrefragable proof refers to evidence that cannot be refuted or disproved; incontrovertible, incontestable, indisputable, irrefutable, undeniable).

## IV. Mr. Hooker Has Failed To State A Claim For Breach Of Contract Based On The Government's Rejection Of Domestic Pigs Or The Government Removing Two Of His Employees

Mr. Hooker mistakenly relies upon patent claims construction law to offer guidance to this Court on how best to interpret the meaning of the word "wild" as used in the hog contract. As stated in our motion, the term "wild hog," is used throughout the contract and it is clear that its definition does not encompass domestic pigs. An SRS biologist who was conducting a study on the wild hogs noticed that Mr. Hooker and his employees were submitting animals that had the characteristics of domestic pigs and not wild hogs; these characteristics include dull rounded hooves, which is an indication of standing on concrete, extra teats, and the absence of parasites, also an indication of being kept indoors. Pl's complaint in case no. 04-1126, Attachment, Contracting Officer's Final Decision, June 10, 2004 at 1. Pursuant to contract specification E.2 the Government had the right to reject any services it deemed out of conformance with the contract. App. 27-28. Furthermore, USFS conducted an investigation to determine why Mr. Hooker and his employees were submitting the domestic hogs, and it was determined that Mr. Hooker's employees were doing so intentionally and with knowledge that they were not wild hogs. Pl's complaint in case no. 04-1126, Attachment, Contracting Officer's Final Decision, June 10, 2004 at 1. This investigation led to USFS barring two of Mr. Hooker's employees from the

SRS, also something the Government had the right to do pursuant to the contract pursuant to contract specifications H6 and H16. App. 33, 39-40. Thus, Mr. Hooker has failed to identify a duty the Government had pursuant to the contract that it did not fulfill with respect to rejecting the domestic hogs or removing his employees from the SRS.

IV. Mr. Hooker Has Failed To State A Claim For Breach Of Contract With Respect To The Alleged Loss Of His Contraband Pass

Mr. Hooker once again asserts that the Government hindered his ability to perform under the hog contract by "losing" his contraband pass for "at least six weeks." Pl's Resp. at 13. Mr. Hooker has proffered no evidence that he was unable to perform under the hog contract due to the alleged loss of his contraband pass. In fact, the Government was completely unaware of the "lost" pass and certainly unaware that Mr. Hooker was not performing under the contract. If Mr. Hooker truly were not performing under the contract, it would have been apparent to USFS and it would have become an issue of concern. There is no evidence this occurred. This is in fact what the contracting officer states in her decision, that she was unable to locate any records substantiating a delay. Compl., case no. 04-1126, Attachment, Contracting Officer's Final Decision, June 10, 2004 at 2. Further, lost income constitutes consequential damages, which are not recoverable. Holden v. United States, 38 Fed. Cl. 732, 734 (1997). "As a matter of law, unforeseeable consequential damages cannot be recovered in the Court of Federal Claims." Pratt v. United States, 50 Fed. Cl. 469, 482 (2001) (citing Bohac v. Dep't of Agriculture, 239 F.3d 1334, 1339 (Fed. Cir. 2001).

CONCLUSION

For the foregoing reasons, we respectfully request that this Court grant the Government's partial motion to dismiss plaintiff's complaints.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Todd M. Hughes
TODD M. HUGHES
Assistant Director

s/ Lindsay E. Williams
LINDSAY E. WILLIAMS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tel:(202) 353-7995
Fax: (202) 514-8624

February 24, 2005

Attorneys for Defendant