IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER,d/b/a<br>GEORGIA BOWHUNTERS SUPPLY,<br><br>Plaintiff<br>Vs<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 03-1501C, 04-1126<br>Judge Allegra |

Plaintiff's Motion for Summary Judgment

Comes now Plaintiff William D. Hooker d/b/a Georgia Bowhunters Supply, through his undersigned counsel and pursuant to Rule 56, RCFC, files this Motion for Summary Judgment. This motion is based upon:

1. All pleadings filed in the above-styled case to date;
2. Plaintiff's memorandum in support of the motion which is filed contemporaneously with this motion;
3. Excerpts from depositions of William D. Hooker, John A. Cromer, III, Frankie Brooks, David Sanders, Homer Gabard, and Margaret Yeaton; including exhibits and
4. Documents received from defendant in discovery, and
5. Memorandum in support of the motion.

Plaintiff moves for summary judgment as to all of his claims on the ground that there are no genuine issues of material fact and summary judgment should, therefore, be granted in favor of William D. Hooker .

Respectfully submitted,

/s/ Berta E. (Robbie) Nichols

206 Carolina Bldg., P. O. Box 7925
Hilton Head Isl., SC 29938

July 28, 2006

Attorney for Plaintiff

TABLE OF CONTENTS

TABLE OF AUTHORITIES . i

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

There is no genuine issue of material fact as to whether the Forest Service breached the beaver and hog contracts when the beaver contract states no toxicological hazards and hazards did exist. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

There is no genuine issue of material fact as to whether Modification 4 of the hog contract extended the contract until November 1, 2001 when a new contract was awarded. This modification should be enforced against the Forest Service to allow Hooker to receive the minimum amount of the value of the contract for the two years until a new contract was awarded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

The Forest Service breached both the hog contract and the beaver contract in bad faith in response to Hooker’s concerns about the negligence of the Forest Service . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

## CASES

*Am-Pro Protective Agency, Inc.v. United States*,281 F.3d 1234 (Fed. Cir. 2002) . 25

*Anderson v. Liberty Lobby, Inc.*,477 U.S. 242(1986) . . . . . . . . . . . . . . . . . . . . . . . 14

*Atlantic Dredging Co. v. United States*, 53 Ct. Cl.490 (1918) . . . . . . . . . . . . . . . . . 16

*Arizona v. United States*, 216 Ct. Cl. 221, 575 F. 2d 855 (1978) . . . . . . . . . . . . . . 21

*Crown Laundry & Dry Cleaners, Inc. v. United States*,29 Fed. Cl. 506(1993) . .17,18,20.

*Datalect v. United States*,41 Fed. Cl. 720(1998) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Dawco Const., Inc. v. United States*, 930 F.2d 872(1991) . . . . . . . . . . . . . . . . . . . 18,19

*Kalvar Corporation, Inc. v. United States*, 543 F.2d 1298, 211 Ct. Cl. 192(1976) . 24,25

*Knotts v. United States*, 121 F. Supp. 630, 128 Ct. Cl. 192(1976) . . . . . . . . . . . . 24

*Locke v. United States*, 151 Ct. Cl, 283 F.2d 521 (Ct. Cl. 1960) . . . . . . . . . . . . . . 18

*L. P. Consulting Group, Inc. v. United States*, Ct. Cl. Filed July 7, 2005 . . . . . . . 24

*Malone v. United States*,849 F.2d 1441 (Fed. Cir. 1988). . . . . . . . . . . . . . . . . . . . 24

*Mason v. United States*, 222 Ct. Cl. 436,615 F.2d 1343 (1980). . . ... . . . . . . . . . . 20

*Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,475 U.S.574(1986) . . . . . 15

*Morrison Knudson Co. v. United States*, 345 F.2d 535 (1965) . . . . . . . . . . . . . . 16

*Price v. Symsek*, 988 F.2d 1187 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 25

*Rumsfeld v. Applied Cos., Inc.*, 325 F.3d 1328 (Fed. Cir. 2002) . . . . . . . . . . . . . . 18

*San Carlos Irrigation & Drainage Dist. v. United States*, 111 F. 3d 1557 (Fed. Cir. 1997) . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554 , 174 Ct. Cl. 153(1966) . . . . . . . . .. . . . . . . . . .. . . . . . . . . . . . . . . . . .. . . . . . . .. . . . . . . 19

*Torncello v. United States*, 681 F. 2d 756 (1982) . . . . . . . . . . . . . . . . . . . . . 21,24

*United Medical Supply Co. v. United States*, 63 Fed. Cl. 430 (2005) . . . . . . . . . 14

*United States v. Diebold*, 369 U.S. 654 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Womack v. United States*, 389 F.2d 793 (1968) . . . . . . . . . . . . . . . . . . . . . . . . 16

*WRB Corporation v. United States,* 183 Ct. Cl. 409 (1968) . . . . . . . . . . . . . . . 19

COURT RULES

56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . 14

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WILLIAM D. HOOKER,d/b/a<br>GEORGIA BOWHUNTERS SUPPLY,<br><br>Plaintiff<br>Vs<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br>No. 03-1501C, 04-1126<br>Judge Allegra |

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT

STATEMENT OF QUESTIONS INVOLVED

1. Is there is a genuine issue of material fact concerning the contamination of certain beaver trapping sites at the Savannah River Site. Should both the hog contract and the beaver contract be reformed to fully reflect the price Hooker would have bid had he known that he would be working unprotected in areas that were identified as Soil Contamination Areas and Contamination Areas?
2. Is there a genuine issue of material fact as to whether Modification 4 of the Hog Contract extended the contract until November, 2001 when a new contract was awarded? Should this modification be enforced against the government to allow Hooker to receive the minimum amount of the value of the contract for the two years until a new contract was awarded?
3. Is there a genuine issue of material fact as to whether the USFS breached both the hog contract and the beaver contract in bad faith in order to get rid of Hooker because of his concerns as to the negligence of the Forest Service?

STATEMENT OF FACTS

On October 29, 1997 William D. Hooker, ("Hooker") was awarded contract #53-4660-8-04 with the U.S. Forest Service to control the wild hog population on the Savannah River Site by trapping and the use of trained dogs. The hog contract guaranteed a minimum quantity of 200 hogs and a maximum quantity of 800, at a unit price of $55.00 per hog. Modification No. 1 to the hog contract increased the maximum quantity to 1000 The contract was then extended for the option year, or until September 30, 1999. The contracting officer was Homer Gabard. (Defs Resp. to Req. for Production, Exh. A) . Hooker had previously been awarded contracts with USFS since 1992.(Dep. of W. Hooker December 8, 2005;16:7-13[1] Attached as Exhibit B)

On January 22, 1999 Hooker was awarded contract #53-4660-9-06 to trap beaver on the Savannah River Site. This contract was a requirements contract with two option years. The beaver contract price as negotiated was $45.00 per beaver, with an estimated quantity of 700 beaver, plus 1100 hours of culvert maintenance at $18.00 per hour. The general specifications for the beaver contract specifically stated that "no toxicological hazards are associated with trapping beaver at SRS; however, normal environment and physical hazards such as snakes and uncertain footing do exist." (Defs Resp. to Req. for Production, Exhibit C) Hooker had previously been awarded beaver contracts with the USFS beginning in 1992.(Dep. of W. Hooker Dec. 8, 2005;16:10)

Hooker was directed to trap in beaver sites 1 through 55 on the SRS, as directed by the contracting officer's representative, Frankie Brooks. She issued work orders for every site that was to be trapped.(Purchase Order dated January 29, 1999 and May 20,

[1] The depositions of William Hooker and John Andrew Cromer were held on two dates; December 8, 2005 and June2, 2006. As the court reporter did not continue numbering the transcripts in the second deposition but started over from page 1, all references to these depositions will include the date.

1999, Resp. to Req. for Production, Exhibit D)(Dep. of F. Brooks;7:17-21, Attached as Exhibit E) She also acknowledged that some orders were verbal.(Dep. of F. Brooks; 25:9-15) The contracting officer for the beaver contract was also Homer Gabard.

When Hooker first became a contractor on the SRS, Andy Cromer asked Homer Gabard, the contracting officer, if there was any problem with the water and Gabard replied, just don't drink more than two liters. (Dep. of W. Hooker June 2, 2006; 11:5-8, Attached as Exhibit F) Gabard does not recall that Hooker ever asked him what kind of contamination existed at the SRS, or asking what was in the water.(Dep. of H. Gabard; 46:17-20 Attached as Exhibit G) Andy Cromer worked with Hooker and remembered that "we asked about the water. Is there any precautions we need? Are you going to have Health Protection? The answer was no- just don't drink it.(Dep. of A. Cromer Dec. 8, 2005;70:16-24 Attached as Exhibit H) Cromer remembers seeing a soil contamination sign in 1997 and he asked Frankie Brooks about it. She said just don't go there.(Dep. of A. Cromer Dec. 8, 2005;60:19-24)

On February 22, 1999 Hooker was presented with a Work Clearance Permit for the beaver trapping site in Four Mile Creek at Road 4. (Dep. of W. Hooker Dec. 8, 2005; 35:21-22; Pl. Exh. 1, Attached as Exhibit I) This Work Clearance Permit required that the worker be RAD II trained, and required a stand-by person and certain protective equipment. At all times during the contracts, Hooker was RAD II trained because he worked full time at Westinghouse.(Dep. of W. Hooker Dec.8, 2005; 14:11-12) Hooker and Frankie Brooks had previously seen a radiation sign that was pushed over on Road 4. They discussed it and Brooks contacted Chuck Fanning who worked for CSWE. Fanning told her she had to have a Work Clearance Permit to trap in that area. (Dep. of F.

Brooks;12:18-25;13:1-6) Hooker did trap at that site. (Dep. of W. Hooker Dec.8, 2005;39:7-16)

Brooks testified that neither DOE or Westinghouse had ever given the Forest Service or herself a list of contaminated areas on the SRS.(Dep. of F. Brooks; 16:16-20) Brooks also testified that there were a couple of other areas that were posted as contaminated.(Dep. of F. Brooks; 17:2-8) She discussed Site 19 which is a beaver pond.(Dep. of F. Brooks; 7:22) At the time Hooker trapped at Site 19, there weren't any postings. "I don't know how I found out. I think it was from our engineering people with the Forest Service; found out that – I really don't remember how I found out, but somebody had gone in and put up radiation signs at that site; and I remember talking to the CSWE people- I mean engineering because they were also cleaning culverts. They were helping with the big work. And our Forest Service people were in there cleaning culverts, went to clean it and found these radiation signs, brand new, that had just been posted. (Dep. of F. Brooks; 18:2-12) Brooks does not remember when this happened but it was during the same time (as the Work Clearance Permit) and these were areas that beaver had been trapped in. (Dep. of F. Brooks; 19:2-3) Homer Gabard testified that he had worked at the Savannah River Site since 1979. (Dep. of H. Gabard; 5:8-9) Gabard testified that he had never seen a soil contamination sign. (Dep. of H. Gabard; 13:13-19) Gabard testified that DOE never informed him of any contaminated areas where his contractors should not go. (Dep. of H. Gabard;12:4-9) Gabard did not receive a list of contaminated sites. (Dep. of H. Gabard; 12:15-17) Brooks said she became aware of other sites that were posted as contaminated. (Dep. of F. Brooks; 17:2-20) Another Work Clearance Permit was apparently generated at the end of May but Hooker did not use it.

(Contract Daily Diary of Frankie Brooks,May 21, 1999, & Contract Daily Diary of Frankie Brooks dated May 27, 1999, Attached as Exhibit J)

Prior to June, 1999 Hooker requested more money from Homer Gabard for work in the contaminated areas that was not per his contract. (Dep. of W. Hooker Dec. 8, 2005;49:20-25) Hooker made this request verbally and said "Homer, this is not per my contract. I need more money." (Dep. of W. Hooker Dec. 8, 2005; 50:4-6) Gabard testified that Hooker asked for more money and his response was that Hooker did not have to work in that area…that he could refuse to work in the area and we would not force him to do so, but that we would not pay him additional money for trapping in this area. (Dep. of H. Gabard; 45:2-16) Hooker remembered that Gabard answered, "It is per the contract, go do the work." Hooker then went to Frankie Brooks. A few days later, she got back to Hooker and said "Homer said it is per your –per the contract. You either default the contract or do the work." (Dep. of W. Hooker Dec. 8, 2005; 50:7-13)Frankie Brooks documented that Hooker was to start trapping beaver at four sites that are considered contaminated. Brooks also documented Hooker's request for more money in her Contract Daily Diary, dated May 27, 1999.(Exh. J )

Westinghouse created and disseminated a training document that pictures various radiological and contamination signs on the Savannah River Site. (Depositions of December 7, 2005, Pl. Exhibit #3, Attached as Exhibit K). This document requires RAD worker 2 training for work that disturbs the soil in a Soil Contamination Area. Gabard stated that he did not know what protection is required for workers whose activities involve disturbing the soil within soil contamination areas. (Dep. of H. Gabard; 50:9-13) Andy Cromer testified that beaver trapping involves picking mud and sediment up off the

bottom of the creeks and placing it on the bank. (Dep. of A. Cromer Dec. 8, 2005;97:2-15) Andy Cromer also testified that during the time he was trapping beaver and hunting hogs on the Savannah River Site, he was never monitored by health protection. (Dep. of A. Cromer Dec. 8, 2005; 97:16-19)

Hooker wrote a letter to the National Institute for Occupational Safety and Health (NIOSH) asking for an investigation because the U. S. Forestry Service would not address the contamination issues. Hooker asked Frankie Brooks what was in HP-52, another beaver trapping site. "I'd asked for information at every creek and every canal on that plant. For nine months, or six months, I got no answer.(Dep. of W. Hooker Dec. 8, 2005; 17:19-24) Hooker then had his employee Mark Lubert videotape the site at HP-52 in June, 1999. (Dep. of W. Hooker Dec. 8, 2005; 30:16-25) (Pl. Resp. to Defendant's Request for Production; video titled Savannah River Site August 1, 1999/June 1, 1999(38 min.) This video shows soil contamination signs at HP-52 beaver trapping site. Hooker also saw soil contamination signs at four other sites. (Dep. of W. Hooker Dec. 8, 2005;32:8-25;33-1-25). After July, 1999 the beaver trapping sites were reduced from 55 to 2. (Pl. Comp.¶16)

NIOSH did an investigation in response to Hooker's request for a Health Hazard Evaluation and a site visit took place March 20-22, 2000. The final report stated that "during our visit to the SRS we came to understand an issue involving communications between the Forest Service personnel and DOE and DOE contract personnel at SRS. The issue centered on a lack of understanding between Forest Service personnel and SRS staff as to what is involved in the trapping of beaver, particularly the fact that beaver trapping

necessarily involves the disturbance of sediments in order to build castor mounds. Work Clearance Permits (WCPs) were issued to the trappers by the U. S. Forest Service and Westinghouse Environmental Section. The WCPs were issued by Westinghouse staff without a full understanding that the work would involve disturbing contaminated soil during the placement of beaver traps. (Def. Resp. to Req. for Production Attachment 29, Attached as Exhibit L).

Margaret Yeaton is the current contracting officer for the Forest Service at the Savannah River Site. (Dep. of M. Yeaton; 4:13, Attached as Exhibit M) Yeaton said she had never seen radiological signs on the Savannah River Site. (Dep. of M. Yeaton;9:4-11) She testified that the Forest Service does not deal with contamination. (Dep. of M. Yeaton; 11:21-22) Asked if she had a list of contaminated areas where her contractors should not be sent, she responded “no”. (Dep. of M. Yeaton; 12:4-8) Yeaton further testified that the soil contamination areas had been identified, and that an awardee of a contract may request copies. (Dep. of M. Yeaton; 7:22-25;8:1-10)[2] The Forest Service later produced a list of the beaver trapping sites with notation as to whether each site was posted as soil contamination areas. (Resp. to Pl. Supp. Req. for Production)(Dep. of D. Sanders, Exh. P-10, Attached as Exhibit N) Sites 19, 25, 29, 30, 32,35,36,40,43,44,45,47 and 53 are posted as radiological areas or posted as “keep out”. (Dep. of D. Sanders, Exhibit P-10) Hooker trapped beaver in all these sites. (Defs. Resp. G-0994 Attached as Exhibit O) In response to Plaintiff’s Requests for Production, a site visit was made by counsel to four beaver trapping sites on December 8, 2005. Photographs were taken of these sites by a Westinghouse photographer and provided to Plaintiff. (Response to Pl.

[2] The defendant , in response to discovery requests for such copy, stated that Margaret Yeaton was mistaken. (Resp. to Pl.Supp. Req. for Production)

Req. for Production) Two of the beaver trapping sites, 19 and 53 were posted with radiological soil contamination signs. Two; 49 and 32, were not. (Resp. to Pl. Req. for Production)

David Sanders has been employed by Westinghouse since 1992. His current title is RAD-CON manager. (Dep. of D. Sanders;4:1-3) His job is to protect personnel from radiation contamination, prescribing whatever protective equipment or monitoring needs to be prescribed to conduct work activities at SRS. (Dep. of D. Sanders;4:14-18, Attached as Exhibit P) Sanders' responsibility includes (radiologic) posting and signage. (Dep. of D. Sanders; 6:13-24) Orange balls mark hazardous sites. (Dep. of D. Sanders;6:25;7:1) Sanders doesn't know what the orange balls are marking. He said he typically doesn't deal with the orange balls so he doesn't know. (Dep. of D. Sanders;7:4-5) Hooker testified that these orange balls mean danger. "I found them where the trees had growed over them maybe 10/15 years." (Dep. of W. Hooker Dec. 8, 2005; 54:3-9) Hooker saw orange balls in a couple of places. "In front of 100-R where we was hog hunting". (Dep. of W. Hooker Dec. 8, 2005; 54:17-18) When Sanders was asked why the soil contamination area sign would be placed in an area, he replied it could be a combination of either us performing soil samples or historical knowledge. (Dep. of D. Sanders; 7:21-23) Sanders testified that his group is also involved in remediating waste sites. (Dep. of D. Sanders;10-23-24) "If we have concentration levels in the soil, or whatever we're remediating, they would survey for the personnel to remove that soil, place it into containers, or whatever we decide to- --however we decide to disposition the material. (Dep. of D. Sanders;11:1-6) When asked about personnel who work outside doing brush cutting and tree cutting in a radiological area, Sanders' function would be to monitor for

personnel, to make sure they are not spreading contamination and to make sure they are not exceeding any (radiation) dose levels. (Dep. of D. Sanders; 10:3-8) Sanders was not sure that he or his department monitor any of the beaver trappers; he stated the current beaver trapper is not being monitored. (Dep. of D. Sanders; 38:10-14) Asked if the beaver trappers were ever monitored, Sanders was not sure but said that Hooker was monitored most of the time by TLD, by whole body counts, from '92 to '99 because his full time job was with Westinghouse. Asked if he agreed that the monitoring had nothing to do with his beaver contracting, Sanders agreed that it didn't, but "he was monitored". (Dep. of D. Sanders;38:23-25;39:1-9) Sanders was not sure if the rest of Hooker's employees were monitored. (Dep. of D. Sanders; 39:10-11) The current beaver trapper and hog contractors are not monitored. (Dep. of D. Sanders; 39:12-17) There are six areas that are contamination areas in Steed Pond. The beaver site location is posted as an SCA, it was posted in 1997. (Dep. of D. Sanders; 41:16-25) In the contaminated areas of Steed Pond, the isotope of concern is depleted uranium. "We took a conservative approach because we didn't understand at the time that the isotope we were dealing with was uranium. Sometime in the future it will not be a contamination area anymore based on the isotope of depleted uranium. The values are a lot less conservative for uranium versus plutonium. (Dep. of D. Sanders; 43:7-16) Andy Cromer testified that he regularly trapped in Steed Pond. (Dep. of A. Cromer Dec. 8, 2005; 65:7-13) Asked if he had ever seen a posting at Steed Pond, he replied not until near the time of seeing the signs at Site 19. (Dep. of A. Cromer Dec. 8, 2005; 65:16-17) Cromer testified that he saw the signs at Site 19 five years after he had been in the pond. He went back to Frankie Brooks and told her of that stuff. "She didn't know. Again, DOE hadn't told –hadn't notified Forestry.

(Dep. of A. Cromer; 56:16-22) When questioned about beaver trapping Site #43, behind the motor pool, Sanders stated it is posted as a RCRA CERCLA site. (Dep. of D. Sanders; 33:21-23) Asked what a CERCLA site is, Sanders replied he didn't know. "That's not inside of RAD-CON business. That is regulatory business. They do business totally different than RAD protection. (Dep. of D. Sanders; 34:1-4) Sanders also stated that there is no protection required for work that disturbs the soil in a soil contamination area. (Dep. of D. Sanders;27:14-17) This is contrary to Westinghouse's own document that states a worker must be a RAD Worker II in order to work in soil contamination areas in work that disturbs the soil. (Exhibit K) Sanders stated it did not appear to be a document that governed RAD-CON, or directs RAD-CON activities or protocols. These are not the governing documents that dictate how we perform our work, he stated. (Dep. of D. Sanders; 29:1-20) Asked if it was possible that there could be areas on the Savannah River Site that have never been surveyed, and therefore are not posted that could be contaminated, Sanders stated "there are places that are potentially above levels that have residual contamination on them that we haven't identified." (Dep. of D. Sanders; 14:11-13) Further, "in order to determine contamination, we look at all the radionuclides and we have concentrations for all of them that would prescribe when an area would be considered contaminated". (Dep. of D. Sanders; 14:20-22)

The beaver trapping sites were suddenly reduced in July, 1999.(Def. Resp. to Req. for Production, unnumbered document listing number of beaver trapped by month, Attached as Exhibit Q) Hooker was then given one trapping site in August, one in September, and trapped three beaver in December. Homer Gabard testified that the reason the beaver contract was drastically reduced was due to weather conditions,

drought. (Dep. of H. Gabard; 51:18-22) Rainfall records for the month of July, 1999 at Augusta Bush Regional Airport, Georgia (approximately twenty miles away) show 3.68 inches of rainfall compared to 4.24 inches average. Rainfall records for August, 1999 show 2.19 inches compared 4.40 average. Rainfall records for September, 1999 show 4.57 inches of rainfall compared with 3.32 average. Rainfall records for October, 1999 show 2.74 inches of rainfall compared with 2.71 average. (Pl. Response to Def. Req. for Production, Source www.wunderground.com, Attached as Exhibit R) Gabard also testified that if there had been an occasional requirement for culvert cleaning, it would have been CSWE or Forestry personnel that did it. "But that would not have been very often neither with the drought and so forth going on." (Dep. of H. Gabard; 52:1-4) Gabard then testified that if there had been a requirement for culvert cleaning, (he) Hooker would have done it during the period of the contract, but there was not –with a drought like that. (Dep. of H. Gabard; 52:10-13) In November, Gabard summarized a phone call from Hooker. Gabard asked Hooker why he had only caught one beaver in September and none in October. Hooker asked why the beaver sites had been reduced after the Ellers were removed from the hog contract. Hooker wanted to know why the number of culverts he cleans was also reduced since some culverts are blocked again. (Defs. Resp. to Pl. Req. for Production, unnumbered, attached as Exhibit S) Andy Cromer thought the reduction in the beaver trapping sites was done to "get us out of there, trying to, if we would, just get ticked off and leave". (Dep. of A. Cromer Dec. 8, 2005; 92:16-19) Questioned as to why he thought the Forest Service perceived he and Hooker to be such a threat that they would try to remove them from the property… Cromer said he thought somebody made a mistake, they were wrong, they were

negligent. (Dep. of A. Cromer Dec. 8, 2005; 84:22-25;85:2-5) Hooker was also paid twice for an invoice by the government in July, 1999. Instead of canceling the deposit, they said, "“Well, we’ll just take it out of the next coming checks.” (Dep. of W. Hooker June 2, 2006; 17:8-18) When asked why that was bad faith, Hooker stated “Well, it’s not if you’re not going to cut the work out”. (Dep. of W. Hooker June 2, 2006; 20:7-8) Gabard did recall that the overpayment would be deducted from future invoices. (Dep. of H. Gabard; 51:1-2) Asked if he was aware that Hooker’s beaver trapping sites were drastically reduced after that point and he became unable to pay back the money, Gabard did not recall. (Dep. of H. Gabard; 51:14-17)

Regarding the hog contract, on June 30, 1999 the contracting officer, Homer Gabard, issued a letter to Hooker withholding payments totaling $1,320.00 and refused to pay for hogs itemized in subsequent invoices. (Pl. Comp.¶7)(Dep. of H. Gabard; 19:7-8) This letter barred two of Hooker’s employees, Goldman E. Eller and Michael E. Eller from working on the hog contract or any other contract with the Forest Service at the Savannah River Site forever. (Dep. of H. Gabard; 26:19-22) The Ellers were accused of bringing domestic hogs to the cooler for payment and defrauding the government. (Def. Resp. to Production, Attached as Exhibit T) Both Michael Eller and Goldman Eller wrote letters vigorously denying the charges. (Defs. Resp. to Pl. Req. for Production, Attachments 30 & 31 attached as Exhibit U) . Cromer testified that the difference between a domestic hog and a wild hog was that a domestic pig is one in a pen in a farmer’s yard and a wild hog is one that’s on Savannah River Site. (Dep. of A. Cromer Dec. 8, 2005; 85:10-16)

Hooker was given fifteen days to obtain replacement employees for the Ellers. (Dep. of H. Gabard; 30:1-4) Hooker was also required to submit resumes for replacement personnel to Gabard for approval prior to the personnel starting work. (Dep. of H. Gabard; 30:9-13) Gabard did not approve one of the replacements, James Reid Boylston IV, until August 26, 1999. (Defs. Resp. to Req. for Production Attachment 19 Attached as Exhibit V) Hooker also had to purchase dogs to meet the terms of the hog contract since the Ellers owned the dogs. (Dep. of W. Hooker June 2, 2006; 42:3-10)

The hog contract expired on September 30, 1999. Modification No. 4 dated September 4 and 7, 1999 extended the contract until October 31, 1999 or until a new contract is awarded. (Exhibit A) Hooker submitted a response to a solicitation for the new contract (RFP-36-99-09) on or about September 3, 1999. (Defs. Resp. to Req. for Production Attachment 32, Attached as Exhibit W) Homer Gabard wrote to Hooker on November 24, 1999 requesting a 60 day extension of the offer acceptance period. (Defs. Resp. to Req. for Production Attachment 34, Attached as Exhibit X) Again on February 2, 2000, Hooker gave USFS permission to extend his bid for the Wild Hog Contract for another 60 days. (Defs. Resp. to Pl. Req. for Production Attachment 36, Attached as Exhibit Y) The contracting officer states a decision was made to perform the hog contract in house. (Response to Hooker's Request for Equitable Adjustment, Attached as Exhibit Z ) Gabard also testified that since the new contract awarded in November, 2001 was slightly different, that it did not qualify as a new hog contract. ( Dep. of H. Gabard 33:22-23) Gabard testified that the normal procedure would have been to notify the bidders in writing, either through an amendment to the solicitation, or with a letter saying the solicitation was canceled. (Dep. of H. Gabard;36:18-24) Defendant states in response

to requests for production that defendant does not have these documents. (Defs. Resp. to Supplemental Req. for Production) A new hog contract was not awarded until November, 2001. (Dep. of H. Gabard; 37:8-25) The general specifications for the current hog contract (EAZ-33-03-2012) state that Contractor/employees shall not enter or operate in Radiological Control Areas (RCA) or Soil Contaminated Areas (SCA) and may be required to submit to monitoring by Westinghouse Health Protection personnel. (Resp. to Req. for Production, unnumbered. Attached as Exhibit AA)

Hooker testified that he would like to get paid five times what he bid his contracts for. (Dep. of W. Hooker June 2, 2006; 41:21-22) Hooker said that he didn't bid contracts to work in uranium. "I didn't bid contracts to work in any kind of stuff that had heavy metals in it. I didn't bid contracts to haul crap around in my truck that needed to be in a burial ground." (Dep. of W. Hooker June 2, 2006;41:6-10)

## ARGUMENT

### Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,247-8(1986) Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment. *Id.* at 248. The court must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 250-252. *United Medical Supply Co., Inc. v. United States*, 63 Fed. Cl. 430,435(2005). In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must

be viewed in the light most favorable to the party opposing the motion. *Matushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574,587 (1986) (citing *United States v. Diebold*, 369 U.S. 654,655(1962).

I. There is no genuine issue of material fact as to whether the Forest Service breached the beaver and hog contracts when the beaver contract states no toxicological hazards and hazards did exist

It cannot be disputed that soil contamination existed in certain beaver trapping sites on the SRS. The government in discovery provided a listing of the beaver trapping sites that were posted as contaminated (Exhibit N ) and also a listing of the beaver sites actually trapped by Hooker. (Exhibit O) Westinghouse's witness, David Sanders, also testified that there could be other areas not yet identified as contamination sites. (Dep. of D. Sanders; 14:11-13) It is also undisputed that Hooker hunted hogs over the entire Savannah River Site (Exhibit A ) and the general specifications for the current hog contract (EAZ-33-03-2012) state that Contractor/employees shall not enter or operate in Radiological Control Areas (RCA) or Soil Contaminated Areas (SCA) and may be required to submit to monitoring by Westinghouse Health Protection personnel. (Resp. to Req. for Production, unnumbered. Exhibit AA) The beaver contract stated that no toxicological hazards exist. The hog contract was silent as to toxicological hazards but was entered into contemporaneous with the beaver contract and covered essentially the same topographic area. (Exhibit C )Hooker, in submitting his bid for both contracts, had a right to rely on the positive representations that were made by the Forest Service regarding the absence of toxicological hazards. Such positive representations amounted to a warranty and established a predicate for a possible action for breach of contract when

it was later discovered that the representations were untrue. *Morrison-Knudson Co. v.The United States*, 345F.2d 535,539 (1965), citing *Atlantic Dredging Co. v. United States*, 53 Ct. Cl. 490, 502, aff. 253 U.S. 1, 40 S. Ct. 423, 64 L.Ed.d 735(1918) The representation by the Forest Service was particularly important because the Savannah River Site is a Superfund site and a representation as to the absence of toxicological hazards was critical to Hooker's consideration of his bid for trapping beavers.

The government has an implied obligation to carry out its duties under a contract in good faith. *L. P. Consulting Group, Inc. v. United States*, Ct. Cl. Filed July 7, 2005, citing *Malone v. United States*, 849 F.2d 1441,1445(Fed. Cir. 1988) But an inadvertent misrepresentation stemming from negligence is fully as damaging as a deliberate one to the party that relies on it to his detriment. *Womack v. The United States*, 389 F.2d 793, 800(1968), citing *Morrison-Knudsen* (id). Hooker does not claim that the Forest Service's representation as to contamination was deliberate, but it is apparent that there was a massive breakdown in communication between DOE, Westinghouse and the Forest Service. (NIOSH report) By making the representation, the Forest Service was negligent in that it apparently made no effort to ascertain whether that representation was indeed accurate. Both the CO Gabard and COR Brooks testified that neither Westinghouse or the Department of Energy ever provided them with information regarding the soil contamination areas (Dep. of H. Gabard; 12:15-17)(Dep. of F. Brooks; 16:16-20). Even when the COR Brooks was advised of the posting of a beaver trapping site in 1997, apparently the Forest Service displayed a lack of curiosity and took no action, merely advising Cromer "Don't go there". (Dep. of A. Cromer Dec. 8; 2005;59:13-24) The Forest Service, in 1997, was or should have been, on notice that

there was a possibility of contamination. Sanders, the Westinghouse RAD CON manager, testified that his responsibility was to monitor health and protect workers (Dep. of D. Sanders; 4:14-18) Sanders conceded that the contractors were not monitored at present and he didn't know whether they were ever monitored. (Dep. of D. Sanders; 38:10-14) That Sanders disputes the documents of his own employer, Westinghouse, as to required protection in soil contamination areas, demonstrates a lack of communication as to the whole Savannah River Site. That Sanders was unable to define the term CERCLA, stating that it was a regulatory matter that wasn't his responsibility, shows an almost determined unwillingness to address any concern outside of what he considered his area of responsibility. (Dep. of D. Sanders; 34:1-4)

Pure contract interpretation is a question of law which may be resolved by summary judgment. *Crown Laundry & Dry Cleaners, Inc. v. United States*, 29 Fed. Cl. 506,515(1993) The Forest Service breached the beaver contract, and by implication, the hog contract, when it affirmatively misrepresented the contamination in the beaver contract, and remained silent on the hog contract. There has been no beaver trapping contract awarded since the contract at issue, but the current hog contract now prohibits contractors from operating in contaminated areas. Both contracts, therefore, should be considered breached, and summary judgment for Hooker is appropriate. Hooker is entitled to damages, if proven, for the government's breach of contract. The general rule in common law breach of contract cases is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed. *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63(Fed. Cir. 1997). Moreover, the damages must have been foreseeable at the

time the parties entered the contract, which requires that they "be the natural and proximate result of the breach." *Locke v. United States*, 151 Ct. Cl. 262,283 F.2d 521,526(Ct. Cl. 1960)

Hooker has asked that both contracts be reformed to reflect the amount he would have bid had he known he would be working in contaminated areas without protection. Presumably, contractors rely on the proffered estimates in formulating bids, so the government must act in good faith. Where a contractor can show by preponderant evidence that estimates were negligently prepared…the government could be liable for appropriate damages resulting. *Rumsfeld v. Applied Cos., Inc.*. 325 F.3d 1328 (Fed. Cir.2003), citing *Crown Laundry,* id. at 520. In *Crown Laundry,* the court further stated that, in such a situation, the contractor is entitled to be paid the reasonable value of the work performed. Id. at 524. Here, the estimates were not negligent, but the warranty within the contract itself was negligent. In order for the damages claimed to be related to the breach, plaintiff must present the prices that it would have charged had the estimate not been negligently prepared. *Datalect v. United States*, 41 Fed. Cl. 720,726 (1998) Hooker has testified that he would have bid five times the price of both contracts.(Dep. of W. Hooker June 2, 2006;41:21-22) There is no way to calculate what a fair bid would be given the circumstances in this case; i.e. what a reasonable contractor would bid for unprotected work in radiologically contaminated areas, because no contract would have been formed under those facts. One method of approximation is the "jury verdict" which is most often employed when damages cannot be ascertained by any reasonable computation from actual figures. *Dawco Const., Inc. v. United States*, 930 F.2d 872, 880 (1991) It is, however, not favored and may be used only when other, more exact,

methods cannot be applied. *Id.* citing *Specialty Assembling & Packing Co. v. United States*,355 F.2d 554, 572, 174 Ct. Cl. 153 (1966). Before adopting the "jury verdict method", the court must first determine three things: (1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages. *Dawco*, citing *WRB Corporation v. United States*,183 Ct. Cl. 409, 425(1968). The court in *Dawco* rejected the Claims Court finding that it was not possible for Dawco to prove actual damages, and that sufficient information existed to enable the court to arrive at a fair approximation of the damages. The *Dawco* court also warned of the risk of using the "jury verdict method" that unrealistic assumptions will be adopted and extrapolated, greatly multiplying an award beyond reason, and rewarding preparers of imprecise claims based on undocumented costs with unjustified windfalls. *Id.* at 882. Hooker can be distinguished from *Dawco* in that there is no reliable method for computing damages, and he did not prepare an imprecise claim. To the contrary, he relied on the representations contained in the contract. There is only Hooker's testimony as to what he would have bid. Is the evidence sufficient for a court to make a fair and reasonable approximation of the damages? Perhaps not, but if Hooker is to have a remedy for this breach, he must look to the court to make the determination of damages.

2. There is no genuine issue of material fact as to whether Modification 4 of the Hog Contract extended the contract until November, 2001 when a new contract was awarded. This modification should be enforced against the Forest Service to allow Hooker to receive the minimum amount of the value of the contract for the two years until a new contract was awarded.

Contract #53-4660-8-04 was awarded to Hooker on October 29, 1997 to control the wild hog population on the Savannah River Site by trapping and the use of trained

dogs. The contract guaranteed a minimum quantity of 200 hogs and a maximum quantity of 800 hogs at a unit price of $55.00 per hog. Modification No. 1 to the contract increased the maximum quantity to 1000. The contract was extended for the option year, or until September 30, 1999. Modification No. 4 extended the contract until October 31, 1999 or until a new contract is awarded. (Exhibit A) Hooker submitted a response to a solicitation for the follow on contract on or about September 3, 1999. The contracting officer requested a 60 day extension on November 24, 1999 for the offer acceptance period. Again on February 2, 2000, Hooker gave permission to extend his bid for another 60 days. Hooker never received a response to his bid. A hog contract was not awarded until November, 2001, two years later. The contracting officer stated that a decision was made to perform the hog contract in house.(Resp. to Hooker's REA, Exhibit Z) Gabard testified that the normal procedure would have been to notify the bidders in writing, either through an amendment to the solicitation, or with a letter stating the solicitation was canceled. (Dep. of H. Gabard; 36:18-24) Defendant further states that it does not have these documents. Gabard also testified that since the new contract awarded in November, 2001 was slightly different, that it did not qualify as a new hog contract. (Dep. of H. Gabard; 33:22-23 ) This is clearly disingenuous in that the modification clearly states "until a new contract is awarded" and a new contract was not awarded until November, 2001. The hog contract is an indefinite quantity contract. The indefinite quantity contract is described in *Crown Laundry and Dry Cleaners, Inc. v. United States*, 29 Fed. Cl. 506,516 (1993) citing *Mason v. United States*, 222 Ct. Cl. 436,444, 615 F.2d 1343,1347 (1980). "An indefinite quantity contract is a contract under which the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer

chooses to purchase from the seller. To make such contracts enforceable, the buyer must agree to purchase from the seller at least a guaranteed minimum quantity of goods or services. If the contract contains such a minimum quantity clause, the buyer is required to purchase at least this minimum amount, but this is the extent of his legal obligation." The contract at issue states a minimum quantity of 200 hogs during the contract year. The Forest Service chose to use its own employees to hunt hogs during the two years, but this does not relieve it of its obligation under the contract. The parties assumed a binding contract be formed. Thus, any choice of alternative interpretations, with one interpretation saving the contract and the other voiding it, should be resolved in favor of the interpretation that saves the contract. *Torncello v. United States*, 681 F.2d 756,761 (1982) citing *Arizona v. United States*, 216 Ct. Cl. 221, 575 F.2d 855 (1978). Hooker remained ready to perform under the contract, as demonstrated by his response to the solicitation, and requests that this court grant him summary judgment on this claim and award him the minimum value of this contract over two years, plus interest at the statutory rate from the date of denial of his request for equitable adjustment.

3. <u>The Forest Service breached both the hog contract and the beaver contract in bad faith in response to Hooker's concerns about the negligence of the Forest Service</u>

Hooker first became aware of the contamination in the beaver site when he was presented with the Work Clearance Permit in February, 1999 to trap at Road C and Four Mile Creek which was posted as contaminated. He did the work under the permit but then testified that for the next several months he asked what was in the water. _He received no response from the Forest Service. He continued to trap beaver. In May, 1999 another Work Clearance Permit was generated and he asked for more money,

stating he did not bid the contract in order to do RAD work. The contracting officer denied this request and said he had to continue to trap beaver or default the contract. Hooker continued to complain. After the beginning of June, everything went downhill on both contracts, and the following events unfolded. 1) On June 30, 1999, Hooker was called to Homer Gabard's office and presented with a letter that required him to fire two employees who were accused of defrauding the government by bringing domestic hogs onto the Savannah River Site and submitting them for payment under the contract. These employees were barred from SRS "forever". Both of these employees vigorously denied these allegations. The contracting officer also withheld payments of $1,320.00 for "domestic hogs" brought to the cooler. The contract stated feral hogs and the government has been unable to respond to questioning regarding domestic versus feral hogs and what the policy was regarding domestic hogs . One of the barred forever employees owned the dogs required to be used under the contract and Hooker had to purchase the dogs and find new employees whose resumes were required to be submitted to the contracting officer. Gabard did not approve one of the men until late August, preventing Hooker from performing fully under the contract. One of these barred forever employees, Michael Eller, was awarded the hog contract in 2001, and Gabard testified that he changed his mind.

2) Hooker's beaver invoices were overpaid in July, 1999 and it was agreed that the overage would be taken out of subsequent invoices. Hooker became unable to pay back the overage due to the following.

3) At approximately the same time, at the beginning of July, 1999 Hooker's beaver trapping sites were reduced from 55 to 2. Culvert cleaning was also reduced since

he only cleaned culverts at the beaver sites. (Exhibit Q ) He was given several sites back at the end of the year but Hooker only caught ten beaver until the end of the contract.(Exhibit Q) Gabard said the reason the beaver contract was reduced was due to weather conditions - drought. Rainfall records for the area during the fall do not support this. (Exhibit R) Moreover, in November, 1999 Gabard summarized a call from Hooker . Gabard asked Hooker why he had only caught one beaver in September and none in October. Hooker asked why the beaver sites had been reduced after the Ellers had been removed from the hog contract. He also wanted to know why the number of culverts was also reduced since some culverts are blocked again. (Exhibit S) This summary does not reflect that Gabard mentioned weather conditions or drought. Gabard testified that any culvert cleaning would have been done by Forest Service personnel (Dep. of H. Gabard;52:1-4) and then corrected himself and explained that if any culvert cleaning was needed, Hooker would have done it pursuant to the contract. (Dep. of H. Gabard: 52:10-13 ) However, Hooker only trapped in three sites after July, 1999 so only cleaned culverts at those locations. Andy Cromer testified that he thought the reduction in beaver trapping sites was done to "get us out of there, trying to, if we would, just get ticked off and leave." (Dep. of A. Cromer Dec.8, 2005; 92:16-19; 84:22-25; 85:2-5)

The foregoing actions by the Forest Service, all taken contemporaneous with Hooker's request for more money under the contracts, are suspect. If the intention was to injure Hooker economically, it succeeded. The Forest Service had a problem at the end of May when Hooker questioned the contamination and asked for more money. It solved the problem by curtailing Hooker's performance under the beaver contract. The beaver contract was a requirements contract. While the Forest Service had the right in a

requirements contract to limit the amount of beavers caught , the timing is suspect because it occurred right after Hooker requested more money. The Forest Service had had requirements, however, since 1992, so under the history of dealing as well as the reasons given in discovery, the Forest Service acted in bad faith. Gabard didn't mention drought in November, 1999; instead he asked Hooker why he wasn't catching beaver.

The government has an implied obligation to carry out its duties under a contract in good faith. *Malone v. United States,* 849 F.2d 1441, 1445 (Fed. Cir. 1988). In order to demonstrate a breach of that duty, plaintiff must demonstrate that the government acted in bad faith. *Torncello v. United States*, 681 F.2d 756, 770-771(Ct. Cl.1982) In order to overcome the presumption that public officials "act conscientiously in the discharge of their duties", it requires 'well-nigh irrefragable proof to induce the court to abandon the presumption of good faith dealing. *Kalvar Corporation, Inc. v. United States.*, 543 F.2d 1298, 1302, 211 Ct. Cl. 192 (1976) , citing *Knotts v. United States,* 121 F. Supp. 630,631, 128 Ct. Cl. 489,492 (1954). In *Knotts*, the court found bad faith in a civilian pay suit only in view of a proven "conspiracy to get rid of plaintiff." *Knotts,* supra. At 128 Ct. Cl. 500, 121 F. Supp. 636. The *Kalvar* court considered whether the government had withheld information from Kalvar, applied a double standard of treatment when it sought out another contractor to supply film and made a wholly arbitrary finding that the other contractor's film was beyond the specification of Kalvar's contract. The court looked at the standard or proof required to show bad faith (tantamount to a showing of malice or conspiracy) *Kalvar*, 1302, and decided that Kalvar had failed to make its case. The court further stated, that "Kalvar makes no conceptual distinction between "bad faith" and "abuse of discretion" and, for the purposes of this decision, we accept Kalvar's equation

of the two concepts. *Kalvar*, 1301. The Court of Appeals for the Federal Circuit further refined the quality of evidence required to overcome the good faith presumption, considering what proof is needed to show that the government acted in good faith. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234,1237 (Fed. Cir. 2002) The court further stated that the clear and convincing evidence standard most closely approximates the language traditionally used to describe the burden for negating the good faith presumption; namely, the "well-nigh irrefragable" proof standard. *Id.* at 1239,1240. Clear and convincing evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable'. *Am-Pro Protective Agency, Inc.* citing *Price v. Symsek,* 988 F.2d 1187, 1191 (Fed. Cir. 1993) The court then found that Am-Pro's belated assertions, one affidavit and lack of contemporaneous documentary evidence with no corroboration, fall short of the "clear and convincing" or "highly probable" (formerly described as "well-nigh irrefragable") threshold. *–Am-Pro Protective Agency, Inc.* at 1243.

Taken alone, each of the Forest Service's actions directed at Hooker; the withheld contract payment and barring of his employees, and drastic reduction of the beaver trapping sites would not necessarily negate the good faith presumption that the contracting officer was acting in good faith. However, the timing is suspicious in that these actions were taken directly after Hooker questioned working in radiologic soil contamination areas and then demanded more money. Further, subsequent events have cast suspicion on the reasoning provided by the Forest Service for its actions. Gabard, the contracting officer, barred Michael Eller forever for defrauding the government, but two years later awarded him a hog contract. Again, Gabard insisted at deposition that the

drought was the only reason for the reduction in the beaver trapping sites, yet never mentioned this at the time in his memorandum documenting his phone conversation with Hooker, instead, asking Hooker why he wasn't catching any beaver. Andy Cromer testified that he felt the Forest Service was trying to get rid of them, to make them leave. The evidence demonstrates that the Forest Service's actions were directed toward damaging Hooker economically and encouraging him to abandon the two contracts. If this evidence is highly probable, then the Forest Service acted in bad faith and should be liable in damages to Hooker.

Conclusion

The Plaintiff respectfully requests that this court find that summary judgment is appropriate in this case; reform both the beaver and hog contracts, find that the modification extended the hog contract until November, 2001 and require the government to pay to Hooker the minimum amount due under the hog contract. The Plaintiff also requests that the court find that the Forest Service acted in bad faith in both beaver and hog contracts, and award appropriate damages to the Plaintiff.

Respectfully submitted,

/s/Berta E. (Robbie) Nichols
206 Carolina Bldg., P.O. Box 7925
Hilton Head Isl., SC 29938

July 28, 2006

Attorney for Plaintiff