# EXHIBIT B

## Deposition of William D. Hooker taken December 8, 2005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY, | ) | |
| Plaintiff, | ) | |
| vs. | ) | NOS. 03-1501C, 04-1126 |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

\- - - - -

**DEPOSITION OF WILLIAM D. HOOKER**

taken by Counsel for the Defendant

before Alice D. Boni, Certified Court Reporter

at the offices of Department of Energy

151 Corporate Parkway, Aiken, South Carolina

on Thursday, the 8th day of December 2005

commencing at 10:35 a.m.

\- - - - -

**ALICE D. BONI, COURT REPORTER**
Post Office Box 2474
Aiken, South Carolina 29802-2474
(803) 648-9434

beginning; right?

A. Yes, ma'am. I went back to where I originally started.

Q. Oh, then you went back to H Tank Farm at the end; okay. All right. Okay, then I'm just going to go like I did with Mr. Cromer. So I'm assuming that since you're working in these areas and you're working for Savannah River Site that you're required to have certain trainings and certain certifications. So what trainings and certifications did you have?

A. I'm sure I had the GET training, RAD worker two. I didn't have HAZOPER.

Q. You didn't have what?

A. HAZOPER.

Q. HAZ --

A. Wopper.

Q. Wopper? W-o-p-p-e-r?

A. I think it's H-A-Z-O-P-E-R; HAZOPER.

Q. Oh, HAZOPER, okay.

A. Or something like that.

Q. Okay. So you had GET training, RAD worker --

A. I had HAZMAT.

Q. HAZMAT? Okay.

A. And a lot of different little technical stuff that was required to keep the job.

Q. And the same thing for hog trapping, that's the first time you did hog trapping/hunting professionally?

A. First time I'd ever killed a hog was on the hog contracts. I'd never killed a hog before.

Q. Before that?

Q. Uh-uh [no].

Q. Okay. So your first contract with Savannah River Site, or on the Savannah River Site, to hog hunt and trap and beaver trap was in 1992; is that correct?

A. The first contract started February 10th, 1992.

Q. Okay. So that was the first contract that Georgia Bowhunters had?

A. Officially.

Q. Okay. And who else did you hunt and trap for?

A. At that time, I can't -- I can't recollect. I mean, different people I had --

Q. But there were others?

A. It was probably '93 before I ever started doing it for other people.

Q. Okay. Okay, so let's go back to Westinghouse, when you were working for them. I'm assuming that because you had this RAD workers training and also the HAZMAT training that you worked with radiation, or near radiation when you were working for Westinghouse.

A. When I worked for Bechtel, M.K. Ferguson, B.F.

Shaw and Westinghouse, I knew the radiation requirements and stuff.

Q. Okay, let me -- let's jump back over to -- I lost Plaintiff's Exhibit 3. Let me see what I've done with it. This isn't the original one, but that's a copy of it. Wait, I've got it. All right, if you'll just take a look at Plaintiff's Exhibit 3 and let me know when you've looked at it.

A. What do you want to know about it?

Q. Have you had a chance to look at it?

A. Oh, yeah.

Q. Do you recognize it, that document?

A. Yes, ma'am.

Q. Okay, what is it? Where did you get that?

A. I got this from a HP person that worked for Westinghouse prior to the NIOSH investigation.

Q. Did you get it in a work capacity, or you just asked for it?

A. I got it -- what I originally did, I wrote a letter to NIOSH, asking for an investigation because the U.S. Forestry Service would not address the issues. I'd asked Frankie Brooks for what was in HP-52, I'd asked for information at every creek and every canal on that Plant. For nine months, or six months, I got no answer. Okay?

Q. Okay.

1999. I'd videoed from 1992 through 1999, the entire Plant, you know.

Q. And why was that?

A. I had a little sporting goods archery shop and where we used the -- learned to use the 330 Conibear that was required by the contract, by the U.S. Forestry Service, we bought a video that showed us how to use that particular trap, and I think I paid $25 for that tape. Tom Miranda put it out. It was a -- so I watched that tape; me and Andy watched it for, I'd like to say, a hundred times. Okay? And what we did, we took what the contract said and how that particular guy used the trap and we adjusted to make it work for us at Savannah River Site.

Q. Okay, and just because I'm confused and I want to go back. Okay, so I know that you videotaped along Steed Pond around June of 1999, but you just said that you videotaped the whole site beginning in 1992.

A. I have a -- I had a video recorder, a cam recorder, and a 35 millimeter camera with me just about all the time.

Q. Okay, so you were -- so you basically documented -- what were you taking pictures of?

A. We'd get in the swamps and we'd take pictures of the entire swamp.

Q. Okay.
A. 1992/93, we was in it; in it with a video camera. We didn't know nothing about the tritium that was being released on December 24th, 1991.
Q. Right.
A. We didn't know about the 6,000 curies that was released from K-Reactor.
Q. Right. Okay. All right, well, just still, just saying -- I'm not asking you to produce them right now, but we may if we determine they're relevant, so make sure you keep those around. Okay, so any other sites other than that that -- other than along Steed Pond that you saw soil contamination signs when you were there, when you were trapping beaver or hunting hog?
A. The only places I've seen them was those four sites.
Q. Okay.
A. One other -- one other place where signs had been posted was Site -- I want to say it was Site 43.
Q. Okay, tell me the geographical location of that since we're all over the place with our sites.
A. It's behind the motor pool at 3 and 700 Areas. It's called the Met Lab Carolina Bay.
Q. Okay. And that was posted when?
A. I don't know exactly when they posted it. It

wasn't posted while me and Andy was trapping it, or when CSWE busted the dam that was holding the water in the Carolina Bay.

Q. When was it posted? Before or after that?

A. The first time I ever seen it posted was at the NIOSH investigation.

Q. Okay. So it was never posted while you were trapping?

A. Well, it was posted. I want to reframe that. It was posted because when I wrote the letter to NIOSH on 2006 -- I mean in January of 2000, I did include the Met Lab Carolina Bay. So it was posted as a danger, keep out.

Q. Danger, keep out?

A. Right.

Q. Okay, so --

A. Not a radiological area.

Q. Okay, so -- just so I clarify. Sorry to ask you this so many times, but when you were working in that area, was it posted?

A. No. When Frankie Brooks took me there, it was not posted, and when CSWE broke the beaver dam that was holding the water back in Carolina Bay, it was not posted.

Q. Okay, and when did that happen?

A. I did wear a TLD badge then.
Q. Okay. And now, because I don't know what a TLD badge is, what is a TLD badge, and what's the significance of it?
A. It picks up dose.
Q. It's a dosimeter basically?
A. [Indicates affirmatively].
Q. Okay, got you. And you wore it every day when you had it on?
A. Anytime I was inside H Tank Farm. Not while I was beaver trapping. The only time I wore it beaver trapping was when I was required to be RAD worker II trained to get in Four Mile Creek on February 22nd, 1999.
Q. And did it register a high dose?
A. I couldn't tell you.
Q. Did anybody monitor it when you got out?
A. They give -- I think you get a yearly monitoring. What they did on February 22nd -- you got the Work Clearance Permit?
Q. Plaintiff's Exhibit 1.
A. I was given this right here by Frankie Brooks. Okay. I read it and I didn't agree with it.
Q. Okay.
A. Okay, everybody that's ever worked for me that I put in the water, beaver trapping, was not required to

the Work Clearance Permit; correct?
A. I wouldn't have to get in the water, which required not having --
Q. Okay, listen to my question. If you used snares, would you need the Work Clearance Permit?
A. I'd say no.
Q. Okay. So I just want to clarify that when -- so your testimony is that you drove to Four Mile Creek and Road Four to trap and Frankie handed you the Work Clearance Permit that's Plaintiff's Exhibit 1, and at that point in time, did you tell her you didn't want to do this?
A. No.
Q. All right. After the fact, you requested --
A. When I come out of the water, I asked her could I use snares.
Q. And she said yes?
A. She said yes.
Q. And did you go back to this site and trap with snares after that?
A. I trapped close to that area.
Q. But not the exact same area?
A. Not the exact same area.
Q. Were you ever required to get another Work Clearance Permit?

Q. Okay. So you think that when you continued to bid on these that you've upped your bid to six or seven hundred dollars per hog?

A. Per hog.

Q. Per hog. Okay, what about beaver? No beaver? Because they haven't had any solicitations; right?

A. They -- what I was told on the beaver contract, when it ended, was they was going to let another one in six months. That was per Frankie Brooks.

Q. Right. But they didn't, they chose --

A. They never did.

Q. They chose to keep it in-house?

A. They never addressed any of the issues I had brought up either.

Q. Well, we sure are addressing them now in Federal Court, aren't we? Okay, so let's finish this up so we can get moving. When did you -- or did you; I should start with did you ever request more money from Frankie Brooks or Homer Gabard?

A. Prior to doing the work June 1st, I'd asked Homer for more money.

Q. Okay, so prior to June 1st of 1999, you asked Homer for more money why?

A. Because the work he was asking me to do was not per my contract. I don't have to hire a stand-by person,

I don't have to be RAD worker trained.

Q. And did you ask that in writing, or did you just ask that verbally?

A. I looked him dead in the eyes like I'm looking at you right now, and I said, "Homer, this is not per my contract, I need more money."

Q. Right.

A. His answer was, "It is per the contract, go do the work." I went straight to Frankie Brooks, I said, "Frankie, this is not per my contract." A couple of days later, she got back with me, she said, "Homer said it is per your -- per the contract. You either default the contract or do the work."

Q. Okay, so you're saying that she did -- that she did threaten to default your contract if you didn't hunt in the areas they told you to; hunt and trap?

A. Trap beavers --

Q. Trap beavers.

A. -- on June 1st in HP-52.

Q. HP-52. Using snares or going in the water?

A. Going in the water.

Q. Okay, now, I have to say, Mr. Hooker, that that conflicts with what you said a couple of minutes ago. A couple of minutes ago you said that the only time that you ever used -- and tell me where I'm getting it wrong

A. No, ma'am.

Q. Okay.

A. Now, I went back after the -- before the contract was over and found these orange balls that mean danger. I found them where the trees had growed over them maybe 10/15 years, and then I went to the reactor canals and started looking there, too, and I did find one growing in a honeysuckle vine that said, "Plant Waste, keep out."

Q. And what site number was that again?

A. I don't recall which site it was, but I want to say it was C-Reactor canal.

Q. And what year -- that was after your contract --

A. It was 1999.

Q. 1999? Okay. Where did you see orange balls?

A. I seen them in a couple of places. In front of 100-R where we was hog hunting.

Q. In front of 100 --

A. 100-R.

Q. R.

A. They're actually in the woods. There's a little small Carolina Bay. And I seen them on -- I'd like to make sure that what I'm calling Beaver Dam Creek is. It's where the water comes out of the power house at