# EXHIBIT E

## Deposition of Frankie Brooks

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY, | ) | |
| Plaintiff, | ) | |
| vs. | ) | NOS. 03-1501C, 04-1126 |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

\- - - - -

**DEPOSITION OF FRANKIE R. BROOKS**

taken by Counsel for the Plaintiff

before Sharon DeHart, Certified Court Reporter

at the offices of Department of Energy

151 Corporate Parkway, Aiken, South Carolina

on Wednesday, the 7th day of December 2005

commencing at 12:56 p.m.

\- - - - -

**SHARON DEHART, COURT REPORTER**
Post Office Box 2474
Aiken, South Carolina 29802-2474
(803) 648-9434

timber; that type of work.
Q. And I'm not trying to get technical, but is there regular -- some kind of -- are there people that roam around the Site just looking for stuff like that? Is that how you found out, or would these be people who were doing other things and say --
A. It was both. I would look for sites, myself, and other people on Site would call me if they had problems in certain areas that I wasn't -- you know, wasn't my daily job to be in.
Q. So when you would find out about some blockage going on somewhere, then you would identify that site and tell Mr. Hooker, or the other --
A. I'd go look at it, myself, and then tell him.
Q. Did you visit all of the beaver trapping sites?
A. Yes.
Q. Did you prepare a work order for every site that was to be trapped? And I'm not trying to -- I just don't understand how the whole thing worked.
A. Yes, there were work orders written for the sites for him to work in.
Q. So he would not have been trapping if he did not have a work order for that particular area?
A. Shouldn't have been.
Q. I don't know if I asked you this already, but

Q. [Ms. Nichols] So you didn't personally observe Mr. Hooker or any of his workers actually putting their hands into the soil?
A. No.
Q. Okay. I forgot to ask you at the very beginning here. Did you provide information to help with the responses to our questions, our interrogatories that we asked? Were you involved in helping draft those responses?
A. For this?
Q. The Government was asked certain questions, and they're written questions called interrogatories. And Ms. Williams answers them, but she does it on the basis of asking you folks questions about it. So, from that standpoint, did you aid in drafting the responses to the questions?
A. Yes.
Q. Okay, good. In your experience, while you were working at the Site in 1999, did you view any signs from the -- that anyone had posted marking soil contamination areas?
A. Yes.
Q. You did. Do you remember where those were?
A. Hooker and I were together at that site on Road Four and we saw this radiation sign that was pushed over.

We talked about it and I got in touch with Chuck Fanning who works for CSWE, and he told me that we had to have a Work Clearance Permit to trap in there. So I told him that I wanted one and got it.

Q. Is that the Work Clearance Permit that was generated in February 1999, I think?

A. Yes. It's the only -- it's the one.

Q. That was the only Work Clearance Permit that you ever --

A. Well, there were two, but he only used one.

Q. Two for the same area, or --

A. I don't remember where the other one was for, but that was the only one he used.

Q. Would you identify that as the --

A. That's it.

Q. Okay.

**MS. NICHOLS:** Could we have this marked as Plaintiff's Number 1, please?

**[PLAINTIFF'S EXHIBIT 1 IS MARKED FOR IDENTIFICATION]**

Q. [Ms. Nichols] Let me ask you about this. You generated, or you had this generated as a result of actually seeing a soil contamination, or some kind of --

A. Right.

Q. -- radiological sign there. And I see your signature is on the second page; is that correct? As the

Service, then automatically it's also with the Savannah River Institute?

A. It's the same thing.

Q. Same thing; okay, good, thanks. Did you have a standby person that day?

A. Yes.

Q. And all of the other requirements were met, I assume?

A. Yes.

Q. Okay. I would like to show you -- this apparently is a policy from the Westinghouse Savannah River Company. Are you familiar with this document?

A. No.

Q. You've never seen it before?

A. No.

Q. Okay. Well, we're not going to worry about it. Let me ask you this. Did DOE or Westinghouse ever give the Forest Service or you, personally, a list of contaminated areas of any sort on the Savannah River Site?

A. They never gave me one.

Q. Okay. So you personally were not aware that there were areas, other areas besides this area we just talked about at Four Mile Creek and Road Four, that were posted? Is that your testimony?

A. Ask me that again.
Q. Okay, I'll ask it not as a negative. Were you aware of any other beaver trapping or hog dispatching site on the Savannah River Site during the time you worked there that was posted as contaminated in any form, other than this particular site that we just discussed?
A. I became aware at some time there was a couple of other sites.
Q. Okay, when was that?
A. It was during the same time as this Work Clearance Permit.
Q. Okay. And do you remember where those sites were?
A. On the Four Mile Creek and, what's that? 19?
Q. Four Mile Creek is -- that's the one that we were discussing with the Work Clearance Permit.
A. There's four trapping sites on Four Mile Creek.
Q. Four trapping sites, and they were posted as contaminated?
A. [Indicates affirmatively].
Q. Okay. And Site 19 is what, if you'll help me?
A. It's a beaver pond.
Q. A beaver pond? Is that what it's called, beaver pond?
A. It's what we call it.

Q. Okay. And how is that posted?

A. Well, at the time when he trapped there, there weren't any postings. I don't know how I found out. I think it was from our engineering people with the Forest Service; found out that -- I really don't remember how I found out, but somebody had gone in and put up radiation signs at that site, and I remember talking to the CSWE people -- I mean engineering because they were also cleaning culverts. They were helping with the big work. And our Forest Service people were in there cleaning culverts, went to clean it and found these radiation signs, brand new, that had just been posted.

Q. Do you remember when that was?

A. No.

Q. You don't know?

A. I know it was during this same time, but I don't remember when it was.

Q. Would it have been -- that was February. Would it have been during the summer --

A. I can't --

Q. -- or do you think it was closer in time to that?

A. I can't guess.

Q. Okay. So sometime between -- you say that the postings were not there, and then they were, but -- so

you can't really narrow the time that they were put up, but were these areas that beaver had been trapped in?

A. Yes.

Q. Okay. And Mr. Hooker trapped beaver in those areas?

A. And Andy.

Q. And Andy; okay. Let me ask you about the culverts. How did the contractor decide which culverts to work on?

A. Sometimes we'd tell him and sometimes, when he would go to trap beaver, he would see that the place was plugged up. Sometimes I would be out looking, myself, and call him and tell him that certain culverts were stopped up and needed opening.

Q. And did you ever see Andy or Mr. Hooker cleaning out culverts?

A. I don't think I ever watched them do that.

Q. Would you think that that involved getting their hands in the culverts?

A. It involved pulling tree limbs -- mostly tree limbs and stuff out of the culverts.

Q. Would you say there would be soil in the culverts that would have to be moved out?

A. Not particularly because it'd be mostly limbs. There were leaves, they'd pull them out, they'd just all

a domestic pig that was found on the property, gone wild?

A. I don't know.

Q. Okay. Let me ask you, the contract that Mr. Hooker had that was modified in October or September of 1999, did you have anything to do with that modification?

A. I really don't know what modification you're talking about.

Q. There was a modification of the contract that extended the contract through the end of October of '99, or until a new contract was awarded. Are you aware of that?

A. [Indicates negatively].

Q. Okay, that's fine.

**MS. NICHOLS:** I tell you what, can we take a five-minute, and then I think I'm done, but I want to make sure.

**MS. WILLIAMS:** Absolutely.

**[OFF THE RECORD]**

**MS. NICHOLS:** Thank you very much, Ms. Brooks, for answering my questions. Please answer any questions that Ms. Williams has for you.

\- - - - -

**EXAMINATION**

**BY MS. WILLIAMS:**

Q. I'll just remind you that you're still under

oath, and I just have a few questions that I want to ask you. Earlier in the deposition, Ms. Nichols had asked you about the beaver contract and how a contractor knew where to trap beaver.

A. Right.

Q. And my question to you is every time that a contractor, that Mr. Hooker was ordered to trap beaver, was that done with a written work order?

A. I don't think so. If I had written him a work order for, say, Site 1 and it was in the same month or whatever, the same month, I'd call him and tell him, "Go back to Site 1, it's plugged up again."

Q. So is it a correct statement to say that some work orders were verbal?

A. Right, some were.

Q. So that -- okay, that's all I wanted to know. Okay, let's go back. You also discussed a Work Clearance Permit, and if you'll look at Exhibit Number 1, this is a Work Clearance Permit. Can you tell me what the date of that is?

A. I'll have to get my glasses.

Q. I'm sorry, if you don't have your glasses, I can tell you what it is.

A. Okay.

Q. So, looking at this, you see that this -- this