# EXHIBIT F

## Deposition of William D. Hooker taken June 2, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY, ) | |
| Plaintiff, ) | |
| vs. ) | NOS. 03-1501C, 04-1126 |
| THE UNITED STATES, ) | |
| Defendant. ) | |

\- - - - -

**DEPOSITION OF WILLIAM D. HOOKER**

taken by Counsel for the Defendant

before Alice D. Boni, Certified Court Reporter

at the offices of Department of Energy

151 Corporate Parkway, Aiken, South Carolina

on Friday, the 2nd day of June 2006

commencing at 9:20 a.m.

\- - - - -

**ALICE D. BONI, COURT REPORTER**
Post Office Box 2474
Aiken, South Carolina 29802-2474
(803) 648-9434

but -- so, first, if you could start with the beaver contract.

A. Okay. The beaver contract started February 10th, 1992, and to my knowledge, it was -- everything was -- no toxicological hazard. We had actually -- Andy had actually asked Homer was anything in the water that we needed to worry about, and he said, "Just don't drink two liters of the water."

Q. Okay, but what I'm asking is what toxicological hazards did you encounter?

A. At my time -- at the time, I did not know about the tritium as being released from 100-K on December 24th, 1991. I think it was something like 6,000 curies was actually dumped into Indian Grave and Pen Branch. I didn't know about that. I did not know about all the heavy metals that were identified in 1989 by a group called CRESP, which makes up the CERCLA and RCRA, or the superfund site. I had no knowledge of any of that kind of stuff, that Savannah River Plant had become a superfund in 1989. I didn't know about the 519 hazardous waste sites on the Plant that had been identified by the EPA and CRESP. I had no knowledge of none of that type stuff. Just like Mr. Sanders yesterday said he didn't know what CERCLA was, or that RCRA, I had no knowledge of that type stuff either.

so far, I've heard something about an investigation and then something about some paperwork that wasn't provided to you, but, I mean, you're alleging here that, you know, they administered this contract in bad faith. I'm trying to put my finger on what is the bad faith that they engaged in that somehow injured you and entitles you to damages.

A. Well, they cut my money. They overpaid me twice. Well, the first time, they -- I think the check was 3,000 and something dollars, and instead of just canceling that check, they said, "Well, we'll just take it out of the next coming checks, okay?" I said, "Fine." But at that time, I did not know that I was under investigation, that they was going to take domestic hogs from me that wasn't domestic hogs, just because of the way it was -- somebody said they were domestic hogs. I mean I can give you another example of, you know, how y'all comprehend things, if it's all right.

Q. Before we do that -- you know, I want to hear that, but you said they -- well, okay, let me just hear what you have to say.

A. I mean y'all are using Jack Mayer as your expert for hogs, and I asked her to bring me this book the other day and I did start reading it. And Jack Mayer did the -- Jack Mayer, Lynn D. Wike and Michael B.

Q. But if they over -- what people do, when they overpay somebody on a contract, is they --
A. Normally, you would just return the check, you know.
Q. Well, they -- but, I mean, how is that bad faith if somebody just takes, you know --
A. Well, it's -- it's not if you're not going to cut all the work out.
Q. Okay.
A. Okay? I mean, at the time, he said, "I'm going to just leave the money and let you keep the money and we'll take it back each month." I said okay.
Q. Okay, so what other items of bad faith are you alleging?
A. Wackenhut checking the traps. Goldman and -- Goldman Eller did work in security for years and he had a bunch of friends that were in security. They'd go around, checking my traps. You can't catch hogs if you've got people checking your traps for you. Wasn't but one person supposed to be checking those traps, and that was me and whoever I hired. Okay?
Q. And I asked you --
A. I had people going around cutting the triggers on the traps. Okay? I also had people going out there, cutting trees down that were 10/15 years old and laying

A. I would think it would come under bad faith if you've got a good contractor trying to find out what he had worked men in, good men in, and then everybody thinks it's a big damn joke. I don't think it's a joke to this day, and maybe the Government by now doesn't believe that I'm still joking. I didn't bid contracts to work in uranium. I didn't bid contracts to work in any kind of stuff that had heavy metals in it. I didn't bid contracts to haul crap around in my truck that needed to be in a burial ground.

Q. Okay, I understand, you know, your argument, but you have two complaints here and the claims in these complaints, the ones that haven't been dismissed is what is before the Court, and what we're trying to determine is, you know, here we are at the end of discovery, these cases have been going on for --

A. Six years.

Q. -- six years, or three years, or four years, and, you know, what we need is an accounting of what the damages are.

A. I would like to get -- I would like to get paid five times what I had bid my contracts for. And then whatever the bad faith is, I mean we can go back through and read every little laugh and giggle that was put up by the little plays that DOE and Westinghouse and Bechtel

put on to NIOSH. We can go through the whole little hurrah again, you know.

Q. You say something about dogs that you had.

A. I had to buy dogs.

Q. And why did you have to buy dogs?

A. Because the men that owned the dogs, they were barred forever for working at Savannah River Site by Homer Gabard.

Q. So you bought those dogs?

A. I bought those dogs.

Q. And did you -- how much did you pay for those dogs?

A. I'd have to go back and look at the receipt.

Q. Now, were you paying those men? The men?

A. The men? What men?

Q. The Ellers, I believe?

A. Yeah, I paid them -- I think it was between 36 and $40 a head per hog.

Q. Okay, and so you had to buy the dogs.

A. Right.

Q. And then, you know, who used the dogs?

A. I used the dogs until I could get men that were approved by Homer Gabard, but Forestry had lost the resumes that I submitted on one particular man. Contraband passes for myself had been -- the numbers had