# EXHIBIT G

## Deposition of Homer Gabard

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY, | ) | |
| Plaintiff, | ) | |
| vs. | ) | NOS. 03-1501C, 04-1126 |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

\- - - - -

**DEPOSITION OF HOMER RONDAL GABARD**

taken by Counsel for the Plaintiff

before Sharon DeHart, Certified Court Reporter

at the offices of Department of Energy

151 Corporate Parkway, Aiken, South Carolina

on Wednesday, the 7th day of December 2005

commencing at 2:01 p.m.

\- - - - -

**SHARON DEHART, COURT REPORTER**
Post Office Box 2474
Aiken, South Carolina 29802-2474
(803) 648-9434

Q. Oh, so it hasn't been that long. And are you working now?
A. I'm working part-time with Wal-Mart.
Q. Do you like that?
A. It's okay.
Q. What was your position -- or how long had you worked for the Forest Service?
A. I worked for Forest Service from July of 1979 to January 2004.
Q. Always in the same position?
A. No, ma'am.
Q. How did you start?
A. I started as a business management clerk from 1979 to 1985. Then I was in a contract specialist trainee position from 1985 to -- I believe it was October 1988.
Q. And that was what training?
A. Contract specialist trainee position.
Q. Okay.
A. And then I worked as a contract specialist at various grade levels.
Q. What grade level did you retire at, Mr. Gabard?
A. A GS-12.
Q. And how long were you the contracting officer for the Forest Service? Or is that what you mentioned as

Q. Department of Energy would have ultimate authority?

A. Yes, ma'am.

Q. Okay. Did the Department of Energy ever inform you of any contaminated sites where your contractors should not go?

A. Are you talking about me, personally?

Q. Yes.

A. No, ma'am.

Q. Did the Department of Energy ever inform anyone, to your knowledge, in the Forest Service of areas that were contaminated where anyone should not be disturbing the soil?

A. I do not know, ma'am.

Q. You did not receive a list of contaminated sites from them?

A. No, ma'am.

Q. Let me ask you -- and I took this back and I shouldn't have. Thank you. I'd like you to look at Plaintiff's Exhibit Number 3, which is stapled backwards. And if you would, look at the pages that are marked -- the page that has a 7-28 at the bottom, and it has a picture of a soil contamination area sign.

A. Yes, ma'am, I see it.

Q. Okay. Had you ever seen a sign like that

posted on the Savannah River Site?
A. I haven't personally, no.
Q. Was part of your responsibility to travel around the Site for any reason, or were you mostly in the office?
A. I went to various areas that were -- where contractors were working. I did not go out on these specific contracts, no, ma'am.
Q. But you would occasionally travel --
A. Yes, ma'am.
Q. -- to various areas?
A. Yes, ma'am.
Q. And it is your testimony that you never saw a yellow soil contamination area sign?
A. Not to my memory, no, ma'am.
Q. Would you turn over the page and just look at the other descriptions of the signs and tell me if you saw any of those anywhere on the Site?
A. Not to my memory, no, ma'am.
Q. Okay, thank you. And it is your testimony that you never received any sort of list of areas that were contaminated from the Department of Energy or Westinghouse?
A. No, ma'am.
Q. Thank you. I'm going to ask you the same thing

A. And I believe it was in writing, as well.

Q. Yes, it is, and I'm looking for it. Okay, I'd like for you to look at that and ask you if that is the communication that you sent to William Hooker on the 30th of June 1999, or presented to him in person in your office, one or the other?

A. This document was presented to Mr. Hooker at a meeting at Savannah River Forest Station.

**MS. NICHOLS:** Okay, could we have this marked, please, as 6?

**[PLAINTIFF'S EXHIBIT 6 IS MARKED FOR IDENTIFICATION]**

Q. [Ms. Nichols] Could you just summarize for us what actions that you state in this communication placed Mr. Hooker in default on the hog contract?

A. Can you give me a second to look at the letter?

Q. Sure.

A. Okay, are you talking about actions that I took, or --

Q. Yes.

A. -- actions that happened --

Q. Yes, this --

A. -- prior to this?

Q. Yes. Would you just summarize for me the actions that you took?

A. There were 31 domestic pigs that were taken to

performance. You have 15 calendar days from today to have suitable personnel replace both Mr. Ellers so that satisfactory performance can resume on the contract." Do you remember whether he was able to obtain those suitable personnel within 15 days?

A. I can't recall specifically if it was within the 15 days or not. I'd have to look at the contract file to tell you.

Q. Then you go on to say that, "You shall submit resumes for the replacement personnel to me prior to the personnel starting work, and the person with the dogs will be required to perform a demonstration with the dogs for SRI and other SRS personnel. This demonstration will be evaluated and the person with the dogs will not be allowed to work on the contract unless approved by me." Do you remember that that demonstration occurred?

A. I don't remember, ma'am.

Q. You don't remember? Were you aware that Mr. Hooker had to purchase dogs to -- purchase new dogs in order to fulfill the requirements that you set up here?

A. I don't know that I did that -- that I knew that at this time. At some point, I did learn that he purchased dogs.

Q. Would it refresh your memory -- do you remember a time when Mr. Hooker did a demonstration when his

**MS. NICHOLS:** Thank you very much.

Q. [Ms. Nichols] So in the meantime, did you modify the existing contract as noted in number 14 on the first page here?

A. As noted in 14? What are you referring to now?

Q. I'm referring to "Description of Amendment/Modification" down toward the bottom just above the signatures.

A. Yes, that modification was --

Q. Okay, could you just read for me the language in the "Description of Amendment/Modification"?

A. "Contract is extended to October 31st, 1999, or until a new contract is awarded."

Q. When was the new contract awarded?

A. There was never a new contract awarded.

Q. Never?

A. No, ma'am.

Q. Did you not award a contract to Mike Eller in 1991 -- 2001, sorry.

A. Yes, but that was not a -- that award was not a result of the solicitation that went out in August of 1999. There was not a contract awarded from the solicitation that was issued in August 1999.

Q. I'm not understanding what the difference is. When was a contract awarded for trapping hogs?

A. Yes.

Q. Whose responsibility was it for dispatching the hogs on the Savannah River Site? I thought you told me it was the Forest Service who managed all the natural resources.

A. Mr. Wilson is the manager of the Forest Service, or was the manager of the Forest Service Unit at Savannah River Site at the time.

Q. Okay. All right, I'm getting confused. SRI is the Forest Service.

A. Okay, yes.

Q. All right, so he made that decision?

A. Yes, ma'am.

Q. And am I correct that you had these solicitations, had these bids in; you had asked everyone for a 60-day extension; correct?

A. Yes, ma'am.

Q. How were the bidders notified that you were withdrawing the solicitation?

A. Without looking at the files to be sure, I couldn't say. I will tell you that normal procedure would have been to notify them in writing, either through an amendment to the solicitation, or with a letter saying the solicitation was canceled.

**MS. NICHOLS:** Okay, could we ask the Forest

Service to look for any document of that type, withdrawal of the solicitation, or --

**MS. WILLIAMS:** Yes, if we can find the document, we will produce it.

Q. [Ms. Nichols] So it is your contention, then, that that contract was never awarded?

A. That's correct.

Q. Okay. Well, let's go to 2001. Did you then create a new solicitation for hog trapping?

A. Yes.

Q. And if you remember, who were the bidders? Do you remember all of them? Were they the same people who had bid in 1999?

A. No, ma'am, I don't think that they were all previous bidders.

Q. Was Mr. Hooker one of the bidders in 2001?

A. Yes, ma'am.

Q. Was Michael Eller one of the bidders in 2001?

A. Yes, ma'am.

Q. And several others; correct?

A. Yes, ma'am.

Q. And the successful bidders on this contract were?

A. As I recall, Michael Eller, Rawley Hamilton, and I can't remember the third contractor's name.

area?

A. As far as I remember, he did ask for more money. I do not believe he did that initially when he first started working in this area, but at some point in time, he did ask for more money, yes.

Q. And what was the basis for his request for more money?

A. Because of the fact that he was working this area.

Q. And what was your response to that?

A. My response was that he did not have to work in this area, and if he felt like it was outside the scope of the contract, that he could refuse to work in the area and that we would not force him to do so, but that we would not pay him additional money for trapping in this area.

Q. Okay. And to your knowledge, this was the only area that was marked as a contaminated area?

A. To my knowledge, yes.

Q. To your knowledge. Had you visited the beaver sites, any of them?

A. No. Not specifically, no.

Q. No. I think you said earlier, and I can't remember, but you said occasionally you did go out and observe what the contractors were doing?

A. Yes, but not on these two contracts.
Q. Oh, not on these two contracts?
A. No.
Q. Oh, you supervised other contractors, but you never visited a beaver trapping site?
A. No.
Q. And you never visited --
A. No.
Q. -- a hog trapping --
A. No.
Q. -- site?
A. No.
Q. Is it your testimony, then, that the only hog interaction you had was when they were doing demonstrations?
A. Yes.
Q. Okay. Did Mr. Hooker ever ask you what kind of contamination existed at the Savannah River Site, or ask you what was in the water?
A. I don't recall him doing that, no.
Q. Do you recall him -- were you aware that he was making requests to other agencies as to what was in the water and what was in the soil?
A. I don't know that I had personal knowledge of that, no.

**MS. NICHOLS:** Perfect.
Q. [Ms. Nichols] And my question concerned the interrogatory, and you have seen this particular exhibit, so you know what the sign looks like; correct?
A. I haven't seen the sign, no, but I've seen the --
Q. You have never seen a sign like that?
A. No.
Q. Okay. Would you generally know, then, what protection is required for workers whose activities involve disturbing the soil within soil contamination areas?
A. I personally would not know, ma'am.
Q. You would not know; okay. Okay, that's fine. Okay, if you'll just give me a minute to look through these, and we'll be done. Just one thing, if you recall this, and it was a long time ago. Do you remember, sometime in the summer of 1999, that Mr. Hooker received double payment through direct deposit to his Regions Bank account for two -- for one invoice, he was doubly paid for it?
A. I recall that, yes, ma'am.
Q. You recall that. And do you recall how the Government handled that?
A. Not specifically, but I -- I think I remember

that we were going to deduct it from future invoices, and so we had deducted the amount of the double payment.

Q. Okay, and I think that's what I heard, too, or read. Do you remember why you did that instead of just making a reversal in his account right then?

A. I don't remember, ma'am. I'm not sure that I understand what you're talking about, a reversal in his account.

Q. Okay. Well, normally, if you direct deposited $3,000 and then did it again, would you not correct that by reversing that second deposit?

A. I don't know, ma'am. I don't do payments, I don't have any way of knowing that.

Q. Were you aware that Mr. Hooker's beaver trapping sites were drastically reduced after that point and he became unable to pay that money back?

A. I don't know that I recall that.

Q. Do you remember why the beaver trapping sites were reduced?

A. It was due to weather conditions, drought. We no longer had the number of beavers and so forth out on the Site that were there in the past.

Q. So nobody was trapping beavers after that?

A. Not during that period, no.

Q. And was anyone cleaning culverts?

A. If there was an occasional requirement, it would have been CSWE or our personnel that did it. But that would not have been very often neither with the drought and so forth going on.

Q. You're saying during the balance of Mr. Hooker's contract --

A. And that's speculation.

Q. -- when he was not cleaning culverts, a CSWE employee would have done that?

A. I'm saying that -- no. If there had been a requirement for it, he would have done it during the period of his contract, but there was not -- with a drought like that, there would not have been a need to clean culverts as much as there had been in the past because they would not have been clogged up as they would have been in the past.

Q. Could you just explain how that works? Because I'm thinking culverts would get stopped up whether there was a drought or not. Am I wrong?

A. Well, if there's a drought, ma'am, there's not water going through and you don't have -- you don't have beavers trying to dam areas, taking branches and limbs and so forth into the culverts, so you don't have the problem basically.

Q. Okay. I think that's all I have for you, Mr.