# EXHIBIT L

## Letter from Lawrence F. Mazzuckelli, Department of Health and Human Services, to William D. Hooker (The NIOSH Report)

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Public Health Service
Close Out
National Institute for Occupational Safety and Health
Robert A. Taft Laboratories
4676 Columbia Parkway
Cincinnati OH 45226-1998

December 27, 2000
HETA 2000-0117

William D. Hooker
Georgia Bowhunters Supply
5330 Columbia Road
Grovetown, Georgia 30813

Dear Mr. Hooker:

The purpose of this letter is to report the results of the National Institute for Occupational and Health (NIOSH) investigation which was conducted in response to your request for a Health Hazard Evaluation (HHE) in which you expressed concern that you and your employees may have been exposed to harmful chemicals, some of which may have been radioactive, while you (as owner of Georgia Bowhunters Supply) were trapping beaver and wild hogs under contract to the U.S. Forest Service at the Department of Energy (DOE) Savannah River Site (SRS).

In response to your request we reviewed all the material that you supplied that gave rise to your concerns. We also contacted officials at both the DOE and U.S. Forest Service to discuss the nature of your request and asked them to supply additional information.

After a thorough evaluation of the information that you furnished, we decided that a visit to the SRS would help us to determine whether you and your employees were exposed to any health hazards as a consequence of your work. That visit took place March 20 – 22, 2000. During that visit we met with you and some of your employees to discuss the health concerns that were expressed. At that meeting each person was given an opportunity to meet privately with Dr. Singal, the NIOSH physician, to discuss any health problems and questions that were thought to be related to working at SRS.

Since a large part of our evaluation centered on determining the scope of the problem, we also met with individuals from the U.S. Forest Service and the U.S. DOE who had knowledge of the areas entered by you and your employees. As you know the SRS covers approximately 350 sq. miles, and you and your staff were required to be in numerous locations throughout that area to trap beaver and feral pigs. In order to properly address the issues raised in your request it was necessary to determine several things.

First, were there any areas that you and your employees visited more frequently than others?

Second, we needed to determine if there were certain areas at SRS that were more likely to result in exposure to harmful chemicals or to radioactive materials than other locations.

Third, did the areas in which you and your staff spend the greatest amount of time coincide with areas that might be more heavily contaminated than others?

Fourth, and finally, was there any medical evidence that either you or your employees experienced any adverse health effects that could be related to your work?

Information provided by you and U. S. Forest Service staff was used to answer the first question. Based on that information we determined that over the life of the Georgia Bowhunters contracts with the U.S. Forest Service the majority of the beaver which were trapped came from a relatively small number of areas on the SRS. The attached Table lists those areas and the number of beaver which were trapped there (Table 1).

We then contacted the DOE and staff of the Bechtel Corporation (SRS) to obtain any data that they had concerning chemicals found in the streams and ponds associated with the areas described in Table 1. The Department of Energy (DOE SRS) responded to our request by providing data concerning each of the chemicals it is required by the US Environmental Protection Agency (EPA) to monitor. The data that they provided covered all of the years in which you actively trapped at SRS and consisted of approximately 60,000 individual measurements of both chemical substances and radioactive materials. While I reviewed the chemical monitoring data, Mr. Flora, a Certified Health Physicist, reviewed the data concerning the radioactive materials.

**Findings Concerning Exposure to Radioactive Materials**

Many organizations and researchers have explored the relationship between radiation dose and adverse human health effects. For example, a dose of 600,000 millirems received over a short period of time will cause radiation sickness and death within 60 days. A dose of 50,000 millirems will cause radiation sickness but most people will completely recover. Doses of 1,000 – 5, 000 millirems, as a consequence of a nuclear accident, for example, are sufficient to initiate emergency actions to prevent prolonged exposure.

In addition to manmade sources of radiation (such as nuclear power and weapons facilities) there are many natural sources of radiation. The average annual dose of radiation from natural sources is about 300 millirems. Exposure from a typical chest X-ray is about 8 millirems.

In comparison to these doses, the DOE estimated that in 1998 a maximally exposed person at SRS and its surrounding area would have received an annual dose of **0.19 millirems** as a result of the activities at SRS.

Using data provided by DOE SRS that describes the amount of radiation in the streams in which you trapped the greatest number of beaver, Mr. Flora has estimated the internal dose of ionizing radiation that you and your employees would have received if each of you had accidentally ingested 10 grams (about 1/3 ounce) of contaminated soil per year. This represents a worse case example assuming that the building of castor mounds resulted in accidental ingestion of soil from contaminated streams. Ten grams is the amount used by the EPA to establish guidelines for human exposure in their Federal Guidance Report 11, published in 1988. **Based on that assumption, you or any one of your employees would have received a maximum of 2 millirems of radiation per year, or about one fourth of the amount you would have received if you had received one chest X-ray and 1/150 of the amount that humans receive from natural sources.**

In addition to the data reviewed by Mr. Flora, Dr. Singal reviewed radiation dosimetry information that was available for six trappers who had worked at SRS. Four of those trappers participated in interviews with Dr. Singal. One of the six left SRS prior to 1992 (when you were awarded the first trapping contract). The other five had whole body counting conducted for cesium–137 (a uranium fission product) beginning in 1992. Four workers had urine assays conducted to determine whether their bodies contained

any plutonium, uranium, or strontium. All of these whole body counts and urine assays were negative. **Based on the results of the environmental monitoring data reviewed by Mr. Flora and the biological monitoring data reviewed by Dr. Singal, we find no basis for a substantial health risk due to exposure to radioactive materials during beaver trapping**

**Findings Concerning Exposure to Non–radioactive Substances**

SRS staff are required by the U.S. EPA and others to periodically monitor the water quality of the Savannah River and the quality of the waters flowing into the Savannah River for a large number of chemicals. SRS is required to report those results to the U.S. EPA. The goal of that monitoring is to ensure that the water that ultimately flows into the Savannah River meets Federal criteria for drinking water sources. SRS staff also monitor concentrations of radioactive and non–radioactive chemicals in the sediments of those waters. Based on the data supplied by SRS we determined that only rarely did any samples on site at SRS approach concentrations that would trigger concern that the water quality standards were being exceeded. In addition, none of the samples ever had concentrations that would have resulted in exposures that are known to cause adverse health effects among workers in more traditional workplaces as a result of either long–term or short–term exposures. For example, the amount of 1,1,1– trichoroethylene found in wells at the southern end of trapping sites 19 and 43 (Areas A and M) was 5 micrograms per liter of water, which is the upper limit for drinking water in the U. S. We assumed that you immersed both of your hands in water that contained 5 micrograms of trichloroethylene per liter of water, and that each time your hands were in the water you absorbed 5 micrograms of trichloroethylene through your skin. If you immersed your hands in that water 100 times a day then the total amount of trichloroethylene you could have absorbed would have been 500 micrograms. This theoretical absorbed dose can be compared to the amount that a worker would absorb if he was exposed to trichloroethylene at a concentration of 100 parts per million (ppm) (the current OSHA standard) for an 8–hour work day. (100 ppm is equivalent to about 530 micrograms) During an 8–hr work shift, a worker exposed at this concentration would inhale approximately 5,300 micrograms of trichloroethylene, or more than 10 times the amount that you would have absorbed through your skin using the above "worst case" scenario.

The OSHA standard for trichloroethylene of 100 ppm is based on the prevention of acute effects on workers' memory and manual dexterity. There is no data to support the development of skin lesions or other health problems among people exposed to trichloroethylene in amounts as small as 5 micrograms per liter of water.

While I have used trichloroethylene as an example, the same situation exists for the other contaminants in the SRS waters, including metals such as chromium and lead and pesticides that may have entered the SRS waters. In general, the concentrations of those contaminants are several orders of magnitude below the amounts known to cause health problems in workers exposed to them for 8 hours a day, 5 days a week, 52 weeks a year, for as long as 45 years.

The fact that we would not expect to find adverse health effects at exposures similar to those you encountered is bolstered by the findings of Dr. Singal. I have summarized Dr. Singal's findings below, but his complete report is included as an attachment to this letter.

**Findings Concerning the Medical Evaluation**

Dr. Singal conducted in-person medical interviews of you and seven members of your staff to explore any health concerns that you had. Dr. Singal also photographed areas of the skin which were cause for concern. The camera that Dr. Singal used was a digital camera equipped for use by dermatologists. The photographs were then reviewed by Dr. Boris Lusniak, a NIOSH dermatologist certified by the American Board of Dermatology. An eighth employee was interviewed by phone.

In summary, Dr. Singal noted that seven of the nine interviewees reported a health problem that began during or after their work as a trapper at SRS. Those health problems included a variety of dermatologic (skin), neurologic (nervous system), ophthalmologic (eye), musculoskeletal (muscle and joint), endocrine, respiratory (lung), gastrointestinal, cardiac (heart), and urinary tract, symptoms and diagnoses. In some cases, the circumstances or characteristics of the health problems suggested that they had a cause other than chemical or radiation exposure at SRS. These conditions included age-related decreased near-vision acuity, allergies, and certain heart, gastrointestinal, and urinary tract problems. Four workers interviewed by Dr. Singal reported experiencing joint pain. Two of those workers reported that thy had occasional elbow pain. In one case the joint pain began at least two years after the person last worked as a trapper at SRS. Two people, including one with elbow pain, reported pain in both knees. One person also reported generalized joint pains. Two trappers reported recurrent headaches, right-sided in both cases. In one person, they began at an uncertain time after he stopped trapping a few years ago, and in the other person, they began a few years ago, while he was still trapping. In both cases, the headaches continued to recur as of the time of the interviews.

Six people reported at least one skin problem. One person reported a rash on the forehead that resolved in two weeks and which did not return. Another had healed leg lesions that he described as pustular and said they had been diagnosed as "Staph" infections. He also described a recurring hand rash, as well as rashes on his arms and legs that occurred when he immersed his arms in a stream or pond or got his legs wet. The arm and leg rashes would resolve within a day; none were present at the time of the interview. The other four workers had a variety of skin lesions. Based on the digital photos, the NIOSH dermatologist identified probable or possible actinic keratoses in two people. Other probable or possible skin conditions, none of which are known to be caused by chemical or radiation exposures, included seborrheic keratoses, dermatofibromas, progressive pigmented purpuric dermatosis, and rosacea.

Two trappers provided medical records from their own health care providers. In neither case did the records contain medical findings specifically indicative of a health effect related to environmental chemical or radiation exposure. The available information did not demonstrate either the presence or absence of any environmental chemical exposure.

While Dr. Singal found no pattern of health effects that suggested exposure to industrial chemicals or ionizing radiation, this does not rule out the possibility that sporadic or recurrent low-dose exposures might have caused transient health effects that would have had a very short duration and would not necessarily result in persistent, overt health effects. The environmental data, however, provided no evidence of such exposures.

Based on our investigation we conclude that beaver trapping at the SRS was not associated with any health problems due to either chemical or radiation exposure.

**Feral pig trapping**

Workers employed by Georgia Bow Hunters Supply also operated under a contract with the U.S. Forest Service to trap and kill feral pigs. A major concern of you and your employees was the potential for exposure to radioactive cesium-137 dust generated during pig trapping in the PAR Pond area during a time when the water level had been substantially reduced in order to repair the dam at PAR Pond. Well before the NIOSH investigation, repairs to that dam had been completed and the water level restored to its normal depth. Though there is historic data concerning the concentration of cesium-137 in the dust and vegetation that was uncovered during the PAR Pond draw down, it is not possible to determine whether you and your employees were exposed to radiation in amounts that would be harmful. There are two reasons for our inability to make that determination. First, the guidance for worker exposure is based on continuous exposure over 2,000 working hours (1 work year). The exposure that you and your employees may have encountered was intermittent but based on the information that you provided, did not approach 2,000 hours per year. Second, since the water in PAR Pond has been restored to its normal levels it is not possible to conduct any monitoring of radioactive dust in that area since it is once again under water.

In addition, data provided by DOE staff concerning radioactivity in pig and beaver carcasses did not reveal any animals that were contaminated to an extent that would cause concern about their handling or even the limited ingestion of their meat (see the Savannah River Site Environmental Report for 1998, pages 100 – 104)

Based on the available environmental data and our medical findings, we conclude that beaver and pig trapping at SRS has not been associated with harmful exposure to radioactive or toxic environmental contaminants.

* I will note that during our visit to the SRS we came to understand an issue involving communications between the Forest Service personnel and DOE and DOE contract personnel at SRS. This issue centered on a lack of understanding between Forest Service personnel and SRS staff as to what is involved in the trapping of beaver, particularly the fact that beaver trapping necessarily involves the disturbance of sediments in order to build castor mounds. Work Clearance Permits (WCPs) were issued to the trappers by the U.S. Forest Service and Westinghouse Environmental Section. The WCPs were issued by Westinghouse staff without a full understanding that the work would involve disturbing contaminated soil during the placement of beaver traps.

This is particularly noteworthy since a good deal of the trapping took place in areas which were posted as "soil contamination" areas. This posting, particularly in the Steed Pond area took place during the life of the final contract that had been awarded to Georgia Bow Hunters Supply and served as one of the reasons that the Health Hazard Evaluation request was made.

During our investigation we determined that the Forest Service had no knowledge that this area had been posted and that SRS/Westinghouse staff had an incomplete understanding of the beaver trapping process. We discussed this with both the Forest Service and SRS staff and recommended improved communication between those two agencies regarding any future beaver trapping that might be conducted. It is my understanding that as a result of our recommendations, the Forest Service and SRS have reviewed their procedures and have made changes to prevent similar problems from occurring in the future.

Since this letter constitutes our final report copies will also be sent to each of the workers who trapped beaver for you under the Forest Service contract. Copies of this letter will also be provided to the appropriate DOE and Forest Service Staff.

Sincerely yours,

Lawrence F. Mazzuckelli

Lawrence F. Mazzuckelli
Toxicologist
Hazard Evaluation and Technical
Assistance Branch
Division of Surveillance, Hazard
Evaluations, and Field Studies

cc:
Diane Saylor, Department of Energy
Beth LeMaster, U.S. Forest Service