# EXHIBIT M

## Deposition of Margaret Yeaton

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a<br>GEORGIA BOWHUNTERS SUPPLY, | ) | |
| Plaintiff, | ) | |
| vs. | ) | NOS. 03-1501C, 04-1126 |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

\- - - - -

**DEPOSITION OF MARGARET YEATON**

taken by Counsel for the Plaintiff

before Sharon DeHart, Certified Court Reporter

at the offices of Department of Energy

151 Corporate Parkway, Aiken, South Carolina

on Wednesday, the 7th day of December 2005

commencing at 4:11 p.m.

\- - - - -

Q. How long have you been the contracting officer at Savannah River Site?
A. Since January 11th, 2004.
Q. And before that, what did you do?
A. I retired from the Air Force.
Q. What was your retiring rank?
A. I was a senior master sergeant 88.
Q. Did you do this kind of work in the Air Force?
A. Yes.
Q. What are your responsibilities? And I know I asked Mr. Gabard that, but it might have changed since he was there. What are your responsibilities?
A. It's -- basically remains the same. You -- I -- you do solicitations for supply services, construction, architectural engineer. You award the contracts and then you do the administration.
Q. And do you have a COR working with you?
A. It varies for each contract.
Q. Oh, it does?
A. Yes.
Q. Oh, right, of course it would. Of course it would. Did you participate in answering the interrogatories?
A. Yes.
Q. This is going to be really short because you

Q. I understand that, but do you know if there is a definition?
A. No, I do not.
Q. Okay. Then I'd like to have you identify -- I don't know if you prepared this or someone else, but this is a site visit in preparation for solicitation.
A. Um-hum [yes]. Yeah, right.
Q. Did you prepare that document?
A. Yes, I did.
Q. Okay. Let me mark that and I just want to ask you a couple of questions about it.
**[PLAINTIFF'S EXHIBIT 9 IS MARKED FOR IDENTIFICATION]**
Q. [Ms. Nichols] This starts out that this was for hog control and a site visit was conducted on 17 August of last year, and a list of attendees is attached and I believe Mr. Hooker attended that.
A. Right.
Q. Or at least his name is on the list. And you talk about the information that was given to the prospective bidders.
A. Um-hum [yes].
Q. And I'd just like to talk to you about page two where you have Q&As, and the question is, "Have the soil contaminated sites been identified?" And your answer is, "Yes, they have. The contractor, or plural, awarded the

resulting contract may request copies." So those sites have been identified; is that correct?

A. That was the information I was given by the safety officer who was present at the time.

Q. Okay.

A. No one requested them, so I didn't have to --

Q. Okay. We would like a copy of that, please.

A. A copy of what?

Q. The -- it says, "Yes, they have. The contractor awarded the resulting contract may request copies."

A. And they did not request any copies.

Q. I understand that, but if that exists, we would like that document.

A. Isn't that the response to one of the interrogatories?

**MS. WILLIAMS:** Of course, if it exists --

A. Right, I mean, I was going from what the safety officer said at that time.

Q. [Ms. Nichols] I understand. I understand. But if it exists, we would like a copy of it, and Ms. Williams will make sure that happens.

**MS. WILLIAMS:** What's the Exhibit Number? I'm sorry.

**MS. NICHOLS:** It's Exhibit 9.

A. He can submit it to me.
Q. Oh, he has to submit a request for payment?
A. Right.
Q. Somewhere in the contract that you -- in your general specifications, you discuss radiological control areas. Do you have a definition of the RCAs?
A. I would assume it would be what is -- what's used on the Site.
Q. Okay. Is it possible that your attorney could provide us any information about the radiological control areas on the Savannah River Site, and if there is a definition?
A. Isn't that what you showed us? I mean --
Q. Um-hum [yes]. Um-hum [yes]. That was produced by Westinghouse. I don't have anything from the Forest Service or --
**MS. WILLIAMS:** So what you want is the document -- you want the equivalent of Exhibit P-3 produced by the Forest Service?
**MS. NICHOLS:** Right. I would like --
A. The Forest Service does not deal with contamination.
Q. [Ms. Nichols] Okay. Does the Forest Service -- is the Forest Service notified by the Department of Energy as to where the contamination is on the Site? Do

you have any kind of --
A. I do not know that. We're not responsible for marking the sites.
Q. Oh, I understand that. I understand that. I'm assuming that if you were going to be sending contractors out on the Site, they would provide you with a list of areas not to send them. Do they do that?
A. No.
Q. Okay.
A. But the -- no.
Q. Are you aware that some areas are posted as --
A. Well, that's what -- they're given -- they go to GET training and they're told to ignore the orange balls and whatever, other signs, so it would be what's posted on the Site.
Q. Who's told to ignore them? I don't understand what you're saying.
A. I mean during GET training, they're told what the significance of the markings on the Site are.
Q. What is GET training?
A. I don't know what it stands for, but it's a requirement that anybody performing a -- there's different levels and they're required to receive -- they're told about the general practices on the Site.
Q. Okay, GET --