**Nos. 03-1501C & 04-1126**
**(Judge Allegra)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**WILLIAM J. HOOKER, d/b/a**
**GEORGIA BOWHUNTERS SUPPLY,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**TODD M. HUGHES**
**Assistant Director**

**RICHARD P. SCHROEDER**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**Eighth Floor**
**1100 L Street, N.W**
**Washington, D.C. 20530**
**Tele: (202) 353-7961**
**Attorneys for Defendant**

**September 7, 2006**

DEFENDANT'S BRIEF ........ 2

STATEMENT OF THE ISSUES ........ 2

NATURE OF THE CASE ........ 3

A. The Beaver Contract And Related Claims ........ 3

B. The Hog Contract And Related Claims ........ 5

STATEMENT OF FACTS ........ 7

ARGUMENT ........ 8

I. Standard For Summary Judgment ........ 8

II. The Government Is Entitled To Summary Judgment Dismissing Mr. Hooker's Claims That It Breached The Beaver And Hog Contracts ........ 9

A. The Government Is Not Liable For Breach Of The Beaver Contract Due To The Reduction Of Services Required From Mr. Hooker Or Due To Its Decision Not To Exercise The Option To Extend The Contract Term ........ 9

1. The Government Had The Contractual Right To Reduce The Quantity Of Services Ordered Under The Beaver Contract ........ 10

2. The Government Did Not Breach The Beaver Contract Because It Was Under No Obligation To Exercise The Option Period ........ 18

B. The Government Did Not Breach The Hog Contract By Withholding Payment, Barring Two Of Mr. Hooker's Employees, Or Not Paying Him Under The Alleged Contract Extension ........ 19

1. The Government Had The Contractual Right To Refuse Payment For Hogs It Deemed To Be Domestic ........ 19

2. Mr. Hooker Cannot Recover Damages Based Upon The Government's Decision To Bar Two Of His Employees From The Site ........ 22

3. Mr. Hooker Cannot Recover The Alleged Value Of The Hog Contract For The Time Period During Which He Was No Longer Providing Services ........ 24

III. Mr. Hooker Is Not Entitled To Equitable Adjustment of Either Contract Due To The Alleged Existence Of Contamination ........ 26

A. Mr. Hooker's Equitable Adjustment Claim As It Relates To The Hog Complaint Was Dismissed On August 26, 2005 .......... 27

B. Mr. Hooker's Cannot Prove That The Government Breached The Beaver Contract Or That He Incurred Contamination-Related Additional Costs... 29

C. Mr. Hooker Is Not Entitled To Application of the "Jury Verdict Method".... 33

1. Mr. Hooker Cannot Recover Under His Previously Dismissed Hog Claim .......... 33

2. Mr. Hooker Cannot Recover Under The "Jury Verdict" Method In Connection With His Beaver Claim .......... 34

IV. Plaintiff Cannot Prevent Dismissal By Making Unsupported Allegations Of "Bad Faith" .......... 37

A. The Government Is Entitled to a Presumption Of Good Faith .......... 38

B. Mr. Hooker Cannot Overcome This Presumption Because None Of The Government's Actions Demonstrate Bad Faith .......... 40

1. Bad Faith Allegations In The Hog Complaint .......... 40

2. Bad Faith Allegations In The Beaver Complaint .......... 42

3. Mr. Hooker's Summary Judgment Motion Does Not Demonstrate Bad Faith On The Government's Part With Respect To Either Contract... 42

4. The Evidence Presented By The Government Affirmatively Demonstrates That The Government Acted In Good Faith .......... 45

CONCLUSION .......... 47

# TABLE OF AUTHORITIES

## CASES

A-Transport Northwest Co. v. United States,
27 Fed. Cl. 206 (1992) .......... passim

Ace Instructors, Inc. v. U.S.,
70 Fed. Cl. 253 (2006) .......... 31

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) .......... 38

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .......... 8

Asco-Falcon II Shipping Company v. United States,
32 Fed. Cl. 595 (1994) .......... 38, 39

Aspen Helicopters, Inc., v. Department of Commerce,
99-2 B.C.A. (CCH) P30 (Gen. Serv. Admin. Bd. of Contract Appeals 1999) .......... 18

B.V.D. Licensing Corp. v. Body Action Design, Inc.,
846 F.2d 727 (Fed. Cir. 1988) .......... 13

Bannum, Inc. v. United States,
56 Fed. Cl. 453 (2003) .......... 38, 44

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) .......... 8, 44

Citizens Financial Services v. United States,
64 Fed. Cl. 498 (2005)A .......... 37

Continental Collection & Disposal, Inc. v. United States,
29 Fed. Cl. 644 (1993) .......... 39

Cottrell v. United States,
42 Fed. Cl. 144 (1998) .......... 28

Curl v. International Business Machines Corp.,
517 F.2d 212 (5th Cir. 1975), cert. denied, 425 U.S. 943 (1976) .......... 44

D.V. Gonzalez Electrical & General Contractors, Inc. v. Unites States,
55 Fed. Cl. 447 (2003) .......... 39, 40, 41

Fields v. United States,

53 Fed. Cl. 412 (2002) ....................................................................................18

Gadsden v. United States,
75 F. Supp. 126 (1948) ....................................................................................39

Galen Med. Assocs., Inc.,
369 F.3d 1324 (Fed. Cir. 2004) .......................................................................39

Govt Sys. Advisors, Inc. v. United States,
847 F.2d 811 (Fed. Cir. 1988) .........................................................................18

H.J. Lewis Oyster Co. v. United States,
123 Ct. C 107 F. Supp. 570 (1952)..................................................................30

Hi-Shear Technology Corp. v. United States,
53 Fed. Cl. 420 (2002) ....................................................................................11

Hoffman Construction Company of Oregon v. United States,
40 Fed. Cl. 184 (1998) ....................................................................................17

Info. Tech. & Applications Corp.,
316 F.3d 1312 (Fed. Cir. 2003) .......................................................................39

Jackson v. United States,
573 F.2d 1189 (Ct. Cl. 1978)...........................................................................28

LaSalle Partners v. United States,
48 Fed. Cl. 797 (2001) ....................................................................................18

Medart, Inc. v. Austin,
967 F.2d 579 (Fed. Cir. 1992) .........................................................................10

Mega Const. Co., Inc. v. U.S.,
29 Fed. Cl. 396 (1993) ...............................................................................25, 31

Mid-West Construction, Ltd. v. United States,
387 F.2d 957 (Ct. Cl. 1967) ............................................................................15

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) .........................................................................8

National Movers Co. v. United States,
386 F.2d 999 (Ct. Cl. 1967) ............................................................................16

Penthouse Int'l, Ltd., v. Dominion Fed. Sav. & Loan Assoc.,
855 F.2d 963 (2d Cir. 1988) ....................................................................15, 26

Puget Sound Energy, Inc. v. United States,
47 Fed. Cl. 506 (2000) ..............................................................................28

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) ....................................................................30

Rumsfeld v. Applied Companies, Inc.,
325 F.3d 1328 (Fed. Cir. 2003) ..................................................................36

Ryco Const., Inc. v. United States,
55 Fed. Cl. 184 (2002) ..............................................................................31

SAB Construction, Inc. v. United States,
66 Fed. Cl. 77 (2005) ........................................................................34, 35, 36

SRI Intern. v. Matsushita Elec. Corp. of America,
775 F.2d 1107 (Fed. Cir. 1985) ..................................................................17

San Carlos Irrigation and Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) ................................................................9, 29

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) ..................................................................30

Scholle v. Cuban-Venezuelan Oil Voting Trust,
285 F.2d 318 (2d Cir. 1960) ......................................................................16

Somali Dev. Bank v. United States,
508 F.2d 817 (Ct. Cl. 1974) ......................................................................28

Spezzaferro v. FAA,
807 F.2d 169 (Fed. Cir. 1986) ....................................................................38

Story Parchment Co. v. Paterson Parchment Paper Co.,
282 U.S. 555 (1931) ..................................................................................30

Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,
833 F.2d 1560 (Fed. Cir. 1987) ................................................................8, 44

T & M Distributors, Inc. v. U.S.,
185 F.3d 1279 (Fed. Cir. 1999) ..................................................................17

Technical Assistance Intl v. United States,
150 F.3d 1369 (Fed. Cir. 1998) ....................9, 11, 29

Tecom, Inc. v. United States,
66 Fed. Cl. 736 (2005) ....................38

U. S. for Use and Benefit of Arlmont Air Condition Corp. v. Premier Contractors, Inc.,
283 F.Supp. 343 (D. Me. N.D., 1968) ....................26

United States v. Penn Foundry & Mfg.,
337 U.S. 198 (1949) ....................15, 26, 27

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) ....................30

Williams v. Sec'y of the Navy,
787 F.2d 552 (Fed. Cir. 1986) ....................28

**STATUTES**

Contract Disputes Act, 41 U.S.C. 601 ....................5

# TABLE OF CONTENTS TO DEFENDANT'S APPENDIX

**DOCUMENT** **PAGE**


Complaint, Case No. 03-1501C, Filed: June 17, 2003……… ………………….. **A1**

First Amended Complaint, Case No. 03-1501C, Filed: March 17, 2004 ........... **A9**

Complaint and Cover Sheet, Case No. 04-1126C, Filed: July 7, 2004……….... **A14**

Plaintiff's Supplemental Interrogatories, dated April 5, 2006 ………………….. **A23**

Georgia Bowhunter's Wild Hog Technical Proposal (Redacted)………………… **A41**

Wild Hog Contract Number 53-4660-8-04, date issued: September 9, 1997 …… **A47**

Wild Hog Contract Number 53-4660-8-04, Modification No. 4, Effective date: October, 1, 1999 ………………………………………. ………… **A65**

George Bowhunters Supply Company Technical Proposal for R8-36-99-05 (RFP) (Redacted)………………………………………………………… **A66**

Beaver Invoice, dated October 1, 1999 …………………………………………….. **A73**

Beaver Contract Number 53-4660-9-06 ……………………………………………. **A74**

Work Order and Notice of Noncompliance, Beaver Trapping, dated January 27, 1999 …………………………………………………………. **A88**

Hog Data Sheet – January 1999 – November 1999 ………………………………. **A89**

Beaver Trapping Sites – FY 92, FY 97-99 ………………………………………. **A128**

Beaver Control Sheets, 1999 ……………………………………………………... **A130**

Work Clearance Permit, dated February 22, 1999 ………………………………. **A147**

Letter to Frankie Brooks from W.D. Hooker, dated May 6, 1999 ……………….. **A150**

Contracting Officer's letter, dated June 30, 1999, re: Contract 53-4660-8-04, Wild Hog Control ………………………………………………………… **A151**

Wackenhut Security Incorporated-Savannah River Site Investigations Report, dated July 6, 1999 ………………………………………………... **A154**

Savannah River Site's Monthly Precipitation for 1970 – 2000 …………………. **A156**

Beaver Invoice, dated October 1, 1999 ……………………………………………... **A159**

Beaver Invoice, dated November 3, 1999 ………………………………………… **A161**

Record of Phone Conversation, Contrtacting Officer and William Hooker,
dated November 12, 1999 ………………………………………………… **A162**

Beaver Trapping, FY 2000 ……………………………………………………... **A163**

Employee Concern No. SR20000-02-003, dated October 30, 2000,
re: Alleged Exposure to Hazardous Substances on Beaver
Contract ……………………………………………………………… **A166**

National Institute for Occupational Safety and Health Investigation Report,
dated December 27, 2000 ………………………………………………… **A169**

Request for Equitable Adjustment, dated October 23, 2000……………………….. **A178**

Request for Equitable Adjustment, dated October 26, 2000……………………… **A180**

Request for Equitable Adjustment, dated October 26, 2000 ……………………. **A182**

Claim for Beaver Contract 53-4660-9-06 (Four Mile Branch)
(Attachments Omitted) …………………………………………..……... **A184**

Letter from William D. Hooker, Sr., to Homer Gabard, re: Claim for Beaver
Contract 53-4660-9-06, dated April 8, 2002 (Attachments Omitted) ……... **A189**

Letter from William D. Hooker, Sr., to Homer Gabard, re: Claim for Beaver
Contract while working for GA. Bowhunters Supply Co. on
property owned by the Department of Energy), dated April 8, 2002 ……... **A193**

Contracting Officer's letter, dated July 29, 2002, re: Requests for Equitable
Adjustment for Wild Hog Control and Beaver Control Contracts ………... **A195**

Letter from William D. Hooker, Sr., to Homer Gabard, re: Request for
Equitable Adjustment (Claim for Contract #53-5660-9-04)
dated, April 7, 2004 ……………………………………………………….**A199**

Contracting Officer's letter, dated June 10, 2004, re: Request Equitable
Adjustment, Contract #53-4660-0-04 ……………………………………. **A201**

Deposition of Frankie R. Brooks, dated December 7, 2005 ……………………… **A204**

Deposition of Homer R. Gabard, dated December 7, 2005 ……………………......... **A219**

Deposition of Margaret Yeaton, dated December 7, 2005 ……………………….. **A242**

Deposition of John A. Cromer, III, dated December 8, 2005 …………………… **A245**

Deposition of David Sanders, dated June 2, 2006 ……………………………….. **A282**

Deposition of William D. Hooker, dated June 2, 2006 …………………………… **A286**

Deposition of William D. Hooker, dated December 8, 2005 …………………….. **A295**

Incident Report, dated September 27, 1995, re: Miscellaneous/Fishing
Without Consent (9011) (Redacted)…………………………………**A308**

Request for Controlled Articles for William D. Hooker (renewal) and
Mark David Lubert (renewal) dated October 29, 1999, signed by
Marvin Bracy, USDA Forest Service (Redacted) ……………………….. **A315**

Memorandum, dated February 14, 2000, from Homer R. Gabard, Contracting
Officer, to William D. Hooker, Subject: Contract 53-4660-8-04, Wild
Hog Control, with two attachments: (1) USDA-Forest Service Contract
Daily Diary, DAY: January 5, 2000, signed by Frankie Brooks and
(2) Final Invoice Number 107624, for $165.00 for three hogs …..................**A317**

Local newspaper articles on the 1999 Drought Weather Conditions dated:
January 6, 1999 (Aiken, SC) January 22, 1999 (Trenton, SC), March 11, 1999
(Augusta, GA), May 6, 1999 (Athens, GA) June 4, 1999 (Athens, GA)
June 8, 1999 (Augusta, GA) June 12, 1999 (Augusta, GA ……………………… **A321**

Savannah River Site Map ……………………………………………………….. **A340**

Hog Monitoring Report……………………………………………………….. **A343**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a, GEORGIA BOWHUNTERS SUPPLY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Nos. 03-1501C, 04-1126C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rules 5.2 and 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this opposition to plaintiff's motion for summary judgment and further requests that the Court grant summary judgment to the United States dismissing these consolidated actions. We rely upon plaintiff's first amended complaint in Case No. 03-1501C, plaintiff's complaint in Case No. 04-1126C, the declarations of Frankie Brooks, Brian Hennessey, and Kenneth Crase, defendant's proposed findings of uncontroverted fact, defendant's response to plaintiff's proposed findings of uncontroverted fact, defendant's appendix, the following brief, and all of the prior proceedings had herein.[1]

1 Declarations are cited, for example, in the following format: "Brooks Decl. __." The Government's proposed findings of uncontroverted fact are cited "Def. Facts __" and plaintiff's proposed findings of uncontroverted fact are cited "Pl. Facts__" (references are to page and paragraph numbers). Defendant's appendix is cited "A__" (references are to page numbers). This Court's February 25, 2004 and August 26, 2005 opinions are cited "Feb. 2004 Dec. __" and "Aug. 2005 Dec.," and plaintiff's motion for summary judgment is cited "Pl. Mot. __" (references are to page numbers). The exhibits in the appendix to plaintiff's motion for summary judgment are cited "Pl. Exh. __."

## DEFENDANT'S BRIEF

## STATEMENT OF THE ISSUES

1. Whether the Government is entitled to summary judgment upon plaintiff's claim that the Government breached the Beaver Contract, by reducing the quantity of services, where there were legitimate reasons for doing so.

2. Whether the Government is entitled to summary judgment upon plaintiff's claim that the Government wrongfully failed to exercise its option to extend the term of the Beaver Contract where the Government was under no duty to exercise the option.

3. Whether the Government is entitled to summary judgment upon plaintiff's claim that the Government breach the Hog Contract by withholding $1,320 in payments where the Government had legitimate reasons for doing so.

4. Whether the Government is entitled to summary judgment upon plaintiff's claim that the Government breached the Hog Contract by barring two of his employees from the work site where the Government had legitimate reasons for doing so.

5. Whether the Government is entitled to summary judgment upon plaintiff's claim that he is entitled to the alleged value of the Hog Contract for a two-year time period during which he no longer was performing services, and whether plaintiff's motion for summary judgment upon that claim should be denied.

6. Whether Mr. Hooker's motion for summary judgment seeking an equitable adjustment of the Hog Contract due to plaintiff's alleged exposure to contamination should be denied where that claim was dismissed by an order previously issued by this Court in this case and is no longer pending.

7. Whether the Government is entitled to summary judgment upon plaintiff's claim that he is entitled to an equitable adjustment of the Beaver Contract due to

alleged exposure to contamination where he cannot demonstrate a factual basis for that claim or that he suffered damages, and whether plaintiff's motion for summary judgment upon that claim should be denied.

8. Whether the Government is entitled to summary judgment upon plaintiff's "bad faith" claims relating to the Hog and Beaver Contracts where he cannot demonstrate bad faith upon the part of the Government, and whether plaintiff's motion for summary judgment upon those claims should be denied.

## NATURE OF THE CASE

Plaintiff, William Hooker, claims that the Government breached two contracts. One contract (the "Beaver Contract") was to control the beaver population and clean culverts at the Savannah River Site ("SRS") in South Carolina. The other contract (the "Hog Contract") was to control the wild hog population at the SRS.[2] Mr. Hooker seeks summary judgment upon his claims relating to both contracts. For the reasons set forth below, his motion should be denied and our cross-motion for summary judgment should be granted.

### A. The Beaver Contract And Related Claims

Mr. Hooker was awarded the Beaver Contract in January 1999. A74-75. The contract was for trapping beavers at the SRS site and maintaining the free flow of water through certain culvert outlets and inlets. Beaver Comp. 1-2, ¶ 6; Feb. 2004 Dec. 1. The contract was a requirements contract. Beaver Contract, Sec. I-7(a), A83-84. The

[2] Case No. 03-1501 involves the Beaver Contract (Contract No. 53-4660-9-06). Case No. 04-1126 involves the Hog Contract (Contract No. 53-4660-8-04). For ease of reference, the first amended complaint in Case No. 03-1501C is referred to as the "Beaver Complaint" and cited "Beaver Comp. __." The complaint in Case No. 04-1126C is referred to as the "Hog Complaint" and cited "Hog Comp. __." References are to page and paragraph numbers.

contract provided that the quantities set forth in the schedule were estimates only and that the Government was not obligated to order any quantities of work under the contract. Schedule, A81. The initial contract term ran from January 22, 1999 through December 31, 1999. A76, A80. The contract included a one-year option period. A80-81.

Mr. Hooker was paid a predetermined amount for each beaver caught ($45) and for each hour of culvert cleaning ($18). See Feb. 2004 Dec. 2; Beaver Comp. 2, ¶ 7. Mr. Hooker claims that, during performance, he discovered that "at least one pond he had worked in" had been posted as contaminated but that the signs had fallen to the ground and been covered with debris and weeds. Beaver Comp. 2-3, ¶ 12. Mr. Hooker requested additional funds, claiming that, had he known of the alleged contamination, he would have "increased his bid and would have required trained personnel." Beaver Comp. 3, ¶ 14. The contracting officer denied Mr. Hooker's request. Id.

Mr. Hooker claims that, on June 1, 1999, he had a video made of the formerly posted site. Id. Thereafter, he claims that the contracting officer's representative, Frankie Brooks, "effectively terminated" the contract. Beaver Comp. 3, ¶¶ 15-16. He further claims that, prior to July 1, 1999, he had trapped at 55 sites. Beaver Comp. 3, ¶ 16. He claims that, after that date, all culvert cleaning work was stopped, that he was only permitted to trap at one site, and that he only received three additional work orders. Beaver Comp. 3, ¶ 16.

Mr. Hooker also claims that the Government breached its contract with him by reducing the number of trapping sites, as compared to the number specified in the contract, and by "effectively terminat[ing] the contract" by prohibiting him from performing culvert cleaning. Beaver Comp. 3, ¶¶ 16-17. Mr. Hooker asserts that the

alleged breach (i.e., the work reduction/alleged effective termination) resulted in damages arising from his "loss of the remaining contract term plus the option year in the amount of $80,000." Beaver Comp. 3, ¶ 18. He also asserts that he is entitled to consequential damages "as a result of financial hardship caused by the breach." Beaver Comp. 3, ¶ 19.

Additionally, Mr. Hooker alleges that the Government's actions were taken in bad faith. Beaver Comp. 3-4, ¶¶ 21-26. He asserts that the Government should have reformed the contract terms to compensate him for additional expenses, but refused to do so and, instead, effectively stopped him from performing any work. Beaver Comp. 4, ¶ 22. He claims that the Government took these alleged actions in retaliation for his concerns about alleged contamination. Beaver Comp. 4, ¶ 26. Thus, in addition to the $80,000 discussed above, Mr. Hooker claims that he is entitled to an unspecified sum of damages to compensate him for the Government's alleged bad faith in refusing to renegotiate the contract and punitive damages.

For the reasons discussed below, we are entitled to summary judgment dismissing the Beaver Complaint.

**B. The Hog Contract And Related Claims**

On March 17, 2004, Mr. Hooker filed a complaint, pursuant to the Contract Disputes Act, 41 U.S.C. § 601, et. seq., regarding Contract No. 53-4660-8-04. Hog Comp. 1, ¶ 1. The purpose of the contract was to control the hog population at the SRS. Feb. 2004 Dec. 1. Mr. Hooker was awarded that contract in October 1997. Hog Comp. 1, ¶ 2. The contract contained two one-year options, the first of which was exercised on October 1, 1998, extending the contract term until September 30, 1999.

A151. The contract also contains a provision limiting its length to no more than three years, including options. A84.

On June 30, 1999, the contracting officer, Homer Gabard, issued a letter advising Mr. Hooker that the Forest Service would withhold $1,320 in payments because Mr. Hooker's agents improperly tried to pass off domestic pigs as feral or wild hogs. A152, Item 6. Mr. Hooker claims that the deduction constituted a breach of contract. Hog Comp. 3, ¶ 10. In his letter, Mr. Gabard also advised Mr. Hooker that two of his employees were barred from working upon the contract. A152, Items 1-2. Mr. Hooker claims this was a breach of contract as well. Hog Comp. 4, ¶ 15.

On November 29, 1999, the contracting officer, Mr. Gabard, advised Mr. Hooker that the Forest Service would not be extending the contract, which was due to expire on September 30, 1999, for the second option year. A162a. However, on September 4, 1999, the parties entered into Contract Modification No. 4, extending the term of the Hog Contract "to October 31, 1999, or until a new contract is awarded." Hog Comp. 6, ¶ 25. Although this modification extended the contract through, at most, October 31, 1999, Mr. Hooker asserts that this modification extended the contract until November 2001 and that the Government breached the contract by allegedly discontinuing his services without notice. See Hog Comp. 6, ¶ 28. As a result, he seeks $55,000 in alleged damages. Hog Comp. 6, ¶ 29.

Mr. Hooker also had asserted that, for a period of six weeks in 1999, the contracting officer lost the paperwork for his contraband pass, thereby preventing him from obtaining a gun permit to dispatch hogs under the contract. Hog Comp. 4, ¶ 17. He had claimed that, since this was a requirements contract, he was prevented from performing during that time period and that this constituted a breach of contract. Hog

Comp. 4, ¶¶ 17-18. However, Mr. Hooker has subsequently dropped this claim against the Government. A23a. Therefore, Mr. Hooker's contraband pass claim is no longer at issue in this litigation.

In addition, in his Hog Complaint, Mr. Hooker had asserted that he was entitled to readjustment of the contract price because he allegedly was exposed to contamination at SRS. Hog Comp. 4-5, ¶¶ 19-23. Accordingly, he had requested that the Court grant him a price adjustment per hog. Hog Comp. 7, ¶ D. On August 26, 2005, the Court dismissed this count of Mr. Hooker's complaint, without prejudice, finding that Mr. Hooker had conceded that the Court lacked subject matter jurisdiction because the claim never had been properly submitted to the contracting officer. Aug. 2005 Dec. 2. Mr. Hooker has not since filed any claim with the contracting officer contending entitlement to a price readjustment for the Hog Contract, nor has he sought to file an amended complaint reasserting that claim. Therefore, Mr. Hooker's claim for a price readjustment of the Hog Contract also is no longer at issue in this litigation.

Finally, Mr. Hooker asserts a general claim that the Government's alleged actions constituted bad faith. Hog Comp. 6-7, ¶¶ 31-33. Mr. Hooker also claims that he is entitled to attorney fees to compensate him for the Government's alleged bad faith. He also seeks, "punitive damages," although the claim that this request relates to is unclear. Hog Comp. 8, ¶ F.

For the reasons set forth below, we also are entitled to summary judgment dismissing the Hog Complaint.

## STATEMENT OF FACTS

We respectfully refer to our proposed findings of uncontroverted fact and the description, above, of the contracts and Mr. Hooker's claims.

# ARGUMENT

## I. Standard For Summary Judgment

Pursuant to RCFC 56(b), a "party against whom a claim . . . is asserted or a declaratory judgment is sought may, at any time, move with our without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Pursuant to RCFC 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987); RCFC 56(c).

Summary judgment is "a salutary method of disposition 'designed "to secure the just, speedy and inexpensive determination of every action."'" Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). "The party opposing summary judgment must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient." Mingus Contractors, 812 F.2d at 1390-91.

A "material fact" is one "that might affect the outcome of the suit under the governing law," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. at 248.

In both of his complaints, Mr. Hooker alleges breach of contract, reformation, and bad faith as the grounds for recovery. The breach and reformation claims fail because Mr. Hooker cannot show that the Government violated any duty arising under either

contract, and because he cannot demonstrate damages. See Sections II and II of this brief, below. Mr. Hooker's "bad faith" claims fail because they are insufficient to overcome the strong presumption that Government officials execute their duties in good faith. See Section IV, below. Therefore, we are entitled to summary judgment dismissing Mr. Hooker's complaint in each case.

## II. The Government Is Entitled To Summary Judgment Dismissing Mr. Hooker's Claims That It Breached The Beaver And Hog Contracts

To recover for breach of contract, a plaintiff must allege and prove four elements: First, a plaintiff must demonstrate that a valid contract existed between the parties. San Carlos Irrigation and Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). Second, the defendant must have undertaken an obligation or duty arising out of that contract. Id. Third, the defendant must have breached that duty. Id. Fourth, a plaintiff must prove damages arising out of the breach. Id. The party alleging a breach of contract bears the burden of proof for each element. Technical Assistance Int'l v. United States, 150 F.3d 1369, 1373 (Fed. Cir. 1998).

### A. The Government Is Not Liable For Breach Of The Beaver Contract Due To The Reduction Of Services Required From Mr. Hooker Or Due To Its Decision Not To Exercise The Option To Extend The Contract Term

The Government did not breach the Beaver Contract because it was under no obligation to purchase the amount of beaver trapping or culvert cleaning services stated in the contract schedule, nor was it required to exercise the contract's option period. Moreover, even assuming for the sake of argument that the Government's actions amounted to a breach, Mr. Hooker's alleged damages are unrecoverable because they are derived from fictitious amounts that he purportedly would have demanded to fulfill

his contractual obligations, rather than from actual damages suffered due to the alleged breach.

**1. The Government Had The Contractual Right To Reduce The Quantity Of Services Ordered Under The Beaver Contract**

The Government did not owe Mr. Hooker a duty to purchase the amount of beavers and culvert cleaning services stated in the contract schedule. The contract was a requirements contract. Contract, Sec. I-7(a), A83-84; Pl. Facts 1, ¶ 6. The contract schedule merely estimated that Mr. Hooker would trap 700 beavers and spend 1,100 hours cleaning culverts. A81. Indeed, the contract expressly provided as follows:

> Estimated quantities are intended as a good faith estimate of the quantities to be ordered. However, the Government is not obligated to order any work to be performed under the resulting contract for either the base period or the option period. Reference FAR Clause 52.216-21 'Requirements'.

Contract Schedule, Sec. B, Requirements (FAR 52.216-22) (Oct 1955), A81.

Further, the contract elsewhere provided that the "quantities of . . . services specified in the Schedule are estimates only and are not purchased by this contract." Beaver Contract, Sec. I.7 (Requirements), A83. Thus, by the express terms of the contract, the Government did not guarantee that any minimum quantity of services would be purchased. Accordingly, the Government was not precluded from reducing the services it ordered from Mr. Hooker. Indeed, the above-quoted contract provisions authorized such action.

Independent of the contract's express language, the very nature of a requirements contract presupposes uncertainty about the buyer's eventual purchasing needs. Medart, Inc. v. Austin, 967 F.2d 579, 581 (Fed. Cir. 1992). Estimated contract requirements, i.e., those contained in the schedule, do not represent a guarantee or

warranty. Hi-Shear Technology Corp. v. United States, 53 Fed. Cl. 420, 428 (2002). Instead, the risks associated with the variance between actual purchases and estimated quantities are allocated to the contractor. Id. at 429.

Indeed, the only limitation upon the Government's ability to vary its requirements is that it must do so in good faith. Technical Assistance Int'l, 150 F.3d at 1373 (Fed. Cir. 1998). A purchaser acts in good faith if he has a valid business reason for varying its requirements other than dissatisfaction with the contract. Id. at 1372. Therefore, a reduction in requirements logically does not constitute either a breach or a termination of contract where the purchaser acts in good faith.

Mr. Hooker asserts that the Government improperly reduced the service it ordered under the Beaver Contract beginning in July 1999. Pl. Mot. 10. However, the evidence shows that the Government had valid business reasons for varying its requirements under the beaver contract. Specifically, the contracting officer testified that the Government reduced the number of beaver trapping and culvert cleaning sites due to well-below average rainfall, which led to a decrease in the prevalence of beavers. See Gabard Dep., p. 51, at 14 – p. 52, at 24, A232-233.

Moreover, the existence of a drought during the relevant time period is well-documented. Specifically, rainfall records show that the Savannah River Site and surrounding areas saw below average rainfall from the beginning of February through May, in August, and from October through the end of 1999. See 1999 Monthly Precipitation Chart, A156. In particular, rainfall during the months of February, March, April, May, and August were more than an inch below their monthly averages. Id. The cumulative rainfall amount for 1999 also was well below average. See 1970-1999 Yearly Avg. Chart, A157. The year 2000, during which Mr. Hooker's option would have

run, experienced even lower rainfall totals than 1999. See 1970-2000 Yearly Avg. Chart, A158.

Notwithstanding Mr. Hooker's assertions to the contrary, see Pl. Mot. 23, the records he discusses do not support his position. As an initial matter, Mr. Hooker states that rainfall was below average in July and August 1999, that rainfall was above average in September 1999, and that rainfall was about average in October 1999 (i.e., 2.74 inches compared to 2.71 average for October). Pl. Mot. 11. Certainly, nothing in the statistics cited by Mr. Hooker contradicts the existence of a drought. Further, Mr. Hooker's data (including the records in the appendix to his brief, see Pl. Exh. R), concern only the months of July through October 1999. However, rainfall records for February through June 1999 show below average totals for four of the five months immediately preceding the reduction in requirements. A156.

The reduced rainfall totals in 1999 and 2000 stand in stark contrast to the precipitation data from the preceding seven years during which Mr. Hooker held contracts with the Government. From 1992 through 1998, the annual precipitation at the Savannah River Site was above the 30-year average for four of seven years, helping to explain why the Mr. Hooker's services were in greater demand previously. See A57-158.

In addition to the contracting officer's deposition testimony and rainfall records for the area, Frankie Brooks, the contracting officer's representative at the time of the Beaver Contract, visited the sites at which Mr. Hooker had been trapping beavers and witnessed a reduced amount of water at those sites. Brooks Decl., ¶¶ 5-10. She noted that this reduction greatly reduced the need for beaver trapping and culvert cleaning relative to previous years. Id. at ¶ 10. A few sites, however, still had significant beaver

populations and the Government continued to issue work permits to Mr. Hooker to trap beavers and clean culverts at those locations. Id. at ¶ 9.

Finally, the existence of drought conditions is documented not only by rainfall records, but also by a contemporaneous local newspaper accounts. The Court may take judicial notice of both the weather records and newspaper articles, where appropriate. See F.R.E. 201 ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."; B.V.D. Licensing Corp. v. Body Action Design, Inc., 846 F.2d 727, 728 (Fed. Cir. 1988) (courts may take judicial notice of facts of universal notoriety, which need not be proved, and of whatever is generally known within their jurisdictions) (citing Brown v. Piper, 91 U.S. (1 Otto) 37, 42, 23 L.Ed. 200 (1875).

For example, the Augusta Chronicle, a local newspaper, published an article on June 4, 1999, that stated, in pertinent part, as follows:

> Drought Threatening to affect farms, wildlife
>
> * * *
>
> ATHENS, Ga. – Georgia's continuing drought threatens to become one of the worst, after one of the driest Mays in history.
>
> For the most part, municipal water supplies are still adequate, but the drought is already having an impact on farmers and wildlife, say those working with it.
>
> "If this hot, dry weather continues, we're in trouble," said Kerry Harrison, a hydrologist and irrigation specialist with the University of Georgia's Cooperative Extension Service in Tifton.

> . . . Athens and Augusta got less than a third [of their normal May rainfall] . . . .

A321. The SRS sits near the Georgia-South Carolina boarder and is located near Augusta, Georgia. A341-342. The above-quoted article supports the previously discussed rainfall records, contracting officer's sworn deposition testimony, and declaration of the contracting officer's representative. Further, the existence of drought conditions is supported by numerous other newspaper articles published between January and June 1999. A324-339.

In sum, the Government has provided more than sufficient evidence to establish that drought conditions existed and caused a decrease in the prevalence of beavers. The fact that fewer beavers needed to be trapped and fewer culverts needed to be cleaned provided the Government with a sufficient good faith basis to reduce its requests for Mr. Hooker's services. In other words, because the Government's requirements decreased, its need for Mr. Hooker's services decreased accordingly. Thus, Mr. Hooker cannot prevail upon his argument that the Government breached the Beaver Contract by reducing its requirements.

In addition to the drought conditions, the decline in the number of beaver pelts that Mr. Hooker brought coincided with Ms. Brooks's practice of marking each beaver to ensure that it was not accidentally or otherwise submitted for payment multiple times. Id. at ¶¶ 12-13. After the marking of beavers began, the number of beavers trapped went from a total of approximately 212 beavers for the first five months of the contract, or an average of about 42 beavers a month (February 1, 1999 through July 1999), to an average of less than four beavers a month for the next six months (July through

December 1999, when a total of about 20 beavers were trapped). See 1999 Beaver Logs, A130-146.

Further, the generally lower rates of beaver trapping did not cease after Mr. Hooker's contract expired. In 2000 and 2001, after Mr. Hooker was no longer performing the Beaver Contract, only 44 and 28 beavers respectively were captured on site. See 2000 - 2001 Beaver Logs, A 163-165. This further undermines Mr. Hooker's argument that the quantity of his work was reduced for anything other than good faith reasons.

In addition, when Mr. Gabard asked Mr. Hooker why he had caught only one beaver in September 1999 and one beaver in October 1999, Mr. Hooker responded that this was because he was devoting time to the Hog Contract and because he allegedly could not afford to hire someone to assist him in performing his duties under the Beaver Contract. See Summary of Call, Pl. Exh. S.

Thus, one the one hand, Mr. Hooker's complains that he was injured because, beginning in July 1999, the beaver trapping and culvert cleaning sites were reduced, see Pl. Mot. 22-23, while on the other hand, he essentially acknowledged that, for at least two months, he was not ready, willing or able to carry out his own contractual responsibilities.

To recover for breach of contract, Mr. Hooker must demonstrate that he was ready, willing, and able to perform when its performance was due. See Penthouse Int'l, Ltd., v. Dominion Fed. Sav. & Loan Assoc., 855 F.2d 963, 979 (2d Cir. 1988); United States v. Penn Foundry & Mfg., 337 U.S. 198, 212 (1949) (plaintiff had the burden of proving that it was ready and able to deliver the items required under the contract in the quantities and at the times specified); Mid-West Construction, Ltd. v. United States, 387

F.2d 957, 966 (Ct. Cl. 1967) (same); National Movers Co. v. United States, 386 F.2d 999, 1002 (Ct. Cl. 1967) (same); Potter v. United States, 167 Ct. Cl. 28, 31 (1964) (same); Scholle v. Cuban-Venezuelan Oil Voting Trust, 285 F.2d 318, 320 (2d Cir. 1960) ("The party wronged must show, however, that the breach caused his loss. To do this he must prove that he intended to and was able to perform when his performance was due"). Mr. Hooker's admission that he was not ready, willing or able to perform provides an additional basis for granting our motion for summary judgment with respect to Mr. Hooker's breach claim.

Mr. Hooker also contends that the reduction was made in bad faith. Specifically, based purely on speculation and innuendo, Mr. Hooker claims that the Government acted in bad faith in reducing his requirements. Some examples of Mr. Hooker's speculation are as follows:

- He speculates that, because the reduction of his requirements roughly coincided with the barring of his two employees over the domestic hogs issue and his request for additional money, the Government may have acted in bad faith in reducing those requirements. Pl. Mot. 22-23.

- He asserts that the timing of the Government's actions were "suspect." Pl. Mot. 23.

- He asserts, that Andy Cromer, one of his employees testified that he "thought" that the reduction in beaver trapping sites was to "get us out of there." Pl. Mot. 23.

- He claimed that the Forest Service's actions were suspicious in that they were taken after Mr. Hooker questioned working in alleged radiological soil contamination areas. Pl. Br. 25.

- He asserts that "subsequent events have cast suspicion on the reasoning provided by the Forest Service for its actions. Pl. Mot. 25.

Mr. Hooker's bad faith arguments are addressed generally in Section IV of this brief, below. However, we note here that Mr. Hooker has failed to set forth a basis upon

which to deny our request for summary judgment, let alone a basis for granting summary judgment in his favor upon that issue. See Pl. Mot. 22-23. We already have shown that the requirements were legitimately reduced because of drought conditions and a decrease in the beaver population. This obviously is inconsistent with his unsupported assertion that the reduction was in bad faith.

Further, as we discuss in greater detail in Section IV, below, Mr. Hooker's suspicions are insufficient to create a genuine issue of material fact avoid summary judgment. T & M Distributors, Inc. v. U.S., 185 F.3d 1279, 1285 (Fed. Cir. 1999) (A party "cannot defeat summary judgment and obtain discovery with just bald assertions and speculation of wrongful conduct."); Hoffman Construction Company of Oregon v. United States, 40 Fed. Cl. 184, 198 (1998) (rejecting unsupported speculative inferences of plaintiffs).

In sum, the evidence shows that the Government reduced the requirements in good faith because of an actual decline in the Government's needs for beaver trapping and culvert cleaning. Because the Beaver Contract was reduced for legitimate reasons, the Government did not breach the Beaver Contract. Therefore, notwithstanding Mr. Hooker's unsupported and conclusory allegations, the Government is entitled to summary judgment upon Mr. Hooker's claim that the Government improperly reduced his requirements. See SRI Intern. v. Matsushita Elec. Corp. of America, 775 F.2d 1107, 1116 (Fed. Cir. 1985) (party opposing summary judgment must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient).

### 2. The Government Did Not Breach The Beaver Contract Because It Was Under No Obligation To Exercise The Option Period

Where a contract contains an option period, the Government, "at its discretion, has a broad, unilateral right either to exercise the option periods or not to exercise them." LaSalle Partners v. United States, 48 Fed. Cl. 797, 806 (2001). The presence of an option provision "does not create a legal obligation on the part of the government to exercise the option and require the work." Id. This principle follows closely from the nature of an option provision, which is designed to "bind only the option giver, and not the option holder." Id. (quoting Aspen Helicopters, Inc., v. Department of Commerce, 99-2 B.C.A. (CCH) P30,581, at 151,024 (Gen. Serv. Admin. Bd. of Contract Appeals 1999). There is, therefore, no requirement that the Government exercise an option period. See e.g., Gov't Sys. Advisors, Inc. v. United States, 847 F.2d 811, 813 (Fed. Cir. 1988); Fields v. United States, 53 Fed. Cl. 412, 419 (2002). Absent a duty to exercise the option, failure to do so cannot give rise to a breach of contract action. See LaSalle Partners, 48 Fed. Cl. at 806.

Here, the Beaver Contract contained a base period and an option period. The base period of the contract was from January 22, 1999 through December 31, 1999. A76, A80. If exercised, the option period was to run from January 1, 2000 through December 31, 2000. A80-81. After completion of the base period in 1999, the Government declined to exercise the option. Moreover, as with the issue regarding the reduction of services required under the contract, Mr. Hooker cannot point to any evidence that the Government's decision not to exercise the option was made in bad faith, was a breach of contract, or was unlawful. Because the Government had no duty

to exercise the option, its decision not to do so cannot give rise to a breach of contract or any other type of claim.

**B. The Government Did Not Breach The Hog Contract By Withholding Payment, Barring Two Of Mr. Hooker's Employees, Or Not Paying Him Under The Alleged Contract Extension**

Mr. Hooker's Hog Complaint contains the following claims: (1) that the Government improperly withheld $1,320 in payments because of the domestic pig issue; (2) that the contracting officer wrongfully barred two of his employees from the SRS; (3) that the Government allegedly "lost" his contraband pass; (4) that the Government extended his contract through November 2001, and that its failure to pay under that alleged extension constituted a breach; (5) that he is entitled to a "contract readjustment" for hunting hogs in allegedly contaminated areas (which was dismissed on August 26, 2005); and (6) that the Government acted in "bad faith."

Mr. Hooker is no longer pursuing the contraband pass claim. A23a. Further, the "contract readjustment" claim already has been dismissed. See discussion in Sec. III, below. Mr. Hooker's "bad faith" claim fails because he cannot establish that the Government acted in bad faith. See discussion in Sec. IV, below. In addition, Mr. Hooker's remaining three claims, i.e., the two claims relating to the domestic pig issue and the claim relating to the contract extension issue, are each with out merit and, as we demonstrate immediately below, we are entitled to summary judgment upon those claims.

**1. The Government Had The Contractual Right To Refuse Payment For Hogs It Deemed To Be Domestic**

Pursuant to the Hog Contract, the Government had the express right to reject any non-conforming services. Contract specification E.2(e) provides:

> If any of the services do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in the contract amount. When the defects in services cannot be corrected by reperformance, the Government may (1) require the Contractor to take necessary action to ensure that future performance conforms to contract requirements and (2) reduce the contract price to reflect the reduced value of the services performed.

A62a-62b.

The goal of the hog contract was to reduce the wild hog population roaming the SRS. Contract Technical Specification C.2.A states: "The contractor shall trap and dispatch wild hogs from the designated areas at SRS during the contract period." A56. Moreover, Mr. Hooker's technical proposal stated the objective of the contract as being to remove "wild hogs from the populations of these animals found on Savannah River Site in a safe and efficient manner as possible." Hooker Technical Proposal, A42.

Here, the Government exercised its right to decline payment only after a careful investigation revealed that some of the hogs that Mr. Hooker's employees were submitting did not conform to the contract. A 151-153; A154-155; see Brooks Decl. ¶ 21. After suspicions arose as to whether the hogs being turned in by Mr. Hooker's employees were actually wild hogs being captured on the SRS, the Government requested Wackenhut Services, Inc. ("Wackenhut"), the firm contracted to provide law enforcement services at the SRS, to investigate. A154-155; see Brooks Decl. ¶ 21.

Wackenhut consulted Dr. John J. Mayer II, Ph.D., who reported that many of the hogs turned in by Mr. Hooker and his employees were not wild hogs, but rather had all the characteristics of domestic hogs. Investigation Report,

A154. These characteristics include dull rounded hooves, which is an indication of standing on concrete, extra teats, and the absence of parasites. Investigation Report, A154. The lack of parasites is characteristic of hogs raised in the clean environment of a hog pallor. Investigation Report, A154. The investigation concluded that "Goldman Eller [Hooker's employee] brought in approximately thirty-one domesticated hogs from off the SRS for disposition through the Wild Hog Control contract." Investigation Report, A155.

Moreover, in addition to the Wackenhut investigation report, Mr. Hooker's own log sheets provide additional support for the Government's position. First, they show that the piglets in question were captured towards the center of the SRS, which is a massive area. Brooks Decl., ¶ 20; see also A340-341. Further, according to Dr. Mayer, parasites were notably absent from their bodies, which was an indication that they were raised in the clean environment of a hog pallor. A154.

Second, the log sheets show prepared by Mr. Hooker's employee stated that the piglets were captured by hunting dogs, but the carcasses showed no sign of dog trauma. A154. Rather, the piglets had evidence of head trauma associated with a fatal strike to the head. A154.

This evidence shows that the hogs were born domestic. It shows that they were dispatched either before or quickly after being brought onto the site and that the data entered into the log sheets was incorrect. Therefore, there were more than adequate grounds for the Government to refuse to pay Mr. Hooker for the domestic hogs, and the Government is entitled to summary judgment upon this aspect of Mr. Hooker's claim.

**2. Mr. Hooker Cannot Recover Damages Based Upon The Government's Decision To Bar Two Of His Employees From The Site**

Mr. Hooker contends that the Government's decision to bar two of his employees from working on the SRS constituted a breach of contract and he seeks damages for lost earnings because he allegedly had to locate new employees and additional hunting dogs. Compl. 04-1126C ¶¶ 11-15. The Government's decision does not constitute a breach because the Government had the contractual right to bar Mr. Hooker's employees from the site and the Government properly exercised that right.

Hog Contract specification H.6 provides that the Government "reserves the right to require the Contractor to remove [an] employee." A62c. Further, specification H.16 provides that the "contractor shall be responsible for replacing those employee(s) denied access to SRS and denial of access for contractor's employee(s) shall not be construed as a suitable excuse for nonperformance of the contract." A62e.

Indeed, in pursuing the Hog Contract, Mr. Hooker made specific representations to the Government about his ability to quickly obtain replacement personnel. His SRS Wild Hog Contract Technical Proposal includes a "Contingency Plan for Replacement Personnel," which states: "I know and have hunted with other hog hunters in the local Georgia and South Carolina vicinity. I can readily provide experienced replacement personnel for anyone who cannot continue to work the contract for whatever reason." A42.

Thus, Mr. Hooker bore the burden of any expenses incurred as a result of the contracting officer's decision to bar two of his employees from the site.

Further, nothing in the record suggests that the decision to bar the employees was anything other than reasonable under the circumstances. Here, the Government exercised its contractual right to bar two of Mr. Hooker's employees from the SRS only after an investigation revealed alleged fraud upon the part of the employees. A154-155.

That Mr. Hooker may disagree with the Government's determination does not provide a basis for demanding that the Court second-guess the contracting officer's decision to bar the employees from the site. Under the circumstances of this case, Mr. Hooker cannot argue that Government's conduct was in bad faith, or even unreasonable. Indeed, given the Wackenhut investigation report, any contracting officer would have been reasonable in barring the employees.

Moreover, Mr. Hooker's agreement that he would be responsible for replacing employees barred from the site also negated any Government duty to provide access to those employees. Further, Mr. Hooker's representation that he could "readily" obtain replacement employees further undermines his claim.

Similarly, Mr. Hooker accepted responsibility for ensuring an adequate supply of hunting dogs. Contract specification C.2 B states that "[t]he contractor will supply the dogs." A57. Further, contract specification C.1(A) provides that "[t]he Contractor shall supply all supplies, personnel, equipment, (including safety equipment), supervision and transportation (with the exception of traps) for this contract." Specification B.9 requires that replacement dogs "be readily available so as not to delay the use of this technique during the contract." A58. In his SRS Wild Hog Contract Technical Proposal, Mr. Hooker represented to the Government that his organization possessed 97 dogs. A43.

Thus, the contract placed the burden of locating replacement hunting dogs upon Mr. Hooker. It also specifically required Mr. Hooker to have replacement dogs readily available. Certainly, given Mr. Hooker's representations in his proposal and contractual obligations, he cannot maintain a claim for damages regarding additional costs allegedly incurred in obtaining replacement dogs.

Moreover, to the extent that Mr. Hooker's lack of dogs resulted from the Government's reasonable decision to bar the employees, any resulting losses had to be borne by Mr. Hooker, who, for reasons previously discussed, assumed the risk of losses flowing from the termination of employees. Indeed, the Government barred the employees, not their dogs. The fact that Mr. Hooker allegedly relied upon those particular employees to supply the dogs is not something for which the Government is responsible. Thus, we are entitled to summary judgment upon this aspect of Mr. Hooker's claim.

### 3. Mr. Hooker Cannot Recover The Alleged Value Of The Hog Contract For The Time Period During Which He Was No Longer Providing Services

Mr. Hooker's next claims that he is entitled to the maximum value of the Hog Contract for the two years after he stopped trapping hogs but before the Government awarded a new contract to a different trapper. Hog Comp., ¶ 28. That position rests upon language in a contract modification entered into on October 1, 1999 extending the contract to October 31, 1999 or until a new contract is awarded.

Specifically, Modification No. 4, executed on October 1, 1999, states in its entirety: "Contract is extended to October 31, 1999, or until a new contract is awarded." A65. The Government contends that the language means that the

contract would continue until October 31, 1999, or until a new contract was awarded, whichever was earlier. Mr. Hooker contends that the language means that the contract would continue until October 31, 1999, or until a new contract was awarded, whichever was later.

Mr. Hooker's claim has a fatal flaw. The precise termination date of Mr. Hooker's contract is irrelevant because it is undisputed that Mr. Hooker did not continue to perform during the two-year period for which he seeks compensation. Specifically, Mr. Hooker admitted in his deposition that he never hunted hogs after November 30, 1999. Hooker Dep., p. 58 at 16-22. When asked why he had stopped hunting hogs, Mr. Hooker replied, "I'd had enough of the BS, I promise you." Hooker Dep., p. 59 at 5.

Consequently, assuming for the sake of argument that the Hog Contract was extended indefinitely by the modification, Mr. Hooker is not entitled to payment for work he did not perform. Indeed, if Mr. Hooker is correct in his interpretation, and a valid contract existed, he breached it by admittedly making no effort to perform his obligations.

This Court has long held that "a contractor may not be compensated, or receive a profit, for work not performed, whether the non-performance results from termination or from deletion of a severable portion of the work." Mega Const. Co., Inc. v. U.S., 29 Fed. Cl. 396, 475 (1993) (quoting J.F. Shea Co. v. U.S., 10 Cl. Ct. 620, 626 (1986)). "It is axiomatic in the law of contracts that party cannot recover on his own contract unless he can show substantial performance of his own obligations under the contract or that performance was made impossible by the breach of the other party." U. S. for Use and Benefit of

Arlmont Air Condition Corp. v. Premier Contractors, Inc., 283 F.Supp. 343, 348 (D. Me. N.D., 1968). In this case, Mr. Hooker offers no evidence of either.

Further, to recover, Mr. Hooker had to be ready, willing, and able to perform. Penthouse Int'l, Ltd., v. Dominion Fed. Sav. & Loan Assoc., 855 F.2d at 979; Penn Foundry, 337 U.S. at 212. Here, he admittedly was not ready or willing to perform. Therefore, he cannot recover, even assuming for the sake of argument that the contract period was extended for the period claimed. Nonetheless, Mr. Hooker is requesting that the Court order the Government to pay him $55,000 (the price of 1,000 hogs), for services he never rendered. His request should be rejected and the Court should grant summary judgment in favor of the Government upon this aspect of Mr. Hooker's claim.

## III. Mr. Hooker Is Not Entitled To Equitable Adjustment of Either Contract Due To The Alleged Existence Of Contamination

Mr. Hooker alleges that he is entitled to reformation or readjustment of the contracts because he allegedly was required to hunt hogs, trap beavers and clean culverts in contaminated areas. Beaver Comp. 3-4, ¶¶ 20-21; Hog Comp. 5, ¶ 23. Because Mr. Hooker's contract reformation/readjustment claim relating to the Hog Contract previously was dismissed, he cannot obtain summary judgment upon that claim. Further, for the reasons set forth below, this Court should deny his motion for summary judgment upon that claim, as it relates to the Beaver Contract, and grant summary judgment to the Government.

### A. Mr. Hooker's Equitable Adjustment Claim As It Relates To The Hog Complaint Was Dismissed On August 26, 2005

Mr. Hooker's appears to assert, in his summary judgment motion, that the Government breached the Hog Contract by not disclosing the existence of alleged toxicological hazards. Pl. Mot. 15. Mr. Hooker further claims that he had the right to rely upon the representations made in the Beaver Contract when submitting his bid for both the Beaver Contract and the Hog Contract. Id. He further claims that "[s]uch positive representations amounted to a warranty and established a predicate for a possible action for breach of contract." Id. He asks the Court to grant him summary judgment and reform the Beaver and Hog Contracts. Id. at 26. Mr. Hooker further asks the Court to apply the "jury verdict" method to calculate damages. Pl. Mot. 18-19.

Because Mr. Hooker's claim already has been dismissed, it is no longer at issue in this case. See Hog Comp. 4-5, ¶¶16-23. Specifically, on August 26, 2005, this Court dismissed, without prejudice, Mr. Hooker's claim "for additional costs incurred in performing the [Hog Contract] (see Complaint in No. 04-1126C, at ¶¶ 19-23)." Aug. 2005 Dec. 2. The Court held that it did not possess jurisdiction to entertain that claim because Mr. Hooker had failed to properly submit the claim to the contracting officer. Id. Indeed, the Court noted that Mr. Hooker had conceded the lack of subject matter jurisdiction.

Following the August 26, 2006 dismissal, Mr. Hooker did not file a claim with the contracting officer. Nor has he amended his complaint to reassert the claim. Thus, the claim set forth in paragraphs 19 through 23 of the Hog Complaint is no longer pending and cannot provide a basis for recovery in this action. Further, Mr. Hooker's may not revive the previously dismissed claim by attempting to label it as a breach of contract

claim or a warranty claim, or any other type of claim, or by seeking relief under the "jury verdict" method.

It is well-settled that this Court considers the "true nature" of a plaintiff's claim, regardless of how the plaintiff characterizes its complaint. See Williams v. Sec'y of the Navy, 787 F.2d 552, 557 (Fed. Cir. 1986) ("Substance, not form is controlling."); see also Somali Dev. Bank v. United States, 508 F.2d 817, 820 (Ct. Cl. 1974); Jackson v. United States, 573 F.2d 1189, 1199 (Ct. Cl. 1978); Puget Sound Energy, Inc. v. United States, 47 Fed. Cl. 506, 510, 511 (2000) (granting Government's motion to dismiss for lack of jurisdiction because plaintiff's breach of contract complaint in actuality stated a different type of claim over which the Court did not have jurisdiction); Cottrell v. United States, 42 Fed. Cl. 144, 149 (1998) (examining substance of plaintiffs' claims, rather than terminology used by plaintiffs, to determine that plaintiffs' claims are tort claims).

The operative facts underlying the allegations in Mr. Hooker's summary judgment motion – that the Government breached the Hog Contract or violated a warranty, because the SRS allegedly was contaminated – are the same as the facts upon which he based his claim for a contract readjustment. Those facts are set forth entirely in paragraphs 19 though 23 of the Hog Complaint, which this Court specifically referred to in the dismissal order. Aug. 2005 Dec. 2.

Further, the relief sought by Mr. Hooker in his summary judgment relating to the contamination issue is the same relief he sought in the dismissed count of his Hog Complaint. Specifically, in his Hog Complaint, Mr. Hooker requested a "readjustment of the contract price" and a "price adjustment per hog under the contract due to the contamination of the work environment." See Hog Comp. 5, ¶ 23 & 7, ¶ D. In his summary judgment motion, he requests that the Hog Contract "be reformed to reflect

the amount he would have bid had he known he would be working in contaminated areas without protection." Pl. Mot. 18. Thus, the relief sought is virtually identical.

That the claim discussed in Mr. Hooker's summary judgment motion is one and the same as the claim that was dismissed, is further confirmed by the fact that the remaining counts of Mr. Hooker's Hog Complaint do not assert any such claim.

In sum, regardless of what Mr. Hooker calls his Hog Contract reformation/readjustment claim, that claim is no longer before the Court. Mr. Hooker cannot seek summary judgment upon a non-existent claim. Therefore, to the extent that he seeks summary judgment upon that claim, his motion should be denied.

**B. Mr. Hooker's Cannot Prove That The Government Breached The Beaver Contract Or That He Incurred Contamination-Related Additional Costs**

As previously noted, the party alleging a breach of contract bears the burden of proof for each element. Technical Assistance Int'l., 150 F.3d at 1373. Here, Mr. Hooker cannot show that the Government breached the Beaver Contract. Indeed, the evidence in the record shows that there is no underlying factual basis for Mr. Hooker's contamination based claim. Specifically, Mr. Hooker's allegations were fully investigated by numerous agencies, both public and private. See Def. Facts 169-182; A166-168; A169; A170-172. This included environmental studies and medical examinations. Def. Facts 172-182; A166-168; A 169-172. These agencies found that Mr. Hooker's concerns were unfounded. Def. Facts 175-182; A169, 169 - 172. Mr. Hooker cannot point to any competent evidence to the contrary.

In addition, another element of a breach of contract is damages arising from the breach. San Carlos Irrigation, 877 F.2d at 959. Assuming for the sake of argument that Mr. Hooker worked in areas containing high levels of contamination, his claim would still

fail because he cannot prove damages arising from the Government's alleged breach of the Beaver Contract. Therefore, we are entitled to summary judgment dismissing his breach of contract claim as it relates to that contract.

"[A]bsent tangible proof of damages, [plaintiff] may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992). Damages that are remote or based wholly upon speculative expectations are not recoverable. See, e.g., Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-63 (1931) (damages which are not certain result of wrong are precluded); San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) (contract law precludes recovery for speculative damages); Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1020 (Fed. Cir. 1996) (loss of interest on additional loans bank allegedly could have made in absence of breach was too uncertain and remote to be recoverable); see also Restatement § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

As the Court of Claims recognized in H.J. Lewis Oyster Co. v. United States, 123 Ct. Cl. 358, 107 F. Supp. 570, 577 (1952), where "plaintiff's proof [was] uncertain as to the number of oysters remaining on the bottom, uncertain as to whether the damage from the mud was the same on all lots, and uncertain as to whether the oysters would be removed in the future before death overtook them from natural causes," the Court was required to "reject these claims as requests for speculative damages."

Similarly, to make a claim for an equitable adjustment, a contractor must have actually incurred the costs for which he seeks the adjustment. A plaintiff bears the burden of establishing entitlement to an equitable adjustment under the terms of the

contract. Mega Const. Co., Inc. v. U.S., 29 Fed. Cl. 396, 444 (1993). The proper measure of an equitable adjustment is the extra costs incurred by the Government contractor, if those additional costs are reasonable. Ace Instructors, Inc. v. U.S., 70 Fed. Cl. 253, 274 (2006). Showing actual costs "requires the contractor to provide the court with specific documentation of the added expenses caused by the government conduct." Ryco Const., Inc. v. United States, 55 Fed. Cl. 184, 199 (2002).

The conclusory allegation in Mr. Hooker's complaint, that the Government was obligated to reform the Beaver Contract to compensate him for additional expenses incurred due to the alleged contamination of the SRS, is contradicted by the evidence. See Beaver Comp. 3-4, ¶¶ 20-21. Therefore, we are entitled to summary judgment dismissing that aspect of Mr. Hooker's claim.

Specifically, when asked during his June 2, 2006 deposition to identify the additional expenses upon which his claim was based, Mr. Hooker was unable to do so. The Government attempted, numerous times, to persuade Mr. Hooker to identify any additional costs he incurred as a result of Government conduct. See Hooker Dep. p. 24 at 25 – p. 25 at 1; p. 25 at 3-4; p. 25 at 11-13; p. 25 at 19-20; p. 26 at 3-4; p. 27 at 16-19; p. 27 at 25 – p. 28 at 2; p. 31 at 23-24, A289-290. Despite this effort by the Government to ascertain the basis for his claim, Mr. Hooker alternated between changing the subject and concluding that he "can't answer that right now." See, e.g., Hooker Dep. p. 28 at 4-7, A290. Mr. Hooker did, however, agree that he never incurred any expenses for training or equipment, the only costs he identified in his complaint. Hooker Dep. p. 25 at 24 – 26 at 5, A289; Am. Compl. ¶ 21.

In particular, although Mr. Hooker asserted that, "[i]f you're doing radiation contamination type work, you're going to have to have a stand-by person, you have protective equipment," and that "[y]ou've got to have health protection people there," he admitted that he had not actually purchased such protective equipment. Hooker Dep. p. 25 at 5-10 & 24 – p. 26 at 5. Further, as set forth below, he was unable to identify any other items of alleged expenses incurred as a result of the alleged contamination.

When asked whether he could bill the Government for items that he had not actually purchased, Mr. Hooker responded: "Why not?" Hooker Dep. p. 26 at 16-21. Further, Mr. Hooker argued: "I should have had [protective clothing]. Are you saying I shouldn't have had protective clothing?" Hooker Dep. p. 26 at 24-25 (emphasis added). Thus, Mr. Hooker was not seeking compensation for expenses actually incurred, he was seeking compensation for expenses that hypothetically might have incurred if he had known of the alleged contamination.

Moreover, when further pressed to identify the additional expenses that Mr. Hooker was referring to in paragraph 21 of the Beaver Complaint, Mr. Hooker responded: "Well, I can't answer that right now." Hooker Dep. p. 27 at 16 – p. 28 at 7, A289, 290. Accordingly, Mr. Hooker's own testimony contradicts the assertion in his complaint that he incurred additional expenses. Beaver Comp. 3-4, ¶¶ 20-21.

Further, nothing presented by Mr. Hooker in his motion for summary judgment demonstrates that he incurred additional expenses as a result of the conditions he allegedly encountered. Indeed, as we discuss in greater detail in Section II of this brief, below, Mr. Hooker appears to now be pursuing a "jury verdict" method for measuring damages, based upon what he hypothetically would have bid for the work. Pl. Br. 19. Indeed, he states in his brief:

> There is only Hooker's testimony as to what he would have bid. Is the evidence sufficient for a court to make a fair and reasonable approximation of damages? Perhaps not, but if Hooker is to have a remedy for this breach, he must look to the court to make the determination of damages.

Pl. Br. 19.

Thus, Mr. Hooker no longer appears to be pursuing a claim that he is entitled to compensation for additional expenses incurred as a result of the conditions allegedly encountered with respect to either the Beaver Contract (or the Hog Contract for that matter). For this reason, and because the evidence does not support Mr. Hooker's conclusory assertion that he incurred additional expenses, we are entitled to summary judgment upon that portion of Mr. Hooker's claim.

Finally, although Mr. Hooker also has failed to establish damages relating arising from the contamination issue in connection with the Hog Contract, because that claim already has been dismissed, we do not address it further in this brief.

**C. Mr. Hooker Is Not Entitled To Application of the "Jury Verdict Method"**

As previously noted, Mr. Hooker is no longer pursuing his claim for additional expenses and, in any event, we would be entitled to summary judgment upon any such claim even if he still were pursuing it. Rather, Mr. Hooker now requests that this Court apply the "jury verdict" method to grant him relief. For reasons set forth below, such relief would be inappropriate.

**1. Mr. Hooker Cannot Recover Under His Previously Dismissed Hog Claim**

As previously discussed at length, Mr. Hooker's claim based upon alleged contamination, which had been asserted in the Hog Complaint, has been dismissed.

Therefore, he cannot be entitled to damages based upon the "jury verdict" method or any other method.

### 2. Mr. Hooker Cannot Recover Under The "Jury Verdict" Method In Connection With His Beaver Claim

In his Beaver Complaint, Mr. Hooker alleged that he incurred additional expenses due to the alleged contamination. However, as previously demonstrated, we are entitled to summary judgment upon that claim because, among other reasons, Mr. Hooker has failed to identify such expenses. Apparently recognizing this, Mr. Hooker now proposes that the Court employ the "jury verdict method" to compute his alleged damages. Pl. Mot. 19.

Specifically, Mr. Hooker claims that he is entitled to damages that would place him "in as good a position as he . . . would have been" had the Government not allegedly breached the contract. Pl. Mot. 17. He apparently believes he is entitled to have the contract "reformed to reflect the amount he would have bid had he known he would be working in contaminated areas without protection." Pl. Mot. 17. In other words, Mr. Hooker is asserting that this Court should rewrite the contract, upwardly adjust the contract price, and award him a measure of damages calculated in a manner consistent with some higher price for his services.

Mr. Hooker's argument should be rejected. In SAB Construction, Inc. v. United States, 66 Fed. Cl. 77 (2005), this Court was faced with a claim involving a contract for renovation of the visiting airman's quarters at a Nevada Air Force base. Id. at 79. The Air Force had disclosed the existence but not the substance of an asbestos and lead-based paint survey of the building that previously had been performed. Id. at 79. The Government approved the plaintiff-contractor's demolition plan, which did not contain

special precautions for asbestos and lead based paint removal." Id. at 81. Nor was the information in the asbestos and lead assessment report identified during the preconstruction meeting as a potential problem. Id. at 81.

Further, during the litigation, the Government admitted that it had not notified the contractor or other prospective bidders of the "presence, location, and quantity of asbestos containing material or presumed asbestos containing material." Id. at 80. The Government also amended the solicitation in a manner that may have minimized the asbestos and lead based paint issues and omitted a note referencing the asbestos and lead based paint report from the drawings furnished to the contractor, although the note had been included on the drawings submitted by the designer to the Government. See id. at 81.

During the performance of demolition, debris, at least some of which contained asbestos and lead-based paint, was transported to the regional landfill. Id. However, the contractor was unaware of the "problem concerning the presence of hazardous materials affecting [its] work" until after demolition work had been completed. Id. Because it was unaware of the problem, the contractor had "rendered demolition services without special asbestos abatement procedures up until work on the contract was suspended" and "plaintiff was paid for those services pursuant to an express contract." See id. Indeed, except for certain work performed pursuant to a unilateral change order, the Government received no asbestos and lead abatement services from the contractor. Id.

During the subsequent litigation, the contractor sought "restitution for the reasonable value of the services it provided to the government under an implied-in-fact contract theory, or based on a theory of reformation for mutual mistake." Id. at 92. The

Court rejected the contractor's claim. Id. In doing so, the Court held that "restitution is measured by the reasonable value of the services actually rendered, not the value of the government's hypothetical savings due to the breach." Id.

The Court held that, because the contractor had not incurred any additional costs in removing the asbestos or lead-based paint, there was "nothing for the court to restore to [the contractor, and thus paying [the contractor] for services it did not perform would result in a windfall." Id. Therefore, the Court held that "restitution damages based on the value of asbestos abatement services that were not performed by [the contractor] are not recoverable." Id.

As the plaintiff in SAB had attempted before him, Mr. Hooker now seeks reimbursement, not for services actually rendered, but for services he claims he would have rendered had he known about the alleged contamination. Mr. Hooker cannot recover upon that basis. Id.

Further, in rejecting the contractor's claim in SAB, this Court expressly noted that the contractor was seeking restitution based upon an implied-in-fact contactor theory or based upon a theory of reformation for mutual mistake. SAB, 66 Fed. Cl. at 92. Thus, the label used is irrelevant and any attempt by Mr. Hooker to avoid summary judgment by attaching those labels to his claim, or any other labels for that matter, would be to no avail.

In addition, Mr. Hooker's reliance upon cases involving negligently prepared estimates is misplaced. See Pl. Mot. 18. Mr. Hooker's claim is that he is entitled to compensation for working in allegedly contaminated areas. In the cases he cites, the issue was whether the Government misrepresented the quantity of work in a requirements contract solicitation. See, e.g., Rumsfeld v. Applied Companies, Inc., 325

F.3d 1328, 1335 (Fed. Cir. 2003) (Government knew, well in advance of solicitation, that its requirements were about one-tenth the quantities estimated in the solicitation, and therefore was negligent; however, anticipatory profits not appropriate measure of damages).

In sum, Mr. Hooker's request that this Court employ the "jury verdict" method of computing damages should be rejected. In the absence of injury, that method is inapplicable. Citizens Financial Services v. United States, 64 Fed. Cl. 498, 515 (2005) (jury verdict method is not utilized until "clear proof of injury exists") (citing Dawco Constr., Inc. v. United States, 930 F.2d 872, 880 (Fed. Cir. 1991) (overruled on other grounds, Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995)), aff'd. sub nom. McElroy v. Gleasman, 170 Fed. Appx. 131 (Fed. Cir. 2006) (table). For reasons previously discussed, Mr. Hooker cannot prove that he was injured.[3]

## IV. Plaintiff Cannot Prevent Dismissal By Making Unsupported Allegations Of "Bad Faith"

Mr. Hooker attempts to assert general claims of bad faith. Beaver Comp., ¶¶ 20-26; Hog Comp., ¶¶ 30-34. Those claims cannot withstand scrutiny. Because there is an absence of evidence of bad faith, we are entitled to summary judgment dismissing Mr. Hooker's bad faith claims.

[3] Although the relevant portion of Mr. Hooker's Hog Complaint was dismissed by the Court in the August 26, 2005 order, even if it had not been dismissed, we would be entitled to summary judgment upon that claim for the same reasons that we are entitled to summary judgment upon the parallel count of Mr. Hooker's Beaver Complaint.

### A. The Government Is Entitled to a Presumption Of Good Faith

"[I]t is well-settled that government officials are presumed to act conscientiously and in good faith in the discharge of their duties." Asco-Falcon II Shipping Company v. United States, 32 Fed. Cl. 595, 604 (1994). This presumption is exceedingly stringent. The courts are "loath" to find bad faith. Knotts v. United States, 128 Ct. Cl. 489, 492 (1954). "Since good faith is presumed, Mr. Hooker bears an extremely heavy burden of proving the contrary." A-Transport Northwest Co. v. United States, 27 Fed. Cl. 206, 220 (1992). To overcome this presumption, Mr. Hooker must allege and prove, by clear and convincing evidence, specific acts of bad faith upon the part of the Government. Bannum, Inc. v. United States, 56 Fed. Cl. 453, 458 (2003) (citing Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002).[4] Attendant to this presumption is a set of corollaries controlling in this case.

---

[4] This Court's decision in Tecom, Inc. v. United States, 66 Fed. Cl. 736 (2005), did not change, and could not have changed, the "clear and convincing" standard applicable to bad faith claims. Tecom is grounded in claims alleging violation of implied duties related to contract performance, id. at 757, 771, and rejected the Federal Circuit's "clear and convincing" evidence standard for proving allegations of bias, Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1239-40.

The Tecom decision is fundamentally flawed. Tecom's rejection of Am-Pro is based upon a reading of Am-Pro that limits the application of the "clear and convincing evidence" standard to "'fraud or in some other quasi-criminal wrongdoing.'" Tecom, 66 Fed. Cl. at 769 (citing Am-Pro, 281 F.3d at 1239). However, Am-Pro itself did not involve allegations of "fraud or [] quasi-criminal wrongdoing." 281 F.3d at 1239. The plaintiff in Am-Pro alleged duress, and there was no finding that duress was the equivalent of "fraud or . . . some other quasi-criminal wrongdoing." Id. In addition, this Federal Circuit has never limited the requirement to show "clear and convincing evidence" – or "well-nigh irrefragable proof" – to situations demonstrating "fraud or . . . some other quasi-criminal wrongdoing," either before or after Am-Pro – instead readily applying the standard to bad faith. See, e.g., Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1328 (Fed. Cir. 2004) (bias); Info. Tech. & Applications Corp., 316 F.3d

First, Mr. Hooker must prove that the Government had the specific intent to harm him. A-Transport Northwest Co. v. United States, 27 Fed. Cl. 206, 220 (1992). Mr. Hooker therefore cannot show bad faith unless he demonstrates that the Government was "motivated alone by malice." A-Transport Northwest Co. v. United States, 27 Fed. Cl. 206, 220 (1992) (quoting Gadsden v. United States, 75 F. Supp. 126, 127, 111 Ct. Cl. 487, 489-90 (1948)).

Second, the Government "cannot be found to be acting in bad faith for failing to obtain something it was not required to do." D.V. Gonzalez Electrical & General Contractors, Inc. v. Unites States, 55 Fed. Cl. 447, 457 (2003). Thus, "the duty of a Contracting Officer to accord a contractor fair treatment creates no binding obligation to exercise an option to extend a contract for additional years." Continental Collection & Disposal, Inc. v. United States, 29 Fed. Cl. 644, 652 (1993).

Third, the Court cannot infer bad faith merely from a series of events allegedly adverse to Mr. Hooker's interests. Asco-Falcon II, 32 Fed. Cl. at 595. For example, evidence of a "six and one-half year delay" in approving a request for a contract amendment" is irrelevant because "even if this was proven, plaintiffs would not have shown by such fact one scintilla of proof of a specific act of bad faith or malice, nor any intent to injure plaintiffs, on the part of the government." Id.

---

1312, 1323, n.2 (Fed. Cir. 2003) (bias); Spezzaferro v. FAA, 807 F.2d 169, 173 (Fed. Cir. 1986) (bad faith). Thus, the standard governing bad faith remains the clear and convincing evidence standard articulated in Am-Pro, 281 F.3d at 1239-40.

### B. Mr. Hooker Cannot Overcome This Presumption Because None Of The Government's Actions Demonstrate Bad Faith

Mr. Hooker's allegations of unfair treatment are legally insufficient to overcome the Government's presumption of good faith.

#### 1. Bad Faith Allegations In The Hog Complaint

Mr. Hooker lists four examples of alleged bad faith in his Hog Complaint. His first example is the Government's decision to withhold payment for hogs that it found to be fraudulently brought in from off site. Hog Comp., ¶ 31(a). As demonstrated previously, the Government had the right to reject any services that it deemed non-conforming. Because the Government had no obligation to accept the hogs it cannot be found in bad faith for failing to do so. D.V. Gonzalez Electrical & General Contractors, Inc, 55 Fed. Cl. at 457.

Further, the Government indisputably made its decision only after carefully reviewing the matter, obtaining the advice of an expert, and reviewing an investigation by law enforcement officials. This thorough review demonstrates that the agency was not acting with malice towards Mr. Hooker.

The second alleged example of alleged bad faith is the Government's decision to bar two of Mr. Hooker's employees from the site, and its later decision to award a contract to one of those employees. Hog Comp., ¶ 31(b) & (e). As with the decision not to reimburse Mr. Hooker for non-conforming hogs, the Government had the contractual right to bar the employees, and did so only after careful investigation. Although we do not dispute Mr. Hooker's allegation that the Government later awarded a contract to one of the banned employees, the Government took that action only after subsequent investigation revealed that he

was not personally responsible for the other employee's fraudulent scheme. A154-155. Once again, far from demonstrating bad faith, the Government's actions show its willingness to work with its contractors in good faith.

Mr. Hooker's third anecdote allegedly concerns his lost contraband pass. Hog Comp., ¶ 31(c). Aside from the fact that Mr. Hooker is no longer is pursuing his claim as it relates to the contraband pass, A23a, there simply is no evidence that, assuming the Government lost his pass, it did so in bad faith. Indeed, were the Government aiming to deprive Mr. Hooker of his contract rights, it presumably would have insisted that Mr. Hooker stop his work and cease carrying his firearm while he was in non-compliance with the contraband pass requirement. In fact, however, it was Mr. Hooker himself who declared his pass inadequate, notified the Government that he was non-compliant, and refused to carry a firearm during his demonstration. Hooker Dep., p. 56 at 5-12 – p. 57, at 8-14, A307b-307c. Once again, Mr. Hooker's allegations are unsupported by evidence and amount to nothing more than an unfounded accusation.

The fourth alleged example of bad faith is the Government's decision not to award a new contract and "preventing Hooker from performing under the modification." Hog Comp., ¶ 31(d). However, the Government had the right <u>not</u> to award the new contract, and its exercise of that right cannot serve as evidence of bad faith. <u>D.V. Gonzalez Electrical</u>, 55 Fed. Cl. at 457 (2003). Further, the Government did not prevent Mr. Hooker from working under the modification. Mr. Hooker, by his own admission, ceased all attempts to perform under the contract in November of 1999 because, as he puts it, he "had enough of the BS."

Hooker Dep., p. 59 at 5, A307c. In any event, Mr. Hooker's allegations, once again, are unsupported by evidence.

### 2. <u>Bad Faith Allegations In The Beaver Complaint</u>

In his Beaver Complaint, Mr. Hooker also makes allegations of bad faith. Specifically, he claims that that the Government knew or should have known that the trapping and culvert sites were contaminated and should have required protections. Beaver Comp. 3, ¶ 21. He further claims that the Government should have reformed the contract to compensate him for additional expenses. Beaver Comp. 4, ¶ 21. Mr. Hooker alleges, however, that the Government instead improperly reduced the culvert cleaning and beaver trapping work. <u>See</u> Beaver Comp. 4, ¶¶ 22-23. Mr. Hooker speculates that these actions were taken with the specific intent to harm, punish him and retaliate against him for raising concerns about the alleged contamination. Beaver Comp. 4, ¶¶ 22-23.

As discussed at length previously, each of Mr. Hooker's allegations is unsubstantiated and we are entitled to summary judgment with respect to each of those claims.

### 3. Mr. Hooker's Summary Judgment Motion Does Not Demonstrate Bad Faith On The Government's Part With <u>Respect To Either Contract</u>

Nothing in Mr. Hooker's summary judgment motion requires a different result. Thus, we are entitled to summary judgment upon Mr. Hooker's claims of bad faith regarding the Beaver Contract and the Hog Contract.

As an initial matter, according to his brief, "Mr. Hooker does not claim that the Forest Service's representation as to contamination was deliberate." Pl. Mot. 16. We understand that the representation to which Mr. Hooker refers is the statement in the Beaver Contract that no toxicological hazards existed. See Pl. Mot. 15. Thus, Mr. Hooker clearly is not alleging bad faith with respect to the toxicological hazards representation.

Mr. Hooker also asserts that, in June 1999, following his inquiries about contamination and his request for more money, "everything went downhill on both contracts." Pl. Mot. 21-22. Mr. Hooker cites, as acts of alleged bad faith, the contracting officer's decision to bar the two employees from the SRS for defrauding the Government; the withholding of $1,320 in payments because domestic hogs had been brought to the cooler; the reduction of beaver trapping sites and the reduction of culvert cleaning work. Pl. Mot. 22-23.

However, rather than presenting actual evidence to support his allegations, Mr. Hooker asserts, in conclusory fashion, that the Government's actions, "all taken contemporaneous with [his] request for more money under the contracts, is suspect." Pl. Br. 23 (emphasis added). Mr. Hooker claims that, taken alone, each of the Forest Service's actions "would not necessarily negate the good faith presumption that the contracting officer was acting in good faith," but that "the timing is suspicious" and that "subsequent events have cast suspicion on the reasoning provided by the Forest Service for its actions." Pl. Br. 25 (emphasis added).

These cases have been pending for years. Mr. Hooker has had more than ample opportunity to investigate his claims. At the end of the day, all Mr. Hooker has presented to support his allegations are his own purported suspicions. This is not sufficient to overcome our motion for summary judgment, let alone provide a basis for granting summary judgment in his favor on the issue of bad faith. Mr. Hooker's suspicions are not evidence. Certainly, suspicions could not have been what the courts mean when they use phrases like "heavy burden" and "clear and convincing evidence" when describing what is needed to overcome the presumption of good faith. See A-Transport v. United States, 27 Fed. Cl. at 220; Bannum, 56 Fed. Cl. at 458.

Indeed, as is clear from reviewing his summary judgment motion, Mr. Hooker's allegations of bad faith are nothing more than unfounded accusations. Such accusations are not sufficient to overcome summary judgment, especially since fact discovery is now closed. See Sweats Fashions, 833 F.2d at 1562 ("'[T]he burden on the moving party may be discharged by "showing" . . . that is, pointing out . . . that there is an absence of evidence to support the non-moving party's case."') (quoting Celotex Corp. v. Catrett, 477 U.S. at 325); see also Curl v. International Business Machines Corp., 517 F.2d 212, 214 (5th Cir. 1975) ("[T]he party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and . . . the opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve

factually uncontested proof.") (quoting Rinieri v. Scanlon, 254 F. Supp. 469, 474 (S.D.N.Y. 1966)), cert. denied, 425 U.S. 943 (1976).

**4. The Evidence Presented By The Government Affirmatively Demonstrates That The Government Acted In Good Faith**

Although Mr. Hooker's inability to point to demonstrate bad faith through competent evidence is enough justification for granting summary judgment to the Government upon that issue, evidence in the record actually establishes that the Government acted in good faith.

For instance, Ms. Brooks demonstrates, in her declaration, that none of the Government's actions discussed by Mr. Hooker were taken in bad faith. Brooks Decl. ¶¶ 18-21. Ms. Brooks explains that the beaver and culvert cleaning sites were reduced because of the drought and resulting low water levels. Brooks Decl. ¶¶18-19. Her statements in that regard are supported by documentary evidence in the record, which we previously have explored in detail. See A154-155.

Ms. Brooks also demonstrates that the Forest Service had good faith reasons for believing that Mr. Hooker's agents were trying to pass off domestic piglets as wild hogs, and that the Forest Service followed proper channels by referring the issue to law enforcement. Brooks Decl. ¶¶ 20-21. Again, her statements are supported by record evidence. See A154-155. Further, the record shows that Mr. Hooker's agent improperly attempted to obtain payment for fetal piglets in December 1998, before Mr. Hooker raised any issue regarding alleged contamination. A150a-150b.

Indeed, for the Forest Service to have acted in bad faith with respect to the domestic pig issue, its employees would have had to conspire with Dr. Mayer – a WSRC wildlife ecologist who works at the SRS – to prepare a false report and then falsely report the misconduct to Wackenhut Services – which employed special state constables to perform law enforcement functions at the SRS. Any such allegations would fly in the face of the good faith presumption afforded Federal employees, defy logic, and contradict the testimony offered by Ms. Brooks in her declaration.

Moreover, entirely absent from Mr. Hooker's story is the Government's earnest efforts, documented in the record, to accommodate him. For example, the only time the Government asked Mr. Hooker to trap beaver in a contaminated area, it provided him with notice that the area was contaminated, gave him the option not to trap beaver in that area, gave him the option of using snares so that he did not have to enter the water, and informed him as to what protective equipment he needed to use. Gabard Dep., p. 45 at 11-16; Hooker Dep. p. 37 at 15-18.

Additionally, Mr. Hooker's health concerns resulting from possible contamination received on site were investigated. A detailed report resulted, showing that neither Mr. Hooker nor his employees had suffered any health effects from the purported harmful exposure experienced on site. NIOSH Report, A173. The fact that the Government took the time and went to the expense of preparing that report further demonstrates its good faith.

In sum, because Mr. Hooker has failed to demonstrate that the Government acted in bad faith with respect to either the Beaver Contract or the Hog Contract, his request for summary judgment upon that issue should be denied. Pl. Mot. 21-26. Further, our cross-motion for summary judgment upon Mr. Hooker's bad faith claims should be granted.

## **CONCLUSION**

For the foregoing reasons, Mr. Hooker's motion for summary judgment should be denied in its entirety. Further, we respectfully request that the Government's cross-motion for summary judgment, seeking dismissal of both the Hog Complaint and Beaver Complaint, be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

*s/Todd M. Hughes*

TODD M. HUGHES
Assistant Director

*s/Richard P. Schroeder*

RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562

Attorneys for Defendant

September 7, 2006

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 7th day of September 2006, a copy of the foregoing "**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard P. Schroeder