IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Nos. 03-1501C, 04-1126 (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DECLARATION OF FRANKIE BROOKS

I, Frankie Brooks, make the following declaration pursuant to the provisions of 28 U. S. C. Section 1746:

1. I was employed by the United States Forest Service ("Forest Service" or "USFS") at the Savannah River Site ("SRS") in Aiken, South Carolina, as a wildlife technician. The Forest Service is part of the U. S. Department of Agriculture and has responsibility for the management of the nation's forests. I retired from the Forest Service in 2002. I am familiar with the facts set forth below based upon my work for the Forest Service.

2. SRS is a very large nuclear facility in Aiken, Barnwell, and Allendale counties in South Carolina that is owned by the United States Department of Energy ("DOE"). SRS is about the same size as Rhode Island. The Forest Service has an Interagency Agreement with DOE to manage the natural resources of SRS. The management of SRS's natural resources includes responsibility for trapping hogs, trapping beavers and cleaning culverts. The Westinghouse Savannah River Company (now Washington Savannah River Company) ("WSRC") has a contract with DOE to operate and manage SRS. Wackenhut Services Inc. ("WSI") provides security services for SRS.

3. Homer Gabard was the Contracting Officer for the USFS Savannah River Station. I was a Contracting Officer's Representative ("COR") from the mid-80s until my retirement in 2002. I had responsibility for the beaver and hog trapping contracts at SRS.

4. On October 29, 1997, Mr. Hooker d/b/a Georgia Bowhunters Supply Company was awarded a contract for hog trapping (#53-4660-8-04). The contract period was for one base year with options to extend the contract for twelve month increments until a three-year maximum contract period had been reached. On October 1, 1998, the contract was modified to reflect that the first option was exercised, and the contract was extended until September 30, 1999 (Option I). This contract was primarily performed by two employees of Georgia Bowhunters Supply Company: Goldman Eller and Michael Eller.

5. The hog contractor was responsible for trapping nuisance hogs. Rooting hogs can damage timber stands and other natural resources.

6. Mr. Hooker d/b/a Georgia Bowhunters Supply Company was awarded a requirements contract (#53-4660-9-06) with the Forest Service to trap beavers and clean culverts. Beavers would put branches and other debris into culverts under roads at SRS. Consequently, water could not flow freely. Mr. Hooker was contracted to remove the blockage and trap the beavers.

7. These contracts (#53-4660-8-04 and #53-4660-9-06) were not the first contracts Mr. Hooker had with the Forest Service at SRS. His first contract with the Forest Service for hog control and beaver trapping began on February 10, 1992. Andy Cromer worked with Mr. Hooker trapping beavers.

8. In my capacity as COR, I worked daily with Mr. Hooker's contracts with the Forest Service; this included directing Mr. Hooker and his employees to specific sites to trap beavers and to clean culverts when needed.

9. I was familiar with and visited all of the beaver trapping sites that Mr. Hooker was assigned under his contract with USFS. I had a map with all the beaver sites marked on it. Mr. Hooker also had a copy of that map. Mr. Hooker was supposed to trap only at the specific sites marked on the map. For instance, he was not supposed to trap the entire length of Tim's Branch to Upper Three Runs or in Steed's Pond.

10. Mr. Hooker did not have specific hog trapping sites in his contract. I would direct him to trap where hogs had done damage.

11. Mr. Hooker's contracts contained a clause that there were no toxicological hazards likely in the performance of the work. I visited all the beaver trapping sites: none of them were marked as Soil Contamination Areas or otherwise marked to indicate any radiological hazard. I am not aware of any non-radiological hazard at any of the beaver trapping sites. All of the beavers trapped were monitored for radiation up through the mid '90s. None of the beavers ever had any contamination and the requirement for monitoring was dropped. The hogs were also monitored. None of them were contaminated either.

12. Mr. Cromer did tell me in 1997 that he had seen a soil contamination area sign up at the Steed Pond Road (Beaver Site 19) beaver trapping site. I told him that he did not have to go back up there to trap. I have reviewed the beaver trapping logs. Mr. Cromer and Mr. Hooker continued to trap beavers at that site after I told them they did not have to return.

13. Mr. Hooker did have to go into a beaver trapping site on Four Mile Branch at Road 4 near HP-52. This was a new site. When Mr. Hooker and I went to look at the site, we

found a yellow and magenta radiological warning sign that had been knocked down. I called WSRC Radiation Protection about what was required for Mr. Hooker to enter the site.

14. WSRC Radiation Protection required a work permit for work in a radiation area. For safety reasons, Mr. Hooker was also required to wear personal protective equipment including waders and long gloves. Mr. Hooker had received radiation worker training (RAD Worker II) because of his job with WSRC. He was only required to go into this site once.

15. I was with Mr. Hooker on February 22, 1999, when he went into the Four Mile Creek/Road 4 site on the WSRC work permit. He never expressed any concern about his health. He was upset because the inspectors, who had to monitor him for contamination after he finished, were late.

16. Mr. Hooker did ask Homer Gabard for an increase in his contract price for any further trapping at the Four Mile Creek/Road 4 site. Mr. Gabard denied the request. I am not aware of any other requests from Mr. Hooker to increase the amount he charged because he had to enter contaminated areas. Mr. Hooker bid on the hog contract after 1999. He did raise his price per hog significantly.

17. Site law enforcement called me one night in 1995 to tell me that Mr. Hooker had been caught with a cooler full of cleaned fish from L-Lake, which was the cooling lake for the L-Reactor. The hot water from L-Reactor was discharged into L-Lake. Mr. Hooker had told the officers that he had my permission to catch fish in L-Lake. He said he needed the fish as bait for hog trapping. Hogs do not eat fish. I did not give Mr. Hooker permission to fish in L-Lake.

18. During the summer of 1999, I visited frequently trapped beaver trapping sites daily. At most of these sites, I saw water-levels that were well below their normal levels.

Several of the sites were actually dry. I remember there had been a severe drought and above normal temperatures that spring.

19. As a result of these decreased water-levels, I saw that there were less beavers at many of the sites than in previous years and that many of the culverts did not need cleaning. I reduced the number of sites for Mr. Hooker to work at to just those sites where there was a continued need for trapping and cleaning.

20. Around this time, Dr. Jack Mayer, a hog specialist, had been doing research on the hogs the Ellers had trapped. Dr. Mayer reported that Mr. Eller had turned in domestic piglets. The piglets had more teats than feral piglets at SRS and had been raised on concrete pads. They had no parasites or dirt on them. They had been killed by a blow to the head and not by dogs as Mr. Eller had written on the hog trapping log. These piglets were too small to have walked any distance, much less ten miles or more from the site boundary to the center of the site where Mr. Eller claimed to have trapped them.

21. The Forest Service also asked site law enforcement to investigate. The investigation supported Dr. Mayer's findings and recommended that the Ellers be barred from SRS. Mr. Gabard, Dr. Mayer, the law enforcement officers and I met with Goldman Eller on July 1, 1999 in building 760-15G at SRS. Mr. Eller did not deny the charges and did not contest Mr. Gabard barring him from SRS. He did tell Mr. Gabard that his son, Michael, had nothing to do with the scheme.

22. As result of the investigation about the piglets, the call I received about the fish from L-Lake, and another incident where Mr. Eller had logged fetal pigs in the hog log, Mr. Gabard and I began to suspect Mr. Hooker of bringing the same trapped beaver carcasses in multiple times to be counted in the logs. Consequently, I started marking all beavers that were

trapped and brought in to be counted with spray paint to avoid the "recycling" of the same beavers for payment. After we started marking the beavers, the number of beavers that Mr. Hooker brought in under his contract decreased dramatically; from monthly numbers in the 30s and 40s to single digits.

23. After Mr. Gabard barred the Ellers from the site, Mr. Hooker performed both the beaver and the hog contracts. In November, 1999, Mr. Hooker told Mr. Gabard that he had only caught one beaver in both September and October because he had concentrated on the hog contract during the past two months. Mr. Gabard reminded him that he was responsible for performing satisfactorily on both contracts.

24. Because of the problems we had with Mr. Hooker, the USFS decided to do the beaver trapping in house after Mr. Hooker's contract expired.

25. I did not know that Mr. Hooker had any concerns about working in radiological areas until 2000 when he wrote the CDC. He never said anything to me or Mr. Gabard about being worried about his health or what was in the water. I was not aware of these issues until months after the Forest Service had reduced the number of beaver trapping sites.

26. I understand that Mr. Hooker claims that the Forest Service acted in bad faith when we reduced his beaver trapping sites in 1999. I never acted in bad faith to Mr. Hooker. I did not reduce the number of trapping sites because Mr. Hooker made claims about contamination. I reduced the number of sites because there was no need to trap at the other sites.

27. I also understand that Mr. Hooker is claiming that his hog contract was extended until another hog contract was awarded. The Forest Service extended Mr. Hooker's contract until the end of 1999. We obtained renewals of the contraband passes for Mr. Hooker and his employees until the end of December, 1999. Mr. Hooker turned in his final invoice and all of his

equipment at the beginning of January 2000. He never said anything to me about his hog contract extending beyond the end of 1999.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of September, 2006.

Frankie Brooks

Frankie Brooks