**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a<br>GEORGIA BOWHUNTERS SUPPLY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Nos. 03-1501C, 04-1126<br>(Judge Allegra) |

**DECLARATION OF KENNETH W. CRASE, Ph.D.**

I, Kenneth Crase, Ph.D., make the following declaration pursuant to the provisions of 28 U.S.C. Section 1746:

1. I am employed by the Washington Savannah River Company "WSRC" as Technical Advisor to Radiological Protection Services at the Savannah River Site "SRS" in Aiken, South Carolina. I have held that position for more than twenty (20) years. I am also a 37-year member of the Health Physics Society and a Fellow member since 2003. I am familiar with the facts set forth below based upon my work for WSRC.

2. As I understand Mr. Hooker's claims in this action, Mr. Hooker is seeking additional compensation for exposure to radiological contamination as a result of the work performed in connection with the beaver and hog contracts: Contract Nos. 53-4660-9-06 and 53-4660-8-04, respectively (the "Contracts").

3. Most of the SRS lands outside fenced operating areas have not been radiologically impacted by past SRS activities and have minimum levels of radioactivity, which is no different than other areas where there was (or continues to be) Government activity (primarily from atmospheric testing of nuclear weapons by the U. S. or other governments).

4. Residual radioactivity from Government activity is everywhere at detectable levels. Such residual radioactivity, however, does not equate to an increased risk to human health. There are SRS areas with elevated residual radioactivity, and WSRC radiation protection staff evaluates such areas in order to determine whether it is necessary (i) to post as radiological areas, (ii) to monitor workers, and (iii) to require workers to wear personal protective equipment.

5. SRS has developed parameters to protect its on-site workers from radiological contamination. The parameters were implemented to ensure that SRS on-site workers who are likely to receive a radiation dose of 100 mrem per year from SRS sources are monitored.

6. 100 mrem is a very conservative dose. Indeed, everyone, as a result of ordinary, daily, living activities, receives a radiation dose of approximately 360 mrem per year.

7. Certain of these on-site worker parameters are relevant to Mr. Hooker's claims. For example, in order to receive a dose of 100 mrem, Mr. Hooker would have had to have worked in a soil contamination area ("SCA") for 2000 hours in the course of one year, and the area of contamination would have had to have been 10,000 square meters. To my knowledge, there is no evidence that Mr. Hooker, during the performance of the Contracts, spent 2000 hours in a SCA in the course of one year, nor is there any dispute that most of the beaver sites are smaller than 10,000 square meters.

8. As I understand it, Mr. Hooker finds it significant that he worked in the soil while performing the beaver contract. From a radiation protection standpoint, Mr. Hooker's contact with the soil in connection with the beaver contract was incidental. It

did not rise to the level of disturbing the soil. Activities that involve movement of soil, substantial digging in soil, or constructing structures in soil constitute disturbing the soil, whereas activities that involve collection of samples, even soil samples, do not. Consequently, Mr. Hooker was not required to be outfitted with personal protective equipment or to undergo Radiation Worker Training in the performance of the Contracts.

9. Assessment of the radiological hazards, work activity and time spent performing that work led to the conclusion that Mr. Hooker received a radiation dose that was no more than a very small fraction of the dose parameter used at SRS for monitoring workers for radiation, and it is entirely feasible that he received a higher dose of radiation from natural sources while traveling to and from work from his home in Augusta, Georgia, than he did from the performance of the Contracts.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of September, 2006.

Kenneth W. Crase, PhD

Kenneth W. Crase, Ph.D.