IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a<br>GEORGIA BOWHUNTERS SUPPLY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Nos. 03-1501C, 04-1126<br>(Judge Allegra) |

**DECLARATION OF BRIAN HENNESSEY**

I, Brian T. Hennessey, make the following declaration pursuant to the provisions of 28 U. S. C. Section 1746:

1. The Savannah River Operations Office "DOE-SR" has responsibility for the oversight of the Savannah River Site "SRS" owned by the U. S. Department of Energy "DOE".

2. SRS is a large facility, about the size of Rhode Island, in Aiken, Barnwell and Allendale Counties containing a number of complex and unique nuclear facilities.

3. These facilities produce radioactive isotopes for use for defense, space exploration and medical purposes.

4. DOE-SR also has responsibility for waste management and environmental remediation activities at SRS.

5. Only a small portion of SRS is used for nuclear, waste management, environmental clean-up and administrative facilities; the remaining acreage is forested.

6. DOE entered into a Management and Operating "M&O" Contract with the Westinghouse (now Washington) Savannah River Company "WSRC" to operate the SRS facilities in 1989.

7. DOE-SR has contracted with Wackenhut Services Inc. to provide security services for SRS.

8. DOE-SR has an interagency agreement with the United States Forest Service (the "Forest Service") to manage the natural resources at SRS, including timber and wildlife management.

9. I am employed by DOE-SR at the Savannah River Site as the Project Manager for the SRS Federal Facility Agreement "FFA". I am a physical scientist. I have worked in the DOE-SR Soils and Groundwater program for 13 years and have been the FFA Project Manager for ten years. I am familiar with the facts set forth below based upon my work for DOE-SR.

10. The FFA is the agreement between DOE, the United States Environmental Protection Agency "EPA" and the South Carolina Department of Health and Environmental Control "DHEC" for the clean-up of SRS pursuant to the Resource Conservation and Recovery Act "RCRA" and the Comprehensive Environmental Response, Compensation, and Liability Act "CERCLA" signed on August 16, 1993.

11. SRS was put on the National Priorities List "NPL" in 1989.

12. This agreement requires DOE to study all areas, that is, all "operable units," at SRS that contain hazardous, mixed (hazardous and radioactive), or radioactive waste at SRS and to propose remedial action. EPA and DHEC must review all studies DOE prepares and must agree to the remedial action proposed by DOE. EPA and DHEC also must agree to the closure of the particular operable unit.

13. The characterization of operable units started well before 1989 and is mostly completed.

14. DOE, EPA and DHEC have agreed to the priority for the cleanup of operable units according to published criteria. Clean-up decisions are made according to the risk from long term exposure to the chemicals in operable units. DOE-SR assumes that long term exposure is 2000 hours per year for 25 years, consistent with industrial exposure using EPA risk assessment methods. The list is contained in Appendix E to the FFA.

15. Most of the operable units containing hazardous, radioactive or mixed waste are in or near the nuclear facilities, that is, the reactor areas, C-Area, K-Area, L-Area, P-Area and R-Area, and the chemical separations areas, F- and H-Areas. DOE-SR and WSRC have used process knowledge, detailed records, and environmental monitoring data from the beginning of SRS to identify operable units. All operable units are clearly marked.

16. SRS conducts a comprehensive monitoring program for hazardous chemicals and radioactivity in the environment, including air, soil, water and wildlife.

17. SRS takes over one hundred water samples per year for the purposes of environmental monitoring and cleanup investigation. Specifically, for the period 1992 through the third quarter of 1996, water quality measurements and analyses were performed monthly at all locations (156 samples/year); metal analyses were performed quarterly at all locations (44 samples/year); and pesticides/herbicides analyses were performed monthly from selected locations (50 samples/year). For the period of the fourth quarter of 1996 through the year 2000, water quality and metals measurements and analyses were performed monthly (180 samples/year), and pesticides and herbicides analyses were performed quarterly at all locations (60 samples/year). See Exhibit 1

attached hereto (a table summarizing the water quality sampling at SRS for the period 1992-2000).

18. The Environmental Protection Agency is the agency responsible for issuing primary drinking water standards. See Exhibit 2 attached hereto. According to the non-radiological surface water surveillance table from the 1999 SR Environmental Report, which is attached hereto as Exhibit 3, in 1999 all contaminants in the SRS surface waters were below the respective primary drinking water standards, with one exception. That exception was lead. In April of 1999, at Tinker Creek at Kennedy Pond Road, a slight exceedance of lead (.016 mg/L vs .015 mg/L) was found. Tinker Creek at Kennedy Pond Road is near the site perimeter in Williston, South Carolina, it originates off-site, and the monitoring site is upstream of SRS facilities.

19. SRS conducts deer and hog hunts for members of the public. Each animal is monitored for radiation contamination before it is released to the hunter. Any animal exceeding stringent DOE limits will not be released to the hunter. Since the beginning of the monitoring program, only one deer has ever exceeded DOE's stringent limit.

20. Some streams on SRS contain low levels of radioactive contamination and chemical contamination. Clean-up of these streams are generally low priority and will not be addressed until near the end of the SRS cleanup program. The original NPL listing of operable units and areas to be investigated did not include SRS streams. DOE has taken early cleanup action at hot spots in site streams, and will probably do more.

21. Based on my knowledge of the SRS FFA program and the extensive characterization and sampling at SRS, I conclude that a beaver or hog trapper at SRS would not be exposed to a toxicological hazard in the course of his work at SRS.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of September, 2006.

Brian T. Hennessey