**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a<br>GEORGIA BOWHUNTERS SUPPLY,<br><br>Plaintiff<br><br>vs.<br><br>THE UNITED STATES,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 03-1501C, 04-1126<br>(Judge Allegra) |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(1) of the Rules of the United States Court of Federal Claims, defendant, the United States, submits the following proposed findings of uncontroverted fact in support of defendant's motion for summary judgment upon plaintiffs' first amended complaint in Case No. 01-1501 (the "Beaver Complaint") and plaintiff's complaint in Case No. 04-1126 (the "Hog Complaint").[1]

**A. The Savannah River Site**

1. The Savannah River Site ("SRS") is a large area about the size of Rhode Island and is located in Aiken, Barnwell and Allendale counties, South Carolina. Brian Hennessey Decl. 1, ¶ 2.

2. SRS, which is owned by the United States, contains a number of complex and unique nuclear facilities. Hennessey Decl. 1, ¶ 2.

3. These facilities produce radioactive isotopes used for defense, space exploration and medical purposes. Hennessey Decl. 1, ¶ 2.

---

[1] The declarations submitted herewith are cited in the following format "(Name of Declarant) Decl. __". References are to page and/or paragraph numbers. A__" refers to the defendant's accompanying appendix. References are to page numbers. Because Georgia Bowhunters Supply was simply a trade name used by plaintiff, William Hooker, any references to "Georgia Bowhunters" are the equivalent to references to Mr. Hooker.

4. The Department of Energy's ("DOE") Savannah River Operations Office has responsibility for the oversight of SRS, including waste management and environmental remediation activities conducted at the site. Hennessey Decl. 1, ¶ 1.[2]

5. Only a small portion of SRS is used for nuclear, waste management, environmental clean-up and administrative facilities; the remaining acreage is forested. Hennessey Decl. 1, ¶ 5.

6. In 1989, DOE entered into a Management and Operating contract with the Westinghouse (now Washington) Savannah River Company ("WSRC") to operate the SRS facility. Hennessey Decl. 1, ¶ 6.

7. DOE has contracted with Wackenhut Services Inc. to provide security services for SRS. Hennessey Decl. 2, ¶ 7.

8. The United States Forest Service, is an element of the United States Department of Agriculture and has responsibility for the nation's public forests. Frankie Brooks Decl. 1, ¶ 1.

9. Because of the Forest Service's expertise in forest and natural resources management, DOE has an interagency agreement with the Forest Service to manage the natural resources at SRS, including timber and wildlife management. Brooks Decl. ¶ 2.

10. DOE entered into a Federal Facilities Agreement on August 16, 1993 with the United States Environmental Protection Agency ("EPA") and the South Carolina Department of Environmental Control ("SC DEC") for the clean-up of SRS. Hennessey Decl. 2, ¶ 10.

---

[2] For purposes of brevity, DOE's Savannah River Operations Office simply is referred to as "DOE" where context permits.

11. This agreement requires DOE to study all areas, that is, all "operable units" at SRS that contain hazardous, mixed (hazardous and radioactive), or radioactive waste at SRS and to propose remedial action. Hennessey Decl. 2, ¶ 10.

12. EPA and SC DEC must review all studies DOE prepares and must agree to the remedial action proposed by DOE; EPA and SC DEC also must agree to the closure of the particular operable unit. Hennessey Decl. 2, ¶ 12.

13. The characterization of operable units started well before 1989 and is mostly completed. Hennessey Decl. 2, ¶ 13.

14. DOE, EPA and SC DEC have agreed to the priority for the cleanup of operable units according to published criteria; clean-up decisions are made according to the risk from long term exposure to the chemicals in operable units. Hennessey Decl. 3, ¶ 14.

15. DOE assumes that long term exposure is 2000 hours per year for 25 years, consistent with industrial exposure using EPA risk assessment methods. Hennessey Decl. 3, ¶ 14.

16. Most of the operable units containing hazardous, radioactive or mixed waste are in or near the nuclear facilities, that is, the reactor areas, C-Area, K-Area, L-Area, P-Area and R-Area, and the chemical separations areas, F- and H-Areas. DOE and WSRC have used process knowledge, detailed records, and environmental monitoring data from the beginning of SRS to identify operable units. Hennessey Decl. 3, ¶ 15.

17. All operable units are clearly marked. Hennessey Decl. 3, ¶ 14.

18. DOE conducts a comprehensive monitoring program for hazardous chemicals and radioactivity in the environment, including air, soil, water and wildlife. Hennessey Decl. 3, ¶ 16.

19. DOE takes more than one hundred water samples per year for the purposes of environmental monitoring and cleanup investigation. Hennesssey Decl. 3, ¶ 17.

20. Specifically, for the period 1992 through the third quarter of 1996, water quality measurements and analyses were performed monthly at all locations (156 samples/year); metal analyses were performed quarterly at all locations (44 samples/year); and pesticides/herbicides analyses were preformed monthly from selected locations (50 samples/year). Hennessey Decl. 3, ¶ 17.

21. For the fourth quarter of 1996 through the year 2000, water quality and metals measurements and analyses were performed monthly (180 samples/year), and pesticides and herbicides analyses were performed quarterly at all locations (60 samples/year). Hennessey Decl. 3, ¶ 17.

22. The EPA is the Federal agency responsible for issuing primary drinking water standards. Hennessey Decl. 4, ¶ 18.

23. According to the non-radiological surface water surveillance table from the 1999 Savannah River Environmental Report, in 1999, all contaminants in the SRS surface waters were below the respective primary drinking water standards, with one exception, lead. Hennessey Decl. 4, ¶ 18.

24. In April of 1999, at Tinker Creek at Kennedy Pond Road, a slightly elevated level of lead (.016 mg/L vs .015 mg/L) was found. Hennessey Decl. 4, ¶18.

25. WSRC oversees deer and hog hunts for members of the public. See Hennessey Decl. 4, ¶ 19.

26. Each animal is monitored for radiation contamination before it is released to the hunter; any animal exceeding stringent DOE limits will not be released to the hunter. Hennessey Decl. 4, ¶ 19.

27. Since the beginning of the monitoring program, only one deer has exceeded DOE's stringent limits. Hennessey Decl. 4, ¶ 19.

## B. The Hog Contract

28. On October 29, 1997, Mr. Hooker, d/b/a Georgia Bowhunters Supply, was awarded an indefinite quantity (requirements) contract for hog trapping, Contract No. 53-4660-8-04 (the "Hog Contract"). A47, A63.

29. The purpose of the contract was trap and remove hogs causing damage at SRS. See Brooks Decl. ¶ 5.

30. The contract term was for one year, with two option years that the Government could exercise in its discretion. A53, A64.

31. According to Mr. Hooker's technical proposal, submitted during the pre-award process, Mr. Hooker and three employees, Andy Cromer, Goldman Eller and Mike Eller, were to staff the Hog Contract. A42.

32. According to the proposal, Mr. Hooker would hunt and trap hogs by using hog traps and by hunting hogs with specially trained and experienced hog dogs. A43.

33. Mr. Hooker represented that he had a total of 97 "trail", "bay" and "catch" dogs available for contract work. A43.

34. Mr. Hooker bid $55 per hog for the base period and each of the two option periods. A53.

35. The minimum estimated quantity for the base period and the two option periods was 200 hogs. A53.

36. The Hog Contract provided that Mr. Hooker was responsible for providing all supplies, equipment, personnel and dogs, which were to be trained to hunt hogs only. Gen. Spec. C.1.A., A55

37. Mr. Hooker was responsible for providing dogs with rabies vaccinations. Tech. Spec. C.2.B.2, A57

38. Mr. Hooker also was responsible for having replacement dogs available during the course of the contract so as not to cause delay in the use of the dog hunting technique in the event that a dog was killed or lost. Tech. Spec. C.2.B.9, A58.

39. Mr. Hooker and his employees were required to submit to monitoring by Westinghouse Health protection personnel after trapping in specified areas. Tech Spec C.2.E.4, A60

40. Mr. Hooker and all of his employees also were required to attend environmental, safety and health orientation before starting work at SRS and before receiving a SRS site access badge. Tech. Spec. C.2.F.4, A61.

41. The Hog Contract further provided that other personal protective equipment may be required. Tech Spec. C.2.G.11, A62.

42. The Hog Contract stated as follows:

> This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this

contract.

Hog Contract, Sec. I. 7, Indefinite Quantity (FAR 52.216-22) (Oct 1955), A63.

43. On October 1, 1998, the parties modified the Hog Contract to reflect that the first option was being exercised and that the contract term was extended until September 30, 1999. A151.

44. On September 4, 1999, the parties entered into a modification effective October 1, 1999, which extended the Hog Contract to "October 31, 1999 or until a new contract is awarded." Modification No. 4, A65.

45. The Hog Contract contained a provision stating that the "total duration of this contract, including the exercise of any options . . . shall not exceed 36 months or three years." A64, Sec. I.8.c.

46. On January 5, 2000, Mr. Hooker turned in all the Government property assigned to him, except for six panels and two gates that were missing from the hog traps. A319.

47. Mr. Hooker submitted a final invoice for trapped hogs. A320.

48. According to Andy Cromer, one of Mr. Hooker's employees, "we just quit going out there." Cromer Deposition ("Dep."), p. 31, at 11-12, A253.

### C. <u>The Beaver Contract</u>

49. On January 22, 1999, the Forest Service awarded Mr. Hooker a requirements contract, Contract No. 53-4660-9-06 (the "Beaver Contract"), to trap beavers. A74-75.

50. The purpose of the contract was to remove problem beavers whose activities had flooded timber sites, and blocked culverts. A86-87.

51. The contractor was also responsible for clearing beaver dams and debris from the blocked culverts. A87

52. Pursuant to the contract, Mr. Hooker trapped beavers using baited traps set in water. A69, A86.

53. In his technical proposal for the Beaver Contract, Mr. Hooker listed himself, Mr. Cromer and Mr. Eller, Sr. as the project personnel for this contract. A69

54. Mr. Hooker bid $45 per beaver and $18 per hour of culvert cleaning for the base period from the date of contract award to December 31, 1999. A80.

55. Mr. Hooker also bid $45 per beaver and $18 per hour of culvert cleaning for Option period I. A80.

56. The Beaver Contact provided as follows:

> Estimated quantities are intended as a good faith estimate of the quantities to be ordered. However, the Government is not obligated to order any work to be performed under the resulting contract for either the base period or the option period. Reference FAR Clause 52.216-21 "Requirements".

Contract Schedule, Sec. B. Requirements (FAR 52.216-22) (Oct. 1995), A81.

57. Each task order under the Beaver Contract was to include "maps showing where the work was to be performed." Contract Schedule, Sec. B, A81.

58. The Beaver Contract also contained a requirements clause – similar to the requirements clause in the Hog Contract – that provided as follows:

> This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities or supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an

equitable price adjustment.

Beaver Contract, Sec. I.7, A83.

59. The Beaver Contract authorized the Government to direct the contractor to use safety equipment, in addition to the equipment specified in the contract. Tech. Spec. C, A87.

60. The Beaver Contract provided that "[n]o toxicological hazards are associated with beaver trapping at SRS; however, normal environmental hazards such as snakes and uncertain footing do exist." Tech. Spec. C.4, A87.

61. The Beaver Contract did not define "toxicological hazard". A74-A87

62. "Toxicology" is the "science of poisons and their antidotes"; a "toxin" is "any of various unstable poisonous compounds produced by some micro-organisms and causing certain diseases." Snake venom is an example of a toxin. Webster's New World Dictionary, 1505 (2nd ed., 1974)

63. "Radiation is the act or process of radiating, specif., the process in which energy in the form of rays of light, heat etc. is sent out through space from atoms and molecules as they undergo internal change." Webster's New World Dictionary, 1170 (2nd ed., 1974).

64. "Contaminate" is defined as "to make impure, infected, corrupt, radioactive etc. by contact with or addition of something. . . ." Webster's New World Dictionary, 306 (2nd ed., 1974)

65. The Beaver Contract limited Mr. Hooker to trapping only in areas directed by Forest Service personnel. Tech Spec. A, Beaver Trapping, A86.

66. Specifically, the Beaver Contract provided that "selective trapping shall be conducted only in critical areas identified by the Savannah River Institute personnel" and that "[t]he contractor will only trap the areas designated by the Contracting Officer's Representative (COR), Inspectors or Contracting Officer." Tech Spec. A, Beaver Trapping, A86.

D. <u>**Mr. Hooker's Other Work Experience At SRS**</u>

67. Mr. Hooker worked at SRS from June 1976 to March 2000. Hooker Dep, p. 7 at 1-2, A 297.

68. Mr. Hooker primarily worked as a pipefitter and plumber in the F- and H- Area tank farms where the nuclear waste from the chemical separations facilities were stored. Hooker Dep. p. 7, at 13-25 and p. 8 at 1-21, A297.

69. Mr. Hooker worked in nuclear facilities at SRS after he left the tank farms: the Tritium facility and L-Reactor, which was being rebuilt. Hooker Dep. p. 12 at 9-13, A288.

70. For his work at the Tritium facility, Mr. Hooker had to "dress out" in a plastic suit with an air hose and he had to be cut out of the suit when he finished working. Hooker Dep. p. 9 at 4-11, A298.

71. Mr. Hooker worked at the Defense Waste Processing Facility "DWPF" at SRS when the work was clean. Hooker Dep. p. 7 at 7-21, A298.

72. Mr. Hooker left SRS to work for Georgia Power at Plant Vogtle, a nuclear power generation facility, and Turkey Point, a nuclear generation facility in Florida. See Hooker Dep. p. 12 at 16-23, A298.

73. Mr. Hooker knew the radiation requirements when he worked at SRS. Hooker Dep., p. 16 at 20-25 and p. 17 at 1-2. A299-300.

74. Mr. Hooker was familiar with radiation control signs, including, Soil Contamination Area, Underground Radioactive Material, Radiological Buffer Zone, Radiation Area, High Radiation Area, and Contamination Areas, from his work with WSRC because he had seen them inside the fenced-in areas. Hooker Dep. p. 21 at 1-25 – p. 22 at 1, A301.

75. Mr. Hooker wore a dosimeter for his work with WSRC; the only time he was ever told that he had a high reading was in 1977, when he was an apprentice in H-Area tank farm. Hooker Dep. p. 41 at 1-25 – p. 42 at 1.

76. Mr. Hooker's clothes from the 1977 incident at H-Area tank farm were contaminated and had to be buried. Hooker Dep. p. 41 at 12-21. A306.

### E. Mr. Hooker's Other Contracts with the Forest Service

77. These contracts were not the first contracts Mr. Hooker had with the Forest Service at SRS. Hooker Dep., p. 16 at 7-13, A299.

78. His first contracts with the Forest Service for hog control and beaver trapping began on February 10, 1992. Hooker Dep., p. 16 at 7-13, A299.

## F. Mr. Cromer's work experience at SRS

79. Andy Cromer worked with Mr. Hooker trapping beavers when Georgia Bowhunters Supply was first awarded the beaver contract. Cromer Dep., p. 21 at 11-16, A251.

80. Mr. Hooker and Mr. Cromer were partners in Georgia Bowhunter Supply until 1997. Cromer Dep., p. 31 at 23-25, A253.

81. Mr. Cromer continued to assist Mr. Hooker when Mr. Hooker needed help with the Hog Contract and the Beaver Contract after 1997. Cromer Dep., p. 31 at 8-25 – 32 at 1-9, A253.

82. Mr. Cromer also worked as an electrician in nuclear facilities at SRS, including the F-Area tank farm and the Naval Fuel Facility, both of which are nuclear facilities. Cromer Dep. p. 21 at 11-25 – p. 22 at 1-9, A251.

83. Mr. Cromer started working at SRS in 1985 or 1986 for Miller Electric and Bechtel. Cromer Dep., p. 23 at 17-21, p. 24 at 8-9, A251.

84. Mr. Cromer took General Employee Training ("GET") and Radiation ("RAD") Worker training for his work as an electrician at SRS. Cromer Dep., p. 24 at 12-25, A251.

85. Mr. Cromer learned about the different radiation control signs and what was going on at SRS, "so you won't get into anything you shouldn't" from his GET training. Cromer Dep., p. 24 at 21-25 – p. 25 at 1-7, A251-252.

86. Mr. Cromer learned about working around radiation, specifically about time, distance and shielding, from RAD Worker training. Cromer Dep., p. 25 at 8-18, A252.

87. Mr. Cromer took RAD Worker training several times; the course was three or four days and had a walk-through test at the end. Cromer Dep., p. 26 at 21-25 – p. 27 at 1-23, A252.

88. Mr. Cromer was RAD Worker certified until 1993. Cromer Dep., p. 27 at 24-25 – p. 28 at 1-3, A252.

### G. Performance Of The Hog And Beaver Contracts

89. Homer Gabard was the Forest Service's Contracting Officer for the Hog and Beaver Contracts. A195.

90. Frankie Brooks, a Forest Service wildlife technician, was the Contracting Officer's Representative ("COR"). A206.

91. Ms. Brooks worked on a day-to-day basis upon Mr. Hooker's contracts with Forest Service; her responsibilities included directing Mr. Hooker and his employees to specific sites to trap beavers and clean culverts when needed. Brooks Decl. ¶ 8; Brooks Dep., p. 6 at 16-25 – p. 7 at 1-24, A206.

92. Ms. Brooks also told Mr. Hooker where to trap problem hogs. Brooks Dep., p. 8 at 8-19, A206; Brooks Decl. ¶ 10.

93. The Forest Service had established a list of beaver trapping sites. A128.

94. Ms. Brooks was familiar with and visited all of the beaver trapping sites that Mr. Hooker was assigned under his contract with the Forest Service. Brooks Dep. p. 7 at 15-16; Brooks Decl. ¶ 9.

95. Ms. Brooks and Mr. Hooker had a map with all the beaver sites marked on it. Brooks Decl. ¶ 9.

96. Mr. Hooker was supposed to trap only at the specific sites marked on the map; for instance, he was not supposed to trap the entire length of Tim's Branch to Upper Three Runs or in Steed's Pond. Brooks Decl. ¶ 9.

97. Because Mr. Hooker's contract did not specify particular hog trapping sites, Ms. Brooks would direct Mr. Hooker to trap in areas where hogs had done damage. Brooks Decl. ¶ 10.

98. Ms. Brooks regularly visited all the beaver trapping sites and observed that none of them were marked as Soil Contamination Areas or otherwise marked to indicate any radiological hazard. Brooks Dep., p. 15 at 1-7, A208; Brooks Decl. ¶ 11.

99. Ms. Brooks was not aware of any non-radiological hazard at any of the beaver trapping sites. Brooks Decl. ¶ 11.

100. All of the beavers trapped were monitored for radiation through the mid 1990s. Brooks Decl. ¶ 11.

101. The beavers monitored did not have any contamination and the requirement for monitoring was dropped. Brooks Decl. ¶ 11.

102. Hogs were also monitored, but none of them were contaminated either. Brooks Decl. ¶ 11.

103. In early 1997, Mr. Cromer told Ms. Brooks that he had seen a soil contamination area (SCA) sign at the Steed Pond Road beaver trapping site. Cromer Dep. p. 59 at 4-24, A260; Brooks Decl. ¶ 12.

104. Ms. Brooks told Mr. Cromer that he did not have to go back there to trap. Brooks Decl. ¶ 12.

105. Mr. Cromer and Mr. Hooker continued to trap beavers at that site after Ms. Brooks told them they did not have to return. A141; Brooks Decl. ¶ 12.

106. On February 22, 1999, Mr. Hooker trapped at a beaver trapping site on Four Mile Branch at Road 4 near HP-52 marked with a radiological sign. (HP-52 is an environmental compliance sampling location). Brooks Decl. ¶¶ 13, 15.

107. WSRC's radiation protection office required a work permit for work in a radiation area; Mr. Hooker was also required to wear personal protection equipment. A147.

108. Mr. Hooker had been a radiation worker (RAD Worker II) when he work with WSRC. A147.

109. Ms. Brooks was with Mr. Hooker on February 22, 1999 when he went into the Four Mile Creek/Road 4 site on a work permit issued by WSCR. Brooks Decl. ¶ 15.

110. Mr. Hooker did not express any concern about his health with respect to that visit. Brooks Decl. ¶ 15.

111. Mr. Hooker was upset because the inspectors who had to monitor him for contamination after he finished were late. Brooks Decl. ¶ 15.

112. Mr. Hooker asked Homer Gabard, the contracting officer, for an increase in his contract price for any further trapping at the Four Mile Creek/Road 4 site. Gabard Dep., p. 44 at 24-25 – p. 45 at 1-9.

113. Mr. Gabard told Mr. Hooker that he did not have to work in any areas requiring a work clearance permit and Mr. Gabard would not agree to pay Mr. Hooker additional money. Gabard Dep., p. 45 at 10-16.

114. On September 22, 1995, site law enforcement found Mr. Hooker with a cooler full of fish from L-Lake, which was the cooling lake for the L-Reactor (the hot water from L-Reactor was discharged in L-Lake). A308.

115. Mr. Hooker claimed he needed the fish as bait for hog trapping. A308.

116. Ms. Brooks did not give Mr. Hooker permission to fish in L-Lake. Brooks Decl. 17.

## F. The 1999 Drought Conditions

117. During the summer of 1999, Ms. Brooks frequently visited beaver sites. See Brooks Decl. ¶ 18.

118. At most of these sites, she saw water-levels that were well below their normal levels. Brooks Decl. ¶ 18.

119. Several of the sites were actually dry. Brooks Decl. ¶ 18.

120. There had been a severe drought and above normal temperatures that spring. Brooks Decl. ¶ 18.

121. Rainfall records confirm that there was significantly less than normal rainfall during the spring of 1999. A156.

122. According to an article in the Augusta Chronicle, dated June 4, 1999, the drought threatened to become one of the worst in nearby Georgia after the driest spring on record since 1925. A321.

123. The article further states that Augusta, Georgia, located approximately 20 miles from the SRS, got less than a third of normal rainfall in May 1999 and the drought was having an impact on wildlife in the area. A321.

124. As a result of these decreased water-levels, there were fewer beavers at many of the sites than in previous years of Mr. Hooker's contract. Brooks Decl. ¶ 19.

125. Further, because there were fewer beavers and there was not water going through many of the culverts, those culverts did not need cleaning. Brooks Decl. ¶ 19

126. Ms. Brooks reduced the number of beaver trapping sites to just those sites where there was a continued need for trapping and cleaning. Brooks Decl. ¶ 19.

**G. Hog Contract Irregularities**

127. In 1999, Jack Mayer, PhD, a wildlife ecologist employed by WSRC, was studying the wild hog population and conducting research on the hogs that Mr. Hooker's agents, the Ellers, had trapped. A154.

128. According to the Hog Contract, Mr. Hooker was required to deliver the whole carcass of a trapped hog to the Forest Service work center cooler and to record data about the hog, i.e., weight, age, sex, reproductive condition (pregnant) and location trapped. A58.

129. Dr. Mayer examined the hogs in the cooler for a comprehensive study of the wild hog population at SRS. A154.

130. Ms. Brooks noted in her COR diary on December 17, 1998 that Goldman Eller had put hog fetuses in the Forest Service Cooler and had logged them in for payments. A150a-150b.

131. Ms. Brooks told Mr. Eller that he would not be paid for the 6 fetuses. A150b.

132. Dr. Mayer contacted Homer Gabard in May 1999 because he had noticed that some small piglets in the cooler had the characteristics of domestic hogs. A154.

133. The piglets had more teats than feral hogs at SRS; feral hogs normally have twelve or fewer teats while domestic hogs have more than twelve. A154.

134. Feral hogs have sharp pointed hoofs; these piglets had rounded hoofs consistent with being raised on a concrete pad. A154.

135. The subject piglets did not have any parasites on them, which indicated that they had been raised in a hog pallor rather than in the wild. A154.

136. The piglets had been killed by a blow to the head and did not have any teeth marks on them; they did not appear to have been trapped by dogs as Mr. Eller had claimed. A154, A113-120.

137. The piglets were too small to have walked the more than 10 miles from the site bounder to the center of the site, where Mr. Eller had claimed to have trapped them. Brooks Decl., ¶ 20.

138. The Forest Service also asked site law enforcement – Wackenhut Services, Inc. – to investigate. A154.

139. The investigation supported Dr. Mayer's findings and recommended that the Ellers be barred from SRS. A154-155. 28.

140. Mr. Gabard, Dr. Mayer, the law enforcement officers, and Ms. Brooks met with Goldman Eller and Mr. Hooker. A154-155.

141. The law enforcement report shows that Mr. Eller only gave a weak denial of the charges. A155.

142. Mr. Gabard sent Mr. Hooker a letter on June 30, 1999 putting him on notice that he was in default on the Hog Contract, because of "some actions taken in performance of this contract . . . have not been proper or in compliance with the contract and some of the actions could be considered to be illegal." A151-153 at A151.

143. The actions delineated in the letter were entering fetal pigs on the Wild Hog Data Table in an attempt to receive payment for those fetal pigs; attempting to receive payment for 31 domestic pigs; removing hogs and pigs from the cooler before the COR could verify the hogs/pigs were in the cooler; leaving hogs in the woods until they begin to rot; entering hogs in the Data Table without bringing them to the cooler. A151.

144. Mr. Gabard wrote that he was concerned that hogs and pigs were being removed from the cooler and then returned to the cooler so "payment would be made for the same animal twice." A151.

145. Mr. Gabard concluded that Mr. Hooker was not personally involved in the misconduct and, therefore, he did not terminate the contract for default. A152.

146. Mr. Gabard barred the Ellers from the Hog Contract. A152.

147. Mr. Gabard informed Mr. Hooker that $1,320 would be deducted from his June invoice for the 24 domestic pigs for which he already had been paid or that funds would be deducted from subsequent invoices if the amount of the June invoice was insufficient. A152.

148. Mr. Gabard informed Mr. Hooker that, in the future, all hogs, pigs and beavers would be marked with spray paint at the cooler and that he would not be paid for

any animal removed from the cooler before the COR or inspector issued a receipt for the animal. A152.

149. Mr. Hooker's employees working on the beaver and hogs contracts were required to keep the dispatcher notified of the compartment in which they were working. A152-153.

150. After the Forest Service started marking the beavers, the number of beavers that Mr. Hooker brought in under his contract decreased dramatically; from monthly numbers in the 30s and 40s to single digits. Brooks Decl. ¶ 22.

151. After Mr. Gabard barred the Ellers from the site, Mr. Hooker continued to perform both the beaver and the hog contracts. Brooks Decl. ¶ 23.

152. In November 1999, Mr. Hooker told Mr. Gabard that he had only caught one beaver in both September and October because he had concentrated on the hog contract during the past two months; Mr. Gabard reminded him that he was responsible for performing satisfactorily on both contracts. A162.

153. Mr. Hooker had also sent a note to Ms. Brooks on May 6, 1999, apologizing for not giving the beaver contract his full attention. A150.

154. Because of the problems with Mr. Hooker's performance, the Forest Service decided to perform the beaver trapping contract in-house after Mr. Hooker's contract expired. Brooks Decl. ¶ 24.

155. On November 29, 1999, Mr. Gabard informed Mr. Hooker that the Forest Service would not extend the term of the Beaver Contract at the end of the base period and would not exercise its option. A162a.

156. The Beaver Contract expired on December 31, 1999. A80

157. Jim Segar, a Forest Service employee, trapped beavers and cleaned culverts after Mr. Hooker's contract expired. See A163-165.

158. Mr. Segar trapped 44 beaver in 2000 and 28 in 2001. A163-165.

159. There was below average rainfall in both 1999 and 2000. A158.

160. On June 30, 1999, Mr. Gabard informed Mr. Hooker that the Forest Service would not extend the Hog contract for Option Period II (October 1, 1999 – September 30, 2000) and that the Forest Service intended to issue a new contract. A153.

161. On September 4, 1999, the Forest Service extended Mr. Hooker's Hog Contract "to October 31, 1999, or until a new contract is awarded." A65.

162. On October 29, 1999, the Forest Service extended contraband passes for Mr. Hooker and his employee from October 31, 1999 to December 31, 1999. A315-316.

163. Mr. Hooker admitted in his deposition that he never hunted hogs after November 30, 1999. Hooker Dep., p. 58 at 16-22, A307c.

164. Mr. Hooker turned in all of his equipment for the hog contract on January 5, 2000, except for six panels and two gates from the hog traps. A319.

165. Mr. Gabard sent Mr. Hooker a letter informing him that his final invoice under the hog contract would not be paid until he responded to Mr. Gabard about Government equipment for the hog contract that had not be returned. A317.

166. The Forest Service decided not to issue a new contract and to keep the work in house. Gabard Dep., p. 35 at 14-23, A228.

167. In January 6, 2000, Mr. Hooker wrote a letter to the Center for Disease Control requesting a determination regarding whether or not he had been exposed to hazardous substances during his work on the beaver and hog trapping contracts. See A163a.

168. The CDC referred Mr. Hooker's letter to the National Institute for Occupational Safety and Health ("NIOSH"). See A169.

169. Before a NIOSH visit on March 20, 2000, WSRC's Safety and Industrial Hygiene office investigated Mr. Hooker's concerns. A166.

170. WSRC Safety and Industrial Hygiene office prepared detailed reports and concluded that that Mr. Hooker had not been exposed to unsafe substances during his performance of his Forest Service contracts. A167.29.

171. NIOSH conducted an investigation at SRS from March 20 to March 22, 2000. A169.

172. The DOE Savannah River Operations Center Employee Concerns Office also reviewed Mr. Hooker's concern about exposure to hazardous substances in connection with his work on the Beaver and Hog Contracts. A166-168.

173. The Employee Concerns Office wrote Mr. Hooker that DOE Savannah River Operations Center, WSRC, Bechtel Savannah River and Forest Service employees had reviewed the data on radiological and chemical exposure and could not substantiate his concerns. A166.

174. NIOSH sent a letter to Mr. Hooker concluding that Mr. Hooker had not been exposed to unsafe hazardous substances. A172.

175. NIOSH wrote Mr. Hooker that, based upon the assumption that his employees had each accidentally ingested 10 grams of soil per year, the maximum dose to a beaver trapper would be 2 millirems per year or about one fourth the amount of exposure from one chest X-ray and 1/150 of the amount humans receive from natural sources. A170.

176. NIOSH noted that all the workers had whole body counts and urine assays to determine if their bodies contained any plutonium, uranium, or strontium. A170-171.

177. All of the whole body counts and urine assays were negative. A171.

178. NIOSH concluded "we find no basis for a substantial health risk due to exposure to radioactivity." A171.

179. NIOSH examined the water quality standards for SRS streams and found "only rarely did samples on site at SRS approach concentrations that would trigger concern that water quality standards were being exceeded." A173.

180. NIOSH also stated that, "[b]ased on the available environmental data and our medical findings, we conclude that beaver and pig trapping at SRS has not been associated with harmful exposure to radioactive or toxic environmental contaminants." A173.

181. Mr. Hooker did not tell the Forest Service that he had any concerns about working in radiological areas until late 1999 or 2000. Brooks Decl. ¶ 25.

182. Mr. Hooker never said anything to Ms. Brooks or Mr. Gabard about being worried about his health or what allegedly was in the water. Brooks Decl. ¶ 25.

183. The Forest Service was not aware of his claims to NIOSH until months after it

reduced the number of beaver trapping sites. Brooks Decl. ¶ 25.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

*s/Todd M. Hughes*

TODD M. HUGHES
Assistant Director

*s/Richard P. Schroeder*

RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562

Attorneys for Defendant

September 6, 2006

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 7th day of September 2006, a copy of the foregoing "**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard P. Schroeder