IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY, )
)
Plaintiff )
) No. 03-1501C, 04-1126
) Judge Allegra
THE UNITED STATES, )
)
Defendant. )

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**<u>PROPOSED FINDINGS OF UNCONTROVERTED FACT</u>**

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits these responses to the proposed findings of uncontroverted fact ("Proposed Fact(s)") submitted by plaintiff, William Hooker.[1]

## <u>General Objections</u>

The Government objects to Mr. Hooker's proposed facts because they are contrary to the Rules of this Court. Specifically, RCFC 56(h)(2) permits a party opposing summary judgment to file proposed findings of uncontroverted fact only as to "relevant matters." Many of Mr. Hooker's proposed facts are not relevant to the summary judgment issue. Facts that are irrelevant or immaterial to the pending motion for partial summary judgment should be

[1] The paragraph numbers contained in this document correspond to those contained in plaintiff's proposed findings of uncontroverted fact. Our response to each proposed fact is set forth in bold face immediately below the proposed fact. The contract for the control of the beaver population and culvert cleaning is referred to as the "Beaver Contract" and the contract for the control of the wild hog population is referred to as the "Hog Contract." Declarations are cited, for example, in the following format: "Brooks Decl. __." The Government's proposed findings of uncontroverted fact are cited "Def. Facts __" and plaintiff's proposed findings of uncontroverted fact are cited "Pl. Facts__" (references are to page and paragraph numbers). Defendant's appendix is cited "A__" (references are to page numbers). The exhibits in the appendix to plaintiff's motion for summary judgment are cited "Pl. Exh. __.

disregarded by the Court, even if there is a disagreement regarding such facts. Further, our responses are to Mr. Hooker's factual assertions. However, to the extent that we indicate that we agree with any Proposed Fact asserted by Mr. Hooker, this does not constitute an agreement that the citation following the proposed fact is accurate or otherwise supports the proposed fact.

**Government's Responses**

1. On October 29, 1997 Hooker was awarded contract #53-4660-8-04 to control the wild hog population on the Savannah River Site by trapping and the use of trained dogs. (Defendant's Response to Plaintiff's Request for Production).

**Agrees.**

2. This contract guaranteed a minimum quantity of 200 and a maximum quantity of 800, at a unit price of $55.00 per hog.

**Disagrees. The contract was an indefinite quantities contract and specifically provided that the quantities in the schedule were estimates only, and, therefore, no minimum quantities was guaranteed. Beaver Contract, Indefinite Quantities Clause, Sec. I.6. A63.**

3. Modification Number 1 to the hog contract increased the maximum quantity to 1000.

**Agrees.**

4. Hooker had previously been awarded hog contracts with USFS since 1992. (Dep. of W. D. Hooker, 16:7-13).

**Agrees.**

5. Hooker was awarded the beaver contract, #53-4660-9-06 dated January 22,

1999. (Defendant's Response to Plaintiff's Request for Production).

**Agrees.**

6. The beaver contract was a requirements contract, with two option years.

**Disagrees. The beaver contract only had one option year. Beaver Contract, Schedule, A80-81.**

7. Hooker had previously been awarded beaver contracts with USFS beginning in 1992. (Dep. of W. Hooker 12/8/05; 16:10).

**Agrees.**

8. The beaver contract price as negotiated was $ 45.00 per beaver, with an estimated quantity of 700 beaver, and 1100 hours of culvert maintenance at $18.00 per hour.

**Defendant agrees except, by way of clarification, defendant states that the 1100 hours of culvert maintenance was an estimate as well. Beaver Contract, Requirements Clause, Sec. I.7.**

9. The general specifications for the beaver contract specifically stated that "no toxicological hazards are associated with trapping beaver at SRS; however, normal environment and physical hazards such as snakes and uncertain footing do exist."

**Agrees.**

10. Hooker was directed to trap in sites 1 through 55 on the SRS. (Purchase Order dated January 29, 1999 and May 20, 1999, Response to Plaintiff's Request for Production).

**Agrees, except defendant notes that the purchase order contained in Mr. Hooker's appendix refers only to sites 1 through 54.**

11. The contracting officer's representative, Frankie Brooks, directed Hooker where to trap and issued work orders for every site that was to be trapped. (Dep. of F. Brooks; 7: 17-

21).

**Agrees.**

12. Brooks also acknowledged that sometimes the work orders were verbal. (Dep. of F. Brooks; 26:9-15).

**Agrees.**

13. Hooker trapped 256 beaver in 1999 broken down as to site number where trapped. (Defs. Resp. G-0994).

**Agrees.**

14. When Hooker first became a contractor on the site, he asked Homer Gabard, the contracting officer, if there was any problem with the water and Gabard replied, just don't drink more than two liters. (Dep. of W. Hooker June *5*, 2006; 11:5-8).

**Disagrees. Mr. Hooker so testified; however, Mr. Gabard did not recall Mr. Hooker ever asking about the water. Gabard dep. p. 46 at 17-20, A231.**

15. Asked if Hooker ever asked him what kind of contamination existed at the Savannah River Site, or what was in the water, Gabard did not recall that Hooker had asked him. (Dep. of H. Gabard;46:17-20).

**Agrees.**

16. Andy Cromer remembered that "we asked about the water. Is there any precautions we need? Are you going to have HP (health protection)? No. Don't—just don't drink it." (Dep. of A. Cromer Dec. 8, 2005; 70: 16-24).

**Disagrees. Mr. Cromer so testified; however, Mr. Gabard did not recall Mr. Hooker or Mr. Cromer asking about the water. Gabard dep. p. 46 at 17-20, A231.**

17. On February 22, 1999 Hooker was presented with a work clearance permit for

beaver trapping in Four Mile Creek at Road 4. (Dep. of W. Hooker Dec.8, 2005;35:21-22, P1. Exh. 1, attached as Exhibit.

**Agrees.**

18. Frankie Brooks and Hooker saw this radiation sign that was pushed over on Road 4. They talked about it and Brooks contacted Chuck Fanning who works for CSWE. He told her she had to have a work clearance permit to trap in there. (Dep. of F. Brooks; 12:18-25; 13:1-6).

**Agrees.**

19. This work clearance permit required the worker to be RAD II trained, and required a stand-by person and certain protective equipment. (Dep. of F. Brooks, P1. Exh. 1).

**Disagrees with the allegation that the work clearance permit required the work to be RAD II trained. Mr. Hooker has mischaracterized the contents of the work clearance permit. The work clearance permit stated that the person entering the creek was RAD II trained, not that the person was required to be RAD II trained. A147. Defendant agrees that protective equipment (flotation device) and standby person were required. However, defendant notes that nothing in the requirement states that the reason for a flotation devise and a standby person was for radiation protection and, by their nature, a flotation devise and standby person is not required for radiation protection.**

20. Brooks testified that DOE or Westinghouse had never given the Forest Service or herself a list of contaminated areas on the SRS. (Dep. of F. Brooks; 16:16-20).

**Agrees.**

21. An additional work clearance permit was issued for the same site a month or two after the first one. Hooker never used it. (Dep. of F. Brooks; 27:2-17).

**Agrees.**

22. Brooks testified that there were a couple of other sites that were posted as contaminated. (Dep. of F. Brooks; 17:2-8).

**Disagrees. The statement mischaracterizes Ms. Brooks' testimony. A review of her full testimony regarding the issue demonstrates that Ms. Brooks testified that she was aware of one other site, site 19, that was posted as contaminated, in addition to the Four Mile Creek/Road 4 sites. Brooks Dep. p. 17, at 2-25 A209.**

23. Site 19 is a beaver pond. (Dep. of F. Brooks 17:22)

**Agrees.**

24. At the time he (Hooker) trapped there, there weren't any postings. I don't know how I found out. I think it was from our engineering people with the Forest Service; found out that — I really don't remember how I found out, but somebody had gone in and put up radiation signs at that site; and I remember talking to the CSWE people—I mean engineering because they were also cleaning culverts. They were helping with the big work. And our Forest Service people were in there cleaning culverts, went to clean it and found these radiation signs, brand new, that had just been posted. (Dep. of F. Brooks; 18:2-12).

**Assuming that Mr. Hooker is referring to site 19, Ms. Brooks' testimony, quoted above (quotations omitted from original), states that soil contamination signs had been posted in 1997, which predates this contract. Therefore, at the time he performed services under this contract, site 19 was posted as a soil contamination area. We agree that Mr. Hooker trapped in that area before it was posted in 1997; however, that Mr. Hooker's beaver claim does not cover that time period.**

25. Brooks does not remember when this happened but it was during this same time (as the Work Clearance Permit) and these were areas that beaver had been trapped in. (Dep. of

F. Brooks; 19:2-3).

**Defendant cannot respond to Mr. Hooker's factual assertion because it is too vague and would require defendant to speculate as to what Mr. Hooker is referring to. To the extent that a response is deemed required, defendant disagrees.**

26. Gabard testified that DOE never informed him of any contaminated sites where his contractors should not go. (Dep. of H. Gabard; 12:4-9).

**Disagrees. Plaintiff has mischaracterizes Mr. Gabard's testimony. Mr. Gabard testified that he did not know whether the Department of Energy had ever informed anyone in the forest service of areas that were contaminated in which anyone should not disturb the soil. Gabard Dep., p. 12 at 10-14. Defendant further states that the evidence shows there were not levels of contamination that presented a risk to the health of Mr. Hooker or his employees. Crase Decl. 2-3, ¶¶ 6-10; Hennessey Decl. 3-4, ¶¶ 16-21.**

27. Gabard did not receive a list of contaminated sites. (Dep. of H. Gabard; 12:15-17).

**Agrees. Defendant states, however, that the evidence shows there were not levels of contamination that presented a risk to the health of Mr. Hooker or his employees. Crase Decl. 2-3, ¶¶ 6-10; Hennessey Decl. 3-4, ¶¶ 16-21.**

28. Gabard worked at the Savannah River Site since 1979. (Dep. of H. Gabard: 5:8-9).

**Agrees.**

29. Gabard testified that he had never seen a soil contamination sign. (Dep. of H. Gabard; 13:13-19)

**Agrees.**

30. Brooks became aware of other sites that were posted as contaminated. (Dep. of F. Brooks; 17:2-20)

**Defendant cannot respond to Mr. Hooker's factual assertion because it is too vague and would require defendant to speculate as to what Mr. Hooker is referring to. Defendant, however, points out that Ms. Brooks testified that Site 19 and four sites on Four Mile Creek were posted as contaminated. Brooks Dep., p. 17, at 2-22.**

31. Prior to June 1, 1999, Hooker requested more money from Homer Gabard for work not per his contract. (Dep. of W. D. Hooker; 49:20-25)

**Agrees that Mr. Hooker requested additional money; but disagrees with Mr. Hooker's legal conclusion that the work he performed was "not per his contract." As explained in defendant's memorandum of law, Mr. Hooker was not entitled to an equitable adjustment or otherwise entitled to additional money for the work he performed.**

32. Hooker made this request verbally and said "Homer, this is not per my contract. I need more money." (Dep. of W. D. Hooker; 50:4-6)

**Agrees.**

33. Gabard testified that Hooker asked for more money and his response was that Hooker did not have to work in that area, . . . that he could refuse to work in the area and that we would not force him to do so, but that we would not pay him additional money for trapping in this area. (Dep. of H. Gabard; 45:2-16).

**Agrees.**

34. Frankie Brooks documented that Hooker was to start trapping beaver at four sites which are considered contaminated on May 21, 1999 (Contract Daily Diary-Defs. Response to P1. Request for Production).

**Agrees. Ms. Brooks' diary reflects that Mr. Hooker was <u>going to</u> trap beaver at the four sites referred to.**

35. Frankie Brooks documented Hooker's request for more money in her Contract Daily Diary, dated May 27, 1999. (Defs. Responses to Plaintiff's Request for Production)

**Agrees.**

36. Hooker testified that Gabard answered "It is per the contract, go do the work". Hooker then went to Frankie Brooks. A few days later, she got back to Hooker and said "Homer said it is per your—per the contract. You either default the contract or do the work." (Dep. of W. D. Hooker; 50:7-13).

**Agrees that Mr. Hooker testified in that manner stated in the first sentence plaintiff's Proposed Fact No. 36. However, defendant disagrees that Mr. Gabard actually told Mr. Hooker, "[i]ts per the contract, go to the work." Rather, Mr. Gabard testified that he advised Mr. Hooker that Mr. Hooker did not have to go back into the Four Mile Creek/Road 4 site. <u>See</u> Gabard Dep. p 44, at 19-25 – p. 45, at 1-16, A231. Defendant neither agrees nor disagrees with the second and third sentences of plaintiff's Proposed Fact No. 36, because we are unaware of whether that discussion took place and, other than Mr. Hooker's own testimony, we are unaware of any other evidence in the record to support Mr. Hooker's assertion.**

37. Gabard does not recall Hooker ever asking him what kind of contamination existed at the Savannah River Site, or asking what was in the water. (Dep. of H. Gabard; 46:17-20).

**Agrees.**

38. Gabard did not know what protection is required for workers whose activities

involve disturbing the soil within soil contamination areas. (Dep. of H. Gabard; 50:9-13).

**Agrees.**

39. Cromer remembers seeing a soil contamination sign in 1997 and he asked Frankie Brooks about it. She said just don't go there. (Dep. of A. Cromer Dec. 8, 2005;60: 19-24).

**Agrees.**

40. Hooker wrote a letter to NIOSH asking for an investigation because the U. S. Forestry Service would not address the issues. Hooker asked Frankie Brooks what was in HP52. "I'd asked for information at every creek and every canal on that plant. For nine months, or six months, I got no answer". (Dep. of W.D. Hooker 12/08/05; 17:19-24).

**Defendant disagrees that Mr. Hooker wrote a letter to NIOSH, as asserted in the first sentence of plaintiff's Proposed Finding No. 40. Mr. Hooker actually wrote to the Centers for Disease Control ("CDC"), which referred the matter to NIOSH. A163a-163b. Defendant neither agrees nor disagrees with Mr. Hooker perceived reason for writing to the CDC because that is a matter within Mr. Hooker's particular knowledge and relates to his state of mind, and because Mr. Hooker does not identify the "issues" he is referring to. To the extent he is referring to the health issues, Frankie Brooks has stated that, prior to 2000, Mr. Hooker never said anything to the contracting officer or her about his alleged health concerns or concerns about the water. See Brooks Decl. p. 6, 25. The United States denies that Mr. Hooker made any request to the Forest Service for information about the creeks and streams at SRS, including HP-52, as he asserts in plaintiff's Proposed Finding No. 40. Mr. Hooker has to no evidence, other than his own testimony, to support the allegation.**

41. Hooker had Mark Lubert videotape the site at HP-52 in June of 1999. (Dep. of

W. D. Hooker 12/08/05 ;30: 16-25) (Plaintiff's Response to Defendant's Requests for Production; videos titled Savannah River Site August 1, 1999/June 1, 1999 (38 mm.).

**Defendant neither agrees nor disagrees because we are unaware of the date the video was made, the exact location, or the circumstances under which it was made, and those matters are within the particular knowledge of Mr. Lubert and Mr. Hooker.**

42. This video shows soil contamination signs at HP-52.

**Defendant neither agrees nor disagrees because we are unaware of the date the video was made, the exact location, or the circumstances under which it was made, and those matters are within the particular knowledge of Mr. Lubert and Mr. Hooker.**

43. Hooker testified that he saw soil contamination signs at four sites. (Dep. of W. D. Hooker 12/08/05; 32:8-25;33:1-25).

**Agree that Mr. Hooker testified as alleged; however, we do not know whether he actually saw soil contamination signs at the four sites because he does not identify the sites to which he is referring and because the matter asserted is within the particular knowledge of Mr. Hooker.**

44. NIOSH (National Institute for Occupational Safety and Health) did an investigation in response to Hooker's request for a Health Hazard Evaluation and a site visit took place March 20-22, 2000. (Defendant's Response to Plaintiff's Request for Production Attachment 29).

**Agrees.**

45. The final report stated that "during our visit to the SRS we came to understand an issue involving communications between the Forest Service personnel and DOE and DOE contract personnel at SRS. The issue centered on a lack of understanding between Forest

Service personnel and SRS staff as to what is involved in the trapping of beaver, particularly the fact that beaver trapping necessarily involves the disturbance of sediments in order to build castor mounds. Work Clearance Permits (WCPs) were issued to the trappers by the U.S. Forest Service and Westinghouse Environmental Section. The WCPs were issued by Westinghouse staff without a full understanding that the work would involve disturbing contaminated soil during the placement of beaver traps. (Defendant's Response to Plaintiff's Request for Production Attachment 29).

**Agrees that the report states as alleged (the entire excerpt above, except for the citation, is quoted from the report; plaintiff has omitted quotation marks that should close the quotation). However, defendant disagrees that beaver trapping requires disturbing contaminated soil in the radiation protection context. Crase Decl. 2-3, ¶ 9.**

46. After July, 1999 the beaver trapping sites were reduced from 55 to 2. (P1. Comp. ¶ 16).

**Agrees.**

47. Hooker's invoice for July dated August 1, 1999

**Defendant neither agrees nor disagrees because plaintiff's Proposed Finding No. 47 is a sentence fragment.**

48. Margaret Yeaton is the current contracting officer for the Forest Service. (Dep. of M. Yeaton; 4:1-3).

**Agrees.**

49. Yeaton testified that the soil contamination areas had been identified, and that an awardee of the contract may request copies. (Dep. of M. Yeaton; 7:22-25;8:1-10)

**Agrees.**

50. Defendant states that Margaret Yeaton was mistaken. (Response to P1. Supplementary Interrogatories).

**Agrees.**

51. Yeaton testified that she had never seen radiological signs on the Savannah River Site. (Dep. of M. Yeaton; 9:4-11)

**Agrees.**

52. Yeaton testified that the Forest Service does not deal with contamination. (Dep. of M. Yeaton; 11:21-22).

**Agrees. The primary responsibility for contamination issues lies with the Department of Energy and its Management and Operating contractor.**

53. Asked if she had a list of contaminated areas where her contractors should not be sent, Yeaton responded "no". (Dep. of M. Yeaton; 12:4-8).

**Agrees.**

54. The Forest Service provided a list of the beaver sites which are marked as posted as soil contamination areas. (Resp. to P1. Supplementary Requests for Production) (Dep. of D. Sanders, Exh. P-b)

**Agrees.**

55. Sites 19, 25, 29, 30, 32, 35, 36, 40, 43, 44, 45, 47 and 53 are posted as radiological areas or posted as "keep out". (Dep. of D. Sanders, Exh. P-b)

**Disagrees. The statement mischaracterizes the exhibit, which only identifies sites as "posted or not between 1992-and 2001". Sites 19, 25, 30, 36, 40, 47, and 53 are soil contamination areas (SCA), which are not radiological areas. See Pl. Exh. N. Mr. Sanders testified that SCA and contamination area are totally different signs. Sanders Dep. p. 21**

**at 22-25 and p. 22 at 1-6. Sites 29, 32, 35, 44, and 45 were posted "keep out" because of "process water," but those sites did not require a radiological posting. <u>See</u> Pl. Exh. N; Sanders Dep., p. 19 at 22-25 – p. 20 at 1-13. A284a <u>See</u> Pl. Exh. N. Site 43 is posted as a RCRA/CERCLA area, which is not a radiological posting. <u>See</u> Pl. Exh. N; Sanders Dep., p. 33 at 21-25 – p. 34 at 1-4.**

56. In response to Plaintiff's Requests for Production, a site visit was made to four beaver trapping sites on December 8, 2005. Photographs were taken of these sites by a Westinghouse photographer and provided to Plaintiff's counsel. (Response to Plaintiff's Request for Production).

**Agrees.**

57. Two of the beaver trapping sites; 19 and 53 were posted with radiological soil contamination signs. Two; 49 and 32, were not.

**Agrees.**

58. David Sanders has been at Westinghouse since 1992. His current title is RAD-CON manager. (Dep. of D. Sanders; 4:1-3).

**Agrees.**

59. His job is to protect personnel from radiation contamination, prescribing whatever protective equipment or monitoring needs to be prescribed to conduct work activities at SRS. (Dep. of D. Sanders; 4: 14-1 8).

**Agrees.**

60. Sanders' responsibility includes (radiological) posting and signage. (Dep. of D. Sanders;6: 13-24).

**Agrees.**

61. Orange balls mark hazardous sites. (Dep. of D. Sanders;6:25;7:b).

**Agrees.**

62. Sanders doesn't know what hazard the orange balls are marking. "I typically don't deal with the orange balls, so I don't know." (Dep. of D. Sanders; 7:4-5).

**Agrees.**

63. Hooker testified that he saw these orange balls that mean danger. "I found them where the trees had growed over them maybe 10/15 years." (Dep. of W. Hooker 12/8/05; 54:3-9).

**Agrees.**

64. Hooker saw orange balls in a couple of places. "In front of 100-R where we was hog hunting" (Dep. of W. Hooker 12/8/05; 54:17-18).

**Defendant neither agrees nor disagrees with the allegation of what Mr. Hooker saw because that is a matter within his particular knowledge; however, defendant agrees that he testified as alleged.**

65. Asked why the soil contamination area sign would be placed in an area, he replied it could be a "combination of either us performing soil samples or historical knowledge." (Dep. of D. Sanders; 7:21-23).

**Agrees.**

66. Sanders testified that his group is involved in remediating waste sites. (Dep. of D. Sanders; 10:23-24).

**Agrees.**

67. "If we have concentration levels in the soil, or whatever we're remediating, they would survey for the personnel to remove that soil, place it into containers, or whatever we

decide to – however we decide to disposition the material." (Dep. of D. Sanders; 11:1-6).

**Agree**s.

68. Asked about personnel who work outside doing brush cutting and tree cutting, in a radiological area, Sanders' function would be to monitor for personnel, to make sure they are not spreading contamination and to make sure they are not exceeding any (radiation) dose levels. (Dep. of D. Sanders; 10:3-8).

**Agrees.**

69. Sanders is not sure that he or his department monitor any of the beaver trappers; he stated the current beaver trapper is not being monitored. (Dep. of D. Sanders;38: 10-14).

**Agree.**

70. Asked if the beaver trappers were ever monitored, Sanders was not sure but said that Hooker was monitored most of the time by TLD, by whole body counts, from '92 to '99 because his full time job was with Westinghouse. Asked if the monitoring had anything to do with his beaver contracting, Sanders agreed that it didn't, but "he was monitored". (Dep. of D. Sanders; 38:23-25; 39:1-9).

**Agrees.**

71. Sanders was not sure if the rest of Hooker's employees were monitored. (Dep. of D. Sanders; 39:10-11).

**Agrees.**

72. Yeaton testified that now all the hog trapping is monitored by a contracting officer's representative. (Dep. of M. Yeaton, 6:3-6).

**Agrees.**

73. Andy Cromer testified that during the time he was trapping beaver and hunting

hogs on the Savannah River Site, he was never monitored by health protection. (Dep. of A. Cromer Dec. 8, 2005; 97:16-19).

**Agrees.**

74. The current beaver trapper and the hog contractors are not monitored. (Dep. of D. Sanders; 39:12-17)

**Agrees.**

75. There are six areas that are contamination areas in Steed Pond. The beaver site location is posted as an SCA, it was posted in 1997. (Dep. of D. Sanders; 41:16-25).

**Agree with plaintiff's Proposed Finding No. 75, that there are six contamination areas in Steed Pond and that the beaver site is SCA." However, we disagree that the beaver site is in Steed Pond. See Sanders Dep., p. 41 at 16-25.**

76. In the contaminated areas of Steed Pond, the isotope of concern is depleted uranium. We took a conservative approach because we didn't understand at the time that the isotope we were dealing with was uranium. Sometime in the future it will not be a contamination area anymore based on the isotope of depleted uranium. The values are a lot less conservative for uranium versus plutonium. (Dep. of D. Sanders; 43:7-16).

**Agrees.**

77. Andy Cromer testified that he regularly trapped in Steed Pond. (Dep. of A. Cromer; 65:7-1 3)

**Defendant agrees that Mr. Cromer testified in the manner alleged; however, defendant disagrees that Mr. Hooker or Mr. Cromer were authorized to trap beaver at Steed Pond. Brooks Decl. 3, ¶ 9.**

78. Asked if he had ever seen a posting at Steed Pond, he replied not until near the

time of seeing the signs at Site 19. (Dep. of A. Cromer; 65:16-17).

**Agrees.**

79. Cromer testified that he saw the signs at Site 19 five years after he had been in the pond. He went back to Frankie Brooks and told her of that stuff. "She didn't know. Again, DOE hadn't told—hadn't notified Forestry. (Dep. of A. Cromer Dec. 8, 2005; 56:16-22).

**Agrees.**

80. Cromer told Frankie Brooks in 1997 that Site 19 was barricaded. Cromer said Frankie said "you're kidding". She said, "Don't go back there." (Dep. of A. Cromer Dec. 8, 2005; 59:13-24).

**Agrees.**

81. Questioned about Beaver trapping site #43, behind the motor pool, Sanders stated it is posted as a RCRA CERCLA site. (Dep. of D. Sanders; 33:21-23).

**Agrees.**

82. Asked what a CERCLA site is, Sanders replied he didn't know. "That's not inside of RAD-CON business. That is regulatory business. They do business totally different than RAD protection. (Dep. of D. Sanders; 34:1-4).

**Agrees.**

83. Sanders stated there is no protection required for work that disturbs the soil in a soil contamination area. (Dep. of D. Sanders; 27:14-17).

**Disagrees. Mr. Sanders testified that no protection was required unless certain contamination levels were exceeded. Sanders Dep., p. 27 at 14-¶19.**

84. Asked about Plaintiff's Exhibit #3 in the depositions of December 7, 2005

(Westinghouse document that states a worker must be RAD II trained in order to work in SCA's in work that disturbs the soil). Sanders stated it did not appear to be a document that governs RAD-CON, or directs RAD-CON activities or protocols. These are not the governing documents that dictate how we perform our work. (Dep. of D. Sanders; 29:1-20).

**Agrees.**

85. Andy Cromer testified that beaver trapping involves picking mud and sediment up off the bottom of the creeks and placing it on the bank. (Dep. of A. Cromer Dec. 8, 2005;97:2-15).

**Agrees.**

86. Asked if it was possible that there could be areas on the Site that have never been surveyed and, therefore are not posted that could be contaminated, Sanders stated 'there are places that are potentially above levels that have residual contamination on them that we haven't identified." (Dep. of D. Sanders; 14:11-13).

**Agrees. However, defendant points out that the deposition question was objected to because it called for speculation. Defendant further states that the project manager for the agreement between Federal and State of South Carolina agencies pertaining to the clean up of the SRS has concluded that beaver and hog trappers would not have been exposed to a toxicological hazard during the course of their work at SRS. Hennessey Decl. p. 4 ¶ 21.**

87. In order to determine contamination, we look at all the radionuclides and we have concentrations for all of them that would prescribe when an area would be considered contaminated. (Dep. of D. Sanders; 14:26-22).

**Agrees.**

88. Homer Gabard testified that the reason the beaver contract was drastically

reduced was due to weather conditions, drought. (Dep. of H. Gabard; 51:18-22).

**Agrees.**

89. Frankie Brooks also testified that there was a drought. The ponds were drying up. Hooker had caught all the beaver. (Dep. of F. Brooks; 20:9-11).

**Agrees.**

90. Rainfall records for the month of July, 1999 at Augusta Bush, Georgia (approximately twenty miles away) show 3.68 inches of rainfall compared with 4.24 inches average. Rainfall records for August, 1999 show 2.19 inches versus 4.40 average. Rainfall records for September, 1999 show 4.57 inches of rainfall compared with 3.32 inches average. Rainfall records for October, 1999 show 2.74 inches of rainfall compared with 2.71 average. (Plaintiff's Response to Defendant's Request for Production, Source www.wunderground.com.

**Agrees.**

91. Gabard testified that if there was an occasional requirement for culvert cleaning, it would have been CSWE or our personnel that did it. But that would not have been very often neither with the drought and so forth going on. (Dep. of H. Gabard, 52:1-4).

**Agrees.**

92. Gabard also testified that if there had been a requirement for culvert cleaning, he (Hooker) would have done it during the period of his contract, but there was not – with a drought like that. (Dep. of H. Gabard; 52:10-13)

**Agrees.**

93. In November, 1999 Gabard summarized a call from Hooker. Gabard asked Hooker why he had only caught one beaver in September and none in October. Hooker asked why the beaver sites had been reduced after the Ellers were removed from the wild hog contract.

Hooker wanted to know why the number of culverts he cleans was also reduced since some culverts are blocked again. (Defendant's Response to Plaintiff's Request for Production, unnumbered).

**Agrees.**

94. Cromer thought the reduction in the beaver trapping sites was done to "get us out of there, trying to, if we would, just get ticked off and leave." (Dep. of A. Cromer; 92: 16-19)

**Defendant agrees that Mr. Cromer testified as alleged. However, defendant states the beaver trapping sites were not reduced for the reason claimed by Mr. Cromer. Rather, they were reduced because drought conditions had reduced the beaver population. See, e.g., Brooks Decl. 4-5, ¶¶ 18-19.**

95. Questioned as to why he thought the Forest Service perceived he and Hooker to be such a threat that they would try to remove them from the property . . . Cromer said he thought somebody made a mistake, they were wrong, they were negligent. (Dep of A. Cromer Dec. 8, 2005; 84:22-25; 85:2-5).

**Defendant agrees that Mr. Cromer testified as alleged; however, defendant disagrees with the substance of his testimony and points out that no other evidence in the record supports his contention that the Forest Service perceived Mr. Cromer and Mr. Hooker to be a threat and that Mr. Cromer acknowledged that "we just quit going" to the SRS to trap hogs for the Forest Service. See Cromer Dep. p. 31 at 8-12.**

96. Hooker was paid twice by the government in July, 1999. Instead of canceling the check, they said, "Well, we'll just take it out of the next coming checks."(Dep. of W. Hooker June 2, 2006; 17:8-18).

**Agrees.**

97. Asked how that was bad faith, Hooker stated "Well, it's —not if you're not going to cut the work out" (Dep. of W. Hooker June 2, 2006; 20:7-8).

**Agrees.**

98. Gabard recalled that we were going to deduct it from future invoices. (Dep. of H. Gabard; 51:1-2).

**Defendant agrees to the extent that Mr. Hooker is referring to the Government's intention to deduct the overpayment.**

99. Asked if he was aware that Hooker's beaver trapping sites were drastically reduced after that point and he became unable to pay the money back, Gabard did not recall. (Dep. of H. Gabard; 51:14-17).

**Agrees.**

100. On June 30, 1999 the contracting officer, Gabard, issued a letter withholding payments from Hooker totaling $1,320.00 and refused to pay for hogs itemized in subsequent invoices. (Plaintiff's Complaint ¶7) (Dep. of H. Gabard; 19:7-8)(P. Exh. 6, deposition of Dec. 7, 2005).

**Defendant agrees. However, by way of clarification, defendant states that it refused to pay for certain hogs that investigation revealed were domestic piglets. A151-153.**

101. Hooker had to pay back the money that he'd already been paid for 24 (hogs) and Gabard refused to pay for the other 7. (Dep. of H. Gabard; 22:4-9)

**Agrees. However, by way of clarification, defendant states that it refused to pay for certain hogs that investigation revealed were domestic piglets. A151-153.**

102. This letter accused two of Hooker's employees, Goldman E. Eller and Michael E. Eller of defrauding the government by bringing domestic hogs to the SRI cooler for payment.

(Dep. of H. Gabard; Pl. Exh. 6).

**Agrees.**

103. Cromer testified that the difference between a domestic hog and a wild hog was that a domestic pig is one in a pen in a farmer's yard and a wild hog is one that's on Savannah River Site. (Dep. of A. Cromer Dec. 8, 2005; 85:10-16)

**Defendant agrees that Mr. Cromer testified as alleged. However, defendant states that a wild hog has different characteristics than a domestic pig. For example a wild hogs has fewer teats and teeth. A154.**

104. This letter also barred two of Hooker's employees, Goldman E. Eller and Michael E. Eller from working on this contract or any other contract with the Forest Service at the Savannah River Site forever. (Dep. of H. Gabard; 26:19-22).

**Agrees.**

105. Both Michael Eller and Goldman Eller wrote letters vigorously denying the charges. (Defendant's Response to Plaintiff's Request for Production, Attachments 30 & 31)

**Agrees.**

106. Michael Eller was awarded the hog contract in November, 2001. (Dep. of H. Gabard; 37:22-25).

**Agrees.**

107. Gabard stated that he changed his mind about Michael Eller .(Dep. of H. Gabard,38: 1-25,39:9-13).

**Agrees.**

108. Hooker was given fifteen days to obtain replacement employees for the Ellers. (Dep. of H. Gabard; 30:1-4).

**Agrees.**

109. Hooker was required to submit resumes for replacement personnel to Gabard prior to the personnel starting work. (Dep. of H. Gabard; 30:9-b 3).

**Agrees.**

110. Gabard did not approve one of the replacement employees, James Reid Boylston IV, until August 26, 1999. (Defendant's Response to Plaintiff's Request for Production Attachment 19).

**Agrees.** By way of clarification, to the extent Mr. Hooker is implying that there was undue delay in the approval, the Government disputes such assertion.

111. Hooker had to purchase dogs to meet the terms of the hog contract.(Dep. of W. Hooker on 6/2/06;42:3-10).

**Agrees.**

112. Hooker's hog contract expired on September 30, 1999. Modification No. 4 dated September 4 and 7, 1999 extended the hog contract until October 31, 1999 or until a new contract is awarded. (Defendant's Response to Plaintiff's Request for Production Attachment 3)

**Defendant agrees that the above language is contained in Modification No. 4, and refers to the document itself for its complete contents. A65.**

113. Hooker submitted a proposal in response to solicitation for the new contract (RFP R8-36-99-09) on or about September 3, 1999 (Defendant's Response to Requests for Production Attachment 32).

**Agrees.**

114. Gabard wrote to Hooker on November 24, 1999 requesting a 60 day extension of the offer acceptance period. (Defendant's Response to Plaintiff's Request for Production

Attachment 34).

**Agrees.**

115. Again on 2/2/00, Hooker gave USFS permission to extend his bid for the Wild Hog Contract for 60 days. (Defendant's Response to Plaintiff's Request for Production Attachment 36.

**Agrees. However, by way of clarification, according to Mr. Gabard's letter, any offer not extended by November 27, 1999 was considered to have expired. Pl. Exh. X.**

116. Gabard also testified that since the new contract awarded in November, 2001 was slightly different, that it did not qualify as a new hog contract, so there was not a contract awarded from the solicitation that was issued in August, 1999. (Dep. of H. Gabard; 33:22-23).

**Agrees.**

117. Gabard testified that the normal procedure would have been to notify the bidders in writing, either through an amendment to the solicitation, or with a letter saying the solicitation was canceled. (Dep. of H. Gabard;36:18-24).

**Agrees.**

118. Defendant states in response to requests for production that defendant does not have these documents. (Defendant's Response to Plaintiff's Supplemental Request for Production).

**Agrees.**

119. A new hog contract was not awarded until November 2001. (Dep. of H. Gabard; 37:8-25).

**Agrees. However, by way of clarification, defendant notes that the testimony cited**

**does not reflect the facts alleged in plaintiff's Proposed Fact No. 119.**

120. Hooker testified that he would like to get paid five times what he bid his contracts for. (Dep. of W. Hooker June 2, 2006; 41 :21-22).

**Agrees.**

121. The general specifications for the current hog contract (EAZ-33-03-2012) state that Contractor/employees shall not enter or operate in Radiological Control Areas (RCA) or Soil Contaminated Areas (SCA) and may be required to submit to monitoring by Westinghouse Health Protection personnel. (Resp. to Req. for Production, unnumbered. Exh. )

**Disagrees. The current hog contracts, 53-4568-04-2012, 2013, and 2014 provide that "the Contractor/employees shall not enter or operate in Radiological Control Areas (RCA) and may be required to submit to monitoring by Westinghouse Health Protection personnel. A342**

122. Hooker testified that he didn't bid contracts to work in uranium. "I didn't bid contracts to work in any kind of stuff that had heavy metals in it. I didn't bid contracts to haul crap around in my truck that needed to be in a burial ground." (Dep. of W. Hooker June 2, 2006; 41:6-10).

**Agrees. However, by way of clarification, defendant states that Mr. Hooker has cited to no evidence that supports any allegation that he worked in uranium.**

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

*s/Todd M. Hughes*

TODD M. HUGHES
Assistant Director

*s/Richard P. Schroeder*

RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562

Attorneys for Defendant

September 6, 2006

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 7th day of September 2006, a copy of the foregoing "**DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.