# WSI-SRS INVESTIGATIONS SECTION
# SAVANNAH RIVER LAW ENFORCEMENT DEPARTMENT
# INVESTIGATIONS REPORT

OFFENSE: Swindling (990023II)

DATE OF REPORT: 07-06-99

DATE OF OCCURRENCE: 05-20-99 to 06-06-99

INVESTIGATOR ASSIGNED: Jimmy G. Clark

SUMMARY:

On 05-27-99, Mr. Homer Gabard of the United States Department of Agriculture, Forest Service–Savannah River Natural Resource Management and Research Institute (Forest Station), contacted Wackenhut Services, Incorporated-Savannah River Site (WSI-SRS) Investigators and reported that a Wild Hog Control employee was suspected of bringing domestic hogs to the Forest Station from off the Savannah River Site (SRS) for disposition.

Mr. Gabard said, that John J. Mayer II, Ph.D., Wildlife Ecologist, Westinghouse Savannah River Company (WSRC), was conducting an ongoing comprehensive study of the wild hog population on the SRS. Dr. Mayer noticed that several hogs brought in for disposition had numerous characteristics indicative of domesticated hogs.

On 06-07-99, Chief Investigator Mack Underwood and Investigator Jimmy Clark met with Dr. Mayer at the Forest Station cooler, where the hog carcasses are kept for study prior to disposal. Dr. Mayer pointed out the different characteristics between the wild hog population on the SRS and the suspect hogs brought in by Wild Hog Control employee Goldman Eller.

Dr. Mayer pointed out the differences in the hooves, teeth, teats, parasites, and the lack of damage caused by the dogs used to capture the hogs. First, he said that the wild hogs had sharp pointed hooves, and the domesticated hogs had dull rounded hooves. The dull rounded hooves are indicative of domestic hogs raised on a cement structure. Second, he said that the number of teats in wild hogs numbered twelve or fewer, while domesticated hogs typically had more than twelve (domesticated hogs are bred for larger litters). The third indicator Dr. Mayer pointed out was the difference in the number of teeth. Another indicator was the lack of parasites on the domesticated hogs. The lack of parasites is characteristic of hogs raised in a clean environment of a hog pallor. Lastly, Goldman Eller indicated on the log sheet that the hogs were captured by dogs, yet there was an absence of any bite marks or trauma associated with that manner of capture. However, the suspect hogs did have indications of head trauma associated with a fatal strike to the head. In contrast, the wild hogs that were logged in did show the trauma and damage associated with bite marks of dogs used for capture of the hogs.

On 07-01-99, Investigator Clark interviewed the Wild Hog Control contractor, Mr. William D. Hooker, Sr., (Georgia Bowhunter Supply Company) at the Forest Station Administration Building 760-15G. The interview focused on whether or not Mr. Hooker was involved with, or had knowledge that, Mr. Eller had

This document contains information that has been gathered from an official Investigation. It is the property of DOE-SR/WSI-SRS and neither the document nor its contents should be disseminated with DOE-SR/WSI-SRS authorization.

 Investigator: J. G. Clark

EXHIBIT PENGAD 800-631-6989 P24

brought domesticated hogs from off site to the Forest Service for disposition. Mr. Hooker said that he was not aware that Mr. Eller had brought any animals onto the SRS for disposition through the contract. Mr. Hooker indicated that he would terminate Mr. Eller and his son, Michael Eller, from the contract if they were involved with any wrongdoing. Mr. Hooker was cooperative and offered no indications of involvement with the Ellers' attempt to defraud the Forest Service.

On 07-01-99, Forest Station personnel, Dr. Mayer, Investigator Clark, Mr. Hooker, and Mr. Goldman Eller met in building 760-15G to resolve the contractual discrepancies. Mr. Goldman Eller was confronted with the allegations that he had brought in thirty-one domesticated hogs from off site for disposition through the contract. Mr. Eller showed no emotion and no reaction to the allegation. Mr. Eller provided one very weak denial. Mr. Eller surrendered his badge upon request from Mr. Gabard and cooperated with all conditions of his termination from the contract. Michael Eller was not present at the meeting, but he was terminated from the contract also.

**CONCLUSION:**

Based on the facts, evidence, and the expert opinion of Dr. Mayer, the investigation showed that Goldman Eller brought in approximately thirty-one domesticated hogs from off the SRS for disposition through the Wild Hog Control contract.

**RECOMMENDATION:**

The Solicitor's Office recommended that the Forest Station settle the discrepancy(s) with the contractor through contractual methods, rather than through the South Carolina Judicial System. Based on the Solicitor's recommendations, the facts and evidence of this case, and the discretion of the Forest Station Management, it was recommended that Goldman Eller and Michael Eller be terminated from the Wild Hog Control contract.

The WSI-SRS Law Enforcement Investigations Section recommended tighter controls on the access and egress of future Wild Hog and Beaver Control employees at the SRS. Each contract employee should enter and exit Barricade One or Barricade Two, submitting to an entry and exit inspection of all vehicles operated by said contract employees. The employees will be required to enter and exit the same barricade during each visit of the SRS. To ensure that access and egress is limited to Barricades One or Two, no contract employee should not have keys to any perimeter gates on the SRS, or be allowed to enter or exit a perimeter gate.

This document contains information that has been gathered from an official Investigation. It is the property of DOE-SR/WSI-SRS and neither the document nor its contents should be disseminated with DOE-SR/WSI-SRS authorization.

 Investigator: [signature]

Hogs2 (1536x1024x16M bmp)



Hogs3 (1536x1024x16M bmp)



Hogs4 (1536x1024x16M bmp)



Hogs5 (1536x1024x16M bmp)



Hogs6 (1536x1024x16M bmp)



Hogs7 (1536x1024x16M bmp)

