# DEPOSITION OF HOMEL RONDAL GABARD - 12/7/05

## WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY V. THE UNITED STATES

**Page 1 to Page 55**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*SHARON DEHART, COURT REPORTER*
*P. O. Box 2474*
*Aiken, SC 29802*
*Phone: 803-648-9434*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY, Plaintiff,

vs. NOS. 03-1501C, 04-1126

THE UNITED STATES, Defendant.

DEPOSITION OF HOMER RONDAL GABARD
taken by Counsel for the Plaintiff
before Sharon DeHart, Certified Court Reporter
at the offices of Department of Energy
151 Corporate Parkway, Aiken, South Carolina
on Wednesday, the 7th day of December 2005
commencing at 2:01 p.m.

SHARON DEHART, COURT REPORTER

Page 2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF: ROBBIE M. NICHOLS, ESQ.
Attorneys At Law
Post Office Box 7925
Hilton Head Island, SC 29938

FOR THE DEFENDANT: LINDSAY E. WILLIAMS, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, DC 20530

LUCY KNOWLES, ESQ.
Westinghouse Savannah River Site
Post Office Box A
Aiken, South Carolina 29802-0900

- - - - -

INDEX TO EXAMINATIONS


| | Page |
|---|---|
| EXAMINATION BY MS. NICHOLS | 3 |
| EXAMINATION BY MS. WILLIAMS | 53 |
| CERTIFICATE OF COURT REPORTER | 55 |


- - - - -

EXHIBITS

(Continued)

Page 2

PLAINTIFF'S

4 INVESTIGATIONS REPORT, 7/6/99

5 SUMMARY OF CALL

6 LETTER, GABARD TO HOOKER, 6/30/99

7 AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

8 QUESTIONS AND ANSWERS FOR RFQ-36-01-018

- - - - -

Page 3

[IT SHOULD BE NOTED THAT Mary-Ellen Noone, Mark Simpson, Margie Yeaton, Mr. Nicholson and John Andrew Cromer, III are also present at the deposition.]

- - - - -

HOMER RONDAL GABARD
having been first duly sworn, was examined
and testified as follows:

EXAMINATION

BY MS. NICHOLS:

Q. Mr. Gabard, as you probably heard, I'm Robbie Nichols. I'm representing Mr. Hooker. My office is on Hilton Head. Can I have your full name and address, please?

A. It's Homer Rondal Gabard. My address is 1219 Old Jackson Highway, Jackson, South Carolina, 29831.

Q. Have you ever been deposed before, Mr. Gabard?

A. No.

Q. No, you never have?

A. [Indicates negatively].

Q. And have you ever been a witness in any kind of litigation?

A. Yes.

Q. When was that?

A. I can't remember --

Q. Or have there been so many times?

Page 4

A. I can't remember the exact year. It was a tally on a deer hunt at Savannah River Site, that I was working on that deer hunt, and I testified in that case.
Q. Okay. There's a deer hunt going on now, isn't there?
A. I don't know, ma'am.
Q. I saw the signs when we were coming in. Did you participate in responding to the interrogatories that we sent?
A. Not since I've retired, no.
Q. Okay. My question is the lawyers trade questions to be answered by their clients, and I just wondered if you'd participated in giving any information in this interrogatory responses?
A. No.
Q. You did not?
MS. WILLIAMS: He did.
MS. NICHOLS: Okay.
THE WITNESS: I did?
MS. WILLIAMS: You did. Not directly with me, but you spoke with Margie Yeaton.
THE WITNESS: Oh, okay.
Q. Okay, fine. That's fine. How long have you been retired, Mr. Gabard?
A. Since January of 2004.

Page 5

Q. Oh, so it hasn't been that long. And are you working now?
A. I'm working part-time with Wal-Mart.
Q. Do you like that?
A. It's okay.
Q. What was your position – or how long had you worked for the Forest Service?
A. I worked for Forest Service from July of 1979 to January 2004.
Q. Always in the same position?
A. No, ma'am.
Q. How did you start?
A. I started as a business management clerk from 1979 to 1985. Then I was in a contract specialist trainee position from 1985 to – I believe it was October 1988.
Q. And that was what training?
A. Contract specialist trainee position.
Q. Okay.
A. And then I worked as a contract specialist at various grade levels.
Q. What grade level did you retire at, Mr. Gabard?
A. A GS-12.
Q. And how long were you the contracting officer for the Forest Service? Or is that what you mentioned as

Page 6

a contract specialist?
A. Yes.
Q. That's what that job is?
A. Yes, ma'am.
Q. And just take me through what your responsibilities were in the contracting officer job.
A. Okay. Issue solicitations for service supply, construction, architect engineering, personal services requirements, award the resulting contracts, administer the resulting contracts, and then close the contracts; close or terminate the contracts as appropriate.
Q. Big job. What kind of contractors do you normally have working for the Forest Service?
A. Could you clarify yourself, please?
Q. Obviously you had more contractors than just hog and beaver trappers. What other kinds of contractors did you supervise or administer? You said personal service contracts; that would be –
A. Are you talking about contracts or contractors?
Q. Both.
A. Okay, contracts range from supplies to buying typewriter ribbons, say, to – I didn't ever buy that, but to construction contracts for renovation of buildings, bridges, building bridges, or replacing bridges.

Page 7

Q. Okay.
A. Planting trees.
Q. That's a big job. What does the Forest Service – what are the parameters of the Forest Service's responsibility at the Savannah River Site? What are you responsible for?
A. Are you talking about me, personally, or –
Q. No. No, sir.
A. – the Forest Service?
Q. What is the Forest Service responsible for in relation to the Savannah River Site?
A. The Forest Service is responsible for management of natural resources at the Savannah River Site.
Q. Okay. That includes animals and vegetation and trees?
A. [Indicates affirmatively].
Q. You have to say yes, you can't –
A. Yes, ma'am.
Q. Okay, thank you. How long have you known Mr. Hooker? Do you remember when he got his first contract with –
A. Not specifically, no, ma'am.
Q. Would '91 or '92 sound right to you?
A. That'd sound about right, but I'm not –

Page 8

without looking at a contract file and looking at the date –
Q. That's fine.
A. – I couldn't tell you for sure.
Q. So you've known Mr. Hooker for awhile?
A. Yes, ma'am.
Q. And to your knowledge, as long as Mr. Hooker was a contractor for the Forest Service, he had hog contracts and beaver and culvert cleaning contracts? Or did he have any other contracts?
A. To the best of my knowledge, when he first started contracting with the Forest Service, it was for beaver trapping.
Q. Okay. Was he the first beaver contractor, or did you have people before him?
A. To the best of my memory, there were a couple or more before him that did the beaver trapping.
Q. And the culvert cleaning, was that contracted out, or was that done in-house before Mr. Hooker came?
A. Before Mr. Hooker performed those tasks, I believe it was done by CSWE.
Q. Could you tell me what CSWE means? Frankie couldn't.
A. I believe it's – it's a division of Westinghouse, I'm not exactly sure, but I'll – this is a

Page 9

guess, that it's Construction Services and Works Engineering.
Q. Okay. And you say they're a division of Westinghouse?
A. Yes, they're a part of Westinghouse Savannah River.
Q. How does that work when – and I'm just going to take you forward a little bit in that in the responses to my interrogatories, it stated that, after Mr. Hooker stopped the beaver – after his contract had run on the beavers and the culvert cleaning, then employees at CSWE performed that work; is that correct? The culvert cleaning?
A. Not – after his contract?
Q. After his contract.
A. Not totally. Those duties were performed by CSWE and also by Forest Service personnel, to the best of my knowledge.
Q. Okay. And I'm not trying to trap you or anything here, I just want to know what is the relationship – who has the authority? Is it Westinghouse or the Forest Service, or is it shared, and how do you – how do the employees – if you had employees from Westinghouse doing the culvert cleaning, and also the Forest Service, how does that happen?

Page 10

A. At one time, Westinghouse had the responsibility for secondary road management, as well as primary road management, at the Site, and sometime in the 1990s, I can't remember the specific date, that responsibility was turned over to the Forest Service for secondary road management.
Basically, the way the relationship works in relation to culverts is that our engineering section would request that they do the cleaning if they needed to do it, or we – or our engineering personnel would do the – Forest Service engineering personnel would do the cleaning in the culverts.
Q. Okay. So there is a close working relationship, kind of shared responsibility?
A. There's some shared responsibility there, yes, ma'am.
Q. Did the Westinghouse employees do anything else in the natural resource management area than that?
A. I can't recall, ma'am.
Q. Okay. I notice, in looking at the map, that the Savannah River Site actually is on the Savannah River at some point. Who is responsible for the property that abuts the river? Is it the Forest Service?
A. Could you rephrase that?
Q. I can try to.

Page 11

A. Or ask again?
Q. Okay. The Savannah River Site is actually on the river.
A. Right.
Q. It has property on the river. Who would be responsible for that part; you know, the beach area, or the area directly on the water? Would that be Westinghouse or would that be the Forest Service?
A. I don't know, ma'am.
Q. Okay. That's fine. I'd like to ask you some questions about the hog contract first.
A. Okay.
Q. To your knowledge – and I know that Ms. Brooks had the responsibility for a lot of this, but to your knowledge, did Mr. Hooker hunt the entire Savannah River Site and trap for hogs?
A. On the hog contract, yes, ma'am.
Q. Okay. Did the DOE or Westinghouse – DOE – Westinghouse reports to DOE; is that correct?
A. Yes, ma'am.
Q. And they have the ultimate authority for anything going on on the Site?
A. Who has ultimate?
Q. DOE?
A. Department of Energy?

Page 12

Q. Department of Energy would have ultimate authority?

**A. Yes, ma'am.**

Q. Okay. Did the Department of Energy ever inform you of any contaminated sites where your contractors should not go?

**A. Are you talking about me, personally?**

Q. Yes.

**A. No, ma'am.**

Q. Did the Department of Energy ever inform anyone, to your knowledge, in the Forest Service of areas that were contaminated where anyone should not be disturbing the soil?

**A. I do not know, ma'am.**

Q. You did not receive a list of contaminated sites from them?

**A. No, ma'am.**

Q. Let me ask you – and I took this back and I shouldn't have. Thank you. I'd like you to look at Plaintiff's Exhibit Number 3, which is stapled backwards. And if you would, look at the pages that are marked – the page that has a 7-28 at the bottom, and it has a picture of a soil contamination area sign.

**A. Yes, ma'am, I see it.**

Q. Okay. Had you ever seen a sign like that

Page 13

posted on the Savannah River Site?

**A. I haven't personally, no.**

Q. Was part of your responsibility to travel around the Site for any reason, or were you mostly in the office?

**A. I went to various areas that were – where contractors were working. I did not go out on these specific contracts, no, ma'am.**

Q. But you would occasionally travel –

**A. Yes, ma'am.**

Q. – to various areas?

**A. Yes, ma'am.**

Q. And it is your testimony that you never saw a yellow soil contamination area sign?

**A. Not to my memory, no, ma'am.**

Q. Would you turn over the page and just look at the other descriptions of the signs and tell me if you saw any of those anywhere on the Site?

**A. Not to my memory, no, ma'am.**

Q. Okay, thank you. And it is your testimony that you never received any sort of list of areas that were contaminated from the Department of Energy or Westinghouse?

**A. No, ma'am.**

Q. Thank you. I'm going to ask you the same thing

Page 14

I asked Ms. Brooks. As far as the hogs that were dispatched on the property, do you know of any domestic pigs that were found running on the Savannah River Site?

**A. No, ma'am.**

Q. Or walking?

**A. No, ma'am.**

Q. Okay. What would have been the policy toward any domestic hog on the property if it had been located?

MS. WILLIAMS: Objection; speculation. You can answer the question.

**A. This would be a pure guess on my part, and –**

Q. [Ms. Nichols] That's fine.

**A. – because it never happened. My guess would be that we would, first of all, determine if it was actually there through natural circumstances, or if someone brought it there, and then take whatever appropriate action that situation called for.**

Q. Okay, fair enough. Did you ever observe the hog trapping going on?

**A. No, ma'am.**

Q. You never did? Okay. But you were aware of the procedure for identifying what hogs had been killed and paying for them?

**A. Yes, ma'am. Yes, ma'am.**

Q. Let me ask you about the investigation that

Page 15

Wackenhut did, and I've forgotten the date, but it was the summer of '99; was that correct?

**A. Yes, ma'am, that's correct.**

Q. Something like that. How did that come to your attention?

**A. I don't – I do not recall specifically how it came to my attention. I can't recall who actually brought it to my attention.**

Q. Okay, but what – I'm just –

MS. NICHOLS: Ms. Williams, I'm just going to let him take a look at these. I'm not going to enter them. You've given them to me and –

MS. WILLIAMS: Well, just for reference, because he's going to be answering questions about them, I think we need to make them exhibits.

MS. NICHOLS: Okay. All right.

MS. WILLIAMS: Well, let her so she can determine which order she wants to do it.

MS. NICHOLS: Okay. I assume I can use that copier.

MS. WILLIAMS: I actually have a copy.

MS. NICHOLS: Oh, you do?

MS. WILLIAMS: Yeah.

MS. NICHOLS: Okay.

MS. WILLIAMS: Is that the report?

Page 16

MS. NICHOLS: Yeah. I've got the report and the summary of –
MS. WILLIAMS: Okay. I'll get copies of it later, that's fine.
MS. NICHOLS: Okay. But I'm going to need copies if I'm entering these in. Mark those as 4, Plaintiff's 4 and Plaintiff's 5.
[PLAINTIFF'S 4 & 5 ARE MARKED FOR IDENTIFICATION]
Q. [Ms. Nichols] If you need a moment to review these before we start – do you recall writing this report entitled "Summary of Call," and then receiving the Report of Investigation by Wackenhut?
**A. Okay.**
Q. Thank you. Could you just tell me how this – how you learned of the problem and what was involved in the investigation?
**A. As I said before, I do not remember who brought this to my attention, but I was the one who brought it to Wackenhut's attention and Wackenhut conducted the investigation. And the report is a result of that investigation.**
Q. Okay. And could you just, for the record, state what the allegations were and what was investigated?
**A. Okay, the allegations were that domestic hogs**

Page 17

**were being brought in to the Site, placed in the cooler and put on the data sheet at the cooler so that payment would be received for these domestic hogs that were not from the Savannah River Site.**
Q. And who was allegedly doing this?
**A. Could you be more specific about that?**
Q. Yes. Who was allegedly responsible for bringing the domestic hogs into the cooler?
**A. At the time that this was discovered, we did not know. I mean it could have been Mr. Hooker or some of his employees. And that's why Wackenhut was – well, that's one of the reasons Wackenhut was brought into it and asked to investigate it.**
Q. Okay, and as a result of that investigation, what were the conclusions from Wackenhut?
**A. Well, as the report states on the second page, Wackenhut concluded that Goldman Eller was the person responsible for bringing the domestic hogs to the Site and putting them in the cooler, and – I don't know if it really states it on here. And they also recommended that Goldman Eller and Michael Eller be removed from working on the contract as employees.**
Q. Okay. Aside from the report of the investigation, did you discuss this with the Wackenhut officer who conducted the investigation?

Page 18

**A. I don't understand.**
Q. Okay. You received the report which was, at the end, the recommendations. Did you have any discussions with Chief Investigator Mack Underwood, or Investigator Jimmy Clark about the situation?
**A. Yes.**
Q. And what did the discussions entail?
**A. I don't recall specific details. Like I said, I'm the person that originally reported the situation to Wackenhut, and I'm sure that it involved reporting what was going on, or at least suspected was going on, and toward the end of the investigation, I know that I specifically asked Wackenhut, or the investigator, Mr. Clark, if Mr. Hooker – if they could determine if Mr. Hooker was involved. Those are the only specifics that I recall at this point.**
Q. And the response to that was?
**A. Was after interviewing Mr. Hooker and after investigation, the conclusion was that he was not.**
Q. Okay. And how many pigs were involved in this?
**A. Thirty-one.**
Q. Thirty-one pigs. Did you then state to Mr. Hooker that you were not going to pay for those pigs?
**A. Yes, I did.**
Q. And did you –

Page 19

**A. And I believe it was in writing, as well.**
Q. Yes, it is, and I'm looking for it. Okay, I'd like for you to look at that and ask you if that is the communication that you sent to William Hooker on the 30th of June 1999, or presented to him in person in your office, one or the other?
**A. This document was presented to Mr. Hooker at a meeting at Savannah River Forest Station.**
MS. NICHOLS: Okay, could we have this marked, please, as 6?
[PLAINTIFF'S EXHIBIT 6 IS MARKED FOR IDENTIFICATION]
Q. [Ms. Nichols] Could you just summarize for us what actions that you state in this communication placed Mr. Hooker in default on the hog contract?
**A. Can you give me a second to look at the letter?**
Q. Sure.
**A. Okay, are you talking about actions that I took, or –**
Q. Yes.
**A. – actions that happened –**
Q. Yes, this –
**A. – prior to this?**
Q. Yes. Would you just summarize for me the actions that you took?
**A. There were 31 domestic pigs that were taken to**

Page 20

the cooler in total, and the Forest Service had actually made payment for 24 of these, so Mr. Hooker was informed that we would be collecting for those 24 that were already paid for. Okay –
Q. Okay, let me ask you a question about that. To your knowledge, did Wackenhut ever tell you how those pigs got into the Site? Did they ever –
A. Wackenhut did not.
Q. Did you know how they got there?
A. I'm not a wild hog expert –
Q. I understand that.
A. – so I don't personally know how they got there.
Q. Okay, but – I don't want to be facetious about this, but they had to be brought in by truck? Would you agree?
MS. WILLIAMS: Objection; assumes facts not in evidence. You can answer.
A. I'd say that's speculation or a guess, but yes, they would have had to have been brought in by truck, yes.
Q. [Ms. Nichols] Right. And when they entered by truck, if they did, did they come through a secured gate, a barricade?
A. I would have no way of knowing that, ma'am.

Page 21

Q. Okay, let's back up then. Knowing the property, what points of entry are there for contractors? Or were there then? They may have changed.
A. There were barricades that they were supposed to enter, but I'll say – well, this is – I don't recall if Mr. Hooker had a timber lock key or not. If his employees had a timber lock key, they could have entered the Site from numerous outside gates that are not manned by guards.
Q. Okay, what is a timber lock key?
A. It's basically a key that unlocks a gate – gates that have interlocking locks on them.
Q. And how many of those entrances would there be? Many?
A. I don't know, ma'am.
Q. Okay. How much do you remember were you paying for hog that was brought to the cooler at that time? Do you have any idea?
A. I believe it was $55 per hog.
Q. $55. So you had already paid Hooker for 26 – 24 of these –
A. Twenty-four, yes.
Q. – of these hogs and pigs. What's the difference between a hog and a pig? Is there a difference?

Page 22

A. A hog's a full grown –
Q. Okay. And a pig is a small one?
A. And a pig is a small one, yes.
Q. So he had to pay back the money that he'd already been paid for 24 –
A. Yes, ma'am.
Q. – and you refused to pay for the other seven; correct?
A. That's correct.
Q. Okay. Just an opinion, and you don't have to answer this, but why would someone do this?
A. As an opinion?
Q. Yes.
A. Money.
Q. But how much was Mr. Eller making?
A. I do not know.
Q. He wasn't getting paid for the whole hog.
A. I do not know what Mr. Hooker and Mr. Eller's arrangements were.
Q. Well, just as an opinion, if you had hogs, couldn't you sell them somewhere else for more money?
A. I have no way of knowing that, ma'am.
Q. Okay. Let's go back to number one. It says, "Fetal pigs that were not born have been removed from sows, placed in the SRL cooler and entered on the SRFS

Page 23

Wild Hog Data Table in an attempt to receive payment for these fetal pigs. Frankie Brooks, COR, refused to pay you for these fetal pigs." Tell me how you found that out. Was that also in the Wackenhut investigation?
A. No, ma'am, I don't believe that it was mentioned in the Wackenhut investigation.
Q. Okay. How did you –
A. And I personally do not recall how that was – how we discovered that.
Q. Did – well, if you don't know, you don't know. Let's go back to number three. "Hogs and/or pigs have been brought to the SRI cooler, entered on the Data Table and then removed from the cooler and taken to the SRS landfill without the COR or one of the inspectors verifying that the hogs/pigs were in the cooler and the COR or inspector initialing the Data Table. Frankie Brooks, COR, refused to pay you for these hogs/pigs." How did you determine that that had happened?
A. Again, I do not recall how we determined that.
Q. Were the hogs marked before they were put in the cooler?
A. Not at that time, no, ma'am.
Q. Okay. And number four in the default issues, "Hogs have been left in the woods until they began to rot and then brought to the SRI cooler." Is that a breach of

Page 24

the contract, do you know?
A. I would have to look at the contract to see. I believe it is.
Q. What would happen, hypothetically, if a hog was shot in an area where it could not be recovered? What would happen then?
A. As I recall, the contract language required the contractor to bring the hog to the cooler immediately after killing, or within the same day of killing the hog. I would have to look at the contract to be sure that my memory is correct, but I believe the contract required that.
Q. Okay. And five, "Recently, two hogs were entered on the Data Table without the hogs being brought to the cooler as required by the contract. Frankie Brooks, COR, has told you that we will not pay for these two hogs." Do you have any memory of that incident?
A. No, ma'am.
Q. Okay. Six, "Although, to our knowledge, this has not occurred, we are also concerned about hogs and/or pigs being brought back to the SRI cooler after being removed from the cooler and entered on the Data Table again so that payment would be made for the same animal twice. This is a concern because the SRS landfill apparently does not require you or your employees to sign

Page 25

in at the landfill as was required in the past." So would it be accurate to say that this was a concern of yours, it was not one of the issues that you felt defaulted the contract?
A. No, it was a concern because we discovered at this time if that had happened that the landfill was no longer requiring them to sign in as it states there they had been required to do in the past.
Q. Okay. Your letter goes on to say, "As a result of an inquiry conducted by myself and other SRI personnel and a limited investigation conducted by Wackenhut Services, Inc., it is my opinion that you were not and are not personally involved in the above listed actions, but that two of your employees, Goldman Eller and Michael Eller, were and are involved in the above listed actions." What inquiry did you conduct with other SRI personnel that led you to believe that?
A. That was primarily based on the Wackenhut report and also discussions with COR and inspectors.
Q. Okay. You go on to say that, "Because of my conclusion that you were not and are not involved in the above listed inappropriate illegal actions taken by two of your employees, I will not terminate this contract for default at this time even though you are accountable and responsible for the actions of your employees when

Page 26

performing a Federal Government contract." Define for me what the illegality is of the actions that you listed on page one.
MS. WILLIAMS: I'm going to object. It calls for a legal conclusion. You can answer the question based on your opinion.
A. My opinion is that anytime anyone tries to obtain payment falsely, it is an illegal action.
Q. [Ms. Nichols] That's fair.
A. Just like if I go out and sign a document that I did something in order to receive some money, then that's illegal if I didn't actually perform that service.
Q. Okay. I agree with you. And then you go on to tell him that if anything happens in the future that the contract will be terminated for default immediately. And you require him to take a number of actions. And would you read for me the actions that you required him to take?
A. Yes. "Both Goldman E. Eller and Michael E. Eller are barred from working on this contract or any other contract with the Forest Service at the Savannah River Site forever. Neither Goldman E. Eller or Michael E. Eller will be issued Site access badges by the Forest Service and WSI may pursue placing both individuals on a list of personnel to be denied access badges by all

Page 27

entities at SRS.
"You and your employees working on this contract and contract 53-4660-9-06, beaver control, will enter and leave SRS through Barricade 2, Aiken Barricade only. You and your employees will have your vehicles searched each time you enter and leave SRS through Barricade 2.
"All hogs, pigs or beavers placed in the SRI cooler will be marked in some manner by the COR or an inspector and the Data Table will be initialed by the COR or inspector. Initially the animals will be marked with spray paint. The COR or an inspector will also issue a receipt to you or your employee each time hogs, pigs and/or beavers are placed in the SRI cooler.
"You will not receive payment for any animals removed from the cooler prior to the COR or inspector doing these tasks. The receipts must be attached to your invoice each month or the invoice will be returned to you without being processed.
"The COR or an inspector will inventory all Government property issued to you or your employees annually prior to the Government exercising the right to extend the contract for any option period.
"The amount of $1,320 will be deducted from your invoice for June for the 24 domestic pigs that have

Page 28

been paid for, or from subsequent invoices if the amount of the June invoice is insufficient.

"You will not receive payment for any hogs, pigs or beavers not brought to the SRI cooler at the end of each work day as required by the contract. You will not receive payment for any hogs, pigs or beavers that are logged on the Data Tables without the carcass being placed in the SRI cooler.

"Starting immediately, personnel working on the wild hog control contract or beaver control contract will tell the SRI dispatcher the timber compartment number that they are in and will call the SRI dispatcher on the radio with their new location each time they move from one timber compartment to another timber compartment. Personnel will no longer give them..."

Q. Their location.

A. "...give their location as general site when contacting the SRI dispatcher."

Q. Thank you. You then go on to list actions that you were requiring Mr. Hooker to take, and you ask him to – required him to ensure that the badges given to Goldman and Michael Eller were turned in prior to leaving this meeting. Did he do that? Did he –

A. I can't recall specifically if I received both of them that day.

Page 29

Q. But you did receive them at some point?

A. Yes.

Q. "Return all Government property issued to Goldman Eller or Michael Eller to me no later than July 2, 1999." Did that happen, to your knowledge, your best recollection?

A. Other than some missing panels for the hog traps, I believe it was all returned.

Q. Okay. "Obtain the locations of all hog traps from Mr. Eller, verify that the traps are at the locations, and then accompany Frankie Brooks to all the traps so that she can account for all 25 traps. You will be charged for any traps or parts of traps that are missing or not in satisfactory condition." Do you remember what happened there?

A. As a result of the inventory that was made, there were some missing panels from some of the hog traps.

Q. And did you then charge Mr. Hooker for those?

A. Yes, I did.

Q. Do you remember how much that was?

A. I believe it was $165.

Q. And then it goes on to say, "All traps must be left open and set so that an animal cannot trip the door to any of the traps until you are ready to continue

Page 30

performance. You have 15 calendar days from today to have suitable personnel replace both Mr. Ellers so that satisfactory performance can resume on the contract." Do you remember whether he was able to obtain those suitable personnel within 15 days?

A. I can't recall specifically if it was within the 15 days or not. I'd have to look at the contract file to tell you.

Q. Then you go on to say that, "You shall submit resumes for the replacement personnel to me prior to the personnel starting work, and the person with the dogs will be required to perform a demonstration with the dogs for SRI and other SRS personnel. This demonstration will be evaluated and the person with the dogs will not be allowed to work on the contract unless approved by me." Do you remember that that demonstration occurred?

A. I don't remember, ma'am.

Q. You don't remember? Were you aware that Mr. Hooker had to purchase dogs to – purchase new dogs in order to fulfill the requirements that you set up here?

A. I don't know that I did that – that I knew that at this time. At some point, I did learn that he purchased dogs.

Q. Would it refresh your memory – do you remember a time when Mr. Hooker did a demonstration when his

Page 31

contraband pass was missing, or had a wrong number on it and he had to kill a hog with a knife? Were you there then?

A. Well, the demonstration was not for this contract.

Q. Oh, it wasn't?

A. No, ma'am.

Q. Okay. It was for the contract that was not awarded till 2001; correct?

A. It was for the contract that was not awarded.

Q. Okay. That's fine. I'm sorry, I did know that and I asked you about the wrong thing. Okay. So you don't have a memory of a demonstration with the dog, the new dogs, to complete this hog contract?

A. No, ma'am.

Q. Okay, that's fine. I'd like you just to note the third to last paragraph in the letter where you state that the Government will not extend the contract for Option Period II, October 1, 1999 to September 30th, 2000, due to the necessity to make some changes in the contract language.

A. Yes, ma'am.

Q. Okay. Can we talk about that?

A. What specifically would you like to know?

Q. I would like to know specifically what changes

Page 32

were you contemplating making to that contract.
A. One of the changes, of course, would be that the hogs would be marked by COR or inspector due to the situation happening with the domestic hogs. We also added a third technique for capturing hogs and dispatching them, which was adding the base stations to the contract. And, let's see. There was something else, but I can't recall what it was, but I'll try to remember.
Q. Okay. When was that new contract language inserted in a –
A. In the new solicitation that was issued.
Q. When?
A. In August of 1999.
Q. In August of 1999?
A. Yes.
Q. All right, I'd like to have you identify this modification dated – it's dated August 9, 1999. Is that the modification you're referring to?
A. No, ma'am, that's not the modification that I'm referring to. The contract language was changed in the solicitation that was –
Q. In this solicitation?
A. – that was issued for a new contract.
Q. Okay, I don't believe I have a copy of that.
MS. WILLIAMS: If you don't, we'll produce one

Page 33

MS. NICHOLS: Thank you very much.
Q. [Ms. Nichols] So in the meantime, did you modify the existing contract as noted in number 14 on the first page here?
A. As noted in 14? What are you referring to now?
Q. I'm referring to "Description of Amendment/Modification" down toward the bottom just above the signatures.
A. Yes, that modification was –
Q. Okay, could you just read for me the language in the "Description of Amendment/Modification"?
A. "Contract is extended to October 31st, 1999, or until a new contract is awarded."
Q. When was the new contract awarded?
A. There was never a new contract awarded.
Q. Never?
A. No, ma'am.
Q. Did you not award a contract to Mike Eller in 1991 – 2001, sorry.
A. Yes, but that was not a – that award was not a result of the solicitation that went out in August of 1999. There was not a contract awarded from the solicitation that was issued in August 1999.
Q. I'm not understanding what the difference is. When was a contract awarded for trapping hogs?

Page 34

A. For what, now?
Q. For trapping hogs?
MS. WILLIAMS: Objection; vague. Can you –
MS. NICHOLS: Yeah.
MS. WILLIAMS: – specify exactly when you're referring to?
Q. [Ms. Nichols] Mr. Gabard, this language says that the contract is extended to October 31, 1999, or until a new contract is awarded. You just responded that no new contract was ever awarded; correct?
A. Not as a result of the solicitation that was issued in August 1999, no, ma'am.
Q. I'm not understanding what relation that has to – okay, you produced a solicitation for a new – for bids on a new hog contract; correct?
A. Yes, ma'am.
Q. And was Mr. Hooker one of the bidders?
A. Yes, ma'am.
MS. WILLIAMS: Objection; vague. Can we specify which year we're talking about, which solicitation?
MS. NICHOLS: Yes. Well, I don't have the solicitation so I can't tell you. Mr. Gabard was talking about a solicitation that went out in August of '99.

Page 35

A. Yes, ma'am.
Q. [Ms. Nichols] And when did you plan to award that contract?
A. We planned to award that contract – I believe offers were due on September 29th, and we planned to award that contract after evaluation and so forth of the forms, so probably – I mean it's – probably by the end of October or November, when the evaluation and so forth was completed and the decision had been made who to award it to.
Q. Okay, did you then ask for an extension from all the bidders for 60 days?
A. Yes, ma'am, I did.
Q. And then what happened?
A. Then the decision was made to perform the work in-house.
Q. And who made that decision?
A. The manager of the Savannah River Forest Station, or Savannah – I can't recall what it was called then; Savannah River Forest Station or Savannah River Institute, David Wilson.
Q. David Wilson made that call?
A. Yes.
Q. He was the manager of the Savannah River Institute?

Page 36

A. Yes.
Q. Whose responsibility was it for dispatching the hogs on the Savannah River Site? I thought you told me it was the Forest Service who managed all the natural resources.
A. Mr. Wilson is the manager of the Forest Service, or was the manager of the Forest Service Unit at Savannah River Site at the time.
Q. Okay. All right, I'm getting confused. SRI is the Forest Service.
A. Okay, yes.
Q. All right, so he made that decision?
A. Yes, ma'am.
Q. And am I correct that you had these solicitations, had these bids in; you had asked everyone for a 60-day extension; correct?
A. Yes, ma'am.
Q. How were the bidders notified that you were withdrawing the solicitation?
A. Without looking at the files to be sure, I couldn't say. I will tell you that normal procedure would have been to notify them in writing, either through an amendment to the solicitation, or with a letter saying the solicitation was canceled.
MS. NICHOLS: Okay, could we ask the Forest

Page 37

Service to look for any document of that type, withdrawal of the solicitation, or –
MS. WILLIAMS: Yes, if we can find the ✓ document, we will produce it.
Q. [Ms. Nichols] So it is your contention, then, that that contract was never awarded?
A. That's correct.
Q. Okay. Well, let's go to 2001. Did you then create a new solicitation for hog trapping?
A. Yes.
Q. And if you remember, who were the bidders? Do you remember all of them? Were they the same people who had bid in 1999?
A. No, ma'am, I don't think that they were all previous bidders.
Q. Was Mr. Hooker one of the bidders in 2001?
A. Yes, ma'am.
Q. Was Michael Eller one of the bidders in 2001?
A. Yes, ma'am.
Q. And several others; correct?
A. Yes, ma'am.
Q. And the successful bidders on this contract were?
A. As I recall, Michael Eller, Rawley Hamilton, and I can't remember the third contractor's name.

Page 38

Q. And Michael Eller had been barred forever from the Site. What changed your mind?
A. I had further discussion with Wackenhut investigators and they informed me that they could not prove or disprove that Michael Eller was involved in the domestic hog situation, and I believe it was either – now, this is – and that they had no objections to him working on a hog contract because of that, that they couldn't prove that he was involved.
Q. So it was Wackenhut's call whether he would be awarded a contract?
A. Well, it was Wackenhut's call as far as – since they're the ones that recommended that he not work on the contract, and this had to do more with access to the Site, and he could bid – anybody can bid on a contract. This had more to do with that issue than whether he could bid or not.
Q. Okay, is it your testimony, then, that you went back and talked to Wackenhut in 2001 and discussed this with them?
A. Yes.
Q. You didn't discuss Michael Eller at the end of the original investigation?
A. Not specifically, no. I mean other than what the Wackenhut report stated.

Page 39

Q. As I recall, the Wackenhut report did not specifically name Michael Eller; is that correct?
A. No.
Q. So why did you bar Michael Eller from the property?
A. Wackenhut recommended that that be done, and normally Michael Eller worked through his father, Goldman Eller, on the hog contract.
Q. Okay. So it's your testimony that you changed your mind about Michael Eller after talking to Wackenhut –
A. Yes, ma'am.
Q. – in 2001?
A. Yes, ma'am.
Q. Fair enough. What was different about the second request for bids – I'm sorry, what do you call it? Solicitation. What was different about the second solicitation in 2001 than the solicitation in 1999?
A. This is purely from memory, I haven't seen a document since I left, and best I can recall from my memory, we changed the contract in that – well, there were several changes. One change was that some of our personnel would escort the hog trappers, would actually be out on the ground with them. Some of the other changes were that it was a much smaller in scope

Page 40

contract, and it was intended to be used only when there was a hog problem in certain areas. It wasn't – when Mr. Hooker performed the contract, it was pretty much a year-round contract, but the new contract was not intended to be that way.

Q. Just on call?

A. Yes. And there may have been some other things that I don't recall, but those are some things that I specifically recall.

Q. Okay.

MS. NICHOLS: Do we need to take a break? Is everybody agreed on that? Because I've got a good long time left.

[OFF THE RECORD]

Q. [Ms. Nichols] Mr. Gabard, I'm almost through with this contract and then we won't talk about it anymore, but I'd like to show you a document entitled, "Questions and Answers for Request for..." What is the "Q" there?

A. Request for quotes.

Q. Quotes, 36-01-018. And I believe Mr. Hooker submitted these to you and you put your answers in bold. Do you recognize that?

A. Yes, I vaguely recall this.

Q. I noticed that in some of the subsequent

Page 41

contracts, this Q&As were incorporated into some of the subsequent hog trapping contracts.

A. Okay.

Q. Okay. Do you remember answering those questions from Mr. Hooker?

A. Yes.

Q. Okay, I'd just like to ask you a couple of questions about this document.

MS. NICHOLS: Could we mark this as –

[PLAINTIFF'S EXHIBITS 7&8 ARE MARKED FOR IDENTIFICATION]

Q. [Ms. Nichols] Number one, he asks about safety and health regulation requirements of the DOE and USDA Forest Service and OSHA that are referenced in the solicitation, and your response, I believe, is several web sites that he can go to to get this information; is that correct?

A. Yes, ma'am.

Q. Number two, he says, "Safety data sheet for toxaphene, which is in every stream at SRS and the dogs and hogs both will be drinking from the streams at SRS, state the EPA standard for toxaphene is 0.003 milligrams per liter, and the readings in each stream is less than 0.100 milligrams per liter. Please explain how this will be handled." And your answer is, "This question is being researched and an answer will be provided." Did you ever

Page 42

provide an answer to this question?

A. I do not recall, ma'am.

Q. You do not recall?

A. No.

Q. Okay. Number three, "How will contractors be notified when Westinghouse SRS is releasing tritium by the thousand curies as was done in '94 and '98 at Four Mile Branch location FM6, Road A13? Almost 30,000 curies were released in Pen Branch near Highway 125." And your answer is that it's being researched. Did you ever provide an answer to this question?

A. I do not recall, ma'am.

Q. Okay. Number four, "Will the contractor and their employees be required to take a urine test for tritium after hunting in the swamp?" And your answer is, "This question is being researched and an answer will be provided as soon as an answer is available." Do you recall –

A. No, ma'am.

Q. Okay. The next question, "There's mercury in the streams and sediment at SRS and the hogs live and eat in these areas. How will the contractor and their employees be required to handle hogs that have mud sediment from the areas containing mercury dried to their skin?" And the answer is, "This question is being

Page 43

researched." Did you ever provide an answer?

A. I do not recall, ma'am.

Q. You don't recall. "Will Work Clearance Permits be required?" And your answer is, "No, contractor will not be required to hunt in areas where Work Clearance Permits are required." Is that still true to your knowledge, or was that true at the time you left?

A. That was true up to the time I left, as far as I recall.

Q. Okay. I'm going to skip to number 11. "Will off-colored hogs be counted?" Your answer is, "Domestic hogs, pigs or piglets will not be counted or paid for. However, this should not be a problem because the COR or an inspector will be with the contractor at all times." What is your definition of an off-colored hog? I don't – I just need a response to that question.

A. To be quite honest with you, I don't recall at this time.

Q. Okay. Okay, and that's really all the questions I have on this document. I'd like to ask you about the beaver contract. And going back to our Exhibit Number 1, are you familiar with this document, this Work Clearance Permit that Mr. Hooker –

A. Yes, ma'am.

Q. Okay, so you know something about this?

Page 44

A. **Something, yes.**
Q. Okay. Do you remember what precipitated the requirement of a Work Clearance Permit for this particular trapping area?
A. **Personally, I do not.**
Q. Okay. Were you aware that this site was posted as contaminated?
A. **Yes.**
Q. And how did you become aware of that?
A. **It probably is a requirement for the Work Clearance Permit.**
Q. Okay. Is all work – does all work that is going to be conducted in a contaminated area require a Work Clearance Permit?
A. **To my knowledge, yes. Now, I don't know if that's entirely true or not, but to my knowledge, yes.**
Q. Okay, at the time you were there?
A. **Yes.**
Q. Okay. Did Mr. Hooker complain to you after he found that he was required to have a Work Clearance Permit for trapping in this area? Did he discuss it with you?
A. **Could you be more specific?**
Q. Right. Did he specifically ask for more money, or inquire as to what was in the soil or water in that

Page 45

area?
A. **As far as I remember, he did ask for more money. I do not believe he did that initially when he first started working in this area, but at some point in time, he did ask for more money, yes.**
Q. And what was the basis for his request for more money?
A. **Because of the fact that he was working this area.**
Q. And what was your response to that?
A. **My response was that he did not have to work in this area, and if he felt like it was outside the scope of the contract, that he could refuse to work in the area and that we would not force him to do so, but that we would not pay him additional money for trapping in this area.**
Q. Okay. And to your knowledge, this was the only area that was marked as a contaminated area?
A. **To my knowledge, yes.**
Q. To your knowledge. Had you visited the beaver sites, any of them?
A. **No. Not specifically, no.**
Q. No. I think you said earlier, and I can't remember, but you said occasionally you did go out and observe what the contractors were doing?

Page 46

A. **Yes, but not on these two contracts.**
Q. Oh, not on these two contracts?
A. **No.**
Q. Oh, you supervised other contractors, but you never visited a beaver trapping site?
A. **No.**
Q. And you never visited –
A. **No.**
Q. – a hog trapping –
A. **No.**
Q. – site?
A. **No.**
Q. Is it your testimony, then, that the only hog interaction you had was when they were doing demonstrations?
A. **Yes.**
Q. Okay. Did Mr. Hooker ever ask you what kind of contamination existed at the Savannah River Site, or ask you what was in the water?
A. **I don't recall him doing that, no.**
Q. Do you recall him – were you aware that he was making requests to other agencies as to what was in the water and what was in the soil?
A. **I don't know that I had personal knowledge of that, no.**

Page 47

Q. Were you part of, or did you attend the results of the investigation that the CDC did? Were you part of that?
A. **I attended one meeting concerning that, concerning the NIOSH investigation.**
Q. The NIOSH investigation, correct.
A. **I believe.**
Q. Did you know that Hooker had initiated that?
A. **I knew it involved Mr. Hooker, yes.**
Q. I'm sorry, I must be getting Alzheimer's. Did you answer my question about off-colored hogs? Did you define that for me?
A. **I told you that I do not recall at the time that I wrote this what I based my answer on, the definition, and I've been away from this for two years, so I – I'm not going to speculate what I used as the definition at that time.**
Q. Back to the investigation of Mike and Goldman Eller, are you aware, or do you remember that both Mike and Goldman wrote you letters after the barring from the Site, after they were –
A. **Yes, I remember that.**
Q. And do you remember what the content of those letters were?
A. **I don't remember the specific contents, no,**

Page 48

ma'am.

Q. Were they general denials?

**A. Yes.**

Q. Okay. Were you also aware that Mike Eller had participated in a – well, I'm going to skip that, I'm not going to go there. You said earlier that you had participated in drafting the responses to the interrogatories for Ms. Williams.

**A. Do what, ma'am?**

Q. The responses to the interrogatories. The information you gave helped her respond to –

**A. If Margie says I did, I did.**

Q. Okay. Okay, I just want to read you one question and the response and get your response to this. The interrogatory number 19, we asked, "What protection is required for workers whose activities involve disturbing the soil within soil contamination areas on the SRS Site?"

MS. WILLIAMS: I'm going to object like I did in my response in that it's vague and I need you to define what you mean by soil contamination areas.

MS. NICHOLS: Okay.

MS. WILLIAMS: I've let it go today, we've thrown the word "contamination" around a lot. I don't know if we need to stipulate to a definition or what, but it means – it's a loaded word and it means a lot of different things, and that's why I objected in there and why I'll object today unless we can come to an agreement as to what you mean so that he knows what he's answering.

Page 49

MS. NICHOLS: Okay. Okay. Okay, I would submit that the Forest Service, itself, has a definition.

MS. WILLIAMS: Okay.

MS. NICHOLS: And I'm going to ask Ms. Yeaton about this when her deposition starts, but these were questions and answers she was asked in reference to a contract that was let in August – or October of this year. This is part of that contract.

MS. WILLIAMS: Okay, then this isn't – I mean but this isn't a definition. I mean, I – let's go off the record for a second.

MS. NICHOLS: Sure.

[OFF THE RECORD]

MS. WILLIAMS: Ms. Nichols and I have stipulated to – that when we use the word "contamination," we're referring to any areas on the SRS property that were marked with the signs that are contained on the last two pages of Plaintiff's Exhibit 3.

Page 50

MS. NICHOLS: Perfect.

Q. [Ms. Nichols] And my question concerned the interrogatory, and you have seen this particular exhibit, so you know what the sign looks like; correct?

**A. I haven't seen the sign, no, but I've seen the –**

Q. You have never seen a sign like that?

**A. No.**

Q. Okay. Would you generally know, then, what protection is required for workers whose activities involve disturbing the soil within soil contamination areas?

**A. I personally would not know, ma'am.**

Q. You would not know; okay. Okay, that's fine. Okay, if you'll just give me a minute to look through these, and we'll be done. Just one thing, if you recall this, and it was a long time ago. Do you remember, sometime in the summer of 1999, that Mr. Hooker received double payment through direct deposit to his Regions Bank account for two – for one invoice, he was doubly paid for it?

**A. I recall that, yes, ma'am.**

Q. You recall that. And do you recall how the Government handled that?

**A. Not specifically, but I – I think I remember that we were going to deduct it from future invoices, and so we had deducted the amount of the double payment.**

Page 51

Q. Okay, and I think that's what I heard, too, or read. Do you remember why you did that instead of just making a reversal in his account right then?

**A. I don't remember, ma'am. I'm not sure that I understand what you're talking about, a reversal in his account.**

Q. Okay. Well, normally, if you direct deposited $3,000 and then did it again, would you not correct that by reversing that second deposit?

**A. I don't know, ma'am. I don't do payments, I don't have any way of knowing that.**

Q. Were you aware that Mr. Hooker's beaver trapping sites were drastically reduced after that point and he became unable to pay that money back?

**A. I don't know that I recall that.**

Q. Do you remember why the beaver trapping sites were reduced?

**A. It was due to weather conditions, drought. We no longer had the number of beavers and so forth out on the Site that were there in the past.**

Q. So nobody was trapping beavers after that?

**A. Not during that period, no.**

Q. And was anyone cleaning culverts?

Page 52

A. **If there was an occasional requirement, it would have been CSWE or our personnel that did it. But that would not have been very often neither with the drought and so forth going on.**

Q. You're saying during the balance of Mr. Hooker's contract –

A. **And that's speculation.**

Q. – when he was not cleaning culverts, a CSWE employee would have done that?

A. **I'm saying that – no. If there had been a requirement for it, he would have done it during the period of his contract, but there was not – with a drought like that, there would not have been a need to clean culverts as much as there had been in the past because they would not have been clogged up as they would have been in the past.**

Q. Could you just explain how that works? Because I'm thinking culverts would get stopped up whether there was a drought or not. Am I wrong?

A. **Well, if there's a drought, ma'am, there's not water going through and you don't have – you don't have beavers trying to dam areas, taking branches and limbs and so forth into the culverts, so you don't have the problem basically.**

Q. Okay. I think that's all I have for you, Mr.

Page 53

Gabard, and I appreciate it. Please answer any questions Ms. Williams has for you.

A. **Okay.**

MS. WILLIAMS: I'm just going to take two seconds just to confer and make sure.

[OFF THE RECORD]

- - - - -

EXAMINATION

BY MS. WILLIAMS:

Q. Mr. Gabard, I just remind you you're under oath, and I'm just going to ask you a couple of questions to clarify some things. If I need to. Let's talk about the dog – what we've referred to as the dog demo. Was the dog demo for – was the dog demo something that Mr. Hooker performed for the contract, the hog contract, that is at issue in this case?

A. **No, ma'am.**

Q. Okay, what was the dog demo – why did Mr. Hooker have to perform the dog demo?

A. **It was for the offer that he submitted on the following – on the follow-on contract that was planned.**

Q. And the follow-on contract that was planned, was that contract ever awarded?

A. **No, ma'am.**

MS. WILLIAMS: I don't have any further

Page 54

questions. I do want to state for the record that we do reserve the right to review and sign the contracts within the next 30 days. And that just means –

MS. NICHOLS: The contracts?

MS. WILLIAMS: Contracts – sorry, the deposition. I apologize. I've got contract on the brain. Nothing further.

MS. NICHOLS: And we'll also reserve that right when it's our turn, too. Thank you very much.

[DEPOSITION CONCLUDED AT 4:01 P.M.]

Page 55

C E R T I F I C A T E

S O U T H C A R O L I N A
AIKEN COUNTY

I hereby certify that the foregoing deposition was reported, as stated in the caption, by the method of Stenomask and speech recognition, with backup, and the questions and the answers thereto were reduced to typewriting by me or under my direction; that the foregoing pages 1 through 54 represent a true, correct, and complete transcript of the evidence given on the 7th day of December 2005, by the witness, HOMER RONDAL GABARD, who was first duly sworn by me; that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I financially interested in the action.
This, the 26th day of January 2006.

SHARON DEHART, CVR
CERTIFIED COURT REPORTER
NSVRA CERTIFIED

Look-See Concordance Report

UNIQUE WORDS: 1,046
TOTAL OCCURRENCES: 3,354
NOISE WORDS: 384
TOTAL WORDS IN FILE: 9,776

SINGLE FILE CONCORDANCE

CASE SENSITIVE

COVER PAGES = 2

INCLUDES ALL TEXT OCCURRENCES

DATES ON

INCLUDES PURE NUMBERS

POSSESSIVE FORMS ON

## – DATES –

**August** [2]
*34:24; 49:13*
**August, 1999** [2]
*33:23; 34:12*
**August 9, 1999** [1]
*32:17*
**August of 1999** [3]
*32:13, 14; 33:21*
**December, 2005** [1]
*55:13*
**January, 2004** [1]
*5:9*
**January, 2006** [1]
*55:17*
**January of 2004** [1]
*4:25*
**July 2, 1999** [1]
*29:4*
**July of 1979** [1]
*5:8*
**June** [2]
*27:25; 28:2*
**June, 1999** [1]
*19:5*
**November** [1]
*35:8*
**October** [2]
*35:8; 49:13*
**October, 1988** [1]
*5:15*
**October 1, 1999** [1]
*31:19*
**October 31, 1999** [1]
*34:8*
**October 31st, 1999** [1]
*33:12*
**September 29th** [1]
*35:5*
**September 30th, 2000** [1]
*31:19*

## – $ –

**$1,320** [1]
*27:24*
**$165** [1]
*29:22*
**$3,000** [1]
*51:10*
**$55** [2]
*21:19, 20*

## – 0 –

**0.003** [1]
*41:21*
**0.100** [1]
*41:23*

## – 1 –

**1** [3]
*31:19; 43:22; 55:11*
**11** [1]
*43:10*
**1219** [1]
*3:14*
**125** [1]
*42:9*
**14** [2]
*33:3, 5*
**15** [3]
*30:1, 5, 7*
**19** [1]
*48:15*
**1979** [2]
*5:8, 14*
**1985** [2]
*5:14, 15*
**1988** [1]
*5:16*
**1990s** [1]
*10:4*
**1991** [1]
*33:19*
**1999** [14]
*19:5; 29:5; 31:19; 32:13, 14, 17; 33:12, 22, 23; 34:8, 12; 37:13; 39:18; 50:18*

## – 2 –

**2** [3]
*27:4, 7; 29:5*
**2000** [1]
*31:20*
**2001** [8]
*31:9; 33:19; 37:8, 16, 18; 38:19; 39:13, 18*
**2004** [2]
*4:25; 5:9*
**2005** [1]
*55:13*
**2006** [1]
*55:17*
**24** [5]
*20:2, 3; 21:21; 22:5; 27:25*
**25** [1]
*29:12*
**26** [1]
*21:20*
**26th** [1]
*55:17*
**29831** [1]
*3:15*
**29th** [1]
*35:5*

## – 3 –

**3** [2]
*12:20; 49:25*
**30** [1]
*54:3*
**30,000** [1]
*42:8*
**30th** [2]
*19:4; 31:19*
**31** [2]
*19:25; 34:8*
**31st** [1]
*33:12*
**36-01-018** [1]
*40:21*

## – 4 –

**4** [3]
*16:6, 7, 8*
**4:01** [1]
*54:10*

## – 5 –

**5** [2]
*16:7, 8*
**53-4660-9-06** [1]
*27:3*
**54** [1]
*55:11*

## – 6 –

**6** [2]
*19:10, 11*
**60** [1]
*35:12*
**60-day** [1]
*36:16*

## – 7 –

**7** [1]
*41:10*
**7-28** [1]
*12:22*
**7th** [1]
*55:12*

## – 8 –

**8** [1]
*41:10*

## – 9 –

**9** [1]
*32:17*
**91** [1]
*7:24*
**92** [1]
*7:24*
**94** [1]
*42:7*
**98** [1]
*42:7*
**99** [2]
*15:2; 34:25*

## – A –

**A13** [1]
*42:8*
**able** [1]
*30:4*
**abuts** [1]
*10:23*
**access** [3]
*26:23, 25; 38:14*
**accompany** [1]
*29:11*
**account** [4]
*29:12; 50:20; 51:5, 8*
**accountable** [1]
*25:24*
**accurate** [1]
*25:2*
**action** [3]
*14:17; 26:8; 55:16*
**actions** [12]
*19:13, 17, 20, 24; 25:13, 16, 22, 25; 26:2, 16, 17; 28:19*
**activities** [2]
*48:16; 50:10*
**added** [1]
*32:5*
**adding** [1]
*32:6*
**additional** [1]
*45:15*
**address** [2]
*3:12, 14*
**administer** [2]
*6:9, 17*
**affirmatively** [1]
*7:17*
**agencies** [1]
*46:22*
**agree** [2]
*20:16; 26:13*
**agreed** [1]
*40:12*
**agreement** [1]
*49:4*
**AIKEN** [1]
*55:4*
**Aiken** [1]
*27:4*
**allegations** [2]
*16:23, 25*
**allegedly** [2]
*17:5, 7*
**allowed** [1]
*30:15*
**Alzheimer's** [1]
*47:10*
**Amendment** [2]
*33:7, 11*
**amendment** [1]
*36:23*
**amount** [3]
*27:24; 28:1; 51:2*
**Andrew** [1]
*3:2*
**animal** [2]
*24:23; 29:24*
**animals** [3]
*7:15; 27:11, 15*
**annually** [1]
*27:22*
**answer** [19]
*14:10; 20:18; 22:11; 26:5; 41:24, 25; 42:1, 10, 11, 15, 16, 17, 25; 43:1, 4, 11; 47:11, 14; 53:1*
**answered** [1]
*4:12*
**answering** [3]
*15:14; 41:4; 49:5*
**Answers** [1]
*40:18*
**answers** [3]
*40:22; 49:12; 55:9*
**anybody** [1]
*38:15*
**anymore** [1]
*40:17*
**anytime** [1]
*26:7*
**anywhere** [1]
*13:18*
**apologize** [1]
*54:6*
**apparently** [1]
*24:25*
**appreciate** [1]
*53:1*
**appropriate** [2]
*6:11; 14:17*
**approved** [1]
*30:15*
**architect** [1]
*6:8*
**area** [17]
*10:18; 11:6, 7; 12:23; 13:14; 24:5; 44:4, 13, 21; 45:1, 4, 9, 12, 13, 16, 18*
**areas** [13]
*12:11; 13:6, 11, 21; 40:2; 42:22, 24; 43:5; 48:17, 21; 49:22; 50:12; 52:22*

arrangements [1]
22:19
Aside [1]
17:23
asks [1]
41:11
assume [1]
15:19
assumes [1]
20:17
attached [1]
27:17
attempt [1]
23:1
attend [1]
47:1
attended [1]
47:4
attention [5]
15:5, 7, 8; 16:18, 19
attorney [1]
55:15
August [8]
32:13, 14, 17; 33:21, 23; 34:12, 24; 49:13
authority [3]
9:21; 11:21; 12:2
available [1]
42:17
award [7]
6:9; 33:18, 20; 35:2, 4, 6, 9
awarded [12]
31:9, 10; 33:13, 14, 15, 22, 25; 34:9, 10; 37:6; 38:11; 53:23
aware [8]
14:21; 30:18; 44:6, 9; 46:21; 47:19; 48:4; 51:14
awhile [1]
8:5

– B –

backup [1]
55:8
backwards [1]
12:20
badges [3]
26:23, 25; 28:21
balance [1]
52:5
Bank [1]
50:19
bar [1]
39:4
barred [2]
26:20; 38:1
Barricade [3]
27:4, 7
barricade [1]
20:24
barricades [1]
21:4
barring [1]
47:20
base [1]
32:6
based [3]
25:18; 26:6; 47:14
Basically [1]
10:7
basically [2]
21:11; 52:24
basis [1]
45:6
beach [1]
11:6
beaver [13]
6:16; 8:9, 13, 14, 17; 9:10; 27:3; 28:10; 43:21; 45:20; 46:5; 51:14, 18
beavers [8]
9:11; 27:8, 14; 28:4, 6; 51:21, 23; 52:22
believe [18]
5:15; 8:21, 24; 19:1; 21:19; 23:5; 24:3, 11; 25:17; 29:8, 22; 32:24; 35:4; 38:6; 40:21; 41:14; 45:3; 47:7
bid [4]
37:13; 38:15, 17
bidders [8]
34:17; 35:12; 36:18; 37:11, 15, 16, 18, 22
bids [3]
34:15; 36:15; 39:16
bit [1]
9:8
bold [1]
40:22
born [1]
22:24
brain [1]
54:7
Branch [2]
42:8, 9
branches [1]
52:22
breach [1]
23:25
break [1]
40:11
bridges [3]
6:24, 25
bringing [2]
17:8, 18
Brooks [6]
11:13; 14:1; 23:2, 17; 24:16; 29:11
building [1]
6:24
buildings [1]
6:24
business [1]
5:13
buy [1]
6:22
buying [1]
6:21

– C –

calendar [1]
30:1
Call [1]
16:11
call [6]
28:12; 35:22; 38:10, 12; 39:16; 40:6
calls [1]
26:4
canceled [1]
36:24
caption [1]
55:7
capturing [1]
32:5
carcass [1]
28:7
Carolina [1]
3:15
case [2]
4:3; 53:16
CDC [1]
47:2
CERTIFIED [2]
55:22, 23
certify [1]
55:6
change [1]
39:22
changed [5]
21:3; 32:20; 38:2; 39:9, 21
changes [5]
31:20, 25; 32:2; 39:22, 25
charge [1]
29:19
charged [1]
29:13
Chief [1]
18:4
circumstances [1]
14:15
clarify [2]
6:14; 53:12
Clark [2]
18:5, 14
clean [1]
52:14
cleaning [9]
8:9, 18; 9:11, 13, 24; 10:9, 12; 51:25; 52:8
Clearance [7]
43:3, 5, 23; 44:3, 11, 14, 20
clerk [1]
5:13
clients [1]
4:12
clogged [1]
52:15
collecting [1]
20:3
coming [1]
4:7
communication [2]
19:4, 13
compartment [3]
28:11, 14
complain [1]
44:19
complete [2]
31:14; 55:12
completed [1]
35:9
concern [3]
24:24; 25:2, 5
concerned [2]
24:20; 50:2
concerning [2]
47:4, 5
CONCLUDED [1]
54:10
concluded [1]
17:17
conclusion [3]
18:19; 25:21; 26:5
conclusions [1]
17:15
condition [1]
29:14
conditions [1]
51:20
conduct [1]
25:16
conducted [5]
16:19; 17:25; 25:10, 11; 44:13
confer [1]
53:5
confused [1]
36:9
Construction [1]
9:1
construction [2]
6:8, 23
contacting [1]
28:18
contained [1]
49:24
containing [1]
42:24
contaminated [7]
12:5, 12, 15; 13:22; 44:7, 13; 45:18
contamination [8]
12:23; 13:14; 46:18; 48:17, 21, 24; 49:22; 50:11
contemplating [1]
32:1
content [1]
47:23
contention [1]
37:5
contents [1]
47:25
continue [1]
29:25
contraband [1]
31:1
Contract [2]
5:18; 33:12
contract [83]
5:14, 20; 6:1; 7:21; 8:1; 9:10, 14, 15; 11:11, 17; 17:22; 19:14; 24:1, 2, 7, 10, 11, 15; 25:4, 23; 26:1, 15, 20, 21; 27:3, 23; 28:5, 10; 30:3, 7, 15; 31:5, 8, 10, 14, 18, 21; 32:1, 7, 9, 20, 23; 33:3, 13, 14, 15, 18, 22, 25; 34:8, 9, 10, 15; 35:3, 4, 6; 37:6, 22; 38:8, 11, 14, 16; 39:8, 21; 40:1, 3, 4, 16; 43:21; 45:13; 49:13, 14; 52:6, 12; 53:15, 21, 22, 23; 54:6
contracted [1]
8:18
contracting [3]
5:24; 6:6; 8:12
contractor [7]
8:8, 14; 24:8; 42:13, 22; 43:4, 14
contractor's [1]
37:25
contractors [10]
6:12, 15, 16, 19; 12:5; 13:7; 21:2; 42:5; 45:25; 46:4
Contracts [1]
54:5
contracts [18]
6:9, 10, 11, 18, 19, 21, 23; 8:9, 10; 13:8; 41:1, 2; 46:1, 2; 54:2, 4
control [3]
27:3; 28:10
cooler [21]
17:1, 2, 8, 19; 20:1; 21:17; 22:25; 23:12, 13, 15, 21, 25; 24:8, 15, 21, 22; 27:9, 14, 16; 28:4, 8
copier [1]
15:20
copies [2]
16:3, 6
copy [2]
15:21; 32:24
COR [13]
23:2, 14, 16, 17; 24:16; 25:19; 27:9, 10, 12, 16, 20; 32:3; 43:13
counsel [1]
55:15
counted [2]
43:11, 12
COUNTY [1]
55:4
couple [3]
8:16; 41:7; 53:11
course [1]
32:2
COURT [1]
55:22
create [1]
37:9
Cromer [1]
3:3
CSWE [6]
8:21, 22; 9:11, 17; 52:2, 8
culvert [5]
8:9, 18; 9:11, 12, 24
culverts [7]

10:8, 12; 51:25; 52:8, 14, 18, 23
curies [2] 42:7, 8
CVR [1] 55:21

– D –

dam [1] 52:22
Data [7] 23:1, 12, 16; 24:14, 22; 27:10; 28:7
data [2] 17:2; 41:18
date [3] 8:2; 10:4; 15:1
dated [2] 32:17
David [2] 35:21, 22
day [5] 24:9; 28:5, 25; 55:13, 17
days [5] 30:1, 5, 7; 35:12; 54:3
December [1] 55:13
decision [4] 35:9, 15, 17; 36:12
deduct [1] 51:1
deducted [2] 27:24; 51:2
deer [3] 4:2, 3, 4
default [4] 19:14; 23:23; 25:24; 26:15
defaulted [1] 25:4
Define [1] 26:1
define [2] 47:12; 48:21
definition [6] 43:15; 47:15, 17; 48:25; 49:8, 16
DEHART [1] 55:21
demo [5] 53:13, 14, 18, 19
demonstration [6] 30:12, 13, 16, 25; 31:4, 13
demonstrations [1] 46:15
denials [1] 48:2
denied [1] 26:25
Department [5] 11:25; 12:1, 4, 10; 13:22
deposed [1] 3:16
deposit [2] 50:19; 51:11
deposited [1] 51:9
DEPOSITION [1] 54:10
deposition [4] 3:3; 49:11; 54:6; 55:6
Description [2] 33:6, 11
descriptions [1] 13:17
details [1] 18:8
determine [4] 14:14; 15:18; 18:14; 23:18
determined [1] 23:19
difference [3] 21:24, 25; 33:24
direct [2] 50:19; 51:9
direction [1] 55:10
discovered [3] 17:9; 23:9; 25:5
discuss [3] 17:24; 38:22; 44:21
discussed [1] 38:19
discussion [1] 38:3
discussions [3] 18:4, 7; 25:19
dispatched [1] 14:2
dispatcher [3] 28:11, 12, 18
dispatching [2] 32:6; 36:2
disprove [1] 38:5
disturbing [3] 12:13; 48:17; 50:11
division [2] 8:24; 9:3
document [9] 19:7; 26:10; 37:1, 4; 39:20; 40:17; 41:8; 43:20, 22
DOE [5] 11:18, 19, 24; 41:12
dog [7] 31:13; 53:13, 14, 18, 19
dogs [8] 30:11, 12, 14, 19, 23; 31:14; 41:19
Domestic [1] 43:11
domestic [10] 14:2, 8; 16:25; 17:3, 8, 18; 19:25; 27:25; 32:4; 38:6
door [1] 29:24
double [2] 50:19; 51:2
doubly [1] 50:20
drafting [1] 48:7
drastically [1] 51:15
dried [1] 42:24
drinking [1] 41:20
drought [5] 51:20; 52:4, 13, 19, 20
due [4] 31:20; 32:3; 35:5; 51:20
duly [2] 3:6; 55:14
duties [1] 9:16

– E –

eat [1] 42:21
Eller [27] 17:17, 21; 22:15; 25:14, 15; 26:19, 20, 22, 23; 28:22; 29:4, 10; 33:18; 37:18, 24; 38:1, 5, 22; 39:2, 4, 7, 8, 10; 47:19; 48:4
Eller's [1] 22:18
Ellers [1] 30:2
employee [3] 27:13; 52:9; 55:15
employees [16] 9:11, 23, 24; 10:17; 17:11, 22; 21:7; 24:25; 25:14, 23, 25; 27:2, 5, 21; 42:14, 23
end [5] 18:3, 12; 28:4; 35:7; 38:22
Energy [5] 11:25; 12:1, 4, 10; 13:22
Engineering [1] 9:2
engineering [4] 6:8; 10:8, 10, 11
ensure [1] 28:21
entail [1] 18:7
enter [4] 15:11; 21:5; 27:4, 6
entered [6] 20:22; 21:7; 22:25; 23:12; 24:14, 22
entering [1] 16:6
entities [1] 27:1
entitled [2] 16:11; 40:17
entrances [1] 21:13
entry [1] 21:2
EPA [1] 41:21
escort [1] 39:23
evaluated [1] 30:14
evaluation [2] 35:6, 8
everybody [1] 40:12
evidence [2] 20:18; 55:12
exact [1] 4:1
exactly [2] 8:25; 34:5
EXAMINATION [2] 3:8; 53:8
examined [1] 3:6
exercising [1] 27:22
EXHIBIT [1] 19:11
Exhibit [3] 12:20; 43:21; 49:24
exhibit [1] 50:3
EXHIBITS [1] 41:10
exhibits [1] 15:15
existed [1] 46:18
existing [1] 33:3
expert [1] 20:10
explain [2] 41:23; 52:17
extend [2] 27:23; 31:18
extended [2] 33:12; 34:8
extension [2] 35:11; 36:16

– F –

facetious [1] 20:14
fact [1] 45:8
facts [1] 20:17
Fair [1] 39:15
fair [2] 14:18; 26:9
falsely [1] 26:8
familiar [1] 43:22
father [1] 39:7
Federal [1] 26:1
felt [2] 25:3; 45:12
Fetal [1] 22:24
fetal [2] 23:2, 3
file [2] 8:1; 30:8
files [1] 36:20
financially [1] 55:16
find [1] 37:3
fine [9] 4:23; 8:3; 11:10; 14:12; 16:4; 31:11, 16; 50:14
first [9] 3:6; 7:21; 8:11, 14; 11:11; 14:14; 33:4; 45:4; 55:14
five [1] 24:13
FM6 [1] 42:8
follow-on [2] 53:21, 22
following [1] 53:21
follows [1] 3:7
force [1] 45:14
foregoing [2] 55:6, 11
Forest [32] 5:7, 8, 25; 6:13; 7:3, 4, 9, 10, 12; 8:8, 12; 9:17, 22, 25; 10:5, 11, 23; 11:8; 12:11; 19:8; 20:1; 26:21, 23; 35:18, 20; 36:4, 6, 7, 10, 25; 41:13; 49:7
forever [2] 26:22; 38:1
forgotten [1] 15:1
forms [1] 35:7
forth [5] 35:6, 8; 51:21; 52:4, 23
forward [1] 9:8
found [3] 14:3; 23:3; 44:20
Four [1] 42:7
four [2] 23:23; 42:13
Frankie [5] 8:22; 23:2, 16; 24:15; 29:11
fulfill [1] 30:20
full [2] 3:12; 22:1
future [2] 26:14; 51:1

– G –

**GABARD** [2] *3:5; 55:14*
**Gabard** [10] *3:10, 14, 16; 4:24; 5:22; 34:7, 23; 40:15; 53:1, 10*
**gate** [2] *20:23; 21:11*
**gates** [2] *21:8, 12*
**gave** [1] *48:11*
**give** [4] *19:15; 28:15, 17; 50:15*
**given** [3] *15:12; 28:21; 55:12*
**giving** [1] *4:13*
**goes** [2] *25:9; 29:23*
**Goldman** [10] *17:17, 21; 25:14; 26:19, 22; 28:22; 29:4; 39:7; 47:18, 20*
**Government** [6] *26:1; 27:21, 22; 29:3; 31:18; 50:24*
**grade** [2] *5:21, 22*
**ground** [1] *39:24*
**grown** [1] *22:1*
**GS-12** [1] *5:23*
**guards** [1] *21:9*
**guess** [4] *9:1; 14:11, 13; 20:19*

– H –

**Hamilton** [1] *37:24*
**handle** [1] *42:23*
**handled** [2] *41:24; 50:24*
**happening** [1] *32:4*
**happens** [1] *26:14*
**hasn't** [1] *5:1*
**haven't** [3] *13:2; 39:19; 50:5*
**he'd** [1] *22:4*
**he's** [2] *15:14; 49:5*
**Head** [1] *3:12*
**health** [1] *41:12*
**heard** [2] *3:10; 51:3*
**helped** [1] *48:11*
**hereby** [1] *55:6*
**Highway** [2] *3:15; 42:9*
**Hilton** [1] *3:12*
**Hog** [1] *23:1*
**hog** [33] *6:16; 8:8; 11:11, 17; 14:8, 19; 19:14; 20:10; 21:17, 19, 24; 22:17; 24:4, 8, 9; 28:10; 29:7, 9, 17; 31:2, 14; 34:15; 37:9; 38:6, 8; 39:8, 23; 40:2; 41:2; 43:15; 46:9, 13; 53:15*
**hog's** [1] *22:1*
**Hogs** [2] *23:11, 24*
**hogs** [32] *11:16; 14:1, 22; 16:25; 17:3, 8, 18; 21:23; 22:20; 23:15, 17, 20; 24:13, 14, 17, 20; 27:8, 13; 28:3, 6; 32:3, 4, 5; 33:25; 34:2; 36:3; 41:20; 42:21, 23; 43:11, 12; 47:11*
**HOMER** [2] *3:5; 55:13*
**Homer** [1] *3:14*
**honest** [1] *43:17*
**Hooker** [37] *3:11; 7:21; 8:5, 7, 19, 20; 9:9; 11:15; 17:10; 18:14, 15, 18, 23; 19:4, 7, 14; 20:2; 21:6, 20; 22:18; 28:20; 29:19; 30:19, 25; 34:17; 37:16; 40:3, 21; 41:5; 43:23; 44:19; 46:17; 47:8, 9; 50:18; 53:15, 19*
**Hooker's** [2] *51:14; 52:6*
**hunt** [5] *4:2, 3, 4; 11:15; 43:5*
**hunting** [1] *42:15*
**hypothetically** [1] *24:4*

– I –

**I'd** [10] *11:10; 12:19; 19:2; 20:19; 30:7; 31:16; 32:16; 40:17; 41:7; 43:20*
**I've** [8] *4:10; 15:1; 16:1; 40:12; 47:15; 48:23; 50:5; 54:6*
**idea** [1] *21:18*
**IDENTIFICATION** [3] *16:8; 19:11; 41:10*
**identify** [1] *32:16*
**identifying** [1] *14:22*
**II** [1] *31:19*
**III** [1] *3:3*
**illegal** [3] *25:22; 26:8, 12*
**illegality** [1] *26:2*
**immediately** [3] *24:8; 26:15; 28:9*
**in-house** [2] *8:19; 35:16*
**inappropriate** [1] *25:22*
**Inc** [1] *25:12*
**incident** [1] *24:17*
**includes** [1] *7:15*
**incorporated** [1] *41:1*
**Indicates** [2] *3:19; 7:17*
**individuals** [1] *26:24*
**inform** [2] *12:4, 10*
**information** [3] *4:13; 41:15; 48:11*
**informed** [2] *20:2; 38:4*
**initialed** [1] *27:10*
**initialing** [1] *23:16*
**Initially** [1] *27:11*
**initially** [1] *45:3*
**initiated** [1] *47:8*
**inquire** [1] *44:25*
**inquiry** [2] *25:10, 16*
**inserted** [1] *32:10*
**inspector** [8] *23:16; 27:10, 11, 12, 16, 20; 32:3; 43:14*
**inspectors** [2] *23:14; 25:19*
**Institute** [2] *35:21, 25*
**insufficient** [1] *28:2*
**intended** [2] *40:1, 5*
**interaction** [1] *46:14*
**interested** [1] *55:16*
**interlocking** [1] *21:12*
**interrogatories** [4] *4:8; 9:9; 48:8, 10*
**interrogatory** [3] *4:14; 48:15; 50:3*
**interviewing** [1] *18:18*
**inventory** [2] *27:20; 29:16*
**investigate** [1] *17:13*
**investigated** [1] *16:24*
**Investigation** [1] *16:12*
**investigation** [17] *14:25; 16:16, 20, 21; 17:14, 24, 25; 18:12, 19; 23:4, 6; 25:11; 38:23; 47:2, 5, 6, 18*
**Investigator** [2] *18:4, 5*
**investigator** [1] *18:13*
**investigators** [1] *38:4*
**invoice** [5] *27:18, 25; 28:2; 50:20*
**invoices** [2] *28:1; 51:1*
**involve** [2] *48:16; 50:11*
**involved** [10] *16:15; 18:10, 15, 20; 25:13, 15, 21; 38:5, 9; 47:9*
**Issue** [1] *6:7*
**issue** [3] *27:12; 38:16; 53:16*
**issued** [7] *26:23; 27:21; 29:3; 32:11, 23; 33:23; 34:12*
**issues** [2] *23:23; 25:3*

– J –

**Jackson** [2] *3:15*
**January** [3] *4:25; 5:9; 55:17*
**Jimmy** [1] *18:5*
**job** [4] *6:3, 6, 12; 7:3*
**John** [1] *3:2*
**July** [2] *5:8; 29:4*
**June** [3] *19:5; 27:25; 28:2*

– K –

**key** [4] *21:6, 7, 10, 11*
**kill** [1] *31:2*
**killed** [1] *14:22*
**killing** [2] *24:9*
**kinds** [1] *6:16*
**knife** [1] *31:2*
**Knowing** [1] *21:1*
**knowing** [3] *20:25; 22:22; 51:13*
**knowledge** [16] *8:7, 11; 9:18; 11:13, 15; 12:11; 20:6; 24:19; 29:5; 43:7; 44:15, 16; 45:17, 19, 20; 46:24*

– L –

**landfill** [4] *23:14; 24:24; 25:1, 6*
**language** [6] *24:7; 31:21; 32:9, 20; 33:10; 34:7*
**last** [2] *31:17; 49:24*
**lawyers** [1] *4:11*
**learn** [1] *30:22*
**learned** [1] *16:15*
**leave** [2] *27:4, 6*
**leaving** [1] *28:22*
**legal** [1] *26:5*
**Let's** [3] *22:23; 23:11; 53:12*
**let's** [4] *21:1; 32:7; 37:8; 49:16*
**letter** [4] *19:15; 25:9; 31:17; 36:23*
**letters** [2] *47:20, 24*
**level** [1] *5:22*
**levels** [1] *5:21*
**limbs** [1] *52:22*
**limited** [1] *25:11*
**list** [4] *12:15; 13:21; 26:25; 28:19*
**listed** [4] *25:13, 15, 22; 26:2*
**liter** [2] *41:22, 23*

**litigation** [1]
3:21
**live** [1]
42:21
**loaded** [1]
49:1
**located** [1]
14:8
**location** [4]
28:13, 16, 17; 42:8
**locations** [2]
29:9, 11
**lock** [3]
21:6, 7, 10
**locks** [1]
21:12
**logged** [1]
28:7
**looks** [1]
50:4
**lot** [3]
11:14; 48:24; 49:1

**– M –**

**ma'am** [69]
4:6; 5:11; 6:4; 7:19, 23; 8:6; 10:16, 19; 11:9, 17, 20; 12:3, 9, 14, 17, 24; 13:8, 10, 12, 15, 19, 24; 14:4, 6, 20, 24; 15:3; 20:25; 21:15; 22:6, 22; 23:5, 22; 24:18; 30:17; 31:7, 15, 22; 32:19; 33:17; 34:12, 16, 18; 35:1, 13; 36:13, 17; 37:14, 17, 19, 21; 39:12, 14; 41:17; 42:2, 12, 19; 43:2, 24; 48:1, 9; 50:13, 22; 51:6, 12; 52:20; 53:17, 24
**Mack** [1]
18:4
**managed** [1]
36:4
**management** [6]
5:13; 7:13; 10:2, 3, 6, 18
**manager** [4]
35:18, 24; 36:6, 7
**manned** [1]
21:8
**manner** [1]
27:9
**map** [1]
10:20
**Margie** [3]
3:2; 4:21; 48:12
**Mark** [2]
3:1; 16:6
**mark** [1]
41:9
**MARKED** [3]
16:8; 19:11; 41:10
**marked** [8]
12:21; 19:9; 23:20; 27:9, 11; 32:3; 45:18; 49:23
**Mary-Ellen** [1]
3:1
**mean** [7]
17:10; 35:7; 38:24; 48:21; 49:4, 15, 16
**means** [4]
8:22; 49:1; 54:3
**meantime** [1]
33:2
**meeting** [3]
19:8; 28:23; 47:4
**memory** [9]
8:16; 13:15, 19; 24:11, 17; 30:24; 31:13; 39:19, 21
**mentioned** [2]
5:25; 23:6
**mercury** [2]
42:20, 24
**method** [1]
55:7
**Michael** [15]
17:21; 25:14; 26:19, 22; 28:22; 29:4; 37:18, 24; 38:1, 5, 22; 39:2, 4, 7, 10
**Mike** [4]
33:18; 47:18, 19; 48:4
**Mile** [1]
42:8
**milligrams** [2]
41:21, 23
**mind** [2]
38:2; 39:10
**minute** [1]
50:15
**missing** [4]
29:7, 14, 17; 31:1
**Modification** [2]
33:7, 11
**modification** [4]
32:17, 18, 19; 33:9
**modify** [1]
33:3
**moment** [1]
16:9
**Money** [1]
22:14
**money** [9]
22:4, 21; 26:11; 44:24; 45:3, 5, 7, 15; 51:16
**month** [1]
27:18
**mostly** [1]
13:4
**move** [1]
28:13
**Mr** [52]
3:2, 10, 11, 16; 4:24; 5:22; 7:20; 8:5, 7, 19, 20; 9:9; 11:15; 17:10; 18:13, 14, 18, 22; 19:7, 14; 20:2; 21:6; 22:15, 18; 28:20; 29:10, 19; 30:2, 18, 25; 34:7, 17, 23; 36:6; 37:16; 40:3, 15, 21; 41:5; 43:23; 44:19; 46:17; 47:9; 50:18; 51:14; 52:5, 25; 53:10, 14, 18
**MS** [48]
3:9; 4:17, 18, 20; 14:9; 15:10, 13, 16, 17, 19, 21, 22, 23, 24, 25; 16:1, 3, 5; 19:9; 20:17; 26:4; 32:25; 33:1; 34:3, 4, 5, 19, 22; 36:25; 37:3; 40:11; 41:9; 48:19, 22, 23; 49:6, 9, 10, 15, 18, 20; 50:1; 53:4, 9, 25; 54:4, 5, 8
**Ms** [19]
11:13; 14:1, 12; 15:10; 16:9; 19:12; 20:22; 26:9; 33:2; 34:7; 35:2; 37:5; 40:15; 41:11; 48:8; 49:10, 20; 50:2; 53:2
**mud** [1]
42:23
**myself** [1]
25:10

**– N –**

**name** [3]
3:12; 37:25; 39:2
**natural** [4]
7:13; 10:18; 14:15; 36:4
**necessity** [1]
31:20
**negatively** [1]
3:19
**NICHOLS** [23]
3:9; 4:18; 15:10, 16, 19, 22, 24; 16:1, 5; 19:9; 33:1; 34:4, 22; 36:25; 40:11; 41:9; 48:22; 49:6, 10, 18; 50:1; 54:4, 8
**Nichols** [14]
3:11; 14:12; 16:9; 19:12; 20:22; 26:9; 33:2; 34:7; 35:2; 37:5; 40:15; 41:11; 49:20; 50:2
**Nicholson** [1]
3:2
**NIOSH** [2]
47:5, 6
**nobody** [1]
51:23
**Noone** [1]
3:1
**normal** [1]
36:21
**normally** [3]
6:13; 39:7; 51:9
**note** [1]
31:16
**NOTED** [1]
3:1
**noted** [2]
33:3, 5
**notice** [1]
10:20
**noticed** [1]
40:25
**notified** [2]
36:18; 42:6
**notify** [1]
36:22
**November** [1]
35:8
**NSVRA** [1]
55:23
**Number** [6]
12:20; 41:11, 18; 42:5, 13; 43:22
**number** [10]
22:23; 23:11, 23; 26:16; 28:11; 31:1; 33:3; 43:10; 48:15; 51:21
**numerous** [1]
21:8

**– O –**

**oath** [1]
53:11
**object** [3]
26:4; 48:19; 49:3
**objected** [1]
49:2
**Objection** [4]
14:9; 20:17; 34:3, 19
**objections** [1]
38:7
**observe** [2]
14:18; 45:25
**Obtain** [1]
29:9
**obtain** [2]
26:8; 30:4
**Obviously** [1]
6:15
**occasional** [1]
52:1
**occasionally** [2]
13:9; 45:24
**occurred** [2]
24:20; 30:16
**October** [6]
5:15; 31:19; 33:12; 34:8; 35:8; 49:13
**off-colored** [3]
43:11, 15; 47:11
**offer** [1]
53:20
**offers** [1]
35:5
**office** [3]
3:11; 13:5; 19:6
**officer** [3]
5:24; 6:6; 17:25
**Oh** [6]
4:22; 5:1; 15:22; 31:6; 46:2, 4
**Okay** [108]
4:4, 11, 18, 23; 5:19; 6:7, 21; 7:1, 15, 20; 8:14; 9:3, 19; 10:13, 20; 11:2, 10, 12, 18; 12:4, 25; 13:20; 14:7, 18, 21; 15:9, 16, 19, 24; 16:3, 5, 13, 22, 25; 17:14, 23; 18:2, 20; 19:2, 9, 17; 20:4, 5, 14; 21:1, 10, 16; 22:2, 10, 23; 23:7, 23; 24:13, 19; 25:9, 20; 26:13; 29:9; 31:8, 11, 12, 16, 23; 32:9, 24; 33:10; 35:11; 36:9, 11, 25; 37:8; 38:18; 39:9; 40:10; 41:3, 4, 7; 42:5, 13, 20; 43:10, 19, 25; 44:2, 6, 12, 17, 19; 45:17; 46:17; 48:4, 13, 22; 49:6, 9, 15; 50:9, 14, 15; 51:3, 9; 52:25; 53:3, 18
**okay** [4]
4:22; 5:5; 34:14; 50:14
**Old** [1]
3:15
**ones** [1]
38:13
**open** [1]
29:24
**opinion** [6]
22:10, 12, 20; 25:12; 26:6, 7
**Option** [1]
31:19
**option** [1]
27:23
**order** [3]
15:18; 26:11; 30:20
**original** [1]
38:23
**originally** [1]
18:9
**OSHA** [1]
41:13
**outside** [2]
21:8; 45:12

**– P –**

**P.M.** [1]
54:10
**page** [5]
12:22; 13:16; 17:16; 26:3; 33:4
**pages** [3]
12:21; 49:24; 55:11
**paid** [7]
20:4; 21:20; 22:5, 17; 28:1; 43:12; 50:20
**paint** [1]
27:12
**panels** [2]
29:7, 17
**paragraph** [1]
31:17
**parameters** [1]
7:4
**part** [7]
9:5; 11:6; 13:3; 14:11; 47:1, 2; 49:14
**part-time** [1]
5:3
**participate** [1]
4:8
**participated** [3]
4:13; 48:5, 7
**parties** [1]
55:16
**parts** [1]
29:13
**pass** [1]
31:1
**pay** [8]
18:23; 22:4, 7; 23:2, 17; 24:16; 45:15; 51:16
**paying** [2]
14:23; 21:16
**payment** [10]

17:2; 20:2; 23:1; 24:23; 26:8; 27:15; 28:3, 6; 50:19; 51:2
**payments** [1] 51:12
**Pen** [1] 42:9
**people** [2] 8:15; 37:12
**Perfect** [1] 50:1
**perform** [4] 26:12; 30:12; 35:15; 53:19
**performance** [2] 30:1, 3
**performed** [5] 8:20; 9:12, 16; 40:3; 53:15
**performing** [1] 26:1
**Period** [1] 31:19
**period** [3] 27:23; 51:24; 52:12
**Permit** [5] 43:23; 44:3, 11, 14, 21
**Permits** [2] 43:3, 6
**person** [5] 17:17; 18:9; 19:5; 30:11, 14
**personal** [3] 6:8, 17; 46:24
**Personally** [1] 44:5
**personally** [7] 7:7; 12:7; 13:2; 20:12; 23:8; 25:13; 50:13
**Personnel** [1] 28:15
**personnel** [14] 9:17; 10:10, 11; 25:10, 17; 26:25; 28:9; 30:2, 5, 10, 11, 13; 39:23; 52:2
**picture** [1] 12:23
**pig** [3] 21:24; 22:2, 3
**piglets** [1] 43:12
**pigs** [20] 14:3; 18:20, 22, 23; 19:25; 20:7; 21:23; 22:24; 23:2, 3, 11, 15, 17; 24:21; 27:8, 13, 25; 28:4, 6; 43:12
**placed** [6] 17:1; 19:13; 22:25; 27:8, 14; 28:8
**placing** [1] 26:24
**PLAINTIFF'S** [3] 16:8; 19:11; 41:10
**Plaintiff's** [4] 12:20; 16:7; 49:24
**plan** [1] 35:2
**planned** [4] 35:4, 5; 53:21, 22
**Planting** [1] 7:2
**Please** [2] 41:23; 53:1
**please** [3] 3:13; 6:14; 19:10
**point** [6] 10:22; 18:16; 29:1; 30:22; 45:4; 51:15
**points** [1] 21:2
**policy** [1] 14:7
**position** [4] 5:6, 10, 15, 18
**posted** [2] 13:1; 44:6
**precipitated** [1] 44:2
**present** [1] 3:3
**presented** [2] 19:5, 7
**pretty** [1] 40:3
**previous** [1] 37:15
**primarily** [1] 25:18
**primary** [1] 10:3
**prior** [5] 19:22; 27:16, 22; 28:22; 30:10
**problem** [4] 16:15; 40:2; 43:13; 52:24
**procedure** [2] 14:22; 36:21
**processed** [1] 27:19
**produce** [2] 32:25; 37:4
**produced** [1] 34:14
**property** [9] 10:22; 11:5; 14:2, 8; 21:2; 27:21; 29:3; 39:5; 49:23
**protection** [2] 48:15; 50:10
**prove** [2] 38:5, 9
**provide** [3] 42:1, 11; 43:1
**provided** [2] 41:25; 42:17
**purchase** [2] 30:19
**purchased** [1] 30:23
**pure** [1] 14:11
**purely** [1] 39:19
**pursue** [1] 26:24
**putting** [1] 17:19

**– Q –**

**question** [14] 4:11; 14:10; 20:5; 26:5; 41:24; 42:1, 11, 16, 20, 25; 43:16; 47:11; 48:14; 50:2
**Questions** [1] 40:18
**questions** [11] 4:12; 11:11; 15:14; 41:5, 8; 43:20; 49:12; 53:1, 11; 54:1; 55:9
**Quotes** [1] 40:21
**quotes** [1] 40:20

**– R –**

**radio** [1] 28:13
**range** [1] 6:21
**Rawley** [1] 37:24
**read** [4] 26:17; 33:10; 48:13; 51:4
**readings** [1] 41:22
**reason** [1] 13:4
**reasons** [1] 17:12
**recall** [36] 10:19; 15:6, 7; 16:10; 18:8, 16; 21:5; 23:8, 19; 24:7; 28:24; 30:6; 32:8; 35:19; 37:24; 39:1, 20; 40:8, 9, 24; 42:2, 3, 12, 18; 43:2, 3, 9, 17; 46:20, 21; 47:13; 50:16, 22, 23; 51:17
**receipt** [1] 27:13
**receipts** [1] 27:17
**receive** [7] 12:15; 23:1; 26:11; 27:15; 28:3, 6; 29:1
**received** [5] 13:21; 17:3; 18:2; 28:24; 50:18
**receiving** [1] 16:11
**Recently** [1] 24:13
**recognition** [1] 55:8
**recognize** [1] 40:23
**recollection** [1] 29:6
**recommendations** [1] 18:3
**recommended** [3] 17:20; 38:13; 39:6
**RECORD** [3] 40:14; 49:19; 53:6
**record** [3] 16:22; 49:17; 54:1
**recovered** [1] 24:5
**reduced** [3] 51:15, 19; 55:9
**reference** [2] 15:13; 49:12
**referenced** [1] 41:13
**referred** [1] 53:13
**referring** [6] 32:18, 20; 33:5, 6; 34:6; 49:22
**refresh** [1] 30:24
**refuse** [1] 45:13
**refused** [3] 22:7; 23:2, 17
**Regions** [1] 50:19
**regulation** [1] 41:12
**relation** [3] 7:11; 10:8; 34:13
**relationship** [3] 9:21; 10:7, 14
**relative** [1] 55:15
**released** [1] 42:9
**releasing** [1] 42:6
**remember** [30] 3:24; 4:1; 7:21; 10:4; 16:17; 21:16; 29:15, 21; 30:4, 16, 17, 18, 24; 32:8; 37:11, 12, 25; 41:4; 44:2; 45:2, 24; 47:19, 22, 23, 25; 50:17, 25; 51:4, 6, 18
**remind** [1] 53:10
**removed** [5] 17:21; 22:24; 23:13; 24:22; 27:16
**renovation** [1] 6:23
**rephrase** [1] 10:24
**replace** [1] 30:2
**replacement** [1] 30:10
**replacing** [1] 6:24
**Report** [1] 16:12
**report** [10] 15:25; 16:1, 11, 20; 17:16, 23; 18:2; 25:19; 38:25; 39:1
**reported** [2] 18:9; 55:7
**REPORTER** [1] 55:22
**reporting** [1] 18:10
**reports** [1] 11:19
**represent** [1] 55:11
**representing** [1] 3:11
**Request** [2] 40:18, 20
**request** [3] 10:9; 39:16; 45:6
**requests** [1] 46:22
**require** [3] 24:25; 26:16; 44:13
**required** [17] 24:7, 11, 15; 25:1, 8; 26:17; 28:5, 21; 30:12; 42:14, 23; 43:4, 5, 6; 44:20; 48:16; 50:10
**requirement** [4] 44:3, 10; 52:1, 11
**requirements** [3] 6:9; 30:20; 41:12
**requiring** [2] 25:7; 28:20
**researched** [4] 41:25; 42:10, 16; 43:1
**reserve** [2] 54:2, 8
**resource** [1] 10:18
**resources** [2] 7:13; 36:5
**respond** [1] 48:11
**responded** [1] 34:9
**responding** [1] 4:8
**response** [8] 18:17; 41:14; 43:16; 45:10, 11; 48:14, 20
**responses** [4] 4:14; 9:8; 48:7, 10
**responsibilities** [1] 6:6
**responsibility** [8] 7:5; 10:2, 5, 14, 15; 11:14; 13:3; 36:2
**responsible** [8] 7:6, 10, 12; 10:22; 11:6; 17:7, 18; 25:25
**result** [6] 16:20; 17:14; 25:9; 29:16; 33:21; 34:11
**resulting** [2] 6:9, 10
**results** [1] 47:1
**resume** [1] 30:3
**resumes** [1]

30:10
retire [1]
5:22
retired [2]
4:10, 24
Return [1]
29:3
returned [2]
27:18; 29:8
reversal [2]
51:5, 7
reversing [1]
51:11
review [2]
16:9; 54:2
ribbons [1]
6:22
Right [3]
11:4; 20:22; 44:24
right [10]
7:24, 25; 15:16; 27:22; 32:16; 36:9, 12; 51:5; 54:2, 8
River [21]
4:2; 7:5, 11, 13; 9:6; 10:21; 11:2, 15; 13:1; 14:3; 17:4; 19:8; 26:22; 35:18, 20, 24; 36:3, 8; 46:18
river [3]
10:23; 11:3, 5
Road [1]
42:8
road [3]
10:2, 3, 6
Robbie [1]
3:10
RONDAL [2]
3:5; 55:13
Rondal [1]
3:14
rot [1]
23:24
run [1]
9:10
running [1]
14:3

– S –

Safety [1]
41:18
safety [1]
41:11
satisfactory [2]
29:14; 30:3
Savannah [22]
4:2; 7:5, 11, 13; 9:5; 10:21; 11:2, 15; 13:1; 14:3; 17:4; 19:8; 26:21; 35:18, 19, 20, 24; 36:3, 8; 46:18
saying [3]
36:23; 52:5, 10
scope [2]
39:25; 45:12
searched [1]
27:6
second [6]
17:16; 19:15; 39:16, 17; 49:17; 51:11
secondary [2]
10:2, 6
seconds [1]
53:5
section [1]
10:8
secured [1]
20:23
sediment [2]
42:21, 24
sell [1]
22:21
September [2]
31:19; 35:5
Service [28]
5:7, 8, 25; 6:13; 7:3, 9, 10, 12; 8:8, 12; 9:17, 22, 25; 10:5, 11, 23; 11:8; 12:11; 20:1; 26:21, 24; 36:4, 7, 10; 37:1; 41:13; 49:7
service [3]
6:7, 18; 26:12
Service's [1]
7:4
Services [2]
9:1; 25:12
services [1]
6:8
seven [1]
22:7
shared [3]
9:22; 10:14, 15
SHARON [1]
55:21
sheet [2]
17:2; 41:18
shot [1]
24:5
show [1]
40:17
sign [10]
12:23, 25; 13:14; 24:25; 25:7; 26:10; 50:4, 5, 7; 54:2
signatures [1]
33:8
signs [3]
4:7; 13:17; 49:23
Simpson [1]
3:2
sir [1]
7:8
Site [28]
4:2; 7:5, 11, 14; 10:3, 21; 11:2, 16, 22; 13:1, 4, 18; 14:3; 17:1, 4, 18; 20:7; 21:8; 26:22, 23; 36:3, 8; 38:2, 15; 46:18; 47:21; 48:18; 51:22
site [4]
28:17; 44:6; 46:5, 11
sites [6]
12:5, 16; 41:15; 45:21; 51:15, 18
situation [5]
14:17; 18:5, 9; 32:4; 38:6
Six [1]
24:19
skin [1]
42:25
skip [2]
43:10; 48:5
smaller [1]
39:25
soil [10]
12:13, 23; 13:14; 44:25; 46:23; 48:17, 21; 50:11
Solicitation [1]
39:17
solicitation [18]
32:11, 21, 22; 33:21, 23; 34:11, 14, 21, 23, 24; 36:19, 23, 24; 37:2, 9; 39:18; 41:14
solicitations [2]
6:7; 36:15
someone [2]
14:16; 22:11
somewhere [1]
22:21
sorry [5]
31:11; 33:19; 39:16; 47:10; 54:5
sort [1]
13:21
sound [2]
7:24, 25
South [1]
3:15
sows [1]
22:25
specialist [4]
5:14, 18, 20; 6:1
specific [6]
10:4; 13:8; 17:6; 18:8; 44:23; 47:25
specifically [13]
7:23; 15:6; 18:13; 28:24; 30:6; 31:24, 25; 38:24; 39:2; 40:9; 44:24; 45:22; 50:25
specifics [1]
18:15
specify [2]
34:5, 20
speculate [1]
47:16
speculation [3]
14:9; 20:19; 52:7
speech [1]
55:8
spoke [1]
4:21
spray [1]
27:12
SRFS [1]
22:25
SRI [14]
23:12, 25; 24:21; 25:10, 16; 27:8, 14; 28:4, 8, 11, 12, 18; 30:13; 36:9
SRL [1]
22:25
SRS [12]
23:13; 24:24; 27:1, 4, 6; 30:13; 41:19, 20; 42:6, 21; 48:18; 49:23
standard [1]
41:21
stapled [1]
12:20
start [2]
5:12; 16:10
started [3]
5:13; 8:12; 45:4
Starting [1]
28:9
starting [1]
30:11
starts [1]
49:11
state [6]
16:23; 18:22; 19:13; 31:17; 41:21; 54:1
stated [3]
9:9; 38:25; 55:7
states [3]
17:16, 20; 25:7
Station [3]
19:8; 35:19, 20
stations [1]
32:6
Stenomask [1]
55:8
stipulate [1]
48:25
stipulated [1]
49:21
stopped [2]
9:10; 52:18
stream [2]
41:19, 22
streams [2]
41:20; 42:21
submit [2]
30:9; 49:7
submitted [2]
40:22; 53:20
subsequent [3]
28:1; 40:25; 41:2
successful [1]
37:22
suitable [2]
30:2, 4
summarize [2]
19:12, 23
Summary [1]
16:11
summary [1]
16:2
summer [2]
15:2; 50:18
supervise [1]
6:17
supervised [1]
46:4
supplies [1]
6:21
supply [1]
6:7
supposed [1]
21:4
suspected [1]
18:11
swamp [1]
42:15
sworn [2]
3:6; 55:14

– T –

Table [6]
23:1, 12, 16; 24:14, 22; 27:10
Tables [1]
28:7
talk [3]
31:23; 40:16; 53:12
talked [1]
38:19
talking [8]
6:19; 7:7; 12:7; 19:17; 34:20, 24; 39:10; 51:7
tally [1]
4:2
tasks [2]
8:20; 27:17
technique [1]
32:5
terminate [2]
6:11; 25:23
terminated [1]
26:15
test [1]
42:14
testified [2]
3:7; 4:3
testimony [5]
13:13, 20; 38:18; 39:9; 46:13
Thank [6]
12:19; 13:25; 16:14; 28:19; 33:1; 54:9
thank [2]
7:20; 13:20
That'd [1]
7:25
There's [3]
4:4; 10:15; 42:20
there's [2]
52:20
thereto [1]
55:9
they're [3]
9:3, 5; 38:13
thinking [1]
52:18
third [3]
31:17; 32:5; 37:25
Thirty-one [2]
18:21, 22
thousand [1]
42:7
three [2]
23:11; 42:5
thrown [1]
48:24
till [1]

*31:9*
**timber** [6]
*21:6, 7, 10; 28:11, 14*
**times** [2]
*3:25; 43:14*
**'otal** [1]
*20:1*
**totally** [1]
*9:16*
**toxaphene** [2]
*41:19, 21*
**trade** [1]
*4:11*
**trainee** [2]
*5:15, 18*
**training** [1]
*5:17*
**transcript** [1]
*55:12*
**trap** [2]
*9:19; 11:16*
**trappers** [2]
*6:16; 39:23*
**trapping** [15]
*8:13, 17; 14:19; 33:25; 34:2; 37:9; 41:2; 44:4, 21; 45:15; 46:5, 9; 51:15, 18, 23*
**traps** [10]
*29:8, 9, 10, 12, 13, 18, 23, 25*
**travel** [2]
*13:3, 9*
**trees** [2]
*7:2, 16*
**tries** [1]
*26:7*
**trip** [1]
*29:24*
**tritium** [2]
*42:6, 15*
**truck** [3]
*20:15, 20, 23*
**true** [5]
*43:6, 7, 8; 44:16; 55:11*
**Twenty-four** [1]
*21:22*
**twice** [1]
*24:24*
**type** [1]
*37:1*
**typewriter** [1]
*6:22*
**typewriting** [1]
*55:10*

– U –

**ultimate** [3]
*11:21, 23; 12:1*
**unable** [1]
*51:16*
**understand** [3]
*18:1; 20:11; 51:7*
**understanding** [2]
*33:24; 34:13*
**Underwood** [1]
*18:4*
**Unit** [1]
*36:7*
**unlocks** [1]
*21:11*
**urine** [1]
*42:14*
**USDA** [1]
*41:12*

– V –

**vague** [3]
*34:3, 19; 48:20*
**vaguely** [1]
*40:24*
**vegetation** [1]
*7:15*
**vehicles** [1]
*27:5*
**verify** [1]
*29:10*
**verifying** [1]
*23:15*
**visited** [3]
*45:20; 46:5, 7*

– W –

**Wackenhut** [22]
*15:1; 16:12, 19; 17:11, 12, 15, 17, 24; 18:10, 13; 20:6, 8; 23:4, 6; 25:11, 18; 38:3, 19, 25; 39:1, 6, 11*
**Wackenhut's** [3]
*16:19; 38:10, 12*
**Wal-Mart** [1]
*5:3*
**walking** [1]
*14:5*
**wants** [1]
*15:18*
**water** [5]
*11:7; 44:25; 46:19, 23; 52:21*
**we'll** [3]
*32:25; 50:16; 54:8*
**we're** [2]
*34:20; 49:22*
**we've** [2]
*48:23; 53:13*
**weather** [1]
*51:20*
**web** [1]
*41:15*
**Westinghouse** [12]
*8:25; 9:4, 5, 22, 24; 10:1, 17; 11:8, 18, 19; 13:23; 42:6*
**What's** [1]
*21:23*
**Wild** [1]
*23:1*
**wild** [2]
*20:10; 28:10*
**William** [1]
*19:4*
**WILLIAMS** [25]
*4:17, 20; 14:9; 15:13, 17, 21, 23, 25; 16:3; 20:17; 26:4; 32:25; 34:3, 5, 19; 37:3; 48:19, 23; 49:9, 15, 20; 53:4, 9, 25; 54:5*
**Williams** [3]
*15:10; 48:8; 53:2*
**Wilson** [3]
*35:21, 22; 36:6*
**withdrawal** [1]
*37:2*
**withdrawing** [1]
*36:19*
**WITNESS** [2]
*4:19, 22*
**witness** [2]
*3:20; 55:13*
**won't** [1]
*40:16*
**wondered** [1]
*4:13*
**woods** [1]
*23:24*
**word** [3]
*48:24; 49:1, 21*
**Work** [7]
*43:3, 5, 22; 44:3, 10, 14, 20*
**work** [11]
*9:7, 12; 28:5; 30:11, 15; 35:15; 38:13; 44:12; 45:11, 13*
**worked** [4]
*5:7, 8, 20; 39:7*
**workers** [2]
*48:16; 50:10*
**working** [13]
*4:3; 5:2, 3; 6:13; 10:13; 13:7; 17:21; 26:20; 27:2; 28:9; 38:8; 45:4, 8*
**Works** [1]
*9:1*
**works** [2]
*10:7; 52:17*
**writing** [3]
*16:10; 19:1; 36:22*
**wrong** [3]
*31:1, 12; 52:19*
**wrote** [2]
*47:14, 20*
**WSI** [1]
*26:24*

– Y –

**Yeah** [3]
*15:23; 16:1; 34:4*
**year** [3]
*4:1; 34:20; 49:14*
**year-round** [1]
*40:4*
**years** [1]
*47:15*
**Yeaton** [3]
*3:2; 4:21; 49:10*
**yellow** [1]
*13:14*
**you'd** [1]
*4:13*
**you'll** [1]
*50:15*
**You've** [1]
*15:12*
**you've** [1]
*8:5*
**yours** [1]
*25:3*
**yourself** [1]
*6:14*