# DEPOSITION OF DAVID SANDERS - 6/2/06

## HOOKER V. THE UNITED STATES

**Page 1 to Page 47**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*ALICE D. BONI, COURT REPORTER*
*P. O. Box 2474*
*Aiken, SC 29802*
*Phone: 803-648-9434*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY, Plaintiff, vs. THE UNITED STATES, Defendant. | NOS. 03-1501C, 04-1126 |

DEPOSITION OF DAVID SANDERS
taken by Counsel for the Plaintiff
before Alice D. Boni, Certified Court Reporter
at the offices of Department of Energy
151 Corporate Parkway, Aiken, South Carolina
on Thursday, the 1st day of June 2006
commencing at 2:05 p.m.

ALICE D. BONI, COURT REPORTER

Page 2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF: ROBBIE M. NICHOLS, ESQ.
Attorney At Law
Post Office Box 7925
Hilton Head Island, SC 29938

FOR THE DEFENDANT: RICHARD SCHROEDER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, DC 20005

LUCY KNOWLES, ESQ.
Westinghouse Savannah River Site
Post Office Box A
Aiken, South Carolina 29802-0900

- - - - -

INDEX TO EXAMINATIONS


| | Page |
|---|---|
| EXAMINATION BY MS. NICHOLS | 3 |
| EXAMINATION BY MR. SCHROEDER | 44 |
| CERTIFICATE OF COURT REPORTER | 47 |


- - - - -

EXHIBITS

PLAINTIFF'S


| | | |
|---|---|---|
| 10 | BEAVER TRAPPING SITE NUMBERS AND LOCATIONS | 11 |
| 11 | SOIL CONTAMINATION AREAS INDEX (SEMI-ANNUAL) - SGCP/RCO | 40 |


(Continued)

Page 2

- - - - -

Page 3

[IT SHOULD BE NOTED THAT William D. Hooker, John Andrew Cromer, III, Harold Oliver, Brandon Hollingshead, Mark Simpson, Margie Yeaton and Mary-Ellen Noone are also present at the deposition.]

- - - - -

DAVID SANDERS
having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. NICHOLS:

Q. Mr. Sanders, I am Robbie Nichols and I am representing Mr. Hooker in this case. Are you familiar at all with the litigation that's going on?

A. A little.

Q. Okay. Mr. Hooker has sued the Forest Service on a contract, and it's been going on for a long time. And thank you very much for coming today. Most of this that I'm going to do today is just going to be informational because I don't know a lot about what you do. They told me you were available and you'd signed something that came to me in discovery, and so that's why we're here. First of all, can you tell me what your job is at Westinghouse, how long you've been there and what your experience is?

Page 12

requested that the Forest Service provide us with information as to what sites were posted; what beaver sites were posted and which were not. And this is what we got back, and thank you very much. I'd like to go through these with you, if you don't mind.
A. Okay.
Q. First of all, how did you – did you send somebody out and just look, or did you have a list of what was posted and what wasn't posted?
A. I used some folks to – that were at this work site doing similar functions that I do that were there before 1992 to help me generate this document.
Q. Okay, but how did you generate it?
A. By quizzing them. I've also gone out to these sites as well. Most of them; most of the sites.
Q. So is there any sort of master list in your possession, or the Department of Energy's, of all the contaminated sites?
A. There is – we would have RAD-CON survey records of any time we establish a posting, yes.
Q. And what would those records look like?
A. They are called radiation survey log sheets. They have a 75-year retention. And it's something that anytime my RAD-CON inspector performs any type of survey, they document a survey.

Page 13

Q. Okay, so these are –
A. This is part of their daily function, to document any findings or readings.
Q. So did you have occasion to go back to those to identify these sites?
A. I used documents that were produced from the original investigation that said that these sites were posted in 1999 based on these surveys. So I used that and the knowledge of the folks that were there prior to me, or prior to 1992.
Q. Okay. But my question was is there a master list of all the contaminated postings?
A. Yes.
Q. On the Site?
A. A master list?
Q. Yes.
A. I'm not sure a master list, but there is a list.
Q. There is a list?
A. Well, let me say there are surveys that support whether a site has been posted or not. As far as a list, a one-page list, or two-page list, not to my knowledge.
Q. Okay.
A. And I'm speaking for every area on Site that has ever been posted, not for certain –

Page 14

Q. Right. Right. With anything?
A. Right.
Q. With anything.
A. Right.
Q. Is it possible that there could be areas on the Site that have never been surveyed and, therefore, are not posted that could be contaminated?
MR. SCHROEDER: Objection to form. Calls for speculation.
Q. [Ms. Nichols] You can answer.
A. There are places that are potentially above levels that have residual contamination on them that we haven't identified. When you speak in terms of contamination, it may not – has a different meaning to me as far as contamination.
Q. Well, that brings up a point. When we're talking about contamination, what determines? Is it a high level of tritium that causes – that would cause you to identify a site as contaminated?
A. We look at all the radionuclides and we have concentrations for all of them that would prescribe when an area would be considered contaminated. As far as – what I have done, all the outfall areas from all the facilities, streams, creeks, I have reviewed the data that has been pulled in most of these and we have –

Page 15

they're well characterized. I mean we have lots of sampling data points up and down these streams, and I have reviewed those. None of those levels would trigger posting a contamination area.
Q. Where are you referring to when you say that?
A. Any outfalls or streams below, that feed out of any process facilities. I'm speaking all the streams throughout the Site. And specifically where I'm speaking is all the – adjacent to, or at the beaver sites. I reviewed all the data during that time period and there are no levels that would require me to put up a contamination area posting.
Q. Okay, but you're talking about Four Mile Creek?
A. Yes.
Q. You're saying –
A. That I don't already have identified, that I don't already have –
Q. – that you don't already have identified?
A. – posted as a contamination area. Because we were speaking about what areas do I not have posted. Okay?
Q. Okay. I understand. There's nothing that would lead you to investigate to put up more?
A. Right.
Q. You think everything else is –

Page 20

streams that we had may not have had RAD postings, but a lot of them had the "Keep out," the process water signs.
Q. Okay.
A. The "Low levels not posted," like I said before, there are streams that lead out of these facilities that have low levels of contamination, may not require – most of them do not require a contamination posting. But there are low levels of – we do understand there are low levels of activity.
Q. Okay. No one is discharging anymore, are they? Or are they still –
A. Not to the best of my knowledge. Our reactors do not operate, so to the best of my knowledge, no.
Q. You would know that, if they were, would you not?
A. We would know if there were any spills or anything to alert us that the activity levels would change in those streams. Yes, we should know that. Facilities have certain levels that they release to and I can't speak to that.
Q. Okay, if you look on the next page, and this site number 25, and I think y'all circled these that were posted.
A. Right.
Q. The HP monitor station number 52, can you tell

Page 21

me what that is?
A. That is an area right outside of H-Tank Farm. It's a discharge right out of H-Tank Farm.
Q. And what is that posted with?
A. Currently?
Q. Um-hum [yes].
A. Currently, it is posted as ERMA [phonetic] SCA, and a – maybe an active contamination area. Yeah, contamination area.
Q. Was it always posted?
A. To the best of my knowledge, the information I was given, it was posted with the old radiological controlled area postings prior to 1992. The area that we have currently posted. Now, I'm not speaking of the stream where the beaver site would be, in fact. That is not posted as a CA or SCA – or, excuse me, that is posted SCA, but not as a CA.
Q. You said it's posted as an SCA, but not a CA?
A. Well, there is an area adjacent to the stream that is posted as a contamination area. The stream, itself, is posted as an SCA, soil contamination area.
Q. Okay. And what would the difference in the signage be between a CA – would there be a signage for CA, or just for the SCA?
A. There is – it has two different meanings. SCA

Page 22

and CA is totally two different signs.
Q. And what would the CA indicate?
A. CA would indicate that you need some type of protective equipment before you can enter. It would have a boundary all the way around it to prevent inadvertent entry. Like basically a road around it.
Q. Does that now exist at that site?
A. Yes. At – at the location adjacent to the stream.
Q. Would you know if that was the case in 1999, in the summer?
A. I was told, in 1999, it had a posting around it and it was the RCA – whoa, whoa, back up. You said what time frame? I'm sorry, I was speaking prior to 1992.
Q. Okay, summer of 1999.
A. I'm not sure without reviewing some data what the exact date was when we transitioned over.
Q. Okay. But your response was that when it was posted in 1992, it was roped off?
A. That's what I was told, yes, that it was roped off as a RCA, radiologically –
Q. As an RCA in '92. And did that –
A. Prior to. Prior to 1992.
Q. Did that continue throughout the years?
A. To the best of my knowledge, it has always been

Page 23

posted, this area of concern, yes.
Q. To your best recollection, was it re-posted sometime in September of 1999?
A. I can't recall without looking at the records. I could go back and look at the records, but off the top of my head – I know we did some activities out there, but like I say, this is an area adjacent to the beaver site, not a beaver site, but that there was actual work scope to go in there and do some more intrusive sampling in that location and I know it prompted a posting. That's what prompted the posting of the contamination area, but I do not know the exact date.
Q. Okay. Let's look at site number 29, Indian Grave Branch. Where is that?
A. That is where the outfall from K-Area comes out. It's close to Road B.
Q. And site 30 would be the F-Area?
A. Four Mile Branch?
Q. No, I'm sorry. No, it has H-Area, doesn't it?
A. Right.
Q. Does Four Mile Creek run past H and F? Here, let's get one of these.
A. Four Mile Branch comes out of HP-52, or down through.
Q. So it would be – would you just kind of look

Page 24

at that and just tell me where that comes from? This would be –
A. I don't know, this is not a very good map.
Q. No, it isn't. It was better in color. Let's look at one of these.
MR. SCHROEDER: Are you going to mark this as an exhibit?
MS. NICHOLS: Maybe. We just need to get a little help right now. Actually, you have all these.
MR. HOOKER: Should be H-Area up in here.
MS. NICHOLS: Is that H?
MR. HOOKER: See Four Mile coming up right here?
MS. NICHOLS: So, this would be F, would it not be? Isn't F and H right there?
MR. HOOKER: That's the burial ground, this is F-Area and this is H-Area.
MR. SCHROEDER: I'm going to object to form and also note that Mr. Hooker was speaking. Do you want to go off the record?
MS. NICHOLS: Yeah, could we go off the record?
[OFF THE RECORD]
Q. [Ms. Nichols] So the Four Mile Branch below H-Area on Power Line would be the outfall from H, right? H-Area?

Page 25

A. I'm not sure if you would technically say it's the outfall. The outfall feeds into Four Mile.
Q. Okay. And 32 – and do you just know offhand what that's posted as, site 30? Would all these be –
A. Site 30 – most of site 30 is posted as a SCA, soil contamination area. A good portion of it.
Q. Okay. And 29, Indian Grave, would that be also SCA?
A. No.
Q. No? What would that be?
A. That is not posted as – can I see that map again?
Q. Um-hum [yes].
A. That was posted with the process signs, but we do not have it posted as an SCA.
Q. Okay, so that would just be the water signs?
A. Yes.
Q. Okay. Okay, look at site 32 where Indian Grave and K Canal meet. Would that be the same answer for that one?
A. Yes.
Q. And –
A. The same answer as for the process signs.
Q. Right. Okay. What about site 34? Do you know where that is, or was, or what it was? Well, it doesn't

Page 26

matter if it's no longer a trapping site. Mr. Hooker says it was a helicopter pad. Site 35, the C-Area outfall, and that is posted. What is that posted as again?
A. That's posted with the process sign.
Q. Okay, that's the water.
A. No RAD sign.
Q. And 36, P-Area outfall?
A. Has the process signs and, down the stream, it has an SCA posted, soil contamination area posted.
Q. Okay.
A. Would it help if I explained the difference between a SCA posting and a CA posting?
Q. Yes, it would.
A. Okay, soil contamination postings are established based on exposure. They're based on 100 millirems. So basically SCA postings are for exposure control. Contamination area postings are established for contamination control. In other words, we don't want personnel to spread contamination or contaminate themselves. Contamination areas would require PPE, some type of protective equipment and a physical boundary. An SCA posting is there to alert the worker that he needs to notify us so we can do an evaluation to make sure that he's not going to be exposed to more than 100 millirems.

Page 27

Now, those concentration levels are determined by an individual staying in that location, wherever those concentrations are, for 2,000 hours. Very conservative. And that's how we establish an SCA. I just wanted to make sure you understood we establish SCAs for exposure. It gives us an opportunity to understand what the individual is doing and to determine whether we need to monitor. In other words, whether we need to put a TLD on the person versus contamination requires us to put them in protective equipment.
Q. Thank you. And I do understand that.
A. Okay. Well, I wanted to make sure that you –
Q. Sure. As long as you brought it up, what is required of a – as far as protection of a worker who is working in an SCA in work that disturbs the soil?
A. Nothing. There's no requirement unless you exceed 10 CFR 835, Appendix D, which is for contamination levels.
Q. I don't have it with me, but would it surprise you that Westinghouse has a –
A. Now, we, RAD-CON, can prescribe protective equipment. And that's based on whatever knowledge they have of the area for working in a SCA. If they choose to do so, they have that authority. And that's in 5-Q as

Page 28

well. Must do it if it's over the CA table levels, or if RAD-CON says you must do it. But there's no requirement that says we have to – that you have to wear protective equipment to –

Q. When you say there's no requirement, you mean by your determination, or –

A. Regulatory determination.

Q. Regulatory determination?

A. Right.

Q. Why would Westinghouse require that, then?

A. Some people take a more conservative approach than others. It's just personal preference.

Q. So, let me make sure I understand it. Westinghouse puts out material that says a worker must be RAD-2 certified to work in work that disturbs the soil in an SCA, and you're telling me that is not the case?

A. I'm telling you the requirement for – repeat that question again and let me make sure I understand it. Repeat it.

Q. Okay.

MS. NICHOLS: Can we go off the record?

[OFF THE RECORD]

Q. [Ms. Nichols] Okay, Mr. Sanders, you were just telling me that the – and correct me if I'm wrong, but I think you said that working in an SCA in work that

Page 29

disturbs the soil, it was discretionary as to whether – as to what your – okay, I'm going to ask you to look at what was entered as Plaintiff's Exhibit Number 3 in the last round of depositions. And I believe this is a publication by Westinghouse, and you probably actually wrote this.

MR. SCHROEDER: Is there another page here to that exhibit?

MS. NICHOLS: Yes.

Q. [Ms. Nichols] Are you familiar with this document?

A. This document appears to be RAD-worker – out of a RAD-worker training document. It does not appear to be a document that governs RAD-CON, or directs RAD-CON activities or protocols.

I also believe that RAD-worker training has a clause in it that it may be that conditions in – within the facility may be different than what we teach in RAD-worker training due to the fact that these are not the governing documents that dictate how we perform our work.

Currently, for – RAD-worker training is not required to enter into a soil contamination area. I believe it no longer says to perform work that disturbs soil. I believe the correct terminology is excavating in a SCA, or where a person could receive over 100 millirem.

Page 30

So I don't think this is the most current information on how we prescribe the requirements today.

Q. Okay. Actually, we're talking about 1999, and what is the date on that?

A. 1998.

Q. So today, in 2006, you would have a different policy?

A. Again, any policies that we have are driven from 10 CFR 835 or 5-Q. 5-Q has a table, 2-2; it's chapter two, table 2-2. 835 has Appendix D. The language in both of them, if a person is going to handle or in areas where the contamination levels are above those levels in those tables, they're required to have protective equipment. Those are the requirements.

Q. Okay.

A. Now, we may have taken administrative controls or policies or whatever to say we're going to prescribe it at lower levels, but as far as required, no, it's not required. And to the best of my knowledge, it has never been required.

Q. Well, why would Westinghouse – you're saying that that looks like something that you would use in training for RAD-worker training?

A. Yes. That's what it appears to me, yes.

Q. And do you do that training?

Page 31

A. No, I do not.

Q. Does your department do that training?

A. That group is currently in our department. I'm not sure during that time that it was under the RAD-CON department. It is regulatory training, is what that department is.

Q. Okay. Well, just tell me what would be the difference between a RAD-worker-1 and -2.

A. The different in RAD-1 and RAD-2, RAD-2 workers are trained to dress out and wear protective equipment, the standard one pair of PCs. That's the major difference.

Q. Okay. So you would – are you disputing that that policy from Westinghouse, this training manual, was actually the policy that governed in 1999?

A. I would have to specifically go back to what our manual said in 1998 to be able to clarify that, but as I said, I don't believe 5-Q and 835 has changed. I think it was the same then as it is now. I think we got the guidance from those two documents, I think – I believe it was 1992.

Q. Are these – the citation you gave me, what is this from? Federal Regulations?

A. 10 CFR 835 is the Code of Federal Regulations for RAD-CON.

Page 32

Q. 835?
A. Right. And it's Appendix D. And mainly what it talks about is the contamination levels.
Q. Okay. So if I could just beat a dead horse here. So even though this training materials that were effective February 23, 1998 say that RW-2 training is required to perform work that disturbs the soil in this area, you are disputing that that is the case, is that correct?
A. I believe that the correct terminology is – I believe the correct terminology is where – working in a soil contamination where you could exceed 100 millirem. I think that's the correct terminology.
Q. Okay. Just for point of accuracy here, would you say that the signs displayed on page three of this document are accurate? You're referring to –
A. They're not all inclusive, but they – that's standard. You can tell it's cut off.
Q. Right. What department in Westinghouse would have been responsible for creating this document?
A. This would be RAD-worker training department's regulatory training.
Q. And if you remember back in 1998, would that have had any connection with your office at all?
A. Yes, I'm sure – I'm sure there was some

Page 33

connection, and I can't speak to why the language may be different, or maybe the language was the same. I can't speak to that. I don't have – I don't have anything to compare it to.
Q. Okay. All right, fine. And we're not marking that because it's already been put in, so that's fine. Let's go back to the list of posted areas that you provided to us. And I think we'd gotten through – site 35 and 36 were process signs. You said 36 was also posted as SCA. Site 40 is marked as posted. Would you agree that site 40 would be the same site as – we talked about HP 52 somewhere, did we not?
A. 25.
Q. 25? So are sites 25 and 40 the same, or are they just close in proximity?
A. I don't know. I think they're close in proximity.
Q. Okay. And so the same answer would apply to 40 as 25? It says old RCA prior –
A. Old RCA sign prior to 1992.
Q. Prior to 1992. Site 43, behind the motor pool, what is that posted as?
A. That is posted as a RCRA CERCLA site.
Q. Tell me what that means.
A. I don't know.

Page 34

Q. You don't know what CERCLA is?
A. That's not inside of RAD-CON business. That is regulatory business. They do business totally different than RAD protection.
Q. Okay, site 44, Four Mile Creek at Road C. What is that posted as?
A. Four Mile Creek at Road C –
Q. Site 44.
A. There is no RAD posting at that site to the best of my knowledge. Over to the side, I have a note over here, "Sign at the road, contaminated stream, keep out," not a RAD sign.
Q. Okay, who would have put that sign there?
A. I don't know.
Q. It would not have been your department?
A. [Indicates negatively].
Q. What would be your opinion if it said "Contaminated stream, keep out"?
A. What would be my opinion?
Q. Yeah.
A. I would keep out.
Q. What would be your opinion as to what contamination was in there?
MR. SCHROEDER: Objection. Calls for speculation.

Page 35

Q. [Ms. Nichols] You can answer.
A. My opinion would be that the CERCLA RCRA guys would have posted it based on some information they have. Their requirements are different than ours and I don't know them to speak to them, so.
Q. You don't have any cooperation between the two?
A. Nothing other than reviewing data from the same data base, but as far as we – we have no ties.
Q. Are they Department of Energy people, or –
A. I think it's a combination of Department of Energy, EPA, Westinghouse, Bechtel. It's a few groups.
Q. Okay, and the same, site 45, H-Area, again, I cannot read that.
A. "Process posting." It says, "Non-RAD at the beaver dam."
Q. Non-RAD. By non-RAD, what do you mean?
A. In other words, it didn't require us to put a RAD posting there.
Q. Okay. Okay, and then we've got – the next page, we've got site 47, Timms Branch. What is that posted as?
A. Timms Branch is posted as an SCA.
Q. I guess the last one here would be site 53, and what is that posted as?
A. Road Four – I think that's Four Mile, as well.

Page 36

That's posted as a SCA, as well.
Q. Who is responsible for maintaining the signage on the Savannah River Site? If it's posted, who is responsible for maintaining that?
A. RAD-CON organization for RAD-CON signs.
Q. And how is that done? Do you have people checking to make sure they're still in good condition?
A. We have – yes, we have regulatory requirements that say on a certain frequency we have to inspect, survey the area, make sure the perimeter is still intact.
Q. Is that done, to your knowledge?
A. Yes.
Q. Would it surprise you to know that in 1999, in that summer, there were areas where the signs were overgrown or laying on the ground?
MR. SCHROEDER: Objection. Calls for speculation and assumes facts not in evidence.
Q. [Ms. Nichols] I'll ask it a different way. Do you know if there were overgrown – signs that were obliterated by foliage during that time period?
A. During that time period, I do not know. However, it could be possible, yeah.
Q. You were not in charge in 1999, were you?
A. No.
Q. Okay, I'm going to show you Exhibit Plaintiff's

Page 37

Number 1 from the last round of depositions. And this is a Work Clearance Permit on – for work at site 53, which are you familiar with this document at all?
A. Yes. Yes.
Q. Okay. Why would that have – do you know what generated that, or what would normally generate a Work Clearance Permit of that type?
A. Typically, any type of work on Site generates some type of work approval or work clearance.
Q. Well, that particular Work Clearance Permit requires the contractor to be RAD-2 certified, correct?
A. I'm trying to make – that's what it appears to be, yes.
Q. And your testimony is that that site was posted as a soil contaminated area?
A. Yes, that is correct.
Q. Why, in your experience, would a Work Clearance Permit be generated for that particular site when other sites were posted as well and did not require that?
MR. SCHROEDER: Objection. Assumes facts not in evidence.
MS. NICHOLS: Well, we can go back and ask if he required Work Clearance Permits for every other site, but I think that's already in evidence.
A. Like I said before, for entering or performing

Page 38

work in a SCA, it is up to RAD-CON's discretion whether or not they require some type of PPE monitoring or whatever. As I said before, if you're RAD-2 trained, you can wear RAD PPE. That was the requirement for putting RAD-2. It can either be above the contamination area levels, as I said in Table 2-2, Appendix D, or at RAD-CON's discretion. RAD-CON may have had a reason to believe that whatever activity that they were doing here needed some type of PPE, I'm not sure.
Q. Okay. Can I see it just one minute? Did your office, or did your department monitor any of the beaver trappers ever?
A. I'm not sure. I can tell you the current beaver trapper is not being monitored.
Q. The current beaver trapper, would that be Jim Seigler?
A. No.
Q. Someone else doing the trapping?
A. I'm not sure of the individual's name, but that name doesn't ring a bell. But to my knowledge, we're not requiring any monitoring of the individual that's currently doing it.
Q. Were the beaver trappers ever monitored?
A. I'm not sure. I can say that Mr. Hooker was monitored most of the time by TLD, by whole body counts,

Page 39

from '92 to '99. I can say that.
Q. Well, because –
A. His exposure –
Q. – he works for Westinghouse.
A. His exposure was monitored. Yes.
Q. Because he worked for Westinghouse?
A. Sure.
Q. But it had nothing to do with his contracting?
A. Sure. Sure, but he was monitored.
Q. Were the rest of his employees monitored?
A. I'm not sure.
Q. So your testimony is that the current beaver trapper, whoever that may be, is not monitored?
A. To the best of my knowledge, he is not monitored.
Q. Are the hog contractors monitored?
A. To the best of my knowledge, no.
Q. Okay, I'm going to show you what will be marked as Plaintiff's whatever. Well, it's going to be –
[OFF THE RECORD]
MR. SCHROEDER: So, we'll remark Plaintiff's Exhibit 1 from today –
MS. NICHOLS: From today would be 10.
MR. SCHROEDER: Okay.
MS. NICHOLS: And this one, which would

Page 40

normally be Number 2, is going to be Number 11.
Q. [Ms. Nichols] Okay, Mr. Sanders, do you recognize that document?
A. Yes.
Q. Was that prepared by your department?
A. Yes.
Q. Okay.
MS. NICHOLS: Okay, could we mark that then?
[PLAINTIFF'S EXHIBIT 11 IS MARKED FOR IDENTIFICATION]
Q. [Ms. Nichols] And again, this was provided to us through discovery requests, and could you just tell me what this is and how often it's produced, and tell me about it?
A. This is a list of the contamination areas that we currently have within our group. You have the area, facility, building, location. What we do is the inspectors, whenever they survey these areas, they'll put the survey date information and then you need the identifying number for the survey. And this will be completed at the end of the year and goes into records.
Q. So the survey number would go after the 06-SG?
A. Right. Right.
Q. And it's required by Federal Regulations that you provide this?
A. This document here?

Page 41

Q. Um-hum [yes].
A. No.
Q. Or this information?
A. The surveys are required, but not this document here, is not required. This is how we keep track of what's required by the Regulation to go and update and maintain these areas.
Q. And what determines what location is going to get on this list?
A. Anytime an area is established, it'll go onto this list.
Q. Are they listed here in order of importance, or contamination, or is it –
A. It appears to be alphabetical.
Q. Alphabetical? Okay. I don't think we talked about Steed Pond when we were talking about trapping areas, but can you tell me what the contamination – is it – it's all soil contamination at Steed Pond. Is that within the pond, or around the pond?
A. We have six areas that are contamination areas that have boundaries around them on the dry pond. Not in the stream, not at the beaver site location.
Q. Has the beaver site location ever been posted?
A. The beaver site location is posted as a SCA. Matter of fact, it was posted in 1997.

Page 42

Q. Is that on our list?
A. Yes. Number 19.
Q. And that's the trapping location?
A. The area that we have posted as an SCA, not the CAs.
Q. So the pond, itself, is a CA?
A. No, not the – the entire pond. We have – we have – and I – what you have, there's a pond above the culvert that comes in. We have it posted. That was to site 19. The stream comes down towards – well, it goes into the stream, Timms Branch, and you have, like, a dry pond over to the left. The dry pond, not in the streams, has four areas where we've gone in and done some work, and they've excavated down to a certain level. We've identified levels that would require posting as a contamination area.
Q. Not an SCA, a CA?
A. Right. Six small areas.
Q. Would you then –
A. Not at the beaver site.
Q. Not at the beaver site. Would you remove the soil, then, in that case?
A. Would we? No, we haven't removed the soil.
Q. What is the policy then? It's just – because I'm interested. If it is contaminated, you said earlier

Page 43

that a lot of the contaminated soil is removed.
A. If it is – it goes back to these regulatory guides to figure out whether it becomes a waste unit. If it becomes a waste unit, they do whatever they do. Then it becomes remediated if it's at whatever risk level required for these guys.
But the isotope of concern in Steed Pond is depleted uranium. The six CAs that we have currently posted, we could very easily go out there right now and de-post them because they're not required per 835 and 5-
Q. Because we understand what the isotope of concern is now. We took a conservative approach because we didn't understand at the time that the isotope we were dealing with was uranium. So, we really – sometime in the future, it will not be a CA anymore based on the isotope of depleted uranium. The values are a lot less conservative for uranium versus plutonium.
Q. Are they?
A. Yes.
Q. I thought they lasted forever.
A. They do, but I guess – no, I'm not going to guess.
Q. I'm not going to take you through all this because we've talked a lot – about this a lot, but are these – on this list that you have created, are these

Page 44

the only areas where there are soil contamination areas? Is that the total, totality of the areas?

A. Those are the areas that we have identified as soil contamination areas.

Q. That you have identified as soil contamination?

A. Yes.

Q. Okay. And just for the record, what does SGCP mean on the top?

A. Soil and groundwater completion projects organization. That's our organization.

Q. And RCO is?

A. RAD-CON.

Q. RAD-CON.

MS. NICHOLS: Could we take just about ten minutes?

MR. SCHROEDER: Sure.

MS. NICHOLS: I think I'm done.

[OFF THE RECORD]

MS. NICHOLS: Thank you. I'm finished.

-----

EXAMINATION

BY MR. SCHROEDER:

Q. I just had one question, please, regarding Plaintiff's Exhibit 1, if you have that. It's this Plaintiff's Exhibit 1.

Page 45

A. No, I do not. I do not have that.

MR. SCHROEDER: Could we borrow that for a minute?

MS. NICHOLS: Yes.

Q. [Mr. Schroeder] There's a couple of stars on the left. The second one says, "Note, person entering."

Do you see that sentence?

A. Um-hum [yes].

Q. Would you please read that sentence?

A. "Person entering creek is RAD-2 qualified and a subcontractor to the Savannah River Institute. After entering the creek, RAD-CON OPS will survey protective equipment, waders, gloves, et cetera."

Q. So that doesn't say that the person is required to be RAD-qualified, does it? It just says a person is RAD-2 qualified?

A. "Person entering creek is RAD-2 qualified and a subcontractor to the SR Savannah River Institute." To me, it reads that this particular person is RAD-2 qualified and a subcontractor of Savannah River Institute. That's what it tells me.

Q. So it's a statement of a fact about an individual?

A. And it says, "After entering, we will survey the protective equipment; waders, gloves, et cetera."

Page 46

Now, one other additional item to add to that is out of all these creeks and streams and so forth, we have never had a person's equipment contaminated coming out of these creeks and streams.

Q. So just to answer my question, that does not say that a person is required to be RAD-2 qualified, correct?

A. I do not read it like that, the way it's written here, no.

Q. Thank you.

A. One other clarification on this that I feel necessary is this is authorized for a certain duration. This is not for any time any person goes into this location. This is authorized for certain times for a certain time period. So this is task and time.

Q. Thank you. Nothing further.

MS. NICHOLS: Thank you.

[DEPOSITION ADJOURNED AT 3:45 P.M.]

Page 47

CERTIFICATE

SOUTH CAROLINA

AIKEN COUNTY

I hereby certify that the foregoing deposition was reported, as stated in the caption, by the method of Stenomask and speech recognition, with backup, and the questions and the answers thereto were reduced to typewriting by me or under my direction; that the foregoing pages 1 through 46 represent a true, correct, and complete transcript of the evidence given on the 1st day of June 2006, by the witness, DAVID SANDERS, who was first duly sworn by me; that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I financially interested in the action.

This, the 5th day of June 2006.

ALICE D. BONI, CVR
CERTIFIED COURT REPORTER
NSVRA CERTIFIED