# DEPOSITION OF WILLIAM D. HOOKER - 6/2/06

## HOOKER V. THE UNITED STATES

**Page 1 to Page 46**

9

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*ALICE D. BONI, COURT REPORTER*
*P. O. Box 2474*
*Aiken, SC 29802*
*Phone: 803-648-9434*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WILLIAM D. HOOKER, d/b/a )
GEORGIA BOWHUNTERS SUPPLY, )
)
Plaintiff, )
)
)
vs. ) NOS. 03-1501C, 04-1126
)
)
THE UNITED STATES, )
)
Defendant. )

DEPOSITION OF WILLIAM D. HOOKER
taken by Counsel for the Defendant
before Alice D. Boni, Certified Court Reporter
at the offices of Department of Energy
151 Corporate Parkway, Aiken, South Carolina
on Friday, the 2nd day of June 2006
commencing at 9:20 a.m.

ALICE D. BONI, COURT REPORTER

Page 2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF: ROBBIE M. NICHOLS, ESQ.
Attorney At Law
Post Office Box 7925
Hilton Head Island, SC 29938

FOR THE DEFENDANT: RICHARD SCHROEDER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, DC 20005

LUCY KNOWLES, ESQ.
Westinghouse Savannah River Site
Post Office Box A
Aiken, South Carolina 29802-0900

- - - - -

INDEX TO EXAMINATIONS


| | Page |
|---|---|
| EXAMINATION BY MR. SCHROEDER | 3 |
| CERTIFICATE OF COURT REPORTER | 46 |


- - - - -

EXHIBITS


| DEFENDANT'S | | |
|---|---|---|
| 3 | FIRST AMENDED COMPLAINT | 9 |
| 4 | PLAINTIFF'S RESPONSE TO DEFENDANT'S PARTIAL MOTION TO DISMISS | 28 |
| 5 | COMPLAINT FILED 7/7/04 | 35 |


(Continued) Page 2

- - - - -

Page 3

[IT SHOULD BE NOTED THAT Harold Oliver, Brandon Hollingshead, Mark Simpson, Margie Yeaton, Mary-Ellen Noone and Pat Thompson are also present at the deposition.]

- - - - -

WILLIAM D. HOOKER
having been first duly sworn, was examined
and testified as follows:

EXAMINATION

BY MR. SCHROEDER:

Q. Good morning, Mr. Hooker.

A. Morning.

Q. Before we start, I'll set a few ground rules. If I ask you a question and you don't understand it, please let me know and I'll rephrase it. If you need a break at any time, just let me know and, once we finish the question we're in, you can take a break. If I ask you a question, you're required to answer it unless your counsel objects, at which point you should stop your answer. Counsel and I will resolve the issue and then, you know, you'll either answer it or we'll make other arrangements. Do you understand these rules?

A. Yes, sir.

Q. Are you on any medication or anything similar that would impair your ability to answer truthfully the

Page 8

Shops and they do – lower it into the tanks and we'd fit them up. Pipefitters, you know, fit pipe.
Q. And what year did you work in the tank farm? Or years?
A. I worked in there different times. Early '80s and the last part of my employment with Westinghouse.
Q. Did you use the – and correct me if I say this wrong, dosimeter?
A. Dosimeters were used whenever we were inside fenced-in areas. We also wore TLD badges.
Q. And what does that stand for? TLD?
A. Thermal unit or some dosimetry or something.
Q. When you wore that, and you wore that at the tank farm when you were working?
A. The only time I wore them was in F-Area, 100-R reactor, 3 and 700 Area. I worked in DWPF. For eight years, I did not wear a TW.
Q. Was there a limit to the RAD exposure that you could have in any given year?
A. I think it's 750 a quarter.
Q. A quarter; okay. And that means three months?
A. Every three months. A lot of times what they would do is, if we were doing hot jobs, they would do a – would wait right there at the end of the quarter and we'd let the guys get 750 right there, and then, Monday

Page 9

morning, it would be another quarter and we could give them another 750.
Q. Okay. Is that 750 million?
A. Milirems.
Q. Milirems. I want to just show you a document.
MR. SCHROEDER: Could I get this marked, please? Do you know what number we're at. This is 3? Please mark that as Defendant's 3.
[DEFENDANT'S EXHIBIT 3 IS MARKED FOR IDENTIFICATION]
Q. [Mr. Schroeder] Please look at what has been marked as Defendant's Exhibit 3. Do you recognize that document?
A. Do you know what that top line says right there?
Q. Yeah, it's – if you'll look on page three, that's – we deal with electronic filing in the Court of Federal Claims so that it gets that kind of a stamp on it when it gets filed, so if you want to print it off the Internet, that's how it prints.
A. Yes, sir.
Q. And what is that document, please?
A. William D. Hooker doing business as Georgia Bowhunters Supply, Plaintiff, versus The United States, Defendant.
Q. Now, is that your first amended complaint in

Page 10

Case Number 03-1501C?
A. Yes, sir.
Q. And would you please look at paragraph eight on page two, and would you please read that into the record?
A. "The general specifications for this contract specifically stated that no toxicological hazards are associated with trapping beavers at SRS. However, normal environmental and physical hazards such as snakes and uncertain footing do exist. No specific statement was made involving the culvert cleaning."
Q. And so do you consider that to be correct, that statement?
A. No, sir.
Q. That's not a true statement?
A. It's true to what my contract said, but I know that's not the truth out there right now.
Q. Okay, I'm sorry, do you – yeah, that's what I meant, was is that what the contract stated?
A. That's what my beaver contact stated.
Q. Okay. Would you please state what toxicological hazards you encountered or were exposed to during performance of this contract?
A. Okay, what particular contract are we talking about?
Q. Well, this is the beaver contract, I believe,

Page 11

but – so, first, if you could start with the beaver contract.
A. Okay. The beaver contract started February 10th, 1992, and to my knowledge, it was – everything was – no toxicological hazard. We had actually – Andy had actually asked Homer was anything in the water that we needed to worry about, and he said, "Just don't drink two liters of the water."
Q. Okay, but what I'm asking is what toxicological hazards did you encounter?
A. At my time – at the time, I did not know about the tritium as being released from 100-K on December 24th, 1991. I think it was something like 6,000 curies was actually dumped into Indian Grave and Pen Branch. I didn't know about that. I did not know about all the heavy metals that were identified in 1989 by a group called CRESP, which makes up the CERCLA and RCRA, or the superfund site. I had no knowledge of any of that kind of stuff, that Savannah River Plant had become a superfund in 1989. I didn't know about the 519 hazardous waste sites on the Plant that had been identified by the EPA and CRESP. I had no knowledge of none of that type stuff. Just like Mr. Sanders yesterday said he didn't know what CERCLA was, or that RCRA, I had no knowledge of that type stuff either.

Page 24

me, she'd spread them out, you know, where they were miles apart. You know, the ones that was like, I think, Dunbarton, Youman Road. I'd have to look at the map to know the other two, but they were out, way out. Bridges being out. They were doing bridge work at the time. I'd have to go way out of the way to trap in these locations, you know.

Q. Let's move on, then. Do you still have that document? Please look at paragraph 21. Just read that to yourself, please. I know it's a little hard to read at the top.

A. I can't read the top on mine.

Q. Well, can you see where it says, on the top line, the last word, USFS?

A. I see that.

Q. That's the United States Forest Service, correct?

A. [Indicates affirmatively].

Q. You have to answer. You can't nod; you have to say yes or no so the court reporter can pick it up.

A. I see U.S. Forestry Service should have reformed the contract terms to compensate Hooker for additional expenses, but instead refused to compensate.

Q. Okay. Well, that's what I was going to ask you to read; thank you. What additional expense are you

Page 25

referring to?

A. For doing the work in HP-52.

Q. Okay, but you say additional expense and I'd like to know specifically what expenses.

A. Well, when I bid these contracts, I bid them as – just like we was working in this room, clean. If you're doing radiation contamination type work, you're going to have to have a stand-by person, you have protective equipment. You've got to have health protection people there.

Q. And so what you're saying is that the additional expense is all those kinds of things that you just mentioned?

A. I mean I didn't work by the hour. These people work by the hour. They go to work at 8:00 and my contract said 24 hours a day, seven days a week, and –

Q. Well, what's the additional expense. I mean this is your complaint and that's a statement in your complaint against the Government. What is the additional expense?

A. Being on a time schedule. I don't – I don't – I got paid by the head. I did not get paid to be there at 8:00 in the morning.

Q. All right, so are you saying that you had to have additional equipment, or something like that, or –

Page 26

A. Yes, you have to have protective – who's going to buy the plastic suits, or -

Q. Did you have those? Did you go out and buy those?

A. No, sir. No, sir.

Q. So, are you – that's what I'm trying to understand. If you didn't buy it, then how can you bill the Government for it? I mean, that's not additional expense you had, it's one that you think you should have had, correct?

A. You should have protective clothes. I shouldn't have been wearing the same clothes that I take home to my wife to let her wash and somebody's dumped

48

tons of depleted uranium, or uranium in Timms Branch and these beaver ponds.

Q. Okay, but the question I'm having is what the – you know, if you didn't buy the protective clothes, then you can't – you know, regardless of what other issues you might have, you can't bill the Government for clothes that you didn't buy, right?

A. Why not?

Q. Because you didn't buy it. You think the Government should –

A. I should have had them. Are you saying I shouldn't have had protective clothing?

Page 27

Q. No, what I'm saying is – well, you have the complaint here in which you're saying that you incurred additional expenses. You know, if you had a car and then it turned out that, you know, the road was bumpy and you needed a truck, but you never went to – you never bought the truck, do you think you can sue the Government to buy you a truck now even though you never used the truck?

A. No.

Q. Okay, so that's what I'm saying, those kind of expenses.

A. My contract said normal environment, and –

Q. But what I'm trying to do is, you have a specific item in your complaint for which you're seeking money damages –

A. Yes, sir, for the dogs –

Q. – additional expenses, and I want to – what I want you to list me now is what additional expenses so that we know what you're talking about and then, you know, can defend this case.

MS. NICHOLS: Can we go off the record just a minute?

MR. SCHROEDER: Sure.

[OFF THE RECORD]

Q. [Mr. Schroeder] I'll try to get through this quickly. What other additional expenses? What

Page 28

additional expenses are you claiming, or were you claiming?

A. For doing the RAD-worker work?

Q. Well, for doing – you know, what were you referring to in paragraph 21 of your first amended complaint?

A. Well, I can't answer that right now.

Q. I want to hand you another document. Just take a look at this.

MR. SCHROEDER: Would you please mark that?

DEFENDANT'S EXHIBIT 4 IS MARKED FOR IDENTIFICATION]

Q. [Mr. Schroeder] What's the exhibit number on that? Four?

A. D-4.

Q. Just briefly look at that and let me know if you recognize that document, please.

MS. NICHOLS: I'm going to object because Mr. Hooker has never seen this as far as I know.

A. I haven't seen this.

Q. [Mr. Schroeder] What is the document – what is it titled?

A. "Plaintiff's Response to Defendant's Partial Motion to Dismiss."

Q. And what's the date on it, please?

A. February 5th, 2005.

Page 29

Q. Would you please turn to page seven of that document? Have you ever seen that document before?

A. I don't believe I have.

Q. Okay. In any event, turn to page seven.

MR. SCHROEDER: Before we get into this, let's just take a short break, if we could.

[OFF THE RECORD]

Q. [Mr. Schroeder] If you please look at page seven. Do you see where it says, in the middle of the page, "So if Hooker had seen the correct language and requirements in the proposal for bids, he would have increased his price per hour, as well as price per beaver, to account for the increased risk and cost of protective clothing and extra training"?

A. Yes.

Q. I mean, you know, first of all, is that – I mean part of the increased costs for protective clothing and extra training, is that no longer part of this case? Is that my understanding?

A. If I – I mean, this is the first time I've seen this, but if I knew that we was working in CERCLA and RCRA sites, or soil contamination sites, or contaminated areas, the fee to catch those beavers would have been tenfold, five times, ten times what I bid. When I originally bidded contracts with the U.S.

Page 30

Forestry, I bid $99 a hog – I mean $99 a beaver. I was called in by Homer Gabard and asked to lower the bid, which I did, to $75 just to catch a normal beaver. The contract was 1992.

Q. Okay, so you said that you would have increased the price per beaver and the price per hour, and what is the price per hour referring to?

A. Because the people that are required, the health protection personnel, the supervisors, they don't work seven 24s, okay? Somebody's going to have to be there with me, okay? I got paid by the head, not by the hour, okay?

Q. Right.

A. Training. RAD-worker training, I think, is a two- or three-day class. Somebody's got to pay that beaver trapper to sit there two or three days, eight hours.

Q. Did you actually have those expenses in this contract?

A. No, sir.

Q. You did not; okay. Now, you said you would increase your price per beaver.

A. Right.

Q. To how much?

A. I'd have probably charged three or four hundred

Page 31

dollars to catch a nuclear beaver, to go through the normal – having somebody geiger-count the beaver, smear him as they do. I mean how you normally do hazardous waste, when they get that shovel full of contaminated dirt and take it over there to the burial ground. What's it cost to do that? I mean that beaver that come out of that hazardous waste site is just as damn dirty as that dirt. He eats the plants that are contaminated, he drinks the water, he lives in them banks where that stuff is soaked in, and then I'm hauling him around in my enclosed truck that I ride my kids around in after I get off work.

Q. But your price per – so the price per beaver, the higher price per beaver that you were speaking of has to do with increased expenses that –

A. Right.

Q. – you would have incurred, right?

A. Would you – well, let me ask you this.

Q. No, I'm not going to answer questions, but –

A. I would not use the same truck that I drive my young'uns around in to haul them goddamn beavers around.

You understand?

Q. But my question is but you didn't incur those expenses. In other words, you're saying you –

A. I didn't know.

Page 32

Q. – would have charged more money.
A. I did not know.
Q. But how does that entitle you to – if you didn't incur the expenses, do you understand you can't get damages based on expenses you didn't incur? That's all I'm saying. I mean, you know, if you didn't have those extra people and you didn't have to pay higher hourly rates, then, you know, you shouldn't be –
A. Then the Government really done a good job of screwing me over on these contracts, knowing that they knew from 1989 that these sites were superfund sites, or operable units. They knew. DOE knew it from 1989, when that plant became a superfund.
Q. So you said you would have charged a few hundred dollars per beaver?
A. I would have done it correctly. It ain't going out there in the normal pair of blue jeans or a leaking pair of waders, a pair of tennis shoes, cutoff blue jeans, and then going home and taking it to my wife and letting her wash these clothes in a –
Q. So what are the – of your increased prices, then, what are the components of that?
A. Everything would have been different, would have been done correctly. Okay, just like Four Mile Creek when I walked up there with that – let's just take

Page 33

Steed Pond, for instance. The day that NIOSH wanted to – I wanted to go in Steed Pond, we were going to have to dress our in coveralls. Westinghouse was going to provide the coveralls. They're going to have a step-off pad, not a plastic bag like I used. They had rinse cans there that they provided. They weren't going to use the drinking water that I went to my cooler and got.
Q. Okay, so, again, back – do you have an estimate that you've actually made of how much you would charge?
A. No, sir. I could probably sit down and – if I could find – I think WMS, Work Management System, out there at the Plant, I think it does have a system in there for bidding hot work. You might could – I mean you know the system.
Q. So, the – you're not sure of how much you would have charged?
A. I would have to go on there – like I say, Navy estimating has a – when I was estimating jobs at the Plant for Westinghouse, they did have a factor that they figured for hot work.
Q. Okay, well, let me ask this question. How much – you know, let's say – you haven't estimated how much you would have charged, but how much are you seeking in this complaint per beaver?

Page 34

A. I'd like to get as much as I can because I've lost everything I own.
Q. So you don't have – what you're saying is you don't actually have an amount in mind that –
A. I would like to get it –
Q. I don't want to ask about the settlement or anything. What I'm asking you is how much, you know, you think that you're entitled to per beaver.
A. I think at least five times what I requested, what the contracts were awarded – I mean – I mean it's water over the bridge now because the work's done, the beavers are dead, and they're planted.
Q. Yeah, so you understand that –
A. Okay, so the Government got off real light, far as I'm concerned.
Q. Are you expecting – I mean there's certain sites that were, as far as you know, not contaminated, correct?
A. Far as I'm concerned, after all the reading I've done at University of Aiken and – the entire Site is a superfund site. There's 519 hazardous waste sites that a lot of them are not fenced in. Some of them are just spills, but some of them, the Government's drawing millions and millions of dollars to clean up. In the eight years that I worked in a lot of them, there wasn't

Page 35

no cleaning up. HP-52 wasn't cleaned up. Site 43 wasn't cleaned up.
Q. So are you seeking the increased cost per beaver only from the soil contaminated areas, the CERCLA areas, these contaminated sites?
A. I would like to be compensated for the entire Site because if I'd knew the Site was a superfund, I'd have charged a lot more.
Q. Okay, and I'm going to ask this same – I'm going to ask you to look at this next document, which is something I think you recognize here.
MR. SCHROEDER: Would you please mark that?
DEFENDANT'S EXHIBIT 5 IS MARKED FOR IDENTIFICATION]
Q. [Mr. Schroeder] And that's Exhibit 5. I should you what's been marked Defendant's Exhibit 5. Take a look and please let me know if you recognize that document.
A. Would you like me to read it?
Q. Just whatever it takes for you to know whether you've seen that before.
A. I've seen this one.
Q. Okay, and what is it?
A. Yes, I've seen it.
Q. What is that document, please?
A. William D. Hooker, doing business as Georgia

Page 36

Bowhunters, Plaintiff, versus The United States, Defendant.
Q. But it doesn't – actually, the document doesn't have a title. Is that the complaint in Case Number 04-1126-C?
A. Yes, sir.
Q. Okay. If you please, turn to paragraph seven, or page seven, down toward the bottom.
A. Page seven down toward the bottom?
Q. Right where it says, "Wherefore." Do you see where it says, "Wherefore, having stated his amended complaint, Hooker requests that this Court award him damages as follows"?
A. Yes, sir. Yes, sir.
Q. And you see "D) A price adjustment per hog under the contract due to the contamination of the work environment"?
A. Yes, sir.
Q. And is that – is your argument similar to your beaver argument on that?
A. Yes, sir. These – Par Pond was drained in, what, '91? '92? And we didn't know about the mercury or the cesium or other heavy metals that are listed in some of the documents that I found.
Q. So you're seeking a price adjustment per hog.

Page 37

How much price adjustment are you seeking?
A. I would – I would have trapped them hogs for five or six hundred dollars.
Q. Well, I mean, but again, that's because – is that because you would have had to incur all these additional expenses?
A. Right.
Q. But since you didn't incur them, you're not entitled to charge for those expenses, correct?
A. I'm not going to say yes because I disagree with you. I mean I'm not going to haul a contaminated animal in the truck that I haul my kids in.
Q. Okay, so how much in this complaint are you seeking, then? You know, putting – taking into account –
A. Five times what the contract was worth.
Q. Okay. When did you first become aware that there was a contamination problem or issue at these sites where you were working?
A. February – whatever the date is on that Work Clearance Permit is what started me asking questions.
Q. Okay, so February 1999. Does that sound about right?
A. Is that the date I signed that WCP?
Q. I don't know. Do we have – let me just show

Page 38

you a document, hoping that this will refresh your recollection. We don't need to mark it. It's already marked Plaintiff's Exhibit 1.
A. I recognize this.
Q. Does that refresh your recollection regarding when you first became aware of the contamination issue?
A. Yes, sir. I was authorized to put somebody in that creek on 2/22/99 at 12:00 through 3/22/99 at 1500. That was the duration of this permit. But this permit also fails to identify the hazards that was in that creek, where it says, like, lead, mercury down in here and contaminant common hazards. And then they'll have procedures that you're supposed to go by off to the right over here, like if we'd have knew the mercury was in there, in the creek, or in the settlement – I mean I used my personal clothes. Again, we shouldn't have used personal – my personal clothes, my personal waders. They should have been supplied by Westinghouse.
Q. Okay, so when did you first notify the Forest Service that you were concerned about, you know, this contamination issue?
A. The exact date, I'm not – I'm not sure of that. I'd have to look at the – maybe Frankie's got it in her diary.
Q. Did you notify them in writing? Do you recall

Page 39

that?
A. No, it was strictly verbal. But this is what opened the door, right here. I mean if I had to be RAD-2 qualified to be in that creek, I knew there was something in that creek that I hadn't knew about. And that's all I was trying to do, was find out what was in these creeks that I worked these men in that had no training. Some of these men had training from Westinghouse or Bechtel, but ain't none of us would have got in anything that would have hurt us knowingly.
Q. So when you first notified them – when did you first notify them that you thought you were entitled to a price increase as a result of this situation?
A. I'd asked Frankie to find out what was in the creeks a couple of times and she never got back with me on it. And so I went in the system and started looking up by key words, and that's how I started. And that's what – and I wanted the Forestry to address the issues, but they never would address the issues.
Q. But my question is did at some point you say to them, "I'm entitled to more money"?
A. That was before the June 1st video'ing of that HP-52. I knew by then that I'd – I didn't know about all the sites, I just knew that Four Mile Creek, I shouldn't have been in it.

Page 40

Q. Did you notify them in writing at some point that you thought you were entitled to more money?
A. I'd went to Homer and requested more money to do the job at HP-52 and –
Q. Verbally?
A. Verbally, looking him dead in the eye just like I'm looking at you.
Q. Aren't you supposed to request – in a Government contract, aren't you supposed to make such –
A. My contract, I had verbals. I could work off verbals. I worked off verbals for eight damn years.
Q. Okay. What is the total amount that you now claim that you are entitled to in damages in this case – in these two cases?
A. After being laughed at, humiliated, marched through buildings and – with a group of attorneys coming up to the floors and making fun of us, all the lying that's been done, covering up, I expect a lot. I'm going to tell you the truth, I –
Q. But, I mean, you don't have a claim for people – what were you saying? People poking fun at you? Is that what you're –
A. Oh, yeah, they've had their – you know –
Q. But you don't have a claim for that in this case. I'm talking about these cases here.

Page 41

A. I would think it would come under bad faith if you've got a good contractor trying to find out what he had worked men in, good men in, and then everybody thinks it's a big damn joke. I don't think it's a joke to this day, and maybe the Government by now doesn't believe that I'm still joking. I didn't bid contracts to work in uranium. I didn't bid contracts to work in any kind of stuff that had heavy metals in it. I didn't bid contracts to haul crap around in my truck that needed to be in a burial ground.
Q. Okay, I understand, you know, your argument, but you have two complaints here and the claims in these complaints, the ones that haven't been dismissed is what is before the Court, and what we're trying to determine is, you know, here we are at the end of discovery, these cases have been going on for –
A. Six years.
Q. – six years, or three years, or four years, and, you know, what we need is an accounting of what the damages are.
A. I would like to get – I would like to get paid five times what I had bid my contracts for. And then whatever the bad faith is, I mean we can go back through and read every little laugh and giggle that was put up by the little plays that DOE and Westinghouse and Bechtel

Page 42

put on to NIOSH. We can go through the whole little hurrah again, you know.
Q. You say something about dogs that you had.
A. I had to buy dogs.
Q. And why did you have to buy dogs?
A. Because the men that owned the dogs, they were barred forever for working at Savannah River Site by Homer Gabard.
Q. So you bought those dogs?
A. I bought those dogs.
Q. And did you – how much did you pay for those dogs?
A. I'd have to go back and look at the receipt.
Q. Now, were you paying those men? The men?
A. The men? What men?
Q. The Ellers, I believe?
A. Yeah, I paid them – I think it was between 36 and $40 a head per hog.
Q. Okay, and so you had to buy the dogs.
A. Right.
Q. And then, you know, who used the dogs?
A. I used the dogs until I could get men that were approved by Homer Gabard, but Forestry had lost the resumes that I submitted on one particular man. Contraband passes for myself had been – the numbers had

Page 43

been put in wrong.
Q. What happened to the dogs?
A. They're dead now.
Q. What happened that they're dead?
A. They just died. I mean –
Q. So you didn't try to sell them, or –
A. No, I give them dogs back to Goldman Eller.
Q. Okay.
A. I could not – I was – had been beat down by the Government, or Westinghouse and U.S. Forestry Service, that I couldn't even buy dog food for those dogs.
Q. So you gave those dogs back?
A. So I gave those dogs back to Goldman Eller.
Q. Did you ever use them on any other job?
A. No. Them dogs never hunted nowhere but Savannah River Site.
MR. SCHROEDER: Let's take maybe 15 minutes, and then I can wrap this up.
MS. NICHOLS: Fine.
[OFF THE RECORD]
Q. [Mr. Schroeder] Mr. Hooker, in 1997, did you and Mr. Cromer talk about the soil contamination, or SCA sign, at Steed Pond Road?
A. Yes.

Page 44

Q. And did you bring that to the attention of the Government at that time?
A. I did not.
Q. Did that concern you?
A. Not at the time.
Q. Why not?
A. I was working at the other end of the Plant. Andy has signature authority on the contracts just like I did, and he handled it, far as I knew.
Q. Well, was work done in that area thereafter?
A. What I recall was Frankie told me not to go back into Steed Pond. I believe that's exactly what I was told. Like I said, I was working at the other ends of areas.
Q. Okay, now, when you were –
A. And I was not told it was a – the exact words that you used. It was – there was some signs up about contamination or something. I don't recall exactly what was, but I knew that Andy and Frankie had talked about it. Frankie had made a decision for us not to go back into Steed Pond.
Q. Okay, now, when you worked at the Site, the Savannah River Site, and you traveled around the Site, correct?
A. Yes, sir.

Page 45

Q. And did you notice signs posted warning of contaminations during your travels through those areas from 1997 on?
A. The work areas had no signs up.
Q. None of them?
A. None of my – none of my sites had the sites worked up. I did not see the contamination signs at site 19 until I went back and started video'ing all the sites.
Q. Now, you said earlier something to the effect that the beavers were as dirty as the soil and you called them nuclear beavers.
A. Yeah. Well, what would you call them?
Q. Well, my question is how do you know they were as dirty as the soil? How do you know they were contaminated?
A. Well, they're living in it. I mean if you was living in a bucket of shit, you'd smell like shit.
Q. So you're just – this is an assumption, isn't it, then? You're making an assumption that they were –
A. That's assumption, yeah.
Q. All right. Okay, I don't think we have any further questions at this time.
MR. SCHROEDER: Unless you have?
MS. NICHOLS: No.
[DEPOSITION ADJOURNED AT 10:55 A.M.]

Page 46

C E R T I F I C A T E

S O U T H C A R O L I N A
AIKEN COUNTY

I hereby certify that the foregoing deposition was reported, as stated in the caption, by the method of Stenomask and speech recognition, with backup, and the questions and the answers thereto were reduced to typewriting by me or under my direction; that the foregoing pages 1 through 45 represent a true, correct, and complete transcript of the evidence given on the 2nd day of June 2006, by the witness, WILLIAM D. HOOKER, who was first duly sworn by me; that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I financially interested in the action.
This, the 10th day of June 2006.

ALICE D. BONI, CVR
CERTIFIED COURT REPORTER
NSVRA CERTIFIED