# DEPOSITION OF WILLIAM D. HOOKER - 12/8/05

## WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY V. THE UNITED STATES

Page 1 to Page 62

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*SHARON DEHART, COURT REPORTER*
*P. O. Box 2474*
*Aiken, SC 29802*
*Phone: 803-648-9434*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY, Plaintiff,

vs. NOS. 03-1501C, 04-1126

THE UNITED STATES, Defendant

DEPOSITION OF WILLIAM D. HOOKER
taken by Counsel for the Defendant
before Alice D. Boni, Certified Court Reporter
at the offices of Department of Energy
151 Corporate Parkway, Aiken, South Carolina
on Thursday, the 8th day of December 2005
commencing at 10:35 a.m.

ALICE D BONI, COURT REPORTER

Page 2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF: ROBBIE M. NICHOLS, ESQ.
Attorney At Law
Post Office Box 7925
Hilton Head Island, SC 29938

FOR THE DEFENDANT: LINDSAY E. WILLIAMS, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, DC 20530
LUCY KNOWLES, ESQ.
Westinghouse Savannah River Site
Post Office Box A
Aiken, South Carolina 29802-0900

- - - - -

INDEX TO EXAMINATIONS


| | Page |
|---|---|
| EXAMINATION BY MS. WILLIAMS | 3 |
| CERTIFICATE OF COURT REPORTER | 62 |


- - - - -

EXHIBITS

DEFENDANT'S

2 SECOND MAP OF BEAVER SITES

- - - - -

Page 3

[IT SHOULD BE NOTED THAT Mary-Ellen Noone, Mark Simpson, Margie Yeaton, Mr. Nicholson and John Andrew Cromer, III are also present at the deposition.]

- - - - -

WILLIAM D. HOOKER
having been first duly sworn, was examined
and testified as follows:

EXAMINATION

BY MS. WILLIAMS:

Q. Hi, Mr. Hooker, how are you?
A. Pretty good.
Q. You know who I am by this point, and pretty much know how a deposition works at this point. I'll just ask you to state your name for the record.
A. William Danny Hooker, Sr.
Q. And your address?
A. 6950 Hair Bastian [phonetic] Road, Appling, Georgia, 30802.
Q. And again, seems like personal questions, but just part of the deposition process. Are you taking any medication today that you think is going to affect your ability to remember or tell the truth?
A. No, ma'am.
Q. And I didn't say this to Mr. Cromer, and he was a good sport, but if at any point you need to take a

Page 4

break, please let me know and we'll take a break. I'm just going to ask you some questions and, just like I said to Mr. Cromer, I know this is a very emotional and sensitive topic for you, and I respect that, but in light of efficiency, I'm just trying to get information from you. Just try to listen to my question and answer what I'm asking you. Okay, so let's start and let's get the –
A. I've got a question. I left my hearing aid. I ask that –
Q. Oh, and you need me to speak up? I can do that.
A. No, just repeat it maybe.
Q. Okay. If you – and that helps me also because if I ask you a question and you can't hear me, please ask me to repeat it. If I ask you a question, you don't understand it, please tell me and – and that's all. So let's start with your education and go from high school forward.
A. I went to Hephzibah High School, quit school in the 11th grade; got a GED at St. Joseph's High School; joined the military. 1971 through 1972, I was stationed at Fort Gordon. MOS was chauffeur, or light truck driver. And went to – was transferred to Berlin, Germany, where I volunteered to work behind the Iron

Page 5

Curtain with Intelligence, or G-2, for the rest of my time in the military. I was honorably discharged, and –
Q. What year were you honorably discharged?
A. I want to say it was January 5th, 1975.
Q. Was that a medical discharge, or –
A. I got a service-connected disability of zero percent at that time for hearing.
Q. For hearing? Okay. Okay, after that?
A. I came home, went to TRW. They had a technical school for machinists; I went to that. Completed it, went to TRW.
Q. What's TRW?
A. It's a manufacturer that made drill bits. I was fired from that job for trying to organize the United Steelworkers Union.
Q. What year was this?
A. 1975. I went – started back to school, went to Augusta Technical School for drafting. By that time, I'd got married and my father-in-law decided I needed to be a plumber. So I entered into a apprenticeship program at Local 150, Plumbers and Steamfitters, and I completed a four-year apprenticeship program there.
Q. And what years was this approximately?
A. I want to say 1976 through 1980.
Q. Okay.

Page 6

A. I also took a forestry course, 18-month forestry course, got a certificate for that.
Q. And what did that entail when you say forestry course?
A. Plant trees and just – just in general stuff. The reason I took it was to enhance myself later on with the contracts I had.
Q. Okay.
A. Okay? I went ahead and took the master plumbing test, Georgia master plumbing test, and luckily, I passed it the first time.
Q. And that was about what year?
A. I'm going to say about 19- – probably '90/91.
Q. Okay, so let's pop back. So were you working as a plumber. Wait, we'll just do the education right now. Yeah. Okay, so we'll come back and do your jobs. Okay, so '90/91, passed the master plumbing test.
A. Again, that was to enhance my job at that time with M.K. Ferguson.
Q. And what's M.K. Ferguson?
A. It's Morrison Knudsen. I think it's called now the Washington Group.
Q. And what do they do?
A. I think they own Westinghouse.
Q. Okay.

Page 7

A. From June 1976 through March 2000, I worked at Savannah River Site.
Q. Okay, let's pop back for a second and then we'll get – we'll come back to this. What did you do – let's see, you were a machinist at TRW. After that, you went to Augusta Tech for drafting, and then you did a four-year apprenticeship for – to become a plumber. Where were you working from the time that you received your – completed your apprenticeship until you started at Savannah River?
A. I worked at the – I was working at the Savannah River Site also.
Q. Okay, and what were you doing there? Just start with what you did in the beginning all the way through.
A. Most the time, I worked on H Tank Farm for a man named Charlie Wilds.
Q. What is an H Tank Farm?
A. It's where – a deal where DuPont, at the time, was storing the waste from Separation areas, H-Area or F-Area. I worked both tank farms.
Q. Okay. And what does that job entail?
A. My job?
Q. Um-hum [yes]. Yes.
A. At that time, I was using jackhammers. I was

Page 8

doing the – when you serve an apprenticeship as a pipefitter or a plumber, and you're not turned out, you do all the – whatever that foreman or that journeyman tells you to do, if it's grinding pipe or beveling pipe or go get this, go get that.
Q. Okay, and so you were doing this in this – on the H Tank Farm. Was there a lot of construction there?
A. Yes, ma'am. We – yes, ma'am.
Q. Were you building – how did you –
A. I don't know exactly what you call it. It's a little like catwalks and stuff around – on top of the tanks now, and it was different things that we could pull; the pumps that spray inside the tanks. They've got a big, like an umbrella, and then they can wash the inside of those waste tanks down.
Q. Okay, so you were helping to build the catwalks that went over it and things around this facility?
A. Right. And we'd install those pumps with the umbrellas, and any other miscellaneous piping that DuPont people didn't want to do.
Q. So you did that from 1976 to –
A. Let's see, I did it for a couple of years. Probably about a couple of years there because they moved you around as a – what B.F. Shaw would do, they wouldn't let an apprentice sit in one place too long. They'd put

Page 9

you in there for six months to a year, and then they'd rotate you to another area. Then I went to Tritium.
Q. Okay, and what's that?
A. Well, my particular job, I was – I was a draftsman in the sketch office in Tritium. We'd go inside the gloveboxes, or where they keep the bell jars, where they take – so you can release the gas that's in the Tritium cylinders and rebuild them. You'd be in a plastic suit, dressed out with, most times, two pair of plastic suit with I think it was about 50 foot of hose, and come out, they cut you out and check you.
Q. Okay. And if at any point you want water, let me know. Okay, so you did Tritium and then – and let me ask you this; this whole time that you're doing this, you're working for B.F. Shaw?
A. At that time, yes, ma'am.
Q. B.F. Shaw till about when?
A. Well, it was till M.K. Ferguson won the contract.
Q. Until M.K. Ferguson, okay. All right, so you did Tritium and then how long did you do that?
A. I did it till I got into a – I got in a little closed door session with a guy named Dan Tyson and a Woody Lufton; I want to say his name is Woody Lufton. They called me in and Bechtel was just getting a contract

Page 10

when they called me in and said, "If you don't play ball the way we're going to play ball, you're going down the F'ing road."
Q. Okay. Sounds like a nice guy.
A. So I called a guy named Mike Mayo who worked in DWPF.
Q. What's DWPF?
A. Defense Waste. It's where they make the glass that comes out of the waste tank farms. I called Mayo, Mike Mayo, and asked him were they looking for any planners. At the time, they was looking for people, they had just started this work controlled process, and I don't remember the man's name I had an interview with, but he was over the little interview and I went over there and met with the man and, a couple of weeks later, I was transferred from Tritium to DWPF. DWPF was coming out of the ground. It was all clean work. I want to say I stayed there from – I want to say six or seven years there. Till I was transferred to – let's see, '92. I did some work at L-Area, too. Let's back up. Can we back up?
Q. Um-hum [yes].
A. Okay, I went to – at some time, I did – I was a general foreman at L-Reactor. I was the general foreman on the B-Shift, had about 60 people under me. We

Page 11

was rebuilding 100-L Reactor. And then I went to DWPF and Morrison Knudsen. I'd failed the physical with them and they wouldn't hire me. I'd went to Vogtle. There was a break there for about, I want to say, three/four months. Might have been a little longer than that. But I went to Georgia Power. And from there, I went to Turkey Point for three or four months, and then I came back to DWPF. Well, I went through the Hall and DWPF was needing people and M.K. wouldn't hire me because I couldn't pass the physical, couldn't blow that – they've got some kind of little apparatus that tests your lungs.
Q. Okay.
A. So I couldn't pass that particular test, so they wouldn't hire me. So I went back down to the Union Hall and they talked to me and turned me – they sent me right back out there the following week.
Q. Where is right back out there?
A. To the same place I –
Q. Okay, let me – I'm going to go back and I'm going to tell you what you told me and you tell me where to plug in stuff.
A. Okay.
Q. All right, so '76 to 2000, you worked at Savannah River Site for both B.F. Shaw and M.K. Ferguson; correct?

Page 12

A. Say that again.
Q. Okay. '76 to 2000, you worked on the Savannah River Site –
A. Right.
Q. – for B.F. Shaw and M.K. Ferguson.
A. Bechtel. I worked for Bechtel.
Q. And Bechtel, too; okay.
A. And then I was – worked for Westinghouse, too.
Q. And Westinghouse. Okay, let me just go through this. Okay, so first, you – you worked at the H Tank Farm, and then you worked in Tritium. Then you were the general foreman rebuilding that 100-L Reactor.
A. I was the – yes, ma'am.
Q. Okay. Then you went and worked for DWPF?
A. Right.
Q. Okay. Then, because you failed the medical, you went and worked for Vogtle, GA Power and Turkey Point.
A. Georgia Power.
Q. Georgia Power.
A. It's not three, it's just two of them. Georgia Power –
Q. Georgia Power and Turkey Point is one.
A. Right.
Q. Okay, got you. Okay, then you came back and

Page 13

M.K. Ferguson wouldn't hire you because you couldn't pass the blowing test, and so you went –
A. Back to the Union Hall.
Q. – back to the Union Hall.
A. They just wrote me another referral and I went right back out there, I want to say, less than a week, and they hired me.
Q. Okay, so M.K. Ferguson hired you?
A. M.K. Ferguson hired me.
Q. Okay. And then what did you do for them?
A. I was – I was what they called a sketcher. Back in the old days, we did a lot of sketching of the fabrication and stuff. Mostly what I've always done is pushed the pencil. And I did sketch work, and then Westinghouse was needing planners.
Q. When you say that, are you saying planner or planter?
A. Planners.
Q. Planners; okay.
A. That's like somebody would plan a job. So from – M.K. loaned me to Bechtel and Bechtel loaned me to Westinghouse. I worked for three different people in about a 12/13-year period and never moved from the same desk up till I went to H Tank Farm.
Q. Okay. And H Tank Farm, that was at the

Page 14

beginning; right?
A. Yes, ma'am. I went back to where I originally started.
Q. Oh, then you went back to H Tank Farm at the end; okay. All right. Okay, then I'm just going to go like I did with Mr. Cromer. So I'm assuming that since you're working in these areas and you're working for Savannah River Site that you're required to have certain trainings and certain certifications. So what trainings and certifications did you have?
A. I'm sure I had the GET training, RAD worker two. I didn't have HAZOPER.
Q. You didn't have what?
A. HAZOPER.
Q. HAZ –
A. Wopper.
Q. Wopper? W-o-p-p-e-r?
A. I think it's H-A-Z-O-P-E-R; HAZOPER.
Q. Oh, HAZOPER, okay.
A. Or something like that.
Q. Okay. So you had GET training, RAD worker –
A. I had HAZMAT.
Q. HAZMAT? Okay.
A. And a lot of different little technical stuff that was required to keep the job.

Page 15

Q. Okay. Let's talk about your beaver and hog trapping experience. When did you first start beaver trapping and hog hunting, hog trapping? Not professionally, but just when did you start doing it?
A. It's back when we was in high school, me and Andy.
Q. And then when was the first time you did it professionally?
A. February 10th, 1992.
Q. And that was for Georgia Bowhunters?
A. That was Georgia Bowhunters Supply Company. I'd been in the archery business and that's how I got Georgia Bowhunters started.
Q. Oh, then tell me about your archery business.
A. I worked out of a back room in my house, worked on compound bows. I'd shot in tournament archers for years, went down to Bear Archery and was trained by – Fred Bear had a school you could go to and you could learn the mechanics of the bows, how they worked.
Q. Did you make them?
A. I did a lot of the cables back then, yes.
Q. All right. And so you were running an archery business and that's how you got into –
A. That's how the Georgia Bowhunters Supply come about.

Page 16

Q. And the same thing for hog trapping, that's the first time you did hog trapping/hunting professionally?
A. First time I'd ever killed a hog was on the hog contracts. I'd never killed a hog before.
Q. Before that?
Q. Uh-uh [no].
Q. Okay. So your first contract with Savannah River Site, or on the Savannah River Site, to hog hunt and trap and beaver trap was in 1992; is that correct?
A. The first contract started February 10th, 1992.
Q. Okay. So that was the first contract that Georgia Bowhunters had?
A. Officially.
Q. Okay. And who else did you hunt and trap for?
A. At that time, I can't – I can't recollect. I mean, different people I had –
Q. But there were others?
A. It was probably '93 before I ever started doing it for other people.
Q. Okay. Okay, so let's go back to Westinghouse, when you were working for them. I'm assuming that because you had this RAD workers training and also the HAZMAT training that you worked with radiation, or near radiation when you were working for Westinghouse.
A. When I worked for Bechtel, M.K. Ferguson, B.F.

Page 17

Shaw and Westinghouse, I knew the radiation requirements and stuff.
Q. Okay, let me – let's jump back over to – I lost Plaintiff's Exhibit 3. Let me see what I've done with it. This isn't the original one, but that's a copy of it. Wait, I've got it. All right, if you'll just take a look at Plaintiff's Exhibit 3 and let me know when you've looked at it.
A. What do you want to know about it?
Q. Have you had a chance to look at it?
A. Oh, yeah.
Q. Do you recognize it, that document?
A. Yes, ma'am.
Q. Okay, what is it? Where did you get that?
A. I got this from a HP person that worked for Westinghouse prior to the NIOSH investigation.
Q. Did you get it in a work capacity, or you just asked for it?
A. I got it – what I originally did, I wrote a letter to NIOSH, asking for an investigation because the U.S. Forestry Service would not address the issues. I'd asked Frankie Brooks for what was in HP-52, I'd asked for information at every creek and every canal on that Plant. For nine months, or six months, I got no answer. Okay?
Q. Okay.

Page 18

A. So I got a CDC report in September, a draft report. And that's where I started. I also started on the Shrine. Westinghouse has a system called Shrine; you can go back and look up –
Q. Right.
A. It's like articles from Augusta Chronicle concerning Savannah River Plant, and there was – there was quite a few during that time period, from February through the end of the contract, concerning Savannah River Plant and contamination in the water.
Q. So when did you talk to an HP person and get that piece of paper that's in your hands?
A. It had to be around November.
Q. November of what year?
A. '99.
Q. Okay. So that wasn't anything that was given to you as part of your job?
A. No, ma'am.
Q. For Westinghouse or for the Forestry?
A. No, ma'am.
Q. Do you know what – I mean did the HP person identify what that document is for?
A. My question was – okay, when I wrote the – a letter, I'd sit down with another Westinghouse manager and we determined if I'd been in what areas I shouldn't

Page 19

have been. Maybe the posting was improper. So we rode out to HP-52 and we rode out to the road on Four Road right there at the bridge. He told me, he said, "Hooker, you ain't got no business in there."
Q. Okay, I'm going to stop you real quick. It's real hard not to tell stories, I know, because we're – I mean everybody from the South is a good story teller. But it will take forever if we do it that way. So let's do it this way and just say – when I asked you what did the HP person tell you that document was for –
A. This was actually a guide for me.
Q. A guide.
A. Right.
Q. Okay, but when the HP –
A. It was his definition of a soil contaminated area. That's his writing.
Q. Okay, did he tell you where he got that document?
A. No, ma'am.
Q. So you don't know whether it's a Westinghouse document, whether it's a Forest Service, whether it's DOE?
A. Well, it says right here, "Copyright 1997, Westinghouse Savannah River Company."
Q. Okay, so from that, we can assume that that's a

Page 20

Westinghouse document?
A. [Indicates affirmatively].
Q. Do you remember the name of the person that was the HP person that you talked to?
A. I can't recollect.
Q. Do you know how long this person had worked as an HP person?
A. He was a HP supervisor. Probably for years. He was – he was about the same age I am.
Q. But you don't remember his name?
A. No, ma'am. I was referred to him by another Westinghouse supervisor that helped me write the letter that I sent to NIOSH.
Q. Do you remember that person's name?
A. Yes, ma'am, but I really –
Q. I know you don't want to give it to me.
A. No, I don't want to give it to you.
Q. I know, but it's part of the process. You brought the lawsuit.
A. Andy Bolin, first-line supervisor on H Tank Farm.
Q. Is he still there?
A. I imagine.
Q. Okay, so there are different signs that are drawn on these pieces of paper, so I know you've seen

Page 21

…, but I'm going to hand it back to you so you can … it in front of you. Can you identify to me which of those signs you have seen on the SRS property, whether for Westinghouse or for the Forest Service? Just the ones you recognize.

A. I've seen both of these right here on this page for Westinghouse.

Q. Can you say what they say?

A. "Underground Radioactive Material," and "Soil Contaminated Areas."

Q. Okay, for Westinghouse, you've seen those?

A. Yes, ma'am, inside the areas.

Q. Inside the areas.

A. Fenced-in areas.

Q. In the fenced-in areas, okay. All right, and what about on the next page, any of those? There's another page of signs.

A. We're still talking about Westinghouse?

Q. Yeah.

A. Caution, Radiological Buffer Zone, radiation area. I've seen the very high radiation areas, high radiation area, contamination area, high contamination area, and airborne contamination.

Q. So all of them you've seen while working for Westinghouse?

Page 22

A. Inside the fence.

Q. Never outside of a fence?

A. The only time I've seen that one –

Q. You have to say which one because the microphones –

A. Soil contamination area is at HP-52, the site on Four Road, beaver trapping site 47.

Q. You sure that's 47? Because I think that's the first time we've mentioned 47.

A. I'd like to clear that up if it's all right.

Q. I would love for you to clear that up.

A. Can we look through these?

Q. Um-hum [yes].

A. There's an index here that has all the trapping sites.

Q. Okay, let me pull that out for you. There it is, Plaintiff's Exhibit 2.

A. I'm going to read what it says about trapping for the Site.

Q. Okay.

A. Trapping site 47, compartment 16, Tim's Branch.

Q. Right. Okay.

A. And it had the coordinates right here, N4-W5. You need to get this map that shows these coordinates.

Q. Okay, what map is that?

Page 23

A. It's a U.S. Forestry map that Frankie Brooks wrote up all beaver sites on. We were required to call these in to a dispatch at Forestry at times.

Q. Okay, and do you have a copy of that map? Do you still have your copy?

A. Oh, yeah, I've got her copy.

Q. You have her copy?

A. Um-hum [yes].

Q. Okay, that would be what we would need a copy of so we can all be talking about the same spot.

A. Now, I'd like to show you on this.

Q. Okay.

A. I'd like to show you on 47 – I can't see that far. On this map, that name, that's not Tim's Branch. Tim's Branch is right there at 19.

Q. Okay, so really, when you say 47, you're talking the new 19, or what's marked as 19 on this map?

A. No. When I say 19 – when I say 47, I'm talking right below that wooden dam at Steed Pond. Right across the road, right below the little water meter where they posted more signs, soil contamination signs –

Q. Okay, and you're talking –

A. – that was not posted when –

Q. Okay, you're getting excited, got to calm it down.

Page 24

A. Just calm me down.

Q. You've got to calm it down.

A. I mean I might get upset, but just chill me out.

Q. Take a breather then. I'll give you a second. Because I don't like getting yelled at.

A. Well, I'm not – and I'm not mad at – well, I'm mad, but –

Q. Well, you can be mad, that's fine, but we're all adults, so let's just take a breather when you need one.

A. Okay, that's fine.

Q. All right, so you're saying that that is not the 47 you're talking about, it's further down?

A. Right. It's going to be across the road. My map will show it closer. I have the big old –

Q. Do you have your map with you?

A. Yes, ma'am, I have it out in the truck.

Q. Why don't we introduce that as an exhibit?

MS. WILLIAMS: Can we do that?

MS. NICHOLS: Fine. Is it –

MS. WILLIAMS: Let's take a break, you guys go discuss it.

[OFF THE RECORD]

MS. WILLIAMS: Okay, we're back on the record

Page 25

and Mr. Hooker has returned from his truck. He's
·rought in the map that he's relying upon, and we're
going to introduce this as the next – yeah, we'll
just do the next – Defendant's 2.
[DEFENDANT'S EXHIBIT 2 IS MARKED FOR IDENTIFICATION]
MS. WILLIAMS: My question is if there's – I wonder if there's a way we can get this shrunk down. I've done it before with blueprints and plans, so we should be able to do it. That'll make it easier.
THE WITNESS: Are we back on record?
MS. WILLIAMS: Yeah, we're back on record.
A. That's the first map that Frankie and – Frankie Brooks give me. I've got two of those like that.
Q. [Ms. Williams] Okay, so why don't you come over here?
A. Site 19, Steed Pond Road. See where it says Steed Pond Road?
Q. Yeah.
A. There's Tim's Branch right there. See where it says Steed Pond?
Q. Steed Pond.
A. Site 19 is right there.
Q. Okay, but why do you have Site 19 written up here?
A. That was just a good space to place it, put

Page 26

Site 19. The spot is right there, though. These spots is where the site is.
Q. Right.
A. This was the first map I got in 1992.
Q. Right.
A. Okay, and I'm using it to show you where Tim's Branch is. Okay?
Q. Okay.
A. The map that you've got showed Site 47 over here on Turner Branch Road. I've never trapped there.
Q. Okay, you've never trapped at Site 47?
A. No. I trapped from these two beaver ponds above Steed Pond Road, or there's actually three here, a couple of them down through here, a couple of them down through here, and trapped all the way down to Site 39, which is – goes into Upper Three Runs.
Q. Okay, so let me just recount this for the court reporter. So you're looking at your map which we've made Defendant's Exhibit Number 2. You have a place marked "Site 19" and a place marked "Site 39" on this map.
A. Right.
Q. You're saying – let me say this and tell me if I'm right or wrong. You're saying you trapped from Site 19 all the way down to Site 39, that whole area?
A. That whole area.

Page 27

Q. Yes or no? Correct?
A. Yes.
Q. Okay.
A. Can I add?
Q. Yes, of course.
A. What they would do is add numbers to them.
Q. Who is "they"? We have to say who "they" is.
A. U.S. Forestry Service.
Q. Okay.
A. Okay, trapped in the Met Lab Carolina Bay; okay?
Q. Okay.
A. There's ditches. DuPont had dug ditches that tied into Tim's Branch. If you pull OPSRMT 900200, I want to say Rev 1 of – the copy was June 26th, 1990, it'll show the beaver ponds in here that was used for settling basins for uranium, nickel that was coming out of 3 and 700 Area.
Q. Okay, but – and I know what you're saying, but because I want to stay focused in what we're trying to do here, is – so in addition to trapping in the area that, on this map, is marked Site 19 down to Site 39, you also trapped in an area that's very close to Barricade 10?
A. I trapped an area that's called Carolina Met Lab Basin.

Page 28

Q. Okay, is that –
A. It's behind the motor pool.
Q. Around this area that my finger is at? If you don't know, that's okay.
A. I have another map that they give us.
Q. Okay, well, I think this – okay, if I say that from about where Barricade 10 is to Site 19, as it is marked on this map, down to Site 39, you trapped in that area?
A. Right.
Q. Okay.
A. I'd like, for the record, that Andy Cromer trapped in there, Dale Hollins trapped with me, and Sly Bailey trapped Tim's Branch, too.
Q. Okay. And because – I guess what I would like, and I know I've said this before, but I'll say it again since we have this one now, is that any map that you're relying upon during the litigation for reference as to where you went and trapped, if we could produce a copy of that so that we're all looking at the same thing so we're all talking about the same thing.
A. Okay.
Q. Because I think it's important we all be on the same page about that. Okay, so then – all right, let's go back to where we were. Okay, so we were talking about

Page 29

the fact that these were the sites that you saw soil contamination signs.
A. Yes, ma'am.
Q. So, all along – basically, we say all along the area of Steed Pond, you saw soil contamination signs?
A. The first time I ever seen the signs was after June 1st, 1999.
Q. 1999; okay. And before that, you never saw a sign?
A. I never seen the ones that Andy spoke to Frankie about. He did tell me about them, but I was at the – I was working another end of the Plant.
Q. And do you remember when that was, when Andy saw those signs? I'm trying to look back and –
A. I want to say it was '97.
Q. Okay. So in 1997, Andy told you about the signs that were at Site 19 on this map?
A. Right.
Q. But you weren't working in that area, so you weren't –
A. I didn't even –
Q. – concerned with it at the time?
A. I didn't even see them.
Q. But you did see them after June 1st of 1999?
A. I went back and started videoing the sites in

Page 30

1999. I'd videoed from 1992 through 1999, the entire Plant, you know.
Q. And why was that?
A. I had a little sporting goods archery shop and where we used the – learned to use the 330 Conibear that was required by the contract, by the U.S. Forestry Service, we bought a video that showed us how to use that particular trap, and I think I paid $25 for that tape. Tom Miranda put it out. It was a – so I watched that tape; me and Andy watched it for, I'd like to say, a hundred times. Okay? And what we did, we took what the contract said and how that particular guy used the trap and we adjusted to make it work for us at Savannah River Site.
Q. Okay, and just because I'm confused and I want to go back. Okay, so I know that you videotaped along Steed Pond around June of 1999, but you just said that you videotaped the whole site beginning in 1992.
A. I have a – I had a video recorder, a cam recorder, and a 35 millimeter camera with me just about all the time.
Q. Okay, so you were – so you basically documented – what were you taking pictures of?
A. We'd get in the swamps and we'd take pictures of the entire swamp.

Page 31

Q. But why?
A. What we were going to do was sell the – you take them and cut them and make our own trapping videos.
Q. Okay, so you were doing this for a trapping video?
A. Right, we was – we – that's the only purpose we had for it. We were trying to sell – I was trying to sell hookers, hot-to-trot and Tom and Jerry beaver lure. And so we was –
Q. So you were videoing and taking pictures of areas that you were trapping in?
A. Right.
Q. Do you still have those?
A. I've got a – I want to say a foot locker full.
Q. You do? I'm not going to ask right now, but I may ask you to produce those at a later date. Not all of them, but I may ask you to produce the ones –
MS. NICHOLS: Well, ask him if they contain any – you don't want to look at all those videos.
MS. WILLIAMS: Well, I mean, if they're –
Q. [Ms. Williams] I'll ask you this; if they are videos or pictures of areas of beaver sites that you were in?
A. Right. We was at Indian – I'll use an example; Indian Grave Creek.

Page 32

Q. Okay.
A. 1992/93, we was in it; in it with a video camera. We didn't know nothing about the tritium that was being released on December 24th, 1991.
Q. Right.
A. We didn't know about the 6,000 curies that was released from K-Reactor.
Q. Right. Okay. All right, well, just still, just saying – I'm not asking you to produce them right now, but we may if we determine they're relevant, so make sure you keep those around. Okay, so any other sites other than that that – other than along Steed Pond that you saw soil contamination signs when you were there, when you were trapping beaver or hunting hog?
A. The only places I've seen them was those four sites.
Q. Okay.
A. One other – one other place where signs had been posted was Site – I want to say it was Site 43.
Q. Okay, tell me the geographical location of that since we're all over the place with our sites.
A. It's behind the motor pool at 3 and 700 Areas. It's called the Met Lab Carolina Bay.
Q. Okay. And that was posted when?
A. I don't know exactly when they posted it. It

Page 33

wasn't posted while me and Andy was trapping it, or when CSWE busted the dam that was holding the water in the Carolina Bay.
Q. When was it posted? Before or after that?
A. The first time I ever seen it posted was at the NIOSH investigation.
Q. Okay. So it was never posted while you were trapping?
A. Well, it was posted. I want to reframe that. It was posted because when I wrote the letter to NIOSH on 2006 -- I mean in January of 2000, I did include the Met Lab Carolina Bay. So it was posted as a danger, keep out.
Q. Danger, keep out?
A. Right.
Q. Okay, so --
A. Not a radiological area.
Q. Okay, so -- just so I clarify. Sorry to ask you this so many times, but when you were working in that area, was it posted?
A. No. When Frankie Brooks took me there, it was not posted, and when CSWE broke the beaver dam that was holding the water back in Carolina Bay, it was not posted.
Q. Okay, and when did that happen?

Page 34

A. The first time she wrote me a work order for that site.
Q. In nineteen-ninety- --
A. It could have been 1995, 1994. I'd have to go back and --
Q. Okay, but not under this contract; all right. Okay, in all the time that you've worked at Westinghouse and Bechtel, anytime that you were working at the Savannah River Site not for the Forest Service, did you ever have your radiation dosimetry monitored?
A. From 1976 to 1991, I wrote -- I used a dosimeter, or a TLD badge.
Q. I'm sorry, say that again.
A. From 1976 through, I want to say, 1991, I believe I did wear a TLD badge. From 1992 through -- till I was transferred to H Tank Farm, I did not wear any type of TLD badge.
Q. Can you give me approximately when you were transferred?
A. I want to say it was November.
Q. Of?
A. '98.
Q. Okay, and then, after that?
A. I worked for a guy named Kevin Bumpas.
Q. And from '98 to --

Page 35

A. I did wear a TLD badge then.
Q. Okay. And now, because I don't know what a TLD badge is, what is a TLD badge, and what's the significance of it?
A. It picks up dose.
Q. It's a dosimeter basically?
A. [Indicates affirmatively].
Q. Okay, got you. And you wore it every day when you had it on?
A. Anytime I was inside H Tank Farm. Not while I was beaver trapping. The only time I wore it beaver trapping was when I was required to be RAD worker II trained to get in Four Mile Creek on February 22nd, 1999.
Q. And did it register a high dose?
A. I couldn't tell you.
Q. Did anybody monitor it when you got out?
A. They give -- I think you get a yearly monitoring. What they did on February 22nd -- you got the Work Clearance Permit?
Q. Plaintiff's Exhibit 1.
A. I was given this right here by Frankie Brooks. Okay. I read it and I didn't agree with it.
Q. Okay.
A. Okay, everybody that's ever worked for me that I put in the water, beaver trapping, was not required to

Page 36

be RAD worker trained.
Q. Okay, I understand that.
A. Okay. That did upset me. Okay?
Q. Okay.
A. Con-Ops -- I went in the creek with my regular waders on that leak. When you're trapping, you usually buy the cheapest pair of waders you've got.
Q. Right.
A. And the briars are usually -- they'll usually last a couple of days, or might last a week or so.
Q. Okay. But remember, we're talking about the dosimeter.
A. I know that the -- I had to -- the only way I could get in the creek was to use that badge and my Westinghouse badge. And that's not per my contracts.
Q. Let me stop you there and ask you a question real quick. Were you given the option of not going into the creek?
A. No.
Q. Forest Service told you you had no choice but to go into the creek?
A. That wasn't discussed at that time. When I pulled up there in a truck, that's what I was handed. And Frankie Brooks was the stand-by person.
Q. Right. But did you at that time say, "I don't

Page 37

want to do this; this isn't per the contract"?
A. I used my drinking water to wash my clothes off and I used a black trash bag –
Q. I'm going to have to –
A. – to stand on.
Q. Okay, Mr. Hooker –
A. Go ahead.
Q. – remember the rules that we set. You have to listen to my question and answer it. I didn't ask you what you used to wash off your equipment, I asked you did you tell Frankie Brooks at that time that you did not want to go into the water?
A. No, ma'am.
Q. Okay.
A. I did tell her that I wanted to use snares at that point right there.
Q. And did she tell you that you could?
A. She give me permission to use snares.
Q. So, then, I want to go back to my question. Did the Forest Service at any point tell you that you had to go into the water and you had to work pursuant to the work permit? Did – let me rephrase my question. Did the Forest Service tell you – let me see this really quickly. Did the Forest Service tell you that you had to trap at Four Mile Creek and Road Four?

Page 38

A. Yes.
Q. Even when you said to them – no, let me rephrase that. So your testimony is that Frankie Brooks told you that you were going to be in default of the contract if you didn't go –
A. She didn't say that.
Q. Okay. Did the Forest Service give you other options other than getting into the water?
A. No.
Q. I thought you just told me that they told you you could use snares.
A. When I got out of the water, they was going to make me use this WCP every time I got in the water.
Q. Okay.
A. When you go to that page right there, you've got to have those people, or someone of that training at every – every time you got in the water.
Q. Right, I understand that.
A. That's not per my contract.
Q. Okay. And my question to you is did you tell Frankie Brooks that?
A. I said I would trap, use the snares. I asked her could I use snares because I knew I could set and catch beavers from the bank.
Q. Okay, and if you used snares, you wouldn't need

Page 39

the Work Clearance Permit; correct?
A. I wouldn't have to get in the water, which required not having –
Q. Okay, listen to my question. If you used snares, would you need the Work Clearance Permit?
A. I'd say no.
Q. Okay. So I just want to clarify that when – so your testimony is that you drove to Four Mile Creek and Road Four to trap and Frankie handed you the Work Clearance Permit that's Plaintiff's Exhibit 1, and at that point in time, did you tell her you didn't want to do this?
A. No.
Q. All right. After the fact, you requested –
A. When I come out of the water, I asked her could I use snares.
Q. And she said yes?
A. She said yes.
Q. And did you go back to this site and trap with snares after that?
A. I trapped close to that area.
Q. But not the exact same area?
A. Not the exact same area.
Q. Were you ever required to get another Work Clearance Permit?

Page 40

A. There was another Work Clearance Permit issued that – I asked for copies of the Work Clearance Permits, but never got them. I asked Frankie Brooks.
Q. Wouldn't you have to have the Work Clearance Permit on your person when you were –
A. They took it up every time.
Q. Okay. So you never – so after February 22nd of 1999, you never trapped again pursuant to a Work Clearance Permit?
A. Usually posted that – usually posted that somewhere, and I don't really recollect where they might have been putting it, but –
Q. Okay. Now, let's go back to the dosimeter because you had to wear a dosimeter, and my original question was that day you were monitored by HP, correct, when you came out of the water?
A. What they monitored was the waders I used. They took a geiger, I want to say a geiger counter, and went over my feet and over my whole body, and then they didn't bring the rinse can –
Q. So that's where the drinking water –
A. – and so I used a gallon of my drinking water.
Q. Okay.
A. Then I was supposed to have a step-off pad, so I used a black trash bag that I had in my truck.

Page 41

Q. And the dosimeter, did they check the dosimeter? What did you do with the dosimeter, or the TLD badge?
A. The TLD badge goes back – my particular TLD badge went back in a rack inside H Tank Farm, and –
Q. Okay. And it's just monitored on a yearly basis?
A. I want to say it's monthly or quarterly.
Q. And that records your internal and external radiation dosimetry; is that correct?
A. I imagine it does.
Q. I mean have you – have you ever, since you've been working on the Savannah River Site, been told that your radiation dosimetry was high?
A. Yes, ma'am.
Q. Okay, when was that?
A. I've got a set of clothes that was buried from H Tank Farm.
Q. Okay, from H Tank, and about when was that?
A. I was an apprentice, probably 1977.
Q. So, a long time ago?
A. Yeah.
Q. Okay. But since then, you've been – during the time that you've been monitored, no one has ever said your radiation dosimetry is high?

Page 42

A. Not to my knowledge.
Q. Okay. When we were talking to Mr. Cromer earlier, he said that sometimes you guys wouldn't trap right at a site, you might need to trap above it or below it. Do you agree with that testimony?
A. I had a verbal order to go get them. Only – I had two places that was – that was required not to go but 20 feet or 30 feet one way or the other, and that was – I want to say Bush Brabum. I can look at the map and tell you what site it is.
Q. The big map or little map?
A. Let me use my map, and then you can compare it. It just makes your –
Q. Okay. You're looking at Defendant's Exhibit 2.
A. It's going to be Site Number 3.
Q. Okay, so –
A. Do you want to look at it?
Q. Yes. Now looking at Defendant's Exhibit 1.
A. You want to see it on this one?
Q. Is it the same on that map? Okay, so we can say – okay. And that was when you had a verbal order to –
A. I can only trap, I'm going to say, the length of this room, which is 20 feet, either way.
Q. And were there other areas that you trapped

Page 43

above or below? Other sites you trapped above or below?
A. Only other site that had a marking on it was Eagle Nest, which was on Four Mile Creek. I couldn't get within, like, a hundred yards of the eagle's nest. I don't have it marked on this map right here. Let me see that one. I'm going to say it's 54.
Q. Okay, that one you couldn't go within a hundred feet of the eagle's nest?
A. There's an eagle nest up in the area.
Q. Okay. And when you – and that was Site 54 on Defendant's Exhibit 1. And when you say the only other site that was marked, what do you mean that was marked? A minute ago, you said the only other –
A. That's where I had instructions not to.
Q. Oh, okay. But here's my other question. Did you or Andy ever trap above or below designated beaver sites?
A. Oh, yeah.
Q. And when you did that, did you always obtain permission to do that?
A. Yes, ma'am. Beth LeMaster had took me to Site, I want to say, 49 on C-Road and told me just to go get them, there to all the way to the Eagle's Nest and Dunbarton. We was having a lot of trouble in the Dunbarton area, and she finally just told me to go get

Page 44

the damn beavers.
Q. And what time period was this?
A. '99.
Q. Any other time that you –
A. [Indicates negatively].
Q. Okay. All right, let me just go through this real quickly. I don't want to keep you much longer because we've got things to do. Let's talk about the hog contract and the domestic hog situation. Tell me what you believe happened.
A. What I believe happened? I believe the whole thing was a show, myself. From putting on – coming up with the domestic hogs being brought in. Once I asked what was in the water and I asked Frankie what was in the creeks on the Savannah River Plant –
Q. So you don't believe they were domestic hogs?
A. I think – well, a hog's a hog is a hog to me. If he ain't in a pen – he's a domestic hog if he's in a pen. If you're raising him, he's a domestic hog. If he's out there running loose, far as I'm concerned, he's a feral hog.
Q. Okay.
A. I'm not – I don't have a biology degree in the hair, the length. I know what they can do; they squeal when you shoot them.

Page 45

Q. Right. All right, I got it. So – but my question is if you have someone who is a hog expert that's telling you these animals that have been brought in have rounded hoofs and that is a sign that they've been standing on concrete, their hoofs are clean, they have no dirt in them; that's kind of strange since they're out in the mud. They have extra teeth. Normally, wild hogs don't have as many. They don't have any parasites. Normally wild hogs have parasites. And this person is an expert, does that make you think anything?
A. Let's say he's a so-called expert.
Q. So you think he's part of the conspiracy as well?
A. I think he is. Him, Paul Johns, and the rest of those guys running the deer hunts.
Q. Okay, so – all right. Let's move on to when the Ellers were barred from the SRS Site. You believe that the removal of the employees was a breach of the contract?
A. The whole thing was just a show. I was called – I was called up there to the Forestry to bring radios up there.
Q. Right.
A. Okay, they'd been investigated me, they said,

Page 46

for three months.
Q. Right.
A. Frankie Brooks told me, she said, "You've been investigated for three months."
Q. Right.
A. She told me they flew my property with a helicopter.
Q. Right.
A. She said they flew Goldman Eller's property with a helicopter. She said they walked on Goldman Eller's property, Wackenhut. I asked my wife, I said, "Have you seen a helicopter flying around here?" I had a 23- or 24-acre little farm out here on Columbia Road.
Q. Right.
A. She said, "Yeah, there was one out here the other day, liked to landed out here in the front yard."
Q. Okay, so you were under investigation.
A. So –
Q. But you don't – okay. So you believe that it was a conspiracy by the Forest Service?
A. I believe it was a conspiracy by the Westinghouse deer hunts who were cutting roads – cutting trees down, going to my hog traps. Once they fired the Forestry – fired Goldman Eller and Mike Eller, barred them forever, they pissed the – I shouldn't say that.

Page 47

Q. Upset.
A. They upset Goldman's friends, or buddies, pals, that worked in WSI and the deer hunts. Because Goldman did hunt the deer hunts. Mike Eller hunts the deer hunts.
Q. Right.
A. And these people cut down trees that had been growing for ten years, put them across the roads, because I caught them. Paul Johns is the one I caught.
Q. Okay, but what does that have to do with the Forest Service?
A. Because I complained about them cutting my trees down, blocking me to get into my hog traps that had hogs in them, or the triggers would be cut where I couldn't – where anything would go in them and come out of them. I couldn't catch them.
Q. Okay. Have you been on hog contracts since your contract that ended in 1999?
A. I say yes.
Q. Okay. Did you increase your bid price based on the fact that you were going to be working in supposedly contaminated areas?
A. I know – I believe I did.
Q. Do you know by how much?
A. I think it was outrageous, like six or seven

Page 48

hundred dollars a head. They had – I was doing one contract when they flew the first jet in on 9/11. I did one bid then because I was writing questions up about the pre-bid. I'd e-mailed Homer about getting an extension, so I know I did that one. And then I did one more where I sat in with Margaret – I sat in with you, and I asked for a tour of the hog trapping sites.
Q. Right.
A. Or the contract site. And Margaret told me, "We're not doing one, there's nothing but woods out there."
Q. Right. Well, you should be pretty familiar with them since you've been hunting them for ten years; right?
A. Eight years.
Q. Eight years?
A. No, I didn't hunt the hogs but since October 1st, 1994.
Q. Your company didn't hunt them before then?
A. My company didn't.
Q. Okay.
A. Goldman Eller –
Q. They did?
A. They worked for John Reiner [phonetic], which is dead now. They worked – he – they worked for him.

Page 49

Q. Okay. So you think that when you continued to bid on these that you've upped your bid to six or seven hundred dollars per hog?

A. Per hog.

Q. Per hog. Okay, what about beaver? No beaver? Because they haven't had any solicitations; right?

A. They – what I was told on the beaver contract, when it ended, was they was going to let another one in six months. That was per Frankie Brooks.

Q. Right. But they didn't, they chose –

A. They never did.

Q. They chose to keep it in-house?

A. They never addressed any of the issues I had brought up either.

Q. Well, we sure are addressing them now in Federal Court, aren't we? Okay, so let's finish this up so we can get moving. When did you – or did you; I should start with did you ever request more money from Frankie Brooks or Homer Gabard?

A. Prior to doing the work June 1st, I'd asked Homer for more money.

Q. Okay, so prior to June 1st of 1999, you asked Homer for more money why?

A. Because the work he was asking me to do was not per my contract. I don't have to hire a stand-by person,

Page 50

I don't have to be RAD worker trained.

Q. And did you ask that in writing, or did you just ask that verbally?

A. I looked him dead in the eyes like I'm looking at you right now, and I said, "Homer, this is not per my contract, I need more money."

Q. Right.

A. His answer was, "It is per the contract, go do the work." I went straight to Frankie Brooks, I said, "Frankie, this is not per my contract." A couple of days later, she got back with me, she said, "Homer said it is per your – per the contract. You either default the contract or do the work."

Q. Okay, so you're saying that she did – that she did threaten to default your contract if you didn't hunt in the areas they told you to; hunt and trap?

A. Trap beavers –

Q. Trap beavers.

A. – on June 1st in HP-52.

Q. HP-52. Using snares or going in the water?

A. Going in the water.

Q. Okay, now, I have to say, Mr. Hooker, that that conflicts with what you said a couple of minutes ago. A couple of minutes ago you said that the only time that you ever used – and tell me where I'm getting it wrong

Page 51

because I'm sure I'm just misunderstanding. A couple of minutes ago you said the only time you ever used a Work Clearance Permit was in February –

A. 22nd, 1999.

Q. Correct. And that –

A. On Four Mile Creek.

Q. Right. Okay, but then after that fact, you were told that you could use snares and that you didn't have to go in the water.

A. On Four Mile Creek as specified. I'm sorry.

Q. I'm not trying to anger you, I'm just trying to understand.

MS. NICHOLS: Objection. Objection. He can answer, but don't badger him.

Q. [Ms. Williams] I'm sorry if you felt badgered.

A. Well, that's fine.

Q. I'm trying – I'm just trying to understand what you said.

A. I only had permission to use snares on Four Mile Creek, at that one particular spot at that time.

Q. Okay. So what I'm trying to clarify is that HP-52 – which is which site? Which beaver site is that?

A. I'm going to say it's Site 25.

Q. Was that a site that a Work Clearance Permit was required?

Page 52

A. It was one – one was generated on June 1st, 1999. I asked for a copy of it, I never received it. I asked for it twice, never received it. I asked a Westinghouse manager there were we going to use a RAD worker permit. It's a tall – taller of the two men. He said, "We're not going to use one for this job."

Q. Because one's not required?

A. My personal opinion, that one was required. As a planner for Westinghouse, I do believe one should have been generated.

Q. Did you agree to go in the water?

A. I did the water – I did the job. Frankie told me right there at the place, she said, "They say it's clean." I said, "Okay, I'm going to get in there." And I'd hired a man named Mark Lupert [phonetic] to video the work.

Q. So did you ever in writing state to Homer or Frankie that you thought that this was outside of the scope of your contract and that you needed more money?

A. No, ma'am.

Q. Okay. All right, I just want to make sure that we've got this correct. Okay, so out of all of the sites that you said you remember seeing signs at, there's HP-52, there's Site Number 47, there's Tim's Branch, which is from Site 19 down to 39 on your map.

Page 53

A. There's a couple more – there's a couple more sites on Tim's Branch –
Q. Right. I'm saying just from there to –
A. – and then there's some that don't even have numbers on Tim's Branch.
Q. Okay, how are they beaver sites if they don't have numbers?
A. That was that verbal.
Q. The verbal where they told you to hunt – to trap around the site?
A. Beth LeMasters – in fact, me and her got in a particular argument at one of them about not having a site number.
Q. Okay. Above Site 19 is another one you said.
A. [Indicates affirmatively].
Q. Okay. And then the Met Lab at Carolina Bay?
A. I did trap – Andy and I trapped Met Lab Carolina Bay. Met Lab had a small pond dug in it. I think it was – from the paperwork I've got, or I calculated, it would fill up in about 205 days, and then the rest of the Plant waste would come into the Carolina Bay.
Q. Are there any other sites that you trapped at that were marked, the signs that you can remember, other than the ones I just named?

Page 54

A. No, ma'am.
Q. Okay.
A. Now, I went back after the – before the contract was over and found these orange balls that mean danger. I found them where the trees had growed over them maybe 10/15 years, and then I went to the reactor canals and started looking there, too, and I did find one growing in a honeysuckle vine that said, "Plant Waste, keep out."
Q. And what site number was that again?
A. I don't recall which site it was, but I want to say it was C-Reactor canal.
Q. And what year – that was after your contract –
A. It was 1999.
Q. 1999? Okay. Where did you see orange balls?
A. I seen them in a couple of places. In front of 100-R where we was hog hunting.
Q. In front of 100 –
A. 100-R.
Q. R.
A. They're actually in the woods. There's a little small Carolina Bay. And I seen them on – I'd like to make sure that what I'm calling Beaver Dam Creek is. It's where the water comes out of the power house at

Page 55

400-D. They had grown up over the balls and the blackberry bushes and stuff like that. I didn't know what I'd put these guys in and, like I said, I was going back and doublechecking.
Q. Okay, I understand. Okay, let's turn to the contraband pass and then we'll wrap up. You allege that there was a period, a six-week period that your contraband pass was lost. Can you tell me when that was?
A. My contraband pass was never lost. My contraband pass number was wrong on a new contraband pass that Homer Gabard had issued to me for a extension of a contract.
Q. Can you remember which extension that was?
A. I want to say it was, like, a 60-day extension. It was in November.
Q. November of '99?
A. It might have been October/November, but it was –
Q. Okay. So it wasn't lost, it was that you had the wrong number. And did you tell him that you had the wrong number?
A. I told him at the – okay, the day of the demonstration, the week before that, Mr. Cromer was supposed to do the demonstration. I had wrote – Homer asked who was going to do the demonstration. Mr. Cromer

Page 56

was supposed to be the one with the gun; okay? We got there, I'd just got off – pulled 12 and a half hours off of the Tank Farm thing. I got off at 7:00, met Homer where we was supposed to meet with Andy. I got out of the truck, Andy was supposed to do the demonstration, and all I was going to do was catch dogs or participate whatever way. Homer said, "You're going to do the demonstration today." I said, "My contraband pass is not right." Which I use a bow a lot, too. And I didn't have a bow with me and the contraband pass was wrong. You can't even bring it on Site. Security, they go crazy sometimes.
But anyway, Homer said I was going to do the contract and I tried to make a different day for it. He was set for dead on one mission. So I reached in my toolbox, got a compass and I had a knife that I used to scrape when I do caster piles and stuff. I want to say it's a Barlow, about three-inch blade, and I turned the dogs – turned the trail dogs loose and she went in there about – we was using just two dogs, and she went in there about 200 yards and hit the scent of about a 300-pound, 350-pound hog and the catch dog caught it and I went in and stabbed the hog twice in the lungs, and Jack Mayer and Homer and Frankie, they was all running. Frankie was taking pictures.

Page 57

Q. Okay. And I'm sorry, I am listening to you, but I really – I want you guys to have time to see the Site and I just – I want to get to the question that I'm trying – I'm working on the contraband pass. And I know this story from that day because I've read over your – read all your stuff.
A. That's fine. That's fine.
Q. But I just want to work on the contraband pass for just a second. So that took place on December 9th of 1999. So at that point, do you remember when you got that contraband pass? You got that contraband pass when your extension was granted?
A. I think so, that particular one. The one that was wrong was the new one. And like I said, I kept a bow with me a lot of times, but when I'm in the parking lot out there when I worked for Westinghouse, I didn't carry a gun with me at all.
Q. Okay.
A. I could shoot the hogs in the pen in the traps with the bow.
Q. Is a bow – do you need a contraband pass for a bow?
A. I had one.
Q. Okay, you had one for the bow, just not one for a gun?

Page 58

A. Right.
Q. Okay.
A. But you just can't run through the woods with a bow and arrow.
Q. Right.
A. I mean I don't know if you know or –
Q. They're huge; right?
A. Well, they're a lot more clumsy.
Q. Right. Okay, so – all right, then the last – I think the last area I want to talk about is – well, let me ask you this. So you told Homer at that point in time that your contraband pass was wrong?
A. Right.
Q. Did you ask him to fix it?
A. No.
Q. No; okay. All right, the last hog, or the last record we have of a hog that you killed was November 30th of 1999. Did you ever hunt after that to your knowledge or recollection?
A. November 30th?
Q. Um-hum [yes].
A. I don't believe I did.
Q. Do you know why?
A. I think I'd had enough of Westinghouse deer hunts, cutting the trees down; Wackenhut riding around

Page 59

checking the traps, and they would be messing with the traps. I'd get phone calls from Wackenhut saying the hogs was in a trap, or –
Q. So you were just tired of it?
A. I'd had enough of the BS, I promise you.
Q. Okay. Do you – are you – do you remember when you first became aware of when you found out that the Forest Service was not going to award the contracts for which you did the dog demo?
A. I can't recall. But what I did, I had wrote Congressman Norwood. I wrote him a letter in 2000, and a man named Hussey, James Hussey, had started an Congressional investigation for me, 13033.
Q. Right.
A. And then, in 2002 – well, I did receive a letter saying I was awarded contracts in 2001, 2002 and 2003.
Q. From who?
A. Congressman Charlie Norwood. I've got a copy of it if you need it.
Q. You do?
A. Oh, yeah.
Q. Okay. Yeah, that'd be great if you could produce that. I don't know that Mr. Norwood's office has authority to do that, but I'd like to see the letters.

Page 60

MS. NICHOLS: Well, wait a minute.
MS. WILLIAMS: Yeah, your attorney has to determine if she's willing to agree with that. So, I'll make the request for production and you can let me know.
MS. NICHOLS: Thank you. I don't know, this is new information.
Q. [Ms. Williams] Did you – let me just – last couple of questions. Did you wear any personal protective equipment when you were cleaning culverts?
A. If you consider hip boots or waders, chest waders, protection. But they – like I say, a lot of time, they leaked.
Q. Yeah, I've actually worn some before. What about gloves?
A. I have wore gloves when it was real, real cold, and I – a couple of times, I had used rubber gloves.
Q. Why did you have to use rubber gloves?
A. Because the water's cold.
Q. Oh, okay. What about personal protective equipment while you were trapping beaver?
A. Nothing other than what's specified in the contract.
Q. Okay. Do you recall cleaning culverts after July of 1999?

Page 61

A. I cleaned culverts from after June – July, yes, ma'am, I cleaned them. I'd catch – the beaver sites had been cut and I'd clean the culverts. I'd stand on top of the culverts and I'd use a potato rake and I would work the mud and that dirt that I'd had my hands in prior to that with that potato rake until the water flushed it downstream.
Q. Okay, and that's after July 1999?
A. Right.
Q. Okay.
MS. WILLIAMS: I think that's all that I have except that I want to say that I'm also keeping this deposition open. And do you want to take a little break for a second and see if you have anything?
MS. NICHOLS: I don't have anything.
MS. WILLIAMS: Oh, you don't? Okay. Thank you very much, I appreciate your time.
[DEPOSITION ADJOURNED AT 12:05 P.M.]

Page 62

CERTIFICATE

SOUTHCAROLINA
AIKEN COUNTY

I hereby certify that the foregoing deposition was reported, as stated in the caption, by the method of Stenomask and speech recognition, with backup, and the questions and the answers thereto were reduced to typewriting by me or under my direction; that the foregoing pages 1 through 61 represent a true, correct, and complete transcript of the evidence given on the 8th day of December 2005, by the witness, WILLIAM D. HOOKER, who was first duly sworn by me; that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I financially interested in the action.

This, the 19th day of December 2005.

ALICE D. BONI, CVR
CERTIFIED COURT REPORTER
NSVRA CERTIFIED