# DEPOSITION OF JOHN ANDREW CROMER, III - 12/8/05

## WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY V. THE UNITED STATES

**Page 1 to Page 98**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*SHARON DEHART, COURT REPORTER*
*P. O. Box 2474*
*Aiken, SC 29802*
*Phone: 803-648-9434*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY,
Plaintiff,

vs. NOS 03-1501C, 04-1126

THE UNITED STATES,
Defendant.

DEPOSITION OF JOHN ANDREW CROMER, III
taken by Counsel for the Defendant
before Alice D. Boni, Certified Court Reporter
at the offices of Department of Energy
151 Corporate Parkway, Aiken, South Carolina
on Thursday, the 8th day of December 2005
commencing at 8:40 a.m.

ALICE D. BONI, COURT REPORTER

Page 2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF: ROBBIE H. NICHOLS, ESQ.
Attorney At Law
Post Office Box 7925
Hilton Head Island, SC 29938

FOR THE DEFENDANT: LINDSAY E. WILLIAMS, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, DC 20530
LUCY KNOWLES, ESQ.
Westinghouse Savannah River Site
Post Office Box A
Aiken, South Carolina 29802-0900

- - - - -

INDEX TO EXAMINATIONS


| | Page |
|---|---|
| EXAMINATION BY MS. WILLIAMS | 3 |
| EXAMINATION BY MS. NICHOLS | 97 |
| CERTIFICATE OF COURT REPORTER | 98 |


- - - - -

EXHIBITS

[NO EXHIBITS PROFFERED]

- - - - -

Page 3

[IT SHOULD BE NOTED THAT Mary-Ellen Noone, Mark Simpson, Margie Yeaton, Mr. Nicholson and William D. Hooker are also present at the deposition.]

- - - - -

JOHN ANDREW CROMER, III
having been first duly sworn, was examined
and testified as follows:

EXAMINATION

BY MS. WILLIAMS:

Q. Hi, Mr. Cromer, my name is Lindsay Williams and I am an attorney for the Department of Justice, and I am representing the Forest Service in the litigation of William D. Hooker versus the United States. Have you ever had your deposition taken before?

A. Yes.

Q. And when was that?

A. It was during the time we was out there, so I'm going to say it was around '96/97. I ain't exactly sure. It was a road contract. We had a problem out there with Hertz.

Q. Okay. And when you say you've had your deposition taken, was it with a court reporter and everybody in the room together?

A. Yes. Yes.

Q. Okay. Did that actually go to a court, or was

Page 4

that before an agency?

A. No, it got straightened up right there with that; with that alone, with the depositions taken.

Q. Okay. And what was the – what did the contract involve?

A. The contract was a road building contract that we put out there to be put in place until U.S. Forestry Service got this larger contract, a larger company to come in, and we was supposed to do the work until another company came in. And it was tearing out culverts, putting culverts back in, rebuilding the roads where – you know, from erosion, road scrapping, such as that.

Q. And what was the dispute about?

A. The dispute was they sent us crap, equipment that was no good. They sent us a road scrap that was leaking oil; they sent us a flat tire on it, didn't have a backup alarm. They sent us dump trucks out there that didn't – wasn't of the tonnage or the cubic foot that was supposed to be per the contract. Because we went – we took the specs of the contract to Hertz and they said they could do the work. Okay, the first day they sent the dump trucks out there, they got turned around at the gate. That's the first time we ever had anything bad against our company, so we said they owed us some money.

Q. Okay, and when you say "we," who – were you

Page 5

part of a company, or were you a –
A. Georgia Bowhunters Supply.
Q. Oh, you were working as Georgia Bowhunters?
A. Yes.
Q. Okay. And so you – Georgia Bowhunters brought action against Hertz?
A. Yes.
Q. Okay. Any other time that you've had your deposition taken?
A. No.
Q. Okay. Well, since it's been awhile, can I go over everything again? And you sat in yesterday, so you saw, but basically I'm just going to be asking you questions today.
A. Sure.
Q. And if you don't understand me, please tell me that you don't understand me and I'll rephrase the question.
A. Right.
Q. If you don't know, then just tell me you don't know. If you don't hear me, ask me to repeat.
A. Okay.
Q. And just remember that you are under oath and all I ask is that you be truthful and try to give me as much information as you can.

Page 6

A. Sure.
Q. Additionally, if I ask you a question and you know part of the answer, but not all of the answer, I'd appreciate it if you'd give me the information that you do have. Any information you don't have, that's fine.
A. Okay. Sure.
Q. Let's start with what are going to seem like personal questions, but it's just kind of routine.
A. Sure.
Q. Are you taking any medication today that would prevent you from either being able to answer truthfully to my questions or being able to recollect?
A. No. No, unless Synthroid for thyroid gland would. No.
Q. Okay. If you would just please state your name for the record.
A. John Andrew Cromer, III.
Q. And if you could please give your address.
A. 1018 Thurmond Street, North Augusta, South Carolina, 29841.
Q. And we're going to start, if you could just tell me what your education is, starting with high school, and any – and by education, I mean if you had vocational training, technical training.
A. Right. Certainly. Certainly. High school,

Page 7

completed that. Two years of college, Brewton Parker College. Four years of tech school, Augusta Tech, graduated.
Q. And when you were in tech school, did you have a specialty or a major?
A. I'm an electrician.
Q. Electrician?
A. Yes.
Q. Okay. And when you graduated from tech school, did you receive a degree?
A. Yes.
Q. Okay, what was that?
A. It was a degree in construction indust- – industrial construction electrician. That might not be verbatim, but that's very close.
Q. Okay. And after you graduated from tech school, what did you do?
A. Was in apprenticeship program. I worked as electrician for G&R Electric Company; that's the first company that hired me. I worked for them for about eight years; six or eight years. And actually turned out as an apprentice with them and continued working with them as a journeyman wireman.
Q. And is that – is G&R Electric here in Aiken?
A. No, they're out of business.

Page 8

Q. I'm sorry?
A. They're out of business.
Q. Out of business? But where were they located?
A. 1406 Reynolds Street, I think was their address.
Q. Here in Aiken?
A. Augusta, Georgia.
Q. Augusta; sorry.
A. Right.
Q. Okay, and then you were there for six or eight years?
A. Yes.
Q. And what year did you graduate from tech school?
A. Around '79/80.
Q. And then, once you left G&R, where did you go?
A. I'm a union electrician and I've been to many, many, many jobs. I went from G&R to Savannah River Plant, Naval Fuels.
Q. I'm sorry, Savannah River Plant –
A. Savannah River Plant, working for DuPont, Miller Electric.
Q. And is that different from – is that on the Savannah River Site, or –
A. It was at the time. It was the major – they

Page 9

were the main contractor at the time.
Q. Okay. And what type of contractor?
A. Electrician.
Q. I mean Dupont was what type of contractor?
A. Oh, they're the same thing as, I assume, Westinghouse is today.
Q. Okay, and so you worked for the equivalent of Westinghouse as an electrician?
A. I worked for a subcontractor under Miller – well, under DuPont, which was Miller Electric out of Jacksonville, Florida.
Q. Okay. I'm sorry if I seem a little dense here, but Miller Electric was a subcontractor to DuPont and DuPont was a contractor of Savannah River Plant?
A. Yes.
Q. Okay, got it. And you worked as a union electrician?
A. Yes.
Q. Okay. And then, other than – when did you begin working for Miller Electric, for DuPont?
A. I'm going to guess in '85/86. It was when nuclear – Naval Fuels was being constructed. I really don't know exactly what the date was.
Q. Okay, but your best estimate is that it was '85 or '86?

Page 10

A. Somewhere in that area, yes.
Q. Okay. And then, after '86, what did you do?
A. Worked for – I've been to Vogtle, it's a plant out of – Vogtle, another nuclear plant under new construction, and went back to G&R Electric for awhile, then went back to the Savannah River Plant at Naval Fuels, and went from Naval Fuels to S-Area and was out there a good little while.
Q. And what was the last thing you said?
A. I was out there a good little while.
Q. At where?
A. At – again, at Savannah River Plant.
Q. Savannah River Plant.
A. Yes.
Q. Okay, sorry. So that ran from '86 to –
A. Working for Savannah River Plant at –
Q. I mean just all of the jobs that you just listed was '86 through –
A. All the jobs, probably around '91/92, I think, was the last time that I worked – actually was there when Westinghouse got it; Bechtel. Bechtel was the general – or the subcontractor.
Q. And you worked as an electrician –
A. Yes.
Q. – the whole time?

Page 11

A. Yes.
Q. Okay. And then what happened in '92?
A. I quit.
Q. Okay, and then what did you do?
A. Worked for the next five or six years as a beaver trapper, hog trapper.
Q. And where did you do that?
A. Savannah River Site.
Q. And that's the only place?
A. No.
Q. Okay, where else did you go?
A. Anywhere from Augusta National Golf Course to Gum Swamp to anywhere.
Q. Okay, and did you do that as Georgia Bowhunters?
A. Georgia Bowhunters, and also Southern Wildlife Management Company.
Q. And what is your position with Georgia Bowhunters?
A. At present?
Q. Um-hum [yes].
A. I'm still an employee, might say. Not really at present. It's kind of dissolved at the moment, but, I mean, it's still an entity. Georgia Bowhunters Supply is still, I reckon, called a company. They're not doing

Page 12

work at present.
Q. Okay. And when you first began to work with them, what was your position?
A. I owned half the business.
Q. So it was a partnership?
A. Yes.
Q. Between you and Mr. Hooker?
A. Yes.
Q. And when did you cease being a partner?
A. Summer of '97. Exactly what date, I don't know.
Q. And was there a particular reason?
A. I couldn't give him the time, my time that I was supposed to give, the 50 percent, so I relinquished it. I said, "Danny, I'm not going to be able to be a part of it," so I gave my half back to him.
Q. Okay. And what were you doing? What were you doing that was preventing you from giving him your time?
A. I was working for another person.
Q. And who were you working for?
A. Sly Bailey.
Q. I'm sorry?
A. Sly Bailey.
Q. And what's that?
A. Has Bailey's Christmas Tree Farm.

Page 13

Q. And what did you do for the Christmas tree farm?
A. I trimmed trees, I painted trees, I drove tractors, I bushhogged. You name it, I did it.
Q. Okay, and you worked there beginning in '97?
A. Possibly a little bit before that, you know, on occasion, part-time, or something like that, but exactly, I don't know.
Q. And for how long did you do that?
A. Off and on for about two years, maybe two and a half years; two and a half, three.
Q. Okay, and when you – I'm sorry, let me go back real quick. You also said you worked for – was it Southern Wildlife Management Company?
A. Yes, ma'am. That was my company.
Q. That was your company that you owned yourself?
A. Yes, ma'am.
Q. Okay, and when was that in existence?
A. It was right around the same time we started Georgia Bowhunters, or Danny started Georgia Bowhunters, and it was '90, '91, '92, somewhere like that.
Q. And then when did that cease to be a company?
A. Oh, Lord.
Q. It could be general, if you want. Was it before or after you started working for Sly Bailey?

Page 14

A. It would be after.
Q. After. So were you still doing beaver trapping for Southern Wildlife Management when you were working for Sly Bailey?
A. Yes.
Q. Okay.
A. Yes. He worked for me sometimes, too.
Q. Okay. Did you leave Georgia Bowhunters on good terms?
A. Sure. Yeah.
Q. After you finished working on the Christmas tree farm, where did you go?
A. The Christmas tree farm, and then I worked for AES. I went back into – you might say back into the electrical trade again. I continued to keep my ticket up, my union ticket up, so a job came open with Advanced Electrical Services; I went back to work as a journeyman wireman, and that lasted for a year, maybe a year and a half. And then unemployed again. And somewhere around '99/2000 is when I went to Dayton, Ohio as a union electrician. Dayton, Ohio; Columbus, Ohio; Patterson, New Jersey; Atlanta, Georgia; Charleston, South Carolina, and that's up to present.
Q. Okay, and were you –
A. And there's been some laid-off times in that –

Page 15

Q. Between?
A. Yeah.
Q. Were you working for different companies during that time?
A. Yes. Yes.
Q. Okay. Sorry, I know that seems tedious to go through all that. And so when did you come back to – where do you – you told me where you live. Are you in Augusta, or –
A. Well, you mean when I went to Dayton, Ohio?
Q. No, when did you come back here, is my question, after you –
A. Well, it was off and on. We might get work for, what, six months –
Q. Oh, you just –
A. – six weeks.
Q. Okay.
A. You know, the job got finished, get laid off, come home and draw unemployment.
Q. So you always maintained a residence here?
A. Sure.
Q. Okay. When did you start beaver trapping?
A. Right around '90.
Q. And how did you get into it?
A. I've been trapping all my life. Just a beaver

Page 16

job came available and I got on.
Q. Well, no, when I asked you how you got into beaver trapping, I mean if you did it as a child, did you do it as –
A. No, I did trapping as a child. There's many avenues of trapping.
Q. Trapping other animals?
A. Yes. Yeah.
Q. All right. So you've done that your whole life?
A. Certainly.
Q. Have you done trapping or hunting of hogs as well?
A. Yes.
Q. So you began trapping beaver professionally in '90?
A. Yes.
Q. 1990; okay. And what about hog trapping, hunting?
A. I'll say whenever we got our first contract as far as professional, yes.
Q. But you had done it for sport before that?
A. Yes.
Q. And in South Carolina, what's required to trap beaver and trap and hunt hogs?

Page 17

A. Hog, in South Carolina, doesn't really have a season. What they have – what the state of South Carolina works off of is depredation permits. And that is a permit that allows you to take an animal any time of the year for just cause, whether it's crop damage, or eating pine trees, or what have you. Okay, beaver trapping – in the specs on hog trapping, you can run with dogs, you bait them, you shoot them any manner you want to as long as it's a feral hog, you've not gone in somebody's pen and shot someone's hog, you know. Okay, beaver trapping is a set – specific rules on it. You have to be in the water, you have to use – you can use all manner – well, you can use Conibears, 330 Conibears.
Q. And what is a Conibear? Because I've heard a lot about it.
A. It's a wildlife trap, is what they call it. It's a kill trap. It's the most humane trap U.S. Government allows.
Q. And how does it work?
A. It's a scissors type trap and you collapse it by two main – it's where the power – where it gets its power, it's just got, like, a scissor on the side and you can press it and lock it. Okay, then you scissor-action the trap and put your safety dog on it, which holds it;

Page 18

you keep your little latches on there, you set it, and it's a vertical trap. In other words, the animal has to pass through like this. It's not like a foot-hold trap –
Q. Right. Okay.
A. – where he steps his foot in. It's just a – it's a vertical animal trap. It's a killer trap.
Q. Okay, and you put those in the water?
A. Yes.
Q. Okay. And so –
A. That's per South Carolina law, plus per our contract to do in South Carolina, too, you know.
Q. Okay, so you said you can go to – you have to be in the water. You can use different manners. You can use Conibear. What else can you use?
A. Foot hold.
Q. Foot hold?
A. Yes.
Q. And that's one that goes like that?
A. Well, steps in it –
Q. Yeah.
A. Yeah.
Q. Okay. And what type of – is there, like, education classes you have to go to, licensing; anything like that?

Page 19

A. There's no – there's no – you have to pay for a license. Education is getting in the woods.
Q. Okay.
A. We did trap some beaver on the Plant with snares, too, now. So – but we had to get a special depredation permit to allow us to do that because, again, you have to dispatch the animal, so you had to get a – our contraband passes had to have a weapon on it.
Q. Okay, how does the snare work?
A. A snare's just a noose, like cowboy's nooses; cattle. It's the same thing, but it's held vertically, the animal walks into it, the noose is down on the animal and holds him right there.
Q. Now, those you can set from the bank; right?
A. That's the reason. It was safety, is the reason why we went to snares, plus contamination.
Q. Because if you did it that way, you didn't have to get in the water; right?
A. Yes. And that was established at – I think right around Road Four, Four-Mile Creek depredation permit – I mean Work Clearance Permit.
Q. Now, let me ask you this. Do you use – what type of weapons do you use with the hogs? Because you said you could shoot them. Do you just shoot them with –

Page 20

A. .22 Magnum was the biggest they'd let us use.
Q. Now, is that South Carolina, or is that the –
A. No, that's U.S. Forestry Service, Savannah River Plant, DOE.
Q. Okay, but what about South Carolina law, though?
A. South Carolina law, you can use whatever.
Q. It doesn't matter?
A. There's a minimum. I think what we were using out there was the minimum that you could use on a hog.
Q. What about a bow and arrow or anything like that?
A. Yes. Yeah. That was also given to dispatch the hogs because of you don't want to be firing a rifle off, or to dispatch a hog or dispatch a beaver, if you're, you know, within a couple hundred yards of people – anytime a rifle – or anytime you would fire a rifle out there, the radios go crazy.
Q. The radios go crazy?
A. Yeah, we had a radio on us.
Q. Oh, because people hear it and they want to know what it is?
A. Yeah. Yeah, it's – yeah, what's going on?
Q. Okay, I understand. And when you say "dispatch" –

Page 21

A. Means to kill.
Q. Okay. Making sure. All right. So how long have you known Mr. Hooker?
A. Since 11th grade homeroom.
Q. Really?
A. Yeah.
Q. Did you guys used to trap and hunt together?
A. Yes.
Q. And you've been doing that since 11th grade?
A. Yes.
Q. And when was the first time you worked with or for Mr. Hooker?
A. Actually working with?
Q. Um-hum [yes].
A. Would be when we started the contracts at Savannah River Plant. I'd worked alongside of him, you know, in construction. He's a pipefitter and I'm an electrician. Sometimes, occasionally, we'd be on a job together as far as work relationships.
Q. Did you guys work on the Savannah River Plant together?
A. On – on –
Q. The Savannah River Plant before the contracts?
A. Yeah. Yes, in construction, Naval Fuels, one area; F-Area was the other area.

Page 22

Q. Say those areas again.
A. Naval Fuels, that's in F-Area, and S-Area, which is right outside of H.
Q. And is that – what is F-Area and S-Area?
A. It's Separations.
Q. You mean just geographical separations?
A. No, no, no, no, no. They're – it's Plant termination. They're Separations. In other words, they're not a reactor, it's where they separate fuels.
Q. Okay, separate fuels.
A. Yeah.
Q. Okay. A lot of stuff you'll have to explain to me because I'm not from –
A. It's no problem.
Q. I'm not from Energy and I'm not from Forest Service, so –
A. No problem.
Q. – a lot of this stuff, I'm learning as we go.
A. Well, I don't know it all either.
Q. So when was the first time that you trapped with – professionally with Mr. Hooker?
A. Professionally?
Q. Um-hum [yes].
A. Would be, I think, around February '91/92.
Q. And that was for SRS?

Page 23

A. Yes.
Q. Okay. And did Georgia Bowhunters trap and hunt beaver and hog other places other than SRS?
A. Beaver.
Q. Beaver? And that was – was that where you said everywhere from the golf course to –
A. Yeah, we – I mean, you know, I can't say we've been everything, but we had a bunch of – you know, we had a bunch of jobs. It'd be from private individuals to companies to whatever. I mean, kind of all over Richmond County. CSRA, you might say.
Q. CS –
A. CSRA, Central Savannah River Area.
Q. Okay, so let's go through your work on the Savannah River Plant. I know we kind of went through it a minute ago, but let's go through it a little bit more. So you said before the first time that you worked on the Savannah River Plant would have been around '85 or '86?
A. Yeah, somewhere in there.
Q. Okay, and you were working as an electrician?
A. Yes.
Q. Okay. And what did your job entail?
A. The first job I had, it was just a – we're called inside wiremen, journeyman wiremen, and it – anywhere from reading prints to running pipe. That's

Page 24

bending it, securing it to walls, putting in slabs, ceilings, pulling the wire, terminating; you name it. Anything electrical.
Q. And did you do that all over the property?
A. I did Naval Fuels – as far as specific areas, I did Naval Fuels, S-Area, I did a little bit at Central Shops, and also 221-H.
Q. And your employer was Miller Electric; right?
A. Miller and Bechtel.
Q. And Bechtel.
A. Yes.
Q. Okay, when you were doing this work, were you required to go through any type of training before you were working on the SRS Site?
A. Yes.
Q. What type of training.
A. GET. Had GET training. I don't know exactly when GET training started. It may have been something I took the first time I went out there. And RAD worker training.
Q. And tell me about – I know we talked a little bit about GET training. What is GET training?
A. It just gives you an idea of, like we talked about yesterday, the signs and all that kind of stuff. It just makes sure that you – you know, you're aware of

Page 25

your surroundings, what you're doing.
Q. So it would show you all of the signs?
A. Yeah. It tells you what's going on at the Plant and what's going on at Savannah River Plant, so you – you won't get into anything you shouldn't. There's a lot of places you ain't supposed to be, blah, blah, blah, security-wise, or crapped-up-wise, or whatever.
Q. And then what's the RAD training?
A. It trains you to be a RAD worker.
Q. And what's a RAD worker?
A. A RAD worker is a person that works – can work around radiation. It doesn't mean you do. I worked out there very little as a RAD worker, but I was RAD-worker trained. So you work around radiation, so it teaches you time, distance and shielding. That's the amount of time you're going to be around it, how far you're going to be away from it, and the shielding you're going to have to be there. And it teaches you a bunch of stuff.
Q. And are there different levels?
A. I had RAD-II. I don't even know if they had a RAD-I. I may have taken it.
Q. I guess you could assume if there's a two, there's a one as well?
A. I've always thought that.
Q. Okay. And how does the – is it a certificate,

Page 26

the RAD?
A. No, it gives you credentials that you actually wear on your lanyard that kind of tells what you're capable – of what kind of schooling you've had.
Q. And so what does that tell people? I mean does that control where you can go on the property?
A. No, pretty much Security controls where you go, where you can go, but it also, when you get in and around radiation or contamination areas, it will tell to what kind of training you have, right.
Q. Okay. And how did that work? Was it something that you had to – like if you were RAD-II certified in, you know – okay, what year was that? In '85, does that mean you're RAD-II certified for the rest of your life, or –
A. No. Uh-uh [no].
Q. You have to –
A. I think the – I'll be honest with you, I think RAD-worker-II was good for a year, and I'm not positive about that.
Q. Do you recall ever having to take the test again?
A. Yeah, I've taken it several times. Every time you leave the Plant, if you – I'm thinking if you're gone for a year, you've got to take it again. And there

Page 27

were some, you know, times when you'd – the whole Plant would have to be retested for some reason, I don't remember what.
Q. And when you're retested, do you go through a class or anything? Do you study anything?
A. Certainly. Sure.
Q. How intensive is that?
A. Pretty intensive, I reckon.
Q. I guess my question is did you go to a class for, you know, an hour every day for a week, or was it six weeks, or was it –
A. I'm thinking the longest I went to RAD training was about three or four days.
Q. Three or four days? Okay.
A. Then you end up taking a walk-through test like you're going through a whatever.
Q. Like a drill?
A. Yeah.
Q. And when you say three or four days, would it be all day?
A. No. Most of the time, we got out a little early or something like that. It wasn't a full eight hours, but they claimed it was eight hours.
Q. Okay. When is the last time that you were RAD certified?

Page 28

A. Probably '92/93, something like that. You know, as far as when it would go through, yes. The last time I left the Plant, plus that year.
Q. Okay, so you had GET training, you had RAD training. Did you have any other type of classes or anything that you had to go through when you were working on the Site?
A. We had a little training, you know, about an hour, what we were doing, you know, in the electrical field, and I don't remember – I do not remember whether I had extra training or whatever, or any other training.
Q. Okay. When you were trapping with Georgia Bowhunters, was it just you and Mr. Hooker?
A. For, I'd say, six to eight months, it was.
Q. You mean in the beginning?
A. Yeah. In the beginning, it was just he and I.
Q. Okay, and then who else came on board?
A. I think Dale Hollins was the next person that actually came out there and went to work for us.
Q. And then, after him?
A. There's so many. There was a Doug Flanders, a Joe Jackson, a – some I don't even – Gary Lewis, Perry Bagwell.
Q. If you could, estimate how many people there were.

Page 29

A. I think total, to estimate – you're talking specifically beaver trapping?
Q. No, Georgia Bowhunters.
A. Georgia Bowhunters. I imagine there were 15/17 people, 18.
Q. 15 or something?
A. Yeah.
Q. From '90 to present?
A. Yeah.
Q. '90 to whenever Georgia Bowhunters was still trapping –
A. Yes. Yes.
Q. – or hunting?
A. Yes.
Q. Okay. Let me show you Defendant's Exhibit 1. Okay, this is a map entitled "SRS Beaver Trapping Sites." Do you recognize that?
A. I've seen similar to that before.
Q. Similar?
A. Yes.
Q. Where did you see it?
A. Savannah River Plant/Site, the contract we had.
Q. Does this come with the contract?
A. All kind of information like that; maps and all kind of stuff came like that.

Page 30

Q. So this was something that you – did you carry this around with you, or is this something that you were so familiar with that you just knew it?
A. The majority of stuff we carried around with us was just a map location just to keep up with the sites; you know, where the sites were and stuff like that.
Q. And if you go to a beaver trapping site, let's say 19, does it say, "Beaver Trapping Site 19"? Is there any sign to say that's –
A. When you get there?
Q. Um-hum [yes].
A. No.
Q. No. So, it's just on the map?
A. Yes.
Q. And there's no markings of where it begins or ends?
A. No.
Q. Okay. Did you trap at all of the sites that are on this map?
A. Pretty much, yes.
Q. Were there any that you were at more often than others? Were there any that had a lot of beavers so you went there more often?
A. In the Deltas, pretty much.
Q. Where is that?

Page 31

A. You've got Four-Mile Delta and Pen Branch Delta, and that is starting right in here – well, actually right here. This is Four-Mile junction right here about 400 to about there. There's about 10/12,000 acres of swamp in there and we had full run of it.
Q. Okay, so more beaver there because it's swamp?
A. It's swamp, yes.
Q. And let me look at this. So you left in the summer of '97, so did you – were you working on the last hog contract that –
A. I worked up until he – we just quit going out there.
Q. Okay, up until –
A. Yeah, occasionally. Not all the time. Hooker manned the job most of the time from the time that the WCPs come into contact. In other words, it was a big thing for us to go back there and do anything after that.
Q. Oh, but you were still working through '99?
A. Oh, yeah, we was friends. I was employees of –
Q. Oh, okay. Okay, I thought –
A. Yeah, I went from –
Q. Oh, it was just in '97 that you were no longer a partner?
A. Yes.

Page 32

Q. Okay, so you were still working through '99?
A. Oh, yeah. Yeah. Whenever he needed some help, I'd go with him.
Q. Okay, I understand.
A. It just got to a point where I was working somewhere else.
Q. So you couldn't do your partner duties?
A. I couldn't do both of them. I couldn't do my partner duties, so I relinquished my half.
Q. So in '97 to '99, were you in the swamp area? Would that have been an area you were in a lot of the time?
A. A good bit. A good bit. Not to mention other places, too, now. I mean, but you're talking a lot of time. Reason why I'm saying, you've got to walk through muck and mud. It just takes so much more time. It's time consuming.
Q. Right.
A. Yeah.
Q. Okay, well, where are areas – where are trapping sites that you went to often because you were always able to get beaver there?
A. As far as always, you can always go to the Deltas and get it. Okay, and then you look for other really swampy areas.

Page 33

Q. So what are some other swampy areas on here?
A. Well, Site 1, 1-A, 1-B. That was a real swampy area. Site 2. Are these – this is definitely different. Are these – what are these dots right here for?
Q. Those are the – those are – well, no, I don't know.
A. Is that specifically telling you beavers that were –
Q. Yeah, those are beaver sites.
A. Okay.
Q. It may be different from when you were there. I think all of the old sites are the same. Are there any new sites?
MS. NOONE: I think it's changed.
Q. [Ms. Williams] Okay, it has changed a little bit.
A. Yeah, it's changed a little bit.
Q. So if it's changed a little bit and you see one that's labeled, you could say near one, or near two, if it's not exactly where, you know –
A. Well, you know, I can't really sit here and say because I would go wherever the beaver problem was at. Because, you know, it was a head-count job. After that, I get paid by how many beaver I caught.

Page 34

Q. Right.
A. Well, I'd go to where at – we – catching beavers at a culvert plant.
Q. And how did you know where to go to catch beaver?
A. Well, you would listen to – sometimes it would come from Forestry, sometimes Danny would say. Danny'd say, "You need to go over here. If you've got time, how about going to area – this area."
Q. Did you guys have a routine of, like, traps that you set and checked on a regular basis, like, "Oh, today, it's time to go to trapping site two"?
A. No, you had – when you put them out, you had to look at them every day. There's a 24-hour check law, South Carolina laws.
Q. Okay. And let's go through the beaver process. Let's go from when you would know where to set a trap, or when you would make the decision to set a trap, to when you get rid of the beaver carcass.
A. First thing, you get a notification from Frankie, verbally. Usually, not all the time. Sometimes it was you got a work order, but most time, it was verbal. And she'd tell you, or give you directions to get there, say, "Put your sign up and go to trapping."
Q. And when you say you'd put your sign up, what

Page 35

does that mean?
A. We had a sign that said something like, "Beaver trapping in the area, be careful, caution," or something like that.
Q. Okay. And so you would lay your trap?
A. Yeah.
Q. How long would it take you to lay your trap?
A. I could be there two or three hours. It's according to how big the area was.
Q. How long would you be in the water?
A. The whole time.
Q. So two or three hours in the water?
A. Yeah. I mean I may walk out on the bank, get a stick, but beaver are in the water. That's where you're at, trapping them.
Q. Okay. And so you'd lay the trap and then you would leave, and –
A. Okay, yeah. Yeah, that – if I was going to trap today, I got permission from Frankie, I go in there, I set the traps, I bait the traps. I come back the next day, take the animals out, dispatch them if they're in a snare, take them – load them in the truck, take them back to Forestry, fill out a thing that says male, female, how much they weigh, what area they come from, and throw them in the cooler.

Page 36

Q. Now, was there anybody there when you were filling out the log –
A. No, no.
Q. – or did you do it by yourself?
A. Do it by myself.
Q. And there's just, like, a scale and –
A. Yeah. Got a cooler and scale, do all your little work there and throw them in the cooler.
Q. Okay. And then did you – what was the situation where you took them to the landfill, or something like that?
A. Okay, afterwards, supposedly, they were supposed to be checked by HP. Most times, they wasn't, but they would get there and they'd get to moving; you know, they'd get to rotting. And they'd say, "Go ahead and take them to the dispatch."
Q. They would move when they were rotting?
A. Yeah, when they got maggots and all on them and stuff.
Q. Oh, okay.
A. You know, they'd be there so long and nobody would check them, and they'd finally just say, "Take them and get rid of them."
Q. And how did you know whether or not HP had checked them?

Page 37

A. It's a thing there, it's either verbal by Frankie, or there's a sheet there that supposedly – very seldom at the time you trap them, or at the time you dispatch them was it marked.
Q. Saying that –
A. Always – it was always a concern of ours how come they hadn't checked them.
Q. I know, but my question still that I'm trying to get clear on is how did you know for sure they hadn't checked them? How did you know for sure that HP had not checked them first?
A. I don't know. We was always told by Frankie when to dump them.
Q. Okay, but – no, I know, but that's not my question. My question is how did you know that HP had not checked the beavers before you took them to the landfill?
A. Well, there's a place out there to be checked.
Q. There's a – you mean there's a piece of paper that people fill out?
A. Yeah, that HP was supposed to check.
Q. And it would be blank?
A. Sometimes it would be.
Q. More often than not, it'd be blank?
A. Yes. Yeah.

Page 38

Q. Did you ever raise concerns with anyone?
A. Just all the time.
Q. Who would you talk to?
A. Frankie. Frankie's the only one that I – the COR. Any time – any kind of questions or whatever, or you had a problem, you went to her.
Q. And what would she say to you?
A. "Please dump them." A lot of times, it was the same old thing with HP, "We don't have a calibrated instrument." You know, "We can't go check them, we don't have a calibrated instrument," blah, blah, blah. So we'd dump them.
Q. Do you know what they meant when they said they didn't have a calibrated instrument?
A. I assume that they didn't have an instrument that was in calibration date. In other words, that's when you make sure that it's so many milligrams or rads or whatever that the machine is just right on. That's my speculation.
Q. Okay. And would this be during the years of '97 to '99?
A. That's all the time, just about, that I remember.
Q. Well, because this litigation is kind of focused on '97 to '99, it's a little bit more important

Page 39

that we know what happened during those years as opposed to what happened in '91 and '92. So if you can think about it, and take all the time you need, if –
A. Well, after '97, Danny took care of that most of the time.
Q. Okay. You mean –
A. I was there occasionally. If he needed help emptying the cooler, I'd be there to help him. But the decision to do it, as an employee, he'd say, "Well, help me do these beavers." I'd say, "Okay."
Q. Okay, and when you say Danny did that most of the time, Danny would empty the cooler?
A. Any time the cooler had to be emptied, we, Georgia Bowhunters Supply had to empty it.
Q. Right, but you just said Danny – starting in '97, Danny did that most of the time, and I was trying to figure out what "did that" was.
A. Empty the cooler.
Q. Empty the cooler. That's what I was trying to figure out. Okay.
A. We did it all the time. Nobody else emptied the cooler.
Q. But when you said that, you said that he took care of it most of the time from '97?
A. Well, I told you summer of '97 is when I

Page 40

relinquished –
Q. Right.
A. You know, like knowing what's going on out there to any extent, yeah.
Q. Okay. So when you talk about that HP wasn't really checking them, you mean prior to '97 was when you had personal knowledge about it?
A. Yeah. Yeah. Yeah.
Q. Okay. And then let's talk about hogs. How did the hog process work from beginning to end?
A. Well, the hog was general – it was general to the Plant. You'd just go hunt hogs wherever you seen damage, or possibly they could call you and tell you, "I saw some hog damage down at Par Pond, I saw some hog damage at L Lake, I saw some hog damage at an outfall." And you would go there, put bait out, put your dogs out and – or actually put a trap in.
Q. Okay. And what is – there are a lot of different ways to hunt for hog. There's a trap, and how does the trap work?
A. It's a root. Actually, you – the opening of the door is held up by a rope that goes down and a board goes on a root or a stake that you've driven in the ground. You pour your corn around it. As the hog is rooting in there, they'll root that board off of those

Page 41

stakes and your trap door closes, you've got him in the trap.

Q. But that doesn't kill him; right?

A. No, it does not.

Q. Well, how do you kill them if you get them in the trap?

A. With a gun or bow.

Q. And then, with dogs, how does that work?

A. Actually, you'd shoot the hog after the dogs would bay. The catch dogs would get there and hold him, you could take him with a gun.

Q. Okay. And then was there any other method?

A. Yeah. Sometimes they was killed with a knife. Danny killed one with a knife during the visitation – not visitation, but the –

Q. The hog demo?

A. Yeah, the demo.

Q. Okay. And if you kill them with – if you kill them with a knife, then that sounds like that's a little bit more gruesome and difficult than using a dog.

A. It's more dangerous.

Q. More dangerous?

A. You're a whole lot closer to that front end of the hog.

Q. And then once you had dispatched the hogs, once

Page 42

you killed the hogs, then what would you do with them?

A. Take them to Forestry. You would weigh them, gender hog, throw it in the cooler.

Q. Okay, so the same process as the beavers?

A. Same process. Same process.

Q. Was it the same cooler or a different cooler?

A. Same cooler.

Q. Would you put them all in there together?

A. Yes, they'd be all throwed in there together.

Q. Were they ever checked by HP?

A. Not to my knowledge.

Q. Were they supposed to be checked by HP?

A. I'm assuming, yes.

Q. Okay, so the same process as the beaver even with HP?

A. To my knowledge, yes. To my knowledge, the same process.

Q. Okay. Okay, let's talk a little bit about what you had to have in order to do the hog and beaver trapping on the Savannah River Site, what the requirements were for you guys to get on the Site and hunt and trap. Did you have to have any special training?

A. No.

Q. Okay, none – no special – did you have any

Page 43

special training from the Savannah River Site?

A. No, zero.

Q. So you didn't have GET training?

A. No.

Q. And you didn't get RAD training for this?

A. I did because of my working as a electrician, but did the contract say that? No.

Q. No. And you didn't have to do it when you came on the Site because you already – let me ask you this. Did you already have credentials to get on the Site when you started beaver trapping?

A. Yes.

Q. From your job?

A. Yes.

Q. Okay.

A. And that was taken away from me.

Q. Okay, why?

A. Because Wackenhut said we had too much security clearance to be running around in their woods. So they made us take a – get a red badge.

Q. Okay, so when you – okay, let me just clarify this because you were working for Westinghouse as an electrician?

A. Yes, ma'am.

Q. And you had badges that they gave you?

Page 44

A. Yes, a TLD badge that I carried with me as an electrician, and a security clearance. Plus my stats as a – what I – you know, my training as a RAD worker.

Q. Okay. And you said that Wackenhut – they're the security on the Site; right?

A. Yes.

Q. They took your badges away from you?

A. They had a problem with us being – running around that Plant, all over that Plant with blue badges. Too much security. We had the potential to be in places we wasn't supposed to do with the contract that we were out there on. You know, just – your work for U.S. Forestry didn't deserve a blue badge.

Q. Okay. So they would – so when you were coming on Site to hunt, then they would say you have to have your red badge on?

A. Well, eventually. In the beginning, it wasn't that way. It was probably six months, maybe, before they caught us in the woods. And they do – they would – sometimes the – most of the time, it was the dog man with Wackenhut. I reckon he was exercising his dog or whatever. But when you run up on somebody in the woods out there, they would stop and make sure that you had business out there, you wasn't someone that just run off 125. You know, because all open gates up 125. Anybody

Page 45

could come in there. And I'm sure – I don't know for a fact, but I'm sure they found people in there that wasn't supposed to be in there. So they would stop you and make sure that you had the right to be there.
Q. Okay. And then I guess what I'm asking is if you were working – was it a situation where when you would go to work for Westinghouse, you would put your red badge on, but when you were hunting, you'd put your blue badge on?
A. No, ma'am, it was the other way around.
Q. I'm sorry. Remember I don't know anything about that so you're going to have to –
A. That's no problem.
Q. You're going to have to walk me through it. So blue badge is the higher security –
A. Yes.
Q. – red badge is the lower security?
A. Yes.
Q. So, when you're working for Westinghouse, you're wearing your blue badge?
A. Yes.
Q. And when you're hunting, you're wearing your red badge?
A. Yes.
Q. Okay. So when you – I guess my question is

Page 46

like how did you – did that happen when you were coming on the Site, they would stop you and they would check and make sure, "Okay, what are you doing?" "I'm hunting." You have your red badge on –
A. Yeah, occasionally, you get stopped. Most of the time you get stopped going in 400.
Q. Going –
A. Into 400 Area.
Q. Okay.
A. I mean there's a good chance you were going to get stopped because they do periodic checks on everybody.
No, you'd have it hanging off your visor up there, a blue badge and a red badge.
Q. Oh, you'd have both, you just say, "Today, I'm using this and I'm ..."
A. I'm going, yeah, beaver trapping or hog trapping.
Q. Okay.
A. I'm mowing, bushhogging; whatever Georgia Bowhunters was doing at the time.
Q. Oh, because you guys did other things other than just hunt and trap?
A. Oh, yeah.
Q. What else did you do?
A. Well, did the road contract.

Page 47

Q. Oh, that was Georgia Bowhunters? Right, okay, road contract.
A. And we also did the bushhogging for U.S. Forestry Service. All that was U.S. Forestry Service.
Q. Okay. And what type of – did you have a blue badge for that or a red badge for that?
A. Everything was red badge for Forestry. Once – you know, Forestry said, "Go ahead and use your badge." Okay, we'd get caught out there by Wackenhut and they'd say we got too much clearance, "Get you a red badge." I mean it was okay, but anything we did for U.S. Forestry Service was a red badge.
Q. And when specifically, or not specifically, because it's hard to remember, approximately did they tell you that you needed to get a red badge when you were doing Forestry Service work?
A. When – I'm saying – you're talking about after Wackenhut had told us, you know, can –
Q. I'm saying when did they tell you?
A. I don't know exactly. I'm saying six months to a year into the contract.
Q. Into the beaver and hog contract?
A. Yes, into the beaver contract.
Q. Okay, so it wasn't when you – it wasn't prior to when you started hunting or trapping, it was when –

Page 48

A. Uh-uh [no].
Q. Okay.
A. No, it was like –
Q. Okay, so – I went to the SRS Site for the first time a couple of days ago and I had to go sit in an office and fill out a form and watch a video and then get a badge and then had to go through a barricade and they stopped me and they looked at my badge, and then I was able to get on the Site. Is that what you had to do to get on the Site every time?
A. Not every day.
Q. Not every day?
A. No.
Q. Okay, what would – tell me a day that you didn't – why wouldn't you do that every day?
A. Because we – the beaver contract, if you're coming on 125, there's Leigh Road and a bunch of barricades up through there that didn't even have a fence on them that we had access to go into. Okay, so that'd be a day that you wouldn't be checked.
Q. Okay.
A. And that was – I mean you could say it could be one day, it could be one day this week, it'd be none this week, or whatever.
Q. So it was really what entrance you chose to

Page 49

come through whether or not you got checked?
A. Exactly. Exactly. It was not specific what entrance we come in.
Q. Okay. And then did you – so when you were working as a hunter and a trapper, did you have to have – because I know that there are some areas that have gates around them and you have to be able to get into the gates in order to do whatever you needed to do. Did you ever have a key or anything like that to –
A. Certainly. I had a timber key.
Q. Okay, what's a timber key?
A. A timber key is for a locked gate, either on 125 or 278. There might have been some – no, I don't think there's any on the inside of the Plant. There's 278 for sure, and 125. There were some timber gates up there that they – U.S. Forestry gave us the keys. Instead of coming in and working the lower end of the Plant where we had a site down there called Bush Brabum Road, we could come back up a half a mile on 125 instead of coming all the way another ten miles up and hit B Road, or Six Gate, I think was the name of it. We could go through a timber gate and hit another track that's really close right there. So it's just access. The convenience of access is all it was.
Q. So, again, it would just depend upon which way

Page 50

you're coming in and which way's more convenient?
A. Yeah, it was our choice, whichever – did we want to run the traps this way, did we want run the traps this – were we in Aiken, we'd come in on the Aiken Barricade. If we were coming from Augusta, we'd come in the Jackson Barricade.
Q. Okay. When you were doing – wait, I do want to go back. When you were doing the road contract and the bushhogging, was that prior to hunting and trapping, or did you do some of that at the same time?
A. It was all – all there together at one time, I think. I know the beaver and the culvert cleaning was at the same time, but I'm not sure about the hogs. I'm just not sure.
Q. Well, I know – like I said, I had to watch this video which everybody gets to watch today before you go on the SRS Site, and it is extremely fun and educational, but one of the things that they said in the video was that if you're operating heavy machinery, then you have to have a certain kind of pass and a certain kind of – like the people with heavy machinery would watch a different video than I would watch. So when you were doing bushhogging – and a bushhog is a big machine; right?
A. It's a tractor with a mowing gate behind it.

Page 51

It runs off PTO –
Q. Okay. So did you have to have a special pass?
A. No, ma'am.
Q. So you didn't have –
A. No.
Q. There wasn't, like, a heavy machinery –
A. There was no training. U.S. Forestry, no training. No training.
Q. But I'm not even talking about training, I'm talking about –
A. The answer's no pass, a red badge.
Q. Just a red badge?
A. So, that's it. That's U.S. Forestry, red badge.
Q. Okay, but when you get a red badge, do you have to watch a movie like I watched?
A. Not with U.S. Forestry.
Q. I'm not talking U.S. Forestry, I mean I – I'm – I was just coming on – just to get on the Site?
A. Yes. Yeah, I would assume. I don't really remember, it's been a long time ago, but I think – I started out with a red badge in construction. They don't give you a blue badge right off the bat. They don't give you a yellow badge right off the bat.
Q. What's yellow? Is that –

Page 52

A. Yellow is an intermediate. You have red, yellow, blue. So, it just – security heightens as it goes up.
Q. Okay.
A. And there was something – yeah, there was some kind of something that I had to do to get even the red badge. The first day I hired out there, I don't know what they did. I know they did a little medical exam and I think we did do something about security, and probably may have done, like, the GET training that told you about signs and radiation and contamination. There's a good chance.
Q. Which you probably already knew about because you were –
A. Not the first day I went out there, no.
Q. Because you hadn't been an electrician yet?
A. No, I hadn't been on a nuclear plant.
Q. You hadn't been on a nuclear plant?
A. No. I think – I may have went to Vogtle before going out there, but Vogtle was new construction and they didn't have – it wasn't nothing to do with – I mean we was ten years away from having radiation on it.
Q. Right, but I'm talking about when you were working for Miller Electric. You worked for Georgia Bowhunters out there prior to working for Miller

Page 53

Electric?
A. No. Uh-uh [no].
Q. Okay. So, when you worked –
A. Miller was already gone.
Q. So, when you worked for Miller Electric and you were working out at Savannah River Plant, that wasn't when you had GET training and RAD training?
A. Yeah, I think so.
Q. All right. Well, so –
A. I think so. I'm not sure about the RAD when I was at Miller, but I eventually got RAD training.
Q. Okay. So I guess all I was saying –
A. Because at the time, Naval Fuels was set aside from – it was like a – it was all clean work, it was all new construction, and it was set aside. Actually, at the time, I think they were going from DuPont to Westinghouse except for that job right there. And we still worked it as Miller. There was something there that wasn't – so, I really don't know.
Q. Okay. Well, I guess my only point was just when you had to watch this for the red badge and you had to watch this stuff about, you know, signs and contamination and stuff, was that something that was old hat to you because you'd already had the training through your working for Westinghouse?

Page 54

A. When I went to work for Miller?
Q. Um-hum [yes].
A. No, it would have been brand new to me.
Q. Okay, when you were working for Miller.
A. Because when I went to work for Miller was the first time I went to Savannah River Plant.
Q. Okay. But when you got your red badge for the road contract and the bushhogging, had you already been working for Miller at that point?
A. Well, I was actually working for Bechtel at that point, but Miller had already gone.
Q. But Miller was before?
A. Yeah, Miller, Bechtel.
Q. Okay.
A. And while Bechtel was there is when U.S. – Georgia Bowhunters Supply got some contracts.
Q. Okay. So let's talk about this, all these signs. Let me pull our sheet from yesterday. I was going to ask you about – this is Plaintiff's Exhibit 3. If you'll just take a minute to look at that.
A. Okay.
Q. Have you ever seen that document before?
A. There's a lot of things on here that didn't look – I mean I don't remember seeing a buffer area. I don't remember seeing an underground radiological area.

Page 55

So I'm going to say I may have seen one similar to this, but not this one. I don't think so.
Q. Okay, so you've never seen that particular document?
A. I don't remember it. I don't remember.
Q. Okay. Have you seen a document similar to that?
A. Yeah, I want to say I have.
Q. And where would that have come from?
A. It probably come from RAD worker training and stuff like that.
Q. Okay. Let me see it back real quick. Now, this document, Plaintiff's Exhibit 3, it has samples of signs on it, and just looking at that, could you tell me if you've ever seen any signs – which signs on there you've –
A. I know I've seen the soil contamination, I've seen radiation signs, I've seen – whatever would be in an area – whatever is in here, I've seen except for some of these I've never heard of before.
Q. Okay, we need to distinguish which ones you've seen and which ones you haven't, so tell me which ones you haven't seen.
A. That buffer area, I want to say I never have seen a sign like that.

Page 56

Q. Okay, tell me the ones you have seen. You've seen soil contamination –
A. Radiation area, I want to say I've seen one of them. High radiation, very high radiation area. I don't remember it being like that, I just remember it being a magenta sign and a yellow magenta fence. That's what I remember. Airborne radioactivity area –
Q. Do those signs mean anything to you?
A. Yes, a danger point. You need to read it. You need to call HP if you've got to do anything that's messing with these. That's right. That's what RAD worker trains you to do.
Q. So you would have known when you were on the Site hunting and trapping if you came across one of those signs, you needed to call somebody?
A. I was the one that saw the signs at Site 19 when I drove up there five years after getting in the thing and it was eat up with barricades and signs. I'm the one that went back to Frankie and told her of that stuff. She didn't know. Again, DOE hadn't told – hadn't notified Forestry. Yeah, I understand exactly what you're talking about.
Q. Okay. All right, I'm sensing this, and I know this is going to happen. I know this is really emotional for both –

Page 57

A. It's a passion of mine right now, you better believe it. You've gotten to the point, yeah, it means something.
Q. Okay, but let me tell you something. Today is my deposition.
A. I know that.
Q. And I'm in control today and so I'm going to ask –
A. Every bit of –
Q. Wait, stop. I'm going to ask you to just listen to my question and answer what I'm asking you and we'll get out of here a lot faster. And you will definitely get your chance to say as much as you want to say.
A. Thank you very much.
Q. And I respect how passionate you are about this. But this is going to move more efficiently and you guys are going to have more time on the Site if we just go through and you just answer exactly what I'm asking you.
A. Yes, ma'am.
Q. So let me see this back. Thanks. All right, so my question to you is, because of your training that you've had, you know when you see one of these signs –
A. Yes, I do.

Page 58

Q. – that you're supposed to call someone in HP?
A. We don't disseminate nothing. I don't even care if I was a RAD worker working for Westinghouse as an electrician, or a beaver trapper. I don't have the ability to disseminate these signs, or to know anything about it other than the paperwork that they're going to give me that I can read, which is a Work Clearance Permit. So at that point in time, I have to go to HP.
Q. Okay. So your answer to my question would be yes?
A. Yes. Yes.
Q. Okay.
A. All I know is just back up, punt.
Q. Okay, so yes is the answer; okay. So when you were hunting and trapping – not five years later, but when you were hunting and trapping beaver at the beaver site, did you ever see either the soil contamination sign or the radiation sign, the high radiation sign, or the very high radiation sign?
A. Yes.
Q. Okay, where did you see it?
A. Site 19.
Q. Okay, you saw that when you were trapping –
A. Yes.
Q. – not five years later? Because just a minute

Page 59

ago, I thought you said you saw it five years later.
A. Well, I went there when it was there and went back with NIOSH and it wasn't there. I mean I – it's –
Q. Okay, here's my question. When you were trapping, did you ever go out to Site 19 to trap beaver, because you'd been directed to go to Site 19 and trap beaver, and look over and go, "Oh, my God, there is a soil contamination sign"?
A. Yes, ma'am.
Q. Okay, and what did you do?
A. I backed up and went to see Frankie Brooks.
Q. And what did you say to Frankie?
A. I said, "Frankie, they have barricaded a place – or Site 19; they have barricaded Site 19." And she said, "You're kidding?" She said, "Don't go back down there."
Q. Okay. And when was the last time – when was this that you saw the sign?
A. I'm going to say early '97. That's – again, I'm not positive.
Q. Okay, so early '97. So it was still winter when you saw it?
A. I won't – yeah, something like that. Yes. I want to – yeah.
Q. And when was the last time that you had trapped

Page 60

there and the sign wasn't there?
A. It could have been a month before that. I mean it's – we could trap anywhere.
Q. I'm sorry?
A. We trapped anywhere that we had the right to be; we'd go there at any time.
Q. Right.
A. We didn't have to have Frankie say, "You need to go back in there." Once we had the 50-something sites, we could go back in there any time. We could go ride by there and go right back in there.
Q. Okay. But what I'm saying is that when you drove by and you saw the sign, it had been about a month that you had not been in that site?
A. Yes.
Q. So, to you, that meant they had put the sign up within the last month?
A. I would say so, yes.
Q. And do you remember what the sign said?
A. It was soil contamination.
Q. Okay. All right. And so you went to Frankie and you said, "Frankie, you know, they've got it barricaded. What's going on?" And she said don't go back in there –
A. Yes, ma'am.

Page 61

Q. – and then what happened?
A. We went on trapping.
Q. So you never went back to Site 19 again?
A. Oh, no. No, no. Yeah, we did with NIOSH. That's the only other time I went back in there.
Q. You went back with NIOSH?
A. Yes.
Q. So the Forestry Service never told you to go back in there?
A. No.
Q. Okay. Did you ever see a sign like that at any other site while you were trapping?
A. HP-52 and Four Mile at Four Run.
Q. Okay, what sites would those be on this map, if you can figure it out?
A. Do you know where C Road is?
Q. No.
A. Can you tell me where C Road is?
Q. I cannot. Can anyone here?
A. All right, there's the cloverleaf. Okay, I'm on it. I'm on it.
Q. You've got it?
A. Yeah. Okay, right down there is Upper Three Runs, there's Four Mile and that is Four Road right there. It appears to be 25 and it's either 53 or 49.

Page 62

53; I think it's 53. Yeah, there's Four Road right there; 04. Yes, ma'am.
Q. All right, and do you remember what signs you saw at these sites?
A. Soil contamination.
Q. Soil contamination?
A. Yes, ma'am.
Q. That's all?
A. [Indicates affirmatively].
Q. And you saw these while you were trapping?
A. Yeah, after they had come up with the WCPs, I saw them.
Q. Okay, so that was after you received the Work Clearance Permit for –
A. Yes, ma'am.
Q. – Road Four?
A. Yes, ma'am.
Q. So it would have been after February of '99?
A. Yes.
Q. That's when you received the work permit.
A. Yes, ma'am.
Q. All right, let's take just a little break because we've been going for a little while, and we'll come back in five minutes.
[OFF THE RECORD]

Page 63

Q. [Ms. Williams] We were talking about sites, beaver trapping sites that you've been to that you saw soil contamination signs at while you were working from '97 to '99.
A. Um-hum [yes].
Q. And we have said a couple of things about how this map, this Defendant's Exhibit 1, is different from the map that you guys were using.
A. It is.
Q. If you have a copy of the map that they were relying upon at the time, if you could produce that, that would be great just so I can see what you guys were thinking of when you said sites. And let me actually jump back for one second, and when we're talking about – just a second ago, you said that Site 19 was one right there that you had seen a soil contamination sign at.
A. Yes.
Q. What did Site 19 encompass for you? I mean, like, not on – you can either show this on the map or you can tell me by description.
A. The description is anytime we'd go to an area that they give us a site, okay, the beavers are not always right there. You'd have to understand a beaver to understand exactly what I'm talking about. They could live 500 yards from right where they're packing the

Page 64

culvert pipe. That may be why they put us there. We would go back to Forestry and tell them that we need permission to go upstream, or downstream, from any site to go get the beavers, and their quote was, "Go get them."
Q. Did you always ask permission when you did that, or you just asked one time?
A. I asked permission anytime we got out of – getting away from the site.
Q. Okay. And who would you ask?
A. Frankie Brooks.
Q. Frankie? And she would just verbally tell you it's okay?
A. "Go get them."
Q. So it's possible that when you were working on Site 19, really, you were working either upstream or downstream from Site 19?
A. I – well, there's sites below it that I would – I think 47, I was on it.
Q. You went that – well, now, I'm not talking about other sites. I mean it looks like this is on a stream right here.
A. Yes.
Q. Do you know what that's called?
A. Yeah, I went – there's two beaver ponds below

Page 65

that at that point where Site 19 is and approximately four below it; two above it, itself, and three to four below it that goes right on down into Steed Pond.
Q. Down to Steed Pond; okay. And where is Steed Pond on the –
A. It is downstream from Site 19.
Q. Did you ever go down to Steed Pond?
A. Regularly. When I was trapping that area, yes.
Q. Did you ask permission to go to Steed Pond?
A. Certainly.
Q. And we're not talking Steed Pond Road, we're talking actually the pond?
A. The pond, yes.
Q. Did you ever see a posting at Steed Pond that said don't trap?
A. Not until – at the time of seeing the signs at Site 19.
Q. That's the first time you ever knew there was a problem trapping at Steed Pond?
A. Yes.
Q. Okay. Let's go back. You also said 25, 53 and 49, which is HP-52 and Four Mile Creek along Four road; is that right?
A. Yes.
Q. Those are other areas that you saw

Page 66

contamination signs?
A. Yes, ma'am.
Q. And it was after February of 1999?
A. Yes, ma'am.
Q. Did you ever – did you get Work Clearance Permits for those sites?
A. I was – I think Forestry generated two for Four Road and one for HP-52.
Q. Do you remember when those were done, approximately?
A. Started around February through June of '99.
Q. February to June?
A. Yes.
Q. And so did you hunt or trap in those areas on a Work Clearance Permit?
A. No, I did not.
Q. You did not?
A. Uh-uh [no].
Q. Were you part of – did you use a Work Clearance Permit for the – for Road Four in February?
A. No, ma'am.
Q. You did not; okay. Were you RAD-II certified at that time?
A. What year was that? '99? No.
Q. February of '99.

Page 67

A. No, my certs would have been gone a long time.
Q. Like how many years?
A. Been gone by – assuming '92/93 would have been when they would have been no good, so what would that be? '93 to '99; six years?
Q. So, like, a good amount of time?
A. Yes.
Q. When you did the RAD training, did Westinghouse pay for it, or did they make you guys pay for it?
A. It's paid for by the company.
Q. By the company?
A. Yes.
Q. Can just individuals – do you know if just individuals can get RAD-II certified if you're not working for a company?
A. Well, if our contract specified it, what they told us later on – we were trying to figure out how much we should have made while we were in there trapping for U.S. Forestry Service on all the crapped-up jobs –
Q. Let me stop you for a second.
A. Certainly.
Q. Because listen to my question. My question is do you know if an individual can get a RAD-II certified – if I walk out of here and I go, "I feel like getting RAD-II certified," can I go do it?

Page 68

A. No, you have to be – have a purpose, and that was going along with – okay, all of a sudden, Georgia Bowhunters needed RAD worker trained employees. I'm assuming, and I thought at that time you could get it, but you would have to pay for it, best of my knowledge.
Q. So, if you – I guess what I'm trying to say is, so if I worked for Georgia Bowhunters and I went in and I said, "Well, I work for Georgia Bowhunters and I work for the Forestry Service and they told me to get RAD-II certified, so let me sign up," is that all I need to do, or do I have to show something, or, you know –
A. I would imagine the company you work for, going through Georgia Bowhunters, using that as an example, they would have to have a cause, like a reason, a place that was radiation or soil contamination that you needed to be RAD worker trained. And then, I don't know, I doubt – I heard that – I think we discussed it. I don't know if we discussed it with Forestry. I think it was going to come out of our pocket if we had to get into that.
Q. Okay. Where is Four Mile Creek on here? Can you show me?
A. Yes, ma'am. Here's the cloverleaf here and here's that C Road coming in right there. That's Upper Three Runs. Okay, that's it. Four Mile Creek is right

Page 69

there.
Q. Okay. Did you trap a lot along there?
A. I did trap 49.
Q. Oh, yeah, you said that, right. And then what's next to 49? 53; okay, so this is the area that you said right in there that you trapped.
A. Yeah.
Q. Okay.
A. Well, Four Mile – that's Four Mile Delta. It runs right on down into Four Mile Delta. There's a bunch of trapping sites in there. Well, the whole Delta was a trapping site.
Q. Okay, now, I'm going to ask you a question. Knowing that you have done all the work that you've done on the Savannah River Site prior to trapping beaver and hog, and knowing that – knowing that you've gone through RAD-II training and knowing that – you can remember even sitting here today time, distance, shielding.
A. Better believe it.
Q. And knowing that HP had to check the beaver carcass, or was supposed to check the beaver carcass and the pig carcass, you didn't think that there was a chance that you guys were going to be working in contamination areas?
A. In the beginning, our first meeting with Homer

Page 70

Gabard, Frankie Brooks, I think Tony Baray was there, is that very first meeting, and we'd actually won the contract and we went in there and Danny and I, both, were Rad worker II trained at the time.
Q. Okay, can you tell me which contract this is, what year?
A. It's the very first one. So it'd be –
Q. '91?
A. Yeah, '91. Okay, he and I, since we were RAD worker trained, we understood the thing about water, how you – immediately, you got a drip out there, you call HP; okay, that's water and we're fixing to go get in water because we're beaver trappers now, we won this contract.
Q. Right.
A. The main thing that we asked was, you know, "What about the water? What about the water?" You know, "Is there any precautions that we need? Are we going to have HP?" "No. Don't – just don't drink it. After Frankie Brooks calls you, you have 72 hours without a written work order that you need to go ahead and get in there and trap them beavers. Everything has been looked after. Frankie Brooks has done everything that needs to be done."
Q. So you just trusted her?

Page 71

A. We had to because that was the contract, the verbal portion of the contract.
Q. Well, I mean, you can choose not to accept the contract.
A. That's right. You're exactly right.
Q. Okay, so – but when they're – when HP is checking the beaver and the hogs, I mean that didn't concern you at that time.
A. I'm going to tell you the only thing that I think they ever found on a hog or a beaver that they talked about was cesium, and they said that's everywhere. They said you get it in the deer meat that you eat, the squirrel that you kill that you happen to want to eat; you get it in everything. And that's the only thing that I heard; said it was everywhere. It was across the river in Richmond County, Burke County, Georgia; everywhere. Okay?
Q. Okay. And so, I mean, I guess my question is you've been working out there for a long time. I mean since the '80s. And you've been going in a lot of different areas. I guess I just don't understand why you think, a, that you've been exposed to contamination that's at a harmful level and, b, why that would come solely from the hog and beaver and not from work you had done for ten years prior to ever entering into a contract

Page 72

with the Forest Service. And before you answer, because that's a compound question, let me split it up.
A. Yes.
Q. Let's start with the first one. Why exactly do you think you've been exposed to contamination at any level?
A. Okay. Right. DOE had a reading room at University of South Carolina-Aiken that exposed everything that you need to know about the Plant, especially the studies of the nuclear physicists and this and that, and studying this place and showing how much some of the places we were in were messed up since the '50s. Okay, and that's – you think that's information that Forestry would know about, let you know about. But –
Q. And do you think that they don't know that?
A. I hope they do now. I hope they've evolved where they know that today.
Q. Okay. So you think that the information that you uncovered at the reading room is not public knowledge?
A. It was public knowledge.
Q. Okay. So you went to the reading room and you read some material about different contaminants that were contained at the SRS property?

Page 73

A. Specific sites and stuff.
Q. Specific sites; okay.
A. Yeah.
Q. And what prompted you to go to the reading room?
A. WCPs in our contract, our contract has – says specifically, "No toxicological hazards; only unsure footing and rattlesnakes, cottonmouths, snakes.
Q. That's the beaver contract.
A. Okay, so when you're alarmed to the point that you're working out there for so many years and you – there's a WCP generated and you're knowing exactly what – you know, immediately there's a problem.
Q. And that's on the beaver contract when you said the no toxicological? That's not the hog, that's the beaver; right?
A. I'm assuming it's on both of them.
Q. It's not, it's on the beaver.
A. Okay. Well, the hogs is the one you can go anywhere with.
Q. Right. Okay, so – okay, so you read some material at – so you got the WCP, you went to the reading room and you read some material. Is there anything else that makes you think you –
A. The EPA, the Center of Disease Control, Phase

Page 74

Two; that's another thing. The EPA on the internet.
Q. These are all things you've read?
A. Yeah, I've read portions of it. Most of the time, Hooker looked them up and I had to read them.
Q. Okay. Did you get paid to read?
A. I wish. We'd be rich.
Q. Okay, let me ask you this. Do you have any physical symptoms?
A. The only one that I have that I personally, my opinion, is my thyroid gland.
Q. Okay, what's wrong with your thyroid?
A. It's a underactive thyroid gland.
Q. And when did that pop up?
A. Well, it popped up after the – I had medical screening through the Augusta Building and Trades.
Q. Through what?
A. Medical screening through Augusta Building and Trades. They drew blood, stool samples and blood pressure and checked you for cholesterol; checked you for everything. They were looking for if you had anything in you, such as the asbestosis, the –
Q. And that's for construction?
A. Yes.
Q. That's not related to Savannah River Site?
A. Yes, it is Savannah River Site.

Page 75

Q. It is?
A. Yes, it is.
Q. It's part of Savannah River Site?
A. It's – the reason why they do it is because of Savannah River Site, mostly.
Q. But is Augusta Building and Trade –
A. It's all – it was all a union job and that was – Augusta Building and Trade was union contractors, whether it was carpenters, ironworkers, steelworkers.
Q. So the union was the one that did it. It was an agreement they had with SRS?
A. Yeah, but they have – I'm sure they had some grants or something for the Government or whatever. I'm not exactly sure exactly how it generated, or how it worked.
Q. Okay, so you had a medical screen with them, and when was that?
A. It's right before the NIOSH visit when I got mine back.
Q. And what did – did that indicate that you had had exposure to contamination?
A. No, it did not.
Q. They just indicated you had an underactive thyroid gland?
A. Right. It's not – I don't have it in my

Page 76

family and –
Q. Is that a genetic trait that you know of?
A. That I know of, yes. In my opinion, I think it's a genetic trait other than the iodine 131. That'd go straight to the thyroid gland once you get the reading about the stuff out there.
Q. Okay, so it's your belief that unless someone in your family has it, it comes from being exposed to iodine?
A. Yes, ma'am.
Q. Do you believe you worked with iodine on SRS property?
A. I think in the outfalls I was, yes. I believe I read it.
Q. Okay. So when you were working for the Savannah River Site, I know that, you know, a lot of people, and also from this video I watched, they have to wear things called – I think they're called dosimeters around their neck.
A. Yes, ma'am.
Q. And they have to – they're dose –
A. It's TLD badges. Dosimetry?
Q. Um-hum [yes].
A. Yes.
Q. Okay, what does TLD stand for?