IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a<br>GEORGIA BOWHUNTERS SUPPLY<br><br>Plaintiff<br><br>vs<br><br>THE UNITED STATES,<br><br>Defendant | ) | No. 03-1501C |

COMPLAINT

Jurisdiction

FILED JUN 17 2003

1. This complaint is brought under the Contract Disputes Act. 41 U.S.C. §609(a)(1)(2002). The Court of Federal Claims has jurisdiction over claims based on any express or implied contract pursuant to 28 U.S.C. §1491(a)(1)(1994).

2. William D. Hooker (Hooker) brings this action for equitable adjustment for four contracts with the United States Department of Agriculture Forest Service as follows: Contract number 53-4660-8-04 dated October 30, 1997; number 53-4660-9-06 dated January 29, 1999; 43-4660-3-0134; and 53-4660-4-14 (dates unknown).

3. Eight Requests for Equitable Adjustment dated between October 1, 2000 and October 27, 2000 and an additional seven requests dated between April 1 and April 15, 2002 were denied by the contracting officer, Homer R. Gabard, in a letter dated July 29, 2002.

Background

4. During the period from February, 1992 through 2000, Hooker was a contractor with the U.S.D.A. Forest Service, performing under two contracts; one for hog control and the other for beaver trapping and culvert cleaning at the Savannah River Site which is managed by Westinghouse.

<u>Hog Contract</u>

5. Contract number 43-4660-8-0027 for hog control and dated October 30, 1997 had a base period of 12 months, with two option periods of October 1, 1998 to September 30, 1999 and October 1, 1999 to September 30, 2000.

6. Hooker performed satisfactorily under this contract from its inception.

7. On June 30, 1999 the contracting officer, Homer Gabard, wrote to Hooker alleging Hooker's default of the contract.

8. These allegations concerned two of Hooker's employees, Goldman E. Eller and Michael E. Eller, complaining of inappropriate documentation of hogs and complaining that domestic pigs had been brought to the SRI cooler.

9. The contracting officer gave Hooker fifteen days to correct problems or default the hog contract.

10. The contracting officer also forever barred both Michael and Goldman Eller from working on this or any other contract with the Forest Service.

11. The contracting officer was not within his authority under H.16(f) under the contract to bar these employees, but this same contracting officer has subsequently awarded contracts to Michael Eller. Hooker was effectively deprived of these two employees.

12. The contracting officer was not within his authority under the contract to make the determination that pigs killed under the contract were wild or domestic.

13. The contracting officer then deducted the sum of $1,320.00 from future payments for so called domestic pigs trapped on the SRS site, and demanded that Hooker find new replacement personnel within fifteen days.

14. This deduction was arbitrary and in violation of the terms of the contract as the contract does not define the difference between "wild" and "domestic" hogs.

15. Unstated in the contract, Hooker and employees were required to obtain contraband passes from Wackenhut Security for the firearms used to dispatch the hogs. On 7/9/99, Hooker produced the information required by Wackenhut for contraband pass. This paperwork was lost for six weeks, and then held without issuing the pass.

16. Hooker called the contracting officer about the contraband pass on 11/10/99 with no response.

17. On 11/29/99 and 11/30/99 Hooker was required to put on a "hog hunt" using his dogs for the new hog contract. He was not allowed a gun because the contraband pass had still not been issued. Hooker was required to kill a 300 lb. boar using only his pocket knife, which was not only dangerous but contrary to the hog contract . Hooker also hunted the following day with only a knife.

18. Hooker was effectively prevented from performing under the hog contract which requires a firearm to be used in dispatching hogs.

19. Hooker claims an equitable adjustment and contract damages because of the USFS actions in preventing him from fulfilling the terms of the contract.

20. Hooker claims damages in the amount of $20,000.00 as an adjustment because of the breach of contract by the contracting officer, as well as the sum of $30,000.00 for the balance of the contract.

21. Hooker claims damages in an unspecified amount for the contracting officer's unreasonable delay in responding to the Requests for Equitable Adjustment.

22. Total damages are estimated at $50,000.00, plus interest from the date of denial.

<u>Beaver and Culvert Cleaning Contract</u>

23. Contract #53-4660-9-06 involved killing of beaver by trapping on the SRS site and also cleaning of culverts at the Savannah River Natural Resource Management and Research Institute. The contract price as negotiated was $51,300.00 a year, beginning February 1, 1999 and ending December 31, 1999 with an option period for one year, and an additional option period for one more year at $51,300.00.

24. This contract required Hooker to trap 700 beaver at sites 1 through 53 as directed by the Contracting Officer's Representative and perform 1100 hours

of culvert maintenance. Unit price per beaver was $45.00 and hourly rate for culvert cleaning was $18.00.

25. The general specifications for this contract specifically stated that no toxicological hazards are associated with trapping beavers at SRS; however, normal environmental and physical hazards such as snakes and uncertain footing do exist. No specific statement involved the culvert cleaning.

26. On or about February 22, 1999, Hooker learned that the beaver trapping he had performed under the contract now required a work clearance permit and protective equipment, waders, gloves, etc. Hooker made inquiries as to what substances were in the water he and his men had been trapping in without protection since the beginning of the contract term in October, 1997.

27. These inquiries produced no answers, but on further investigation Hooker found that the ponds he had worked in unprotected since the beginning of the contract had been posted as contaminated, but the signage had not been maintained

    a) From October, 1997 until February, 1999 USFS failed to notify Hooker of the contamination of the ponds he and his employees worked in; and only after February, 1999 required protective equipment.

b) If Hooker had known that he and his employees would be working in contaminated areas without protection, his bid of $55.00 per hog would have been increased to $110.00 per hog .

c) If Hooker had known that he and his employees would be working barehanded in contaminated culverts without protection, his bid of $18.00 per hour would have been increased to $50.00 per hour.

28. The USDA Forest Service contract stated no toxicological hazards, but subsequent to the contract formation, one site that Hooker had previously worked in was posted and barricaded. Hooker would have worn protective gear if this situation was disclosed. Instead, he put his employees and himself at risk.

29. Subsequent to Hooker's discovery of the contamination, and questioning as to what substances were in the ponds, USFS failed to renew the contract as to the option.

30. Hooker now has emotional difficulties because of fear of past exposure to contaminants.

31. Hooker has been damaged in the amount of $80,700.00 for the initial contract and $80,700.00 for the option year.

32. Hooker has been damaged in an unspecified amount for the emotional damages caused by defendant's breach of contract.

<u>Contracting Officer's Delay in Issuing Decision</u>

33. Hooker has suffered damages because the Contracting Officer unreasonably delayed consideration of the Requests for Equitable Adjustment.

34. Hooker filed eight Requests for Equitable Adjustment between October 1 and October 27, 2000.

35. No response was received until July 10, 2001 when Hooker made an inquiry to the Department of Energy. Mark W. Frie, Deputy Assistant Secretary for Project Completion, Office of Environmental Management reported that the contracting officer, Homer Gabard had assured him that a response would be received on or before July 31, 2001.

36. No response was received.

37. The Contracting Officer, Homer Gabard, did not reply to these requests until February 13, 2002, when he "hoped to provide a response" by February 28, 2002 or certainly no later than March 31, 2002.

38. No response was forthcoming.

39. Hooker filed seven Requests for Equitable Adjustment between April 1 and April 15, 2002.

40. No response was received until the denial of all requests dated July 29, 2002.

41. Hooker has been damaged in the Contracting Officer's unreasonable delay in responding to the Requests for Equitable Adjustment and requests this Court to allow him interest under the Contracts Disputes Act to the date of filing of the Requests pursuant to 41 U.S.C.§611.

NOW THEREFORE, the plaintiff requests that this Court award him the following damages under the contracts:

A. The sum of $50,000.00 as damages in Hog Contract number 43-4660-8-0027;

B. The sum of $170,400.00 as damages in Beaver and Culvert Cleaning contract 53-4660-9-06;

C. Reformation and damages from Contract 53-4660-8-04;

D. Interest at the statutory rate from date of filing of Requests.

Respectfully submitted,

Berta E. (Robbie) Nichols

Berta E. (Robbie) Nichols, Attorney for Plaintiff
Post Office Box 7925
Hilton Head Isl., South Carolina 29938
(843) 686-5884 (Facsimile (843) 842-3933

June 9, 2003

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY<br><br>Plaintiff<br><br>vs<br><br>THE UNITED STATES,<br><br>Defendant | ) | No.03-1501C<br>(Judge Allegra) |

## FIRST AMENDED COMPLAINT

### Jurisdiction

1. This complaint is brought under the Contract Disputes Act 41 U.S.C.§609(a)(1)(2002). The Court of Federal Claims has jurisdiction over claims based on any express or implied contract pursuant to 28 U.S.C.§1491(a)(1)(1994).
2. William D. Hooker (Hooker) brings this action for equitable adjustment of Contract #53-4660-9-06 dated January 29, 1999 with the United States Department of Agriculture Forest Service.
3. Hooker also brings an action for bad faith breach of this contract and failure to renew the option period .
4. Requests for Equitable Adjustment dated between October 1, 2000 and October 27, 2000; and between April 1 and April 15 , 2002 were denied by the contracting officer, Homer R. Gabard, in a letter dated July 29, 2002.
5. This action was timely filed on June 17, 2003, and motion was granted to amend the original complaint on February 20. 2004.

### Beaver and Culvert Cleaning Contract

6. During the period from February, 1992 through July, 2000, Hooker held contracts with the U.S. Forest Service for beaver trapping and culvert cleaning at the Savannah River Site (SRS) , New Ellenton, South Carolina. Contract #53-4660-9-06 dated January 29,

1999 involved the killing of beaver by trapping on the SRS site and also cleaning culverts at the Savannah River Natural Resource Management and Research Institute. The contract price as negotiated was $51,300.00 per year, beginning February 1, 1999 and ending December 31, 1999 with an option period for one year, and an additional option period for one more year at $51,300.00.

7. This contract was based upon Hooker trapping 700 beaver at sites 1 through 53 as directed by the Contracting Officer's Representative Frankie Brooks; and to perform 1100 hours of culvert maintenance. The unit price per beaver was $45.00 and the hourly rate for culvert cleaning was $18.00.

8. The general specifications for this contract specifically stated that "no toxicological hazards are associated with trapping beavers at SRS; however, normal environmental and physical hazards such as snakes and uncertain footing do exist." No specific statement was made involving the culvert cleaning.

9. On or about February 22, 1999, Hooker for the first time in his seven years of contracting with the U.S.F.S. was presented with a work clearance permit for the beaver trapping.

10. This work clearance permit required Hooker to be RAD II qualified; have a standby person, and also required protective equipment, waders, gloves, etc. It further required that Hooker rinse off the waders and lay them on plastic for RCO (Radiological Control Organization) survey.

11. Hooker was at that time RAD II qualified, but his employees were not. He began to make inquiries of the USFS as to what substances were in the water that he and his men had been trapping in without protection since the beginning of the original contract term in October, 1997.

12. There was no response to these inquiries; Hooker investigated and found that at least one pond he had worked in without protection since the beginning of the contract had been posted as contaminated, but the signs had fallen on the ground and covered with debris

and weeds.

13. Hooker requested additional money under the contract in order to hire RAD II trained workers; stating that he would have increased his bid if he had known the sites were not clean and would require trained personnel. This request was denied by the contracting officer and he was told he had to honor the contract price as it was.

14. Hooker continued to request information on what contamination existed in the sites and on June 1, Hooker had his standby person, Mark Lubert, make a video of the contaminated site that had been posted and where Hooker had trapped beaver.

15. USFS became aware of the videotaping and shortly thereafter Hooker's contract was effectively terminated.

16. USFS breached the contract on July 21, 1999 when the COR Frankie Brooks effectively terminated the contract for beaver trapping and culvert cleaning. Hooker had previously trapped 55 sites for the USFS; after July 1, all culvert cleaning was stopped and he was only allowed to trap 1 site. For the remainder of the contract term, Hooker was only given 3 additional work orders.

17. Defendant USFS has breached the contract in reducing the number of trapping sites from the original contract language, and prohibiting Hooker from performing the culvert cleaning.

18. Hooker has been damaged by USFS' breach in the loss of the remaining contract term plus the loss of the option year in the amount of $80,000.00.

19. Hooker has also suffered consequential damages as a result of financial hardship caused by the breach.

<u>Bad Faith</u>

20. Paragraphs 1 through 19 are realleged as if herein rewritten.

21. USFS knew or should have known prior to February, 1999 that some of the beaver trapping and culvert sites were contaminated; and should have required the protections that were instituted by way of the work clearance permit of February 22, 1999.

21. In requiring additional training and equipment because of the contamination, USFS should have reformed the contract terms to compensate Hooker for the additional expense, but instead refused to compensate him.

22. As a result of Hooker's inquiries and concern over the contamination, instead of addressing these concerns, USFS effectively stopped Hooker from performing any work, breaching the contract.

23. The USFS later published a report in the form of a bar graph showing Beavers trapped in 1999. This report showed an average of 40 to 50 beavers trapped every month until July, 1999 when no beavers were trapped; with the rest of the year 1999 showing no beavers trapped for the months of October and November, and 2 beavers trapped for the month of December.

24. Hooker is informed and believes that USFS deliberately failed to trap beavers or clean culverts for the balance of the year 1999 in order to breach Hooker's contract.

25. Hooker believes that these actions were taken with a specific intent to injure him economically, and punish him for his concerns about the negligence of the Forest Service.

26. USFS has acted in bad faith, both in failing to inform Hooker of the contamination in the ponds that USFS required him to work in; and breach of the contract and options, in retaliation for Hooker's concerns about the contamination.

WHEREFORE, having stated his amended complaint, Hooker requests that this Court award him damages as follows:

A. The sum of $80,000.00 representing the balance of the breached contract plus the option year;

B. A sum to compensate him for the defendant's bad faith in refusing to renegotiate the contract after learning of changed circumstances;

C. Punitive damages;

D. And such other and further relief as this Court may allow.

Respectfully submitted,

/s/ Berta E. (Robbie) Nichols, Attorney for Plaintiff
Post Office Box 7925
Hilton Head Isl., South Carolina 29938
(843) 686-5884 (Facsimile (843) 842-3933

March 16, 2003

ECF

ORIGINAL

RECEIVED
JUL 7 2004
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

Cover Sheet

Plaintiff(s) or Petitioner(s) William D. Hooker d/b/a Georgia Bowhunters Supply

If this is a multi-plaintiff case, pursuant to RCFC 20(a), please attach an alphabetized, numbered list of all plaintiffs.

Name of the attorney of record (See RCFC 83.1(c)): Berta E (Robbie) Nichols

Firm Name:

Post Office Box: PO Box 7925

04-1126C

Street Address: 206 Carolina Bldg.

City-State-Zip: Hilton Head, SC 29938

Telephone & Facsimile Numbers: (843) 686-5884 Fax: (843) 842-3933

Is the attorney of record admitted to the Court of Federal Claims Bar? Yes

If **NO**, please call (202) 219-9630 for admission papers and instructions.

Nature of Suit Code: 1 1 4

Select only one (three digit) nature of suit code from attached sheet and if numbers 118, 134, 226, 312, 356, or 528 are used, please explain.

Agency Identification Code: A G R

See attached sheet for three digit codes.

Amount Claimed: $ 80,000.00 (est)

Use estimate if specific amount is not pleaded.

Vaccination Date (vaccine cases only) ______________________

If this is case directly related to any pending or previous case, you are required to file a separate notice of directly related case(s). See RCFC 40.2.

**Natures of Suit Codes for General Jurisdiction Cases**

ORIGINAL

ECF

FILED
JUL 7 2004
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WILLIAM D. HOOKER, d/b/a
GEORGIA BOWHUNTERS SUPPLY

Plaintiff

vs

THE UNITED STATES,

Defendant

04-1126C

(Judge Allegra)

Jurisdiction

1. This complaint is brought under the Contract Disputes Act 41 U.S.C.§601 *et seq.* The Court of Federal Claims has jurisdiction over claims based on any express or implied contract pursuant to 28 U.S.C.§1491(a)(1)(1994).

2. William D. Hooker ("Hooker") brings this action for equitable adjustment of Contract #53-4660-8-04 awarded October 29, 1997 as modified October 1, 1999 with the United States Department of Agriculture Forest Service ("USFS").

3. Hooker also brings an action for bad faith breach of this contract and failure to renew the option period .

4. Hooker submitted a Request for Equitable Adjustment dated April 7, 2004 which was denied by the contracting officer, Margaret J. Yeaton on June 10, 2004.

5. Hooker brings this action within twelve months of the date of receipt of the decision.

The Hog Contract

6. On October 29, 1997 Hooker was awarded contract #53-4660-8-04 by the United States Department of Agriculture Forest Service to control the wild hog population on the Savannah River Site by trapping and the use of trained dogs. This contract was further modified as of October 1, 1999.

A. THE WITHHELD PAYMENTS

7. On June 30, 1999 the then contracting officer, Homer Gabard, issued a letter withholding payments totaling $1,320.00 due to non-conformance to contract specifications, and further refused to pay for hogs itemized in subsequent invoices. Specifically, the contracting officer advised that domestic pigs were brought to the cooler as substitutes for wild hogs, claiming that the animals had dull rounded hooves from standing on hard surfaced floors, extra teats, the absence of parasites, and other factors indicating the hogs were domestic, not feral hogs. The contracting officer failed to note whether Wackenhut security had noticed hogs being transported into the Savannah River Site.

8. The contract language does not define feral, but according to *The New Shorter Oxford English Dictionary,* feral is defined as "forming or belonging to a wild population ultimately descended from individuals which escaped from captivity or domestication".

9. Plaintiff Hooker states these hogs were dispatched while on the SRS property, were running wild, and were within the definition of wild or feral hogs under the contract.

10. Hooker is informed and believes that this deduction as well as the unpaid subsequent invoices constituted a breach of the terms of the hog contract.

B. USFS BARRED TWO OF HOOKER'S EMPLOYEES FROM THE SRS SITE

11. On June 30, 1999; the Contracting Officer, Homer Gabard, presented Hooker with a letter stating that as a result of the alleged dispatching of domestic pigs; two of Hooker's employees, Michael E. Eller and Goldman E. Eller were barred from working on the contract or any other contract at the Savannah River Site forever. I

12. As a consequence of losing these two employees, who owned the dogs required to be used under the contract; Hooker was unable to perform the contract and had to purchase dogs and other equipment to complete the contract, as well as hire new employees.

13. The response to Hooker's Request for Equitable Adjustment states that Wackenhut Services, Inc., who provide security for the site, determined that Michael Eller and Goldman Eller were involved in defrauding the government and as a result were denied access to the site. Further, the government states that under the contract (H.6, Compliance with Area Regulations) USFS had the right to require the contractor to remove an employee.

14. Michael Eller subsequently was awarded the hog contract in November, 2001 (43-4568-2-2018); and in March, 2003 (43-3468-3-2100); the contractor's response to the REA states that a review of the case determined inconclusive evidence against Mr. Eller.

15. Hooker is informed and believes that the removal of these employees constituted a breach of the contract terms and requests this court award him damages in an amount to compensate him for the purchase of dogs and equipment and lost employee time .

C. THE LOST CONTRABAND PASS

16. At all times during the contract term, Hooker and his employees were required to obtain a contraband pass from the Department of Energy through the contracting officer(Section C.E.1) Contractors were not permitted to use firearms without securing this contraband pass.

17. For a period of over six weeks in 1999, the contracting officer "lost" the paperwork for Hooker's contraband pass; thereby preventing Hooker from obtaining a gun permit to dispatch hogs under the contract. As the contract is a requirements contract, this prevented Hooker from performing under the contract during this time.

18. Hooker is informed and believes that this constituted a breach of the contract and he should be compensated for his lost income during this breach.

D. CONTRACT READJUSTMENT FOR HUNTING IN CONTAMINATED AREAS

19. Hooker and his employees hunted throughout the entire SRS property; and at no time were they warned about contaminated areas.

20. Prior to the disciplinary actions taken by the Contracting Officer on June 30, 1999; Hooker and his employees became aware that they had been working in contaminated areas such as Par Pond and requested an adjustment in the contract price.

21. The Contracting Officer refused to discuss any adjustment to the price and instituted the previously stated actions against Hooker and his employees.

22. The response to Hooker's REA points to the report of December 27, 2000 from the National Institute of Occupational Safety and Health (NIOSH) as stating that "based on the available environmental data and our medical findings, we conclude that beaver and pig trapping at SRS has not been associated with harmful exposure to radioactive or toxic environmental contaminants". This response fails to relate NIOSH's findings relative to Par Pond; i.e. the potential for exposure to radioactive cesium-137 dust generated during pig trapping in the Par Pond area during a time when the water level had been substantially reduced in order to repair the dam. The NIOSH findings were

> "Though there is historic data concerning the concentration of cesium-137 in the dust and vegetation that was uncovered during the Par Pond drawdown, it is not possible to determine whether you and your employees were exposed to radiation in amounts that would be harmful. There are two reasons for our inability to make that determination. First, the guidance for worker exposure is based on continuous exposure over 2,000 working hours (1 work year). The exposure that you and your employees may have encountered was intermittent but based on the information that you provided, did not approach 2,000 hours per year. Second, *since the water in Par Pond has been restored to its normal levels it is not possible to conduct any monitoring of radioactive dust in that area since it is once again under water.* (emphasis supplied)"

23. Hooker is informed and believes that there should have been a readjustment to the contract price in light of the possible exposure to contamination in Par Pond.

D. FAILURE TO EXERCISE THE OPTION

24. Hooker and USFS entered into a modification of contract (Amendment/Modification No. 04) effective October 1, 1999.

25. This modification extended the contract to October 31, 1999, or *until a new contract is awarded.* (Emphasis supplied)

26. Hooker was informed that new contract language would be inserted for the third option period. Hooker was invited by the contracting officer to modify his proposal for this option period. Hooker did so, but received no response.

27. In its response to Hooker's Request for Equitable Adjustment, the contracting officer states that a decision was made to perform the service with USFS employees, but this was never communicated to Hooker. A new contract was not awarded until November, 2001 (See para. 14).

28. Hooker is informed and believes that the hog contract was extended under the above modification to November, 2001 and the USFS breached the contract by discontinuing Hooker's performance without notice.

29. Hooker has been damaged in the amount of the maximum contract price, or $55,000.00.

BAD FAITH

30. Paragraphs 1 through 29 are realleged as if herein rewritten.

31. As previously alleged, the contracting officer Homer Gabard took the following actions against Hooker:

(a) Withheld payments and refused to pay invoices for hogs deemed "domestic";

(b) Barred Hooker's two employees from SRS *forever*, but one year later awarded the same hog contract to one of these employees, Michael Eller;

(c) Lost Hooker's contraband pass for six weeks, preventing him from carrying a firearm on SRS property to dispatch hogs pursuant to the contract;

(d) Failed to respond to Hooker's proposal subsequent to the modification; failed to award a new contract for over a year; preventing Hooker from performing under the modification; and

(e) Awarded the hog contract to Hooker's former employee who was alleged to have defrauded the government.

32. Hooker believes that these actions were taken in bad faith; and with a specific intent to injure him economically, and punish him for his concerns about the negligence of the Forest Service.

34. Plaintiff further believes that under 28 U.S.C.§2412(b), he is entitled to attorney's fees to compensate him for the defendant's bad faith.

WHEREFORE, having stated his amended complaint, Hooker requests that this Court award him damages as follows:

A. A sum to compensate Hooker for loss of employees, dogs and equipment purchased to perform under the contract;

B. A sum to compensate Hooker for withheld payments and unpaid invoices;

C. A sum to compensate Hooker for the breach of contract subject to the modification and until the new contract was awarded in the amount of $55,000.00;

D. A price adjustment per hog under the contract due to the contamination of the work environment;

E. Attorney's fees;

F. Punitive damages;

G. And such other and further relief as this Court may allow.

Respectfully submitted,

Berta E. (Robbie) Nichols

Berta E. (Robbie) Nichols, Attorney for Plaintiff
Post Office Box 7925
Hilton Head Isl., South Carolina 29938
(843) 686-5884 (Facsimile (843) 842-3933

July 2, 2004