5-6-99

Frankie,

I'm very sorry that I haven't gave the USFS contracts (Beaver/ Culvert cleaning) my full attention. I have been on vacation for the last couple of days, and haven't performed very much trapping / culvert cleaning for the latter part of April or the first week of May. My family and I have had some family problems concern the school shooting in Coloroado.

If engineering has any problem areas that need additional attention please give me a list and I will correct the problem areas ASAP. My beeper # is 16798 and phone numbers are 869-8226 home and Office is 863-0220.

Thanks,

N.D. [signature]

G-0521

USDA Forest Service

FS-6300-20 (12/85)

**CONTRACT DAILY DIARY**
(Reference FSH 6309.11)

1. FOREST: SRI

2. CONTRACT NO.: 43-4660-9-0016

3. PROJECT: HOG CONTROL

4. CONTRACTOR: W.D. HOOKER

5. CONTRACTOR'S REPRESENTATIVE ON SITE: GOLDMAN ELLER, FRANKIE BROOKS

6. GOVERNMENT OFFICIALS ON SITE:

| 7. DATE | 8. DAY OF WEEK | 9. TIME ARRIVED | 10. TIME DEPARTED | 11. WEATHER |
|---|---|---|---|---|
| 12-17-98 | | | | |

| 12. TEMPERATURE Min. Max. | 13. GROUND COND. | 14. CONTRACT TIME | 15. DAYS USED | 16. COMPLETION DATE |
|---|---|---|---|---|
| | | | | |

17. TIME USED (%)

18. WORK COMPLETED (%)

19. WORK ON SCHEDULE Yes X[ ] No [ ]

20. CONTRACTOR'S WORK Acceptable [ ] Unacceptable [ ]

21. CHANGE ORDERS / AMENDMENTS ISSUED

22. WORK ORDERS ISSUED (Include SUSPEND/RESUME)

23. MATERIALS FURNISHED TO JOB SITE (Furnished by: G-Govt; C-Cont; S-Subcont)

24. LIST EQUIPMENT ON SITE (Furnished by: G-Govt; C-Cont; S-Subcont)

| Type | Control Item Number and Location of Use | Hours Used |
|---|---|---|
| | | |

25. LIST CONTRACT PAYMENTS, REPORTS, CORRESPONDENCE, ETC.

| Item | Prep. | Submit |
|---|---|---|
| | | |

26. WORKERS ON SITE

| Classification | Number Prime | Number Sub. |
|---|---|---|
| | | |

27. GOVERNMENT PROVIDED SERVICE ADEQUATELY AND TIMELY Yes [ ] No - Explain in Narrative

28. NARRATIVE REPORT:

G-0323

BETH GOT A REPORT THAT GOLD... ..N ELLER BROUGHT PIGS TO THE CO ..R THAT HE DID NOT KILL. BETH, BILL, DON, AND MYSELF DISCUSSED A MEETING WITH HOOKER AND ELLER. BILL ASKED ME TO CONTACT HOOKER . I DID , HE DIDN'T KNOW ANYTHING ABOUT THIS AND WAS VERY UPSET WHEN I TOLD HIM.HE CALLED ELLER IMMEDIATELY THEN ELLER CALLED ME. HE STATED THAT HE WAS AT THE DEER HUNT CHECK STATION WHEN A PREGNANT SOW WAS BEING CUT OPEN. THE PIGLETS WERE READY TO BE BORN. HE STATED HE TOLD THEM TO PUT THE PIGS ASIDE AND HE WOULD BRING THEM BACK HERE AND LET JACK MAYER MEASURE THEM.( JACK IS STILL MEASURING HOGS). I TOLD HIM THAT HE WAS NOT SUPOSE TO LOG THEM IN AND WOULD NOT BE PAID FOR THE 6 PIGS. WE ARE PLANNING A MEETING FOR THE FIRST WEEK IN JANUARY.

| 29. SIGNATURE: | 30. TITLE 12-17-98 | 31. ADDTL. SPACE NEEDED [ ] |
|---|---|---|
| Frankie D. Brooks | E.E CoR | (continued on 6300-21) |

G-0324

United States Department of Agriculture | Forest Service | Savannah River Natural Resource Management and Research Institute | P.O. Box 700 New Ellenton SC 29809

File Code: 6320
Route To:

Date: June 30, 1999

EXHIBIT SGD P6

Subject: Contract 53-4060-8-04, Wild Hog Control

To: William D. Hooker, Sr.
GA Bowhunter Supply Co.
5330 Columbia Road
Grovetown, GA 30813

Contract 53-4060-8-04 was awarded to GA Bowhunter Supply Co. on October 29, 1997, as a result of competitive negotiated procurement procedures.

The contract has a base year and two option years and the contract was modified effective October 1, 1998, to exercise the option and extend the contract to September 30, 1999 (Option Period I).

There have been some actions taken during the performance of this contract that have not been proper or in compliance with the contract and some of the actions could be considered to be illegal.

These actions place you in default on this contract and are listed below:

1. Fetal pigs that were not born have been removed from sows, placed in the SRI cooler, and entered on the SRFS Wild Hog Data Table in an attempt to receive payment for these fetal pigs. Frankie Brooks, COR, refused to pay you for these fetal pigs.

2. Thirty-one (31) domestic pigs have been brought to the SRI cooler and entered on the SRFS Wild Hog Data Table in an attempt to receive payment for these domestic pigs. According to our records you have received payment for 24 of the domestic pigs on your invoice no. 107602 submitted on May 31, for the month of May. Seven of the domestic pigs were brought to the cooler and entered on the Data Table during June for which you have not yet invoiced.

3. Hogs and/or pigs have been brought to the SRI cooler, entered on the Data Table, and then removed from the cooler and taken to the SRS landfill without the COR or one of the Inspectors verifying that the hogs/pigs were in the cooler and the COR or Inspector initialing the Data Table. Frankie Brooks, COR, refused to pay you for these hogs/pigs.

4. Hogs have been left in the woods until they begin to rot and then brought to the SRI cooler.

5. Recently, two hogs were entered on the Data Table without the hogs being brought to the SRI cooler as required by the contract. Frankie Brooks, COR, has told you that we will not pay for these two hogs.

6. Although to our knowledge this has not occurred we are also concerned about hogs and/or pigs being brought back to the SRI cooler after being removed from the cooler and entered on the Data Table again so that payment would be made for the same animal twice. This is a concern because the SRS landfill apparently does not require you or your employees to sign in at the landfill as was required in the past.

As a result of an inquiry conducted by myself and other SRI personnel and a limited investigation conducted by Wackenhut Services, Inc. (WSI), it is my opinion that you were not and are not personally involved in the above listed actions, but that two of your employees, Goldman E. Eller and Michael E. Eller, were and are involved in the above listed actions.

Because of my conclusion that you were not and are not involved in the above listed inappropriate/illegal actions taken by two of your employees I will not terminate this contract for default at this time even though you are accountable and responsible for the actions of your employees when performing a Federal Government contract.

Let this letter serve as notice to you that if inappropriate and/or illegal actions are taken on this contract in the future that the contract will be terminated for default immediately.

The following actions are taken by me immediately to insure that performance on contract 53-4660-8-04 once again becomes appropriate and/or legal and remains appropriate and/or legal:

1. Both Goldman E. Eller and Michael E. Eller are barred from working on this contract or any other contract with the Forest Service at the Savannah River Site forever.

2. Neither Goldman E. Eller or Michael E. Eller will be issued Site Access Badges by the Forest Service and WSI may pursue placing both individuals on the list of personnel to be denied access badges by all entities at SRS.

3. You and your employees working on this contract and contract 53-4660-9-06, Beaver Control, will enter and leave SRS through Barricade 2 (Aiken Barricade) only. You and your employees will have your vehicles searched each time you enter and leave SRS through Barricade 2.

4. All hogs, pigs, or beavers placed in the SRI cooler will be marked in some manner by the COR or an inspector and the Data Table will be initialed by the COR or Inspector. Initially the animals will be marked with spray paint. The COR or an inspector will also issue a receipt to you or your employee each time hogs, pigs and/or beavers are placed in the SRI cooler. You will not receive payment for any animals removed from the cooler prior to the COR or Inspector doing these tasks. The receipts must be attached to your invoice each month or the invoice will be returned to you without being processed.

5. The COR and/or an inspector will inventory all Government property issued to you or your employees annually, prior to the Government exercising the right to extend the contract for any option period.

6. The amount of $1,320 will be deducted from your invoice for June for the 24 domestic pigs that have been paid for or from subsequent invoices if the amount of the June invoice is insufficient.

7. You will not receive payment for any hogs, pigs, or beavers not brought to the SRI cooler at the end of each work day as required by the contract.

8. You will not receive payment for any hogs, pigs, or beavers that are logged on the Data Tables without the carcass being placed in the SRI cooler.

9. Starting immediately personnel working on the Wild Hog control contract or Beaver Control contract will tell the SRI Dispatcher the Timber compartment number that they are in and will

call the SRI Dispatcher on the radio with their new location each time they move from one timber compartment to another timber compartment. Personnel will no longer give their location as "General Site" when contacting the SRI dispatcher.

You shall take the following actions:

1. Insure the Site Access Badges issued to Goldman Eller and/or Michael Eller by the Forest Service are turned in to me prior to leaving this meeting.

2. Return all Government property issued to Goldman Eller or Michael Eller to me no later than July 2, 1999. This includes two way radios, chargers, contraband passes, property passes, timber lock key, and any other Government property issued to either Mr. Eller. You will be charged for any Government property that is not returned in satisfactory condition or that is not returned.

3. Obtain the locations of all hog traps from Mr. Eller, verify that the traps are at the locations, and then accompany Frankie Brooks, COR, to all the traps so that she can account for all 25 traps. You will be charged for any traps or parts of traps that are missing or not in satisfactory condition.

4. All traps must be left open and set so that an animal cannot trip the door to any of the traps until you are ready to continue performance on the contract.

You have 15 calendar days from today to have suitable personnel replace both Mr. Ellers so that satisfactory performance can resume on the contract.

You shall submit resumes for the replacement personnel to me prior to the personnel starting work and person(s) with the dogs will be required to perform a demonstration with the dogs for SRI and other SRS personnel. This demonstration will be evaluated and the person(s) with the dogs will not be allowed to work on the contract unless approved by me.

Failure to have suitable personnel and dogs available to continue performance on the contract at the end of the ~~10~~ 15 HRG calendar days may result in the Government terminating the contract for default under the terms and conditions of Federal Acquisition clause 52.249-8, Default (Fixed Price Supply and Service) on page 69 of the contract.

This letter is also notice to you that the Government will not extend the contract for Option Period II (October 1, 1999 to September 30, 2000), due to the necessity to make some changes in the contract language.

We hope that you will submit an offer for the new solicitation.

Please call me at (803)725-0239 if you have questions.

Homer R. Gabard

HOMER R. GABARD
Contracting Officer

cc: Frankie Brooks, COR
Beth LeMaster, Asst. Manager for WF&B
Bill Jarvis, Inspector

# WSI-SRS INVESTIGATIONS SECTION
# SAVANNAH RIVER LAW ENFORCEMENT DEPARTMENT
# INVESTIGATIONS REPORT

OFFENSE: Swindling (990023II)

DATE OF REPORT: 07-06-99

DATE OF OCCURRENCE: 05-20-99 to 06-06-99

INVESTIGATOR ASSIGNED: Jimmy G. Clark

SUMMARY:

On 05-27-99, Mr. Homer Gabard of the United States Department of Agriculture, Forest Service–Savannah River Natural Resource Management and Research Institute (Forest Station), contacted Wackenhut Services, Incorporated-Savannah River Site (WSI-SRS) Investigators and reported that a Wild Hog Control employee was suspected of bringing domestic hogs to the Forest Station from off the Savannah River Site (SRS) for disposition.

Mr. Gabard said, that John J. Mayer II, Ph.D., Wildlife Ecologist, Westinghouse Savannah River Company (WSRC), was conducting an ongoing comprehensive study of the wild hog population on the SRS. Dr. Mayer noticed that several hogs brought in for disposition had numerous characteristics indicative of domesticated hogs.

On 06-07-99, Chief Investigator Mack Underwood and Investigator Jimmy Clark met with Dr. Mayer at the Forest Station cooler, where the hog carcasses are kept for study prior to disposal. Dr. Mayer pointed out the different characteristics between the wild hog population on the SRS and the suspect hogs brought in by Wild Hog Control employee Goldman Eller.

Dr. Mayer pointed out the differences in the hooves, teeth, teats, parasites, and the lack of damage caused by the dogs used to capture the hogs. First, he said that the wild hogs had sharp pointed hooves, and the domesticated hogs had dull rounded hooves. The dull rounded hooves are indicative of domestic hogs raised on a cement structure. Second, he said that the number of teats in wild hogs numbered twelve or fewer, while domesticated hogs typically had more than twelve (domesticated hogs are bred for larger litters). The third indicator Dr. Mayer pointed out was the difference in the number of teeth. Another indicator was the lack of parasites on the domesticated hogs. The lack of parasites is characteristic of hogs raised in a clean environment of a hog pallor. Lastly, Goldman Eller indicated on the log sheet that the hogs were captured by dogs, yet there was an absence of any bite marks or trauma associated with that manner of capture. However, the suspect hogs did have indications of head trauma associated with a fatal strike to the head. In contrast, the wild hogs that were logged in did show the trauma and damage associated with bite marks of dogs used for capture of the hogs.

On 07-01-99, Investigator Clark interviewed the Wild Hog Control contractor, Mr. William D. Hooker, Sr., (Georgia Bowhunter Supply Company) at the Forest Station Administration Building 760-15G. The interview focused on whether or not Mr. Hooker was involved with, or had knowledge that, Mr. Eller had

This document contains information that has been gathered from an official Investigation. It is the property of DOE-SR/WSI-SRS and neither the document nor its contents should be disseminated with DOE-SR/WSI-SRS authorization.

 Investigator: J. G. Clark

EXHIBIT D-24

PENGAD 800-631-6989

brought domesticated hogs from off site to the Forest Service for disposition. Mr. Hooker said that he was not aware that Mr. Eller had brought any animals onto the SRS for disposition through the contract. Mr. Hooker indicated that he would terminate Mr. Eller and his son, Michael Eller, from the contract if they were involved with any wrongdoing. Mr. Hooker was cooperative and offered no indications of involvement with the Ellers' attempt to defraud the Forest Service.

On 07-01-99, Forest Station personnel, Dr. Mayer, Investigator Clark, Mr. Hooker, and Mr. Goldman Eller met in building 760-15G to resolve the contractual discrepancies. Mr. Goldman Eller was confronted with the allegations that he had brought in thirty-one domesticated hogs from off site for disposition through the contract. Mr. Eller showed no emotion and no reaction to the allegation. Mr. Eller provided one very weak denial. Mr. Eller surrendered his badge upon request from Mr. Gabard and cooperated with all conditions of his termination from the contract. Michael Eller was not present at the meeting, but he was terminated from the contract also.

**CONCLUSION:**

Based on the facts, evidence, and the expert opinion of Dr. Mayer, the investigation showed that Goldman Eller brought in approximately thirty-one domesticated hogs from off the SRS for disposition through the Wild Hog Control contract.

**RECOMMENDATION:**

The Solicitor's Office recommended that the Forest Station settle the discrepancy(s) with the contractor through contractual methods, rather than through the South Carolina Judicial System. Based on the Solicitor's recommendations, the facts and evidence of this case, and the discretion of the Forest Station Management, it was recommended that Goldman Eller and Michael Eller be terminated from the Wild Hog Control contract.

The WSI-SRS Law Enforcement Investigations Section recommended tighter controls on the access and egress of future Wild Hog and Beaver Control employees at the SRS. Each contract employee should enter and exit Barricade One or Barricade Two, submitting to an entry and exit inspection of all vehicles operated by said contract employees. The employees will be required to enter and exit the same barricade during each visit of the SRS. To ensure that access and egress is limited to Barricades One or Two, no contract employee should not have keys to any perimeter gates on the SRS, or be allowed to enter or exit a perimeter gate.

This document contains information that has been gathered from an official Investigation. It is the property of DOE-SR/WSI-SRS and neither the document nor its contents should be disseminated with DOE-SR/WSI-SRS authorization.

 Investigator: [signature]

Hogs2 (1536x1024x16M bmp)



Hogs3 (1536x1024x16M bmp)



Hogs4 (1536x1024x16M bmp)



Hogs5 (1536x1024x16M bmp)



Hogs6 (1536x1024x16M bmp)



Hogs7 (1536x1024x16M bmp)




SRS Monthly Precipitation
Precipitation (inches)
0
1
2
3
4
5
6
7
8
9
10
11
Jan
Feb
Mar
Apr
May
Jun
Jul
Aug
Sep
Oct
Nov
Dec
1970-1999 Monthly Avg
1999


SRS Annual Precipitation 1970-1999
Precipitation (inches)
30
35
40
45
50
55
60
65
70
1970
1971
1972
1973
1974
1975
1976
1977
1978
1979
1980
1981
1982
1983
1984
1985
1986
1987
1988
1989
1990
1991
1992
1993
1994
1995
1996
1997
1998
1999
30-yr Avg: 51.1"


SRS Annual Precipitation 1970-2000
Precipitation (inches)
30
35
40
45
50
55
60
65
70
30-yr Avg: 51.1"
1970
1972
1974
1976
1978
1980
1982
1984
1986
1988
1990
1992
1994
1996
1998
2000

Sept 107617

| CUSTOMER'S ORDER NO. | DEPARTMENT | DATE |
|---|---|---|
| 43-4660-9-0108 | | 10-1-99 |

NAME: W. O. Hoch

ADDRESS: 5330 Columbia Road

CITY, STATE, ZIP: Grovetown GA 30813

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE RETD | PAID OUT |
|---|---|---|---|---|---|---|
| | | | | | | |

| QUAN. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| 1 | Beaver | | 45 00 |
| ~~41~~ 36 | Culverts | | ~~738 00~~ 648 00 |
| | Total | | ~~783.00~~ 693 00 |
| | * Balance Due Government from Previous Invoice W D Hoch | | -2295 00 |
| | Current Balance Due Government | | $1,602 00 |

Work Completed Accepted
Frankie S Burke 11-8-99

Remit to:
GA Bowhunter Supply
5330 Columbia Road
VID 582135211 A
Grovetown, GA 30813

RECEIVED BY (over)

G-0576

* Over payment of $3,933 was made to GA Bowhunters Supply by NFC in July, 1999. Refer to letter dated July 20, 1999.

[illegible]

G-0577

oct 107621

CUSTOMER'S ORDER NO. 43-4660-9-0108
DEPARTMENT
DATE 11-3-99

NAME W. D. Hooker

ADDRESS 5330 Columbia Road

CITY, STATE, ZIP Grovetown GA 30813

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE RETD | PAID OUT |
|---|---|---|---|---|---|---|
| | | | | | | |

| QUAN. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| O | Beaver | | |
| 20 Hrs ~~19~~ | Culverts Cleaning | | 360.00 ~~342.00~~ |
| | * Balance due Government from previous invoice No. 107617 | | -1602.00 |
| | Current Balance Due Government | | $1,242.00 |
| | * Overpayment of $3933 was made to GA Bowhunters Supply by NFC in July, 1999. Refer to letter dated July 20, 1999. | | |

W. D. Hooker

Work Completed & Accepted
Frankie Brooks 11-8-99

Remit to:
GA Bowhunter Supply
5330 Columbia Road
VID 582135211 A
Grovetown, GA 30813

RECEIVED BY

G-0574

A161

PHONE CONVERSATION [illegible]

DATE: 11/12/99
TIME: 8:00 A.M. (Approximately)
CALL: MADE ____ RECEIVED ✓ RETURNED ____ PHONE (829-8226
CONTRACTOR GA Bowhunter Supply PROJECT Beaver Trapping and Maintenance of Culverts
CONTRACT# 53-4460-9-06
CONVERSATION WITH W. D. Hooker, Owner

SUMMARY OF CALL

I wanted to talk
Mr. Hooker called me and said that he had heard that
with him. In fact, I had tried to call him on Wednesday 11/10.
Told Mr. Hooker that I needed to ask him about the Time Sheets turned
in with the invoice dated 11/3/99 for the month of October 1999. Time Sheets
are to record time spent cleaning culverts. For October I have two sets of the time
sheets; one set shows 45.5 Hrs. and the other set shows 20 hrs. and the invoice shows
19 hrs. - Asked Mr. ~~what~~ which set of time sheets is the correct set for October and
should the hours on the invoice be 19 Hrs. or 20 hrs. Mr. Hooker said that the
I shredded the Time sheets with 45.5 hrs.
correct set of time sheets is for 20 hrs.
Then I asked Mr. Hooker why he only caught one beaver in September and none
in October. Mr. Hooker responded that he had concentrated on the Wild Hog Contract
contract during those two months and that he could not afford to have someone to help
on the Beaver contract. I reminded Mr. Hooker that he is responsible for
performing satisfactorily on both contracts and that he cannot decide not to work
on one contract and neglect the other one. Mr. Hooker then [illegible] why the Beaver
contract was reduced to one site after the two Ellers were removed from the Wild
Hog contract. Then he got 3 sites and now he has 6 sites. Mr. Hooker said he is now
back to beaver trapping. Mr. Hooker said that the number of culverts he cleans was
also reduced from about 40 or so down to a few. Wants to know why because he says
some culverts are ~~[illegible]~~ blocked again.

SIGNATURE: [signature]

Reminded Mr. Hooker that the only culverts he is to clean are the culverts which he
is trapping.

G-0971

9:00 A.M. - called Frankie Brooks & left a voice mail for return call.

United States Department of Agriculture | Forest Service | Savannah River Natural Resource Management and Research Institute | P.O. Box 700 New Ellenton SC 29809

**File Code:** 6320
**Route To:**

**Date:** November 29, 1999

**Subject:** Contract 53-4660-9-06, Beaver Trapping and Maintenance of Culverts

**To:** William D. Hooker
GA Bowhunter Supply Co.
5330 Columbia Road
Grovetown, GA 30813

This letter is to notify you that the Government will not extend the term of the above cited contract at the end of the Base Period. Therefore, the above cited contract will expire on December 31, 1999.

Due to an overpayment of $3,933 that was erroneously made to you by the Government in July, 1999 you currently owe the Government $1,242.00. Please refer to our letter dated July 20, 1999.

Deductions will be made from your invoices for November and December, but if your invoices are not enough to deduct the total of $1,242, a Bill for Collection will be issued to you for the amount still owed; and you will be expected to pay the Government that amount prior to the contract being closed.

If you have any questions, please call me at (803) 725-0239.

HOMER R. GABARD
Contracting Officer

cc: Frankie Brooks, COR
Beth LeMaster, Asst. Mgr. for WF&B

G-0970

W E Hooker

Larry Ellott,
CDC

00/06/00

In the past Beaver Contracts (1992 - 1999) that I have performed worked under for SRI state that there is no toxicological hazards associated with beaver trapping at SRS. I found that not to be the case on March 1999 when I trapped beavers at site #25 (HP Station #52) for SRI. See CO for the list of hazards chemicals that have been dumped/released into that stream from the process areas over a period of years. These chemicals have settled in the mud or sediment per the report I have been reading. Myself and other trappers have had our hands in working in with out any regards being take to our health. See the enclosed picture of the sediment in the trapper's hand.

I believe some of the other 52 sites unknowing to me have also exposed us to unknown chemical or contamination hazard. All these sites may not have chemicals in the mud/sediment or been posted as Soil Contamination Area. I cannot tell you which ones are clean and which ones are not. Hopefully DOE/SRI can tell you. See photo labeled M-Area Hazardous Waste Site. This is shown as Site #43 3-700 Area behind motor pool on my list of places to trap. I would like to know what chemicals hazards we have been exsposed to and is there any health hazards associated with these chemicals.

I am requesting a list of the hazardous chemicals that may or may not have been dumped/released into these 53 different sites that myself and my employees have worked in without the proper type of safety equipment since February 10-1992 to July 21-99.

I am requesting that the DOE/SRI provide medical evaluation for all employee's we were exposed to hazards chemicals and contamination that are in the mud or sediment that we worked in prior to July 21-99

In September of 1999 I requested from the CDC a copy of the 1400 page report titled The Savannah River Site Dose Reconstruction Project Phase II. See chapter 12.1 for some idea of what is in Steed Pond. We trapped this site for years without knowing we could be in endangering ourselves.

It is now posted as a Soil Contamination Areas. There's a posting every 50' and is now barricade off. We trapped this area for years without any posting ever being up or barricade off. I would like to know what we been exposed to in this area?

See attached pictures labeled Steed Pond.

No personal protection of any kind other than specified by the contract. The equipment we used has not ever being checked by Radcon, no WCPS were ever issued stating safety requirements or the chemicals that have been dumped into the water to later settle in the mud or sediment where we made our sets as documented in the CDC report. We used our bare hands to reach down and get a big pile of mud to make our castor sets. Castor that's the only thing the SRI allowed us to have off these beavers was the beaver castor and it was to be used to attract beavers. We used it to make castor mounds sets the same way the beavers do with the mud or sediments from the bottom of the creeks, basins, pond, ditches.

We may or may not have been exposed/contaminated over the years who would know?

What is correct path forward now?

Our tools,trucks,homes may or may not have been contaminated over the years who knows?

Myself and the worker's maybe have chemicals in their systems again who knows?

What about chemical that are insoluble (MSDS Sheets) with water in these sites but that settles in the mud or sediment as mentioned in chapter 12.1 that we have had our bare hands in over the years.

These chemicals could enter our bodies thru absorption through our skin due to us not knowing to have to wear gloves on up to our arm pits. This is what I was required to wear by Radcon when trapping site #25 (HP station 52) in March of 1999. Mine you that this stream is at the most 2' wide and about one foot deep with out beaver activity. But there is (3) 36" culverts located at this site and all of them have been stopped up at times. With mud and sediment from that stream bed. All this mud and sediment just goes down stream to next trapping site.

* I do feel that there is health concerns that need to be addressed due to SRI neglecting to contact the proper departments at SRS and finding out what's in each trapping site prior to sending trappers into these sites from February 1992 to July-21-1999.

* I do feel that it is the responabilty of the DOE/SRI to fined out if these workers need to have any testing performed for the different types chemicals that may be in there systems.

* I do feel that it is the responabilty of the DOE/SRI to pay for any damages to these workers because the SRI neglecting to contact the proper departments at SRS prior to letting us work these 53 sites for the last 7 years.

Theres just to many studies concerning SRS ground water,surface water and the environment going on to just say we don't know. Somebody knows whats in these 53 sites we have been working in for the last 7 years. And I am asking you to find out what is in the 53 sites and if it is harmful to myself and the workers I have allowed to work in these site over a 7 years period with out wearing the proper safety equipment.

I have enclosed a copy of the statement that is in all my contracts stating that there is no toxicological hazards associated with beaver trapping at SRS. Also a few picture's on the trapper's making a set using the mud /sediment.

These are my concerns and request and I would like to have these concerns answered ASAP. The Contracting Officer is Homer Garbard his phone work number is 1-803-725-0239. My home number is 1-706-869-8226.

Sincerely,

W.D. Hooker

W. D. Hooker

# Beaver trapping FY-2000

Jim Segar

| Month | No. Beaver | | Site # | Date | | ✓ monitored By HP |
|---|---|---|---|---|---|---|
| | 1 | 1 | 41 - Patterson Mill | 1-20-2000 | | ✓ |
| Jan | 2 | 1 | 41 - " " | 1-20-2000 | | ✓ |
| | 3 | 1 | 1 - Sub Station | 1-25-2000 | | ✓ |
| | 4 | 1 | 1 - " " | 1-25-2000 | | ✓ |
| | 5 | 1 | 17 - North By Pass | 2-6-2000 | | ✓ |
| | 6 | 1 | 1 - Substation | 2-6-2000 | | end of Permit for Jan ✓ |
| | 7 | 1 | 31 Beaver Baffler | 2-9-2000 | | turned in for Permit (7) |
| | 8 | 1 | 2 - Leigh Rd | 2-12-2000 | | ✓ |
| | 9 | 1 | 31 - Beaver Baffler | 2-13-2000 | | ✓ |
| | 10 | 1 | 31 - Beaver Baffler | 2-19-2000 | | ✓ |
| | 11 | 1 | 42 - Youman Rd | 2-22-2000 | | ✓ |
| | 12 | 1 | 42 Youman Rd | 2-27-2000 | | ✓ |
| | 13 | 1 | 2 Leigh Rd | 3-2-2000 | | ✓ |
| March | 14 | 1 | 51 Atta Range | 3-13-2000 | | ✓ |
| | 15 | 1 | 51 Atta Range | 3-13-2000 | | ✓ |
| | 16 17 | 2 | 53 Rd 4 at 4 mile SHOT | 3-14-2000 | Jim & Robbie | New Permit; left in water |
| | 18 | 1 | 51 Atta Range | 3-19-2000 | | ✓ |
| | 19 | 1 | 7 Banana Rd | 3-19-2000 | | ✓ |
| | 20 | 1 | 53 Rd 4 at Four Mile SHOT | 3-21-2000 | Jim + Robbie | left in water |
| April | 21 | 1 | 42 Youman Rd | 4-3-2000 | | ✓ |
| | 22 | 1 | 52 Robbins Station | 4-26-2000 | | 1 otter |
| May | 23 | 1 | 42 Youman Rd | 5-13-2000 | | ✓ |
| | 24 | 1 | 50 Chips Rd | 5-14-2000 | | ✓ |
| June | | | | | | |

# BEAVER TRAPPING 2000

| | NO BEAVER | Site # | DATE | |
|---|---|---|---|---|
| [illegible] | 1 | 50 | 6-9-2000 | Doesn't Have to Be Monitored |
| [illegible] | 1 | 36 Leigh Rd | 10-28-2000 | |
| 29 | 1 | E & H (25) | 11-4-2000 | Monitored (HP) (Good) |
| 30 | 1 | Leigh Rd (36 | 11-11-2000 | not monitored HP |
| 31 | 1 | Kennedy Pond (15 | 12-3-2000 | Not Monitored |
| 32 | 1 | Kennedy Pond (15 | 12-2-2000 | Not Monitored |
| [illegible] | 1 | Leigh Rd (2 | 12-10-2000 | Not monitored |
| [illegible] | 1 | Youmans Rd (42 | 12/10/00 | Trap |
| 35 | 1 | Leigh Rd (2 | 12/11/00 | Trap |
| 36 | 1 | Rd 4 near C (53 | 12/14/00 | Gun |
| 37 | 1 | Rd 4 near C (53 | 12/14/00 | Gun |
| 38 | 1 | Rd 4 near C (53 | 12/14/00 | Gun |
| 39 | 1 | Robbins St. (23 | 12/17/00 | ~~Gun~~ |
| 40 | 1 | Robbins Station (23 | 12/17/00 | Trap |
| 41 | 1 | Robbins Station (23 | 12/19/00 | Trap |
| 42 | 1 | Robbins Station (23 | 12/20/00 | Trap |
| 43 | 1 | Fire Pond Rd F (8 | 12/21/00 | Trap |
| 44 | 1 | Rd 4 near C (53 | 12/21/00 | Gun |

Beaver Trapping
Jim Segar

| # Beaver | Amount | Site # | Date | Monitoring |
|---|---|---|---|---|
| 1 | 1 | 8 Banana Rd | 1/11/01 | Gun |
| 2 | 1 | 8 Banana Rd. | 1/18/01 | Gun |
| 3 | 1 | 5 Dunbarton Rd | 1/28-01 | Gun |
| 4 | 1 | 18 K-To L waterline | 1-31-01 | Trap |
| 5 | 1 | K To L 18 waterline | 1-31-01 | OTHER Trap |
| 6 | 1 | 42 Youman Rd. | 2-1-01 | Trap |
| 6 | 1 | 53 Rd 4 near C | 3-6-01 | Gun |
| 7 | 1 | North By Pass 17 | 3-17-01 | trap |
| 8 | 1 | K-Area entrance 58 | 3-17-01 | trap |
| 9 | 1 | North By Pass 17 | 3-20-01 | trap |
| 10 | 1 | Meyers mill 12 | 3-23-01 | trap |
| 11 | 1 | K area entrance 58 | 3-23-01 | trap |
| 12 | 1 | Steel Pond 19 | 3-27-01 | Gun |
| 13 | 1 | north Hickson mill ~~35~~ 57 | 4-14-01 | trap |
| 14 | 1 | North Hickson Mill ~~35~~ 57 | 4-15-01 | trap |
| 15 | 1 | Rd 4 near C 53 | 4-19-01 | Gun |
| 16 | 1 | north Hickson mill 57 | 4-20-01 | trap |
| 17 | 1 | north By Pass 17 | 4-26-01 | trap |
| 18 | | ~~[illegible]~~ 42 | 10-11-01 | |
| 19 | | ~~[illegible]~~ 35 | 10-16-01 | |
| 20 | | ~~[illegible]~~ 35 | 10-19-01 | |
| 21 | | Dunbarton 5 | 11-7-01 | |
| 22 | | Youman Rd 42 | 11-14-01 | |
| 23 | | Leigh Rd. 2 | 10-24-01 | |
| 24 | 1 | Leigh Rd 2 | 12-5-01 | |
| 25 | 1 | Dunbarton Rd - 5 | 12-5-01 | |
| 26 | 1 | 42 ~~[illegible]~~ | 12-10-01 | |
| 27 | 1 | 35 | 12-31-01 | |
| 28 | 1 | | | |

Apr