Mr. Homer Gabard
Contracting Officer
USFS/SRI
P.O. Box 700
New Ellenton SC 29809

04-10-02A09:45 RCVD

Re: Claim for Beaver Contract while working for Ga. Bowhunters Supply Co. on property owned by the Department of Energy.

Example (Four Mile Branch).

I certify that the claim is made in good faith: that the supporting data are accurate and complete to the best of my knowledge and belief: that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable: and that I am duly authorized to certify on behalf of the contractor.

Fraud and False Statements

No toxicological hazards are associated with trapping beaver at SRS; however, normal environmental and physical hazards such, as snakes and uncertain footing do exist.

1.) Following beaver sites have toxicological hazards that are associated with trapping beaver at SRS. See attachment #1

2.) Four Mile Branch is not a normal environment due to being contaminated by metals and radionuclides from ground plumes. DOE is trying to achieve an 80% risk reduction to human health and the environment at the stream. See attachment #2

3.) Four-Mile Branch is not a normal environment due to being contaminated by Tritium being released at location FM6 on road A13. See attachment #3

4.) Four Mile Branch is not a normal environment due to Tritium being above the EPA Drinking Water Standards of 20,000 pci/l. See attachment #4.

5.) Four Mile Branch is not a normal environment due to Tritium low ph and toxic Chemical that have been release over the history of SRS.

DOE never checked on me at anytime while working in any stream and have I attend any training other than how to trap a beaver using (mud or sediment in these trapping sites) making a castor pile set per Mr. Hooker instruction. From all the paper work I have been shown by the owner I had the right to know what I was in the surface water and sediment on Savannah River Site while working for Ga. Bowhunter Supply Co.

G-2153

who was awarded government contracts through USFS/SRI at the Savannah River Site in the counties of Aiken, Barnwell, Allendale South Carolina.

I demand payment of $ dollars for exposing me to toxicological hazards associated with Four Mile Branch and any other stream, Pond, Ditch, Carolina Bay, Reactor Canals, Branch, Creek while beaver trapping for the United States Forest Service/SRI without the proper permits, training, or personal protection being used at anytime while I was in the surface water making castor mound sets for beavers not even my equipment was surveyed by Rad OPS as stated on Work Clearance Permit signed by shift manager Tim L. McCormick on 2-22-1999 at 1200 and Mr. Hooker on 3-25-1999.

Thank You,

Print your full name ____________________

Your Signature ______________________

Date __/__/__

Reference attachment 5 through 10 submitted by owner.

Owner William D. Hook Sr

Date 4/8/02

Seal of Notary Public

CARPII O. EDENFIELD NOTARY PUBLIC EXP. Aug 16, 2002 RICHMOND COUNTY, GA

G-2154

United States Department of Agriculture | Forest Service | Savannah River | P.O. Box 700 New Ellenton, SC 29809

**File Code:** 6320 **Date:** July 29, 2002
**Route To:**

**Subject:** Requests for Equitable Adjustment for Wild Hog Control and Beaver Control Contracts

**To:** William D. Hooker
5330 Columbia Road
Grovetown, GA 30813

RECEIVED AUG 0 1 2002 OGC

CERTIFIED – RETURN RECEIPT REQUESTED

This letter is in response to eight Requests for Equitable Adjustment received from you that are dated between October 1, 2000, and October 27, 2000 and an additional seven dated between April 1 and April 15, 2002. A summary of the Requests for Equitable Adjustment is shown below:

| Contract or Solicitation No. | Description | Amount Requested |
|---|---|---|
| 36-93-08 | | |
| 43-4660-3-0134 | Beaver Control | $ 10,000,000.00 |
| 53-4660-4-14 | Wild Hog Control | $ 10,000,000.00 |
| 53-4660-4-0415(no such Contract No.) | | |
| *43-4660-4-0415 (correct number) | Wild Hog Control | $ 10,000,000.00 |
| *43-4660-5-0209 | Wild Hog Control | $ 10,000,000.00 |
| 53-4660-8-04 | Wild Hog Control | $1,000,000,000.00 |
| **43-4660-8-0027 | Wild Hog Control | $ 10,000,000.00 |
| 53-4660-9-06 | Beaver Control/ Culvert Maintenance | $1,000,000,000.00 |
| **43-4660-9-0016 | Wild Hog Control | $ 10,000,000.00 |
| All contracts 1992-1999 | Wild Hog/Beaver Control | $ 99,999.99 |
| 53-4660-9-06 | Beaver Control/ Culvert Maintenance | $ 100,000,000.00 |
| 53-4660-9-06 | Beaver Control/ Culvert Maintenance | $ 99,999.99 |
| 53-4660-9-06 | Beaver Control/ Culvert Maintenance | $ 252,450.00 |
| 53-4660-9-06 | Beaver Control/ Culvert Maintenance | $ 99,999.99 |
| 53-4660-9-06 | Beaver Control/ Culvert Maintenance | $ 100,000,000.00 |
| 53-4660-9-06 | Beaver Control/ Culvert Maintenance | $ 9,999.100.00 |

* These are Task Orders for Contract 53-4660-4-14.
** These are Task Orders for Contract 53-4660-8-04.



 Printed on Recycled Paper

Z. Co Decision

Since four of your Requests for Equitable Adjustment are for task orders issued for contracts for which you have also submitted Requests for Equitable Adjustment, I will not consider those four Requests.

All of the remaining contracts were awarded to your company, GA Bowhunters Supply, as a result of competitive negotiation procedures with the exception of small purchase contract 43-4660-3-0134 which was awarded to your company as a result of small purchase competitive procedures.

Although it is not entirely clear as to the basis for your Requests for Equitable Adjustment, it appears that the Requests for Equitable Adjustment are submitted because you claim exposure to toxic chemicals while performing work on the four contracts. Your Request for Equitable Adjustment for Contract 53-4660-8-04 also alleges that you were required to work outside the scope of that contract although you do not give details of what work you performed on this contract that you consider to be outside the scope of the contract.

You state in your Requests for Equitable Adjustment that there was a provision in most if not all of these contracts that stated "Safety – No toxocological hazards are associated with trapping beavers at SRS; however, normal environmental and physical hazards, such as, snakes and uncertain footing do exist".

For the Requests for Equitable Adjustment submitted in October, 2000, it appears that you are alleging a Breach of Contract by the Government in that you believe that you were in fact exposed to toxocological chemicals during the performance of the contracts. However, in a report (copy enclosed) addressed to you dated December 27, 2000, from the National Institute for Occupational Safety and Health, NIOSH, it is stated that "based on the available environmental data and our medical findings, we conclude that beaver and pig trapping at SRS has not been associated with harmful exposure to radioactive or toxic environmental contaminants."

Both you and some of your former employees who worked on the contracts participated in the NIOSH investigation.

The findings of the NIOSH investigation substantiates the contract provision that "no toxicological hazards are associated with trapping beavers at SRS."

All areas that you were directed to enter through task orders issued for the above listed contracts were safe and SRS procedures for entry to the areas were followed. You voluntarily trapped beaver at four sites in Four Mile Branch with possible contaminents after being told by the COR and Inspector that you could refuse to trap those four sites. A work clearance permit was issued for these four sites and you and your personnel were monitored by Site Health Protection personnel before entering the sites each time and upon leaving the sites each time. In fact you were allowed to use snares at these four sites so you would not have had to enter the water at these four sites. To my knowledge Health Protection personnel never found any contamination of you, your employees, or any equipment or personal protective equipment when you were trapping these sites. You were never directed by the Contracting Officer, the COR, nor any of the Inspectors for the Beaver Control contracts to go to and trap in Steed Pond.

There was no breach of contract by the Government because as stated in the NIOSH report neither you nor your employees encountered harmful exposure to radioactive or toxic environmental contaminents while working on the beaver and hog control contracts.

Regarding your Request for Equitable Adjustment for electricity and rental of an electrical outlet at your residence to charge a Government furnished hand held radio, the radio and charger were provided to you by the Forest Service for your convenience. All of the contracts required you to have a means of communication with you at all times when you were working on the contracts at SRS. By providing the radio and charger the Forest Service made it possible for you to meet this contractual requirement at no charge to you. Also, by providing both the radio and the charger to you, you did not have to go to the Forest Service Dispatch office to obtain a hand held radio each day and to return the radio prior to leaving SRS each day that you worked on the contracts. The Government did not receive any benefit from allowing you to keep a hand held radio and charger while working on the contracts. In fact you were the only party who benefited from allowing you to keep a hand held radio and charger, therefore you would not be entitled to any compensation for keeping the radio charged.

Regarding your Request for Equitable Adjustment for fraud and false statements that you allege were made in DOE letter dated October 30, 2000, signed by Dianne Saylor, and a memorandum dated March 22, 2000, from Dianne Saylor reference the NIOSH Site Visit, fraud was not committed and false statements were not made in either document. Your Request for Equitable Adjustment discusses Bioassay information for you prior to 1995 not being discussed in the letter dated October 30, 2000. The letter makes no representation concerning Bioassay data for you prior to 1995 or after 2000. It is not clear what you consider to be fraudulent or false about the March 22, 2000, memorandum. This memorandum appears to summarize events during the NIOSH Site Visit, March 20-22, 2000. A Memorandum of Understanding (MOU) cannot limit an agency's requirements to conduct investigations, etc. under certain statutory guidelines. Both of these documents concern a complaint that you had filed through the DOE Employee Concern Program and would not be considered contractual matters because the Employee Concern complaint is outside the scope of your contracts with the Forest Service. Also, some of the Employee Concern issues involved your employment with Westinghouse Savannah River which is clearly outside the scope of your contracts with the Forest Service.

Regarding your Request for Equitable Adjustment for a false statement made at a presentation to NIOSH on March 20, there is not sufficient information provided by you to understand what statement(s) made during the presentation that you consider false.

Your Request for Equitable Adjustment for your time and Mr.Cromer's time and preparing the Requests for Equitable Adjustment is denied in its entirety because time spent preparing Requests for Equitable Adjustment is normally not compensable.

Concerning your Request for Equitable Adjustment for fraud and false statements because of the contract language that states "no toxicological hazards are associated with trapping beaver at SRS; however, normal environmental and physical hazards such as snakes and uncertain footing", as stated previously in this letter the NIOSH investigation substantiates this statement in the contract. Therefore, fraud was not committed by any Forest Service personnel and false statements were not made by any Forest Service personnel. Also, in the same Request for Equitable Adjustment you state that a false statement was made and fraud was committed during

the presentation to NIOSH on March 20, 2000, in that a bar graph showed that no beaver were trapped in November, 1999, and you have submitted a copy of an invoice for eleven beaver that you submitted to the Forest Service on/or about November 30, 1999. There was no intentional misrepresentation made with this bar graph, but a mistake was made either in the data provided for the bar graph or in the preparation of the bar graph. This mistake did not impact the NIOSH investigation in any way and the correct information is available in the contract file. Again, fraud was not committed by any Forest Service personnel and false statements were not made by any Forest Service personnel.

Your Request for Equitable Adjustment concerning toxocological hazards in Four-Mile Branch and alleged fraud and false statements in contract 53-4660-9-06 due to the statement in the contract concerning no toxocological hazards is not substantiated by the NIOSH investigation. Again the NIOSH investigation substantiates the contract statement concerning no toxocological hazards , so fraud was not committed by any Forest Service personnel and false statement(s) were not made by any Forest Service personnel.

Once again your allegations of fraud, false statements, and defamation of your company due to a June 30, 1999, letter signed by me and discussed in a meeting on June 30, 1999, when the letter was given to you are not substantiated by the facts stated in the letter nor by an investigation conducted by Wackenhut Services, Inc. The Wackenhut investigator cleared you of any involvement in the situations discussed in the letter and your contract 53-4660-8-04 for Wild Hog Control was not terminated. The letter was distributed to you, Wackenhut, Beth LeMaster, Frankie Brooks, and Bill Jarvis and was not released to the public or anyone other than those named. The letter does not contain any false statements and fraud was not committed by me with the issuance of the letter. Your company's reputation was not defamed in any way.

Therefore, it is the decision of the Contracting Officer that William D. Hooker has no valid claim against any of the four contracts. Mr. Hooker's Requests for Equitable Adjustment (claim) are denied in their entirety.

This is the final decision of the Contracting Officer. This decision may be appealed to the Board of Contract Appeals, Room 2912, South Building, U.S. Department of Agriculture, Washington, DC 20013. If you decide to make such an appeal you must mail or otherwise furnish written notice thereof to the Board of Contract Appeals within ninety (90) days from the date you receive this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended should reference this decision and identify the contracts by number. In lieu of appealing to the Board of Contract Appeals, you may bring action directly in the U.S. Court of Claims within twelve (12) months of the date you receive this decision.

If you appeal to the Board of Contract Appeals, you may solely at your election proceed under the Board's small claims procedure for claims of $10,000 or less or its accelerated procedures for claims of $50,000 or less.

HOMER R. GABARD
Contracting Officer

Enclosure (1)

Cc: Mark Simpson, USDA, OGC
Mel Booker, R8,P&P
Dave Wilson, Forest Manager
Lucy Knowles, DOE
Tony Towns, DOE

Mr. Homer Gabard
Contracting Officer
USFS SRI
Post Office Box 700
New Ellenton, SC 29809

**REQUEST FOR EQUITABLE ADJUSTMENT**
Claim for Contract #53-5660-9-04

This claim is filed for adjustment of the Hog Contract 53-4660-8-04 awarded October 29, 1997 as modified October 1, 1999, with Georgia Bowhunters Supply Co. and William D. Hooker ("Hooker"). This claim is made for option period 2 ; from October 1, 1999 through October 1, 2000.

1. The Contracting Officer wrongly withheld payment from contractor's invoices for hogs brought to the cooler under the contract, claiming they were "domestic". These hogs were dispatched while on the SRS property, running wild, and were within the definition of wild hogs under the contract. Contracting Officer further deducted payment for these hogs from Hooker's invoices, and refused to pay for hogs itemized in subsequent invoices.

2. On June 30, 1999; the Contracting Officer presented Hooker with a letter stating that Hooker's two employees, Michael E. Eller and Goldman E. Eller, were barred from working on the contract or any other contract at the Savannah River Site <u>forever</u>.[1] Having approved the resumes of these two employees, there was no authority under the contract to bar them. As a consequence of losing these two employees, who owned dogs, Hooker was unable to perform under the contract and was then required to purchase dogs and other equipment to complete the contract, as well as hire new employees. Further, the Contracting Officer gave Hooker only fifteen days to comply with this directive, which was unreasonable under the circumstances and impossible to perform; effectively shutting down Hooker's performance under the contract.

3. The Contracting Officer lost the resume of Hooker's new employee; and "lost" Hooker's paperwork for a contraband pass for a period of six weeks in 1999; thereby preventing Hooker from hunting hogs on the SRS property as he had no gun permit. Thereafter, the Contracting Officer required Hooker to demonstrate hog killing, using only a pocketknife. In the process, one of Hooker's dogs was badly injured and required medical treatment at additional cost to Hooker.

4. Hooker was wrongfully charged for traps and equipment claimed missing or damaged by the Contracting Officer. As there was never a prior inventory taken

[1] This same Michael Eller, barred forever from the SRS, was a successful bidder in a subsequent hog contract with the USFS in November, 2003.

of these traps, it is believed that any deduction for damaged or missing traps was wrongful.

5. Georgia Bowhunters' employees hunted the entire SRS property; and at no time were they warned about contaminated areas. Prior to the disciplinary actions taken by the Contracting Officer on June 30, 1999, Hooker and his employees became aware that they had been working in contaminated areas such as Par Pond and requested more money for the contract. The Contracting Officer refused to discuss any adjustment and instead instituted the previously stated actions against Hooker and his employees.

6. Prior to the contract option period beginning October 1, 1999; Hooker was told that new contract language would be added to the contract. The current contract was extended approximately while the new contract was completed. When Hooker presented a bid for the new contract, there was no response. To date, Hooker has never received a response to this bid.

Having stated a claim for equitable adjustment of Contract #53-5660-8-04, Georgia Bowhunters d/b/a William D. Hooker, requests an adjustment in the contract in the amount of $90,000.00, representing loss of the option period, wrongfully withheld payments, and damages resulting from the barring of his employees; purchase and upkeep of dogs, equipment purchases and wrongful deductions.

I am requesting that the Contracting Officer render a decision within 60 days pursuant to Section I.21(d)(3)(e) of the contract.

William D. Hooker
William D. Hooker

Date: April 7, 2004

**United States Department of Agriculture** **Forest Service** **Savannah River** **P.O. Box 700 New Ellenton, SC 29809**

**File Code:** 6320 **Date:** 10 Jun 04
**Route To:**

**Subject:** Request for Equitable Adjustment, Contract #53-4660-9-04

**To:** William D. Hooker

d/b/a Georgia Bowhunters

C/O Robbie M. Nichols
206 Carolina Building
P. O. Box 7925
Hilton Head Island, SC 29938

CERTIFIED – RETURN RECEIPT REQUESTED

This letter is in response to the request for equitable adjustment, dated April 10, 2004, and received April 13, 2004 against contract number 53-4660-8-04 for wild hog control at the Savannah River Site. (SRS)

The Contracting Officer, Homer Gabard, who is now retired, did withhold payments totaling $1,320.00 due to non-conformance to contract specifications. He advised the contractor of his withholding payments in a letter dated June 30, 1999. Domestic pigs were brought to the cooler as substitutes for wild hogs. A biologist who was conducting a study on feral hogs notified the Contracting Officer of the substitution. The animals had dull rounded hooves from standing on hard surfaced floors, extra teats, the absence of parasites, and other factors indicating the hogs were domestic, not feral hogs. Per the contract schedule, page 7, payment was based on the trapping and dispatching of feral hogs. No payment will be made based on FAR Clause 52.246-4, Inspection of Services, paragraph (e)(2) which reads: "...when the defects in services cannot be corrected by reperformance, the Government may – (2) reduce the contract price to reflect the reduced value of the services performed."

The Contracting Officer asked Wackenhut Services, Inc., who provides security for the Site, to conduct a criminal investigation. While clearing Mr. Hooker of any wrong doing, Wackenhut determined two of his employees, Goldman Eller and Mike Eller were involved in defrauding the government, and as a result they were denied access to the Site.

There are two clauses in the contract under Section H, Special Contract Requirements that provided the Contracting Officer with the authority to bar Mr. Hooker's employees. In H.6, Compliance with Area Regulations, the fourth sentence reads: "In the event the Contractor fails to remove any employee whose continued employment is deemed by the Government to be contrary to the public interest, the Government reserves the right to require the Contractor to remove the employee." In H.16 Site Access Authorization for Contactor and Employees, the second to last paragraph reads: "Contractor or their representative shall be notified of employee that will be denied access to SRS and immediately upon notification, contractor shall remove the

employee(s) from SRS and return the site access badge(s) to the Contracting Officer or COR. Contractor shall be responsible for replacing those employee(s) denied access to SRS and denial of access for contractor's employee(s) shall not be construed as a suitable excuse for nonperformance of the contract. If the contractor is denied access to SRS the contract may be terminated for default." Therefore, any claims for damages resulting from the barring of his employees are denied.

Later after reviewing the facts of the case, it was determined that there was inconclusive evidence against Mike Eller, so he was permitted access to the Site. Subsequently, he was awarded contracts in November 2001 (43-4568-2-2018) and March 2003 (43-4568-3-2100).

Based on the information provided by the contractor regarding the lost contraband pass for Mr. Hooker for six weeks in 1999, I cannot locate any records to substantiate any claims due to delays caused by the government. Consider any claim denied.

Regarding the injury to Mr. Hooker and one of his dogs, the injuries appeared to have happened during the technical evaluation for the new solicitation in November 1999. The demonstration was to show how the dogs and the contractor worked together. No firearms were allowed during the demonstration. Mr. Hooker was not required to kill the hog that the dogs captured during the demonstration. The incident does not appear to deal with the performance of the subject contract, so I will not address it as part of this claim other than to note what I can determine to be the basic facts surrounding the incident.

In a letter, dated February 14, 2000, Mr. Gabard advised the contractor that the final invoice number 107624 in the amount of $165.00, was not processed to off-set the costs for the missing government furnished property. This deduction ($165.00) and the deduction made for the hog substitution ($1,320.00) were the only payment deductions I discovered after reviewing the file. (Total deductions $1,485.00) The contractor's response was there was never an inventory conducted in five years. Moreover, the location where the traps were kept was not a secure site. I have reviewed the files and I agree with the contractor. I cannot locate an inventory sheet signed by the contractor acknowledging receipt of the property. Therefore, the contractor is entitled to the payment of $165.00.

Regarding the contaminated areas, in a report (copy enclosed) addressed to Mr. Hooker, dated December 27, 2000, from the National Institute for Occupational Safety and Health, NIOSH, it is stated that "based on the available environmental data and our medical findings, we conclude that beaver and pig trapping at SRS has not been associated with harmful exposure to radioactive or toxic environmental contaminants." The employees were barred from the site due to their illegal actions not based on any contamination claims on their part.

Modification 4 extended the contract until 31 Oct 1999 or until a new contract was awarded. Mr Gabard states the option was not exercised because changes needed to be made to the contract. After consulting with Mr. Gabard, a contract was never awarded as a result of the solicitation Mr. Hooker referred to in the letter. A decision was made to perform the service with U.S. Forest Service employees. Another hog control contract was not awarded until November 2001. Mr. Gabard remembers he informed the contractor of the decision to perform the service in-house.

The exercising of a contract option is the unilateral right of the government. The government is free to choose not to exercise an option. Note any claims by the contractor for the loss of the option should be based not on the maximum estimated contract amount ($55,000.00) but the minimum guaranteed amount of $11,000.00. I find no evidence of bad faith on the part of the government. Any requests for equitable adjustment based on losses caused by the government not exercising the option are denied.

In summary, the Contracting Officer hereby determines that the contractor should be reimbursed for the $165.00 that was withheld due to missing government furnished property, all other requests for equitable adjustments in representing the loss of the option period, wrongfully withheld payments, and damages resulting from the barring of his employees; purchase and upkeep of dogs, equipment purchases and wrongful deductions are hereby denied.

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C.603, regarding Maritime Contracts) within 12 months of the date you receive this decision

MARGARET J. YEATON
Contracting Officer

Enclosure (1)

Cc: Mark Simpson, USDA, OGC
Stefanie A. Gayton, EAZ, P&P
Dave Wilson, Forest Manager
Lucy Knowles, DOE
Tony Towns, DOE
Lindsey Williams, DOJ Attorney
William Hooker, Grovetown, GA

# DEPOSITION OF FRANKIE R. BROOKS - 12/7/05

## WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY V. THE UNITED STATES

Page 1 to Page 35

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*SHARON DEHART, COURT REPORTER*
*P. O. Box 2474*
*Aiken, SC 29802*
*Phone: 803-648-9434*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WILLIAM D. HOOKER, d/b/a )
GEORGIA BOWHUNTERS SUPPLY, )
)
Plaintiff, )
)
)
vs. ) NOS. 03-1501C, 04-1126
)
)
THE UNITED STATES, )
)
Defendant. )

DEPOSITION OF FRANKIE R. BROOKS
taken by Counsel for the Plaintiff
before Sharon DeHart, Certified Court Reporter
at the offices of Department of Energy
151 Corporate Parkway, Aiken, South Carolina
on Wednesday, the 7th day of December 2005
commencing at 12:56 p.m.

SHARON DEHART, COURT REPORTER

Page 2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF: ROBBIE M. NICHOLS, ESQ.
Attorney At Law
Post Office Box 7925
Hilton Head Island, SC 29938

FOR THE DEFENDANT: LINDSAY E. WILLIAMS, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, DC 20530
LUCY KNOWLES, ESQ.
Westinghouse Savannah River Site
Post Office Box A
Aiken, South Carolina 29802-0900

- - - - -

INDEX TO EXAMINATIONS


| | Page |
|---|---|
| EXAMINATION BY MS. NICHOLS | 4 |
| EXAMINATION BY MS. WILLIAMS | 25 |
| REEXAMINATION BY MS. NICHOLS | 31 |
| REEXAMINATION BY MS. WILLIAMS | 33 |
| CERTIFICATE OF COURT REPORTER | 35 |


- - - - -

Page 3

EXHIBITS
PLAINTIFF'S

1 WORK CLEARANCE PERMIT

2 LIST OF BEAVER TRAPPING SITES

3 DOCUMENT CONTAINING DIFFERENT SIGNS

DEFENDANT'S
1 SRS BEAVER TRAPPING SITES MAP CREATED 11/15/05

- - - - -

Page 4

[IT SHOULD BE NOTED THAT Mary-Ellen Noone, Mark Simpson, Margie Yeaton, Homer Gabard and John Andrew Cromer, III are also present at the deposition.]

- - - - -

FRANKIE R. BROOKS
having been first duly sworn, was examined
and testified as follows:

EXAMINATION
BY MS. NICHOLS:

Q. As you know, I'm Robbie Nichols. I'm representing Mr. Hooker in this action. You are retired now?

A. Yes.

Q. And where do you live?

A. Jackson, South Carolina.

Q. Oh, we came through there. I heard it's a speed trap, so we slowed down.

A. Oh, I'm hard of hearing, you'll have to speak up.

Q. Oh, I said we came through there and I heard it's a speed trap.

A. Oh. It is.

Q. So we did slow down coming through there. Are you doing anything in retirement?

A. No.

Page 5

Q. What is your full name, please?
A. Frankie Arnold Brooks.
Q. Have you ever been deposed before?
A. No.
Q. This is your first time?
A. Yes.
Q. And have you ever been a witness in a – or in a lawsuit of any sort before?
A. No.
Q. No auto accidents or anything like that?
A. No.
Q. So this is your first deposition and this is the first time you will have been a witness in any kind of court trial; is that right?
A. Yes.
Q. Can you tell me when you worked for the Forest Service?
A. From, I think, November of '78 till July of 2003.
Q. And what was your position when you started with the Forest Service, and then just take me through your career with the Forest Service.
A. I always worked in wildlife from the beginning till the end.
Q. As – were you always a COR, or did you have

Page 6

other titles?
A. I was called a technician for – in some jobs. I was COR – I don't remember when I started being COR on contracts. Back in the '80s.
Q. And just define COR for me just for the record.
A. It's a contractor's – Contracting Officer Representative.
Q. And what are the duties involved in that job?
A. Keeping records, keeping in touch with the contractors.
Q. Would you say that your job would be to make sure everybody is performing under the contract?
A. Yes.
Q. And do you then direct the contractors?
A. To do what?
Q. Well, in the case of – for example, Mr. Hooker's contract with the Forest Service, one of his contracts involved trapping beaver. Did you direct him as to where he should trap the beavers?
A. Yes.
Q. And how did you decide what sites to send him to?
A. Other people on Site would get in touch with the Forest Service to let us know of problem areas, culverts being stopped up, flooding roads, flooding

Page 7

timber; that type of work.
Q. And I'm not trying to get technical, but is there regular – some kind of – are there people that roam around the Site just looking for stuff like that? Is that how you found out, or would these be people who were doing other things and say –
A. It was both. I would look for sites, myself, and other people on Site would call me if they had problems in certain areas that I wasn't – you know, wasn't my daily job to be in.
Q. So when you would find out about some blockage going on somewhere, then you would identify that site and tell Mr. Hooker, or the other –
A. I'd go look at it, myself, and then tell him.
Q. Did you visit all of the beaver trapping sites?
A. Yes.
Q. Did you prepare a work order for every site that was to be trapped? And I'm not trying to – I just don't understand how the whole thing worked.
A. Yes, there were work orders written for the sites for him to work in.
Q. So he would not have been trapping if he did not have a work order for that particular area?
A. Shouldn't have been.
Q. I don't know if I asked you this already, but

Page 8

did you actually accompany the contractors when they were doing the trapping?
A. Sometimes I would take him and show him certain areas, but I didn't go with him every time he trapped.
Q. Okay. You were also in charge of the hog contract; is that correct?
A. Yes.
Q. And what were the – did Mr. Hooker have to have work orders for trapping hogs, or was it in his own discretion as to what he was going to – where he was going to hunt?
A. There weren't specific work orders, but he was told of specific areas that needed work done in it.
Q. Again, would somebody see hogs or signs of hogs –
A. Right.
Q. – and say, "You need to..."
A. They'd call, I'd go look at it, tell him, take him out there.
Q. And would you participate in the hog hunts?
A. Not with him.
Q. Not with him? With anybody else?
A. No. Are we talking about the time that he was out there up until '99?
Q. Yes. Yes, ma'am, we were. So there were no

Page 9

work orders, per se, during that time?
**A. Right.**
Q. There might be now, but there weren't then; correct?
**A. I don't know about now.**
Q. Can you just walk me through the procedure since you're probably the closest to it for the contractors dispatching hogs? And then we'll ask you about how the beaver trapping worked. Could you just tell me what the contractor was supposed to do?
**A. I don't understand what you mean.**
Q. Okay. When you were notified of a clogged stream or some place where beavers needed to be trapped and you would write out a work order for Mr. Hooker and give it to him and say, "Go trap here," what would happen after the beavers were trapped, to your knowledge? I mean what was the procedure? What was Mr. Hooker supposed to do after that?
**A. With the beaver?**
Q. Um-hum [yes].
**A. Bring them in to the cooler, weigh them. That's about it. And take them to the landfill after they were – after I had checked them, written him a receipt for them.**
Q. So you actually wrote him receipts for

Page 10

everything that was caught?
**A. [Indicates affirmatively].**
Q. And did that also specify the place where it was trapped?
**A. Yes. Yes.**
Q. Does the Forest Service, to your knowledge, keep records, those records yet to today?
**A. Of what he did?**
Q. Of the –
**A. Or what they do now?**
Q. Of the receipts that you issued.
**A. I really don't know.**
Q. Who would be able to answer that question for me?
**A. I couldn't tell you.**
Q. But you issued receipts to Mr. Hooker for all the beavers that were brought in and that was the basis he was paid?
**A. Right.**
Q. Okay. So those receipts would be somewhere?
**A. Gave him copies of them, also.**
Q. Besides the generalized hog hunting that you said Mr. Hooker did, and that – and did that encompass the entire Site, itself?
**A. Yes.**

Page 11

Q. Okay. Besides that, were there any other hog hunts going on in – at the Site, to your knowledge?
**A. When they had deer hunts, their annual deer hunts, the people that hunt are allowed to kill hogs also.**
Q. Oh, they are? Are they allowed to just carry away the hogs when they do that?
**A. They are monitored by Health Protection and then they can take them with them.**
Q. You said that you had accompanied Mr. Hooker at some points on beaver trapping, so you watched him trap beaver?
**A. Mostly what I'd be with him for is to show him where we wanted him to trap. I did see him set some traps, but I didn't go with him to watch him trap.**
Q. Okay. When you observed Mr. Hooker trapping, would you say that that trapping, setting those traps disturbed the soil in any way?
MS. WILLIAMS: I'm going to object because that calls for speculation. You can answer the question.
**A. I really – I can't say because the traps I just remember seeing were just set down in the edge of the water. They weren't dug out, they were just set in the water with about that much of the trap sticking out the top.**

Page 12

Q. [Ms. Nichols] So you didn't personally observe Mr. Hooker or any of his workers actually putting their hands into the soil?
**A. No.**
Q. Okay. I forgot to ask you at the very beginning here. Did you provide information to help with the responses to our questions, our interrogatories that we asked? Were you involved in helping draft those responses?
**A. For this?**
Q. The Government was asked certain questions, and they're written questions called interrogatories. And Ms. Williams answers them, but she does it on the basis of asking you folks questions about it. So, from that standpoint, did you aid in drafting the responses to the questions?
**A. Yes.**
Q. Okay, good. In your experience, while you were working at the Site in 1999, did you view any signs from the – that anyone had posted marking soil contamination areas?
**A. Yes.**
Q. You did. Do you remember where those were?
**A. Hooker and I were together at that site on Road Four and we saw this radiation sign that was pushed over.**

Page 13

**We talked about it and I got in touch with Chuck Fanning who works for CSWE, and he told me that we had to have a Work Clearance Permit to trap in there. So I told him that I wanted one and got it.**
Q. Is that the Work Clearance Permit that was generated in February 1999, I think?
**A. Yes. It's the only – it's the one.**
Q. That was the only Work Clearance Permit that you ever –
**A. Well, there were two, but he only used one.**
Q. Two for the same area, or –
**A. I don't remember where the other one was for, but that was the only one he used.**
Q. Would you identify that as the –
**A. That's it.**
Q. Okay.
MS. NICHOLS: Could we have this marked as Plaintiff's Number 1, please?
[PLAINTIFF'S EXHIBIT 1 IS MARKED FOR IDENTIFICATION]
Q. [Ms. Nichols] Let me ask you about this. You generated, or you had this generated as a result of actually seeing a soil contamination, or some kind of –
**A. Right.**
Q. – radiological sign there. And I see your signature is on the second page; is that correct? As the

Page 14

work group supervisor?
**A. Right.**
Q. And the Mr. Fanning that you were mentioning signed above you?
**A. Right.**
Q. And I just note that it says that the [reading] "Person entering the creek is RAD-II qualified and is subcontracted to Savannah River Institute. After entering creek, RAD CON OPS will survey protective equipment, waders, gloves, et cetera. Standby person required and personal floatation device. Use water can to rinse off waders and lay on plastic for RCO survey." Did I get that right? It's kind of hard to read. It's a bad copy.
**A. [Indicates affirmatively].**
Q. Is this the first time that you ever saw one of those signs that generated a Work Clearance Permit like this?
**A. Yes.**
Q. You had never seen a sign on the property before?
**A. Not where we were trapping.**
MS. WILLIAMS: Clarify what "property" is, what you mean by "property."
Q. [Ms. Nichols] Yeah, on the Savannah River Site

Page 15

property. So you, at one time or another, had visited all the beaver trapping sites at some point during your career –
**A. Right.**
Q. – and you had never seen another soil contamination sign; soil contamination area sign –
**A. Not that I remember.**
Q. – at any other site? Okay. Back to this Work Clearance Permit, you said this was the only one ever issued and it was – the duration was from February 22nd to March 22nd. Did Mr. Hooker then – did he then go ahead and trap in this area after you issued this?
**A. Yes.**
Q. And was he RAD-II qualified at the time?
**A. He said he was.**
Q. Was he subcontracted to Savannah River Institute?
**A. I don't understand that.**
Q. Well, I don't either. It's on here.
**A. He was – he had a contract with – what did you say? Savannah River Institute?**
Q. Um-hum [yes]. That's what –
**A. Yeah, that was the name of it back then. Yes, he was a subcontractor.**
Q. So when there is a contract with the Forest

Page 16

Service, then automatically it's also with the Savannah River Institute?
**A. It's the same thing.**
Q. Same thing; okay, good, thanks. Did you have a standby person that day?
**A. Yes.**
Q. And all of the other requirements were met, I assume?
**A. Yes.**
Q. Okay. I would like to show you – this apparently is a policy from the Westinghouse Savannah River Company. Are you familiar with this document?
**A. No.**
Q. You've never seen it before?
**A. No.**
Q. Okay. Well, we're not going to worry about it. Let me ask you this. Did DOE or Westinghouse ever give the Forest Service or you, personally, a list of contaminated areas of any sort on the Savannah River Site?
**A. They never gave me one.**
Q. Okay. So you personally were not aware that there were areas, other areas besides this area we just talked about at Four Mile Creek and Road Four, that were posted? Is that your testimony?

Page 17

A. Ask me that again.
Q. Okay, I'll ask it not as a negative. Were you aware of any other beaver trapping or hog dispatching site on the Savannah River Site during the time you worked there that was posted as contaminated in any form, other than this particular site that we just discussed?
A. I became aware at some time there was a couple of other sites.
Q. Okay, when was that?
A. It was during the same time as this Work Clearance Permit.
Q. Okay. And do you remember where those sites were?
A. On the Four Mile Creek and, what's that? 19?
Q. Four Mile Creek is – that's the one that we were discussing with the Work Clearance Permit.
A. There's four trapping sites on Four Mile Creek.
Q. Four trapping sites, and they were posted as contaminated?
A. [Indicates affirmatively].
Q. Okay. And Site 19 is what, if you'll help me?
A. It's a beaver pond.
Q. A beaver pond? Is that what it's called, beaver pond?
A. It's what we call it.

Page 18

Q. Okay. And how is that posted?
A. Well, at the time when he trapped there, there weren't any postings. I don't know how I found out. I think it was from our engineering people with the Forest Service; found out that – I really don't remember how I found out, but somebody had gone in and put up radiation signs at that site, and I remember talking to the CSWE people – I mean engineering because they were also cleaning culverts. They were helping with the big work. And our Forest Service people were in there cleaning culverts, went to clean it and found these radiation signs, brand new, that had just been posted.
Q. Do you remember when that was?
A. No.
Q. You don't know?
A. I know it was during this same time, but I don't remember when it was.
Q. Would it have been – that was February. Would it have been during the summer –
A. I can't –
Q. – or do you think it was closer in time to that?
A. I can't guess.
Q. Okay. So sometime between – you say that the postings were not there, and then they were, but – so

Page 19

you can't really narrow the time that they were put up, but were these areas that beaver had been trapped in?
A. Yes.
Q. Okay. And Mr. Hooker trapped beaver in those areas?
A. And Andy.
Q. And Andy; okay. Let me ask you about the culverts. How did the contractor decide which culverts to work on?
A. Sometimes we'd tell him and sometimes, when he would go to trap beaver, he would see that the place was plugged up. Sometimes I would be out looking, myself, and call him and tell him that certain culverts were stopped up and needed opening.
Q. And did you ever see Andy or Mr. Hooker cleaning out culverts?
A. I don't think I ever watched them do that.
Q. Would you think that that involved getting their hands in the culverts?
A. It involved pulling tree limbs – mostly tree limbs and stuff out of the culverts.
Q. Would you say there would be soil in the culverts that would have to be moved out?
A. Not particularly because it'd be mostly limbs. There were leaves, they'd pull them out, they'd just all

Page 20

wash through on the other side. I did it myself some, so that's how I did it.
Q. So you know what it's like. Did you – sometime in the summer of 1999, the beaver trapping sites were reduced. Can you tell me why? Had all the beavers been trapped that needed to be trapped, or – because it went dramatically, I believe, after July 1999 to one or two sites to be trapped. Can you tell me why that was?
A. We had a drought. The ponds were drying up. Hooker had caught all the beaver. Mainly because of drought. There were just no beaver ponds and no culverts needing –
Q. So the culverts weren't getting stopped up either?
A. Very little.
Q. I'll be asking Mr. Gabard more questions about the hog contract, but in the response to my interrogatories, you were listed as one of the hog trappers for 1999 through 2001; is that true?
A. [Indicates affirmatively].
MS. WILLIAMS: I'm sorry, you need to speak audibly with yes or no.
A. Oh. Yes. Sorry.
Q. [Ms. Nichols] How long did you do that job?
A. Till I retired in – I think I retired in 2002.

Page 21

**I can't remember.**
Q. Okay, 2002 or – well, you said July 2003.
**A. Okay.**
Q. I'm just going to show –
**A. It was 30 years, so that was 2002.**
Q. Okay. And just because one of the functions of depositions is just to make sure that the documents we have are accurate, I'd just like to hand you this one. You probably created this. Is this a list of the beaver trapping sites in 1999?
**A. It looks familiar.**
Q. Okay.
MS. NICHOLS: Can we have this marked as Plaintiff's Number 2, please?
[PLAINTIFF'S EXHIBIT 2 IS MARKED FOR IDENTIFICATION]
Q. [Ms. Nichols] And just to have you look at this and then go back to the Work Clearance Permit that we discussed earlier, and can you just tell me where on this list the Four Mile Creek and Road Four is? Because these might have different names.
**A. It's 49.**
Q. Site 49 –
**A. Wait a minute. It's 53 in this group, and this Road Four near Road C.**
Q. Okay, so 53 is the –

Page 22

**A. Four Mile –**
Q. – Four Mile Creek and Road Four?
**A. That's it.**
Q. And the other location that you mentioned was Site Number 19, and would that be Steed Pond?
**A. Steed Pond Road, it's supposed to be.**
Q. Okay.
**A. There's no trapping at Steed Pond.**
Q. Okay, so Site 19, then, would be something called Beaver Pond, I think you described it as?
**A. Right. Up here. Steed Pond Road.**
Q. Steed Pond Road. Okay, good. One more thing I'd like for you to look at. I'm showing you something that you probably actually created. This is the – or helped to create. This is entitled, "USDA Forest Service Savannah River Fact Sheet, November 2003."
**A. I didn't have anything to do with this.**
Q. You were gone by that time?
**A. Pardon?**
Q. You were retired by that time?
**A. Yes.**
Q. So you didn't have any input into this. I'm almost through here, but I wanted to ask you, were you involved in the investigation with the Ellers that there were domestic pigs being brought onto the Savannah River

Page 23

Site?
**A. What do you mean involved?**
Q. I mean were you aware of that investigation going on?
**A. Yes.**
Q. Did you have any input into that, or were you just aware because it was happening?
**A. I was aware of it. I wasn't even at work when it happened.**
Q. So you have no personal knowledge as far as that investigation goes?
**A. Right.**
Q. If you'll just bear with me a minute here. When Mr. Hooker's beaver contract ended at the end of '99, I think, who continued to trap beavers on the Savannah River Site after his contract was over?
**A. Jim Seigler, Forest Service.**
Q. Okay, so it was done in-house?
**A. Right.**
Q. Did you have any involvement in trapping beavers?
**A. No.**
Q. Didn't do that. And I believe you said that culvert cleaning was also done by employees at the Forest Service after that time?

Page 24

**A. Yes.**
Q. Is that correct?
**A. And CSWE.**
Q. What does that stand for?
**A. Construction – I don't know. Works Engineering; Construction and Works Engineering, or something.**
Q. Okay. I had asked this question in my interrogatories and did not get an answer. Maybe I framed it very badly. And I'm not going to ask you about the investigation about the domestic hogs because you weren't even involved in that, but what was – what were the instructions to the contractors as far as what they should trap and what they should not trap? Were they instructed not to trap domestic hogs?
**A. I don't understand what you mean.**
Q. Okay. The contractors had a contract to dispatch wild or feral hogs, which both terms are used. What if they saw a domestic hog? Were they to let it go?
MS. WILLIAMS: Objection. Calls for speculation. But you can answer it.
Q. [Ms. Nichols] Had that ever happened, to your knowledge?
**A. Not that I know of.**
Q. Okay. Do you know what would have happened to

Page 25

a domestic pig that was found on the property, gone wild?
**A. I don't know.**
Q. Okay. Let me ask you, the contract that Mr. Hooker had that was modified in October or September of 1999, did you have anything to do with that modification?
**A. I really don't know what modification you're talking about.**
Q. There was a modification of the contract that extended the contract through the end of October of '99, or until a new contract was awarded. Are you aware of that?
**A. [Indicates negatively].**
Q. Okay, that's fine.
MS. NICHOLS: I tell you what, can we take a five-minute, and then I think I'm done, but I want to make sure.
MS. WILLIAMS: Absolutely.
[OFF THE RECORD]
MS. NICHOLS: Thank you very much, Ms. Brooks, for answering my questions. Please answer any questions that Ms. Williams has for you.
- - - - -
EXAMINATION
BY MS. WILLIAMS:
Q. I'll just remind you that you're still under

Page 26

oath, and I just have a few questions that I want to ask you. Earlier in the deposition, Ms. Nichols had asked you about the beaver contract and how a contractor knew where to trap beaver.
**A. Right.**
Q. And my question to you is every time that a contractor, that Mr. Hooker was ordered to trap beaver, was that done with a written work order?
**A. I don't think so. If I had written him a work order for, say, Site 1 and it was in the same month or whatever, the same month, I'd call him and tell him, "Go back to Site 1, it's plugged up again."**
Q. So is it a correct statement to say that some work orders were verbal?
**A. Right, some were.**
Q. So that – okay, that's all I wanted to know. Okay, let's go back. You also discussed a Work Clearance Permit, and if you'll look at Exhibit Number 1, this is a Work Clearance Permit. Can you tell me what the date of that is?
**A. I'll have to get my glasses.**
Q. I'm sorry, if you don't have your glasses, I can tell you what it is.
**A. Okay.**
Q. So, looking at this, you see that this – this

Page 27

Work Clearance Permit is authorized from February 22nd, 1999 to March 22nd, 1999. And my question to you is, during your testimony, you stated that there was another Work Clearance Permit that was issued to Mr. Hooker. When was that Work Clearance Permit issued to him?
**A. It was after this one expired.**
Q. So the second Work Clearance Permit was issued after March 22nd, 1999?
**A. Right.**
Q. Do you recall about when it was issued?
**A. It was probably a month or so after this one because it was for the same site.**
Q. So the second Work Clearance Permit was for the exact same site?
**A. Right.**
Q. And did Mr. Hooker use that –
**A. No.**
Q. – Work Clearance Permit?
**A. No.**
Q. Did Mr. Hooker trap that site again?
**A. Not after this.**
Q. And when you say "this," you're referring to –
**A. This Work Clearance Permit.**
Q. And I just wanted to clarify something else just to make sure. Earlier, Ms. Nichols asked you if you

Page 28

have ever seen another soil contamination sign on the SRS property while you were there, and I just want to clarify something. When you say soil contamination sign, what are you talking about?
**A. It's an actual sign that says, "Soil Contamination Area."**
Q. Okay, that'd be the exact words that are on the sign?
**A. Yes, or either a radiology sign.**
Q. Okay, is a radiology sign different from a soil contamination sign?
**A. I can't tell you exactly what the radiation sign looks like. It's purple and yellow and has the sign on it.**
Q. But is it different from –
**A. Yes.**
Q. – a soil contamination sign?
**A. Soil contamination says "Soil Contamination Area."**
Q. And can you from memory tell me what the sign said that was posted at Site 53?
**A. I can't remember.**
Q. And just to clarify, in your history of working on the SRS property, you have seen other signs on the property other than the one sign at Site 53; correct?

Page 29

A. Yes.
Q. Okay, and I want to cover something else. Okay, we're going to – we're referring to a beaver trapping site map which I'd like to identify.
MS. WILLIAMS: You want to do it Defendant's Exhibit 1?
[DEFENDANT'S EXHIBIT 1 IS MARKED FOR IDENTIFICATION]
Q. [Ms. Williams] Okay, in referring – first of all, are you familiar with this map?
A. Yes.
Q. Have you seen it before?
A. I don't know when this one was revised. It was done after I left. This is 2005.
Q. Did you work with a map of this type when you were –
A. Similar to that, yes.
Q. When you were at the Forest Service, you worked with a map like this?
A. Yes.
Q. Okay. Looking at this map, can you show me where beaver trapping Site Number 19 is?
A. Right up here.
Q. And can you show me where Steed Pond is?
A. It's down here close to Road Two, wherever that is. That's Road Two. Steed Pond is right around here.

Page 30

Q. Okay.
A. About right there.
Q. Are beaver trapping Site Number 19 and Steed Pond the same area?
A. No.
Q. Okay, I don't have anything further for you.
MS. WILLIAMS: The only other thing I'd like to do is you referred to two documents that you didn't introduce as exhibits, and I'd just like to request that those be produced to us.
MS. NICHOLS: Absolutely. In fact, I'll probably –
MS. WILLIAMS: Use them later?
MS. NICHOLS: – use them again.
MS. WILLIAMS: Okay.
MS. NICHOLS: But if you don't mind, right now I would just like to round this out with –
MS. WILLIAMS: Sure.
MS. NICHOLS: I had asked Ms. Brooks if she had ever seen this document, and basically what this is is a document produced by the Westinghouse Savannah River Company, giving instructions as to who is allowed in various contamination areas.
- - - - -
REEXAMINATION

Page 31

BY MS. NICHOLS:
Q. And I would like you to look at page two and identify, if you can, if that is the soil contamination area sign that you were referring to. If it was in yellow.
A. What I've seen is just the writing, not the emblem.
Q. Okay.
A. Just the writing.
Q. Okay.
MS. WILLIAMS: And I'm going to ask that we –
MS. NICHOLS: I'm going to put that in.
MS. WILLIAMS: – designate this as the next exhibit.
MS. NICHOLS: Yes, I'll put that in as Plaintiff's 3.
[PLAINTIFF'S EXHIBIT 3 IS MARKED FOR IDENTIFICATION]
Q. [Ms. Nichols] And so your response was that the signs you had seen said "Soil Contamination Area," but did not necessarily have the radiologic –
A. Right.
Q. – sign on it? Okay. Would you look at the next page, please, and see if those are typical of signs you've ever seen on the Savannah River Site?
A. I've seen a couple of these.

Page 32

Q. Okay.
A. "Contamination Area." That's really all I remember seeing.
Q. Okay. If you would, just turn back to that first page where it says – the page that starts with "Introduction, RW-I or RW-II." It says that at the top here.
A. Okay.
Q. And you'll note that they have areas and then it says, "RAD Worker I or RAD Worker II," and it says yes or no as far as who is allowed to be in those areas. Would you look down to the second to last entry in the box and just read that line, starting with "Entry into"?
A. "Entry into Soil Contamination Areas to perform work that disturbs the soil."
Q. Right. And is that – can you be a Radiological Worker Number I to do that?
A. I don't know.
Q. I mean just according to this? I'm not saying it's gospel, I'm just asking according to this that came from Westinghouse.
A. According to this, it says no.
Q. Okay. And for RAD Worker II, unescorted entry, yes or no on that?
A. It says yes.

Page 33

Q. Okay. Okay, fine, thanks.
MS. WILLIAMS: I need to follow up with a couple of things.
- - - - -
REEXAMINATION
BY MS. WILLIAMS:
Q. Looking at what's been marked as Plaintiff's Exhibit 3, before today, have you ever seen that document?
**A. No.**
Q. To your knowledge, do you know where that document came from?
**A. No.**
Q. So, do you – you couldn't say for sure that that document came from anywhere on the SRS property?
**A. I couldn't say because I've never seen it.**
Q. Okay. Turning to the page – turning to this page, which is the second page, can you state for sure, from personal knowledge today, that you saw this sign at a beaver trapping site that Mr. Hooker trapped in?
**A. No.**
Q. Okay, turning the page. Can you say for sure that you saw any of these specific signs at the sites that Mr. Hooker trapped at from your personal knowledge and memory?

Page 34

**A. I can't say for sure that it was.**
Q. I'm done. No further questions.
MS. NICHOLS: Okay, thank you very much.
[DEPOSITION CONCLUDED AT 1:59 P.M.]

Page 35

CERTIFICATE

SOUTH CAROLINA
AIKEN COUNTY

I hereby certify that the foregoing deposition was reported, as stated in the caption, by the method of Stenomask and speech recognition, with backup, and the questions and the answers thereto were reduced to typewriting by me or under my direction; that the foregoing pages 1 through 34 represent a true, correct, and complete transcript of the evidence given on the 7th day of December 2005, by the witness, FRANKIE R. BROOKS, who was first duly sworn by me; that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I financially interested in the action.
This, the 19th day of December 2005.

SHARON DEHART, CVR
CERTIFIED COURT REPORTER
NSVRA CERTIFIED

Look-See Concordance Report

- - -

UNIQUE WORDS: 629
TOTAL OCCURRENCES: 1,755
NOISE WORDS: 384
TOTAL WORDS IN FILE: 5,596

- - -

SINGLE FILE CONCORDANCE

- - -

CASE SENSITIVE

- - -

COVER PAGES = 2

- - -

INCLUDES ALL TEXT OCCURRENCES

- - -

DATES ON

- - -

INCLUDES PURE NUMBERS

- - -

POSSESSIVE FORMS ON


## – DATES –

**11/15/05** [1]
*3:7*
**December, 2005** [2]
*35:13, 17*
**February** [1]
*18:18*
**February, 1999** [1]
*13:6*
**February 22nd** [1]
*15:10*
**February 22nd, 1999** [1]
*27:1*
**July, 1999** [1]
*20:7*
**July, 2003** [1]
*21:2*
**July of 2003** [1]
*5:18*
**March 22nd** [1]
*15:11*
**March 22nd, 1999** [2]
*27:2, 8*
**November** [1]
*5:18*
**November, 2003** [1]
*22:16*
**October** [2]
*25:4, 9*
**September of 1999** [1]
*25:4*

## – 1 –

**1** [10]
*3:2, 7; 13:18, 19; 26:10, 12, 18; 29:6, 7; 35:11*
**11/15/05** [1]
*3:7*
**19** [6]
*17:14, 21; 22:5, 9; 29:21; 30:3*
**1999** [10]
*12:19; 13:6; 20:4, 7, 19; 21:10; 25:5; 27:2, 8*
**19th** [1]
*35:17*
**1:59** [1]
*34:4*

## – 2 –

**2** [3]
*3:3; 21:14, 15*
**2001** [1]
*20:19*
**2002** [3]
*20:25; 21:2, 5*
**2003** [3]
*5:19; 21:2; 22:16*
**2005** [3]
*29:13; 35:13, 17*
**22nd** [5]
*15:10, 11; 27:1, 2, 8*

## – 3 –

**3** [4]
*3:4; 31:16, 17; 33:8*
**30** [1]
*21:5*
**34** [1]
*35:11*

## – 4 –

**49** [2]
*21:21, 22*

## – 5 –

**53** [4]
*21:23, 25; 28:21, 25*

## – 7 –

**78** [1]
*5:18*
**7th** [1]
*35:12*

## – 8 –

**80s** [1]
*6:4*

## – 9 –

**99** [3]
*8:24; 23:15; 25:9*

## – A –

**able** [1]
*10:13*
**Absolutely** [2]
*25:17; 30:11*
**accidents** [1]
*5:10*
**accompanied** [1]
*11:10*
**accompany** [1]
*8:1*
**According** [1]
*32:22*
**according** [2]
*32:19, 20*
**accurate** [1]
*21:8*
**action** [2]
*4:11; 35:16*
**actual** [1]
*28:5*
**affirmatively** [4]
*10:2; 14:15; 17:20; 20:20*
**aid** [1]
*12:15*
**AIKEN** [1]
*35:4*
**allowed** [4]
*11:4, 6; 30:22; 32:11*
**Andrew** [1]
*4:2*
**Andy** [3]
*19:6, 7, 15*
**annual** [1]
*11:3*
**answer** [5]
*10:13; 11:20; 24:9, 21; 25:20*
**answering** [1]
*25:20*
**answers** [2]
*12:13; 35:9*
**anybody** [1]
*8:22*
**anywhere** [1]
*33:15*
**apparently** [1]
*16:11*
**Area** [4]
*28:6, 19; 31:19; 32:2*
**area** [7]
*7:23; 13:11; 15:6, 12; 16:23; 30:4; 31:4*
**Areas** [1]
*32:14*
**areas** [13]
*6:24; 7:9; 8:4, 13; 12:21; 16:19, 23; 19:2, 5; 30:23; 32:9, 11*
**Arnold** [1]
*5:2*
**asking** [3]
*12:14; 20:16; 32:20*
**assume** [1]
*16:8*
**attorney** [1]
*35:15*
**audibly** [1]
*20:22*
**authorized** [1]
*27:1*
**auto** [1]
*5:10*
**automatically** [1]
*16:1*
**awarded** [1]
*25:10*
**aware** [7]
*16:22; 17:3, 7; 23:3, 7, 8; 25:10*

## – B –

**backup** [1]
*35:8*
**badly** [1]
*24:10*
**basically** [1]
*30:20*
**basis** [2]
*10:17; 12:13*
**bear** [1]
*23:13*
**BEAVER** [2]
*3:3, 7*
**Beaver** [1]
*22:10*
**beaver** [26]
*6:18; 7:15; 9:9, 19; 11:11, 12; 15:2; 17:3, 22, 23, 24; 19:2, 4, 11; 20:4, 10, 11; 21:9; 23:14; 26:3, 4, 7; 29:3, 21; 30:3; 33:20*
**beavers** [7]
*6:19; 9:13, 16; 10:17; 20:5; 23:15, 21*
**believe** [2]
*20:7; 23:23*
**Besides** [2]
*10:22; 11:1*
**besides** [1]
*16:23*
**blockage** [1]
*7:11*
**box** [1]
*32:13*
**brand** [1]
*18:12*
**BROOKS** [2]
*4:5; 35:13*
**Brooks** [3]
*5:2; 25:19; 30:19*

## – C –

**call** [5]
*7:8; 8:18; 17:25; 19:13; 26:11*
**Calls** [1]
*24:20*
**calls** [1]
*11:20*
**caption** [1]
*35:7*
**career** [2]
*5:22; 15:3*
**Carolina** [1]
*4:15*
**carry** [1]
*11:6*
**case** [1]
*6:16*
**caught** [2]
*10:1; 20:10*
**CERTIFIED** [2]
*35:22, 23*
**certify** [1]
*35:6*
**cetera** [1]
*14:10*
**charge** [1]
*8:5*
**checked** [1]
*9:23*
**Chuck** [1]
*13:1*
**Clarify** [1]
*14:23*
**clarify** [3]
*27:24; 28:2, 23*
**clean** [1]
*18:11*
**cleaning** [4]
*18:9, 10; 19:16; 23:24*
**CLEARANCE** [1]
*3:2*
**Clearance** [17]
*13:3, 5, 8; 14:17; 15:9; 17:11, 16; 21:17; 26:17, 19; 27:1, 4, 5, 7, 13, 18, 23*
**clogged** [1]
*9:12*
**closer** [1]
*18:21*
**closest** [1]
*9:7*
**coming** [1]
*4:23*
**Company** [2]
*16:12; 30:22*
**complete** [1]
*35:12*
**CON** [1]
*14:9*
**CONCLUDED** [1]
*34:4*
**Construction** [2]
*24:5, 6*
**CONTAINING** [1]
*3:4*
**contaminated** [3]
*16:19; 17:5, 19*
**Contamination** [5]
*28:6, 18; 31:19; 32:2, 14*
**contamination** [11]
*12:20; 13:22; 15:6; 28:1, 3, 11, 17, 18; 30:23; 31:3*
**continued** [1]
*23:15*
**contract** [14]
*6:12, 17; 8:6; 15:20, 25; 20:17; 23:14, 16; 24:17; 25:3, 8, 9, 10; 26:3*
**Contracting** [1]
*6:6*

contractor [4]
9:10; 19:8; 26:3, 7
contractor's [1]
6:6
contractors [6]
6:10, 14; 8:1; 9:8; 24:13, 17
contracts [2]
6:4, 18
cooler [1]
9:21
copies [1]
10:21
copy [1]
14:14
COR [4]
5:25; 6:3, 5
counsel [1]
35:15
COUNTY [1]
35:4
couple [3]
17:7; 31:25; 33:3
COURT [1]
35:22
court [1]
5:14
cover [1]
29:2
create [1]
22:15
CREATED [1]
3:7
created [2]
21:9; 22:14
Creek [6]
16:24; 17:14, 15, 17; 21:19; 22:2
creek [2]
14:7, 9
Cromer [1]
4:3
CSWE [3]
13:2; 18:7; 24:3
culvert [1]
23:24
culverts [12]
6:25; 18:9, 11; 19:8, 13, 16, 19, 21, 23; 20:11, 13
CVR [1]
35:21

– D –

daily [1]
7:10
date [1]
26:19
day [3]
16:5; 35:13, 17
December [2]
35:13, 17
decide [2]
6:21; 19:8
deer [2]
11:3
DEFENDANT'S [2]
3:6; 29:7
Defendant's [1]
29:5
define [1]
6:5
DEHART [1]
35:21
deposed [1]
5:3
DEPOSITION [1]
34:4
deposition [4]
4:3; 5:12; 26:2; 35:6
depositions [1]
21:7
described [1]
22:10
designate [1]
31:13
device [1]
14:11
direct [2]
6:14, 18
direction [1]
35:10
discretion [1]
8:10
discussed [3]
17:6; 21:18; 26:17
discussing [1]
17:16
dispatch [1]
24:18
dispatching [2]
9:8; 17:3
disturbed [1]
11:18
disturbs [1]
32:15
DOCUMENT [1]
3:4
document [6]
16:12; 30:20, 21; 33:9, 12, 15
documents [2]
21:7; 30:8
DOE [1]
16:17
domestic [5]
22:25; 24:11, 15, 19; 25:1
draft [1]
12:8
drafting [1]
12:15
dramatically [1]
20:7
drought [2]
20:9, 11
drying [1]
20:9
dug [1]
11:23
duly [2]
4:6; 35:14
duration [1]
15:10
duties [1]
6:8

– E –

edge [1]
11:22
Ellers [1]
22:24
emblem [1]
31:7
employee [1]
35:15
employees [1]
23:24
encompass [1]
10:23
end [3]
5:24; 23:14; 25:9
ended [1]
23:14
Engineering [2]
24:6
engineering [2]
18:4, 8
entering [2]
14:7, 9
entitled [1]
22:15
Entry [2]
32:13, 14
entry [2]
32:12, 23
equipment [1]
14:10
et [1]
14:10
everybody [1]
6:12
evidence [1]
35:12
exact [2]
27:14; 28:7
exactly [1]
28:12
EXAMINATION [2]
4:8; 25:23
examined [1]
4:6
example [1]
6:16
EXHIBIT [4]
13:19; 21:15; 29:7; 31:17
Exhibit [3]
26:18; 29:6; 33:8
exhibit [1]
31:14
EXHIBITS [1]
3:1
exhibits [1]
30:9
experience [1]
12:18
expired [1]
27:6
extended [1]
25:9

– F –

Fact [1]
22:16
fact [1]
30:11
familiar [3]
16:12; 21:11; 29:9
Fanning [2]
13:1; 14:3
February [4]
13:6; 15:10; 18:18; 27:1
feral [1]
24:18
financially [1]
35:16
find [1]
7:11
fine [2]
25:13; 33:1
first [8]
4:6; 5:5, 12, 13; 14:16; 29:8; 32:5; 35:14
five-minute [1]
25:15
floatation [1]
14:11
flooding [2]
6:25
folks [1]
12:14
follow [1]
33:2
follows [1]
4:7
foregoing [2]
35:6, 11
Forest [14]
5:16, 21, 22; 6:17, 24; 10:6; 15:25; 16:18; 18:4, 10; 22:15; 23:17, 24; 29:17
forgot [1]
12:5
form [1]
17:5
found [6]
7:5; 18:3, 5, 6, 11; 25:1
Four [13]
12:25; 16:24; 17:14, 15, 17, 18; 21:19, 24; 22:1, 2
four [1]
17:17
framed [1]
24:10
FRANKIE [2]
4:5; 35:13
Frankie [1]
5:2
full [1]
5:1
functions [1]
21:6

– G –

Gabard [2]
4:2; 20:16
Gave [1]
10:21
gave [1]
16:21
generalized [1]
10:22
generated [4]
13:6, 21; 14:17
give [2]
9:15; 16:17
given [1]
35:12
giving [1]
30:22
glasses [2]
26:21, 22
gloves [1]
14:10
goes [1]
23:11
gospel [1]
32:20
Government [1]
12:11
group [2]
14:1; 21:23
guess [1]
18:23

– H –

hand [1]
21:8
hands [2]
12:3; 19:19
happening [1]
23:7
hard [2]
4:18; 14:13
Health [1]
11:8
heard [2]
4:16, 20
hearing [1]
4:18
help [2]
12:6; 17:21
helped [1]
22:15
helping [2]
12:8; 18:9
hereby [1]
35:6
history [1]
28:23
hog [8]
8:5, 20; 10:22; 11:1; 17:3; 20:17, 18; 24:19
hogs [9]

8:9, 14; 9:8; 11:4, 7; 24:11, 15, 18
**Homer** [1] 4:2
**Hooker** [22] 4:11; 7:13; 8:8; 9:14, 17; 10:16, 23; 11:10, 16; 12:2, 24; 15:11; 19:4, 15; 20:10; 25:4; 26:7; 27:4, 16, 20; 33:20, 24
**Hooker's** [2] 6:17; 23:14
**hunt** [2] 8:11; 11:4
**hunting** [1] 10:22
**hunts** [4] 8:20; 11:2, 3, 4

– I –

**I'd** [9] 7:14; 8:18; 11:13; 21:8; 22:13; 26:11; 29:4; 30:7, 9
**I've** [3] 31:6, 25; 33:16
**IDENTIFICATION** [4] 13:19; 21:15; 29:7; 31:17
**identify** [4] 7:12; 13:14; 29:4; 31:3
**II** [2] 32:10, 23
**III** [1] 4:3
**in-house** [1] 23:18
**Indicates** [5] 10:2; 14:15; 17:20; 20:20; 25:12
**information** [1] 12:6
**input** [2] 22:22; 23:6
**Institute** [4] 14:8; 15:17, 21; 16:2
**instructed** [1] 24:15
**instructions** [2] 24:13; 30:22
**interested** [1] 35:16
**interrogatories** [4] 12:7, 12; 20:18; 24:9
**introduce** [1] 30:9
**Introduction** [1] 32:6
**investigation** [4] 22:24; 23:3, 11; 24:11
**involved** [8] 6:8, 18; 12:8; 19:18, 20; 22:24; 23:2; 24:12
**involvement** [1] 23:20
**issued** [8] 10:11, 16; 15:10, 12; 27:4, 5, 7, 10
**it'd** [1] 19:24

– J –

**Jackson** [1] 4:15
**Jim** [1] 23:17
**job** [4] 6:8, 11; 7:10; 20:24
**jobs** [1] 6:2
**John** [1] 4:2
**July** [3] 5:18; 20:7; 21:2

– K –

**keep** [1] 10:7
**Keeping** [1] 6:9
**keeping** [1] 6:9
**kill** [1] 11:4
**knowledge** [8] 9:16; 10:6; 11:2; 23:10; 24:23; 33:11, 19, 24

– L –

**landfill** [1] 9:22
**last** [1] 32:12
**lawsuit** [1] 5:8
**lay** [1] 14:12
**leaves** [1] 19:25
**let's** [1] 26:17
**limbs** [3] 19:20, 21, 24
**line** [1] 32:13
**LIST** [1] 3:3
**list** [3] 16:18; 21:9, 19
**listed** [1] 20:18
**live** [1] 4:14
**location** [1] 22:4
**looks** [2] 21:11; 28:13

– M –

**ma'am** [1] 8:25
**Mainly** [1] 20:10
**MAP** [1] 3:7
**map** [5] 29:4, 9, 14, 18, 20
**March** [3] 15:11; 27:2, 8
**Margie** [1] 4:2
**Mark** [1] 4:1
**MARKED** [4] 13:19; 21:15; 29:7; 31:17
**marked** [3] 13:17; 21:13; 33:7
**marking** [1] 12:20
**Mary-Ellen** [1] 4:1
**mean** [8] 9:11, 17; 14:24; 18:8; 23:2, 3; 24:16; 32:19
**memory** [2] 28:20; 33:25
**mentioned** [1] 22:4
**mentioning** [1] 14:3
**method** [1] 35:7
**Mile** [7] 16:24; 17:14, 15, 17; 21:19; 22:1, 2
**mind** [1] 30:16
**minute** [2] 21:23; 23:13
**modification** [3] 25:5, 6, 8
**modified** [1] 25:4
**monitored** [1] 11:8
**month** [3] 26:10, 11; 27:11
**Mostly** [1] 11:13
**mostly** [2] 19:20, 24
**moved** [1] 19:23
**Mr** [24] 4:11; 6:16; 7:13; 8:8; 9:14, 17; 10:16, 23; 11:10, 16; 12:2; 14:3; 15:11; 19:4, 15; 20:16; 23:14; 25:3; 26:7; 27:4, 16, 20; 33:20, 24
**MS** [28] 4:9; 11:19; 13:17; 14:23; 20:21; 21:13; 24:20; 25:14, 17, 19, 24; 29:5; 30:7, 11, 13, 14, 15, 16, 18, 19; 31:1, 11, 12, 13, 15; 33:2, 6; 34:3
**Ms** [14] 12:1, 13; 13:20; 14:25; 20:24; 21:16; 24:22; 25:19, 21; 26:2; 27:25; 29:8; 30:19; 31:18
**myself** [4] 7:7, 14; 19:12; 20:1

– N –

**name** [2] 5:1; 15:23
**names** [1] 21:20
**narrow** [1] 19:1
**needing** [1] 20:12
**negative** [1] 17:2
**negatively** [1] 25:12
**NICHOLS** [13] 4:9; 13:17; 21:13; 25:14, 19; 30:11, 14, 16, 19; 31:1, 12, 15; 34:3
**Nichols** [10] 4:10; 12:1; 13:20; 14:25; 20:24; 21:16; 24:22; 26:2; 27:25; 31:18
**Noone** [1] 4:1
**note** [2] 14:6; 32:9
**NOTED** [1] 4:1
**notified** [1] 9:12
**November** [2] 5:18; 22:16
**NSVRA** [1] 35:23
**Number** [7] 13:18; 21:14; 22:5; 26:18; 29:21; 30:3; 32:17

– O –

**oath** [1] 26:1
**object** [1] 11:19
**Objection** [1] 24:20
**observe** [1] 12:1
**observed** [1] 11:16
**October** [2] 25:4, 9
**Officer** [1] 6:6
**Oh** [6] 4:16, 18, 20, 22; 11:6; 20:23
**Okay** [56] 8:5; 9:12; 10:20; 11:1, 16; 12:5, 18; 13:16; 15:8; 16:10, 16, 22; 17:2, 9, 12, 21; 18:1, 24; 19:4; 21:2, 3, 6, 12, 25; 22:7, 9, 12; 23:18; 24:8, 17, 25; 25:3, 13; 26:17, 24; 28:7, 10; 29:2, 3, 8, 20; 30:1, 6, 15; 31:8, 10, 22; 32:1, 4, 8, 23; 33:1, 17, 22; 34:3
**okay** [3] 16:4; 19:7; 26:16
**opening** [1] 19:14
**OPS** [1] 14:9
**order** [5] 7:17, 23; 9:14; 26:8, 10
**ordered** [1] 26:7
**orders** [5] 7:20; 8:9, 12; 9:1; 26:14

– P –

**P.M.** [1] 34:4
**page** [9] 13:25; 31:2, 23; 32:5; 33:17, 18, 22
**pages** [1] 35:11
**paid** [1] 10:18
**Pardon** [1] 22:19
**participate** [1] 8:20
**parties** [1] 35:15
**people** [8] 6:23; 7:3, 5, 8; 11:4; 18:4, 8, 10
**perform** [1] 32:14
**performing** [1] 6:12
**PERMIT** [1] 3:2
**Permit** [17] 13:3, 5, 8; 14:17; 15:9; 17:11, 16; 21:17; 26:18, 19; 27:1, 4, 5, 7, 13, 18, 23
**Person** [1] 14:7
**person** [2] 14:10; 16:5
**personal** [4] 14:11; 23:10; 33:19, 24
**personally** [3] 12:1; 16:18, 22
**pig** [1] 25:1
**pigs** [1] 22:25
**place** [3] 9:13; 10:3; 19:11
**PLAINTIFF'S** [4]

3:1; 13:19; 21:15; 31:17
Plaintiff's [4] 13:18; 21:14; 31:16; 33:7
plastic [1] 14:12
Please [1] 25:20
please [4] 5:1; 13:18; 21:14; 31:23
plugged [2] 19:12; 26:12
point [1] 15:2
points [1] 11:11
policy [1] 16:11
Pond [9] 22:5, 6, 8, 10, 11, 12; 29:23, 25; 30:4
pond [3] 17:22, 23, 24
ponds [2] 20:9, 11
position [1] 5:20
posted [7] 12:20; 16:25; 17:5, 18; 18:1, 12; 28:21
postings [2] 18:3, 25
prepare [1] 7:17
present [1] 4:3
problem [1] 6:24
problems [1] 7:9
procedure [2] 9:6, 17
produced [2] 30:10, 21
property [9] 14:20, 23, 24; 15:1; 25:1; 28:2, 24, 25; 33:15
Protection [1] 11:8
protective [1] 14:9
provide [1] 12:6
pull [1] 19:25
pulling [1] 19:20
purple [1] 28:13
pushed [1] 12:25
putting [1] 12:2

– Q –

qualified [2] 14:7; 15:14
question [5] 10:13; 11:20; 24:8; 26:6; 27:2
questions [11] 12:7, 11, 12, 14, 16; 20:16; 25:20, 21; 26:1; 34:2; 35:9

– R –

RAD [4] 14:9; 32:10, 23
RAD-II [2] 14:7; 15:14
radiation [4] 12:25; 18:6, 11; 28:12
radiologic [1] 31:20
Radiological [1] 32:17
radiological [1] 13:24
radiology [2] 28:9, 10
RCO [1] 14:12
read [2] 14:13; 32:13
reading [1] 14:6
recall [1] 27:10
receipt [1] 9:24
receipts [4] 9:25; 10:11, 16, 20
recognition [1] 35:8
RECORD [1] 25:18
record [1] 6:5
records [3] 6:9; 10:7
reduced [2] 20:5; 35:9
REEXAMINATION [2] 30:25; 33:5
referred [1] 30:8
referring [4] 27:22; 29:3, 8; 31:4
regular [1] 7:3
relative [1] 35:14
remember [13] 6:3; 11:22; 12:23; 13:12; 15:7; 17:12; 18:5, 7, 13, 17; 21:1; 28:22; 32:3
remind [1] 25:25
reported [1] 35:7
REPORTER [1] 35:22
represent [1] 35:11
Representative [1] 6:7
representing [1] 4:11
request [1] 30:9
required [1] 14:11
requirements [1] 16:7
response [2] 20:17; 31:18
responses [3] 12:7, 9, 15
result [1] 13:21
retired [4] 4:11; 20:25; 22:20
retirement [1] 4:24
revised [1] 29:12
Right [17] 8:16; 9:2; 10:19; 13:23; 14:2, 5; 15:4; 22:11; 23:12, 19; 26:5, 15; 27:9, 15; 29:22; 31:21; 32:16
right [5] 5:14; 14:13; 29:25; 30:2, 16
rinse [1] 14:12
River [13] 14:8, 25; 15:16, 21; 16:2, 12, 19; 17:4; 22:16, 25; 23:16; 30:21; 31:24
Road [11] 12:24; 16:24; 21:19, 24; 22:2, 6, 11, 12; 29:24, 25
roads [1] 6:25
roam [1] 7:4
Robbie [1] 4:10
round [1] 30:17
RW-I [1] 32:6
RW-II [1] 32:6

– S –

Savannah [13] 14:8, 25; 15:16, 21; 16:1, 11, 19; 17:4; 22:16, 25; 23:16; 30:21; 31:24
saying [1] 32:19
se [1] 9:1
second [5] 13:25; 27:7, 13; 32:12; 33:18
Seigler [1] 23:17
send [1] 6:21
September [1] 25:4
Service [14] 5:17, 21, 22; 6:17, 24; 10:6; 16:1, 18; 18:5, 10; 22:15; 23:17, 25; 29:17
setting [1] 11:17
SHARON [1] 35:21
Sheet [1] 22:16
show [6] 8:3; 11:13; 16:10; 21:4; 29:20, 23
showing [1] 22:13
sign [20] 12:25; 13:24; 14:20; 15:6; 28:1, 3, 5, 8, 9, 10, 11, 13, 17, 20, 25; 31:4, 22; 33:19
signature [1] 13:25
signed [1] 14:4
SIGNS [1] 3:4
signs [9] 8:14; 12:19; 14:17; 18:7, 12; 28:24; 31:19, 23; 33:23
Simpson [1] 4:2
Site [22] 6:23; 7:4, 8; 10:24; 11:2; 12:19; 14:25; 16:20; 17:4, 21; 21:22; 22:5, 9; 23:1, 16; 26:10, 12; 28:21, 25; 29:21; 30:3; 31:24
site [12] 7:12, 17; 12:24; 15:8; 17:4, 6; 18:7; 27:12, 14, 20; 29:4; 33:20
SITES [2] 3:3, 7
sites [13] 6:21; 7:7, 15, 21; 15:2; 17:8, 12, 17, 18; 20:4, 8; 21:10; 33:23
slow [1] 4:23
slowed [1] 4:17
Soil [5] 28:5, 18; 31:19; 32:14
soil [13] 11:18; 12:3, 20; 13:22; 15:5, 6; 19:22; 28:1, 3, 10, 17; 31:3; 32:15
somebody [2] 8:14; 18:6
somewhere [2] 7:12; 10:20
Sorry [1] 20:23
sorry [2] 20:21; 26:22
sort [2] 5:8; 16:19
South [1] 4:15
speak [2] 4:18; 20:21
specific [3] 8:12, 13; 33:23
specify [1] 10:3
speculation [2] 11:20; 24:21
speech [1] 35:8
speed [2] 4:17, 21
SRS [4] 3:7; 28:1, 24; 33:15
stand [1] 24:4
Standby [1] 14:10
standby [1] 16:5
standpoint [1] 12:15
started [2] 5:20; 6:3
starting [1] 32:13
starts [1] 32:5
state [1] 33:18
stated [2] 27:3; 35:7
statement [1] 26:13
Steed [8] 22:5, 6, 8, 11, 12; 29:23, 25; 30:3
Stenomask [1] 35:8
sticking [1] 11:24
stopped [3] 6:25; 19:14; 20:13
stream [1] 9:13
stuff [2] 7:4; 19:21
subcontracted [2] 14:8; 15:16
subcontractor [1] 15:24
summer [2] 18:19; 20:4
supervisor [1] 14:1
supposed [3] 9:10, 18; 22:6
survey [2]

14:9, 12
**sworn** [2]
4:6; 35:14

## – T –

**talked** [2]
13:1; 16:24
**talking** [4]
8:23; 18:7; 25:7; 28:4
**technical** [1]
7:2
**technician** [1]
6:2
**terms** [1]
24:18
**testified** [1]
4:7
**testimony** [2]
16:25; 27:3
**Thank** [1]
25:19
**thank** [1]
34:3
**thanks** [2]
16:4; 33:1
**that'd** [1]
28:7
**There's** [2]
17:17; 22:8
**thereto** [1]
35:9
**They'd** [1]
8:18
**they'd** [2]
19:25
**they're** [1]
12:12
**Till** [1]
20:25
**till** [2]
5:18, 24
**timber** [1]
7:1
**titles** [1]
6:1
**touch** [3]
6:9, 23; 13:1
**transcript** [1]
35:12
**trap** [18]
4:17, 21; 6:19; 9:15; 11:11, 14, 15, 24; 13:3; 15:12; 19:11; 23:15; 24:14, 15; 26:4, 7; 27:20
**trapped** [13]
7:18; 8:4; 9:13, 16; 10:4; 18:2; 19:2, 4; 20:6, 8; 33:20, 24
**trappers** [1]
20:19
**TRAPPING** [2]
3:3, 7
**trapping** [22]
6:18; 7:15, 22; 8:2, 9; 9:9; 11:11, 16, 17; 14:22; 15:2; 17:3, 17, 18; 20:4; 21:10; 22:8; 23:20; 29:4, 21; 30:3; 33:20
**traps** [3]
11:15, 17, 21
**tree** [2]
19:20
**trial** [1]
5:14
**true** [2]
20:19; 35:11
**Turning** [1]
33:17
**turning** [2]
33:17, 22
**type** [2]
7:1; 29:14
**typewriting** [1]
35:10
**typical** [1]
31:23

## – U –

**Um-hum** [2]
9:20; 15:22
**understand** [4]
7:19; 9:11; 15:18; 24:16
**unescorted** [1]
32:23
**USDA** [1]
22:15

## – V –

**verbal** [1]
26:14
**view** [1]
12:19
**visit** [1]
7:15
**visited** [1]
15:1

## – W –

**waders** [2]
14:10, 12
**Wait** [1]
21:23
**walk** [1]
9:6
**wanted** [5]
11:14; 13:4; 22:23; 26:16; 27:24
**wash** [1]
20:1
**watch** [1]
11:15
**watched** [2]
11:11; 19:17
**water** [3]
11:23, 24; 14:11
**we'd** [1]
19:10
**we'll** [1]
9:8
**we're** [3]
16:16; 29:3
**weigh** [1]
9:21
**weren't** [6]
8:12; 9:3; 11:23; 18:3; 20:13; 24:12
**Westinghouse** [4]
16:11, 17; 30:21; 32:21
**what's** [2]
17:14; 33:7
**wherever** [1]
29:24
**wild** [2]
24:18; 25:1
**wildlife** [1]
5:23
**WILLIAMS** [15]
11:19; 14:23; 20:21; 24:20; 25:17, 24; 29:5; 30:7, 13, 15, 18; 31:11, 13; 33:2, 6
**Williams** [3]
12:13; 25:21; 29:8
**witness** [3]
5:7, 13; 35:13
**words** [1]
28:7
**WORK** [1]
3:2
**Work** [17]
13:3, 5, 8; 14:17; 15:8; 17:10, 16; 21:17; 26:17, 19; 27:1, 4, 5, 7, 13, 18, 23
**work** [19]
7:1, 17, 20, 21, 23; 8:9, 12, 13; 9:1, 14; 14:1; 18:9; 19:9; 23:8; 26:8, 9, 14; 29:14; 32:15
**worked** [6]
5:16, 23; 7:19; 9:9; 17:5; 29:17
**Worker** [4]
32:10, 17, 23
**workers** [1]
12:2
**working** [2]
12:19; 28:23
**Works** [2]
24:5, 6
**works** [1]
13:2
**worry** [1]
16:16
**write** [1]
9:14
**writing** [2]
31:6, 9
**written** [5]
7:20; 9:23; 12:12; 26:8, 9
**wrote** [1]
9:25

## – Y –

**Yeah** [2]
14:25; 15:23
**years** [1]
21:5
**Yeaton** [1]
4:2
**yellow** [2]
28:13; 31:5
**you'll** [5]
4:18; 17:21; 23:13; 26:18; 32:9
**You've** [1]
16:14
**you've** [1]
31:24