# DEPOSITION OF DAVID SANDERS - 6/2/06

## HOOKER V. THE UNITED STATES

**Page 1 to Page 47**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*ALICE D. BONI, COURT REPORTER*
*P. O. Box 2474*
*Aiken, SC 29802*
*Phone: 803-648-9434*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY,

Plaintiff,

vs. NOS. 03-1501C, 04-1126

THE UNITED STATES,

Defendant.

DEPOSITION OF DAVID SANDERS
taken by Counsel for the Plaintiff
before Alice D. Boni, Certified Court Reporter
at the offices of Department of Energy
151 Corporate Parkway, Aiken, South Carolina
on Thursday, the 1st day of June 2006
commencing at 2:05 p.m.

ALICE D. BONI, COURT REPORTER

Page 2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF: ROBBIE M. NICHOLS, ESQ.
Attorney At Law
Post Office Box 7925
Hilton Head Island, SC 29938

FOR THE DEFENDANT: RICHARD SCHROEDER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, DC 20005

LUCY KNOWLES, ESQ.
Westinghouse Savannah River Site
Post Office Box A
Aiken, South Carolina 29802-0900

- - - - -

INDEX TO EXAMINATIONS


| | Page |
|---|---|
| EXAMINATION BY MS. NICHOLS | 3 |
| EXAMINATION BY MR. SCHROEDER | 44 |
| CERTIFICATE OF COURT REPORTER | 47 |


- - - - -

EXHIBITS

PLAINTIFF'S


| | | |
|---|---|---|
| 10 | BEAVER TRAPPING SITE NUMBERS AND LOCATIONS | 11 |
| 11 | SOIL CONTAMINATION AREAS INDEX (SEMI-ANNUAL) - SGCP/RCO | 40 |


(Continued)

Page 2

- - - - -

Page 3

[IT SHOULD BE NOTED THAT William D. Hooker, John Andrew Cromer, III, Harold Oliver, Brandon Hollingshead, Mark Simpson, Margie Yeaton and Mary-Ellen Noone are also present at the deposition.]

- - - - -

DAVID SANDERS
having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. NICHOLS:

Q. Mr. Sanders, I am Robbie Nichols and I am representing Mr. Hooker in this case. Are you familiar at all with the litigation that's going on?

A. A little.

Q. Okay. Mr. Hooker has sued the Forest Service on a contract, and it's been going on for a long time. And thank you very much for coming today. Most of this that I'm going to do today is just going to be informational because I don't know a lot about what you do. They told me you were available and you'd signed something that came to me in discovery, and so that's why we're here.

First of all, can you tell me what your job is at Westinghouse, how long you've been there and what your experience is?

Page 12

requested that the Forest Service provide us with information as to what sites were posted; what beaver sites were posted and which were not. And this is what we got back, and thank you very much. I'd like to go through these with you, if you don't mind.
A. Okay.
Q. First of all, how did you – did you send somebody out and just look, or did you have a list of what was posted and what wasn't posted?
A. I used some folks to – that were at this work site doing similar functions that I do that were there before 1992 to help me generate this document.
Q. Okay, but how did you generate it?
A. By quizzing them. I've also gone out to these sites as well. Most of them; most of the sites.
Q. So is there any sort of master list in your possession, or the Department of Energy's, of all the contaminated sites?
A. There is – we would have RAD-CON survey records of any time we establish a posting, yes.
Q. And what would those records look like?
A. They are called radiation survey log sheets. They have a 75-year retention. And it's something that anytime my RAD-CON inspector performs any type of survey, they document a survey.

Page 13

Q. Okay, so these are –
A. This is part of their daily function, to document any findings or readings.
Q. So did you have occasion to go back to those to identify these sites?
A. I used documents that were produced from the original investigation that said that these sites were posted in 1999 based on these surveys. So I used that and the knowledge of the folks that were there prior to me, or prior to 1992.
Q. Okay. But my question was is there a master list of all the contaminated postings?
A. Yes.
Q. On the Site?
A. A master list?
Q. Yes.
A. I'm not sure a master list, but there is a list.
Q. There is a list?
A. Well, let me say there are surveys that support whether a site has been posted or not. As far as a list, a one-page list, or two-page list, not to my knowledge.
Q. Okay.
A. And I'm speaking for every area on Site that has ever been posted, not for certain –

Page 14

Q. Right. Right. With anything?
A. Right.
Q. With anything.
A. Right.
Q. Is it possible that there could be areas on the Site that have never been surveyed and, therefore, are not posted that could be contaminated?
MR. SCHROEDER: Objection to form. Calls for speculation.
Q. [Ms. Nichols] You can answer.
A. There are places that are potentially above levels that have residual contamination on them that we haven't identified. When you speak in terms of contamination, it may not – has a different meaning to me as far as contamination.
Q. Well, that brings up a point. When we're talking about contamination, what determines? Is it a high level of tritium that causes – that would cause you to identify a site as contaminated?
A. We look at all the radionuclides and we have concentrations for all of them that would prescribe when an area would be considered contaminated. As far as – what I have done, all the outfall areas from all the facilities, streams, creeks, I have reviewed the data that has been pulled in most of these and we have –

Page 15

they're well characterized. I mean we have lots of sampling data points up and down these streams, and I have reviewed those. None of those levels would trigger posting a contamination area.
Q. Where are you referring to when you say that?
A. Any outfalls or streams below, that feed out of any process facilities. I'm speaking all the streams throughout the Site. And specifically where I'm speaking is all the – adjacent to, or at the beaver sites. I reviewed all the data during that time period and there are no levels that would require me to put up a contamination area posting.
Q. Okay, but you're talking about Four Mile Creek?
A. Yes.
Q. You're saying –
A. That I don't already have identified, that I don't already have –
Q. – that you don't already have identified?
A. – posted as a contamination area. Because we were speaking about what areas do I not have posted. Okay?
Q. Okay. I understand. There's nothing that would lead you to investigate to put up more?
A. Right.
Q. You think everything else is –

Page 20

streams that we had may not have had RAD postings, but a lot of them had the "Keep out," the process water signs.
Q. Okay.
A. The "Low levels not posted," like I said before, there are streams that lead out of these facilities that have low levels of contamination, may not require – most of them do not require a contamination posting. But there are low levels of – we do understand there are low levels of activity.
Q. Okay. No one is discharging anymore, are they? Or are they still –
A. Not to the best of my knowledge. Our reactors do not operate, so to the best of my knowledge, no.
Q. You would know that, if they were, would you not?
A. We would know if there were any spills or anything to alert us that the activity levels would change in those streams. Yes, we should know that. Facilities have certain levels that they release to and I can't speak to that.
Q. Okay, if you look on the next page, and this site number 25, and I think y'all circled these that were posted.
A. Right.
Q. The HP monitor station number 52, can you tell

Page 21

me what that is?
A. That is an area right outside of H-Tank Farm. It's a discharge right out of H-Tank Farm.
Q. And what is that posted with?
A. Currently?
Q. Um-hum [yes].
A. Currently, it is posted as ERMA [phonetic] SCA, and a – maybe an active contamination area. Yeah, contamination area.
Q. Was it always posted?
A. To the best of my knowledge, the information I was given, it was posted with the old radiological controlled area postings prior to 1992. The area that we have currently posted. Now, I'm not speaking of the stream where the beaver site would be, in fact. That is not posted as a CA or SCA – or, excuse me, that is posted SCA, but not as a CA.
Q. You said it's posted as an SCA, but not a CA?
A. Well, there is an area adjacent to the stream that is posted as a contamination area. The stream, itself, is posted as an SCA, soil contamination area.
Q. Okay. And what would the difference in the signage be between a CA – would there be a signage for CA, or just for the SCA?
A. There is – it has two different meanings. SCA

Page 22

and CA is totally two different signs.
Q. And what would the CA indicate?
A. CA would indicate that you need some type of protective equipment before you can enter. It would have a boundary all the way around it to prevent inadvertent entry. Like basically a road around it.
Q. Does that now exist at that site?
A. Yes. At – at the location adjacent to the stream.
Q. Would you know if that was the case in 1999, in the summer?
A. I was told, in 1999, it had a posting around it and it was the RCA – whoa, whoa, back up. You said what time frame? I'm sorry, I was speaking prior to 1992.
Q. Okay, summer of 1999.
A. I'm not sure without reviewing some data what the exact date was when we transitioned over.
Q. Okay. But your response was that when it was posted in 1992, it was roped off?
A. That's what I was told, yes, that it was roped off as a RCA, radiologically –
Q. As an RCA in '92. And did that –
A. Prior to. Prior to 1992.
Q. Did that continue throughout the years?
A. To the best of my knowledge, it has always been

Page 23

posted, this area of concern, yes.
Q. To your best recollection, was it re-posted sometime in September of 1999?
A. I can't recall without looking at the records. I could go back and look at the records, but off the top of my head – I know we did some activities out there, but like I say, this is an area adjacent to the beaver site, not a beaver site, but that there was actual work scope to go in there and do some more intrusive sampling in that location and I know it prompted a posting. That's what prompted the posting of the contamination area, but I do not know the exact date.
Q. Okay. Let's look at site number 29, Indian Grave Branch. Where is that?
A. That is where the outfall from K-Area comes out. It's close to Road B.
Q. And site 30 would be the F-Area?
A. Four Mile Branch?
Q. No, I'm sorry. No, it has H-Area, doesn't it?
A. Right.
Q. Does Four Mile Creek run past H and F? Here, let's get one of these.
A. Four Mile Branch comes out of HP-52, or down through.
Q. So it would be – would you just kind of look

Page 24

at that and just tell me where that comes from? This would be –

A. I don't know, this is not a very good map.

Q. No, it isn't. It was better in color. Let's look at one of these.

MR. SCHROEDER: Are you going to mark this as an exhibit?

MS. NICHOLS: Maybe. We just need to get a little help right now. Actually, you have all these.

MR. HOOKER: Should be H-Area up in here.

MS. NICHOLS: Is that H?

MR. HOOKER: See Four Mile coming up right here?

MS. NICHOLS: So, this would be F, would it not be? Isn't F and H right there?

MR. HOOKER: That's the burial ground, this is F-Area and this is H-Area.

MR. SCHROEDER: I'm going to object to form and also note that Mr. Hooker was speaking. Do you want to go off the record?

MS. NICHOLS: Yeah, could we go off the record?

[OFF THE RECORD]

Q. [Ms. Nichols] So the Four Mile Branch below H-Area on Power Line would be the outfall from H, right? H-Area?

Page 25

A. I'm not sure if you would technically say it's the outfall. The outfall feeds into Four Mile.

Q. Okay. And 32 – and do you just know offhand what that's posted as, site 30? Would all these be –

A. Site 30 – most of site 30 is posted as a SCA, soil contamination area. A good portion of it.

Q. Okay. And 29, Indian Grave, would that be also SCA?

A. No.

Q. No? What would that be?

A. That is not posted as – can I see that map again?

Q. Um-hum [yes].

A. That was posted with the process signs, but we do not have it posted as an SCA.

Q. Okay, so that would just be the water signs?

A. Yes.

Q. Okay. Okay, look at site 32 where Indian Grave and K Canal meet. Would that be the same answer for that one?

A. Yes.

Q. And –

A. The same answer as for the process signs.

Q. Right. Okay. What about site 34? Do you know where that is, or was, or what it was? Well, it doesn't

Page 26

matter if it's no longer a trapping site. Mr. Hooker says it was a helicopter pad. Site 35, the C-Area outfall, and that is posted. What is that posted as again?

A. That's posted with the process sign.

Q. Okay, that's the water.

A. No RAD sign.

Q. And 36, P-Area outfall?

A. Has the process signs and, down the stream, it has an SCA posted, soil contamination area posted.

Q. Okay.

A. Would it help if I explained the difference between a SCA posting and a CA posting?

Q. Yes, it would.

A. Okay, soil contamination postings are established based on exposure. They're based on 100 millirems. So basically SCA postings are for exposure control. Contamination area postings are established for contamination control. In other words, we don't want personnel to spread contamination or contaminate themselves. Contamination areas would require PPE, some type of protective equipment and a physical boundary. An SCA posting is there to alert the worker that he needs to notify us so we can do an evaluation to make sure that he's not going to be exposed to more than 100 millirems.

Page 27

Now, those concentration levels are determined by an individual staying in that location, wherever those concentrations are, for 2,000 hours. Very conservative. And that's how we establish an SCA. I just wanted to make sure you understood we establish SCAs for exposure. It gives us an opportunity to understand what the individual is doing and to determine whether we need to monitor. In other words, whether we need to put a TLD on the person versus contamination requires us to put them in protective equipment.

Q. Thank you. And I do understand that.

A. Okay. Well, I wanted to make sure that you –

Q. Sure. As long as you brought it up, what is required of a – as far as protection of a worker who is working in an SCA in work that disturbs the soil?

A. Nothing. There's no requirement unless you exceed 10 CFR 835, Appendix D, which is for contamination levels.

Q. I don't have it with me, but would it surprise you that Westinghouse has a –

A. Now, we, RAD-CON, can prescribe protective equipment. And that's based on whatever knowledge they have of the area for working in a SCA. If they choose to do so, they have that authority. And that's in 5-Q as

Page 28

well. Must do it if it's over the CA table levels, or if RAD-CON says you must do it. But there's no requirement that says we have to – that you have to wear protective equipment to –

Q. When you say there's no requirement, you mean by your determination, or –

A. Regulatory determination.

Q. Regulatory determination?

A. Right.

Q. Why would Westinghouse require that, then?

A. Some people take a more conservative approach than others. It's just personal preference.

Q. So, let me make sure I understand it. Westinghouse puts out material that says a worker must be RAD-2 certified to work in work that disturbs the soil in an SCA, and you're telling me that is not the case?

A. I'm telling you the requirement for – repeat that question again and let me make sure I understand it. Repeat it.

Q. Okay.

MS. NICHOLS: Can we go off the record?

[OFF THE RECORD]

Q. [Ms. Nichols] Okay, Mr. Sanders, you were just telling me that the – and correct me if I'm wrong, but I think you said that working in an SCA in work that

Page 29

disturbs the soil, it was discretionary as to whether – as to what your – okay, I'm going to ask you to look at what was entered as Plaintiff's Exhibit Number 3 in the last round of depositions. And I believe this is a publication by Westinghouse, and you probably actually wrote this.

MR. SCHROEDER: Is there another page here to that exhibit?

MS. NICHOLS: Yes.

Q. [Ms. Nichols] Are you familiar with this document?

A. This document appears to be RAD-worker – out of a RAD-worker training document. It does not appear to be a document that governs RAD-CON, or directs RAD-CON activities or protocols.

I also believe that RAD-worker training has a clause in it that it may be that conditions in – within the facility may be different than what we teach in RAD-worker training due to the fact that these are not the governing documents that dictate how we perform our work.

Currently, for – RAD-worker training is not required to enter into a soil contamination area. I believe it no longer says to perform work that disturbs soil. I believe the correct terminology is excavating in a SCA, or where a person could receive over 100 millirem.

Page 30

So I don't think this is the most current information on how we prescribe the requirements today.

Q. Okay. Actually, we're talking about 1999, and what is the date on that?

A. 1998.

Q. So today, in 2006, you would have a different policy?

A. Again, any policies that we have are driven from 10 CFR 835 or 5-Q. 5-Q has a table, 2-2; it's chapter two, table 2-2. 835 has Appendix D. The language in both of them, if a person is going to handle or in areas where the contamination levels are above those levels in those tables, they're required to have protective equipment. Those are the requirements.

Q. Okay.

A. Now, we may have taken administrative controls or policies or whatever to say we're going to prescribe it at lower levels, but as far as required, no, it's not required. And to the best of my knowledge, it has never been required.

Q. Well, why would Westinghouse – you're saying that that looks like something that you would use in training for RAD-worker training?

A. Yes. That's what it appears to me, yes.

Q. And do you do that training?

Page 31

A. No, I do not.

Q. Does your department do that training?

A. That group is currently in our department. I'm not sure during that time that it was under the RAD-CON department. It is regulatory training, is what that department is.

Q. Okay. Well, just tell me what would be the difference between a RAD-worker-1 and -2.

A. The different in RAD-1 and RAD-2, RAD-2 workers are trained to dress out and wear protective equipment, the standard one pair of PCs. That's the major difference.

Q. Okay. So you would – are you disputing that that policy from Westinghouse, this training manual, was actually the policy that governed in 1999?

A. I would have to specifically go back to what our manual said in 1998 to be able to clarify that, but as I said, I don't believe 5-Q and 835 has changed. I think it was the same then as it is now. I think we got the guidance from those two documents, I think – I believe it was 1992.

Q. Are these – the citation you gave me, what is this from? Federal Regulations?

A. 10 CFR 835 is the Code of Federal Regulations for RAD-CON.

Page 32

Q. 835?
A. Right. And it's Appendix D. And mainly what it talks about is the contamination levels.
Q. Okay. So if I could just beat a dead horse here. So even though this training materials that were effective February 23, 1998 say that RW-2 training is required to perform work that disturbs the soil in this area, you are disputing that that is the case, is that correct?
A. I believe that the correct terminology is – I believe the correct terminology is where – working in a soil contamination where you could exceed 100 millirem. I think that's the correct terminology.
Q. Okay. Just for point of accuracy here, would you say that the signs displayed on page three of this document are accurate? You're referring to –
A. They're not all inclusive, but they – that's standard. You can tell it's cut off.
Q. Right. What department in Westinghouse would have been responsible for creating this document?
A. This would be RAD-worker training department's regulatory training.
Q. And if you remember back in 1998, would that have had any connection with your office at all?
A. Yes, I'm sure – I'm sure there was some

Page 33

connection, and I can't speak to why the language may be different, or maybe the language was the same. I can't speak to that. I don't have – I don't have anything to compare it to.
Q. Okay. All right, fine. And we're not marking that because it's already been put in, so that's fine. Let's go back to the list of posted areas that you provided to us. And I think we'd gotten through – site 35 and 36 were process signs. You said 36 was also posted as SCA. Site 40 is marked as posted. Would you agree that site 40 would be the same site as – we talked about HP 52 somewhere, did we not?
A. 25.
Q. 25? So are sites 25 and 40 the same, or are they just close in proximity?
A. I don't know. I think they're close in proximity.
Q. Okay. And so the same answer would apply to 40 as 25? It says old RCA prior –
A. Old RCA sign prior to 1992.
Q. Prior to 1992. Site 43, behind the motor pool, what is that posted as?
A. That is posted as a RCRA CERCLA site.
Q. Tell me what that means.
A. I don't know.

Page 34

Q. You don't know what CERCLA is?
A. That's not inside of RAD-CON business. That is regulatory business. They do business totally different than RAD protection.
Q. Okay, site 44, Four Mile Creek at Road C. What is that posted as?
A. Four Mile Creek at Road C –
Q. Site 44.
A. There is no RAD posting at that site to the best of my knowledge. Over to the side, I have a note over here, "Sign at the road, contaminated stream, keep out," not a RAD sign.
Q. Okay, who would have put that sign there?
A. I don't know.
Q. It would not have been your department?
A. [Indicates negatively].
Q. What would be your opinion if it said "Contaminated stream, keep out"?
A. What would be my opinion?
Q. Yeah.
A. I would keep out.
Q. What would be your opinion as to what contamination was in there?
MR. SCHROEDER: Objection. Calls for speculation.

Page 35

Q. [Ms. Nichols] You can answer.
A. My opinion would be that the CERCLA RCRA guys would have posted it based on some information they have. Their requirements are different than ours and I don't know them to speak to them, so.
Q. You don't have any cooperation between the two?
A. Nothing other than reviewing data from the same data base, but as far as we – we have no ties.
Q. Are they Department of Energy people, or –
A. I think it's a combination of Department of Energy, EPA, Westinghouse, Bechtel. It's a few groups.
Q. Okay, and the same, site 45, H-Area, again, I cannot read that.
A. "Process posting." It says, "Non-RAD at the beaver dam."
Q. Non-RAD. By non-RAD, what do you mean?
A. In other words, it didn't require us to put a RAD posting there.
Q. Okay. Okay, and then we've got – the next page, we've got site 47, Timms Branch. What is that posted as?
A. Timms Branch is posted as an SCA.
Q. I guess the last one here would be site 53, and what is that posted as?
A. Road Four – I think that's Four Mile, as well.

Page 36

That's posted as a SCA, as well.
Q. Who is responsible for maintaining the signage on the Savannah River Site? If it's posted, who is responsible for maintaining that?
A. RAD-CON organization for RAD-CON signs.
Q. And how is that done? Do you have people checking to make sure they're still in good condition?
A. We have – yes, we have regulatory requirements that say on a certain frequency we have to inspect, survey the area, make sure the perimeter is still intact.
Q. Is that done, to your knowledge?
A. Yes.
Q. Would it surprise you to know that in 1999, in that summer, there were areas where the signs were overgrown or laying on the ground?
MR. SCHROEDER: Objection. Calls for speculation and assumes facts not in evidence.
Q. [Ms. Nichols] I'll ask it a different way. Do you know if there were overgrown – signs that were obliterated by foliage during that time period?
A. During that time period, I do not know. However, it could be possible, yeah.
Q. You were not in charge in 1999, were you?
A. No.
Q. Okay, I'm going to show you Exhibit Plaintiff's

Page 37

Number 1 from the last round of depositions. And this is a Work Clearance Permit on – for work at site 53, which are you familiar with this document at all?
A. Yes. Yes.
Q. Okay. Why would that have – do you know what generated that, or what would normally generate a Work Clearance Permit of that type?
A. Typically, any type of work on Site generates some type of work approval or work clearance.
Q. Well, that particular Work Clearance Permit requires the contractor to be RAD-2 certified, correct?
A. I'm trying to make – that's what it appears to be, yes.
Q. And your testimony is that that site was posted as a soil contaminated area?
A. Yes, that is correct.
Q. Why, in your experience, would a Work Clearance Permit be generated for that particular site when other sites were posted as well and did not require that?
MR. SCHROEDER: Objection. Assumes facts not in evidence.
MS. NICHOLS: Well, we can go back and ask if he required Work Clearance Permits for every other site, but I think that's already in evidence.
A. Like I said before, for entering or performing

Page 38

work in a SCA, it is up to RAD-CON's discretion whether or not they require some type of PPE monitoring or whatever. As I said before, if you're RAD-2 trained, you can wear RAD PPE. That was the requirement for putting RAD-2. It can either be above the contamination area levels, as I said in Table 2-2, Appendix D, or at RAD-CON's discretion. RAD-CON may have had a reason to believe that whatever activity that they were doing here needed some type of PPE, I'm not sure.
Q. Okay. Can I see it just one minute? Did your office, or did your department monitor any of the beaver trappers ever?
A. I'm not sure. I can tell you the current beaver trapper is not being monitored.
Q. The current beaver trapper, would that be Jim Seigler?
A. No.
Q. Someone else doing the trapping?
A. I'm not sure of the individual's name, but that name doesn't ring a bell. But to my knowledge, we're not requiring any monitoring of the individual that's currently doing it.
Q. Were the beaver trappers ever monitored?
A. I'm not sure. I can say that Mr. Hooker was monitored most of the time by TLD, by whole body counts,

Page 39

from '92 to '99. I can say that.
Q. Well, because –
A. His exposure –
Q. – he works for Westinghouse.
A. His exposure was monitored. Yes.
Q. Because he worked for Westinghouse?
A. Sure.
Q. But it had nothing to do with his contracting?
A. Sure. Sure, but he was monitored.
Q. Were the rest of his employees monitored?
A. I'm not sure.
Q. So your testimony is that the current beaver trapper, whoever that may be, is not monitored?
A. To the best of my knowledge, he is not monitored.
Q. Are the hog contractors monitored?
A. To the best of my knowledge, no.
Q. Okay, I'm going to show you what will be marked as Plaintiff's whatever. Well, it's going to be –
[OFF THE RECORD]
MR. SCHROEDER: So, we'll remark Plaintiff's Exhibit 1 from today –
MS. NICHOLS: From today would be 10.
MR. SCHROEDER: Okay.
MS. NICHOLS: And this one, which would

Page 40

normally be Number 2, is going to be Number 11.
Q. [Ms. Nichols] Okay, Mr. Sanders, do you recognize that document?
A. Yes.
Q. Was that prepared by your department?
A. Yes.
Q. Okay.
MS. NICHOLS: Okay, could we mark that then?
[PLAINTIFF'S EXHIBIT 11 IS MARKED FOR IDENTIFICATION]
Q. [Ms. Nichols] And again, this was provided to us through discovery requests, and could you just tell me what this is and how often it's produced, and tell me about it?
A. This is a list of the contamination areas that we currently have within our group. You have the area, facility, building, location. What we do is the inspectors, whenever they survey these areas, they'll put the survey date information and then you need the identifying number for the survey. And this will be completed at the end of the year and goes into records.
Q. So the survey number would go after the 06-SG?
A. Right. Right.
Q. And it's required by Federal Regulations that you provide this?
A. This document here?

Page 41

Q. Um-hum [yes].
A. No.
Q. Or this information?
A. The surveys are required, but not this document here, is not required. This is how we keep track of what's required by the Regulation to go and update and maintain these areas.
Q. And what determines what location is going to get on this list?
A. Anytime an area is established, it'll go onto this list.
Q. Are they listed here in order of importance, or contamination, or is it –
A. It appears to be alphabetical.
Q. Alphabetical? Okay. I don't think we talked about Steed Pond when we were talking about trapping areas, but can you tell me what the contamination – is it – it's all soil contamination at Steed Pond. Is that within the pond, or around the pond?
A. We have six areas that are contamination areas that have boundaries around them on the dry pond. Not in the stream, not at the beaver site location.
Q. Has the beaver site location ever been posted?
A. The beaver site location is posted as a SCA. Matter of fact, it was posted in 1997.

Page 42

Q. Is that on our list?
A. Yes. Number 19.
Q. And that's the trapping location?
A. The area that we have posted as an SCA, not the CAs.
Q. So the pond, itself, is a CA?
A. No, not the – the entire pond. We have – we have – and I – what you have, there's a pond above the culvert that comes in. We have it posted. That was to site 19. The stream comes down towards – well, it goes into the stream, Timms Branch, and you have, like, a dry pond over to the left. The dry pond, not in the streams, has four areas where we've gone in and done some work, and they've excavated down to a certain level. We've identified levels that would require posting as a contamination area.
Q. Not an SCA, a CA?
A. Right. Six small areas.
Q. Would you then –
A. Not at the beaver site.
Q. Not at the beaver site. Would you remove the soil, then, in that case?
A. Would we? No, we haven't removed the soil.
Q. What is the policy then? It's just – because I'm interested. If it is contaminated, you said earlier

Page 43

that a lot of the contaminated soil is removed.
A. If it is – it goes back to these regulatory guides to figure out whether it becomes a waste unit. If it becomes a waste unit, they do whatever they do. Then it becomes remediated if it's at whatever risk level required for these guys.
But the isotope of concern in Steed Pond is depleted uranium. The six CAs that we have currently posted, we could very easily go out there right now and de-post them because they're not required per 835 and 5-
Q. Because we understand what the isotope of concern is now. We took a conservative approach because we didn't understand at the time that the isotope we were dealing with was uranium. So, we really – sometime in the future, it will not be a CA anymore based on the isotope of depleted uranium. The values are a lot less conservative for uranium versus plutonium.
Q. Are they?
A. Yes.
Q. I thought they lasted forever.
A. They do, but I guess – no, I'm not going to guess.
Q. I'm not going to take you through all this because we've talked a lot – about this a lot, but are these – on this list that you have created, are these

Page 44

the only areas where there are soil contamination areas?
Is that the total, totality of the areas?
A. Those are the areas that we have identified as soil contamination areas.
Q. That you have identified as soil contamination?
A. Yes.
Q. Okay. And just for the record, what does SGCP mean on the top?
A. Soil and groundwater completion projects organization. That's our organization.
Q. And RCO is?
A. RAD-CON.
Q. RAD-CON.
MS. NICHOLS: Could we take just about ten minutes?
MR. SCHROEDER: Sure.
MS. NICHOLS: I think I'm done.
[OFF THE RECORD]
MS. NICHOLS: Thank you. I'm finished.
-----
EXAMINATION
BY MR. SCHROEDER:
Q. I just had one question, please, regarding Plaintiff's Exhibit 1, if you have that. It's this Plaintiff's Exhibit 1.

Page 45

A. No, I do not. I do not have that.
MR. SCHROEDER: Could we borrow that for a minute?
MS. NICHOLS: Yes.
Q. [Mr. Schroeder] There's a couple of stars on the left. The second one says, "Note, person entering."
Do you see that sentence?
A. Um-hum [yes].
Q. Would you please read that sentence?
A. "Person entering creek is RAD-2 qualified and a subcontractor to the Savannah River Institute. After entering the creek, RAD-CON OPS will survey protective equipment, waders, gloves, et cetera."
Q. So that doesn't say that the person is required to be RAD-qualified, does it? It just says a person is RAD-2 qualified?
A. "Person entering creek is RAD-2 qualified and a subcontractor to the SR Savannah River Institute." To me, it reads that this particular person is RAD-2 qualified and a subcontractor of Savannah River Institute. That's what it tells me.
Q. So it's a statement of a fact about an individual?
A. And it says, "After entering, we will survey the protective equipment; waders, gloves, et cetera."

Page 46

Now, one other additional item to add to that is out of all these creeks and streams and so forth, we have never had a person's equipment contaminated coming out of these creeks and streams.
Q. So just to answer my question, that does not say that a person is required to be RAD-2 qualified, correct?
A. I do not read it like that, the way it's written here, no.
Q. Thank you.
A. One other clarification on this that I feel necessary is this is authorized for a certain duration. This is not for any time any person goes into this location. This is authorized for certain times for a certain time period. So this is task and time.
Q. Thank you. Nothing further.
MS. NICHOLS: Thank you.
[DEPOSITION ADJOURNED AT 3:45 P.M.]

Page 47

CERTIFICATE

SOUTH CAROLINA
AIKEN COUNTY

I hereby certify that the foregoing deposition was reported, as stated in the caption, by the method of Stenomask and speech recognition, with backup, and the questions and the answers thereto were reduced to typewriting by me or under my direction; that the foregoing pages 1 through 46 represent a true, correct, and complete transcript of the evidence given on the 1st day of June 2006, by the witness, DAVID SANDERS, who was first duly sworn by me; that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I financially interested in the action.
This, the 5th day of June 2006.

ALICE D. BONI, CVR
CERTIFIED COURT REPORTER
NSVRA CERTIFIED

# DEPOSITION OF WILLIAM D. HOOKER - 6/2/06

## HOOKER V. THE UNITED STATES

**Page 1 to Page 46**

9

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*ALICE D. BONI, COURT REPORTER*
*P. O. Box 2474*
*Aiken, SC 29802*
*Phone: 803-648-9434*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY, Plaintiff,

vs. NOS. 03-1501C, 04-1126

THE UNITED STATES, Defendant.

DEPOSITION OF WILLIAM D. HOOKER
taken by Counsel for the Defendant
before Alice D. Boni, Certified Court Reporter
at the offices of Department of Energy
151 Corporate Parkway, Aiken, South Carolina
on Friday, the 2nd day of June 2006
commencing at 9:20 a.m.

ALICE D. BONI, COURT REPORTER

Page 2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF: ROBBIE M. NICHOLS, ESQ.
Attorney At Law
Post Office Box 7925
Hilton Head Island, SC 29938

FOR THE DEFENDANT: RICHARD SCHROEDER, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, DC 20005

LUCY KNOWLES, ESQ.
Westinghouse Savannah River Site
Post Office Box A
Aiken, South Carolina 29802-0900

- - - - -

INDEX TO EXAMINATIONS


| | Page |
|---|---|
| EXAMINATION BY MR. SCHROEDER | 3 |
| CERTIFICATE OF COURT REPORTER | 46 |


- - - - -

EXHIBITS


| DEFENDANT'S | | |
|---|---|---|
| 3 | FIRST AMENDED COMPLAINT | 9 |


(Continued)

Page 2


| | | |
|---|---|---|
| 4 | PLAINTIFF'S RESPONSE TO DEFENDANT'S PARTIAL MOTION TO DISMISS | 28 |
| 5 | COMPLAINT FILED 7/7/04 | 35 |


- - - - -

Page 3

[IT SHOULD BE NOTED THAT Harold Oliver, Brandon Hollingshead, Mark Simpson, Margie Yeaton, Mary-Ellen Noone and Pat Thompson are also present at the deposition.]

- - - - -

WILLIAM D. HOOKER
having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SCHROEDER:

Q. Good morning, Mr. Hooker.

A. Morning.

Q. Before we start, I'll set a few ground rules. If I ask you a question and you don't understand it, please let me know and I'll rephrase it. If you need a break at any time, just let me know and, once we finish the question we're in, you can take a break. If I ask you a question, you're required to answer it unless your counsel objects, at which point you should stop your answer. Counsel and I will resolve the issue and then, you know, you'll either answer it or we'll make other arrangements. Do you understand these rules?

A. Yes, sir.

Q. Are you on any medication or anything similar that would impair your ability to answer truthfully the

Page 8

Shops and they do – lower it into the tanks and we'd fit them up. Pipefitters, you know, fit pipe.
Q. And what year did you work in the tank farm? Or years?
A. I worked in there different times. Early '80s and the last part of my employment with Westinghouse.
Q. Did you use the – and correct me if I say this wrong, dosimeter?
A. Dosimeters were used whenever we were inside fenced-in areas. We also wore TLD badges.
Q. And what does that stand for? TLD?
A. Thermal unit or some dosimetry or something.
Q. When you wore that, and you wore that at the tank farm when you were working?
A. The only time I wore them was in F-Area, 100-R reactor, 3 and 700 Area. I worked in DWPF. For eight years, I did not wear a TW.
Q. Was there a limit to the RAD exposure that you could have in any given year?
A. I think it's 750 a quarter.
Q. A quarter; okay. And that means three months?
A. Every three months. A lot of times what they would do is, if we were doing hot jobs, they would do a – would wait right there at the end of the quarter and we'd let the guys get 750 right there, and then, Monday

Page 9

morning, it would be another quarter and we could give them another 750.
Q. Okay. Is that 750 million?
A. Milirems.
Q. Milirems. I want to just show you a document.
MR. SCHROEDER: Could I get this marked, please? Do you know what number we're at. This is 3? Please mark that as Defendant's 3.
[DEFENDANT'S EXHIBIT 3 IS MARKED FOR IDENTIFICATION]
Q. [Mr. Schroeder] Please look at what has been marked as Defendant's Exhibit 3. Do you recognize that document?
A. Do you know what that top line says right there?
Q. Yeah, it's – if you'll look on page three, that's – we deal with electronic filing in the Court of Federal Claims so that it gets that kind of a stamp on it when it gets filed, so if you want to print it off the Internet, that's how it prints.
A. Yes, sir.
Q. And what is that document, please?
A. William D. Hooker doing business as Georgia Bowhunters Supply, Plaintiff, versus The United States, Defendant.
Q. Now, is that your first amended complaint in

Page 10

Case Number 03-1501C?
A. Yes, sir.
Q. And would you please look at paragraph eight on page two, and would you please read that into the record?
A. "The general specifications for this contract specifically stated that no toxicological hazards are associated with trapping beavers at SRS. However, normal environmental and physical hazards such as snakes and uncertain footing do exist. No specific statement was made involving the culvert cleaning."
Q. And so do you consider that to be correct, that statement?
A. No, sir.
Q. That's not a true statement?
A. It's true to what my contract said, but I know that's not the truth out there right now.
Q. Okay, I'm sorry, do you – yeah, that's what I meant, was is that what the contract stated?
A. That's what my beaver contact stated.
Q. Okay. Would you please state what toxicological hazards you encountered or were exposed to during performance of this contract?
A. Okay, what particular contract are we talking about?
Q. Well, this is the beaver contract, I believe,

Page 11

but – so, first, if you could start with the beaver contract.
A. Okay. The beaver contract started February 10th, 1992, and to my knowledge, it was – everything was – no toxicological hazard. We had actually – Andy had actually asked Homer was anything in the water that we needed to worry about, and he said, "Just don't drink two liters of the water."
Q. Okay, but what I'm asking is what toxicological hazards did you encounter?
A. At my time – at the time, I did not know about the tritium as being released from 100-K on December 24th, 1991. I think it was something like 6,000 curies was actually dumped into Indian Grave and Pen Branch. I didn't know about that. I did not know about all the heavy metals that were identified in 1989 by a group called CRESP, which makes up the CERCLA and RCRA, or the superfund site. I had no knowledge of any of that kind of stuff, that Savannah River Plant had become a superfund in 1989. I didn't know about the 519 hazardous waste sites on the Plant that had been identified by the EPA and CRESP. I had no knowledge of none of that type stuff. Just like Mr. Sanders yesterday said he didn't know what CERCLA was, or that RCRA, I had no knowledge of that type stuff either.

Page 24

me, she'd spread them out, you know, where they were miles apart. You know, the ones that was like, I think, Dunbarton, Youman Road. I'd have to look at the map to know the other two, but they were out, way out. Bridges being out. They were doing bridge work at the time. I'd have to go way out of the way to trap in these locations, you know.

Q. Let's move on, then. Do you still have that document? Please look at paragraph 21. Just read that to yourself, please. I know it's a little hard to read at the top.

A. I can't read the top on mine.

Q. Well, can you see where it says, on the top line, the last word, USFS?

A. I see that.

Q. That's the United States Forest Service, correct?

A. [Indicates affirmatively].

Q. You have to answer. You can't nod; you have to say yes or no so the court reporter can pick it up.

A. I see U.S. Forestry Service should have reformed the contract terms to compensate Hooker for additional expenses, but instead refused to compensate.

Q. Okay. Well, that's what I was going to ask you to read; thank you. What additional expense are you

Page 25

referring to?

A. For doing the work in HP-52.

Q. Okay, but you say additional expense and I'd like to know specifically what expenses.

A. Well, when I bid these contracts, I bid them as – just like we was working in this room, clean. If you're doing radiation contamination type work, you're going to have to have a stand-by person, you have protective equipment. You've got to have health protection people there.

Q. And so what you're saying is that the additional expense is all those kinds of things that you just mentioned?

A. I mean I didn't work by the hour. These people work by the hour. They go to work at 8:00 and my contract said 24 hours a day, seven days a week, and –

Q. Well, what's the additional expense. I mean this is your complaint and that's a statement in your complaint against the Government. What is the additional expense?

A. Being on a time schedule. I don't – I don't – I got paid by the head. I did not get paid to be there at 8:00 in the morning.

Q. All right, so are you saying that you had to have additional equipment, or something like that, or –

Page 26

A. Yes, you have to have protective – who's going to buy the plastic suits, or -

Q. Did you have those? Did you go out and buy those?

A. No, sir. No, sir.

Q. So, are you – that's what I'm trying to understand. If you didn't buy it, then how can you bill the Government for it? I mean, that's not additional expense you had, it's one that you think you should have had, correct?

A. You should have protective clothes. I shouldn't have been wearing the same clothes that I take home to my wife to let her wash and somebody's dumped

48

tons of depleted uranium, or uranium in Timms Branch and these beaver ponds.

Q. Okay, but the question I'm having is what the – you know, if you didn't buy the protective clothes, then you can't – you know, regardless of what other issues you might have, you can't bill the Government for clothes that you didn't buy, right?

A. Why not?

Q. Because you didn't buy it. You think the Government should –

A. I should have had them. Are you saying I shouldn't have had protective clothing?

Page 27

Q. No, what I'm saying is – well, you have the complaint here in which you're saying that you incurred additional expenses. You know, if you had a car and then it turned out that, you know, the road was bumpy and you needed a truck, but you never went to – you never bought the truck, do you think you can sue the Government to buy you a truck now even though you never used the truck?

A. No.

Q. Okay, so that's what I'm saying, those kind of expenses.

A. My contract said normal environment, and –

Q. But what I'm trying to do is, you have a specific item in your complaint for which you're seeking money damages –

A. Yes, sir, for the dogs –

Q. – additional expenses, and I want to – what I want you to list me now is what additional expenses so that we know what you're talking about and then, you know, can defend this case.

MS. NICHOLS: Can we go off the record just a minute?

MR. SCHROEDER: Sure.

[OFF THE RECORD]

Q. [Mr. Schroeder] I'll try to get through this quickly. What other additional expenses? What

Page 28

additional expenses are you claiming, or were you claiming?
A. For doing the RAD-worker work?
Q. Well, for doing – you know, what were you referring to in paragraph 21 of your first amended complaint?
A. Well, I can't answer that right now.
Q. I want to hand you another document. Just take a look at this.
MR. SCHROEDER: Would you please mark that?
DEFENDANT'S EXHIBIT 4 IS MARKED FOR IDENTIFICATION]
Q. [Mr. Schroeder] What's the exhibit number on that? Four?
A. D-4.
Q. Just briefly look at that and let me know if you recognize that document, please.
MS. NICHOLS: I'm going to object because Mr. Hooker has never seen this as far as I know.
A. I haven't seen this.
Q. [Mr. Schroeder] What is the document – what is it titled?
A. "Plaintiff's Response to Defendant's Partial Motion to Dismiss."
Q. And what's the date on it, please?
A. February 5th, 2005.

Page 29

Q. Would you please turn to page seven of that document? Have you ever seen that document before?
A. I don't believe I have.
Q. Okay. In any event, turn to page seven.
MR. SCHROEDER: Before we get into this, let's just take a short break, if we could.
[OFF THE RECORD]
Q. [Mr. Schroeder] If you please look at page seven. Do you see where it says, in the middle of the page, "So if Hooker had seen the correct language and requirements in the proposal for bids, he would have increased his price per hour, as well as price per beaver, to account for the increased risk and cost of protective clothing and extra training"?
A. Yes.
Q. I mean, you know, first of all, is that – I mean part of the increased costs for protective clothing and extra training, is that no longer part of this case? Is that my understanding?
A. If I – I mean, this is the first time I've seen this, but if I knew that we was working in CERCLA and RCRA sites, or soil contamination sites, or contaminated areas, the fee to catch those beavers would have been tenfold, five times, ten times what I bid. When I originally bidded contracts with the U.S.

Page 30

Forestry, I bid $99 a hog – I mean $99 a beaver. I was called in by Homer Gabard and asked to lower the bid, which I did, to $75 just to catch a normal beaver. The contract was 1992.
Q. Okay, so you said that you would have increased the price per beaver and the price per hour, and what is the price per hour referring to?
A. Because the people that are required, the health protection personnel, the supervisors, they don't work seven 24s, okay? Somebody's going to have to be there with me, okay? I got paid by the head, not by the hour, okay?
Q. Right.
A. Training. RAD-worker training, I think, is a two- or three-day class. Somebody's got to pay that beaver trapper to sit there two or three days, eight hours.
Q. Did you actually have those expenses in this contract?
A. No, sir.
Q. You did not; okay. Now, you said you would increase your price per beaver.
A. Right.
Q. To how much?
A. I'd have probably charged three or four hundred

Page 31

dollars to catch a nuclear beaver, to go through the normal – having somebody geiger-count the beaver, smear him as they do. I mean how you normally do hazardous waste, when they get that shovel full of contaminated dirt and take it over there to the burial ground. What's it cost to do that? I mean that beaver that come out of that hazardous waste site is just as damn dirty as that dirt. He eats the plants that are contaminated, he drinks the water, he lives in them banks where that stuff is soaked in, and then I'm hauling him around in my enclosed truck that I ride my kids around in after I get off work.
Q. But your price per – so the price per beaver, the higher price per beaver that you were speaking of has to do with increased expenses that –
A. Right.
Q. – you would have incurred, right?
A. Would you – well, let me ask you this.
Q. No, I'm not going to answer questions, but –
A. I would not use the same truck that I drive my young'uns around in to haul them goddamn beavers around.
You understand?
Q. But my question is but you didn't incur those expenses. In other words, you're saying you –
A. I didn't know.

Page 32

Q. – would have charged more money.
A. I did not know.
Q. But how does that entitle you to – if you didn't incur the expenses, do you understand you can't get damages based on expenses you didn't incur? That's all I'm saying. I mean, you know, if you didn't have those extra people and you didn't have to pay higher hourly rates, then, you know, you shouldn't be –
A. Then the Government really done a good job of screwing me over on these contracts, knowing that they knew from 1989 that these sites were superfund sites, or operable units. They knew. DOE knew it from 1989, when that plant became a superfund.
Q. So you said you would have charged a few hundred dollars per beaver?
A. I would have done it correctly. It ain't going out there in the normal pair of blue jeans or a leaking pair of waders, a pair of tennis shoes, cutoff blue jeans, and then going home and taking it to my wife and letting her wash these clothes in a –
Q. So what are the – of your increased prices, then, what are the components of that?
A. Everything would have been different, would have been done correctly. Okay, just like Four Mile Creek when I walked up there with that – let's just take

Page 33

Steed Pond, for instance. The day that NIOSH wanted to – I wanted to go in Steed Pond, we were going to have to dress our in coveralls. Westinghouse was going to provide the coveralls. They're going to have a step-off pad, not a plastic bag like I used. They had rinse cans there that they provided. They weren't going to use the drinking water that I went to my cooler and got.
Q. Okay, so, again, back – do you have an estimate that you've actually made of how much you would charge?
A. No, sir. I could probably sit down and – if I could find – I think WMS, Work Management System, out there at the Plant, I think it does have a system in there for bidding hot work. You might could – I mean you know the system.
Q. So, the – you're not sure of how much you would have charged?
A. I would have to go on there – like I say, Navy estimating has a – when I was estimating jobs at the Plant for Westinghouse, they did have a factor that they figured for hot work.
Q. Okay, well, let me ask this question. How much – you know, let's say – you haven't estimated how much you would have charged, but how much are you seeking in this complaint per beaver?

Page 34

A. I'd like to get as much as I can because I've lost everything I own.
Q. So you don't have – what you're saying is you don't actually have an amount in mind that –
A. I would like to get it –
Q. I don't want to ask about the settlement or anything. What I'm asking you is how much, you know, you think that you're entitled to per beaver.
A. I think at least five times what I requested, what the contracts were awarded – I mean – I mean it's water over the bridge now because the work's done, the beavers are dead, and they're planted.
Q. Yeah, so you understand that –
A. Okay, so the Government got off real light, far as I'm concerned.
Q. Are you expecting – I mean there's certain sites that were, as far as you know, not contaminated, correct?
A. Far as I'm concerned, after all the reading I've done at University of Aiken and – the entire Site is a superfund site. There's 519 hazardous waste sites that a lot of them are not fenced in. Some of them are just spills, but some of them, the Government's drawing millions and millions of dollars to clean up. In the eight years that I worked in a lot of them, there wasn't

Page 35

no cleaning up. HP-52 wasn't cleaned up. Site 43 wasn't cleaned up.
Q. So are you seeking the increased cost per beaver only from the soil contaminated areas, the CERCLA areas, these contaminated sites?
A. I would like to be compensated for the entire Site because if I'd knew the Site was a superfund, I'd have charged a lot more.
Q. Okay, and I'm going to ask this same – I'm going to ask you to look at this next document, which is something I think you recognize here.
MR. SCHROEDER: Would you please mark that?
DEFENDANT'S EXHIBIT 5 IS MARKED FOR IDENTIFICATION]
Q. [Mr. Schroeder] And that's Exhibit 5. I should you what's been marked Defendant's Exhibit 5. Take a look and please let me know if you recognize that document.
A. Would you like me to read it?
Q. Just whatever it takes for you to know whether you've seen that before.
A. I've seen this one.
Q. Okay, and what is it?
A. Yes, I've seen it.
Q. What is that document, please?
A. William D. Hooker, doing business as Georgia

Page 36

Bowhunters, Plaintiff, versus The United States, Defendant.
Q. But it doesn't – actually, the document doesn't have a title. Is that the complaint in Case Number 04-1126-C?
A. Yes, sir.
Q. Okay. If you please, turn to paragraph seven, or page seven, down toward the bottom.
A. Page seven down toward the bottom?
Q. Right where it says, "Wherefore." Do you see where it says, "Wherefore, having stated his amended complaint, Hooker requests that this Court award him damages as follows"?
A. Yes, sir. Yes, sir.
Q. And you see "D) A price adjustment per hog under the contract due to the contamination of the work environment"?
A. Yes, sir.
Q. And is that – is your argument similar to your beaver argument on that?
A. Yes, sir. These – Par Pond was drained in, what, '91? '92? And we didn't know about the mercury or the cesium or other heavy metals that are listed in some of the documents that I found.
Q. So you're seeking a price adjustment per hog.

Page 37

How much price adjustment are you seeking?
A. I would – I would have trapped them hogs for five or six hundred dollars.
Q. Well, I mean, but again, that's because – is that because you would have had to incur all these additional expenses?
A. Right.
Q. But since you didn't incur them, you're not entitled to charge for those expenses, correct?
A. I'm not going to say yes because I disagree with you. I mean I'm not going to haul a contaminated animal in the truck that I haul my kids in.
Q. Okay, so how much in this complaint are you seeking, then? You know, putting – taking into account –
A. Five times what the contract was worth.
Q. Okay. When did you first become aware that there was a contamination problem or issue at these sites where you were working?
A. February – whatever the date is on that Work Clearance Permit is what started me asking questions.
Q. Okay, so February 1999. Does that sound about right?
A. Is that the date I signed that WCP?
Q. I don't know. Do we have – let me just show

Page 38

you a document, hoping that this will refresh your recollection. We don't need to mark it. It's already marked Plaintiff's Exhibit 1.
A. I recognize this.
Q. Does that refresh your recollection regarding when you first became aware of the contamination issue?
A. Yes, sir. I was authorized to put somebody in that creek on 2/22/99 at 12:00 through 3/22/99 at 1500. That was the duration of this permit. But this permit also fails to identify the hazards that was in that creek, where it says, like, lead, mercury down in here and contaminant common hazards. And then they'll have procedures that you're supposed to go by off to the right over here, like if we'd have knew the mercury was in there, in the creek, or in the settlement – I mean I used my personal clothes. Again, we shouldn't have used personal – my personal clothes, my personal waders. They should have been supplied by Westinghouse.
Q. Okay, so when did you first notify the Forest Service that you were concerned about, you know, this contamination issue?
A. The exact date, I'm not – I'm not sure of that. I'd have to look at the – maybe Frankie's got it in her diary.
Q. Did you notify them in writing? Do you recall

Page 39

that?
A. No, it was strictly verbal. But this is what opened the door, right here. I mean if I had to be RAD-2 qualified to be in that creek, I knew there was something in that creek that I hadn't knew about. And that's all I was trying to do, was find out what was in these creeks that I worked these men in that had no training. Some of these men had training from Westinghouse or Bechtel, but ain't none of us would have got in anything that would have hurt us knowingly.
Q. So when you first notified them – when did you first notify them that you thought you were entitled to a price increase as a result of this situation?
A. I'd asked Frankie to find out what was in the creeks a couple of times and she never got back with me on it. And so I went in the system and started looking up by key words, and that's how I started. And that's what – and I wanted the Forestry to address the issues, but they never would address the issues.
Q. But my question is did at some point you say to them, "I'm entitled to more money"?
A. That was before the June 1st video'ing of that HP-52. I knew by then that I'd – I didn't know about all the sites, I just knew that Four Mile Creek, I shouldn't have been in it.

Page 40

Q. Did you notify them in writing at some point that you thought you were entitled to more money?
A. I'd went to Homer and requested more money to do the job at HP-52 and –
Q. Verbally?
A. Verbally, looking him dead in the eye just like I'm looking at you.
Q. Aren't you supposed to request – in a Government contract, aren't you supposed to make such –
A. My contract, I had verbals. I could work off verbals. I worked off verbals for eight damn years.
Q. Okay. What is the total amount that you now claim that you are entitled to in damages in this case – in these two cases?
A. After being laughed at, humiliated, marched through buildings and – with a group of attorneys coming up to the floors and making fun of us, all the lying that's been done, covering up, I expect a lot. I'm going to tell you the truth, I –
Q. But, I mean, you don't have a claim for people – what were you saying? People poking fun at you? Is that what you're –
A. Oh, yeah, they've had their – you know –
Q. But you don't have a claim for that in this case. I'm talking about these cases here.

Page 41

A. I would think it would come under bad faith if you've got a good contractor trying to find out what he had worked men in, good men in, and then everybody thinks it's a big damn joke. I don't think it's a joke to this day, and maybe the Government by now doesn't believe that I'm still joking. I didn't bid contracts to work in uranium. I didn't bid contracts to work in any kind of stuff that had heavy metals in it. I didn't bid contracts to haul crap around in my truck that needed to be in a burial ground.
Q. Okay, I understand, you know, your argument, but you have two complaints here and the claims in these complaints, the ones that haven't been dismissed is what is before the Court, and what we're trying to determine is, you know, here we are at the end of discovery, these cases have been going on for –
A. Six years.
Q. – six years, or three years, or four years, and, you know, what we need is an accounting of what the damages are.
A. I would like to get – I would like to get paid five times what I had bid my contracts for. And then whatever the bad faith is, I mean we can go back through and read every little laugh and giggle that was put up by the little plays that DOE and Westinghouse and Bechtel

Page 42

put on to NIOSH. We can go through the whole little hurrah again, you know.
Q. You say something about dogs that you had.
A. I had to buy dogs.
Q. And why did you have to buy dogs?
A. Because the men that owned the dogs, they were barred forever for working at Savannah River Site by Homer Gabard.
Q. So you bought those dogs?
A. I bought those dogs.
Q. And did you – how much did you pay for those dogs?
A. I'd have to go back and look at the receipt.
Q. Now, were you paying those men? The men?
A. The men? What men?
Q. The Ellers, I believe?
A. Yeah, I paid them – I think it was between 36 and $40 a head per hog.
Q. Okay, and so you had to buy the dogs.
A. Right.
Q. And then, you know, who used the dogs?
A. I used the dogs until I could get men that were approved by Homer Gabard, but Forestry had lost the resumes that I submitted on one particular man. Contraband passes for myself had been – the numbers had

Page 43

been put in wrong.
Q. What happened to the dogs?
A. They're dead now.
Q. What happened that they're dead?
A. They just died. I mean –
Q. So you didn't try to sell them, or –
A. No, I give them dogs back to Goldman Eller.
Q. Okay.
A. I could not – I was – had been beat down by the Government, or Westinghouse and U.S. Forestry Service, that I couldn't even buy dog food for those dogs.
Q. So you gave those dogs back?
A. So I gave those dogs back to Goldman Eller.
Q. Did you ever use them on any other job?
A. No. Them dogs never hunted nowhere but Savannah River Site.
MR. SCHROEDER: Let's take maybe 15 minutes, and then I can wrap this up.
MS. NICHOLS: Fine.
[OFF THE RECORD]
Q. [Mr. Schroeder] Mr. Hooker, in 1997, did you and Mr. Cromer talk about the soil contamination, or SCA sign, at Steed Pond Road?
A. Yes.

Page 44

Q. And did you bring that to the attention of the Government at that time?
A. I did not.
Q. Did that concern you?
A. Not at the time.
Q. Why not?
A. I was working at the other end of the Plant. Andy has signature authority on the contracts just like I did, and he handled it, far as I knew.
Q. Well, was work done in that area thereafter?
A. What I recall was Frankie told me not to go back into Steed Pond. I believe that's exactly what I was told. Like I said, I was working at the other ends of areas.
Q. Okay, now, when you were –
A. And I was not told it was a – the exact words that you used. It was – there was some signs up about contamination or something. I don't recall exactly what was, but I knew that Andy and Frankie had talked about it. Frankie had made a decision for us not to go back into Steed Pond.
Q. Okay, now, when you worked at the Site, the Savannah River Site, and you traveled around the Site, correct?
A. Yes, sir.

Page 45

Q. And did you notice signs posted warning of contaminations during your travels through those areas from 1997 on?
A. The work areas had no signs up.
Q. None of them?
A. None of my – none of my sites had the sites worked up. I did not see the contamination signs at site 19 until I went back and started video'ing all the sites.
Q. Now, you said earlier something to the effect that the beavers were as dirty as the soil and you called them nuclear beavers.
A. Yeah. Well, what would you call them?
Q. Well, my question is how do you know they were as dirty as the soil? How do you know they were contaminated?
A. Well, they're living in it. I mean if you was living in a bucket of shit, you'd smell like shit.
Q. So you're just – this is an assumption, isn't it, then? You're making an assumption that they were –
A. That's assumption, yeah.
Q. All right. Okay, I don't think we have any further questions at this time.
MR. SCHROEDER: Unless you have?
MS. NICHOLS: No.
[DEPOSITION ADJOURNED AT 10:55 A.M.]

Page 46

CERTIFICATE

SOUTH CAROLINA
AIKEN COUNTY

I hereby certify that the foregoing deposition was reported, as stated in the caption, by the method of Stenomask and speech recognition, with backup, and the questions and the answers thereto were reduced to typewriting by me or under my direction; that the foregoing pages 1 through 45 represent a true, correct, and complete transcript of the evidence given on the 2nd day of June 2006, by the witness, WILLIAM D. HOOKER, who was first duly sworn by me; that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I financially interested in the action.
This, the 10th day of June 2006.

ALICE D. BONI, CVR
CERTIFIED COURT REPORTER
NSVRA CERTIFIED