IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a<br>GEORGIA BOWHUNTERS SUPPLY,<br><br>Plaintiff<br><br>vs<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 03-1501C, 04-1126<br>Judge Allegra |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims, plaintiff, William D. Hooker, respectfully submits these responses to the proposed findings of uncontroverted fact.

**A. <u>The Savannah River Site</u>**

1. The Savannah River Site ("SRS") is a large area about the size of Rhode Island and is located in Aiken, Barnwell and Allendale counties, South Carolina. Brian Hennessey Decl. 1, ¶ 2

**The plaintiff objects to Brian Hennessey's declaration because Mr. Hennessey was never identified as a witness in this case; plaintiff had no opportunity to depose him.**

2. SRS, which is owned by the United States, contains a number of complex and unique nuclear facilities. Hennessey Decl. 1,¶2.

**Please see objection to No. 1.**

3. These facilities produce radioactive isotopes used for defense, space exploration and medical purposes. Hennessey Decl. 1, ¶2.

**Please see objection to No. 1.**

4. The Department of Energy's ("DOE") Savannah River Operations Office has responsibility for the oversight of SRS, including waste management and environmental remediation activities conducted at the site. Hennessey Decl. 1, ¶1

**Please see objection to No. 1.**

5. Only a small portion of SRS is used for nuclear, waste management, environmental clean-up and administrative facilities; the remaining acreage is forested. Hennessey Decl. 1, ¶5.

**Please see objection to No. 1.**

6. In 1989, DOE entered into a Management and Operating contract with the Westinghouse (now Washington) Savannah River Company ("WSRC") to operate the SRS facility. Hennessey Decl. 1, 6.

**Please see objection to No. 1.**

7. DOE has contracted with Wackenhut Services Inc. to provide security services for SRS. Hennessey Decl. 1, ¶7.

**Please see objection to No. 1.**

8. The United States Forest Service is an element of the United States Department of Agriculture and has responsibility for the nation's public forests. Frankie Brooks Decl. 1, ¶1.

**Agree.**

9. Because of the Forest Service's expertise in forest and natural resources management, DOE has an interagency agreement with the Forest Service to manage the natural resources at SRS, including timber and wildlife management. Brooks Decl.¶2.

**Agree.**

10. DOE entered into a Federal Facilities Agreement on August 16, 1993 with the United States Environmental Protection Agency ("EPA") and the South Carolina Department of Environmental Control ("SC DEC") for the clean-up of SRS. Hennessey Decl.2,¶10.

**Please see objection to No. 1.**

11. This agreement requires DOE to study all areas, that is, all "operable units" at SRS that contain hazardous, mixed (hazardous and radioactive), or radioactive waste at SRS and to propose remedial action. Hennessey Decl. 2,¶10.

**Please see objection to No. 1.**

12. EPA and SC DEC must review all studies DOE prepares and must agree to the remedial action proposed by DOE; EPA and SC DEC also must agree to the closure of the particular operable unit. Hennessey Decl. 2, ¶13.

**Please see objection to No. 1.**

13. The characterization of operable units started well before 1989 and is mostly completed. Hennessey Decl. 2, ¶13.

**Please see objection to No. 1.**

14. DOE, EPA and SC DEC have agreed to the priority for the cleanup of operable units according to published criteria; clean-up decisions are made according to the risk from long term exposure to the chemicals in operable units. Hennessey Decl. 3, ¶14.

**Please see objection to No. 1.**

15. DOE assumes that long term exposure is 2000 hours per year for 25 years, consistent with industrial exposure using EPA risk assessment methods. Hennessey Decl. 3, ¶14.

**Please see objection to No. 1.**

16. Most of the operable units containing hazardous, radioactive or mixed waste are in or near the nuclear facilities, that is, the reactor areas, C-Area, K-Area, L-Area, P-Area and R-Area, and the chemical separations areas, F- and H- Areas. DOE and WSRC have used process knowledge, detailed records, and environmental monitoring data from the beginning of SRS to identify operable units. Hennessey Decl. 3, ¶15.

**Please see objection to No. 1.**

17. All operable units are clearly marked. Hennessey Decl. 3, ¶14.

**Please see objection to No. 1.**

18. DOE conducts a comprehensive monitoring program for hazardous chemicals and radioactivity in the environment, including air, soil, water and wildlife. Hennessey Decl. 3, ¶16.

**Please see objection to No. 1.**

19. DOE takes more than one hundred water samples per year for the purposes of environmental monitoring and cleanup investigation. Hennessey Decl. 3,¶17.

**Please see objection to No. 1.**

20 Specifically, for the period 1992 through the third quarter of 1996, water quality measurements and analyses were performed monthly at all locations (156 samples/year); metal analyses were performed quarterly at all locations (44 samples/year); and pesticides/herbicides analyses were performed monthly from selected locations (50 samples/year). Hennessey Decl. 3, ¶17.

**Please see objection to No. 1.**

21. For the fourth quarter of 1996 through the year 2000, water quality and metals measurements and analyses were performed monthly (180 samples/year), and pesticies and herbicides analyses were performed quarterly at all locations (60 samples/year). Hennessey Decl. 4, ¶18.

**Please see objection to No. 1.**

22. The EPA is the Federal agency responsible for issuing primary drinking water standards. Hennessey Decl. 4, ¶18.

**Please see objection to No. 1.**

23. According to the non-radiological surface water surveillance table from the 1999 Savannah River Environmental Report, in 1999, all contaminants in the SRS surface water were below the respective primary drinking water standards, with one exception, lead. Hennessey Decl. 4, ¶18.

**Please see objection to No. 1.**

24. In April of 1999, at Tinker Creek at Kennedy Pond Road, a slightly elevated level of lead (.016 mg/L vs .015 mg/L was found. Hennessey Decl. 4,¶18.

**Please see objection to No. 1.**

25. WSRC oversees deer and hog hunts for members of the public. Hennessey Decl. 4,¶19.

**Please see objection to No. 1.**

26. Each animal is monitored for radiation contamination before it is released to the hunter; any animal exceeding stringent DOE limits will not be released to the hunter. Hennessey Decl. 4, ¶19.

**Please see objection to No. 1.**

27. Since the beginning of the monitoring program, only one deer has exceeded DOE's stringent limits. Hennessey Decl. 4, ¶19.

**Please see objection to No. 1.**

**B. <u>The Hog Contract</u>**

28. On October 29, 1997, Mr. Hooker, d/b/a Georgia Bowhunters Supply, was awarded an indefinite quantity (requirements) contract for hog trapping. Contract No. 53-4660-8-04 (the "Hog Contract"). A47,A63.

**Agree that the this contract was an indefinite quantity contract for hog trapping.**

29. The purpose of this contract was trap and remove hogs causing damage at SRS. See Brooks Decl. ¶5.

**Agree.**

30. The contract term was for one year, with two option years that the Government could exercise in its discretion. A53,A64.

**Agree.**

31. According to Mr. Hooker's technical proposal, submitted during the pre-award process, Mr. Hooker and three employees, Andy Cromer, Goldman Eller and Mike Eller, were to staff the Hog Contract. A42.

**Agree.**

32. According to the proposal, Mr. Hooker would hunt and trap hogs by using hog traps and by hunting hogs with specially trained and experienced hog dogs. A43.

**Agree.**

33. Mr. Hooker represented that he had a total of 97 "trail", "bay" and "catch" dogs available for contract work. A43.

**Agree.**

34. Mr. Hooker bid $55 per hog for the base period and each of the two option periods. A53.

**Agree.**

35. The minimum <u>estimated</u> quantity for the base period and the two option periods was 200 hogs. A53.

**Agree.**

36. The Hog Contract provided that Mr. Hooker was responsible for providing all supplies, equipment, personnel and dogs, which were to be trained to hunt hogs only. Gen. Spec. C.1.A., A55.

**Disagree. Mr. Hooker was not responsible for providing the hog traps, which were the property of the government.**

37. Mr. Hooker was responsible for providing dogs with rabies vaccinations. Tech. Spec. C.2.B.2, A57.

**Agree.**

38. Mr. Hooker also was responsible for having replacement dogs available during the course of the contract so as not to cause delay in the use of the dog hunting technique in the event that a dog was killed or lost. Tech. Spec. C.2.B.9, A58.

**Agree.**

39. Mr. Hooker and his employees were required to submit to monitoring by Westinghouse Health protection personnel after trapping in specified areas. Tech Spec C.2.E.4, A60.

**Agree that the specifications so required, but neither Hooker or his employees were ever monitored.**

40. Mr. Hooker and all of his employees also were required to attend environmental, safety and health orientation before starting work at SRS and before receiving a SRS site access badge. Tech. Spec. C.2.F.4,A61.

**Agree.**

41. The Hog Contract further provided that other personal protective equipment may be required. Tech. Spec. C.2.G.11,A62.

**Agree that this specification states "Other personal protective equipment may be required for any other special equipment in use on this contract."**

42. The Hog Contract stated as follows:

> This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.
> Hog Contract, Sec. I.7, Indefinite Quantity (FAR 52.216-22)(Oct 1955),A63.

**Agree.**

43. On October 1, 1998, the parties modified the Hog Contract to reflect that the first option was being exercised and that the contract term was extended until September 30, 1999. A151

**Agree.**

44. On September 4, 1999, the parties entered into a modification effective October 1, 1999, which extended the Hog Contract to "October 31, 1999 or until a new contract is awarded." Modification No. 4, A65.

**Agree.**

45. The Hog Contract contained a provision stating that the "total duration of this contract, including the exercise of any options…shall not exceed 36 months or three years." A64, Sec. 1.8.c.

**Agree.**

46. On January 5, 2000, Mr. Hooker turned in all the Government property assigned to him, except for six panels and two gates that were missing from the hog traps. A319.

**Agree.**

47. Mr. Hooker submitted a final invoice for trapped hogs. A320.

**Agree.**

48. According to Andy Cromer, one of Mr. Hooker's employees, "we just quit going out there." Cromer Deposition ("Dep."), p. 31, at 11-12, A253.

**Agree.**

**C. <u>The Beaver Contract</u>**

49. On January 22, 1999, the Forest Service awarded Mr. Hooker a requirements contract, Contract No. 53-4660-9-06 (the "Beaver Contract"), to trap beavers. A74-75.

**Agree that the contract was to trap beavers, it also specified certain hours of culvert cleaning** .

50. The purpose of the contract was to remove problem beavers whose activities had flooded timber sites, and blocked culverts. A86-87.

**Agree.**

51. The contractor was also responsible for clearing beaver dams and debris from the blocked culverts. A87

**Agree.**

52. Pursuant to the contract, Mr. Hooker trapped beavers using baited traps set in water. A69-A86.

**Disagree. These traps were also set into the banks of the streams.**

53. In his technical proposal for the Beaver Contract, Mr. Hooker listed himself, Mr. Cromer and Mr. Eller, Sr. as the project personnel for this contract. A69.

**Agree.**

54. Mr. Hooker bid $45 per beaver and $18 per hour of culvert cleaning for the base period from the date of contract award to December, 1999. A80.

**Agree.**

55. Mr. Hooker also bid $45 per beaver and $18 per hour of culvert cleaning for Option period 1. A80.

**Agree.**

56. The Beaver Contract provided as follows:

> Estimated quantities are intended as a good faith estimate of the quantities to be ordered. However, the Government is not obligated to order any work to be performed under the resulting contract for either the base period or the option period. Reference FAR Clause 52.216-21 "Requirements"
>
> Contract Schedule, Sec. B. Requirements (FAR 52.216-22)(Oct 1955) A81.

**Agree.**

57. Each task order under the Beaver Contract was to include "maps showing where the work was to be performed." Contract Schedule, Sec.B,A81.

**Agree.**

58. The Beaver Contract also contained a requirements clause – similar to the requirements clause in the Hog Contract – that provided as follows:

> This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities or supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

Beaver Contract, Sec. 1.7, A83.

**Disagree. The Hog Contract did not contain a requirements clause.**

59. The Beaver Contract authorized the Government to direct the contractor to use safety equipment, in addition to the equipment specified in the contract. Tech. Spec. C,A87.

**Agree.**

60. The Beaver Contract provided that "no toxicological hazards are associated with beaver trapping at SRS; however, normal environmental hazards such as snakes and uncertain footing do exist." Tech. Spec. C.4,A87.

**Agree.**

61. The Beaver Contract did not define “toxicological hazard”. A74-A87.

**Agree.**

62. “Toxicology” is the “science of poisons and their antidotes”; a “toxin” is “any of various unstable poisonous compounds produced by some micro-organisms and causing certain diseases." ”Snake venom is an example of a toxin. Webster's’New World Dictionary, 1505 (2nd ed., 1974).

**Plaintiff neither agrees nor disagrees with this “uncontroverted fact”, but disputes its relevance to this litigation as it has not appeared previously in any discovery responses or requests.**

63. “Radiation is the act or process of radiating, specif., the process in which energy in the form of rays of light, heat, etc. is sent out through space from atoms and molecules as they undergo internal change.” Webster’s New World Dictionary, 1170 (2nd ed. 1974).

**Please see response to No. 62.**

64. “Contaminants” is defined as “to make impure, infected, corrupt, radioactive etc. by contact with or addition of something…” Webster’s New World Dictionary, 306 (2nd Ed. 1974)

**Please see response to No.62.**

65. The Beaver Contract limited Mr. Hooker to trapping only in areas directed by Forest Service Personnel. Tech. Spec. A, Beaver Trapping, A86.

**Agree. Hooker, Cromer, and Brooks all agreed that this was not always in writing, but could be a verbal directive.**

66. Specifically, the Beaver Contract provided that “selective trapping shall be conducted only in critical areas identified by the Savannah River Institute personnel” and that “[t]he contractor will only trap the areas designated by the Contracting Officer’s Representative (COR), Inspectors or Contracting Officer. Tech. Spec. A, Beaver Trapping, A86.

**Agree.**

D. **<u>Mr. Hooker’s Other Work Experience at SRS</u>**

67. Mr. Hooker worked at SRS from June 1976 to March 2000. Hooker Dep. p.7 at 1-2, A297.

**Agree.**

68. Mr. Hooker primarily worked as a pipefitter and plumber in the F-and H-Area tank farms where the nuclear waste from the chemical separations facilities were stored. Hooker Dep. p.7 at 13-25 and p.8 at 1-21, A297.

**Agree.**

69. Mr. Hooker worked in nuclear facilities at SRS after he left the tank farms; the Tritium facility and L-Reactor, which was being rebuilt. Hooker Dep. p. 12 at 9-13. A288.

**Agree.**

70. For his work at the Tritium facility, Mr. Hooker had to “dress out” in a plastic suit with an air hose and he had to be cut out of the suit when he finished working. Hooker Dep. p.9 at 4-11, A298.

**Agree.**

71. Mr. Hooker worked at the Defense Waste Processing Facility "DWPF" at SRS when the work was clean. Hooker Dep. p. 7 at 7-21. A298.

**Agree.**

72. Mr. Hooker left SRS to work for Georgia Power at Plant Vogtle, a nuclear power generation facility, and Turkey Point, a nuclear generation facility in Florida. See Hooker Dep. p. 12 at 16-23, A298.

**Agree.**

73. Mr. Hooker knew the radiation requirements when he worked at SRS. Hooker Dep. p.16 at 20-25 and p.17 at 1-2. A299-300.

**Agree that Hooker had GET training, RAD worker training, and HAZMAT training when he worked for Westinghouse.**

74. Mr. Hooker was familiar with radiation control signs, including, Soil Contamination Area, Underground Radioactive Material, Radiological Buffer Zone, Radiation Area, High Radiation Area, and Contamination Areas, from his work with WSRC because he had seen them inside the fenced-in areas. Hooker Dep. p. 21 at 1-25 –p.22 at 1. A301.

**Agree. However, Hooker testified that he had not seen them outside the fenced-in areas until he saw the SCA sign at HP-52.**

75. Mr. Hooker wore a dosimeter for his work with WSRC; the only time he was ever told that he had a high reading was in 1977, when he was an apprentice in H-Area tank farm. Hooker Dep. p. 41 at 1-25 – p.42 at 1.

**Agree.**

76. Mr. Hooker's clothes from the 1977 incident at H-Area tank farm were contaminated and had to be buried. Hooker Dep. p. 41 at 12-21. A306

**Agree.**

**E. <u>Mr. Hooker's Other Contracts with the Forest Service</u>**

77. These contracts were not the first contracts Mr. Hooker had with the Forest Service at SRS. Hooker Dep. p.16 at 7-13, A299.

**Agree.**

78. His first contracts with the Forest Service for hog control and beaver trapping began on February 10, 1992. Hooker Dep. p.16 at 7-13, A299.

**Agree.**

**F. <u>Mr. Cromer's work experience at SRS</u>**

79. Andy Cromer worked with Mr. Hooker trapping beavers when Georgia Bowhunters Supply was first awarded the beaver contract. Cromer Dep. p. 21 at 11-16, A251.

**Agree.**

80. Mr. Hooker and Mr. Cromer were partners in Georgia Bowhunter Supply until 1997. Cromer Dep. p. 31 at 23-25. A253.

**Agree.**

81. Mr. Cromer continued to assist Mr. Hooker when Mr. Hooker needed help with the Hog Contract and the Beaver Contract after 1997. Cromer Dep., p.31 at 8-25-32 at 1-9, A253.

**Agree.**

82. Mr. Cromer also worked as an electrician in nuclear facilities at SRS, including the F-Area tank farm and the Naval Fuel Facility, both of which are nuclear facilities. Cromer Dep. p. 21 at 11-25, p.22 at 1-9, A251.

**Agree.**

83. Mr. Cromer started working at SRS in 1985 or 1986 for Miller Electric and Bechtel. Cromer Dep. p. 23 at 17-21, p.24 at 8-9, A251.

**Agree.**

84. Mr. Cromer took General Employee Training ("GET") and Radiation ("RAD") Worker training for his work as an electrician at SRS. Cromer Dep. p.24 at 12-25, A251.

**Agree. Cromer testified that he was RAD worker certified until 1992 or 1993.**

85. Mr. Cromer learned about the different radiation control signs and what was going on at SRS, "so you won't get into anything you shouldn't" from his GET training. Cromer Dep. p. 24 at 21-25-p.25 at 1-7, A251-252.

**Agree.**

86. Mr. Cromer learned about working around radiation, specifically about time, distance and shielding, from RAD Worker training. Cromer Dep. p. 25 at 8-18, A252.

**Agree.**

87.Mr. Cromer took RAD Worker training several times; the course was three or four days and had a walk-through test at the end. Cromer Dep. p. 26 at 21-25 – p. 27 at 1-23, A252

**Agree.**

88. Mr. Cromer was RAD Worker certified until 1993. Cromer Dep. p. 27 at 24-25 –p. 28 at 1-3, A252.

**Agree.**

**G. <u>Performance of the Hog and Beaver Contracts</u>**

89. Homer Gabard was the Forest Service's Contracting Officer for the Hog and Beaver Contracts. A195

**Agree.**

90. Frankie Brooks, a Forest Service wildlife technician, was the Contracting Officer's Representative ("COR"). A206

**Agree.**

91. Ms. Brooks worked on a day-to-day basis upon Mr. Hooker's contracts with Forest Service; her responsibilities included directing Mr. Hooker and his employees to specific sites to trap beavers and clean culverts when needed. Brooks Decl. ¶8, Brooks Dep. p.6 at 16-25 – p. 7 at 1-24. A206

**Agree.**

92. Ms. Brooks also told Mr. Hooker where to trap problem hogs. Brooks Dep. p.8 at 8-19; Brooks Decl. ¶10.

**Agree.**

93. The Forest Service had established a list of beaver trapping sites. A128

**Agree.**

94. Ms. Brooks was familiar with and visited all the beaver trapping sites that Mr. Hooker was assigned under his contract with the Forest Service. Brooks Dep. p.7 at 15-16; Brooks Decl. ¶9.

**Agree.**

95. Ms. Brooks and Mr. Hooker had a map with all the beaver sites marked on it. Brooks Decl. ¶9.

**Not all the beaver sites were marked on this map, supplemental maps were issued by Brooks.**

96. Mr. Hooker was supposed to trap only at the specific sites marked on the map; for instance, he was not supposed to trap the entire length of Tim's Branch to Upper Three Runs or in Steed's Pond. Brooks Decl. ¶9.

**Agree that she so declared.**

97. Because Mr. Hooker's contract did not specify particular hog trapping sites, Ms. Brooks would direct Mr. Hooker to trap in areas where hogs had done damage. Brooks Decl. ¶10.

**Agree that she so declared.**

98. Ms. Brooks regularly visited all the beaver trapping sites and observed that none of them were marked as Soil Contamination Areas or otherwise marked to indicate any radiological hazard. Brooks Dep. p.15 at 1-7; A208; Brooks Decl. ¶11.

**Agree that she so testified; however, Westinghouse produced a document showing the beaver trapping sites that were indeed marked as radiological hazard and/or Soil Contamination Areas. Brooks further testified that Site 19 and four sites on Four Mile Creek were posted as contaminated. Brooks Dep. 17:2-22.**

99. Ms. Brooks was not aware of any non-radiological hazard at any of the beaver trapping sites. Brooks Decl. ¶11.

**Agree that she so declared. Non-radiological hazard is not defined, so therefore cannot agree or disagree.**

100. All of the beavers trapped were monitored for radiation through the mid-1990s. Brooks Decl. ¶11.

**Agree that Brooks so declared. Plaintiff has no information relating to this and cannot agree or disagree.**

101. The beavers monitored did not have any contamination and the requirement for monitoring was dropped. Brooks Decl. ¶11.

**Agree that Brooks so declared.**

102. Hogs were also monitored, but none of them were contaminated either. Brooks Decl. ¶11.

**Agree that Brooks so declared.**

103. In early 1997, Mr. Cromer told Ms. Brooks that he had seen a soil contamination area (SCA) sign at the Steed Pond Road beaver trapping site. Cromer Dep. P.59 at 4-24, A260; Brooks Decl. ¶12.

**Agree.**

104. Ms. Brooks told Mr. Cromer that he did not have to go back there to trap. Brooks Decl. ¶12.

**Agree that Brooks so declared. Cromer testified that Brooks said "don't go back there".**

**105.** Mr. Cromer and Mr. Hooker continued to trap beavers at that site after Ms. Brooks told them they did not have to return. A141; Brooks Decl. ¶12.

**Agree.**

106. On February 22, 1999, Mr. Hooker trapped at a beaver trapping site on Four Mile Branch at Road 4 near HP-52 marked with a radiological sign. (HP-52 is an environmental compliance sampling location). Brooks Decl. ¶¶13,15.

**Agree as to the fact that Mr. Hooker trapped at a beaver trapping site on Four Mile Creek at Road 4. Ms. Brooks did not testify as to what kind of location HP-52 is so plaintiff can neither agree nor disagree with this parenthetical statement.**

107. WSRC's radiation protection office required a work permit for work in a radiation area; Mr. Hooker was also required to wear personal protection equipment. A147.

**Agree.**

108. Mr. Hooker had been a radiation worker (RAD Worker II) when he work (sic) with WSRC. A147

**Agree.**

109. Ms. Brooks was with Mr. Hooker on February 22, 1999 when he went into the Four Mile Creek/Road 4 site on a work permit issued by WSCR. Brooks Decl. ¶15.

**Agree.**

110. Mr. Hooker did not express any concern about his health with respect to that visit. Brooks Decl. ¶15.

**Agrees that Brooks so declared, but further states that Hooker testified that he asked what was in HP52. "For nine months, I got no answer." (Dep. of W. Hooker 12/08/05; 17:19-24)**

111. Mr. Hooker was upset because the inspectors who had to monitor him for contamination after he finished were late. Brooks Decl. ¶15.

**Agree that Brooks so declared.**

112. Mr. Hooker asked Homer Gabard, the contracting officer, for an increase in his contract price for any further trapping at the Four Mile Creek/Road 4 site. Gabard Dep., p.44 at 24-25 – p.45 at 1-9.

**Agrees.**

113. Mr. Gabard told Mr. Hooker that he did not have to work in any areas requiring a work clearance permit and Mr. Gabard would not agree to pay Mr. Hooker additional money. Gabard Dep. p.45 at 10-16.

**Agrees that Gabard so testified. Hooker's testimony disputes this. (Dep. of W. Hooker; 50:7-13)**

114. On September 22, 1995, site law enforcement found Mr. Hooker with a cooler full of fish from L-Lake, which was the cooling lake for the L-Reactor (the hot water from L-Reactor was discharged in L-Lake). A308.

**Disagrees that A308 describes that the hot water from L-Reactor was discharged in L-Lake. Further, plaintiff questions the relevance of this proposed finding as it predates the contracts which are the subject of this litigation by four years.**

115. Mr. Hooker claimed he needed the fish as bait for hog trapping. A308.

**Same objection as to 114.**

116. Ms. Brooks did not give Mr. Hooker permission to fish in L-Lake. Brooks Decl. ¶17.

**Same objection as to 114, but agrees that Brooks so declared.**

**<u>F. The 1999 Drought Conditions</u>**

117. During the summer of 1999, Ms. Brooks frequently visited beaver sites. Brooks Decl. ¶18

**Agrees that Brooks so declared. Plaintiff can neither agree nor disagree with this statement.**

118. At most of these sites, she saw water-levels that were well below their normal levels. Brooks Decl. ¶18.

**Agrees that Brooks so declared. Plaintiff can neither agree nor disagree with this statement.**

119. Several of the sites were actually dry. Brooks Decl. ¶18.

**Agrees that Brooks so declared. Plaintiff can neither agree nor disagree with this statement.**

120. There had been a severe drought and above normal temperatures that spring. Brooks Decl. ¶18.

**Agrees that Brooks so declared, but plaintiff disagrees that this affected the beaver population in that he caught 43 beaver in March, 25 beaver in April, 40 beaver in May, and 54 beaver in June, thereafter work orders stopped. Pl. Mot. For Summary Judgment Exhibit Q.**

121. Rainfall records confirm that there was significantly less than normal rainfall during the spring of 1999. A156.

**Plaintiff can neither agree nor disagree with this exhibit.**

122. According to an article in the Augusta Chronicle, dated June 4, 1999, the drought threatened to become one of the worst in nearby Georgia after the driest spring on record since 1925. A321.

**Agree that the article so states, but does not specifically mention SRS. See response to No. 120. This is misidentified as A321, it is actually A332.**

123. The article further states that Augusta, Georgia, located approximately 20 miles from the SRS, got less than a third of normal rainfall in May, 1999 and the drought was having an impact on wildlife in the area. A 321.

**Agree that the article so states. See response to No. 120. Misidentified as A321, actually A332.**

124. As a result of these decreased water-levels, there were fewer beavers at many of the sites than in previous years of Mr. Hooker's contracts. Brooks Decl.¶19.

**Agrees that Brooks so declared. Disagrees as to the statement of fact.**

125. Further, because there were fewer beavers and there was not water going through many of the culverts, those culverts did not need cleaning. Brooks Decl.¶19.

**Agrees that Brooks so declared. Disagrees as to the statement of fact.**

126. Ms. Brooks reduced the number of beaver trapping sites to just those sites where there was a continued need for trapping and cleaning. Brooks Decl. ¶19.

**Agrees that Brooks so declared. Disagrees as to the statement of fact.**

**G. Hog Contract Irregularities**

127. In 1999, Jack Mayer, Ph.D., a wildlife ecologist employed by WSRC, was studying the wild hog population and conducting research on the hogs that Mr. Hooker's agents, the Ellers, had trapped. A 154

**Agree.**

128. According to the Hog Contract, Mr. Hooker was required to deliver the whole carcass of a trapped hog to the Forest Service work center cooler and to record data about the hog; i.e. weight, age, sex, reproductive condition (pregnant) and location trapped. A58.

**Agree.**

129. Dr. Mayer examined the hogs in the cooler for a comprehensive study of the wild hog population at SRS. A 154

**Agree.**

130. Ms. Brooks noted in her COR diary on December 17, 1998 that Goldman Eller had put hog fetuses in the Forest Service Cooler and had logged them in for payments. A150a-150b.

**Agree.**

131. Ms. Brooks told Mr. Eller that he would not be paid for the 6 fetuses. A150b

**Agree.**

132. Dr. Mayer contacted Homer Gabard in May 1999 because he had noticed that some small piglets in the cooler had the characteristics of domestic hogs. A154

**Agree that Gabard so testified.**

133. The piglets had more teats than feral hogs at SRS; feral hogs normally have twelve or fewer teats while domestic hogs have more than twelve. A154

**Agree that the report from Wackenhut so stated, cannot agree or disagree as to the factual accuracy of the statement.**

134. Feral hogs have sharp pointed hoofs; these piglets had rounded hoofs consistent with being raised on a concrete pad. A 154.

**See response to No. 133.**

135. The subject piglets did not have any parasites on them, which indicated that they had been raised in a hog pallor rather than in the wild. A154.

**See response to No. 133.**

136. The piglets had been killed by a blow to the head and did not have any teeth marks on them; they did not appear to have been trapped by dogs as Mr. Eller had claimed. A 154, A113-120.

**See response to No. 133.**

137. The piglets were too small to have walked the more than 10 miles from the site bounder (sic) to the center of the site, where Mr. Eller had claimed to have trapped them. Brooks Decl. ¶20.

**Agree that Brooks so declared. Have no information as to the fact stated.**

138. The Forest Service also asked site law enforcement – Wackenhut Services, Inc.- to investigate. A154

**Agree.**

139. The investigation supported Dr. Mayer's findings and recommended that the Ellers be barred from SRS. A154-155. 28(?)

**Agree.**

140. Mr. Gabard, Dr. Mayer, the law enforcement officers, and Ms. Brooks met with Goldman Eller and Mr. Hooker. A154-155.

**Disagree. Ms. Brooks testified at deposition that she had no personal knowledge of the investigation and wasn't even at work when it happened. Dep. of Frankie Brooks, 23:2-11.**

141. The law enforcement report shows that Mr. Eller only gave a weak denial of the charges. A155

**Agree.**

142.Mr. Gabard sent Mr. Hooker a letter on June 30, 1999 putting him on notice that he was in default on the Hog Contract, because of "some actions taken in performance of this contract…have not been proper or in compliance with the contract and some of the actions could be considered to be illegal." A151-153 at A151.

**Agree.**

143.The actions delineated in the letter were entering fetal pigs on the Wild Hog Data Table in an attempt to receive payment for those fetal pigs; attempting to receive payment for 31 domestic pigs; removing hogs and pigs from the cooler before the COR could verify the hogs/pigs were in the cooler; leaving hogs in the woods until they begin to rot; entering hogs in the Data Table without bringing them to the cooler. A 151.

**Agree.**

144.Mr. Gabard wrote that he was concerned that hogs and pigs were being removed from the cooler and then returned to the cooler so "payment would be made for the same animal twice." A151

**Agree.**

145.Mr. Gabard concluded that Mr. Hooker was not personally involved in the misconduct and, therefore, he did not terminate the contract for default. A152.

**Agree.**

146.Mr. Gabard barred the Ellers from the Hog Contract. A152.

**Agree. Gabard barred the Ellers from "working on this contract or any other contract with the Forest Service at the Savannah River Site forever." A152**

147.Mr. Gabard informed Mr. Hooker that $1,320 would be deducted from his June invoice for the 24 domestic pigs for which he already had been paid or that funds would be deducted from subsequent invoices if the amount of the June invoice was insufficient. A152.

**Agree.**

148.Mr. Gabard informed Mr. Hooker that, in the future, all hogs, pigs and beavers would be marked with spray paint at the cooler and that he would not be paid for any animal removed from the cooler before the COR or inspector issued a receipt for the animal. A152.

**Agree.**

149.Mr. Hooker's employees working on the beaver and hog contracts were required to keep the dispatcher notified of the compartment in which they were working. A 152-153.

**Agree.**

150.After the Forest Service started marking the beavers, the number of beavers that Mr. Hooker brought in under his contract decreased dramatically; from monthly numbers in the 30s and 40s to single digits. Brooks Decl.¶22

**Strongly disagree with this misleading statement from Brooks' Declaration. The Forest Service didn't start marking the beavers until after June 30, 1999. After June 30, 1999, no work orders were given to Hooker for July, only 2 for August, 1 for September, none for October or November, and one for December. (Pl. Mot. For Summary Judgment, Exhibit Q) Hooker was only allowed to trap beaver pursuant to a work order from the COR. If the government's contention is that marking the**

**beavers caused a reduction in the number of beavers brought in, this is in direct opposition to the government's argument that there was a drought which caused a decrease in the work orders.**

151. After Mr. Gabard barred the Ellers from the site, Mr. Hooker continued to perform both the beaver and the hog contracts. Brooks Decl.¶23

**Agree.**

152. In November, 1999, Mr. Hooker told Mr. Gabard that he had only caught one beaver in both September and October because he had concentrated on the hog contract during the past two months; Mr. Gabard reminded him that he was responsible for performing satisfactorily on both contracts. A162.

**Agree that Gabard documented this conversation. Why did Gabard ask Hooker why he had only caught two beaver if Gabard knew there were no work orders due to the drought. Please see response to No. 150.**

153. Mr. Hooker had also sent a note to Ms. Brooks on May 6, 1999, apologizing for not giving the beaver contract his full attention. A150.

**Agree. Plaintiff assumes that this note referred to the month of April in that he caught 43 beaver in March, 25 beaver in April, 40 beaver in May, and 54 beaver in June, thereafter work orders stopped. Pl. Mot. For Summary Judgment Exhibit Q.**

154. Because of the problems with Mr. Hooker's performance, the Forest Service decided to perform the beaver trapping contract in-house after Mr. Hooker's contract expired. Brooks Decl.¶24

**Agree that Brooks so declared, plaintiff is unaware of any problems with his performance so cannot agree or disagree.**

155.On November 29, 1999, Mr. Gabard informed Mr. Hooker that the Forest Service would not extend the term of the Beaver Contract at the end of the base period and would not exercise its option. A162a

**Agree.**

156.The Beaver Contract expired on December 31, 1999. A80

**Agree.**

157.Jim Segar, a Forest Service employee, trapped beavers and cleaned culverts after Mr. Hooker's contract expired. See A163-165

**Agree.**

158.The Beaver Contract expired on December 31, 1999. A80

**Agree.**

159.There was below average rainfall in both 1999 and 2000. A158

**Plaintiff can neither agree nor disagree with this statement.**

160.On June 30, 1999, Mr. Gabard informed Mr. Hooker that the Forest Service would not extend the Hog Contract for Option Period II (October 1, 1999-September 30, 2000) and that the Forest Service intended to issue a new contract. A153.

**Agree.**

161.On September 4, 1999, the Forest Service extended Mr. Hooker's Hog Contract "to October 31, 1999, or until a new contract is awarded." A65.

**Agree.**

162.On October 29, 1999, the Forest Service extended contraband passes for Mr. Hooker and his employee from October 1, 1999 to December 31, 1999. A315-316.

**Agree.**

163.Mr. Hooker admitted in his deposition that he never hunted hogs after November 30, 1999. Hooker Dep., p.58 at 16-22, A307c

**Agree.**

164.Mr. Hooker turned in all of his equipment for the hog contract on January 5, 2000, except for six panels and two gates from the hog traps. A319

**Agree.**

165.Mr. Gabard sent Mr. Hooker a letter informing him that his final invoice under the hog contract would not be paid until he responded to Mr. Gabard about Government equipment for the hog contract that had not be (sic) returned. A317

**Agree. The Forest Service later granted a request for equitable adjustment on this issue and owes Mr. Hooker $165.00. (Response to Hooker's REA by Margaret Yeaton)**

166.The Forest Service decided not to issue a new contract and to keep the work in house. Gabard Dep., p.35 at 14-23, A228.

**Agree that Gabard so testified.**

167.In January 6, 2000, Mr. Hooker wrote a letter to the Center for Disease Control requesting a determination regarding whether or not he had been exposed to hazardous substances during his work on the beaver and hog contracts. See A163a.

**Agree.**

168.The CDC referred Mr. Hooker's letter to the National Institute for Occupational Safety and Health ("NIOSH"). See A169

**Agree.**

169.Before a NIOSH visit on March 20, 2000, WSRC's Safety and Industrial Hygiene Office investigated Mr. Hooker's concerns. A166.

**Agree.**

170.WRSC Safety and Industrial Hygiene office prepared detailed reports and concluded that Mr. Hooker had not been exposed to unsafe substances during his performance of his Forest Service contracts. A167.29

**Disagree. The report speaks for itself.**

171. NIOSH conducted an investigation at SRS from March 20 to March 22, 2000. A169.

**Agree.**

172.The DOE Savannah River Operations Center Employee Concerns Office also reviewed Mr. Hooker's concern about exposure to hazardous substances in connection with his work on the Beaver and Hog Contracts. A166-168.

**See response to 170.**

173.The Employee Concerns Office wrote Mr. Hooker that DOE Savannah River Operations Center, WSRC, Bechtel Savannah River and Forest Service employees had reviewed the data on radiological and chemical exposure and could not substantiate his concerns.A166

**See response to 170.**

174.NIOSH sent a letter to Mr. Hooker concluding that Mr. Hooker had not been exposed to unsafe hazardous substances. A172

**Disagree. The document speaks for itself.**

175. NIOSH wrote Mr. Hooker that, based on the assumption that his employees had each accidentally ingested 10 grams of soil per year, the maximum dose to a beaver trapper would be 2 milirems per year or about one fourth the amount of exposure from one chest x-ray and 1/150 of the amount humans receive from natural sources. A170.

**Agree. Again, the entire document speaks for itself.**

176.NIOSH noted that all the workers had whole body counts and urine assays to determine if their bodies contained any plutonium, uranium or strontium. A170-171

**Disagree. The letter suggests that dosimetry information was reviewed for six trappers who had worked at SRS. Four of those trappers participated in interviews. Four workers had urine assays conducted to determine whether their bodies contained plutonium, uranium or strontium.**

177.All of the whole body counts and urine assays were negative. A171

**Agree, see response to 176.**

178.NIOSH concluded "we find no basis for a substantial health risk due to exposure to radioactivity". A171

**The entire document speaks for itself.**

179.NIOSH examined the water quality standards for SRS streams and found "only rarely did samples on site at SRS approach concentrations that would trigger concern that water quality standards were being exceeded. A173.

**Please see response to 177. Why, then, did they require the work clearance permit and protections to enter the water at Four Mile Creek at Road 4?**

180.NIOSH also stated that "[b]ased on the available environmental data and our medical findings, we conclude that beaver and pig trapping has not been associated with harmful exposure to radioactive or toxic environmental contaminants." A173

**Agree .Please see earlier responses.**

181.Mr. Hooker did not tell the Forest Service that he had any concerns about working in radiological areas until late 1999 or 2000. Brooks Decl.¶25

**Disagree.**

182.Mr. Hooker never said anything to Ms. Brooks or Mr. Gabard about being worried about his health or what allegedly was in the water. Brooks Decl.¶25.

**Disagree.**

183.The Forest Service was not aware of his claims to NIOSH until months after it reduced the number of beaver sites. Brooks Decl. ¶25.

**Disagree.**

Respectfully submitted,

**s/** Berta E. (Robbie) Nichols
206 Carolina Bldg., P. O. Box 7925
Hilton Head Isl., SC 29938
(843)686-5884 Fax: (843) 842-3933

Attorney for Plaintiff

October 10, 2006