IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER,d/b/a GEORGIA BOWHUNTERS SUPPLY, | ) | |
| Plaintiff | ) | |
| Vs | ) | No. 03-1501C, 04-1126 Judge Allegra |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE AND REPLY TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 7.2(b) of the Rules of the Court of Federal Claims, plaintiff, William D. Hooker d/b/a Georgia Bowhunters Supply, respectfully responds to defendant's cross motion for summary judgment and replies to defendant's response to plaintiff's motion for summary judgment.

ARGUMENT

1. There is a genuine issue of material fact as to whether the government breached the beaver contract by reducing services and failing to exercise the option.

When Hooker was presented with the Work Clearance Permit in February, 1999 in order to trap beaver at Site 55, Four Mile Creek at Road 4, he learned that at least one beaver trapping site was posted as contaminated. Thereafter, he began to investigate the other sites and found Soil Contamination Area postings at four other sites, one of which he and his employee videotaped in June, 1999. Soon thereafter, Hooker's work orders for beaver trapping stopped.(First Am. Comp. ¶16,22) Hooker claims that the beaver contract was "stopped" in retaliation for his questioning the contamination at several beaver trapping sites. (First Am. Comp.¶26)

Hooker had trapped 50 beaver in June, 1999 but received no work orders in July, and only 3 work orders until the end of the contract. (First Am. Comp.¶16 ). There is no testimony as to what reason the Forest Service gave at that time. In November, 1999 Gabard's memorandum to the file documents that Hooker asked why his beaver sites had been reduced. (Pl. Mot. Exh. S ) This memorandum also documents that Gabard questioned Hooker why he wasn't catching beaver. Hooker also stated at that time that the culverts were blocked again; and Gabard reminded Hooker that he was only to clear culverts where he is trapping. Nothing in this memorandum refers to drought conditions as being the reason the sites were reduced.

Plaintiff's amended complaint was filed on March 17, 2004. Paragraphs 16,17 , 22 and 24 of the amended complaint all contain allegations that the beaver trapping was stopped in retaliation for Hooker's concerns over the contamination.

16. USFS breached the contract on July 21, 1999 when the COR Frankie Brooks effectively terminated the contract for beaver trapping and culvert cleaning. Hooker had previously trapped 55 sites for the USFS; after July 1, all culvert cleaning was stopped and he was only allowed to trap 1 site. For the remainder of the contract term, Hooker was only given 3 additional work orders.

17. Defendant USFS has breached the contract in reducing the number of trapping sites from the original contract language, and prohibiting Hooker from performing the culvert cleaning.

22. As a result of Hooker's inquiries and concern over the contamination, instead of addressing these concerns, USFS effectively stopped Hooker from performing any work, breaching the contract.

24. Hooker is informed and believes that USFS deliberately failed to trap beavers or clean culverts for the balance of the year 1999 in order to breach Hooker's contract.

(First Am. Comp.)

Defendant answered the amended complaint on September 4, 2004. Defendant offered the same answer to paragraph 16, 17 and 22; as follows.

> " The allegations contained in paragraph 17 are conclusions of law and plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact they are denied."

The answer to paragraph 24 is

> "Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 24, so denies."

The defendant could have offered, as an affirmative defense to these allegations, that there was a valid business reason for the decrease in requirements, but it failed to do so.

It wasn't until almost six years after the beaver contract ended, in December, 2005 during the depositions of Frankie Brooks and Homer Gabard, that drought was asserted as a reason for the decrease in requirements. Both Brooks and Gabard testified at that time that the beaver trapping sites were reduced because of drought. (Dep. of H. Gabard;51:18-22 and Dep. of F. Brooks; 20:9-11 ) Neither of these witnesses testified that they discussed drought as a reason for the reductions at the time the beaver sites were reduced. Defendant now comes forward with newspaper articles describing drought conditions during the spring of 1999, asserting that the drought was a valid business reason for the reduction in the beaver trapping sites.

It is well settled that the government may decrease its requirements in a contract. The only limitation upon the government's ability to vary its requirements under a requirements contract is that it must do so in good faith. *Technical Assistance Intl., Inc. v. U.S.*,150 F.3d 1369, 1373 (Fed. Cir.1998) A buyer acts in good faith if it has a valid

business reason for varying its requirements other than dissatisfaction with the contract. *Id.* Citing *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333(7th Cir. 1988) .

The government in this case now produces what it terms as a valid business reason for decreasing its requirements under the beaver contract; i.e. the drought. This valid business reason was raised for the first time in depositions. This court, in *Susan S. Fahey v. United States*, 71 Fed. Cl. 522(2006) , looked at a contract terminated for convenience by the Postal Service, where the plaintiff , like Hooker, alleged that the Postal Service terminated her contract in retaliation for complaints she had made against the contracting officer. The Postal Service relied on an affidavit prepared during litigation as its defense against bad faith. The court cited *Rice Systems, Inc. v. United States*, 62 Fed. Cl. 608 (2004) for the proposition that the plaintiff did not defeat summary judgment where there was no contemporaneous evidence to support "bald assertions and speculation of wrongful conduct in the plaintiff's declaration, which had been prepared after litigation had begun." Thus, in *Fahey*, the court denied the government's motion for summary judgment because the plaintiff had made contemporaneous complaints about the postmaster's treatment of herself and her employees, and the government had relied on the contracting officer's belated declaration to support its version of the facts. In Mr. Hooker's case, there is no contemporaneous evidence that drought was ever given as a valid business reason for the decrease in requirements; rather, Hooker inquired why his beaver sites were reduced and Gabard asked why he wasn't catching beaver (Pl. Mot. Exh. S). The subject of drought only surfaced at depositions six years later and was expanded upon in the present motions. Summary judgment for the government is inappropriate where it failed to propound a

valid business reason contemporaneous with the decrease in requirements. Similarly, in *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234(2002), the court, in weighing Am-Pro's affidavit submitted during litigation and prepared six years after the fact, noted "we also view as telling Am-Pro's lack of contemporaneous documentary evidence. Had Brown, or any other Am-Pro representative present when the alleged threats took place, made a notation or some form of contemporaneous record either to Am-Pro's attorneys or simply to Am-Pro's internal files, this might be a different case." *Id.* at 1243.

The government further asserts that the drought was ongoing throughout the spring. (Brooks Decl. ¶18 ) It is undisputed that Hooker trapped many beaver during the spring of 1999, the only month that was slightly decreased was April (Pl. Mot. Exh. Q ), and Hooker's letter to Brooks explains that he had been on vacation.(Defs. Mot. Exh. A150 ) If drought conditions were present during the spring, it stands to reason that Hooker's trapping sites should have been reduced early in the year. Instead, he was given work orders for the trapping sites on a regular basis until he videotaped a posted trapping site. Then, and only then, did the work orders stop.

Further, the government also attempts to imply that the decrease in beavers was caused by defendant's decision to mark them as they came into the cooler to ensure that beavers were not accidentally or otherwise submitted for payment multiple times. (Brooks Decl.¶12,13 ). Brooks declared that this decision was made in late June, after the hog investigation. Brooks further stated that "after we started marking the beavers, the number of beavers that Mr. Hooker brought in under his contract decreased dramatically; from monthly numbers in the 30s and 40s to single digits. (Brooks Decl.

¶22 ) Since Hooker had no control over where his beaver trapping occurred; and the COR, Brooks, made the decisions as to what work orders to present to Hooker, it is misleading to suggest that the marking impacted the amount of beavers trapped since Hooker received no work orders in July or August, one in September, and none until December, when the contract ended. If the foregoing is presented as a valid business reason, it fails. The government then points to the fact that when Hooker's contract expired, only 44 beavers were trapped in 2000 and 28 beavers were trapped in 2001. The government fails to mention that this trapping was done by Forest Service employees as part of their regular duties with no special incentive such as a bounty per beaver trapped, as was the case with the beaver contract. Further, "because of the problems we had with Mr. Hooker, the USFS decided to do the beaver trapping in house after Mr. Hooker's contract expired". (Brooks Decl. ¶24) This declaration fails to elaborate on what "problems" the Forest Service had with Hooker. Since there has been no previous testimony or documentation of any "problems" with Hooker during the beaver contract, it can be inferred that his questions regarding contamination and requests for more money were the "problems"

In Brooks' declaration, she states that she "did not know that Mr. Hooker had any concerns about working in radiological areas until 2000 when he wrote the CDC. He never said anything to me or Mr. Gabard about being worried about his health or what was in the water". (Brooks Decl. ¶25) This conflicts with Hooker's own testimony as noted previously, as well as Brooks' own daily diaries (Pl. Mot. Exh.J) which reflect that she told Hooker in May, 1999 that he would use snares when beaver trapping so he wouldn't have to get in the water in sites that were considered contaminated.

Summarizing the foregoing, there is a genuine issue of material fact as to whether the Forest Service breached the beaver contract by discontinuing the work orders in July, 1999. The Forest Service did not provide a valid business reason for its decreased requirements in 1999, failed to plead it as a defense in its answer to Plaintiff's complaint, and has only during the discovery phase of this litigation proffered a reason; that of the drought. Summary judgment for the government should be denied.

2. The Government has breached the modification of the Hog Contract which extended the contract to October 31, 1999 or until a new contract is awarded.

The government argues that the precise termination date of Mr. Hooker's hog contract is irrelevant because Hooker did not continue to perform during the two year period, and he is not entitled to payment for work he did not perform. Hooker stated in his deposition that he never hunted hogs after November, 1999, but he remained ready to perform under the contract as evidenced by his submission of a bid for the new contract to be awarded. Instead, the Forest Service failed to withdraw the solicitation and instead, used its own employees to hunt hogs. This was a breach of the underlying contract extension and under the Restatement of Contracts (Second) §237 (1981), a party's continuing obligations under a contract are conditioned upon there being no "uncured material failure by the other party to render any such performance due at an earlier time." The hog contract was an indefinite quantity contract. Under an indefinite quantity contract, the government is required to purchase at least the minimum quantity in the contract from the seller. *Crown Laundry and Dry Cleaners, Inc. v. United States*, 29 Fed. Cl. 506,516 (1993) Therefore, under the contract extension, Hooker is owed at least the minimum quantity; or $22,000.00, for two years until the new contract was awarded in 2001. The fact that the government used its own employees to hunt hogs during 2000

and 2001 is unimportant in the context of a minimum quantity contract, and summary judgment should be granted to plaintiff.

<u>There is a genuine issue of material fact as to whether the Government breached the hog contract when it barred Hooker's employees and withheld payment.</u>

It is undisputed that the Government had the contractual right to reject any non-conforming services in the hog contract. The Government relies on the declaration of Frankie Brooks who stated that an investigation revealed that some of the hogs that Mr. Hooker's employees were submitting did not conform to the contract. (Brooks Decl.¶21.) Brooks' declaration states that she met with Gabard, Dr. Mayer, the law enforcement officers and Goldman Eller on July 1, 1999 in building 760-15G at SRS. "Eller did not deny the charges and did not contest Mr. Gabard barring him from the SRS" (Brooks Decl. ¶21) This is disputed by the written denials and appeals from both Goldman and Michael Eller. (Pl. Mot. Exh.U ) Further, this part of the declaration is in direct opposition to Brooks' testimony on deposition. Brooks was asked if she was involved in the investigation with the Ellers that there were domestic pigs being brought onto the Savannah River Site:

Answer: "What do you mean involved?"

Question: " I mean were you aware of that investigation going on?"

Answer: "Yes."

Question: "Did you have any input into that, or were you just aware because it was happening?"

Answer: "I was aware of it. I wasn't even at work when it happened."

Question: "So you have no personal knowledge as far as that investigation goes."

Answer: "Right".

(Dep. of F. Brooks, 22:22-25;23:1-12)

There is conflict in Brooks' own testimony on the matter of the hog investigation. The Court should have the opportunity to weigh the credibility of all of the witnesses, and for this reason, summary judgment is inappropriate and should be denied.

3. <u>Hooker is entitled to equitable adjustment of both contracts due to the existence of contamination.</u>

It is agreed between the parties that Hooker's complaint for reformation of both the hog and beaver contracts has survived the government's motion to dismiss. (Defendant's Status Report of September 20, 2006) Once again, the government continues to argue that because the allegations of contamination were fully investigated, and Hooker was not found to have suffered from the effects of contamination, that there is no basis for his claim for reformation. This misses the point, and again the government continues to argue apples, while Hooker argues oranges.

The government relies on *SAB Construction, Inc. v United States*, 66 Fed. Cl. 77 (2005) The Plaintiff in *SAB* sought restitution for the reasonable value of the services it provided to the government under an implied in fact contract theory, or based on a theory of reformation for mutual mistake. The plaintiff argued that the measure of restitution is the value of the benefit the government received. The government would have had to pay $436,462 more if it had paid for asbestos abatement; therefore the plaintiff claimed entitlement to that amount because the asbestos was removed, saving the government the amount it would have paid for abatement. The court agreed with the government that the

proper measure of restitution is the reasonable value of services that have in fact been rendered, not the amount of money the alleged breaching party saved by breaching the contract. Therefore, restitution damages based on the value of asbestos abatement services not performed by SAB are not recoverable. The court also declined to award speculative damages that SAB claimed were necessary to create a fund to self-insure for any asbestos related worker claims that might be asserted in the future, *Id.*

Hooker's claim can be distinguished from *SAB Construction, Inc.* The plaintiff in SAB was arguing that the services he provided were actually asbestos abatement services, not merely demolition services for which he had contracted and the government benefited by not having to pay for the asbestos abatement, which would have cost more. *Id.* Hooker, in contrast, provided exactly the services he contracted for under the contracts with the Forest Service. What is at issue is the price that he bid for this contract. He argues that because of the exposure to contamination, he would have bid a higher price on both the contracts. The equitable remedy of reformation is "…available only if the government knew or should have known of a mistake in a bid costly to the bidder." *Burnett Electronics Laboratory, Inc. v. United States,* 202 Ct. C l. 463, 479 F.2d 1329 (1973) citing *Southwest Welding & Mfg. Co. v. United States,* 179 Ct. Cl. 39, 373 F.2d 982(1967) Did the Government know of the contaminated sites? The testimony from witnesses varies greatly. David Sanders is responsible for radiological posting and identifying contamination sites for Westinghouse. He provided a list of those beaver trapping sites that were posted as Soil Contamination Areas. (Pl. Mot. Exh. N ) He also testified that there could be contamination that so far has not been identified. (Dep. of D. Sanders; 14:11-13) Homer Gabard, the contracting officer, testified that he had

worked for the Forest Service since 1979 and had never seen a radiological sign. (Dep. of H. Gabard; 5:8-9;13:13-19 ) Margaret Yeaton, the new contracting officer, testified that she had never seen radiological signs. (Dep. of M. Yeaton; 9:4-11) Frankie Brooks testified that she had visited all the beaver trapping sites and "none of them were marked as Soil Contamination Areas or otherwise marked to indicate any radiological hazard." (Brooks Decl.¶11) This directly contradicts her deposition testimony (Dep. of F. Brooks; 17:2-8). Yet, Sanders' list of beaver sites that were posted states that Site 19 had been posted in 1997; Site 25 was posted prior to 1992, Site 36 was posted prior to 1992, Site 40 was posted prior to 1992, Site 43 was posted in 1993 and Site 44 was posted as contaminated, and Sites 47 and 53 were posted as Soil Contamination Areas.(Pl. Exh.N) And during a site visit by the parties and counsel during discovery, two of the four beaver trapping sites visited were clearly marked as Soil Contamination Areas. (Resp. to Pl. Req. for Prod. ) Brooks also declared that "in 1997 Mr. Cromer told her he had seen a soil contamination area sign up at the Steed Pond Road (Beaver Site 19) beaver trapping site. I told him that he did not have to go back up there to trap." Brooks Decl. ¶12. The Forest Service knew or should have known, based on this evidence , in 1997 that at least one beaver trapping site was posted, yet the beaver contract clearly stated that no toxicological hazards existed, and required no protective equipment or health monitoring . The Forest Service had or should have had superior knowledge that was not communicated to Hooker. "Superior knowledge" is defined as knowledge which is vital to performance of a contract but which is unknown and is not reasonably available to bidders who are thereby misled. The government must disclose such superior knowledge or be held liable for breach. *J. F. Shea Co., Inc.*, 4 Cl. Ct. 46 (1983) Westinghouse

clearly had a requirement that work that disturbed the soil in Soil Contamination Areas was to be performed by RADII trained workers,(Pl. Mot., Exh. K ) although this point was disputed by David Sanders, the Westinghouse RAD-CON manager, who claimed no protection was required for work that disturbs the soil in a soil contamination area. (Dep. of D. Sanders; 27:14-17) The Forest Service and Westinghouse further required additional protection when the SCA posting was discovered at HP-52 at Four Mile Creek and Road 4. It is clear that trapping performed at the additional posted sites should have had the same requirements. The Forest Service should have had access to this information if indeed Brooks was visiting all of the beaver trapping sites. Hooker clearly did not have the same access to information relating to contamination and could only rely on the contract language. Was it costly to Hooker? Hooker testified that it was. He testified that he hadn't signed up to work in contamination, (Pl.Mot. Exh.J) and would have bid more on the contracts for RADII work. (Dep. of W. Hooker June 2, 2006;41:6-10,21-22) For this reason, the contracts should be reformed to reflect a fair price to compensate Hooker for the price he would have bid for unprotected exposure to contamination.

3. <u>There is a genuine issue of material fact as to whether the government acted in bad faith in both contracts.</u>

Based on the work clearance permit issued in February, 1999; clearly protection was required in beaver trapping in sites which were posted as radiological control areas, or SCA's. Yet, work clearance permits had never been issued for work at any of the other beaver trapping sites which were posted, and where Hooker and his employees trapped.

After February, 1999, Hooker testified that he asked what was in the water, but got no answer.(Dep. of W. Hooker,12/08/05; 17:19-25) The Forest Service denies that Mr. Hooker made any request for information about the creeks and streams at SRS. (Defs. Resp. to Pl. Prop. Findings ¶40), so therefore could not have retaliated against him. Both Hooker and Cromer also testified that at the time of the award of the first contracts in 1992, they both asked Homer Gabard if there was any problem with the water, and Gabard said "just don't drink it". (Dep. of W. Hooker June 5, 2006; 11:5-8 and Dep. of A. Cromer, Dec. 8, 2005; 70:16-24) In June of 1999, Hooker had his employee videotape the site at HP-52, and the video showed soil contamination signs at HP-52. (Pl. Response to Defs. Req. for Production; videos titled Savannah River Site August 1, 1999/June 1, 1999)

Within approximately thirty days of the June 1, 1999 videotaping; Hooker's beaver trapping sites were decreased from 53 to 1 after July. Hooker's two employees on the hog contract were barred forever from the SRS on June 30, 1999; one was later awarded the next hog contract in 2001.

It is undisputed that a new beaver contract has never been awarded. It is also undisputed that hog contracts were not awarded until 2001 and the current hog contracts specifically address the issue of contamination; requiring the contractors to not trap in RCA's or SCA's and to submit to monitoring by Westinghouse health protection.

The government has an implied obligation to carry out its duties under a contract in good faith. *L. P. Consulting Group, Inc. v. United States,* 66 Fed. Cl. 238(2005). In order to demonstrate a breach of such duty, Hooker must show that the government acted in bad faith. *Asco-Falcon II Shipping Co. v. United States,* 32 Fed. Cl. 595(1994). It is

well-settled that government officials are presumed to act conscientiously and in good faith in the discharge of their duties. *Id.* In order to overcome this presumption, plaintiff "must ***allege and prove,*** by clear and strong evidence, specific acts of bad faith on the part of the government". *L. P. Consulting Group, Inc.*, citing *Asco-Falcon II Shipping Co.* (emphasis in original). The courts are certainly not called on to allow governmental actors to treat contractors with bad faith or a specific intent to injure in any case where the bad faith is not, in effect, admitted by the government. *The Libertatia Associates, Inc. v. United States*, 46 Fed. Cl. 702 (2000). The court should consider whether the plaintiff has shown "evidence of some specific intent to injure" plaintiff or whether the government was "actuated by animus toward the plaintiff". *Id.*

As discussed previously, the issue of the abrupt cessation of the beaver trapping contract contains several contradictions. The evidence and testimony surrounding this decrease in requirements shows at least the possibility that the Forest Service reduced the sites in retaliation for Hooker's complaints and the realization that the posted sites required work clearance permits. Evidence of retaliation may support a finding of bad faith. *Labat-Anderson, Inc. v. United States,* 42 Fed. Cl. 806 (1999). Whether there was a specific intent to injure Hooker economically or just get rid of him and his concerns, the effect was the same. The government knew or should have known that the reduction in beaver trapping would impact Hooker's income. If the government did not have a valid business reason for the reduction, then it is in breach, and that breach is in bad faith if the reasons for the reduction were not the true reasons. The Court similarly denied summary judgment in *Fahey* ,stating "a trial is needed to determine the merits of the plaintiff's claim and for the government to present its side of the facts." id.. To the extent

the government relies upon Brooks' declaration to support its version of the facts, it is plain that those facts are disputed by the plaintiff in his testimony.

Conclusion

For the reasons set forth above, Plaintiff respectfully requests that this Court deny the government's cross-motion for summary judgment and grant Plaintiff's motion for summary judgment.

Respectfully submitted,

/s/ Berta E. (Robbie) Nichols

206 Carolina Bldg., P. O. Box 7925
Hilton Head Isl., SC 29938

October 10, 2006

Attorney for Plaintiff