IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER,d/b/a<br>GEORGIA BOWHUNTERS SUPPLY, | ) | |
| Plaintiff | ) | |
| Vs | ) | No. 03-1501C, 04-1126<br>Judge Allegra |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S SURREPLY TO DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Background

The Court's Order of August 26, 2005 , through a scrivener's error, dismissed paragraphs 19 through 23 of Complaint 04-1126C. This error was only discovered after Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment was filed. Therefore, pursuant to the Court's Order of October 13, 2006; paragraphs 19 through 23 of 04-1126C (The Hog Complaint) were restored and Defendant was permitted to raise any new issues beyond those previously raised regarding the reinstated paragraphs in its reply to Plaintiff's cross-motion for summary judgment. Plaintiff is then permitted to file a surreply, on any such issues. To the extent that the issues involving the beaver complaint and the hog complaint are intertwined, Plaintiff's replies to those new arguments in Defendant's reply address these issues together.

The New Issues

The restored paragraphs in the Hog Complaint allege as follows:

(19) Hooker and his employees hunted throughout the entire SRS property; and at no time were they warned about contaminated areas.

(20) Prior to the disciplinary actions taken by the Contracting Officer on June 30, 1999; Hooker and his employees became aware that they had been working in contaminated areas such as Par Pond and requested an adjustment in contract price.

(21) The Contracting Officer refused to discuss any adjustment to the price and instituted the previously stated actions against Hooker and his employees.

(22) The response to Hooker's REA points to the report of December 27, 2000 from the National Institute of Occupational Safety and Health (NIOSH) as stating that "based on the available environmental data and our medical findings, we conclude that beaver and pig trapping at SRS has not been associated with harmful exposure to radioactive or toxic environmental contaminants". This response fails to relate NIOSH's findings relative to Par Pond; i.e. the potential for exposure to radioactive cesium-137 dust generated during pig trapping in the Par Pond area during a time when the water level had been substantially reduced in order to repair the dam. The NIOSH findings were:

> "Though there is historic data concerning the concentration of cesium-137 in the dust and vegetation that was uncovered during the Par Pond drawdown, it is not possible to determine whether you and your employees were exposed to radiation in amounts that would be harmful. There are two reasons for our inability to make that determination. First, the guidance for worker exposure is based on continuous exposure over 2,000 working hours (1 work year). The exposure that you and your employees may have encountered was intermittent but based on the information that you have provided, did not approach 2,000 hours per year. *Second, since the water in Par Pond has been restored to its normal levels it is not possible to conduct any monitoring of radioactive dust in that area since it is once again under water*.(emphasis supplied)"

(23) Hooker is informed and believes that there should have been a readjustment to the contract price in light of the possible exposure to contamination in Par Pond.

Argument

The Government contends that there is no underlying factual basis for Mr. Hooker's contamination based claim, because the contamination allegations were fully investigated by numerous agencies, both public and private. These agencies apparently are the Department of Energy at the Savannah River Site, the Forest Service, Westinghouse and the Bechtel corporation, as well as the NIOSH report The Government argument is that "these agencies found Mr. Hooker's concerns to be unfounded", and Mr. Hooker cannot point to any competent evidence to the contrary. The Government relies on a letter from Dianne F. Saylor, Employee Concerns Specialist, addressing [Hooker's] Employee Concern No. SR2000-02-003, Alleged Exposure to Hazardous Substances on Beaver Contract. (Def. A166-168) This letter documented an investigation by DOE-SR, USFS-SR, Westinghouse Savannah River Company (WSRC) and Bechtel Savannah River, Incorporated (BSRI) personnel, who "conducted a review of data and procedures relevant to the issue of potential radiological and chemical exposure, <u>as well as the process used by the USFS_SR to identify potential hazards and ensure safe working conditions for its subcontractors."</u> This investigation relied on the fact that in the 1980's, dosimeters were issued to workers with access to the general site. This dosimetry was discontinued based upon a review that showed null or extremely small doses to this group of workers. (Def. A166-168) It went on to look at Hooker's whole body count and in vitro bioassay date from 1995-2000, and concluded it was not likely that the beaver/hog trappers received internal dose. Finally, the letter stated that

"there is no likely increased risk in the potential for health effects to the beaver/hog trappers involved in trapping operations" and "there is no likely increased risk of health effects from any of the exposures to chemical contaminates in the sediment and/or water of the site streams." (Def. A166-168). However, this same report continues, stating "in addition, an evaluation was conducted of the process used by USFS-SR to identify hazards and ensure safe working conditions for subcontractors. A process, does, in fact, exist for USFS-SR personnel to (1) respond to a "customer" request for trapping at a specific site, (2) identify the potential hazards through the Site Use Permit process, and (3) ensure worker safety through the issuance and implementation of a WCP." (emphasis supplied) This last statement is anomalous, because if there was no risk, why was a process needed to identify potential hazards and ensure worker safety? Further, there were multiple sites potentially as hazardous as the one trapping site (HP-52) which required a WCP, and the "process" was never implemented for those sites. In fact, the contracting officer for the Forest Service denied knowledge of any of these sites.(Pl. Facts #26-29) This agency may have found Hooker's complaint to be unfounded, but it doesn't explain why the Forest Service apparently had a process but did not identify potential hazards or actually enforce worker safety.

The Government further relies on the letter of December 27, 2000 from Lawrence F. Mazzuckelli, (the NIOSH report). (Def. A169-174), which stated that "Based on the available environmental data and our medical findings, we conclude that beaver and pig trapping at SRS has not been associated with harmful exposure to radioactive or toxic environmental contaminants." The author of this report was apparently relying on the assumption that WCPs(Work Clearance Permits) were issued to the trappers by the U. S.

Forest Service and Westinghouse Environmental Section. "The WCPs were issued by Westinghouse staff without a full understanding that the work would involve disturbing contaminated soil during the placement of beaver traps."(Def. A173) The only WCP issued to and used by Hooker was that of February 22, 1999 at HP-52 (Dep. of F. Brooks,Exh.1) and required certain protections and monitoring. The last paragraph of the NIOSH report concludes that "During our investigation we determined that the Forest Service had no knowledge that this area had been posted and that SRS/Westinghouse staff had an incomplete understanding of the beaver trapping process…and as a result of our recommendations, the Forest Service and SRS have reviewed their procedures and have made changes to prevent similar problems from occurring in the future." Further, as to the allegations contained in the hog complaint; i.e. " the potential for exposure to radioactive cesium-137 dust generated during pig trapping in the Par Pond area during a time when the water level had been substantially reduced in order to repair the dam at Par Pond. Well before the NIOSH investigation, repairs to the dam had been completed and the water level restored to its normal depth. Though there is historic data concerning the concentration of cesium-137 in the dust and vegetation that was uncovered during the Par Pond draw down, it is not possible to determine whether you and your employees were exposed to radiation in amounts that would be harmful." The report, therefore, conceded that Par Pond was contaminated but was unable to determine Hooker's exposure.

Neither the NIOSH report nor the employee concern letter deny that there are soil contamination areas on the SRS. Both of these documents appear to rely on the "process" used by the Forest Service, that of Work Clearance Permits, like that issued in February, 1999 which required the contractor to be RADII certified and also required

health monitoring and protective equipment. But there were only two such permits issued, and Hooker only trapped under one of them. (Pl. Facts #21) This does not address the question of the other sites that were similarly posted, yet no work clearance permits were initiated. The Government cannot rely on either of these documents for the proposition that Hooker has shown no underlying factual basis for his contamination allegations. In fact, the current contracts with hog trappers, now specifically state that contractors/employees shall not enter or operate in Radiological Control Areas (RCA) or Soil Contamination Areas (SCA) and may be required to submit to monitoring by Westinghouse Health Protection personnel (Pl. Facts 121) and is further evidence to support Hooker's allegations.

The government argues that the evidence shows that there is no underlying factual basis for Hooker's contamination based claim. This is unreasonable because the Government admits that there were multiple trapping sites that were contaminated. The Government further argues that Hooker has to prove that the contamination was at a high enough level to be material to his performance. The very fact that the "process" used by the Forest Service; i.e. WCPs requiring monitoring and protection which was noted in both the NIOSH report and the employee concern letter was apparently in place (although not used) demonstrates that the "process" was a result of concern about worker safety. The Forest Service and/or Westinghouse clearly felt the contamination was important enough to formulate a "process" . Further, Westinghouse's own training material (Pl. Facts #84 ) required that workers involved in work that disturbs the soil be RADII trained. It is undisputed that the placement of beaver traps involved disturbing the soil.

Clearly, Hooker has provided evidence to demonstrate an underlying factual basis for his claim.

The government further argues that Hooker has failed to show that the mere existence of some level of contamination is sufficient to create a cause of action. Once again, Hooker reminds the government that this is a breach of contract action, not a tort claim. Hooker is not required to provide proof of injury or a health related claim. To survive summary judgment on the breach of contract, Hooker only has to show a genuine issue of material fact. There are several such issues.

A. The Government relies on the NIOSH Report as well as the Employee Concern letter as evidence that Hooker's contamination claim should be denied. Both of these documents are equivocal, in that they each state that there were no increased health risks in beaver and pig trapping on the SRS; yet both of these documents also refer to the "process"; i.e. the issuance of WCPs, to protect the workers. Did the Forest Service utilize this process? This is a question of material fact.

B. It is conceded by the parties that there was soil contamination on the SRS. At least one beaver trapping site required a Work Clearance Permit and required the worker to be RADII trained, and required health monitoring and protection. More trapping sites were similarly identified but protection and monitoring was not initiated. Were Work Clearance Permits necessary for the remaining trapping sites? Did the Forest Service breach Hooker's contract by allowing him to work in contaminated areas which required a Work Clearance Permit? This is a genuine issue of material fact.

C. The beaver contract stated that no toxicological hazards existed, the hog contract covered the same geographic area but was silent on the subject. Plaintiff argues that there was contamination and therefore toxicological hazards present. The Government maintains that these concerns were unfounded. This is a genuine issue of material fact.

## CONCLUSION

For the reasons above stated, the Plaintiff, William Hooker, respectfully requests that this Court deny Defendant's cross motion for summary judgment.

Respectfully submitted,

/s/ Berta E. (Robbie) Nichols

206 Carolina Bldg., P. O. Box 7925
Hilton Head Isl., SC 29938

November 27, 2006

Attorney for Plaintiff