IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER,d/b/a<br>GEORGIA BOWHUNTERS SUPPLY,<br><br>Plaintiff<br>Vs<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 03-1501C, 04-1126<br>Judge Allegra |

**PLAINTIFF'S MEMORANDUM OF CONTENTION OF FACTS AND LAW**

Plaintiff William D. Hooker ("Hooker" or "Plaintiff") hereby submits his Memorandum of Contention of Facts and Law pursuant to Paragraph 14 of Appendix A to the Rules of the Court of Federal Claims. The relationship between Hooker and Defendant United States of America ("Government" or "Defendant") is governed by two contracts; #53-4660-8-04 awarded on October 29, 1997 to control the wild hog population on the Savannah River Site ("Hog Contract") and #53-4660-9-06 awarded January 22, 1999 to trap beaver on the Savannah River Site ("Beaver Contract"). This memorandum addresses three issues involving the contracts: Hooker's contention that Modification 4 of the hog contract extended the contract until November 2001 when a new hog contract was awarded; the contention that the government breached the beaver contract provision that stated no toxicological hazards were associated with beaver trapping on the Savannah River Site; and finally, the contention that the government acted in bad faith on both contracts to punish Hooker for his concerns about possible exposure to contamination on the site.

## I. STATEMENT OF FACTS PLAINTIFF WILL PROVE AT TRIAL & PLAINTIFF'S POSITION RESPECTING FACTS ON WHICH DEFENDANT IS EXPECTED TO RELY

**A. Modification 4 of the Hog Contract Extended the Contract until November, 2001.**

Modification No. 4 to Contract #53-4660-8-04 extended the hog contract past its expiration date of September 30, 1999; "until October, 1999 or until a new contract is awarded." A new hog contract was not awarded until November, 2001, two years later. The hog contract was an indefinite quantity contract; "a contract under which the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer chooses to purchase from the seller. To make such contracts enforceable, the buyer must agree to purchase at least a guaranteed minimum quantity of goods or services. If the contract contains such a minimum quantity clause, the buyer is required to purchase at least this minimum amount, but this is the extent of his legal obligation". *Crown Laundry and Dry Cleaners, Inc. v. United States,* 29 Fed. Cl. 506,516 (1993). The hog contract guaranteed a minimum of 200 hogs and a maximum quantity of 800 hogs at a unit price of $55.00 per hog. Hooker therefore claims the minimum value of the contract for two years, or $22,000.00.

The government is expected to argue that the modification should be given a different meaning than a literal reading, and that it was written to extend the contract only to October 31, 1999 or until a new contract is awarded, whichever was sooner. The government is also expected to argue that because Hooker was not ready to perform under the contract, he should not be accorded the minimum value. The government is expected to rely on Hooker's statement on deposition that after the end of 1999, "we just didn't go out there anymore". This argument will be contradicted with the facts in evidence that Hooker was still performing under the hog contract until at least the end of November, 1999, so a reading of the modification that limited the extension to October

31, 1999 is not reasonable. Homer Gabard's record of a phone call to Hooker in November confirmed that Hooker was still hunting and trapping hogs. The SRFS Wild Hog Data Sheet shows hogs killed until November 30, 1999. Additionally, a solicitation for a new contract had been issued in September, 1999 and Hooker had submitted his bid. Hooker and the other bidders (assumed) were requested to grant 60 day extensions twice by Gabard, taking the deadline to April, 2000. Gabard testified at deposition that the contract was never awarded and it was decided to perform the hog contract in-house. However, Hooker was never notified that the offer was withdrawn. Gabard testified at deposition that the usual practice was to notify the bidders in writing of a withdrawal of solicitation, however, the government states it does not have a document of this nature. Therefore, it can be assumed that the solicitation was never withdrawn. Hooker remained willing and able to perform under the old contract as well as the potential new contract; however, he was required to turn in his hog traps in January, 2000, so he was prevented from performance, thence his statement that he didn't go out there anymore.

**B. The Beaver Contract stated that there were no toxicological hazards yet the Government's own policies and procedures contradict this statement.**

Hooker trapped beaver for many years at the Savannah River Site and during the term of the beaver contract at issue. The beaver contract language stated that no toxicological hazards exist . In February, 1999 a trapping area he was to visit was considered contaminated and he was required to be RAD trained and wear certain protective clothing and be monitored. A work clearance permit was required for this. A subsequent work clearance permit was required for another area but not used. Hooker then discovered that certain other trapping areas were posted as Soil Contamination Areas ("SCA's") Hooker asked the contracting officer, Homer Gabard, for an adjustment in the contract price for

working in areas that were Soil Contamination Areas and required RAD II training. Gabard refused to adjust the contract price. Hooker now contends that the contract price for the beaver contract should be adjusted or reformed to reflect the price he would have bid for this work had the contract language stated that he would be expected to be RAD trained and work in SCAs.

The Government is expected to argue, through its expert witnesses, that none of the areas Hooker worked in could have caused harm to him or his workers. Dr. Cham Dallas, the government's retained expert, cites the NIOSH report findings that "beaver trapping at the SRS was not associated with any health problems due to either chemical or radiation exposure". Dr Dallas states that the presence of soil contamination signs "simply indicates that a person might receive 100 millirems of radioactivity in a year if the worker had significant contact with the contaminated soil there for 2000 hours in that one year period". And "even if a worker did receive 100 millirems they would still not exhibit deleterious health problems." This opinion is supported by the Government's employed witness, Dr. Kenneth Crase.

This position is not confirmed by the Government's own documents. The Plaintiff received a large amount of documents from the Government after discovery had closed. Rather than move to reopen discovery and prolong this case, Hooker plans to submit some of these documents to witnesses for explanation. These documents show that indeed, certain protections and monitoring were required for work that disturbs the soil in SCAs; that it was deemed too expensive to test all of the areas for contamination, that the Forest Service did not require its contractors to have GET training; and in fact, demonstrated by the absence of site use permits for the hog and beaver contractors, the

Government had no idea if the contractors were working in contaminated areas or not. The Government witnesses will also be questioned for information regarding the Site Specific Health and Safety Plan for Investigation of the Savannah River Swamp and Fourmile Branch Integrator Operable Units. Through Government witnesses, Hooker expects to show that the current hog contractors are prohibited from operating in SCAs and are required to submit to monitoring by Health Protection.

**C. The Government breached the beaver contract in bad faith when Hooker raised concerns relating to possible exposure to contamination during beaver trapping.**

When Hooker requested information from the Government regarding possible exposure to contamination, demanded an increase in the contract price and videotaped contamination signs at one of the trapping sites, the Plaintiff expects to show that the Government sought to injure him economically. The evidence will show that the beaver contract was substantially restricted. The beaver contract was a requirements contract and Hooker trapped at the direction of the contracting officer's representative, Frankie Brooks. Brooks provided work orders both written and verbal. Formerly Hooker had trapped 54 trapping sites. In June, 1999 Hooker trapped 55 beavers. After July, 1999 the trapping sites were reduced to 1 and Hooker was only given three work orders until the end of the year. Contemporaneously, with the companion hog contract, the contracting officer, Homer Gabard, fired two of Hooker's employees for allegedly bringing domestic hogs onto the Savannah River Site for payment as wild or feral hogs. These two employees, Goldman and Michael Eller, were barred from the site forever. This caused economic damage to Hooker as he was prevented from performing under that contract while new employees were approved. He was given fifteen days to replace these two

employees, but one of the replacements was not approved until the end of August, causing Hooker economic damage. Michael Eller was awarded a hog contract in November, 2001. Additionally, in July, 1999 the Government paid Hooker's June beaver invoice twice. Instead of asking for a return of the double payment, the contracting officer stated that this would be deducted from future payments. Because the work orders then stopped, Hooker never received enough money on the contract to fully pay back the double payment. John A. Cromer, Hooker's associate and fellow trapper, will testify that these actions were taken to get rid of Hooker and make him go away. Hooker expects to show, through his witnesses, that the Government had no good business reasons for these actions and instead, these actions were taken deliberately to injure Hooker and cause him to abandon both contracts.

The Government is expected to show, through its witnesses and exhibits, that the beaver contract was stopped because of a severe drought in the area that kept the beavers from building dams and obstructing the streams. The Government has submitted newspaper articles describing a lack of rainfall in the area. The Government is also expected to show through its expert that the allegations regarding the domestic hogs and the two employees barred forever, were reasonable and not taken to injure Hooker.

To counter the above argument, Hooker will submit his own exhibits including rainfall records for the months in question, and a document from the Environmental Protection Department at the Savannah River Site written in the middle of May, 1999 entitled Beaver Infested Gaging Sites. Government witnesses will be questioned as to the alleged drought and its effect on the beaver activity at all of the trapping sites subsequent to June, 1999. Hooker also plans to elicit testimony from both Michael and Goldman

Eller as to their participation in the domestic hog incident and verify their written denials at the time of the investigation. Hooker will argue that he is entitled to the balance of the Beaver Contract plus the option year to compensate him for the Government's bad faith.

D. **Issues the Court is Expected to Resolve**

1. Whether Modification 4 to the Hog Contract extended the contract until November, 2001 and if so, the amount that Hooker is entitled to receive as minimum payment.
2. Whether the Government breached the Beaver Contract and if so, is Hooker is entitled to a reformation of the Beaver Contract as a result of the breach.
3. Whether the Government acted in bad faith in damaging Hooker economically as a result of the investigation into the Hog Contract and the shutdown of the Beaver Contract and if so, how is Hooker to be compensated.

Respectfully submitted,

/s/ Berta E. (Robbie) Nichols

206 Carolina Bldg., P. O. Box 7925
Hilton Head Isl., SC 29938

July 16, 2007

Attorney for Plaintiff