IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a<br>GEORGIA BOWHUNTERS SUPPLY,<br><br>Plaintiff,<br><br><br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 03-1501C, 04-1126<br>Judge Hodges |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**<u>CONTENTIONS OF FACT AND LAW</u>**

Defendant, the United States, respectfully submits this response to the Plaintiff's Memorandum of Contentions of Fact and Law ( "Pl. Mem. __") pursuant to Paragraph 14(b) of Appendix A to the Rules of the United States Court of Federal Claims.

**<u>INTRODUCTION</u>**

This is a breach of contract case concerning two contracts, No. 53-4660-8-04 (the "Hog Contract"), awarded on October 29, 1997, to control the wild hog population on the Savannah River Site ("SRS"), and No. 53-4660-9-06, awarded January 22, 1999, to trap beaver at SRS (the "Beaver Contract"). Below, we address the issues raised by Mr Hooker. As we understand the claims discussed in Mr. Hooker's memorandum, Mr. Hooker intends to present evidence relating to three claims: (1) a claim that he is entitled to compensation upon the Hog Contract arising from a contract modification (Modification 4) extending the performance period; (2) a claim that he is entitled to additional compensation because he would have submitted higher bids had he known that the worksite was contaminated; and (3) a claim that the Government acted in bad faith in its dealings with Mr. Hooker, thereby causing him economic harm. At trial, the evidence

will demonstrate that Mr. Hooker is not entitled to any further compensation due to Modification No. 4 and that, in fact, he was not ready or willing to perform during most of the period in question. The evidence also will demonstrate that Mr. Hooker was not exposed to a hazardous level of contamination and that he did not incur additional costs relating to contamination. Therefore, he cannot obtain compensation based upon his allegations of contamination. Finally, the evidence will demonstrate that the Government did not act in bad faith in its dealings with Mr. Hooker.

## STATEMENT OF THE ISSUES

1. Whether Modification No. 4 to the Hog Contract extended performance until November 2001 or some earlier date and, if so, whether Mr. Hooker is entitled to compensation as a result.

2. Whether Mr. Hooker is entitled to additional compensation where he was not exposed to a hazardous level of contamination.

3. Whether Mr. Hooker is entitled to additional compensation where he incurred no extra expenses based upon work performed in contaminated areas.

4. Whether Mr. Hooker is entitled to additional compensation where he cannot demonstrate that he trapped hogs in contaminated areas.

5. Whether Mr. Hooker can demonstrate that the Government acted in bad faith in its dealings with Mr. Hooker on the Hog and Beaver Contracts.

## ARGUMENT

### I. Mr. Hooker Is Not Entitled To Compensation Based Upon The Alleged Two-Year Extension Of The Hog Contract Pursuant To Modification No. 4

Mr. Hooker is not entitled to additional compensation under the Hog Contract for the two-year additional period for which he seeks compensation. Mr. Hooker relies upon

Modification No. 4, which states that the "[c]ontract is extended to October 31, 1999, or until a new contract is awarded." Mr. Hooker contends that he is entitled to the alleged $22,000 guaranteed minimum value of the Hog Contract, from October 1, 1999 through November 2001, the date that a new hog contract was awarded. Mr. Hooker's claim is without merit.

First, Mr. Hooker admitted that he never hunted hogs after November 30, 1999. Hooker Dep., p. 58 at 16-22. Indeed, when asked why he had stopped hunting hogs, Mr. Hooker replied, "I'd had enough of the BS, I promise you." Hooker Dep., p. 59 at 5. In other words, Mr. Hooker had no intention of continuing to perform and did not do so. In fact, the evidence shows that Mr. Hooker turned in his keys to the contracting officer in January 2000, which is near the beginning of the alleged two-year extension period. Accordingly, Mr. Hooker cannot be entitled to compensation for the post-November 30, 1999 time period because he was not ready or willing to perform the services at issue. Thus, assuming the Hog Contract was extended for the more than two years, as Mr. Hooker claims, he made no effort to perform his obligations.

To be entitled to the value of the Hog Contract for the two-year additional period for which he seeks compensation, Mr. Hooker must demonstrate that he was ready, willing and able to perform. Penthouse Int'l., Ltd. V. Dominion Fed. Sav. & Loan Assoc., 855 F.2d 963, 979 2d Cir. 1988); U.S. v. Penn Foundry & Mfg., 337 U.S. 198, 212 (1949). Given that Mr. Hooker had no intention to perform additional work, he will not be able to make that showing.

Similarly, this Court has long held that "a contractor may not be compensated, or receive a profit, for work not performed, whether the non-performance results from

termination or from deletion of a severable portion of the work. Mega Const. Co., Inc. v. United States, 29 Fed. Cl. 396, 475 (1993) (quoting J.F. Shea Co. v. United States, 10 Cl. Ct. 620, 626 (1986)). "It is axiomatic in the law of contracts that a party cannot recover on his own contract unless he can show substantial performance of his own obligations under the contract or that performance was made impossible by the breach of the other party." U.S. for Use and Benefit of Arlmont Air Condition Corp. v. Premier Contractors, Inc., 283 F. Supp. 343, 348 (D. Me. N.D. 1968). In this case, Mr. Hooker cannot demonstrate either element. Thus, Mr. Hooker is not entitled to the alleged $22,000 value of the Hog Contract.

Further, Mr. Hooker simply assumes that the language in Modification 4 means that the Hog Contract would continue until October 31, 1999, or until a new contract was awarded, whichever is later. Under this theory, the contract literally could have continued indefinitely. In any event, regardless of Mr. Hooker's theory, because he ceased work in November 1999, he cannot be entitled to compensation.

## II. Mr. Hooker Is Not Entitled To A Contaminated-Related Equitable Adjustment Under Either The Beaver Or Hog Contract

Mr. Hooker asserts that he is entitled to reformation of the contracts to reflect what he allegedly would have bid had he known that he would be exposed to contamination. See Pl. Mem. 4. Mr. Hooker is not entitled to recovery upon that basis.

To recover for a breach of contract, a plaintiff must prove four elements. First, a valid contract must exist between the parties. Carlos Irrigation and Drainage Dist. v. United States, 877 F. 2d 957, 959 (Fed. Cir. 1989). Second, the defendant must have undertaken an obligation or duty arising out of the contract. Id. Third, the defendant must have breached that duty. Id. Fourth, a plaintiff must prove damages arising out of the breach. Id.

Mr. Hooker cannot show that the Government breached any duty to him. The Beaver contract specifically states that there were no toxicological hazards associated with beaver trapping. However, the issue here appears to concern alleged radiological hazards, not toxicological hazards. More importantly, Mr. Hooker will be unable to produce competent evidence that he was exposed to any level of radiation that would constitute a hazard. Indeed, any radiological contamination at beaver trapping sites was well below Federal regulatory limits and, therefore, was not a toxicological or radiological hazard in the context of Mr. Hooker's work.

Dr. Kenneth Crase, one of our experts, will testify that under the SRS standard for Soil Contamination Area (SCA), an employee could spend 2000 hours (one work year) in an SCA without exceeding the SRS standard of 200 millirem per year, which is 300 millirem per year below the Federal standard of 500 millirem. Dr. Cham Dallas, Dr. Crase and Lawrence Mazzuckelli, a toxicologist from the National Institute for Occupational Health and Safety ("NIOSH") all concluded that the exposure of Mr. Hooker and his employees was de minimis. Indeed, in a December 27, 2000 letter, Mr. Mazzuckelli concluded that, under the worst case, that is, internal ingestion of contaminated soil, Mr. Hooker and his employees would have received "a maximum of 2 millirem a year or one fourth the amount of one chest x-ray and 1/150 of the amount humans receive from natural sources." Id. We do not believe that Mr. Hooker will be able to offer any competent, admissible evidence to the contrary.

By way of analogy, there is no cause of action in tort for radiation exposure where the dose does not exceed the Federally-permissible dose limits. See Lokos v. Detroit Edison, 67 F. Supp. 2d 740, 744 (D. Mich. 1999); Roberts v. Florida Power & Light

Company, 146 F.3d 1305, 1306 (11th Cir. 1998). For example, in Roberts, 146 F.3d at 1308, the Court held that Federal safety regulations "conclusively established the duty of care owed in a public liability action." The Court found Roberts had failed to establish that the defendant breached its duty of care by exposing Roberts to radiation in excess of the maximum permissible amount allowed by Federal regulation. Id. Although Mr. Hooker alleges a breach of contract, not a tort, the fact that the evidence would not support a tort claim underscores that he was not exposed to a hazardous level of contamination and that the Government was not in breach of contract.

The heart of Mr. Hooker's reformation claim is that he would have charged more per beaver if he had know about contamination at the beaver sites. However, it is undisputed that Mr. Hooker had extensive experience at SRS. He had been a radiation worker at SRS and received training to work in radiation areas. Thus, Mr. Hooker had substantial knowledge of the conditions at SRS when he bid upon the contracts.

Mr. Hooker also cannot show any damages from the alleged breach. The proper measure of an equitable adjustment is the extra costs incurred by the contractor, if those costs are reasonable. Ace Constructors, Inc. v. the United States, 70 Fed. Cl. 253, 274 (2006). Mr. Hooker has not provided any proof of extra costs he incurred because he trapped in SCAs. In SAB Construction, Inc. v. United States, 66 Fed. Cl. 77 (2005), this Court was faced with a claim by a contractor who, during the course of demolition, removed asbestos and lead containing material. Id. at 79-80. The Government had knowledge of the condition. Id. at 79-81. The contractor apparently was unaware of the "problem concerning the presence of hazardous materials affecting [its] work" until after demolition was complete and, as a result, did not utilize special abatement procedures.

Id. at 81. This Court rejected the contractor's claim for restitution under an implied-in-fact contract theory or a theory of reformation for mutual mistake. Id. at 92. The Court held that, because the contractor had not incurred additional costs, it was not entitled to restitution damages. Id. Here, Mr. Hooker similarly did not incur additional costs and essentially seeks restitution for services that he did not render. Thus, as with the contractor in SAB, Mr. Hooker is not entitled to damages.

Finally, Mr. Hooker also has no evidence that he trapped hogs in any contaminated areas. This provides an additional reason for denying him relief under the Hog Contract.

**III. Mr. Hooker Cannot Demonstrate That The Government Acted In Bad Faith**

"Government officials are presumed to act conscientiously and in good faith in the discharge of their duties." Asco-FaIcon II Shipping Company v. United States, 32 Fed. Cl. 595, 604 (1994). This presumption is exceedingly stringent. The courts are "loath" to find bad faith. Knotts v. United States, 128 Ct. Cl. 489, 492 (1954). To overcome the presumption of good faith, Mr. Hooker must allege and prove, by clear and convincing evidence, specific acts of bad faith upon the part of the Government. Bannum, Inc. v. United States, 56 Fed. Cl. 453, 458 (2003) (citing Am-Pro Protective Agency, Inc. v. United States. 281 F.3d 1234, 1240 (Fed. Cir. 2002)). Attendant to this presumption is a set of corollaries controlling in this case.

First, Mr. Hooker must prove that the Government had the specific intent to harm him. A-Transport Northwest Co. v. United States, 27 Fed. CI. 206, 220 (1992). Mr. Hooker therefore cannot show bad faith unless he demonstrates that the Government was "motivated alone by malice." A-Transport Northwest Co.v. United States, 27 Fed. Cl.

206, 220 (1992) (quoting Gadsden v. United States, 75 F. Supp. 126, 127, 111 Ct. CI. 487,489-90(1948)).

Second, the Government "cannot be found to be acting in bad faith for failing to obtain something it was not required to do." D.V. Gonzalez Electrical & General Contractors, Inc. v. Unites States, 55 Fed. CI. 447, 457 (2003). Thus, "the duty of a Contracting Officer to accord a contractor fair treatment creates no binding obligation to exercise an option to extend a contract for additional years." Continental Collection & Disposal, Inc. v. United States, 29 Fed. CI. 644, 652 (1993).

Third, the Court cannot infer bad faith merely from a series of events allegedly adverse to Mr. Hooker's interests. Asco-Falcon II, 32 Fed. CI. at 595. For example, evidence of a "six and one-half year delay" in approving a request for a contract amendment" is irrelevant because "even if this was proven, plaintiffs would not have shown by such fact one scintilla of proof of a specific act of bad faith or malice, nor any intent to injure plaintiffs, on the part of the government." Id.

Mr. Hooker contends that the Government's decision to bar two of his employees from the site and withhold payment for hogs that it found to have been fraudulently brought in from off site is an instance of bad faith. Pl. Mem. 5-6. Yet, the Government had no obligation to accept any hogs it found to be nonconforming to the requirements of the Hog Contract. Thus, the Government cannot be found in bad faith for failing to accept nonconforming hogs. D.V. Gonzalez, 55 Fed. Cl. at 457. Further, the evidence will establish that the Government made its decision to bar the employees and withhold payment only after carefully reviewing the matter, obtaining the advice of an expert, and reviewing an investigation by law enforcement officials. This thorough review

demonstrates that the Government was not acting with malice towards Mr. Hooker. Indeed, given the circumstances, it would have been unreasonable for the contracting officer not to take action.

Mr. Hooker also appears to contend that the Government's decision not to award him an option year upon the Beaver Contract was in bad faith. See Pl. Mem. 7. However, the Government had the right not to award the option, and its exercise of that right does not constitute bad faith.

Mr. Hooker also claims that, when he raised the issue of contamination, "the Government sought to injure him economically." Pl. Mem. 5. Specifically, Mr. Hooker alleges that the Government improperly reduced his culvert cleaning and beaver trapping work. Id. Mr. Hooker's allegations amount to mere unsupported speculation and accusations.

Further, although the burden is upon Mr. Hooker to demonstrate bad faith, the evidence will show that the Government acted in good faith. For instance, Frankie Brooks, a former contracting officer's representative, will testify that that the beaver and culvert cleaning sites were reduced because of the drought and resulting low water levels. Her statements in that regard will be supported by documentary evidence in the record, and by other testimony.

For these reasons, Mr. Hooker is not entitled to any damages resulting from his claims of bad faith with respect to either the Beaver or Hog Contracts.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

***s/Todd M. Hughes***
TODD M. HUGHES
Deputy Director

***s/Richard P. Schroeder***
RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562

Attorneys for Defendant

August 24, 2007

Of Counsel:

Lucy M. Knowles, Chief Counsel
Mary-Ellen Noone, Attorney
U.S. Department of Energy
Savannah River Operations Office
P.O. Box A
Aiken, SC 29809
Telephone: (803) 952-7618

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 24th day of August 2007, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard P. Schroeder