IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WILLIAM D. HOOKER, d/b/a GEORGIA BOWHUNTERS SUPPLY, Plaintiff, | ) | |
| vs. | ) | No. 03-1501C, 04-1126 Judge Hodges |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

DEFENDANT'S CONTENTIONS OF FACT

1. The Savannah River Site (SRS) is a large area located in Aiken, Barnwell and Allendale counties, South Carolina.

2. SRS, which is owned by the United States, contains a number of complex and unique nuclear facilities which produce radioactive isotopes used for defense, space exploration and medical purposes.

3. The Department of Energy's (DOE) Savannah River Operations Office has responsibility for the oversight of SRS, including waste management and environmental remediation activities conducted at the site.

4. Only a small portion of SRS is used for nuclear, waste management, environmental clean-up and administrative facilities; the remaining acreage is forested.

5. In 1989, DOE entered into a Management and Operating contract with the Westinghouse (now Washington) Savannah River Company (WSRC) to operate the SRS facility.

6. DOE has contracted with Wackenhut Services Inc. to provide security services for SRS.

7. The United States Forest Service, is an element of the United States Department of Agriculture and has responsibility for the nation's public forests.

8. Because of the Forest Service's expertise in forest and natural resources management, DOE has an interagency agreement with the Forest Service to manage the natural resources at SRS, including timber and wildlife management.

9. DOE entered into a Federal Facilities Agreement on August 16, 1993 with the United States Environmental Protection Agency (EPA) and the South Carolina Department of Environmental Control (SCDHEC) for the clean-up of SRS.

10. This agreement requires DOE to study all areas, that is, all operable units at SRS that contain hazardous, mixed (hazardous and radioactive), or radioactive waste and to propose remedial action.

11. EPA and SC DHEC must review all studies DOE prepares and must agree to the remedial action proposed by DOE; EPA and SC DHEC also must agree to the closure of the particular operable unit.

12. The characterization of operable units started well before 1989 and is mostly completed.

13. DOE, EPA and SC DHEC have agreed to the priority for the cleanup of operable units according to published criteria. Clean-up decisions are made according to the risk from long term exposure to the chemicals in operable units.

14. DOE assumes that long term exposure is 2000 hours per year for 25 years, consistent with industrial exposure using EPA risk assessment methods.

15. Most of the operable units containing hazardous, radioactive or mixed waste are in or near the nuclear facilities, that is, the reactor areas, C-Area, K-Area, L-Area, P-Area and R-Area, and the chemical separations areas, F- and H-Areas. DOE and WSRC have used process knowledge, detailed records, and environmental monitoring data from the beginning of SRS to identify operable units.

16. All operable units are clearly marked.

17. DOE conducts a comprehensive monitoring program for hazardous chemicals and radioactivity in the environment, including air, soil, water and wildlife.

18. The EPA is the Federal agency responsible for issuing primary drinking water standards.

19. According to the non-radiological surface water surveillance table from the 1999 Savannah River Environmental Report, in 1999, all contaminants in the SRS surface waters were below the respective primary drinking water standards, with one exception, lead.

20. WSRC oversees deer and hog hunts for members of the public.

21. Each animal is monitored for radiation contamination before it is released to the hunter. Any animal exceeding stringent DOE limits will not be released to the hunter.

22. Since the beginning of the monitoring program, only one deer has exceeded DOE"s stringent limits.

23. On October 29, 1997, William Hooker, d/b/a Georgia Bowhunters Supply, was awarded an indefinite quantity (requirements) contract for hog trapping. Contract No. 53-4660-8-04 (the "Hog Contract").

24. The purpose of the contract was trap and remove hogs causing damage at SRS.

25. The contract term was for one year, with two option years that the Government could exercise in its discretion.

26. According to Mr. Hooker's technical proposal, submitted during the pre-award process, Mr. Hooker and three employees, Andy Cromer, Goldman Eller and Mike Eller, were to staff the Hog Contract.

27. Mr. Hooker bid $55 per hog for the base period and each of the two option periods.

28. The minimum quantity for the base period and the two option periods was 200 hogs.

29. The Hog Contract provided that Mr. Hooker was responsible for providing all supplies, equipment, personnel and dogs, which were to be trained to hunt hogs only. Gen. Spec. C.1.A.

30. Mr. Hooker also was responsible for having replacement dogs available during the course of the contract so as not to cause delay in the use of the dog hunting technique in the event that a dog was killed or lost. Tech. Spec. C.2.B.9.

31. Mr. Hooker and his employees were required to submit to monitoring by WSRC Health protection personnel after trapping in specified areas. Tech Spec C.2.E.4.

32. Mr. Hooker and all of his employees also were required to attend environmental, safety and health orientation before starting work at SRS and before receiving a SRS site access badge. Tech. Spec. C.2.F.4.

33. The Hog Contract stated as follows:

> This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

Hog Contract, Sec. I. 7, Indefinite Quantity (FAR 52.216-22) (Oct 1955).

34. On October 1, 1998, the parties modified the Hog Contract to reflect that the first option was being exercised and that the contract term was extended until September 30, 1999.

35. On September 4, 1999, the parties entered into a modification effective October 1, 1999, which extended the Hog Contract to "October 31, 1999 or until a new contract is awarded." Modification No. 4.

36. The Hog Contract contained a provision stating that the total duration of this contract, including the exercise of any options . . . shall not exceed 36 months or three years.

37. Mr. Hooker submitted a proposal in response to solicitation for the new contract (RFP R8-36-99-09) on or about September 3, 1999.

38. On January 5, 2000, Mr. Hooker turned in all the Government property assigned to him, except for six panels and two gates that were missing from the hog traps and submitted a final invoice for trapped traps.

39. According to Andy Cromer, one of Mr. Hooker's employees, "we just quit going out there." Cromer Deposition (Dep.), p. 31, at 11-12.

40 On January 22, 1999, the Forest Service awarded Mr. Hooker a requirements contract, Contract No. 53-4660-9-06 (the Beaver Contract), to trap beavers and clean culverts.

41. The purpose of the contract was to remove problem beavers whose activities had flooded timber sites, and blocked culverts.

42. The contractor was also responsible for clearing beaver dams and debris from the blocked culverts.

43. Mr. Hooker bid $45 per beaver and $18 per hour of culvert cleaning for the base period from the date of contract award to December 31, 1999.

44. Mr. Hooker also bid $45 per beaver and $18 per hour of culvert cleaning for Option period I.

45. The Beaver Contact provided as follows:

> Estimated quantities are intended as a good faith estimate of the quantities to be ordered. However, the Government is not obligated to order any work to be performed under the resulting contract for either the base period or the option period. Reference FAR Clause 52.216-21 "Requirements".

Contract Schedule, Sec. B. Requirements (FAR 52.216-22) (Oct. 1995).

46. Each task order under the Beaver Contract was to include "maps showing where the work was to be performed." Contract Schedule, Sec. B.

47. The Beaver Contract also contained a requirements clause B that provided as follows:

> This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities or supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government'=s requirements do not result in orders in the quantities described as estimated or maximum in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

Beaver Contract, Sec. I.7.

48. The Beaver Contract authorized the Government to direct the contractor to use safety equipment, in addition to the equipment specified in the contract. Tech. Spec. C.

49. The Beaver Contract provided that no toxicological hazards are associated with beaver trapping at SRS; however, normal environmental hazards such as snakes and uncertain footing do exist. Tech. Spec. C.4.

50. The Beaver Contract did not define toxicological hazard.

51. The Beaver Contract limited Mr. Hooker to trapping only in areas directed by Forest Service personnel. Tech Spec. A, Beaver Trapping.

52. Specifically, the Beaver Contract provided that "selective trapping shall be conducted only in critical areas identified by the Savannah River Institute personnel" and that the contractor will only trap the areas designated by the Contracting Officer's Representative (COR), Inspectors or Contracting Officer. Tech Spec. A, Beaver Trapping.

53. In addition to beaver and hog trapping Mr. Hooker worked for contractors at SRS from June 1976 to March 2000. Hooker Dep, p. 7 at 1-2.

54. Mr. Hooker primarily worked as a pipefitter and plumber in the F- and H- Area tank farms where the nuclear waste from the chemical separation facilities were stored. Hooker Dep. p. 7, at 13-25 and p. 8 at 1-21.

55. Mr. Hooker worked in nuclear facilities at SRS after he left the tank farms, the Tritium facility and L-Reactor, which was being rebuilt. Hooker Dep. p. 12 at 9-13.

56. For his work at the Tritium facility, Mr. Hooker had to dress out in a plastic suit with an air hose and he had to be cut out of the suit when he finished working. Hooker Dep. p. 9 at 4-11.

57. Mr. Hooker was trained as a radiation worker when he worked at SRS. Hooker Dep., p. 16 at 20-25 and p. 17 at 1-2.

58. Mr. Hooker was familiar with radiation signs, including Soil Contamination Area, Underground Radioactive Material, Radiological Buffer Zone, Radiation Area, High Radiation Area, and Contamination Areas, from his work with WSRC because he had seen them inside the fenced-in areas. Hooker Dep. p. 21 at 1-25 - p. 22 at 1.

59. These contracts were not the first contracts Mr. Hooker had with the Forest Service at SRS. Hooker Dep., p. 16 at 7-13.

60. His first contracts with the Forest Service for hog control and beaver trapping began on February 10, 1992. Hooker Dep., p. 16 at 7-13.

61. Andy Cromer worked with Mr. Hooker trapping beavers when Georgia Bowhunters Supply was first awarded the beaver contract. Cromer Dep., p. 21 at 11-16.

62. Mr. Hooker and Mr. Cromer were partners in Georgia Bowhunter Supply until 1997. Cromer Dep., p. 31 at 23-25.

63. Mr. Cromer continued to assist Mr. Hooker when Mr. Hooker needed help with the Hog Contract and the Beaver Contract after 1997. Cromer Dep., p. 31 at 8-25 – p. 32 at 1-9.

64. Mr. Cromer also worked as an electrician in nuclear facilities at SRS, including the F-Area tank farm and the Naval Fuel Facility, both of which are nuclear facilities. Cromer Dep. p. 21 at 11-25 - p. 22 at 1-9.

65. Mr. Cromer started working at SRS in 1985 or 1986 for Miller Electric and Bechtel. Cromer Dep., p. 23 at 17-21, p. 24 at 8-9.

66. Mr. Cromer took General Employee Training (GET) and Radiation (RAD) Worker training for his work as an electrician at SRS. Cromer Dep., p. 24 at 12-25.

67. Mr. Cromer learned about the different radiation control signs and what was going on at SRS, "so you won't get into anything you shouldn't" from his GET training. Cromer Dep., p. 24 at 21-25 - p. 25 at 1-7.

68. Mr. Cromer learned about working around radiation, specifically about time, distance and shielding, from RAD Worker training. Cromer Dep., p. 25 at 8-18.

69. Mr. Cromer took RAD Worker training several times; the course was three or four days and had a walk-through test at the end. Cromer Dep., p. 26 at 21-25 - p. 27 at 1-23.

70. Mr. Cromer was RAD Worker certified until 1993. Cromer Dep., p. 27 at 24-25 - p. 28 at 1-3.

71. Homer Gabard was the Forest Service's Contracting Officer for the Hog and Beaver Contracts.

72. Frankie Brooks, a Forest Service wildlife technician, was the Contracting Officer's Representative (COR).

73. Ms. Brooks worked on a day-to-day basis on Mr. Hooker's contracts with Forest Service; her responsibilities included directing Mr. Hooker and his employees to specific sites to trap beavers and clean culverts when needed.

74. Ms. Brooks also told Mr. Hooker where to trap problem hogs.

75. The Forest Service had established a list of beaver trapping sites.

76. Ms. Brooks was familiar with and visited all of the beaver trapping sites that Mr. Hooker was assigned under his contract with the Forest Service.

77. Ms. Brooks and Mr. Hooker had a map with all the beaver sites marked on it.

78. Mr. Hooker was supposed to trap only at the specific sites marked on the map; for instance, he was not supposed to trap the entire length of Tim's Branch to Upper Three Runs or in Steed's Pond.

79. Because Mr. Hooker's contract did not specify particular hog trapping sites, Ms. Brooks would direct Mr. Hooker to trap in areas where hogs had done damage.

80. Ms. Brooks regularly visited all the beaver trapping sites and observed that none of them were marked as Soil Contamination Areas or otherwise marked to indicate any radiological hazard.

81. Ms. Brooks was not aware of any non-radiological hazard at any of the beaver trapping sites.

82. Ms. Brooks testified that DOE or Westinghouse had never given the forest service or herself a list of contaminated areas on the SRS.

83. Mr. Cromer testified that he regularly trapped at Steed Pond.

84. All of the beavers trapped were monitored for radiation through the mid 1990s.

85. The beavers monitored did not have any contamination and the requirement for monitoring was dropped.

86. Hogs were also monitored, but none of them were contaminated either.

87. In early 1997, Mr. Cromer told Ms. Brooks that he had seen a soil contamination area (SCA) sign at the Steed Pond Road beaver trapping site. Cromer Dep. p. 59 at 4-24.

88. Ms. Brooks told Mr. Cromer that he did not have to go back there to trap.

89. Mr. Cromer and Mr. Hooker continued to trap beavers at that site after Ms. Brooks told them they did not have to return.

90. On February 22, 1999, Mr. Hooker trapped at a beaver trapping site on Four Mile Branch at Road 4 near HP-52 marked with a radiological sign. (HP-52 is an environmental compliance sampling location).

91. WSRC's radiation protection office required a work permit for work in a radiation area. Mr. Hooker was also required to wear personal protection equipment for safety reasons.

92. Ms. Brooks was with Mr. Hooker on February 22, 1999 when he went into the Four Mile Creek/Road 4 site on a work permit issued by WSCR.

93. Mr. Hooker did not express any concern about his health with respect to that visit.

94. Mr. Hooker was upset because the inspectors who had to monitor him for contamination after he finished were late.

95. An additional work clearance permit was issued for the same site a month or two after the first one. Hooker never used it.

96. Mr. Hooker asked Homer Gabard, for an increase in his contract price for any further trapping at the Four Mile Creek/Road 4 site.

97. Mr. Gabard told Mr. Hooker that he did not have to work in any areas requiring a work clearance permit and Mr. Gabard would not agree to pay Mr. Hooker additional money.

98. Frankie Brooks documented Hooker's request for more money in her Contract Daily Diary, dated May 27, 1999.

99. Margaret Yeaton is the current contracting officer for the Forest Service.

100. On September 22, 1995, site law enforcement found Mr. Hooker with a cooler full of fish from L-Lake, which was the cooling lake for the L-Reactor (the hot water from L-Reactor was discharged in L-Lake). Mr. Hooker claimed he needed the fish as bait for hog trapping.

101. Ms. Brooks did not give Mr. Hooker permission to fish in L-Lake.

102. During the summer of 1999, Ms. Brooks frequently visited beaver sites.

103. At most of these sites, she saw water-levels that were well below their normal levels and several of the sites were actually dry.

104. There had been a severe drought and above normal temperatures that spring.

105. As a result of these decreased water-levels, there were fewer beavers at many of the sites than in previous years of Mr. Hooker's contract.

106. Further, because there were fewer beavers and there was not water going through many of the culverts, those culverts did not need cleaning.

107. Ms. Brooks reduced the number of beaver trapping sites to just those sites where there was a continued need for trapping and cleaning.

108. In 1999, Jack Mayer, PhD, a wildlife ecologist employed by WSRC, was studying the wild hog population at SRS and conducting research on the hogs that Mr. Hooker's agents, the Ellers, had trapped

109. According to the Hog Contract, Mr. Hooker was required to deliver the whole carcass of a trapped hog to the Forest Service work center cooler and to record data about the hog, i.e., weight, age, sex, reproductive condition (pregnant) and location trapped.

110. Dr. Mayer examined the hogs in the cooler for a comprehensive study of the wild hog population at SRS.

111. Ms. Brooks noted in her COR diary on December 17, 1998 that Goldman Eller had put hog fetuses in the Forest Service Cooler and had logged them in for payments.

112. Ms. Brooks told Mr. Eller that he would not be paid for the 6 fetuses.

113. Dr. Mayer contacted Homer Gabard in May 1999 because he had noticed that some small piglets in the cooler had the characteristics of domestic hogs

114. The piglets had more teats than feral hogs at SRS; feral hogs normally have twelve or fewer teats while domestic hogs have more than twelve.

115. Feral hogs have sharp pointed hoofs; these piglets had rounded hoofs consistent with being raised on a concrete pad.

116. The piglets did not have any parasites on them, which indicated that they had been raised in a hog pallor rather than in the wild.

117. The piglets had been killed by a blow to the head and did not have any teeth marks on them; they did not appear to have been trapped by dogs as Mr. Eller had claimed.

118. The piglets were too small to have walked the more than 10 miles from the site bounder to the center of the site, where Mr. Eller had claimed to have trapped them.

119. The Forest Service also asked site law enforcement, Wackenhut Services, Inc. to investigate.

120. The investigation supported Dr. Mayer's findings and recommended that the Ellers be barred from SRS.

121. Mr. Gabard sent Mr. Hooker a letter on June 30, 1999 putting him on notice that he was in default on the Hog Contract, because "some actions taken in performance of this contract . . . have not been proper or in compliance with the contract and some of the actions could be considered to be illegal."

122. The actions delineated in the letter were entering fetal pigs on the Wild Hog Data Table in an attempt to receive payment for those fetal pigs; attempting to receive payment for 31 domestic pigs; removing hogs and pigs from the cooler before the COR could verify the hogs/pigs were in the cooler; leaving hogs in the woods until they begin to rot; entering hogs in the Data Table without bringing them to the cooler.

123. Mr. Gabard wrote that he was concerned that hogs and pigs were being removed from the cooler and then returned to the cooler so payment would be made for the same animal twice.

124. Mr. Gabard concluded that Mr. Hooker was not personally involved in the misconduct and, therefore, he did not terminate the contract for default.

125. Mr. Gabard barred the Ellers from the Hog Contract.

126. Mr. Gabard informed Mr. Hooker that $1,320 would be deducted from his June invoice for the 24 domestic pigs for which he already had been paid or that funds would be deducted from subsequent invoices if the amount of the June invoice was insufficient.

127. Mr. Gabard informed Mr. Hooker that, in the future, all hogs, pigs and beavers would be marked with spray paint at the cooler and that he would not be paid for any animal removed from the cooler before the COR or inspector issued a receipt for the animal.

128. Mr. Hooker trapped 256 beaver in 1999 broken down as to site number where.

129. After Mr. Gabard barred the Ellers from the site, Mr. Hooker continued to perform both the beaver and the hog contracts.

130. In November 1999, Mr. Hooker told Mr. Gabard that he had only caught one beaver in both September and October because he had concentrated on the hog contract during the past two months; Mr. Gabard reminded him that he was responsible for performing satisfactorily on both contracts

131. Because of the problems with Mr. Hooker's performance, the Forest Service decided to perform the beaver trapping contract in-house after Mr. Hooker's contract expired.

132. On November 29, 1999, Mr. Gabard informed Mr. Hooker that the Forest Service would not extend the term of the Beaver Contract at the end of the base period and would not exercise its option.

133. The Beaver Contract expired on December 31, 1999.

134. Jim Segar, a Forest Service employee, trapped beavers and cleaned culverts after Mr. Hooker's contract expired.

135. Mr. Segar trapped 44 beaver in 2000 and 28 in 2001.

136. There was below average rainfall in both 1999 and 2000.

137. On June 30, 1999, Mr. Gabard informed Mr. Hooker that the Forest Service would not extend the Hog contract for Option Period II (October 1, 1999 - September 30, 2000) and that the Forest Service intended to issue a new contract.

138. On September 4, 1999, the Forest Service extended Mr. Hooker's Hog Contract to October 31, 1999, because the Forest Service had issued a solicitation for a new hog contract and needed extra time to evaluate the bidders.

139. Mr. Hooker admitted in his deposition that he never hunted hogs after November 30, 1999.

140. Mr. Hooker turned in all of his equipment for the hog contract on January 5, 2000, except for six panels and two gates from the hog traps.

141. On January 6, 2000, Mr. Hooker wrote a letter to the Center for Disease Control requesting a determination regarding whether or not he had been exposed to hazardous

149. NIOSH examined the water quality standards for SRS streams and found only rarely did samples on site at SRS approach concentrations that would trigger concern that water quality standards were being exceeded.

150. NIOSH also stated that, based on the available environmental data and medical findings, beaver and pig trapping at SRS has not been associated with harmful exposure to radioactive or toxic environmental contaminants.

151. Mr. Hooker did not tell the Forest Service that he had any concerns about working in radiological areas until late 1999 or 2000.

152. Mr. Gabard does not recall Hooker ever asking him what kind of contamination existed at Savannah River Site, or asking what was in the water.

153. The Forest Service was not aware of his claims to NIOSH until months after it reduced the number of beaver trapping sites.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

*s/Todd M. Hughes*
TODD M. HUGHES
Deputy Director

*s/Richard P. Schroeder*
RICHARD P. SCHROEDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7788

Attorneys for Defendant

OF COUNSEL:
Lucy M. Knowles, Chief Counsel
Mary-Ellen Noone, Attorney
U.S. Department of Energy
Savannah River Operations Office
P.O. Box A
Aiken, SC 29809
Telephone: (803) 952-7618

August 24, 2007

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on this 24th day of August 2007, a copy of the foregoing "DEFENDANT'S CONTENTIONS OF FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard P. Schroeder