# In the United States Court of Federal Claims

No. 03-1501C
(Filed: November 28, 2007)

| | |
|---|---|
| * * * * * * | |
| WILLIAM HOOKER d/b/a GEORGIA BOWHUNTERS SUPPLY, Plaintiff, * | |
| v. * | Trial; RCFC 52(c); Breach of Contract; Differing Site Conditions; Equitable Adjustment. |
| UNITED STATES OF AMERICA, Defendant. * | |
| * * * * * * | |

Robbie Nichols, Hilton Head, South Carolina, for plaintiff.

Richard Schroeder, United States Department of Justice, Commercial Litigation Division, Court of Federal Claims Section, Washington, D.C., for defendant.

**ORDER AND OPINION**

**HODGES,** Judge

The United States owns a large tract of land in South Carolina known as the Savannah River Site. Savannah River produces various types of radioactive isotopes for defense, exploration, and medical purposes. The Department of Energy is responsible for the operation and maintenance of the site, including waste management and environmental remediation activities. The entire area is heavily forested.

The Department of Energy contracted with plaintiff in October 1997 to trap wild hogs and beavers that were causing various types of damage on the Site. The indefinite quantity contract required Mr. Hooker to hunt and trap hogs using specially trained dogs and hog traps. The Beaver Contract required Mr. Hooker to remove beavers whose activities had flooded timber sites and blocked culverts.

For various reasons, the parties to the contract became disaffected with regard to contract

performance. Defendant notified Mr. Hooker in June 1999 that the Forest Service would not extend its option period for the hog contract and that it intended to issue a new solicitation. Mr. Hooker submitted a bid for the new Forest Service contract. The Forest Service eventually cancelled the solicitation.

Plaintiff filed suit in this court alleging that defendant breached the hog contract and the beaver contract. The Government filed a motion to dismiss for lack of jurisdiction and failure to state a claim for which relief may be granted. The court resolved these preliminary issues and we conducted a trial in Aiken, South Carolina. Defendant moved for judgment on partial findings pursuant to Rule 52(c) at the close of plaintiff's case. For reasons stated on the record of trial, we granted defendant's motion.

## BACKGROUND

### I. Savannah River Site

The Savannah River Site is a large government research area located in Aiken, Barnwell, and Allendale counties, South Carolina. The site contains a number of complex and unique nuclear facilities that produce radioactive isotopes used for defense, space exploration, and medical purposes. The Department of Energy's Savannah River Operations Office has responsibility for management of facilities at Savannah River, including waste management and environmental remediation activities conducted at the Site. A small portion of the Site is used for nuclear waste management, environmental clean-up, and administrative facilities; the remaining acreage is heavily forested.

The Department of Energy has an interagency agreement with the Forest Service to oversee the natural resources at the Savannah River Site, including timber and wildlife management. DOE studies all operable units at the Site that may contain hazardous or radioactive waste. DOE defines long term exposure to radiation as 2000 hours per year for twenty-five years, consistent with industrial exposure using Environmental Protection Agency risk assessment methods.

DOE conducts a comprehensive monitoring program for hazardous chemicals and radioactivity in the environment, including air, soil, water and wildlife. The Agency takes more than one hundred water samples per year for environmental monitoring and clean-up investigation.

Mr. Hooker was familiar with radioactive material. He worked at the Savannah River Site from June 1976 to March 2000 as a pipe fitter and a plumber in the tank farms where nuclear waste from chemical separations facilities was stored. Plaintiff continued to work in nuclear facilities at Savannah River after he left the tank farms, including the Tritium Facility and the L-Reactor, which were being rebuilt. For his work in the Tritium facility, Mr. Hooker dressed in a plastic suit with an air hose. He was familiar with radiation danger signs and the risks of

operating in contaminated areas. Mr. Hooker's first contracts with the Forest Service at the Savannah River Site predated those at issue in this case by at least five years, beginning in February 1992.

II. The Hog Contract

The technical proposal Mr. Hooker submitted during the pre-award process stated that he and a staff of three men would manage the hog contract. He would use traps and specially trained dogs to hunt and trap the hogs for $55 each. The Government estimated that the job would require trapping a minimum of 200 hogs. Defendant awarded plaintiff the indefinite quantity contract for one year, with two option years that the Government could exercise in its discretion.[1] The contract's term would not exceed three years. The Government exercised the first option on October 1, 1998, extending the contract term through September 30, 1999.

The contract required Mr. Hooker to deliver carcasses of trapped hogs to a cooler maintained by the Forest Service. The hogs would be accompanied by a log showing the weight, age, sex, and reproductive data for each hog, along with the areas in which the hogs were trapped. Mr. Hooker and his employees submitted to monitoring by on-site Health Protection personnel after trapping in specified areas.

A wildlife ecologist conducted a study of the wild hog population in the Savannah River area for the Government in 1999. His study included research on the hogs that plaintiff's company had trapped and placed in the Forest Service's cooler. The ecologist found that plaintiff had been putting hog fetuses into the cooler and logging them for payment. The Government withheld payment for six fetuses that had been logged, and advised Hooker that he would not be paid for this practice in the future. Later, the contracting officer sent Mr. Hooker a letter notifying him that "some actions taken in performance of this contract . . . have not been proper or in compliance with the contract and some of the actions could be considered illegal." Letter from Mr. Gabard to Mr. Hooker, June 30, 1999.

The contracting officer alleged that plaintiff's company had (1) entered fetal pigs on the Wild Hog Data Table in an attempt to receive payment for them; (2) attempted to obtain payment for thirty-one domestic pigs; (3) removed hogs and pigs from the cooler before the contracting officer could verify their status; (4) left hogs in the woods to rot; and 5) entered hogs in the Data Table without bringing them to the cooler. The contracting officer suspected that the contractor was removing hogs and pigs from the cooler and returning them later, obtaining payment for the same animals twice.

---

[1] The Government's agreement with plaintiff was "an indefinite-quantity contract for the supplies and services specified, and effective for the period stated in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract. See 52 FAR § 216.22 (1995).

The contracting officer concluded that Mr. Hooker, owner of the company, was not responsible for this conduct because his employees had acted on their own. For that reason, apparently, he did not terminate the contract for default. Instead, he deducted $1,320 from Hooker's June invoice for twenty-four animals that were non-feral domestic pigs, and for which he had already been paid. He informed Mr. Hooker that all hogs and pigs would be marked with spray paint at the cooler so they could not be submitted for payment again. Hooker would not be paid for any animal removed from the cooler before an inspector had issued a receipt for that animal. The employees who conducted the improper activities could no longer work for Mr. Hooker.

The contracting officer informed Mr. Hooker on June 30, 1999, that the Forest Service would not exercise its second option, but would issue a new contract. A September 4, 1999 modification extended Mr. Hooker's contract temporarily to "October 31, 1999 or until a new contract is awarded." Mr. Hooker submitted a bid for the new Forest Service contract, but the contracting officer advised plaintiff that the Forest Service would no longer require his services.[2] Mr. Hooker turned in the Government's trapping equipment on January 5, 2000, and submitted a final invoice dated November 30, 1999. Mr. Hooker conceded at trial that he did not perform services pursuant to the hog contract after November 30, 1999.[3]

## III. The Beaver Contract

The Government awarded the beaver contract to Mr. Hooker's company two years after award of the hog contract in January 1999. The contractor would remove problem beavers whose activities had flooded timber sites and blocked culverts. Plaintiff would be responsible for clearing beaver dams and debris from the blocked culverts. The beaver contract provided that "[e]stimated quantities are intended as a good faith estimate of the quantities to be ordered. However, the Government is not obligated to order any work to be performed under the resulting contract for either the base period or the option period. See 52 FAR § 216.21 (1995). Mr. Hooker was required to provide maps and other information showing where the beavers were trapped or removed. See Contract Schedule, Sec. B. Mr. Hooker bid $45 per trapped beaver and $18 per hour for culvert cleaning from the date of contract award to December 31, 1999.

The beaver contract contained a clause similar to the requirements clause used in the hog contract:

---

[2] The timing of this phone conversation is unclear. The contracting officer testified that he could not remember the conversation, but agreed that it must have taken place because the Forest Service had decided to bring the hog trapping in house.

[3] Mr. Hooker stated at trial that he stopped performing the contract as of November 30, 1999, because he was tired of dealing with the Government.

> This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities or supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, <u>if the Government's requirements do not result in orders in the quantities described as estimated or maximum in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.</u>

Beaver Contract, Sec. I.7 (emphasis added).

The Government asserted in the beaver contract that no toxicological hazards were associated with beaver trapping at the Savannah River site. Technical specifications showed that the contractor could expect normal environmental hazards such as snakes and uncertain footing. The beaver contract limited trapping to areas directed by Forest Service personnel: "[S]elective trapping shall be conducted only in critical areas identified by the Savannah River Institute personnel [and] the contractor will only trap the areas designated by the Contracting Officer's Representative (COR), Inspectors, or the Contracting Officer." Tech Spec. A.

The contracting officer informed plaintiff on November 29, 1999, that the Forest Service would not extend the beaver contract at the end of the base period and would not exercise its option to renew the contract. The beaver contract expired on December 31, 1999.

IV. Plaintiff's Concerns

Mr. Hooker became concerned that he might have been exposed to hazardous substances during his work on the beaver and hog contracts. He wrote a letter to the Centers for Disease Control in Atlanta on January 6, 2000, to express this concern. Meanwhile, Savannah River's Safety and Industrial Hygiene office investigated the matter and reported that, based on the assumption that his employees had each accidentally ingested 10 grams of soil per year, the maximum dose to a beaver trapper would be 2 millirems per year. This would be the equivalent of one-fourth the exposure from one chest X-ray and 1/150 of the radiation humans receive from natural sources.

The CDC referred Mr. Hooker's letter to the National Institute for Occupational Safety and Health, which conducted an investigation at Savannah River March 20 – March 22, 2000. The Safety and Health Institute study found "no basis for a substantial health risk due to exposure to radioactivity" at the Site. The Institute also examined the water quality of local streams and found that samples rarely approached concentrations that would trigger concerns about water quality standards there. It concluded, "beaver and pig trapping at SRS has not been associated with harmful exposure to radioactive or toxic environmental contaminants."[4]

---

[4] Mr. Hooker does not allege in his complaint that he suffered physical harm from alleged exposure to radiological hazards at the Savannah River Site.

## DISCUSSION

We granted defendant's motion pursuant to RCFC 52(c) at the close of plaintiff's case. A Rule 52(c) motion is similar in effect to a motion for directed verdict, but it differs in important respects. See Fed. R. Civ. P. 50(a). When considering a motion for directed verdict, the court makes "all reasonable inferences and resolves all issues of credibility in the plaintiff's favor." Persyn v. United States, 34 Fed. Cl. 187, 195 (1995). RCFC 52(c) provides, "the judge may weigh the evidence and is not required to resolve all issues of evidence and credibility in the plaintiff's favor."

### I. Rule 52(c) Motions

RCFC 52(c) provides,

> [i]f during a trial a party has been fully heard with respect to an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party on any claim, counterclaim, cross-claim or third-party claim that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

The Court of Claims explained the importance of the Rule in the circumstances of this case:

> When a court sitting without a jury has heard all of the plaintiff's evidence, it is appropriate that the court shall then determine whether or not the plaintiff has convincingly shown a right to relief. A plaintiff who has had full opportunity to put on his own case and has failed to convince the judge, as trier of the facts, of a right to relief, has no legal right under the due process clause of the Constitution, to hear the defendant's case, or to compel the court to hear it, merely because the plaintiff's case is a prima facie one in the jury trial sense of the term.

Howard Indus., Inc. v. United States, 126 Ct. Cl. 283, 288 (1946).

The importance of RCFC 52(c) is evident in this case, where it appears that plaintiff intended to develop his case through cross examination of defendant's witnesses. Mr. Hooker's own case established no credible or coherent causes of action and no damages As the Court of Claims emphasized, "a plaintiff who has had full opportunity to put on his own case and has failed to convince the judge . . . of a right to relief, has no legal right . . . to hear the defendant's case, or to compel the court to hear it . . . ." Id. at 288.

II. Breach of Contract

Plaintiff had to prove that he had a valid contract with the United States; that defendant undertook an obligation or duty arising out of the contract; that defendant breached that duty; and plaintiff could prove damages arising from the breach. See Carlos Irrigation and Drainage Dist.v. United States, 877 F.2d 957, 959 (Fed.Cir. 1989). Plaintiff had valid contracts with the United States, but defendant did not breach its duties under those contracts. Moreover, plaintiff admitted that he suffered no damages arising from the Government's alleged breaches.

A. Hog Contract

Plaintiff argued that he was entitled to damages based upon an alleged two-year extension of the Hog Contract pursuant to Modification No. 4. Modification No. 4 states: "Contract is extended to October 31, 1999, or until a new contract is awarded." Hooker contended that Modification No. 4 was a new contract that obligated defendant to pay him a 200-hog minimum until the Government formed an agreement with a new contractor. Plaintiff abandoned the hog contract in November 1999, however. Mr. Hooker testified at trial that he did not perform or attempt to perform after November 30, 1999. He returned government equipment to the Forest Service in January 2000, with a final invoice dated November 30, 1999. He did not request additional payment or attempt to perform any part of the contract thereafter.[5]

B. Beaver Contract

Mr. Hooker alleged breach of the beaver contract and stated that he was entitled to reformation because the soil in at the Savannah River Site was contaminated. He claims that he is entitled to reformation of the beaver contract because his bid would have been higher had he known of the radiation risks. Plaintiff did not prove breach of the beaver contract. If radiological hazards existed at the Savannah River Site materially different from the Government's representations, Mr. Hooker did not produce evidence that he suffered physical or financial damages as a result. The authorities could not establish that radiological hazards on the Site affected Mr. Hooker's trapping operations.

1. Equitable Adjustment

Mr. Hooker argued that he was entitled to an equitable adjustment because he might have

---

[5] See, e.g., Patton v. United States, 74 Fed.Cl. 110, 118 (2006) (holding "[w]hen a party engages in acts inconsistent with the existence of a contract . . . courts have found an objective intent to abandon despite the party's assertion of subjective intent to the contrary.") (quoting Franconia Assocs. v. United States, 61 Fed.Cl. 718, 745 (2004)), and Restatement (Second) of Contracts § 283 cmt. a (stating that "mere inaction on both sides, such as the failure to take any steps looking toward performance or enforcement, may indicate an intent to abandon the contract.").

submitted a higher bid if he had known of the contamination. Such a contention is too speculative for us to consider in calculating damages against the United States. Moreover, the argument has obvious logical problems. A higher bid might have resulted in another bidder having won the contract. His argument that the alleged soil contamination created a change in circumstances from the original contract contains a variation of a similar problem: he did not show dangerous levels of soil contamination. If he had, he did not show that it damaged him. Mr. Hooker had no evidence of additional time or money spent on the beaver contract because of the soil contamination. He cannot recover damages that he did not incur.

2. Differing Site Condition

A claim based on differing site conditions must show materially different conditions on site, compared to those represented by the contract. The conditions must be reasonably unforeseeable based on all the information available to the contractor at the time of bidding. Travelers Cas. and Sur. Contracting officer. of America v. United States, 75 Fed.Cl. 696 (2007). Most importantly, the contractor must have reasonably relied upon its interpretation of the contract and contract-related documents, and show damages as a result of the reliance. Id.

Mr. Hooker's differing site condition claim is the same or related to the claims discussed above. He did not establish by convincing evidence or testimony the amount that he would have bid had he known of the alleged contamination; he did not show damages. Plaintiff was well familiar with the area containing the Savannah River Site. He had worked at the Site and he knew that radiation was a concern. Mr. Hooker had extensive radiological training during his work at the Site from 1976 through 2000. He was familiar with radiation signs, including SOIL CONTAMINATION AREA, UNDERGROUND RADIOACTIVE MATERIAL, RADIOLOGICAL BUFFER ZONE, RADIATION AREA, HIGH RADIATION AREA, and CONTAMINATION AREA. It was foreseeable to this contractor during the bidding process that radiological contamination could exist in some beaver trapping areas.

## CONCLUSION

Mr. Hooker seemed to be searching for a punitive remedy against the Government for the Forest Service's alleged failure to inform him that some trapping sites could be contaminated. We do not have jurisdiction to provide such a remedy in the circumstances presented. Plaintiff did not present a valid theory of recovery during trial. He could not prove he was damaged by relying on language in the original contract, or in any other manner. In fact, Mr. Hooker testified that he was not claiming damages. He did not suffer physical damage and he did not spend additional money on the contract once he discovered that some sites allegedly were contaminated. Mr. Hooker abandoned the hog contract as of November 29, 1999, the effective date of his final invoice. He returned defendant's trapping equipment along with the invoice in January 2000.

These findings of fact, along with the lack of a recognizable legal theory of recovery, convinced the court to grant the Government's motion for judgment on partial findings when plaintiff rested. The reasons are summarized here, and stated more fully on the record of trial. The Clerk of the Court will dismiss plaintiff's complaint and enter judgment for defendant. No costs.

SO ORDERED.

s/ Robert H. Hodges, Jr.
Robert H. Hodges, Jr.
Judge